Exhibit 1

Monica Rogers
3/8/2016

---

**Page 1**

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

MONICA J. ROGERS,
    Plaintiff,
               CASE NO:2:15-cv-12312
vs.             Hon. Marianne O. Battani
HENRY FORD HEALTH SYSTEM,
a Michigan corporation,

    Defendant.
_____/

    The deposition of MONICA ROGERS,
taken before me, Lauri A. Sheldon, CSR 4045, RPR, on March 8,
2016, at 33 Bloomfield Hills Parkway, Suite 250, Bloomfield
Hills, Michigan, commencing at or about 9:51 a.m.

APPEARANCES:
    VARNUM LLP
    BY: TERRENCE J. MIGLIO, ESQUIRE
    and BARBARA BUCHANAN, ATTORNEY AT LAW
    160 W. Fort Street, 5th Floor
    Detroit, Michigan 48226
    313-481-7335
    Appearing on behalf of the Defendant.
    STERLING ATTORNEYS AT LAW, P.C.
    BY: GERALD D. WAHL, ESQUIRE
    33 Bloomfield Hills Parkway, Suite 250
    Bloomfield Hills, Michigan 48304
    248-851-1500
    gwahl@sterlingattorneys.com
    Appearing on behalf of the Plaintiff.

---

**Page 2**

1             INDEX
2   WITNESS: MONICA ROGERS       PAGE
3   Examination by Mr. Miglio      5
4   Examination by Mr. Wahl      317
5   Re-Examination by Mr. Miglio    337
6   Re-Examination by Mr. Wahl    350
7   Re-Examination by Mr. Miglio    351
8         *   *   *
9      INDEX OF EXHIBITS
10  EXHIBIT  DESCRIPTION       PAGE
11  No. 1   Complaint       11
12  No. 2   Docket Sheet    12
13  No. 3   Case Inquiry    13
14  No. 4   Register of Action    13
15  No. 5   Resume      22
16  No. 6   Employee Reference Guide   50
17  No. 7   Job Description    58
18  No. 8   Interoffice Memorandum   61
19  No. 9   OHRD - Monthly/Staff Meeting  62
20  No. 10  Employee Performance Appraisal  65
21  No. 11  June 20, 2008, Memo    67
22  No. 12  Department - OHRD Meeting July 29, 2008 68
23  No. 13  July 30, 2008, Letter   74
24  No. 14  Typed Notes    78
25  No. 15  Monday, 1/12/09, Week 2 Results  82

---

**Page 3**

1   No. 16  Employee File Report    84
2   No. 17  Employee Track Meeting Summary Notes  86
3   No. 18  Employee File Report    89
4   No. 19  Note to File    93
5   No. 20  HFHS - Employee Assistance Program  99
6        Formal Disciplinary Action Referral
7   No. 21  Memorandum    106
8   No. 22  Requirement Guidelines   108
9   No. 23  Email      114
10  No. 24  Typed Notes    115
11  No. 25  List of OHRD Consultants   154
12  No. 26  HFHS 2013 Performance Plan Goal for  166
13        Monica J. Rogers
14  No. 27  Letter to Derick Adams   169
15  No. 28  Notes and Observations - Interview  192
16        with Monica Rogers May 8, 2013
17  No. 29  Monica's Duties    214
18  No. 30  Email      205
19  No. 31  Job Title: Consultant - OHRD   209
20  No. 32  Email      215
21  No. 33  EEOC Intake Questionnaire   217
22  No. 34  HER Analyst - F05818   218
23  No. 35  U.S. Department of Labor Letter   237
24  No. 36  Typed Notes    245
25

---

**Page 4**

1   No. 37  Impaired Healthcare Worker Behavioral  246
2        Observation Checklist and Fitness for
3        Duty Evaluation
4   No. 38  Impaired Healthcare Worker Behavioral  247
5        Observation Checklist and Fitness for
6        Duty Evaluation
7   No. 39  Impaired Healthcare Worker Behavioral  247
8        Observation Checklist and Fitness for
9        Duty Evaluation
10  No. 40  Charge of Discrimination   248
11  No. 41  Employee Health Physician Activity  250
12  No. 42  Letter to Mr. Louzon   259
13  No. 43  Typed Notes    261
14  No. 44  Return to Work Meeting   273
15  No. 45  Charge of Discrimination   275
16  No. 46  Typed Notes    277
17  No. 47  Request for Flexible Work Arrangement  284
18  No. 48  Notes on Discrimination   291
19  No. 49  Conciliation Agreement   306
20  No. 50  Letter      306
21  No. 51  Typed Notes    307
22  No. 52  Email Stream    308
23
24
25

---

1 (Pages 1 to 4)

Electronically signed by Lauri Sheldon (001-336-738-9633)       a6c3207c-a588-4746-8455-daabafd5685d

Monica Rogers
3/8/2016

Page 25

1  Q   What position were you holding at the time you applied
2      for the OHRD consultant position?
3  A   Business partner.  HR business partner.
4  Q   And that would be your current position?
5  A   Correct.
6  Q   So while you were a business partner in -- within Health
7      Alliance Plan, you applied for an OHRD consultant
8      position.
9  A   Yes.
10 Q   And where was that position posted?  What area or what
11     location?
12 A   It was posted at One Ford Place.
13 Q   Okay.  And what was the result of your application?
14 A   I just got a rejection saying that I didn't meet the
15     qualifications, I think, is what it said.
16 Q   Do you know who was selected for that job?
17 A   I don't.
18 Q   And were you applying for that position because you were
19     interested in it?
20 A   Absolutely.
21 Q   Do you know who it reported to?
22 A   Yes.
23 Q   Who?
24 A   It reported to the manager.  I don't know -- the new
25     manager that was in the area.  I don't know -- I think

Page 26

1      it was Doreen.  I'm not sure if it was Doreen.
2  Q   When you say "new manager in the area," what new
3      manager?
4  A   There was a change in leadership after I left the
5      department, and so whoever the new manager was over the
6      area that I applied for is who I would have been
7      reporting directly to.
8  Q   When you say "new manager," you mean the manager that
9      replaced the previous manager?
10 A   Yes.
11 Q   And who did the new manager replace?
12 A   Barbara Bressack.
13 Q   So essentially you were applying to go back to the same
14     department that you came from when you went to Health
15     Alliance Plan.
16 A   Yes.
17 Q   Why were you doing that?
18 A   Because that's the job that I loved.
19 Q   And in that position you would have reported to the new
20     manager, and the new manager would have reported to
21     whom?
22 A   To Laurie Jensen.
23 Q   Laurie Jensen, the person that you said discriminated
24     against you.
25 A   The person that did discriminate against me.

Page 27

1  Q   Okay.  And she discriminated against you by not giving
2      you a senior OHRD consultant position.
3  A   That's one of the ways, yes.
4  Q   How else did Laurie Jensen discriminate against you?
5  A   It started as late as -- as early as late July of 2008
6      is when there was an issue that came up that we were
7      discussing flex schedule when two white employees were
8      given preferential treatment over everybody else in the
9      department, and I said -- and I had a conversation
10     that -- that it was discriminatory.  And later on it
11     happened again in 2010.  I had a conversation even after
12     the -- with Laurie Jensen regarding the 2008 incident
13     and I asked her why is it that she can come into a
14     meeting and yell at us and call us names and do
15     everything virtually except for jumping on the table,
16     walk out of the door and slam the door, and everybody
17     looks at her and says, "Oh, but isn't she cute?"  And I
18     said, "Why is it that if I as a black woman disagrees
19     with you, then I'm an angry black woman?"  And she said,
20     "You girls always use that as a copout."  So I filed a
21     formal complaint with Ed Kai about her at that time.  So
22     it goes -- This goes way back.
23 Q   Okay.  So let me get this straight.  So in 2008 you felt
24     that she was discriminating against you, you personally,
25     because she was allowing white employees to utilize flex

Page 28

1      time and not you?  Is that what you're saying?
2  A   No, that's not what I'm saying.  What I'm saying is I
3      felt that the process that she used was discriminatory
4      in selecting who got flex time and who didn't, and when
5      I objected to it, it became an issue which later on -- I
6      mean even two years later it comes up again, and I'm
7      sitting over in, you know, EAP for this issue.  So it
8      was -- It's just been an ongoing thing since that time.
9  Q   All right.  Just focus on 2008, though.  You're saying
10     that she would grant, if I understand what you're
11     saying, and correct me if I'm wrong, she would grant
12     white employees the opportunity to use flex time?
13 A   No.  What I'm saying to you is that the flex was
14     something that was a new program that was rolled out,
15     and when she announced it to the team that it was rolled
16     out, she also announced that two employees who happened
17     to be white had already come to them with their
18     selections on what they wanted, so they got first, you
19     know, treatment of what -- first opportunity to choose
20     what days they wanted to flex.
21 Q   Okay.  So who were those two employees?
22 A   It was Deedra Climer and Barbara Bressack.
23 Q   Okay.  And you objected because she already gave -- went
24     to these employees and offered them flex time?
25 A   Yes.

7 (Pages 25 to 28)

Electronically signed by Lauri Sheldon (001-336-738-9633)                    a6c3207c-a588-4746-8455-daabafd5685d

Monica Rogers
3/8/2016

---

**Page 29**

1  Q  Did you ever use flex time?
2  A  I did for a short while.
3  Q  So you requested and received the opportunity to use
4     flex time.
5  A  Afterwards, yes.
6  Q  And your issue was that because she went to these
7     employees first --
8  A  Hm-hmm.
9  Q  -- you felt that was discriminatory.
10 A  It was, especially since it's proper protocol that
11    anytime that you are -- a new benefit that is going into
12    effect, if it's going to be something that is for
13    everybody, that everybody should be notified at the same
14    time, because with a flex schedule it depends on, and I
15    asked her, you know, because the debate was, you know,
16    what if you get two employees that are requesting the
17    same time off?  And she said it would be first come,
18    first serve, so that kind of validated to me that,
19    again, that that was discriminatory practice, because
20    they were allowed to have this opportunity before
21    everyone else.
22 Q  Well, you thought it was discriminatory because she said
23    first come, first serve?
24 A  No.  I thought it was discriminatory because they had
25    the opportunity before anyone else.

---

**Page 30**

1  Q  Okay.  But if I'm hearing what you're saying, when you
2     requested to use flex time, she allowed you to use it?
3  A  I requested flex time afterwards, yeah, but I had to
4     take whatever days were left.  They were, you know, the
5     days, they had already select -- Two people couldn't be
6     off at the same time.
7  Q  So what did you want that you didn't get is what I'm
8     saying to you in the way of flex time?
9  A  I wanted Monday off.
10 Q  So you didn't get Monday off.
11 A  Right.
12 Q  But you got some other day.
13 A  Right.
14 Q  And you're saying under oath that the reason you didn't
15    get Monday off was because one or both of these two
16    white employees you just identified were given Monday
17    off?  Is that what you're saying?
18 A  I'm saying under oath that's what I believe.
19 Q  All right.  Well, is that the case or that's just what
20    you think is what I'm asking?
21 A  It happened, so it's a fact.
22 Q  And did you ever tell her in 2008, "I don't think you
23    should have given them the first opportunity"?
24 A  I did.
25 Q  Okay.  What did she say?

---

**Page 31**

1  A  Well, she objected to it and she told Amy Schultz,
2     "That's why I didn't want to do this."
3  Q  When you say -- What I asked you was did you ever tell
4     her that you had problems with her offering flex time to
5     these two white employees.  You said, yes, correct, you
6     did say that?
7  A  Yes.
8  Q  And what did she say in response to you?
9  A  I just said -- told you what she said.
10 Q  She said --
11 A  "That's why I didn't want to do this."
12 Q  That's what she told you.
13 A  That was her response.
14 Q  What did you understand her to mean by that?
15 A  She was having -- She said that -- directed that
16    response to Amy, not me.
17 Q  That's why she didn't want to do that.  So tell me
18    what -- your interpretation of what she said.
19 A  I think that's what she meant was that that's why she
20    didn't want to participate in the flex scheduling.
21    Because she didn't want to get involved in all the
22    bickering over it.
23    I have no -- I guess.  I have no idea to understand what
24    she meant as far as -- All I -- I know she was talking
25    about flex schedule, but that's all I can think that she

---

**Page 32**

1     was referring to.
2  Q  So is this what you made a complaint to Ed Kai about?
3  A  No.  What I made a complaint to Ed Kai about was the
4     fact that she said, when I asked her about this whole
5     thing why that she could act and disagree in a very
6     unprofessional way that she is looked at as being cute,
7     and when I disagreed with her, using the same tone as
8     I'm using right now, I'm looked at as being an angry
9     black woman?  And she said, "You girls always use that
10    as a copout."
11 Q  When did you make the complaint to Ed Kai?
12 A  Immediately after that meeting, which was in July of
13    2008.
14 Q  Okay.  So this was something that also occurred in 2008?
15 A  Hm-hmm.
16 Q  You have to answer yes --
17 A  Yes.
18 Q  -- or no.
19 A  I'm sorry.
20 Q  So in addition to the flex time issue in 2008, there's a
21    conversation where you asked her what, about why she was
22    slamming doors or showing anger or something?
23 A  No.  I -- My question to her was, because we were having
24    a transparent dialogue and I asked her permission to
25    have -- to provide her with some honest feedback and she

---

8  (Pages 29 to 32)

Electronically signed by Lauri Sheldon (001-336-738-9633)                    a6c3207c-a588-4746-8455-daabafd5685d

Monica Rogers
3/8/2016

## Page 49

1  A  Really?  Yes, it's in there.
2  Q  Well, maybe it's not in there because we didn't have you
3     sign the psychiatric psychology release, but we'll see
4     about that.
5        MR. WAHL:  I think the dates are wrong.
6        MR. MIGLIO:  What?
7        MR. WAHL:  I think the dates on your subpoena
8     were from 2005 --
9        THE WITNESS:  Oh.
10       MR. MIGLIO:  Okay.
11       MR. WAHL:  -- forward, and if it just goes
12    back to the early 'nineties, then we're off 10 to 15
13    years.
14       THE WITNESS:  Yeah.
15  Q  (Continuing by Mr. Miglio):  Can you describe for me your
16    educational background?
17  A  I have, I guess it's equivalent to about a year-and-half
18    to two years of credits toward a degree.
19  Q  And where did you take those one-and-a-half to two
20    years?
21  A  Davenport University.
22  Q  Do you know how many credits that would have equaled?
23  A  I don't know exactly how many.
24  Q  But you say it was one-and-a-half to two years.
25  A  Hm-hmm.

## Page 50

1  Q  Correct?
2  A  Yes.
3  Q  When did you attend Davenport University?
4  A  Oh, off and on probably since the eighties.
5  Q  When is the last time you attended?
6  A  Was it in the 2000?  Maybe.  It was like the beginning
7     2000s or late nineties.
8        (Exhibit 6 marked.)
9  Q  (Continuing by Mr. Miglio):  Let me show you what's been
10    marked as Exhibit No. 6.
11  A  Hm-hmm.
12  Q  And ask you to take a look at that.  Do you know what
13    this is?
14  A  Looks like an evaluation form.
15  Q  So it looks like you acknowledge receiving an employee
16    reference guide.
17  A  Yeah, back in 1997.
18  Q  You had some discovery that's gone back and forth in
19    this case, and your lawyer has requested some
20    information pertaining to particular employees within
21    the human resources department within Henry Ford Health
22    System.  One of them is Brian Robertson.  And my
23    question to you is have you ever accessed any
24    information concerning Brian Robertson using your HR
25    access code to get into the computer system?

## Page 51

1  A  His PeopleSoft record?  No.
2  Q  Okay.  Have you ever accessed any information concerning
3     Brian Robertson?
4  A  Not unless it had to do with the Henry Ford University.
5  Q  Meaning that he applied for some college -- I mean some
6     course; is that you're saying?
7  A  Yeah.
8  Q  What about Patti Sanburn?  Have you ever accessed any
9     information of hers?
10  A  No.
11  Q  What about Debbie Saoud?
12  A  No.
13  Q  Carol Bridges?
14  A  No.
15       MR. WAHL:  Tara Boufford is --
16  Q  (Continuing by Mr. Miglio):  Tara Boufford?
17  A  No.
18  Q  What do you know about whether any of those individuals
19    have degrees, college degrees, or college education?
20  A  Terry, I guess the only -- I'm sorry, Mr. Miglio, I
21    guess the only thing that I could say to that is that
22    it's common knowledge that people talk in HR about the
23    things that happen, and it's based off of conversations
24    that I've had.
25  Q  What about Nicole Logan, the same question?  Have you

## Page 52

1     accessed any of her information?
2  A  No.
3  Q  And so what do you know about Brian Robertson's
4     educational background?
5  A  I know, because he worked with me, that he didn't have a
6     degree.  He said it.
7  Q  Okay.
8  A  He and I talked about it.
9  Q  What about Patti Sanburn?
10  A  What do I know about her?
11  Q  Yeah.
12  A  Just based of what I've heard in HR.
13  Q  And what have you heard in HR?
14  A  That she doesn't have a degree.
15  Q  Okay.  And what about Carol Bridges?
16  A  I know that because she told me herself that she didn't.
17  Q  All right.  And Tara Boufford, what do you know about
18    her educational background?
19  A  I know that she didn't have a degree.
20  Q  Did not or does not?
21  A  At the time that I wrote this did not.
22  Q  What about Nicole Logan?
23  A  I just -- I know that Nicole has an undergraduate
24    degree.  Nicole came to Henry Ford as an intern, so I
25    worked with her then.

13  (Pages 49 to 52)

Electronically signed by Lauri Sheldon (001-336-738-9633)                                                                 a6c3207c-a588-4746-8455-daabafd5685d

Monica Rogers
3/8/2016

## Page 53

1   Q   Okay.  And what about Debbie Saoud?  What do you know
2       about her education?
3   A   I don't know about her education.
4   Q   Well, she is listed as somebody who you claim didn't
5       have the educational qualifications for the position
6       she --
7   A   No.  What I claimed with Debbie Saoud is that the job
8       description was changed for experience level, that the
9       job descriptions for people for leadership position
10      is -- was normally at a minimum of two years, and I know
11      that she had one.
12  Q   Were you ever encouraged during the course of your
13      employment at Henry Ford Health System to complete your
14      college education and get a degree?
15  A   Early on, yeah.
16  Q   By whom?
17  A   Patrick Irwin.
18  Q   Anybody since Patrick Irwin encouraged you to do that?
19  A   No.
20  Q   And does -- At any time during the time that you worked
21      at Henry Ford Health System have they had a tuition
22      reimbursement program --
23  A   Yes.
24  Q   -- you could get reimbursed for?
25  A   Yes.

## Page 54

1   Q   And is it your understanding that had you completed your
2       coursework at Davenport University to get a degree that
3       you would have been reimbursed by Henry Ford Health
4       System?
5   A   That's my understanding.
6   Q   Now, when did you first become an OHRD consultant?
7   A   That title changed for 2007.
8   Q   When is the first time you held the position?
9   A   With that title in 2007.
10  Q   Okay.  And how did you get it?
11  A   I actually was in the position as a senior rep for OD
12      and I was put on a rotation where I worked over at Henry
13      Ford Health System for four or five years, however long
14      it was, and upon return to my position it was changed,
15      the job title had changed to -- to senior OD consultant
16      and OD consultant.
17  Q   Okay.  So you were on rotation as a senior employment
18      rep.
19  A   No.  a senior rep for OD.
20  Q   Okay.  And what do you mean you were rotating?
21  A   I was approached by Bob Riney to -- asked to do a
22      rotation at Detroit campus in the employee relations
23      division, to cover for Rebecca Claxton while out on a
24      maternity leave, and she came back, but in the process
25      of her coming back to work, the position that I held was

## Page 55

1       filled by Amy Schultz.  She -- So there was no position
2       at that time for me to come back to.
3   Q   Okay.  So what did they do?  They created one for you?
4   A   No.  I stayed over at -- Patrick Irwin had the FTE, so I
5       stayed in the employee relations position.
6   Q   So when you came back, you became an OHRD consultant?
7   A   No.  My title never changed.  The whole time I was on
8       the rotation my title was senior rep OD.
9   Q   All right.  When did it change?
10  A   When I came back they had changed it to . . .
11  Q   Okay.
12  A   2007.
13  Q   So you never applied for an OHRD position other than
14      recently.
15  A   It was my old position.  I rotated back into it.
16  Q   So the answer is you never had to apply to become an
17      OHRD consultant, correct?
18  A   I did not have to apply.
19  Q   All right.  So what they basically did is they slotted
20      you into that position?
21  A   That is not true.  They didn't slot me.  I was on a
22      rotation, so I just went back to my position.  The title
23      just happened to change.
24  Q   Did you meet the qualifications for the OR -- OHRD
25      consultant position --

## Page 56

1   A   As a --
2   Q   -- when you first assumed that job?
3   A   As a senior rep OD I met the qualification because it
4       was college degree or equivalency with experience.
5   Q   And that was when?
6   A   When I first got that position?  Is that your question?
7   Q   Yeah.
8   A   I got that position in late nineties.
9   Q   Okay.  And didn't it require a college degree?
10  A   No, it did not.
11  Q   As a requirement?
12  A   No, it did not.
13  Q   Okay.  So you got the job because you met the
14      requirements for that position.
15  A   Yes, I did.
16  Q   When is it your understanding, if at all, the job
17      changed to require a -- Strike that.
18          When -- Is it your understanding that the OHRD
19      consultant position ever required a bachelor's degree?
20  A   The OHRD?
21  Q   Consultant position.
22  A   It was changed.  I don't know when that happened, but it
23      is my understanding that that is true.  It does require
24      a --
25  Q   Okay.  And is it your testimony that it didn't require a

14  (Pages 53 to 56)

Electronically signed by Lauri Sheldon (001-336-738-9633)                                                    a6c3207c-a588-4746-8455-daabafd5685d

Monica Rogers
3/8/2016

## Page 57

1    bachelor's degree before you assumed the position?
2  A    It is my testimony that as a senior rep of OD I met the
3       qualifications, so I was grandfathered into my same
4       position. It was the same position. The title just
5       changed.
6  Q    I understand what you're saying, but I want to be clear
7       on all these job titles.
8  A    Okay.
9  Q    At some point in time you became a consultant OHRD or
10      OHRD consultant, correct?
11  A    Yes.
12  Q    And you're saying you were grandfathered into that
13      position because of your previous position that you
14      held, which was a senior OD rep, correct?
15  A    No. What I'm saying to you is one in the same position.
16      A simple title change.
17  Q    Okay. When you say "grandfathered," what do you mean?
18  A    I mean that I -- since I met the qualifications of the
19      senior rep for OD, which was a position that I held, so
20      I met that qualification, and because the title changed
21      I got grandfathered into meeting the qualifications,
22      because those were for people as of 2007 that were not
23      in the position. I was already in the position.
24  Q    But when -- Define what you mean by grandfathered. You
25      mean you didn't have to meet the qualification?

## Page 58

1  A    It means that I met the qualifications as it was for the
2       job that I was hired for.
3  Q    But if we looked at the job description of OHRD
4       consultant as of the time you assumed that job, we would
5       see that it required a bachelor's degree, correct?
6  A    At the time that I assumed that job, that is correct.
7  Q    Okay. So let's just . . .
8           (Exhibit 7 marked.)
9  Q    (Continuing by Mr. Miglio): So let me show you what's
10      been marked as Exhibit 7 --
11  A    Okay.
12  Q    -- and ask you if this is the position description --
13  A    Hm-hmm.
14  Q    -- or job description of the consultant OHRD position
15      that you were grandfathered in.
16  A    It looks like it, yes.
17  Q    Okay.
18           MR. WAHL: Flip it over.
19           THE WITNESS: Okay.
20           MR. WAHL: Well, he may ask you about it.
21      Keep it open.
22  Q    (Continuing by Mr. Miglio): Who told you that you were
23      grandfathered in?
24  A    It is practice within Henry Ford Health System that I
25      have been a part of opportun -- many times when a person

## Page 59

1       was in a position, when the qualifications changed,
2       those people that are in that position get grandfathered
3       into that same position even though the qualifications
4       may have changed.
5  Q    Okay. That's not what I asked you. I asked you who
6       told you that you were being grandfathered in, if
7       anybody?
8  A    Bill Peterson for one.
9  Q    He said you're being grandfathered in?
10  A    He said that I qualified for the position. He didn't
11      use those terms.
12  Q    To your knowledge, since 2007, since this job
13      description, has the OHRD consultant position ever had a
14      requirement of less than a bachelor's degree?
15  A    Not that I know of.
16  Q    When did the senior OHRD consultant position come into
17      place?
18  A    I don't know.
19  Q    Did it come into place at the same time that OHRD
20      consultant position came into existence?
21  A    I would imagine that it did, but I can't say for
22      certain.
23  Q    And if I understand your testimony, you were a senior OD
24      rep and then you became an OHRD consultant, correct?
25  A    That is correct.

## Page 60

1  Q    And you became an OHRD consultant when they changed the
2       job title, or were there still senior OD reps in the
3       system when you became an OHRD consultant?
4  A    There were no more senior OD reps. My -- They -- I
5       don't know if that title got changed prior to me coming
6       back or not, but I just know that my title didn't
7       change until after I came back to OD.
8  Q    So when you slotted into the -- Strike that.
9           When you were grandfathered into the OHRD
10      consultant position, who was your immediate supervisor?
11  A    Laurie Jensen.
12  Q    And do you know whether she had anything to say with
13      whether you would get that job or not?
14  A    I think -- Well, based off of what I was told by Bill
15      Peterson, there was some conversation that they didn't
16      want me to come to that position, and he told them that
17      it was the right thing to do, and that's why I was put
18      back into my old job.
19  Q    Do you know anything more about the conversation why
20      they didn't want you in that position?
21  A    I don't.
22  Q    So you came into the -- You were grandfathered into the
23      OD -- OHD -- O --
24  A    H.
25  Q    I've said it so many times now. OHRD consultant

Tri-County Court Reporters
248-608-9250

Electronically signed by Lauri Sheldon (001-336-738-9633)                    a6c3207c-a588-4746-8455-daabafd5685d

Monica Rogers
3/8/2016

Page 69

1    she wrote, "presented --
2  A    That I wrote.?
3  Q    -- concerns to Monica" -- No.  I said --
4  A    Oh.
5  Q    Let's assume that she wrote it since her name's at the
6    bottom.
7  A    Okay.
8  Q    "Presented concerns to Monica Rogers, who leads our
9    Renewal program.  See letter stating that I'm concerned
10    that she has not brought the Renewal facilitators
11    together for regular meetings as was known prior to her
12    taking over the program."
13       Do you remember Laurie approaching you or
14    having a discussion with you about that?
15  A    We had a lot of conversations about Renewal, and this
16    could have been one about we need to bring them
17    together.  But to say this, I don't recall this specific
18    conversation, no.
19  Q    Okay.  Let's go back to Exhibit 12.  All right.  So can
20    you take a look at this?
21  A    Yes.
22  Q    And have you seen this before?
23  A    Yes.
24  Q    Okay.  And this seems to be about some meetings about
25    flex time?

Page 70

1  A    Yes.
2  Q    All right.  And do you know who wrote this?
3  A    Yes.
4  Q    Who?
5  A    Amy Schultz.
6  Q    Okay.
7  A    Hm-hmm.
8  Q    And she says here, "Monica Roger continues to challenge
9    me in public at our OHRD meetings.  This time I was
10    verbally assaulted by Monica as she blamed me for
11    unfairly approving Deedra's flex arrangement without it
12    going out to the entire group at once.  This is untrue,
13    as the email sent to the entire OHRD team was at the
14    same time with the flex policy within it, and because
15    Deedra has initiative, she filled it out and sent it to
16    me.  After reviewing it with Laurie, I approved it."
17  A    Hm-hmm.
18  Q    Do you dispute that?
19  A    It's not accurate.
20  Q    What's not accurate about it?
21  A    It's not accurate, first, the word "challenges" in her
22    in public, it was very few meetings, first of all, that
23    I've had that included Amy since I didn't report to her.
24    And the other thing was is that the emails announcing
25    flex may have gone out to everybody at the same time,

Page 71

1    but the issue that was brought up with this is that
2    prior to that email going out they had already met and
3    approved days off for two people, Deedra and Barbara
4    Bressack.  So that was the concern.
5  Q    Well, I'm not getting that from here.  I mean she seems
6    to be saying that after the email went out Deedra took
7    the initiative and asked for flex time, and you dispute
8    that.
9  A    I do.
10  Q    Okay.  And we can find an email presumably announcing
11    it?
12  A    I don't know.  She said an email went out.
13  Q    So are you denying that an email went out to everybody
14    announcing flex time?
15  A    I can't -- No, I'm not denying it.
16  Q    But you're saying you have some evidence to suggest that
17    even before the email went out Deedra had flex time
18    approved, Deedra and Barbara Bressack.
19  A    Bressack.
20  Q    Correct?
21  A    Yes.
22  Q    And how do you know that?
23  A    Because Laurie told everybody.
24  Q    Okay.  Then she says here in the third paragraph,
25    "Monica used communication violence when speaking with

Page 72

1    me.  This was confirmed by others in the room, and she
2    accused me of being unfair and that everyone now does
3    not have the same chance to get a flex schedule once
4    she sees it as a first come, first serve opportunity.  I
5    did not agree.  I think this is based on productivity
6    and results and there's specific job descriptions that
7    will enable them to work from home and have flexibility
8    or not work from home because they may have
9    responsibilities that keep them within the office."
10  A    Hm-hmm.
11  Q    You didn't dispute that?
12       MR. WAHL:  Dispute what part of -- Objection.
13    Form.  Foundation.
14  Q    (Continuing by Mr. Miglio):  Do you dispute -- I mean is
15    that what you were saying, that you saw it as a first
16    come, first serve opportunity and you disagreed, saying
17    it was unfair?
18  A    Laurie said it was a first come, first serve
19    opportunity, and so that being said, that if you already
20    made a decision about who was going to get two of the
21    days before the email went out, then I do dispute it.
22  Q    All right.  But separate for me the fact that you
23    believe that Barbara Bressack and Deedra got
24    consideration for flex time before the email come {sic}
25    out.  I mean were you also, in addition to that,

18  (Pages 69 to 72)

Electronically signed by Lauri Sheldon (001-336-738-9633)                    a6c3207c-a588-4746-8455-daabafd5685d

Monica Rogers
3/8/2016

Page 93

1    office, so I can't tell you what she meant exactly,
2    because she didn't give me a response.
3  Q  Did you ever understand what she said was --
4  A  She never gave me a response.
5  Q  She never told you what she thought was unacceptable
6    behavior by you; is that what you're saying?
7  A  That's what I'm saying.
8  Q  Okay.
9        (Exhibit 19 marked.)
10 Q  (Continuing by Mr. Miglio):  Take a look at that look at
11    Exhibit 19 and tell me if you've ever seen this
12    document.
13 A  No.
14 Q  Never seen it.
15 A  Not until it was in the parts of the information that
16    Mr. Wahl gave me.
17 Q  Okay.  Ever seen any form of it?
18 A  I had conversations about this, but I don't recall ever
19    having gotten a document.
20 Q  Well, it looks like somebody wrote down "Debbie Saoud.
21    Monica Rogers sent a copy," but you're saying now that
22    you never saw it.
23      MR. WAHL:  Wait.  By the term "now" --
24    Objection to form.  Go ahead.
25      MR. MIGLIO:  I mean you're saying --

Page 94

1        MR. WAHL:  She never said she had seen a copy
2    of it before and --
3        MR. MIGLIO:  No, I mean --
4        MR. WAHL:  -- your "now" implies that.
5    Objection to form.
6  Q  (Continuing by Mr. Miglio):  You're saying today that
7    you've never seen a copy of this.
8  A  Right.
9  Q  Well, when you read it and when Mr. Wahl gave it to you,
10    what did you think?
11 A  That it was --
12 Q  I mean did you think that this -- what Monica Rogers put
13    down on this memo was false?
14      MR. WAHL:  You mean what Monica
15    Jackson-Lewis --
16 Q  (Continuing by Mr. Miglio):  I'm sorry, Monica
17    Jackson-Lewis.  All right.  Let me re-ask it.  When you
18    looked at this document when Mr. Wahl showed it to you,
19    what was your reaction?  Had you known that Monica
20    Jackson-Lewis took issue with your conduct?
21      MR. WAHL:  Objection to form of the question.
22      MR. MIGLIO:  As indicated here?
23      MR. WAHL:  Which question do you want her to
24    answer?
25      MR. MIGLIO:  Go ahead.  You can answer.

Page 95

1        MR. WAHL:  Well, objection to form.  Which
2    question do you want her to answer?  You asked her what
3    was her reaction and then you asked her, "Did you
4    think?"
5  Q  (Continuing by Mr. Miglio):  Well, what was your reaction?
6    Let's do it that way.
7  A  Well, my reaction to it is that, first of all, I felt
8    this stuff was done all after the fact, because I never
9    saw the document.  Secondly --
10 Q  What do you mean "after the fact"?  Like months later?
11    Years later?  What?
12      MR. WAHL:  You don't want to let her answer?
13    Go ahead.
14      THE WITNESS:  I don't -- I know that this
15    didn't happen when this is dated, so that's what I'm
16    talking about after the fact.
17 Q  (Continuing by Mr. Miglio):  Well, when you say you know
18    that it didn't happen when it was dated, what does --
19 A  Meaning that I didn't get the document and I didn't see
20    it until now.
21 Q  All right.
22 A  And is that the only --
23 Q  No, are you saying the document wasn't prepared until
24    later or you're saying that you just didn't -- I mean I
25    don't understand.  You said it was done after.  What was

Page 96

1    done after?
2  A  It wasn't given to me on this date --
3  Q  Okay.
4  A  -- is what I'm saying.  And it's dated on the back that
5    on July 19th, 2010, it appears that something was sent
6    to me.  I mean how would they send it to me?  But okay.
7    Anyway, and I looked at failing to initiate the
8    scheduling, and I looked at that and I said, although I
9    didn't send her a formal appointment, I was meeting with
10    her every two weeks regularly.  So I didn't miss any
11    appointments.  It's just failed to put it on the
12    calendar.  Not only did I not put it on immediately,
13    neither did Liz Mallory.
14      The second thing I looked at was challenging
15    the time sheets.  Because I was an employee relations
16    and I know a little bit about employee relations, we
17    were exempt employees and she was requiring us to do
18    time sheets, and I said, "By law that appears that time
19    is being tracked, which means you're if tracking time,
20    you've got to pay for overtime."  She took exception to
21    that.
22      Communication that is not open and
23    constructive.  When I make attempts to have one-on-one
24    discussions regarding an issue with me regarding
25    behavior or a decision that was made, you shut down by

24  (Pages 93 to 96)

Electronically signed by Lauri Sheldon (001-336-738-9633)                    a6c3207c-a588-4746-8455-daabafd5685d

Monica Rogers
3/8/2016

Page 97

1    saying "whatever you want."  And, you know, that may be
2    true in some instance when I have thought that I have
3    made my point as best as I could, I may have said,
4    "Whatever you want."
5          And not training Crucial Conversations after
6    you asked and agreed to do so during our 4-27 meeting,
7    you failed to even -- Well, the reason I didn't do it,
8    because there were no classes scheduled to do Crucial
9    Conversations, and as soon as the next class was
10   scheduled, I did it.
11         Focusing on what other employees are doing or
12   saying, what this conversation -- this statement is all
13   about the fact that both Liz and -- Mallory and I were
14   both required to be at orientation at 7:30 every Monday.
15   Every Monday Liz would show up after 8 o'clock, and I --
16   that went on for about three or four months before I
17   said anything.  I talked to Liz about it first, like I
18   always do talk to the person first, but when the
19   behavior didn't change, I talked to Monica, and I was
20   told I needed to concentrate on what I was doing rather
21   than someone else.  So that's what that was all about.
22         So I looked at these and I said, you know,
23   there is some truth in these, but these basically don't
24   represent the truth, the full truth.
25   Q    Why would Monica Jackson-Lewis write down all of these

Page 98

1    things if they weren't true about you?
2    A    You have to ask Monica, because I don't know.
3    Q    Well, so far from what I'm hearing is you said Amy
4    Schultz was not correct in her criticisms of you.  You
5    said that, correct?
6    A    Yes.
7    Q    You said that Rita Fields, what she supposedly said
8    about your presentation and bizarre behavior wasn't
9    correct.
10   A    Well, that was what Laurie said.  I didn't see anything
11   that Rita Fields wrote that.  So I'm just -- Based off
12   of what I saw Rita wrote, that's not what she wrote.
13   Q    So you also said Elizabeth Mallory, her summary of the
14   meeting saying that you were arguing or verbal exchanges
15   that extended the meeting, you said that was not
16   correct.
17   A    I said that that wasn't correct for every single meeting
18   is what I said.
19   Q    Did Monica Jackson-Lewis ever tell you that she thought
20   you were being insubordinate and acting unprofessionally
21   towards her in meetings?
22   A    She -- What she said, this was at this last conversation
23   in 2010 when Laurie was in the meeting with us, she did
24   say something to that effect.
25   Q    So what -- Do you remember exactly what she said?

Page 99

1    A    I don't know exactly what she said, but she said that
2    she felt that basically by not doing Crucial
3    Conversations, that that was being insubordinate, and I
4    explained to her why I hadn't done Crucial Conversations
5    up to that point, based off the conversation that we had
6    with Laurie that was involved and the fact that I was on
7    the schedule and had done it.  So we talked about that,
8    so we have had some conversations.
9    Q    And did you understand from the conversation that she
10   wasn't pleased with your behavior and treatment of her?
11   A    She did say that.
12         (Exhibit 20 marked.)
13   Q    (Continuing by Mr. Miglio:)  Let me show you what's been
14   marked as Exhibit 20.
15   A    Hm-hmm.
16   Q    Now, this looks like this is the Employee Assistance --
17   the EAP referral form?
18   A    Yes.
19   Q    Have you seen this before?
20   A    No, I haven't.  Well, I saw it in some of the documents
21   that I reviewed, yeah.
22   Q    Well, I thought you said you had seen an Employee
23   Assistance Program referral form and you were sure that
24   it was Laurie Jensen writing it, even though it was
25   Monica Jackson-Lewis' name on it.  This is not that

Page 100

1    form?
2    A    I think it was a different form.
3    Q    You think or it is?
4    A    Because one of them -- Let's see.  I saw this form, yes.
5    Q    Okay.  And is this the form that you said, even though
6    it was Monica Jackson-Lewis' name on it, that you were
7    sure that it was Laurie Jensen?
8    A    No.
9    Q    No what?
10   A    It is not the form.
11   Q    Okay.  Is there another form?
12   A    I think there is.  I saw something that was Laurie's
13   writing.
14   Q    What did it look like?
15   A    That was a -- I'm trying to think.  It might have been
16   the referral to see the Dr. Bodnar for.
17   Q    Most recently when you were referred EAP.
18   A    Yes.
19   Q    Okay.  Well -- All right.  So now you're saying that it
20   wasn't the referral in 2010 that you think Laurie Jensen
21   was behind; it was now the referral in 2015?
22   A    I think Laurie Jensen was behind this one, because
23   Laurie Jensen incited that response from Amy Schultz
24   that was two years prior to this, at 2008, that Laurie
25   solicited that information from Amy so that she could

25 (Pages 97 to 100)

Electronically signed by Lauri Sheldon (001-336-738-9633)                                    a6c3207c-a588-4746-8455-daabafd5685d

Monica Rogers
3/8/2016

|  | Page 101 |
|---|---|
| 1 | send -- so I could be sent to EAP. |
| 2 | Q  Well, I know, but as you sit here and you look at |
| 3 | Exhibit 20, I mean when it says here, "Please write the |
| 4 | reasons why employee's being referred for EAP services," |
| 5 | that whole paragraph has to do with the things that you |
| 6 | said Monica Jackson-Lewis brought to your attention -- |
| 7 | well, let me -- Forget that.  Withdraw the question. |
| 8 | Just tell me specifically on this form what is |
| 9 | it that makes you suspect that Laurie Jensen was behind |
| 10 | sending you for the EAP referral as opposed to Monica |
| 11 | Jackson-Lewis? |
| 12 | A  The whole content of it, because I don't think it would |
| 13 | have happened without Laurie inciting that and |
| 14 | soliciting that information that she had indicated on -- |
| 15 | that came from Amy Schultz. |
| 16 | Q  Well, where is that referenced in this -- |
| 17 | A  It's not referenced in this letter, but all of -- that |
| 18 | letter came right at the same time, within a few days, |
| 19 | that Laurie solicited that information and Amy indicated |
| 20 | on that information that let me know.  I'm willing to do |
| 21 | whatever you need to -- whatever you need me to do to |
| 22 | help make your case, and the case was, I believe, to |
| 23 | send me to EAP. |
| 24 | Q  But don't you recognize the things that are identified |
| 25 | in here as the reasons, that those are reasons that |

|  | Page 102 |
|---|---|
| 1 | Monica Jackson-Lewis brought to your attention? |
| 2 | A  I think that this in itself would not have been |
| 3 | something to go to EAP about. |
| 4 | Q  Okay.  So if I understand what you're saying, you're |
| 5 | saying Monica Jackson-Lewis didn't have the wherewithal |
| 6 | or was somehow a puppet of Laurie Jensen and then was |
| 7 | just doing at it at Laurie Jensen's insistence? |
| 8 | A  I do. |
| 9 | Q  Okay. |
| 10 | A  I do. |
| 11 | Q  Hmm.  Okay.  So just go back for clarification.  There |
| 12 | is nothing, no reference or anything, on Exhibit 20 that |
| 13 | suggests anything about Laurie Jensen soliciting |
| 14 | information so that the EAP referral could be made or |
| 15 | should be made.  You're just saying you surmise that |
| 16 | that was the reason behind it, correct? |
| 17 | A  I believe that is the reason.  That is what's behind it. |
| 18 | Q  Well, I guess the question that I have, then, is if you |
| 19 | thought this was all about Laurie Jensen, then I take it |
| 20 | you didn't think that you needed to correct the behavior |
| 21 | that Monica Jackson-Lewis was telling you was |
| 22 | inappropriate.  Would that be fair? |
| 23 | A  No, that's not fair. |
| 24 | Q  So you did correct the behavior that Monica |
| 25 | Jackson-Lewis was telling you that you were exhibiting |

|  | Page 103 |
|---|---|
| 1 | that was unacceptable? |
| 2 | A  Say that again. |
| 3 | Q  Did you make changes in your behavior that Monica |
| 4 | Jackson-Lewis brought to your attention as being |
| 5 | inappropriate? |
| 6 | A  We had the -- The answer to that is after this EAP visit |
| 7 | that I approached Monica differently and we had a |
| 8 | conversation.  Yes. |
| 9 | Q  Why did you approach her differently? |
| 10 | A  Because I went to Monica and I said to her that based |
| 11 | off of these conversations that she and I've had and |
| 12 | this breakdown in communication is that why -- I asked |
| 13 | her, I said, "Why are you falling for the same thing |
| 14 | with Laurie and allowing her to use you to do these |
| 15 | things to me when she did the same thing to you |
| 16 | before?", and when I was in employee relations I'm the |
| 17 | one who helped her not lose her job. |
| 18 | Q  What did she say about that? |
| 19 | A  And she says that, you know -- And I told her that I was |
| 20 | going to approach things differently with her, and |
| 21 | that's when I told her that I was going to be making |
| 22 | sure that she understood that I was in there to support |
| 23 | her. |
| 24 | Q  What did she say in response to you saying, "Can't you |
| 25 | have see these are the same things she's doing to me |

|  | Page 104 |
|---|---|
| 1 | that she did to you?" |
| 2 | A  She just said, "Yeah," but that was it. |
| 3 | Q  Wait.  I want to know precisely what she said. |
| 4 | A  "Yeah." |
| 5 | Q  She said, "Yeah." |
| 6 | A  Yes. |
| 7 | Q  Okay.  All right. |
| 8 | A  Yeah. |
| 9 | MR. WAHL:  Off the record. |
| 10 | (Whereupon a recess was taken at or about the |
| 11 | hour of 12:35 p.m., and the deposition was resumed at or |
| 12 | about the hour of 1:29 p.m.) |
| 13 | Q  (Continuing by Mr. Miglio):  Did you say earlier that you |
| 14 | helped Monica Jackson-Lewis not lose her job? |
| 15 | A  Hm-hmm. |
| 16 | Q  How did you do that? |
| 17 | A  By providing support and coaching to her and -- when she |
| 18 | and Laurie were at odds. |
| 19 | Q  When was that? |
| 20 | A  2005 or '6? |
| 21 | Q  And what were her and Laurie at odds about? |
| 22 | A  Monica had issue with one of the employees that reported |
| 23 | to her, and it was one of the employees that Laurie was |
| 24 | supporting, supported her, in every way as far as you |
| 25 | don't mess with Lamia or Karen. |

26  (Pages 101 to 104)

Electronically signed by Lauri Sheldon (001-336-738-9633)                    a6c3207c-a588-4746-8455-daabafd5685d

Monica Rogers
3/8/2016

Page 125

1    problems getting along with?
2  A   The only one that I ever -- that I ever had an issue
3    that was of concern was Elizabeth Mallory, and you saw
4    that.
5  Q   How long did you hold the OHRD consultant position?
6  A   From 2007 to 2013.
7  Q   And when was the first time that you came to the
8    conclusion or belief that you should be considered or
9    being given the title of senior OHRD consultant?
10  A   During discussions that took place between December of
11    2012 and January of 2013.
12  Q   Okay.  So -- But what I'm asking you is more generally.
13    When did it come to -- When did you conclude that you
14    should be considered doing the work of a senior OHRD?
15    Would that have been at that time period?
16  A   That's when I determined that my title should be
17    changed, yes.
18  Q   Okay.  And you -- Tell me exactly why you determined, as
19    you said, that your title should be changed from an OHRD
20    consultant to a senior OHRD consultant.
21  A   Because I was performing the duties of a senior OHRD
22    consultant.
23  Q   Okay.  What duties were they -- were there?
24  A   Leading two or more system-level projects {sic},
25    coaching, leadership development, direct interactions

Page 126

1    with senior leadership, program design, the team
2    building re -- filling team building requests from
3    outside leaders, and leading the two leadership
4    programs.
5  Q   Okay.  Let me make sure I have them.
6       MR. WAHL:  Can you read them slowly, Terry?  I
7    apologize.
8  Q   (Continuing by Mr. Miglio):  Leading two or more system --
9    Okay.  Hold on a second.  Leading two or more
10    system-level projects.  Is that one?
11  A   Yes.  Programs.
12  Q   All right.  Wait.  I want to get the language correct.
13    Leading two or more system-level projects.
14  A   Programs.
15  Q   Okay.  And when did you -- what were those two or more
16    system-level programs?
17  A   Advanced Leadership Academy, Leadership Academy --
18  Q   Hold on a second.  Let me write these down.  Two or more
19    system-level programs, and those were?
20  A   Advanced Leadership Academy, Leadership Academy.
21  Q   Okay.
22  A   And Renewal.
23       MR. WAHL:  And what?
24       THE WITNESS:  Renewal.
25       MR. WAHL:  Thank you.

Page 127

1  Q   (Continuing by Mr. Miglio):  All right.  When did you
2    start doing those functions?
3  A   Renewal I started from the beginning in 2007 upon going
4    back to my position in OHRD, and the leadership program
5    started -- Let's see.  I started the Leadership
6    Academy . . . The Leadership Academy took place 2011 or
7    late 2010, and the Advanced Leadership Academy started
8    upon a departure of Angeline, which was in 2011, I
9    think, too, or could be '12, 2012, when she left.
10  Q   So as far as system-level programs, let's look at
11    Renewal first.
12  A   Hm-hmm.
13  Q   What exactly did you do for Renewal?
14  A   I was responsible for promoting that program.
15  Q   What does that mean?
16  A   That means sending out communications to increase
17    participation in the program, responsible for getting
18    people to facilitate the program.
19  Q   What does that mean?
20  A   It means to facilitate the curriculum.
21  Q   What does that mean, facilitate the curriculum?  Getting
22    other people to teach the program?
23  A   Yes.
24  Q   And getting other people to add content to the
25    curriculum, correct?

Page 128

1  A   Yes.
2  Q   So you'd hire teachers or speakers for the program.
3    Not -- Strike that.
4  A   Not hire.
5  Q   You would gather speakers who would present in this
6    program.
7  A   Along with me yes.
8  Q   Okay.  And what were you presenting in the program?
9  A   We all -- There are probably about 13 different modules,
10    so we traded off on which ones that we would do, but I
11    was qualified to do all of them.  We all were.
12  Q   And who put together the actual content for the program?
13  A   Senn Delaney, along with Henry Ford Health System.
14  Q   I'm sorry, who did you say?
15  A   Senn Delaney.
16  Q   Who's that?
17  A   That's the company we talked about earlier.
18  Q   Okay.  And then you're the one that sent out fliers or
19    emails indicating that it was available and you were one
20    of the teachers in the program.
21  A   Yes, and putting, you know, articles and monitoring to
22    encourage growth.
23  Q   Okay.  And Renewal was what, a two-day session, class,
24    group, what?
25  A   Yes.  Two days.

32 (Pages 125 to 128)

Tri-County Court Reporters
248-608-9250

Monica Rogers
3/8/2016

Page 169

1    Q    After the sessions ended?
2    A    Yes.
3    Q    And that was your responsibility.
4    A    Yes.
5    Q    Now, who were the coaches?  It says here, "Continued to
6         work with coaches."  Who were the coaches?
7    A    The coaches, I was one, so that would have been Barbara
8         Bressack, Mike Edge, Kris, Kathy Smith, Laurie, Kathy
9         Oswald, and Jennifer were all considered coaches.
10        (Exhibit 27 marked.)
11   Q    (Continuing by Mr. Miglio):  Let me show you what I'm
12        marking as Exhibit 27.  What is this?
13   A    This is the formal complaint that I provided to Derick
14        Adams.
15   Q    Did somebody assist you in putting this together?
16   A    Me?  No.
17   Q    Do you know the date that you prepared it?  I mean what
18        is the date of this document?
19   A    It's on the back.  I gave it to Derick on March the
20        25th.
21   Q    Okay.  And when you put this together did you have notes
22        or documents to help you remember when these meetings
23        were and when these events occurred?
24   A    Hm-hmm.  Yes.
25   Q    Okay.  Did you tape record any of these conversations?

Page 170

1    A    No.
2    Q    And what was it that you wanted to occur as a result of
3         making this formal complaint?
4    A    To be treated equitably, in an equitable way as my white
5         counterparts were.
6    Q    Who were your white counterparts?
7    A    It was all those listed on the third page.
8    Q    Brian Robertson, Patti Sanburn, Carol Bridges, Tara
9         Boufford.  Is that who your white counterparts were?
10   A    Nicole Logan, Deb Tem -- It says Deb Temrowski, but
11        that's not the right name, but yes.
12   Q    What about Deb Temrowski?
13   A    It should have been Debbie Saoud.
14   Q    So when you say "white counterparts," what exactly do
15        you mean by that?
16   A    What I was only seeking is to be treated the same and
17        given the same considerations that had been given to the
18        other people that I have listed here.
19   Q    Okay.  So let's start with Debbie Saoud.  What was she
20        given that you wanted to be -- Well, first of all,
21        Debbie Saoud.  Let's start at the bottom and go up.  Her
22        position was HR director?
23   A    Debbie Saoud, yes.  She's an HR director now.
24   Q    Okay.  And do you know how many -- how long she had been
25        in that position?

Page 171

1    A    I'm not sure what your -- In what position?  As HR
2         director?
3    Q    Yeah, I --
4    A    It was a recent promotion, so I don't know exactly how
5         long.
6    Q    And so are you saying that she shouldn't have gotten
7         promoted?
8    A    What I'm saying here is I think everybody deserves,
9         first of all, whatever they get.  This is not personal
10        against any of these people.  I'm not even thinking
11        about the names.  I'm looking at the situation.  What
12        I'm saying is for Debbie Saoud, for all of the job
13        descriptions normally to be a director, in the director
14        position, you have to have at least two years of
15        management experience.  She had one.  So the job
16        description may have been changed to preferred rather
17        than required.  So with Nicole Logan, I loved Nicole to
18        death --
19   Q    Well, let's just stay on Debbie Saoud, because I'm going
20        to ask you some questions.  So you're saying the job
21        description may have been changed.  I mean -- Strike
22        that.
23        Let's go back.  Correct me if I'm wrong, but
24        what I understand you to say are these people that
25        hold these positions, but yet they don't meet the

Page 172

1         requirements of the job, correct?
2    A    As they were, yes.
3    Q    All right.  As they were at the time they were promoted
4         or --
5    A    As the time that right before they were promoted they
6         were changed.
7    Q    Okay.  So Debbie Saoud is an HR director.
8    A    Yes.
9    Q    And you said she became an HR director, but before she
10        was promoted to an HR director the job description for
11        HR director may have changed so that the required
12        experience in a management position was changed.
13   A    Right.
14   Q    Okay.  When you say "may," does that mean yes or does
15        that mean it might have been or you don't know or what?
16   A    All I can tell you is that it was the whole conversation
17        on all of the four floors that that is what happened,
18        and obviously it was, because she got the job.
19   Q    But what evidence do you have --
20        MR. WAHL:  Wait.  Wait.  Counsel, let me just
21        interrupt.  We made a request for all these documents
22        regarding these people, you denied all of them, and now
23        you're cross examining my client on what evidence do you
24        have.  Well, if you produced the material, we'd be able
25        to -- everybody would be able to look at it and draw

Electronically signed by Lauri Sheldon (001-336-738-9633)                    a6c3207c-a588-4746-8455-daabafd5685d

Monica Rogers
3/8/2016

---

Page 173

1    their own conclusions and make their own arguments, but
2    you've seen fit to say it's irrelevant.
3              MR. MIGLIO:  Okay.  Are you done now?
4              MR. WAHL:  Yes.
5    Q   (Continuing by Mr. Miglio):  All right.  So you put these
6        names in this letter.  You said they were your
7        counterparts.
8    A   Hm-hmm.
9    Q   White counterparts.
10   A   They are.
11   Q   You said you wanted to be treated like them, and now I'm
12       trying to figure out what basis you had to suggest that
13       these people got the positions in some way that was less
14       than how they should have gotten them.
15   A   I know what all of the jobs descriptions as far as
16       directors said, because I've been working in HR for
17       30-some years, so I know at a director level that the
18       minimum number of years of experience is two.  She had
19       one.  That's all I'm saying.
20   Q   So I want to know what evidence you have that the job
21       description for her position was changed before she got
22       it so that she satisfied the number of years of
23       management experience when she went into the job with
24       that job description.
25   A   If it --

---

Page 174

1              MR. WAHL:  She said "may have changed."  She
2        didn't say it did, but go ahead.
3              THE WITNESS:  It had -- Well, she got the job,
4        first of all, so if she didn't meet the requirements of
5        the job description, she wouldn't have it.  So obviously
6        it must say one year or two years preferred.
7    Q   (Continuing by Mr. Miglio):  But you're --
8    A   Rather than required.
9    Q   But you're saying "may."  You mean to tell me that you
10       don't know the answer to that question?
11   A   I'm telling you just what I said, is that it requires --
12       the job description say {sic} two years.  She had one.
13   Q   Okay.  So -- In the HR director job description for the
14       position she got.
15   A   Yes.
16   Q   Okay.  Where would you -- Where did you see that
17       position, that job description?
18   A   I didn't see a job description.
19   Q   Was this a job that was posted?
20   A   I can't remember if it was posted or not.
21   Q   Did you apply for it?
22   A   No.
23   Q   So do you know -- Did you see it posted with the number
24       of years of experience?
25   A   No.  But the people --

---

Page 175

1    Q   When's the last time you saw --
2              MR. WAHL:  Wait.  But the people what?  I'm
3        sorry.
4              THE WITNESS:  All of the people in Talent
5        Selection were talking about this.  These are the people
6        that do have access to the job descriptions and they
7        know who's applying for positions, so if they said --
8    Q   (Continuing by Mr. Miglio):  Who are "they"?
9    A   The people in Talent Selection.
10   Q   Give me some names.
11   A   The whole Talent Selection team.  I can't give you all
12       their names.
13   Q   Well, give me the names of anybody who was saying that
14       it was changed or somehow it was changed for her, the
15       job description.
16   A   What I'm just -- I'm not saying that -- What they were
17       saying is that that position required normally two years
18       and she got it with one-year experience.
19   Q   Who?
20             MR. WAHL:  He wants names.
21             THE WITNESS:  Names of people in Talent
22       Selection would have been --
23   Q   (Continuing by Mr. Miglio):  Who said this.  Not just
24       names of people in Talent Selection.  People in Talent
25       Selection who said she got it without having the

---

Page 176

1    requirements, without meeting the requirement.
2    A   Bronwyn Davis would have been one person.
3    Q   Okay.
4    A   Who else in Talent Selection?
5              MR. WAHL:  I'm sorry, how do you spell Wyn
6        {sic} Davis?
7              THE WITNESS:  B-r-o-n-w-y-n Davis.
8    Q   (Continuing by Mr. Miglio):  And what did she say?
9    A   We were having conversations about who was being
10       selected for these positions, and we talked about that
11       people were being placed in positions without the proper
12       number of years of experience, and Bron -- had the
13       conversation with Bronwyn and . . . Who else?  It was
14       several conversations.  Kevin Claxton.
15   Q   What did Kevin Claxton say about Debbie Saoud?
16   A   What did he say about the fact that -- the number of
17       years of experience based on . . .
18   Q   Pardon?
19   A   Number of years of experience.
20   Q   What did he say about Debbie Saoud getting the position
21       with less than the number of years of experience
22       required?
23   A   Basically that a lot of people are being promoted that
24       don't have the -- meet the requirements of the job and
25       the job descriptions are -- their requirements are being

---

44  (Pages 173 to 176)

Electronically signed by Lauri Sheldon (001-336-738-9633)                                    a6c3207c-a588-4746-8455-daabafd5685d

Monica Rogers
3/8/2016

---

Page 177

1    changed.
2  Q   So are you saying he just made that general statement or
3      he said about that Debbie Saoud?
4  A   He made that general statement.
5  Q   Okay.
6  A   We were talking about Debbie in particular, but he made
7      that general statement.
8  Q   So what about Bronwyn?  Did Bronwyn make a statement
9      about Debbie Saoud getting promoted without having the
10     required years of experience?
11 A   We just went over that.  It says, yes, that we were --
12     many people on the floor were talking about these job --
13     these promotions.  There was a lot of them that were
14     happening and --
15 Q   I'm not asking you about many people on the floor.  I'm
16     just focusing on who did you hear --
17 A   I just told you --
18 Q   -- in Talent -- listen.  Let me finish.  In Talent
19     Selection who said Debbie Saoud got a job even though
20     she didn't meet the required education requirements?  I
21     understand they may say --
22         MR. WAHL:  It wasn't education.  It was
23         only --
24         MR. MIGLIO:  Experience requirement.
25 Q  (Continuing by Mr. Miglio):  I understand that they may

---

Page 178

1      have general conversations about people get promoted
2      without meeting the requirements.  I want to know who
3      said that Debbie Saoud got promoted without meeting the
4      minimum experience requirements, if anybody.
5  A   I just told you.  The two people.
6  Q   So what did Bronwyn say about Debbie Saoud?
7         MR. WAHL:  We just went through this, counsel.
8  Q  (Continuing by Mr. Miglio):  Did she say that Saoud got
9      the job without meeting the minimum qualifications?
10 A   What was said was that the same conversation pretty much
11     like what Kevin said, that people are being put into
12     positions without meeting the requirements of the job
13     description.  It's like -- It always starts off, "Did
14     you know Debbie was being promoted to director level?
15     She's only got one year of management experience."
16 Q   So are you saying that nobody specifically referred
17     to her; they just had general comments about people
18     getting promoted?
19 A   No.  I just told you they both said, "Did you" -- They
20     started -- The conversation started off casual
21     conversation, "Did you know Debbie's being promoted to
22     director?"
23 Q   Okay.  Who else said anything in Talent Selection?
24 A   That's all I can recall right now.
25 Q   Just so I'm clear, is it a matter of -- it's a

---

Page 179

1      requirement of having two years of management experience
2      or is it preferred, or what's the language in the job
3      description that she didn't comply with?
4         MR. WAHL:  Objection.  Best evidence.  It's in
5      the job description.  Go ahead and answer.
6         THE WITNESS:  The last time I looked at the
7      director level it was required as indicated on that
8      chart that we reviewed back here, it will tell you what
9      it is.
10        MR. MIGLIO:  And is a business --
11        MR. WAHL:  You don't have to go back.
12 Q  (Continuing by Mr. Miglio):  Is a business partner not
13     considered to be a member of management?
14 A   No.
15 Q   It isn't.
16 A   No.
17 Q   Okay.  What is the definition of management?
18 A   First of all, to have people reporting directly to you.
19     I mean it's defined in that chart.  That pretty much is
20     the definition of management.
21 Q   Okay.  All right.  So Nicole Logan, what happened with
22     her?
23 A   The position originally required a master's degree, and
24     she has a bachelor's.
25 Q   Okay.  And did the job description at the time she

---

Page 180

1      was -- First of all, you didn't apply for a senior
2      consultant compensation position.
3  A   No, I didn't.
4  Q   Was that posted?
5  A   I don't know.  I don't recall.
6  Q   All right.  And you're saying that the position when she
7      was given it required a master's degree preferred.
8  A   That when she got it, the --
9  Q   Yeah.
10 A   -- position?  Yes.
11 Q   But she only a bachelor's degree.
12 A   Yes.
13 Q   So she, at best, violated the master -- the preference
14     for having somebody with master's degree.
15 A   No.  When it says "preferred," it's not required.
16     Originally it was the -- all of the consultant -- senior
17     level consultant positions were master's required, and
18     what I'm saying to you is it was changed to master's
19     preferred.
20 Q   Who changed it?
21 A   I don't know.
22 Q   When was it changed?
23 A   I don't know.
24 Q   What about Tara Boufford?
25 A   That was position where a degree was required and she

---

45  (Pages 177 to 180)

Electronically signed by Lauri Sheldon (001-336-738-9633)                                a6c3207c-a588-4746-8455-daabafd5685d

Monica Rogers
3/8/2016

Page 181

1    didn't have one.
2  Q   So what does that mean?  You say here, "Experience in
3    lieu of education"?
4  A   Where are you looking?
5  Q   On your letter next to "Tara Boufford."
6  A   Oh.
7        MR. WAHL:  Thanks.
8        THE WITNESS:  Thank you.
9        MR. WAHL:  Jesus.
10        MR. MIGLIO:  She's got it in front of her, so
11    I thought we were stilling following.  I said, "From the
12    bottom up."
13        MR. WAHL:  Yeah, and then when she asked you
14    where you're reading, you say, "In your letter."  I was
15    just being sarcastic when I said "thanks."  Go ahead and
16    answer.
17        THE WITNESS:  Tara Boufford, experience in
18    lieu of education, so she didn't have the education,
19    so --
20  Q  (Continuing by Mr. Miglio):  What was the education that
21    was required?
22  A   A bachelor's.
23  Q   And the EHR analyst position says that you need a
24    bachelor's degree required?
25  A   Yes.

Page 182

1  Q   So degree -- Unlike these other two, which you say the
2    job description was changed, because that's what I
3    understand you to say.
4  A   Hm-hmm.
5  Q   Logan's senior consultant compensation job description
6    was changed or she just didn't meet it?
7  A   I don't know if it was changed or not.  All I can tell
8    you is from based off of what the positions were, these
9    people didn't meet the original definition of a -- what
10    the requirements were.  They got in the position, so the
11    only way that can happen is the job description has to
12    be changed.
13  Q   Well, when you say "original," what do you mean?  Going
14    back 5 years?  15 years?  10 years?
15  A   I'm talking about prior to them being put in the
16    position.
17  Q   But before you made these allegations, didn't you bother
18    to pull the job descriptions and see when and if and
19    what time frame they were changed?
20  A   No, I did not.  No, I did not.
21  Q   All right.  So Tara Boufford, you think the EHR analyst
22    position, job description, requires what?
23  A   A bachelor's.
24  Q   All right.  And are you saying it was changed before she
25    got it to just have experience in lieu of education, or

Page 183

1    you don't know?
2  A   Repeat that again.
3  Q   I'm just saying, when Tara Boufford was promoted, do you
4    know whether she met the requirements of the job
5    description of EHR analyst?
6  A   At the time that she was put into that position, I'm
7    sure that she probably met the job description
8    requirements.
9  Q   So you're saying that the job description was changed
10    before.
11  A   That's what I'm saying.
12  Q   Do you know when it was changed before?
13  A   I do not.
14  Q   And what about Carol Bridges?  What do you know about
15    her?
16  A   I just know that she is a director and she doesn't have
17    a degree.
18  Q   Was that position of director service excellence, was
19    that posted?
20  A   I don't know.
21  Q   Did you apply for it?
22  A   No.
23  Q   Do you know what her educational background is?
24  A   Yep.
25  Q   What is it?

Page 184

1  A   She doesn't have a degree.
2  Q   And what about Patti Sanburn?  What is -- What's the
3    issue with Patti Sanburn?
4  A   She doesn't have a degree.
5  Q   Okay.  Do you know how long she's been an HR director?
6  A   She's been an HR director probably -- It was since Kathy
7    Oswald was there, so sometime between -- since --
8    between 2007 and now.
9  Q   Okay.  And so you think that she was just promoted to
10    that position or that's a retitling of her job or what?
11  A   If it -- Even if it was a retitling, if it was higher
12    than what she had before, it would be a promotion, so
13    yes.
14  Q   Do you know how many years of experience Patti Sanburn
15    had doing that job?
16  A   No, I don't.
17        MR. WAHL:  Doing that job as HR director?
18        MR. MIGLIO:  Doing those job duties.
19        MR. WAHL:  Well, different question.
20        THE WITNESS:  I don't know if they changed for
21    her.  I don't know.
22  Q  (Continuing by Mr. Miglio):  Don't know anything about
23    what she's doing?
24  A   I know -- I'm looking at the title.  I don't know what
25    her actual job duties are.

46  (Pages 181 to 184)

Electronically signed by Lauri Sheldon (001-336-738-9633)                    a6c3207c-a588-4746-8455-daabafd5685d

Monica Rogers
3/8/2016

---

Page 185

1   Q   So where did you hear that Patti Sanburn didn't somehow
2       meet the HR director job description?
3   A   What I had heard was is that Patti Sanburn didn't have a
4       degree and was in an HR director position.
5   Q   And is it your belief that the HR director position for
6       Debbie Saoud and the HR director position for Patti
7       Sanburn are basically the same job description?
8   A   It may not be, because Patti Sanburn is HR director for
9       a different business unit.  Well, you know what?  We all
10      report to corporate, so it should be the same
11      requirements.
12  Q   Do you know if it is?
13  A   I haven't seen it, so I can't tell you.  No, I don't
14      know.
15  Q   And what about Brian Robertson?  Do you know how he got
16      the OHRD consultant position?
17  A   I do not know how he got it.
18  Q   Do you know if he interviewed?
19  A   I don't know.
20  Q   Okay.
21  A   It wasn't -- I know it wasn't anything posted when he
22      got the position.
23  Q   So when you submitted this complaint what were you
24      looking to see happen?
25          MR. WAHL:  You just asked her that a minute

---

Page 186

1       ago.
2           THE WITNESS:  I just told you that.
3   Q   (Continuing by Mr. Miglio):  Well, I know.  You said you
4       wanted to be treated similar as white, as you referred
5       to them, counterparts, but my question --
6   A   I didn't just refer to them as white.  They are white.
7   Q   Okay.  Well, you said you wanted to be treated the same
8       as your white counterparts.
9   A   Exactly.
10  Q   What did that mean to you?
11  A   That meant exactly the same opportunities and exceptions
12      and provisions that were put in place that they got an
13      opportunity to take advantage of.  I wanted those same
14      ones.
15  Q   But tell me what that meant for you.  Did that mean more
16      money?  Did that mean --
17  A   What that --
18  Q   -- a title change?  Did that mean a car allowance?  I
19      mean what did that mean?
20  A   That meant --
21          MR. WAHL:  Object -- Wait.  Hold on.
22      Objection to form.  You want to know about the car
23      allowance or the money or the title?  Which?
24  Q   (Continuing by Mr. Miglio):  What did it mean?
25  A   What it meant to me, Terry, really is all -- or

---

Page 187

1       Mr. Miglio.  All it meant was is that if I'm doing the
2       job and I work damn hard on that job and, you know,
3       before you said, "Well, you're just doing this" and
4       "you're just doing that" and it's just like mundane
5       work.  Trust me, it was not.  Many of those meetings,
6       most of them I was there at six in the morning and
7       setting up and doing everything that I needed to do and
8       sitting in and doing a darn good job of it whenever I
9       needed to, as referenced and as reflected in my job
10      descript -- in my performance evaluation.  Laurie did --
11      never denied that I was doing the work.  She admitted it
12      herself.
13  Q   But just because you're doing a good job and you're
14      getting high performance evaluations doesn't mean that
15      your job title should be changed.  Would you agree with
16      me?
17  A   That's not what was said in the job description.  It
18      says that Monica took on the job responsibilities of a
19      senior consultant.  That's what it says.
20  Q   What did you want to happen?  You wanted to --
21  A   I wanted --
22  Q   -- have your title changed; is that what you're saying?
23  A   That's what I wanted.  I wanted recognition for the work
24      that I was doing.
25  Q   What did -- And that recognition was in the form of

---

Page 188

1       making you a senior OHRD?
2   A   And compensation.
3   Q   Do you even know how much money you were making compared
4       to the senior OHRD consultant?  Do have any idea as you
5       sit here today?  How much more should you have made?
6           MR. WAHL:  Counsel, since you're raising your
7       voice, have you looked up the two salary grade levels?
8       They're percent difference.
9   Q   (Continuing by Mr. Miglio):  Do you know how much more you
10      would have made had you been granted a senior OHRD
11      consultant position?
12  A   All I know is that the pay ranges are very different.  I
13      do know that.
14  Q   I didn't ask you that.  Do you know --
15  A   Well, how -- It's determined -- That you never know
16      until you get into a situation and you get promoted.  I
17      don't know.  I don't know.
18  Q   Okay.  So I take it that these are the only six examples
19      that you could come up with of white counterparts that you
20      said were somehow given a break on the -- on their job
21      requirements.
22      You need more than six?  Isn't one too many when people
23      are being treated differently?
24  Q   Well, the one name that's not on here is your name,
25      because you were performing at an OHRD consultant

---

47 (Pages 185 to 188)

Electronically signed by Lauri Sheldon (001-336-738-9633)                                        a6c3207c-a588-4746-8455-daabafd5685d

Monica Rogers
3/8/2016

<table>
<tr><td>

Page 189

1  position.  You didn't have the requirements for that job
2  either.
3  A  Well, guess what, Mr. Miglio?  Guess what?  I was in
4  that job of a senior representative of OD prior to 2007
5  when I went on rotation.  My job title never changed.
6  The only thing different is the title change.  The
7  duties were the same.
8  Q  You came back to a position, did you not, where people
9  were saying whether you would get it or not was still up
10 for debate.
11     MR. WAHL:  Well, there's no question pending.
12     THE WITNESS:  It wasn't --
13     MR. WAHL:  Objection to the form.  Look it,
14 he's not asking a question.
15     MR. MIGLIO:  Isn't that correct?  You came
16 back to the department when the job title changed.
17     MR. WAHL:  Listen, you're just arguing with
18 her now.
19     MR. MIGLIO:  Isn't that right?
20     MR. WAHL:  Counsel, we can move on?  You get
21 seven hours in one day.  Let's finish up today.
22 Q  (Continuing by Mr. Miglio):  Isn't that correct?
23 A  Repeat your question.
24     MR. WAHL:  You're just arguing with her.
25 Q  (Continuing by Mr. Miglio):  When you came back to the

</td><td>

Page 191

1  Q  How many people agreed with you that you were doing
2  senior OHRD level work among management?
3  A  I never asked anybody in management.  Obviously, Laurie
4  agreed.  She put it in my performance eval that I was.
5  Q  She agreed?
6  A  Yes.  She put it in -- She -- They're her comments.
7  Barbara Bressack agreed.  She said, "We know you can do
8  the work, because you're doing it."
9  Q  So what happened when you submitted this complaint?
10 A  When I submitted the complaint -- You want me start when
11 I gave it to Derick?
12 Q  Yeah, what did Derick do?
13 A  He told me that he was going to investigate and get back
14 with me in a couple weeks, and then it went to -- He
15 kind of transitioned the whole investigation over to
16 Jolene and I met with her once on it, probably about a
17 month later.  And then after I met with her, about a
18 week later after that she told me that it was going to
19 be turned over to Dan Champney for him to do the
20 investigation.
21 Q  Okay.  And did you interview with Dan Champney?
22 A  I did.
23 Q  Have you ever reviewed his notes from your interview
24 with him?
25 A  Yes.

</td></tr>
<tr><td>

Page 190

1  position it was no longer a senior OD position; it was
2  an OHRD consultant position that they grandfathered you
3  in.
4  A  And all --
5  Q  Correct or not?
6  A  And when I came back to that position, everybody else
7  that was a senior rep of OD, their titles were changed
8  to senior rep of consultant, OHRD consultant.
9  Q  How many of those people had degrees?
10 A  I don't know.
11 Q  All of them have degrees, didn't they?
12 A  Okay.
13 Q  Didn't they?
14 A  I don't know.  I never thought about even checking.
15 They weren't -- They're not in question.
16 Q  So the amount of money that you missed out on, have you
17 ever figured out what that was?
18 A  No.
19 Q  Well, would it have satisfied you to have job duties
20 removed from you so that you weren't in jeopardy of
21 working as a senior OHRD consultant and not getting paid
22 at that rate?
23 A  I was told that wasn't an option.
24 Q  Who told you that?
25 A  Barbara Bressack, my manager.

</td><td>

Page 192

1  Q  And did you find them to be accurate or inaccurate?
2  A  For most part, as I recall them, they are pretty
3  accurate.
4     (Exhibit 28 marked.)
5  Q  (Continuing by Mr. Miglio):  Let me show you what we
6  marked as Exhibit 28.  So you've gone through this
7  before, I take it.
8  A  Yeah.
9  Q  I mean is there anything in here that was inaccurate
10 that he quoted you as saying that you didn't say?
11 A  I think this is . . . It's pretty fair as to what I gave
12 him.
13 Q  So let me ask you some -- If you're done looking, and
14 then I'll ask you a couple more questions.
15 A  Okay.
16 Q  In paragraph 9 he says he asked you about the fact that
17 in the first sentence of your letter of complaint you
18 allege discrimination and harassment and that -- he says
19 that you indicated that your reference to harassment
20 referred to past occurrences, not those contained in the
21 letter.  Is that correct?
22 A  Yes.
23 Q  And what were the past instances of harassment?
24 A  The past instances of harassment that I was referring to
25 here is that the 2008 incident that took place when

</td></tr>
</table>

48  (Pages 189 to 192)

Electronically signed by Lauri Sheldon (001-336-738-9633)                                                    a6c3207c-a588-4746-8455-daabafd5685d

Monica Rogers
3/8/2016

Page 193

1    Laurie solicited information of two years prior to the
2    2010 incident to get me referred to EAP.
3  Q   All right.  And in paragraph 11 he says he asked you for
4      an explanation of why your claims of discrimination were
5      directed at Laurie Jensen --
6  A   Hm-hmm.
7  Q   -- and you indicated that Miss Jensen is the director of
8      the OHRD, not your current supervisor or even direct --
9      former direct supervisor, but I don't see an explanation
10     as to why your claims of discrimination were directed at
11     Laurie Jensen.
12        MR. WAHL:  And your question is?
13  Q  (Continuing by Mr. Miglio):  Why was that the case?  Why
14     were you accusing Laurie Jensen of age and race
15     discrimination, or were you?
16  A   Yes, I was.
17  Q   Okay.
18  A   And am.
19  Q   Okay.  And in the letter you were accusing her, which
20     we've marked as Exhibit 27, of race and age
21     discrimination because you didn't -- you were performing
22     senior OHRD consultant work, but weren't given that
23     title, correct?  That's what the discrimination was?
24  A   The discrimination was that she treated me differently
25     than my white counterpart.

Page 194

1  Q   Okay.  Well, let's --
2  A   You asked me.  I'm just telling you.  That's --
3  Q   But basically what you wanted to be, if I understand you
4      correctly, the letter you wrote you wanted to be a
5      senior OHRD consultant, correct?
6  A   What are -- No.  What I wanted is to be treated equally.
7  Q   But you -- What you're saying equally meant these people
8      were given positions without meeting the language of the
9      qualifications or having the qualifications modified,
10     right?
11  A   Correct.
12  Q   But ultimately what you wanted is to be promoted to a
13     senior OHRD consultant position, correct?
14  A   That's the end product, yes.
15  Q   Okay.  So -- And you're accusing Laurie Jensen of
16     discriminating against you by not promoting you, right?
17  A   I'm accusing her of discrimination because she didn't
18     give me the same opportunities as she did Brian
19     Robertson.
20  Q   Okay.  She doesn't even have responsibility over
21     virtually any of these people except for Brian
22     Robertson, right?
23  A   I'm sorry?
24  Q   She didn't promote Patti Sanburn, right?
25  A   Oh, you're right.  That's correct.

Page 195

1  Q   She didn't promote Carol Bridges.
2  A   That's correct.
3  Q   She didn't promote Tara Boufford, correct?
4  A   That's correct.
5  Q   She didn't promote Nicole Logan.
6  A   That's correct.
7  Q   She didn't promote Debbie Saoud.
8  A   That's correct.
9  Q   But you were blaming her because she treated Brian
10     Robertson different than you.
11  A   That is correct.
12  Q   And you don't even know how Brian Robertson got that
13     job.
14  A   It doesn't matter.  The point is he was put into a job
15     that required a degree and he didn't have one.
16  Q   Doesn't that sound remotely similar to you?
17  A   Not at all.
18  Q   Okay.  All right.
19  A   Not at all.
20  Q   All right.  So I guess we can distill the complaint down
21     to she put him into a position that -- where he didn't
22     have a degree that required a degree and you didn't get
23     the same break for the senior OHRD consultant promotion
24     that you wanted.
25  A   Yes.

Page 196

1  Q   All right.  So at some point in time you must have asked
2      her, "Laurie, I think I should get promoted to a senior
3      OHRD consultant position," right?
4  A   We had conversations about the senior OD position.
5  Q   Okay.  Well, I didn't ask you whether you had
6      conversation.  I asked you if at some point in time you
7      said, "Put me into a position, please," right?  "Put me
8      into the senior consultant position"?
9  A   I didn't have that exact conversation, put me into the
10     position, no.
11  Q   Did you say, "Laurie, I'm asking you to make me a senior
12     OHRD consultant"?
13  A   We had conversation, several conversations, about me
14     being a senior consultant, yes.
15  Q   We're never going to get done with this.  I just asked
16     you if you asked her to make you one.
17  A   And I'm telling you that no, I never said, "Laurie, put
18     me in" -- in those same words.  I'm telling you the
19     words I used.
20  Q   Well, when was the first time Laurie said to you, "No,
21     you're not going to be a senior OHRD consultant"?
22  A   Basically, it was in the meeting that we had with Jan
23     Robertson -- Roberts -- Jan Harrington-Davis, sorry,
24     that took place.
25        MR. WAHL:  The dates of your conversations are

49  (Pages 193 to 196)

Electronically signed by Lauri Sheldon (001-336-738-9633)                    a6c3207c-a588-4746-8455-daabafd5685d

Monica Rogers
3/8/2016

|  | Page 197 |
|---|---|
| 1 | in Exhibit 27, if you need it. |
| 2 | THE WITNESS:  On January 23rd, 2013. |
| 3 | Q  (Continuing by Mr. Miglio):  Okay.  So you're at Jan |
| 4 | Harrington-Davis' office with Laurie Jensen. |
| 5 | A  Yes. |
| 6 | Q  And you say this is the first time Laurie told you that |
| 7 | you shouldn't -- that she didn't think you should be put |
| 8 | in the position? |
| 9 | A  That's the first time. |
| 10 | Q  Okay.  Point out exactly on this letter where you |
| 11 | reference that she said that to you. |
| 12 | A  It's . . . |
| 13 | MR. WAHL:  I'm sorry, you're referring to |
| 14 | something other than what she wrote on January 23, 2013, |
| 15 | the conver -- the five bullet points?  I mean . . . What |
| 16 | do you want her to do? |
| 17 | MR. MIGLIO:  You got an objection or you just |
| 18 | want to talk -- |
| 19 | MR. WAHL:  No, I -- |
| 20 | MR. MIGLIO:  -- and suggest to your client the |
| 21 | answer? |
| 22 | MR. WAHL:  -- just want to try and move -- |
| 23 | It's not suggesting of an answer. |
| 24 | MR. MIGLIO:  Well, then you know how to make |
| 25 | an objection, I hope, so just make one.  Otherwise, let |

|  | Page 198 |
|---|---|
| 1 | her answer the question. |
| 2 | MR. WAHL:  All right, fine.  Objection.  Form |
| 3 | and foundation.  It's argumentative. |
| 4 | THE WITNESS:  I don't see those exact words, |
| 5 | but this is the time when Jan told Laurie as a remedy |
| 6 | for the situation that there were a couple options that |
| 7 | we could do, and one was the change that required to |
| 8 | preferred, and Laurie says, "No, I'm not willing to do |
| 9 | that." |
| 10 | Q  (Continuing by Mr. Miglio):  Well, why wouldn't that be -- |
| 11 | If you're saying that this person discriminated against |
| 12 | you by not giving you a senior OHRD consultant position |
| 13 | and she said that during the meeting, doesn't that seem |
| 14 | significant enough for you to put in the complaint? |
| 15 | MR. WAHL:  Counsel, it says Jan stated she |
| 16 | doesn't support the change in title for Monica.  I mean |
| 17 | what -- Well, you're right. |
| 18 | MR. MIGLIO:  You haven't been paying |
| 19 | attention. |
| 20 | MR. WAHL:  Yeah, it's on Laurie.  You're |
| 21 | right.  Go ahead. |
| 22 | THE WITNESS:  This is what I gave to Derick, |
| 23 | so it's not in here, but in my formal -- and I told Dan |
| 24 | that this was a condensed version of the notes that I |
| 25 | had taken, so this is not all conclusive {sic} of |

|  | Page 199 |
|---|---|
| 1 | everything that was submitted.  It's -- I was told to |
| 2 | make this short and concise, so I did not put it here, |
| 3 | but I -- it is in the documentation. |
| 4 | Q  (Continuing by Mr. Miglio):  Miss Rogers, I've read this a |
| 5 | couple of times -- |
| 6 | A  Yeah. |
| 7 | Q  -- and I don't see anywhere in here where you say -- |
| 8 | A  Not here. |
| 9 | Q  -- that Laurie Jensen -- |
| 10 | A  It isn't. |
| 11 | Q  -- the person that you're accusing of discrimination |
| 12 | told you that you shouldn't be a senior OHRD consultant. |
| 13 | MR. WAHL:  Since Miss Jensen did like either |
| 14 | suggestion.  Paragraph 17, Exhibit 28. |
| 15 | MR. MIGLIO:  You want to get the Judge on the |
| 16 | phone or you want to continue do to that, really? |
| 17 | MR. WAHL:  You know what?  If you want -- |
| 18 | MR. MIGLIO:  Is that an objection? |
| 19 | MR. WAHL:  Do you want to start |
| 20 | misrepresenting?  You said you've gone through it |
| 21 | twice -- |
| 22 | MR. MIGLIO:  You have an objection you can |
| 23 | make as to form, right? |
| 24 | MR. WAHL:  -- and you're suggesting -- You're |
| 25 | arguing with her.  It says right on the document. |

|  | Page 200 |
|---|---|
| 1 | Why don't you read it a third time? |
| 2 | THE WITNESS:  I'm sorry. |
| 3 | MR. MIGLIO:  Read the question back. |
| 4 | (Whereupon the following portion of the |
| 5 | transcript was read as follows: |
| 6 | "Q  Miss Rogers, I've read this a couple of |
| 7 | times -- |
| 8 | A  yeah. |
| 9 | Q  -- and I don't see anywhere in here where |
| 10 | you say -- |
| 11 | A  Not here. |
| 12 | Q  -- that Laurie Jensen -- |
| 13 | A  It isn't. |
| 14 | Q  -- the person that you're accusing of |
| 15 | discrimination told you that you shouldn't be a senior |
| 16 | OHRD consultant.") |
| 17 | Q  (Continuing by Mr. Miglio):  I mean, are you sure she ever |
| 18 | even said that to you?  I mean I see in here that Jan |
| 19 | Harrington-Davis told you that you she didn't think you |
| 20 | should get the position.  I see that a number of other |
| 21 | people commented on it, but I never see, other than what |
| 22 | you say that Laurie Jensen allegedly said, that I |
| 23 | support that you should be a senior consultant, I don't |
| 24 | see anything in here that says, "Laurie Jensen said I |
| 25 | shouldn't be a senior general consultant," according to |

50  (Pages 197 to 200)

Electronically signed by Lauri Sheldon (001-336-738-9633)                                                     a6c3207c-a588-4746-8455-daabafd5685d

Monica Rogers
3/8/2016

Page 221

1    the position that she should have been required to meet?
2    A    Yes.
3    Q    So do you know whether or not, as it says here, she had
4    experience in lieu of educational requirements?
5    A    Hm-hmm.
6    Q    Is that a yes or a no?
7    A    I'm sorry.  Yes.
8    Q    She did have it?
9    A    The experience?
10   Q    Yes.
11   A    Yes.  I believe she did.
12   Q    So are you saying this -- Well, let me go back, because
13   I'm not understanding this.
14            This is the post -- This is the blurb posting
15   for the position she got, correct?
16   A    Yes.
17   Q    And this is a shortened version of the job description.
18   A    Yes.
19   Q    But even the shortened version usually has the
20   educational and experience requirements, because when
21   people apply for the job they need to know that that's
22   what they're going to have to have, correct?
23   A    Correct.
24   Q    So when she got the job, is this the blurb that was in
25   place?

Page 222

1    A    When she got the job, yes.
2    Q    So couldn't she have qualified for the job even though
3    she didn't have a degree, but because she had experience
4    in lieu of education?
5    A    Can I just tell you that six months before she got this
6    position Patrick Payne applied for the position and it
7    was not experience preferred, it was required.  So
8    between the time he applied and six months later when
9    she got the position, it was changed to preferred.
10   Q    Okay.  So you're saying -- Which is what I'm trying to
11   get at.  You're saying that this blurb was changed to
12   allow somebody to be selected who could satisfy
13   experience over the educational requirements.
14   A    Yes.
15   Q    Okay.  But you're not saying that Tara Boufford didn't
16   meet the requirements of this description.  You're
17   saying she did, but it was previously modified so she
18   could make it.
19   A    Yes.
20   Q    Now, do you know any other ER -- HER analysts who were
21   hired -- EHR analysts who were hired under this
22   description?
23   A    I don't.
24   Q    So you can save us time.  Is the first -- second page of
25   Exhibit 34 the same?

Page 223

1    A    Yeah, it looks like it's a duplicate.
2    Q    And you're saying you cut and pasted this off of
3    PeopleSoft.
4    A    Yes.  Off of the job code table.
5    Q    Did you edit it at all?
6    A    No, I didn't.
7    Q    But you added the Tara Boufford on up.
8            MR. WAHL:  She just said that.
9            THE WITNESS:  Yeah, but the description of the
10   job I did not.
11   Q    (Continuing by Mr. Miglio:)  Okay.
12   A    I did not edit.
13   Q    Then if you look at Patti Sanburn.
14   A    Hm-hmm.
15   Q    "JD changed to reflect the absence of degree."  So
16   you're saying the job description was changed to reflect
17   the absence of the degree, right?
18   A    Yes.
19   Q    Do you know whether this was even the job description
20   that was in place at the time Patti Sanburn assumed the
21   responsibility of director of human resources?
22   A    No, because I didn't -- I didn't see it in two --
23   whenever her position was changed, so no.
24   Q    Well, I mean education says, "Requires a bachelor's
25   degree in human resource or related field or eight years

Page 224

1    of experience as a human resources manager."
2    A    Right.
3    Q    You don't contest that Patti Sanburn didn't have --
4    A    No.
5    Q    -- eight years of experience as a human resources
6    manager, do you?
7    A    I do not.
8    Q    So didn't she meet this job description?
9    A    She met this job description, yes.
10   Q    And you're saying this job description was changed.
11   A    That's what I'm saying.
12   Q    And you're saying that the previous HR director of human
13   resources - CCS said "bachelor's degree required" did
14   not have an exception for experience in lieu of
15   education.
16   A    What I'm saying is this is the first -- she was the
17   first person in this HR director for CCS.  It was a
18   manager position before, so they changed it to be a
19   director position, so it's new.  So they created it with
20   preferred because she didn't have the degree.  Every
21   other HR director in the system has a degree.
22   Q    How long has she been in CCS?
23   A    I have no idea.
24   Q    Maybe 20, 30 years?
25   A    It didn't matter for me.  I've been in HR 30 years.  It

56  (Pages 221 to 224)

Electronically signed by Lauri Sheldon (001-336-738-9633)                                    a6c3207c-a588-4746-8455-daabafd5685d

Monica Rogers
3/8/2016

| | Page 225 |
|---|---|

1    didn't matter for me.
2  Q   Let's take a break.
3  A   Okay.
4        (Whereupon a recess was taken at or about the
5    hour of 4:18 p.m., and the deposition was resumed at or
6    about the hour of 4:34 p.m.)
7  Q  (Continuing by Mr. Miglio):  So at some time were you
8    informed that your position was not going to be
9    reclassified or upgraded or changed to a senior OHRD
10   position?  I mean did anybody ever tell you that?
11       MR. WAHL:  Asked and answered.  Go ahead.
12       THE WITNESS:  Yes.
13 Q  (Continuing by Mr. Miglio):  Who told you that?
14 A   Laurie.
15 Q   When did she tell you?
16 A   In the meeting with Jan Harrington.
17 Q   Okay.  And that's on --
18       MR. WAHL:  Speak up a little bit, Monica.  I
19   can't hear you.
20       THE WITNESS:  Okay.  In the meeting with Jan
21   Harrington.
22       MR. MIGLIO:  Okay.  And that was on what date?
23       MR. WAHL:  27?
24       MR. MIGLIO:  The 23rd.
25       MR. WAHL:  No, Exhibit 27.

| | Page 226 |
|---|---|

1        THE WITNESS:  January.
2        MR. WAHL:  Excuse me.  Exhibit 27.
3        THE WITNESS:  Oh, okay.
4        MR. WAHL:  Was what -- I'm asking you.
5        THE WITNESS:  Yes.
6        MR. WAHL:  Okay.  Thank you.
7        THE WITNESS:  Yes.
8  Q  (Continuing by Mr. Miglio):  And the date was January
9    23rd.
10 A   Yes.
11 Q   Now, at some point in time did you get a copy of
12   Mr. Champney's report of his investigation?
13 A   Only within the last couple of days I got it.
14 Q   You've never seen it before.
15 A   No.  They never -- I asked for it and I was told that I
16   wasn't going to be given one.
17 Q   What were you told about the results of his
18   investigation?
19 A   That he did a thorough investigation and he didn't find
20   any discrimination.  He found that there was one person
21   that was improperly -- those are my words -- put into a
22   position, and that was Brian Robertson.
23 Q   Did you ever tell Barbara Bressack that you thought that
24   she and Laurie Jensen were liars and that justice would
25   be served?

| | Page 227 |
|---|---|

1  A   What I said was Barbara and I had a meeting right after
2    I had provided Derick Adams with this overview, and she
3    came out of the meeting, and within the next few days we
4    were doing an update and she said, "I don't know what to
5    say to you."  And I said, "Why?  What are you -- what
6    are you talking about?"  And she said, "I just came out
7    of a meeting to find out all these things that you said
8    by me, that you said that I told you in order to get a
9    five on your performance evaluation that you had to be
10   performing the duties of the next level up."  And I
11   said, "Barbara, you did say that."  I said, "You said it
12   more than one time."  I said, "Twice in your office we
13   had the conversation and one other time that you said it
14   right outside your door."  And she said, "What I was
15   telling you is about that's what I did."  And I said,
16   "We had the conversation specifically about me."  So I
17   never called her a liar, but I said -- I challenged her.
18   When she denied having said it, I said, "Yeah, you did
19   say it."
20       Now, as far as what I said about Laurie, and
21   she says, "Well, you know my hands are tied.  There's
22   only so much that you can -- that I can do.  I know
23   you're doing the job.  You can do it.  You're already
24   doing the job."  And so she says, "There's only so much
25   that I can do."  And she says, "I don't know why Laurie

| | Page 228 |
|---|---|

1    is -- and Kathy are stuck on this."  And I said, "Well,
2    even though Laurie tells -- told me these things and she
3    went back on it," I said, "but we both know that she
4    lies."  And so I never was in a rage when I said it.  We
5    were having an update meeting.  My voice didn't get
6    loud.  We were having a conversation to a person that --
7    like I would have with somebody that I talked to all the
8    time, because we had a good working relationship as far
9    as I knew.
10 Q   So answer my question.  Did you ever call Barbara
11   Bressack a liar?
12 A   No, I did not.
13 Q   Did you ever refer to Laurie Jensen as a liar?
14 A   I did.
15 Q   Okay.  To Barbara Brussack --
16 A   To Barb --
17 Q   Bressack.
18 A   Bressack, yes --
19 Q   Okay.  And did you ever say in the context of a
20   conversation with Barb Bressack that justice will be
21   served?
22 A   I said, "The truth will come out and justice will be
23   served."  That's what I told her.
24 Q   So you said, "The truth will come out and justice will
25   be served."

Tri-County Court Reporters
248-608-9250

Electronically signed by Lauri Sheldon (001-336-738-9633)                                    a6c3207c-a588-4746-8455-daabafd5685d

Monica Rogers
3/8/2016

Page 229

1  A   And that was around -- This conversation took place
2      around -- sometime in April.  Not later than May.
3          MR. WAHL:  Can you put a year on it, please?
4          THE WITNESS:  Of 2013.
5          MR. WAHL:  Thank you.
6          THE WITNESS:  Between April and May of 2013.
7  Q   (Continuing by Mr. Miglio):  And what did you mean by
8      "justice will be served"?
9  A   Is that -- Because I was planning on taking it to the
10     EEOC, and that if the things didn't get straightened
11     out, you know, if I wasn't able to resolve it and I
12     figured that they would be -- the justice that I was
13     talking about is for them to make things right.  That's
14     the justice I was talking about.
15 Q   Now, did you go and file an EEOC charge?
16 A   Yes.
17 Q   And did you file an OFCCP complaint?
18 A   Yes.
19 Q   What did you complain to the OFCCP about?
20 A   I basically provided them with the same write-up as I
21     did the EEOC of blacks being passed over for promotions.
22 Q   And who were they?
23 A   Who were --
24 Q   When you said you provided them with the same write-up
25     of blacks being passed over promotion, who were the

Page 230

1      blacks that were being passed over for promotion?
2  A   It put -- I included Patrick Payne, Kathy Buyck.
3          MR. WAHL:  Kathy -- Wait, I'm sorry.
4          THE WITNESS:  Buyck, B-y-c-y {sic}.  Patrick
5      Payne, Kathy Byke, Kevin Claxton, Glen Sanford, and
6      Bronwyn Davis.
7  Q   (Continuing by Mr. Miglio):  Okay.  So let's start with
8      how was Patrick Payne passed over for promotion?
9  A   Because like he had applied for -- And these people came
10     to me.  I didn't solicit them, first of all.
11 Q   I didn't ask you that.  Just how was he passed over?
12 A   I'm just clearing that up.  The way he was passed over
13     for promotion, according to him, he applied for the
14     position of EHR analyst and he was not given a position,
15     and he -- it was given to Tara Boufford, and he told me
16     he was told that he was off limits.
17 Q   That he was what?
18 A   Off limits.
19 Q   What does that mean to you?
20 A   It means that he -- Off limits means they couldn't hire
21     him for that position.  I don't know.  Be considered.
22 Q   Where did he get that information, if you know?
23 A   I would not know.
24 Q   So he told you that he was told that he was off limits.
25 A   That's correct.

Page 231

1  Q   Okay.  And so from that you concluded that he was passed
2      over because he was black.
3  A   I did.
4  Q   What did you use to reach that conclusion?
5  A   Because he was black and the person that was put in that
6      position -- He was black with a degree that required the
7      position, and they put a white female in the position
8      who didn't have the degree.
9  Q   Who was that?
10         MR. WAHL:  We just went through this.
11     Counsel, come on.
12         MR. MIGLIO:  The HER position?
13         MR. WAHL:  EHR.
14         THE WITNESS:  EHR.
15 Q   (Continuing by Mr. Miglio):  Who was that?
16 A   Tara Boufford.
17 Q   That got that.  And she competed for the same job that
18     he did?
19 A   Afterwards, yeah.
20 Q   Listen to my question.
21 A   Yes.
22 Q   They were both applying for the same opening?
23 A   It's the same job.  I don't know if they applied at the
24     same time.  I can't answer that.  I don't know.
25 Q   Were they both applying for the same position or was she

Page 232

1      applying for a sec -- a subsequent job?
2  A   For that position.
3  Q   Okay.  So he says to you, "I'm off limits," and you
4      think that's race discrimination.
5  A   I do.
6  Q   Okay.  And then who else did you say was on that list?
7  A   Kevin Claxton.
8  Q   And who's he?
9  A   A black African-American master prepared who was
10     consistently denied a promotion to other HR positions.
11 Q   And how do you know that?
12 A   He told me.  That's the only way I would know.
13 Q   And what positions was he denied promotions to?
14 A   One of them I know was the HR business partner.
15 Q   Okay.
16 A   That's the only one that I know about.  I don't know
17     about any others.
18 Q   But he told you, "I've been denied positions."
19 A   That's exactly what he said.
20 Q   And do you know who got those positions?
21 A   I do not.
22 Q   Who got the business partner position?
23 A   I do not know.
24 Q   Then how could you conclude that he was passed over
25     because of his race?

58  (Pages 229 to 232)

Electronically signed by Lauri Sheldon (001-336-738-9633)                    a6c3207c-a588-4746-8455-daabafd5685d

Monica Rogers
3/8/2016

Page 233

1   A   Because he had applied several times and he was more
2       than meeting the qualifications.
3   Q   But unless you knew whether somebody who was more
4       qualified than him and got the job, how could you
5       possibly make that conclusion?
6   A   You're asking me what I did. I'm telling you. Whether
7       or not it was rationale, I don't know. I'm just telling
8       you what I based it on.
9   Q   So you're saying that there's a possibility that you
10      made irrational allegations against Henry Ford Health
11      System?
12  A   No, I'm not make -- My allegations against Henry Ford
13      Health System was very sound and fact based.
14  Q   Well, we were talking about what complaint you made with
15      the OFCCP. You said you told them that blacks were
16      systematically being denied promotion. So now we're
17      talking about the blacks that you claim were --
18  A   Right.
19  Q   -- systematically denied promotions.
20  A   Right.
21  Q   And you're saying that you're not sure whether your
22      accusation with respect to Mr. Braxton {sic} was
23      rationale?
24  A   Hm-hmm. No.
25      MR. WAHL: It's Claxton, as I understand it.

Page 234

1   Q   (Continuing by Mr. Miglio): Claxton?
2   A   Yes. What I'm saying to you is not that it was -- It
3       was based on people that I knew that had applied for
4       positions, black folks that had applied over and over
5       and over for positions and didn't even get to an
6       interview phase.
7   Q   All right. Who else would you say was --
8   A   Bronwyn Davis. The same scenario.
9   Q   Okay. And what position was Bronwyn Davis passed over
10      for?
11  A   Another business partner position, from what I recall
12      that she told me it was.
13  Q   And did she say, "I've been passed over for promotion
14      and I believe it's because of my race"?
15  A   She did. Because she had also told me, just so you
16      know, that she had gone to the OFCCP as well.
17  Q   Okay.
18  A   And -- To make the same complaint.
19  Q   And who did she get -- Who got her -- the job that she
20      wanted?
21  A   I can't tell you that either.
22  Q   Okay. And who else was in this group that you claim
23      was . . . blacks that were passed over for promotion?
24  A   Kathy Buyck.
25  Q   And what happened to Kathy Buyck?

Page 235

1   A   Same thing. Master's prepared, with the system for a
2       long time, applied for numerous positions, and not even
3       able to get an interview.
4   Q   Okay. Do you know what position she applied for?
5   A   I do not.
6   Q   Do you know whether African-Americans were hired for any
7       of the positions she applied for?
8   A   I do not.
9   Q   Do you know the qualifications of any of the people
10      that -- for the positions she applied for?
11  A   If I don't know who they were, I don't know their
12      qualifications either.
13      MR. WAHL: Why are you shaking your head,
14      counsel? She's giving you testimony and you've been
15      doing that throughout the dep. I mean --
16      MR. MIGLIO: It's really none of your business
17      what I'm doing over here other than asking questions.
18      MR. WAHL: Well, no, you're commenting on
19      her --
20      MR. MIGLIO: I didn't --
21      MR. WAHL: Excuse me. You're commenting on
22      her testimony by the repeated shaking of your head. I'm
23      asking you to stop it. I mean you're acting as if, you
24      know, for some reason you're the judge here.
25      MR. MIGLIO: You don't need to worry about how

Page 236

1       I'm acting.
2       MR. WAHL: No, I need to know about the
3       integrity of my client's ability to testify, and sitting
4       there --
5       MR. MIGLIO: You know about the integrity of
6       your client's ability to testify.
7       MR. WAHL: Everytime she gives you --
8       MR. MIGLIO: And I'm getting a little bit
9       tired of you interrupting my examination.
10      MR. WAHL: Tough.
11      MR. MIGLIO: If you want to get the Judge on
12      the phone, we can resolve this.
13      MR. WAHL: You threatened that before. Get
14      her on the phone.
15      MR. MIGLIO: All right. Let's go.
16      MR. WAHL: I'm going to talk --
17      MR. MIGLIO: Come on.
18      MR. WAHL: -- about the fact that you're --
19      MR. MIGLIO: Let's go.
20      MR. WAHL: -- continually shaking your head in
21      response to her answers, and I'm asking you to stop.
22      Now, what do you want to get the Judge on the phone for?
23      MR. MIGLIO: Let's get the Judge on the phone
24      because I'm sick and tired of you making a bunch of
25      speaking objections interfering with my examination.

59 (Pages 233 to 236)

Electronically signed by Lauri Sheldon (001-336-738-9633)                                        a6c3207c-a588-4746-8455-daabafd5685d

Monica Rogers
3/8/2016

| | Page 237 |
|---|---|
| 1 | Let's go. |
| 2 | MR. WAHL:  Here. |
| 3 | MR. MIGLIO:  All right.  Off the record. |
| 4 | (Whereupon a recess was taken at or about the |
| 5 | hour of 4:49 p.m., and the deposition was resumed at or |
| 6 | about the hour of 4:53 p.m.) |
| 7 | (Exhibit 35 marked.) |
| 8 | Q  (Continuing by Mr. Miglio):  So let me show you what's |
| 9 | been marked as Exhibit 35. |
| 10 | MR. WAHL:  Do we have a 34? |
| 11 | MR. MIGLIO:  Yeah, we have a 34. |
| 12 | MR. WAHL:  All right.  We're on 35. |
| 13 | Q  (Continuing by Mr. Miglio):  So do you remember being |
| 14 | interviewed by the Department of Labor? |
| 15 | A   Yes. |
| 16 | Q   And I notice this document that we received from you |
| 17 | isn't signed, but have you had a chance to review this |
| 18 | and does this accurately reflect your statements to the |
| 19 | compliance officer? |
| 20 | MR. WAHL:  Sorry, Monica.  Excuse me. |
| 21 | THE WITNESS:  No problem.  Yes. |
| 22 | Q  (Continuing by Mr. Miglio):  On the second page, the |
| 23 | handwritten numbered paragraph number 22? |
| 24 | A   Yes. |
| 25 | Q   He's got you saying here, "The senior consultant now |

| | Page 239 |
|---|---|
| 1 | A   I always wondered why, if I was a senior when I left, |
| 2 | why I wasn't brought back as a senior, so that was |
| 3 | always a question.  That's what I -- That's my answer. |
| 4 | It was always a question is why. |
| 5 | Q   All right.  So are you saying you should have been or |
| 6 | you don't know whether you should have been brought back |
| 7 | as a senior OHRD consultant? |
| 8 | A   What I'm saying is, based off of my discovery in January |
| 9 | 16th meeting as defined -- |
| 10 | MR. WAHL:  Provide a year, please.  January |
| 11 | 16. |
| 12 | THE WITNESS:  The January 16, 2013, meeting, |
| 13 | staff meeting, when it was indicated at that time that |
| 14 | the requirement for a senior consultant was two or more |
| 15 | system-level projects or programs, when I answered this |
| 16 | question, the answer was yes.  At the time I was brought |
| 17 | back I did not feel that I should have been brought back |
| 18 | at a senior level, because I didn't have the |
| 19 | understanding of what was required to be a senior |
| 20 | consultant. |
| 21 | Q  (Continuing by Mr. Miglio):  All right.  So now as you sit |
| 22 | here are you saying that, knowing what you know based on |
| 23 | this January 16th meeting, that you think you should |
| 24 | have been brought back in 2007 as a senior OHRD |
| 25 | consultant as opposed to being brought back as an OHRD |

| | Page 238 |
|---|---|
| 1 | requires a master degree and the consultant must have a |
| 2 | bachelor's degree.  They brought me back as a consultant |
| 3 | and not as a senior consultant."  Do you see that? |
| 4 | A   Yes. |
| 5 | Q   Were you ever aware of any time when the senior |
| 6 | consultant position didn't require a master's degree? |
| 7 | A   No. |
| 8 | Q   Okay.  And when you said to him, "They brought me back |
| 9 | as a consultant, not a senior consultant," what does |
| 10 | that mean, brought you back?  Brought you back from |
| 11 | where? |
| 12 | A   From the rotation. |
| 13 | Q   Okay.  And that would have been, you said, in 2007? |
| 14 | A   Yes. |
| 15 | Q   But as I understand it, you're not claiming that in 2007 |
| 16 | you should have been a senior consultant, or are you? |
| 17 | A   Yes. |
| 18 | Q   Yes, you're claiming that you should have been a senior |
| 19 | consultant in 2007? |
| 20 | A   Yes. |
| 21 | Q   Oh, I didn't understand that.  Okay.  So when you came |
| 22 | back and Bill Peterson arranged for this position, you |
| 23 | think you should have been given a senior consultant, |
| 24 | senior OHRD consultant position, not merely an OHRD |
| 25 | consultant position, correct? |

| | Page 240 |
|---|---|
| 1 | consultant? |
| 2 | A   Yes. |
| 3 | Q   Now, he asks you the question in paragraph 29, "So as I |
| 4 | understand there was no single promotion opportunity |
| 5 | where the job was posted and applications were accepted |
| 6 | and then a decision was made.  It was more along the |
| 7 | lines of reorganization within our organization and job |
| 8 | titles changed?  Is that correct?"  And then you say, |
| 9 | "Yes and no.  That was how they hired Cathy Lynn Smith |
| 10 | as a senior consultant." |
| 11 | Now, my question is what do you -- how was what |
| 12 | you were saying about Cathy Lynn Smith responsive to his |
| 13 | question as to whether or not there was a promotional |
| 14 | opportunity or whether it was a reorganization? |
| 15 | A   So the way I understood his question was was there ever |
| 16 | an opportunity when no single promotion where the job |
| 17 | was posted and a person was hired into that position, |
| 18 | and that's why I said, yes, that it happened with Cathy |
| 19 | Lynn Smith.  The job was posted.  She applied.  She got |
| 20 | the position. |
| 21 | Q   When was that? |
| 22 | A   2012. |
| 23 | Q   Okay.  And that position was posted because somebody |
| 24 | vacated it? |
| 25 | MR. WAHL:  Objection.  Foundation. |

60  (Pages 237 to 240)

Electronically signed by Lauri Sheldon (001-336-738-9633)                    a6c3207c-a588-4746-8455-daabafd5685d

Monica Rogers
3/8/2016

Page 241

1         THE WITNESS: Let's see. Yes.
2    Q   (Continuing by Mr. Miglio): Who was in that before Cathy
3         Lynn Smith?
4    A   I think -- Who was in that position? Was it Barbara
5         Bressack?
6    Q   Okay. And she got promoted to the next level up from
7         the senior OHRD consultant position?
8    A   Barbara was promoted to manager.
9    Q   And so then they hired Cathy Lynn Smith?
10   A   Yes.
11   Q   And did she have a master's degree?
12   A   I think so.
13   Q   We didn't talk about this Sammye Van Diver, or did we?
14   A   We did not.
15   Q   Okay. What happened -- What about Sammye Van Diver that
16        you claim was somehow discriminatory or that he or she
17        was passed over for promotions because of their race?
18   A   Based off of conversations with Sammye, she said that
19        she was told because of the fact that she was a female,
20        and she added that because she was black that she wasn't
21        promoted to the --
22   Q   What posi --
23   Q   Pardon me?
24   Q   Go ahead. I'm sorry.
25   A   To the -- She was applying for -- She's a manager and

Page 242

1         she was applying for the director position in her area.
2    Q   Director of what?
3    A   IT director position.
4    Q   Do you know who got the position?
5    A   Yes.
6    Q   Who was it?
7    A   It was a white male.
8    Q   And do you know what his qualifications were?
9    A   I don't.
10   Q   Do you know his name?
11   A   I don't.
12   Q   Do you know if he was more or less qualified than her?
13   A   I don't know the qualifications.
14   Q   So you -- So this is just somebody that says, "I was
15        passed over."
16        MR. WAHL: Because she was black.
17   Q   (Continuing by Mr. Miglio): She said -- Did she say she
18        was passed over because she was black and female?
19   A   That's what she said.
20   Q   Did you talk to any of these people that are listed in
21        paragraph 36 --
22   A   Hm-hmm.
23   Q   -- before you went down to the Department of Labor and
24        identified them as individuals who were passed over for
25        promotions because they were black?

Page 243

1    A   I did.
2    Q   Who did you talk to?
3    A   Each one of them. I was -- talked to them about this,
4        and after I went down I was told by the OFC, Mr. Louzon,
5        that -- to let them know that I had actually filed
6        because they would be contacted, and I did.
7    Q   Okay. And do you know what the outcome of the
8        investigation was?
9    A   Because I filed it at the same time as EEOC, the case
10       was transferred to EEOC.
11   Q   Okay. And what happened with the EEOC's investigation?
12   A   For?
13   Q   Into these promotions, discriminatory promotions.
14   A   They didn't look at any of these. They looked at it on
15       the individual basis.
16   Q   And what happened?
17   A   For me?
18   Q   What happened to any of these they looked at, do you
19       know?
20   A   I don't know.
21   Q   Now, did you ever talk to Patrick Payne about
22       identifying him as somebody who was discriminated
23       against?
24   A   I did.
25   Q   And what did he have to say about that?

Page 244

1    A   He was -- When I told him that I was going to, because
2        I did ask them, because I was told that some people may
3        be nervous about having their names, so before I did
4        that I talked to them, and he agreed. That's how I got
5        it. He gave me -- He's the one who gave me the
6        information about the EHR position. I wouldn't have
7        known otherwise.
8    Q   Did he ever indicate to you that he didn't agree?
9    A   No, he did not.
10   Q   Did you ever call him at home to discuss your complaint?
11   A   I called him on his cell. I don't know if he was at
12       home or not.
13   Q   You -- Had you ever heard that he complained about you
14       bringing into all of -- bringing him into all of this?
15   A   After the fact, yes, I did.
16   Q   And how did you hear that?
17   A   Through Derick Adams.
18   Q   And what did Derick Adams tell you?
19   A   He told me that people were upset that their names were
20       included.
21   Q   Do you remember a conversation with Patrick where you
22       told him that you had named him in your complaint
23       because you knew that he had applied for a position in
24       Talent Selection in 2011 and was not interviewed for the
25       position?

61  (Pages 241 to 244)

Electronically signed by Lauri Sheldon (001-336-738-9633)                              a6c3207c-a588-4746-8455-daabafd5685d

Monica Rogers
3/8/2016

Page 249

1  Q   And this is your signature that you -- on the bottom of
2      this document?
3  A   Yes.  This one is dated July 3rd, 2013.  This is
4      actually the first one.
5  Q   Okay.  And it says here, "Since my complaint, my
6      employer changed my OHRD consultant job description to
7      include all of the senior level tasks so they would not
8      have to promote me to the senior level consultant
9      position."  Do you see that?
10 A   I do.
11 Q   And the changing of the OHRD consultant job description
12     that's referred to in this charge that you filed, that's
13     the job description that came out of those meetings in
14     whenever it was when --
15 A   Yes.
16 Q   -- the OHRD consultant sat down and modified the job,
17     correct?
18 A   Correct.
19 Q   And it says here, "All of the senior level tasks were
20     included.  What does that mean?
21 A   That means to change it from the consultant to being
22     responsible for one program.  It went to two or more.
23 Q   Well, I guess what I'm asking you is it says "All of the
24     senior level tasks," and I was sort of thrown back by
25     "all."  All on the senior consultant job description

Page 250

1      or . . .
2  A   All of the ones that I was -- were completing before.
3  Q   Was there any discussion or deliberation about modifying
4      the senior consultant job description?
5  A   No.
6  Q   So they were just looking at the consultant position.
7  A   Correct.
8  Q   And was there some discussion about looking at all of
9      the position -- job descriptions as a result of what
10     might have been the Beaumont merger?
11 A   There was.
12         MR. WAHL:  Objection to form.  Foundation.  Go
13     ahead.
14         THE WITNESS:  There was -- I do recall a
15     conversation that that may happen, that all the
16     positions in OD would be looked at, depending on whether
17     or not we would merge with Beaumont.
18         (Exhibit 41 marked.)
19 Q  (Continuing by Mr. Miglio):  Now, let me show you what's
20     been marked as Exhibit 41 and ask you if you can tell me
21     what this is.
22 A   This was the form that I completed when I saw Dr. Bodnar
23     for the EAP for the behavioral assessment.
24 Q   And you got this from Dr. Bodnar?
25 A   From his office, yes.

Page 251

1  Q   He says here, "Visit requested for evaluation only," it
2      looks like.
3  A   Hm-hmm.
4  Q   "Recommend follow up with EAP."
5  A   Hm-hmm.
6  Q   Do you see that?
7  A   I do.
8  Q   Did you follow up with EAP?
9  A   I never went back to the department, so no.
10 Q   What did you have to do with following up with EAP,
11     though?
12 A   Because it was a recommendation that Laurie made in her
13     request.  Her original request was for EAP, and so he
14     said he was going to tell me -- He thought I was going
15     back to that same job, and so he recommended that I
16     follow up with EAP for support.
17 Q   But this recommendation to follow up with EAP, as I'm
18     reading it, was a recommendation by the doctor, right?
19 A   Based off of what he said.  He said, "I see in this
20     request that" -- something about the original meant
21     about EAP.  He said, "And I'm just going to recommend
22     that you keep those appointments or make your
23     appointments with EAP," but I never went back to the
24     job.
25 Q   I know, but what made you think that going back to

Page 252

1      the job -- Strike that.
2          What made you think that following up with EAP
3      was conditioned on whether you went back to your job?
4  A   Because it all had to do.  That was the reason that this
5      was happening was because of the job, so if I'm not in
6      the job, why would I need to go back to EAP?
7  Q   And when you said that Laurie Jensen made the
8      recommendation that you follow up with EAP, where would
9      that be?
10 A   I have no idea.  This is based off the conversation I
11     had with Dr. Bodnar.
12 Q   Now, what happened when you came back from the EAP
13     referral?
14 A   Wait a minute.  Not this case.  In 2010?
15 Q   Well, they sent you for a fitness for duty evaluation.
16 A   Oh, see, this wasn't EAP.  So after I came back, I went
17     home.  This was occupational med, not EAP.
18 Q   Okay.
19 A   So --
20 Q   So they sent you for a fitness for duty examination.
21 A   Yeah.
22 Q   Who told you you were going?
23 A   Derick Adams.
24 Q   What did he say to you?
25 A   He said that we want to send you for a fitness for duty

63  (Pages 249 to 252)

Electronically signed by Lauri Sheldon (001-336-738-9633)                    a6c3207c-a588-4746-8455-daabafd5685d

Monica Rogers
3/8/2016

Page 253

```
 1    eval.
 2  Q   What did you say?
 3  A   I said, "Okay. Fine."
 4  Q   All right. Did he explain why?
 5  A   No.
 6  Q   Did you ask him why?
 7  A   Well, they put me off because they told me that they
 8      thought that I was a danger in a work place or a threat
 9      to myself or others, so that -- it was clear why.
10  Q   I'm just asking you what Derick Adams told you.
11  A   I'm just telling you what he --
12  Q   Well, when he told you you were going to EAP or when he
13      was having you sent for a fitness for duty examination,
14      he told you and you said, "Okay"?
15  A   Right.
16  Q   And then was there any other discussion between you and
17      him?
18  A   No. He told me, "I will call you and I will get it set
19      up and I'll call you to let you know when your
20      appointment is."
21  Q   Okay. And did you question him why at that time?
22  A   No.
23  Q   Is that because somebody else told you why you were
24      being referred?
25  A   He had told me that people felt that I was a threat in
```

Page 254

```
 1      the workplace.
 2  Q   In this conversation we've been talking about.
 3  A   All of this -- This was in -- When he took me off work,
 4      all that conversation took place that I was going to be
 5      off work and they were going to have me go for a fit for
 6      duty. All that took place in the same -- at the same
 7      time. So I knew why. He had just told me why.
 8  Q   So when you went for the fitness for duty examination
 9      you saw Dr. Bodnar?
10  A   Correct.
11  Q   And Dr. Bodnar told you what, if anything, about
12      returning to work?
13  A   He told me that you are eligible to -- "You're fit to go
14      back to work. I'm sorry that you had -- I don't know
15      why they sent you down here," and he apologized and that
16      was it. And he told me because -- about the issues of
17      going on with work, he said that, you know, to go for
18      support, you know, for EAP. This was all a part of the
19      whole thing.
20  Q   He told you to go to support for EAP?
21  A   No. He said he was going to recommend to follow up with
22      EAP as indicated on some previous documentation that he
23      had received for me to get this fit for duty.
24  Q   So after the fitness for duty exam was done, you go
25      home. And when's -- Correct?
```

Page 255

```
 1  A   Yes.
 2  Q   When's the next time you hear from anybody at Henry Ford
 3      Health System?
 4  A   It was probably -- It may have been a week afterwards,
 5      because I went -- I think I heard from Derick to say
 6      that he hadn't gotten the results back or something.
 7      And so when he did get the results back he called me to
 8      tell me he got the results and he wanted me to
 9      schedule -- he wanted to a schedule a meeting for me to
10      come in to talk to him about it.
11  Q   And did you schedule a meeting?
12  A   He did. Yes.
13  Q   And was it at his office?
14  A   It was at his office at HAP.
15  Q   Just the two of you present?
16  A   And Jan Harrington was there also.
17  Q   So tell me everything you can remember about what was
18      said during that meeting by anybody.
19  A   So he told me that, "I got the results back, and it's
20      just like you said, there was nothing -- going to be
21      anything in it, and you are, you know, you're fit to go
22      back to work." And so we talked about -- He said,
23      "so -- I know that you asked me in the beginning to give
24      you examples of what you had done for us to make you
25      fit -- have this exam, and I didn't tell you anything."
```

Page 256

```
 1      He says, "This is all new to us," something to that
 2      effect. "We've never done this before and we made a lot
 3      of mistakes." And he said, "but I talked to people and
 4      people said that you hit the desk and they said that --
 5      they brought up this thing about -- they said that you
 6      took a baseball bat to a woman's car." And at that
 7      point I said, "You know what? I am not here to defend
 8      myself. Whatever they said, they said, and I'm not
 9      going to go back and forth it's true, it's not true." I
10      said, "First of all" -- I'm thinking to myself, if I had
11      banged the a's car up, don't you think she would have
12      filed a police report if I had done that to anybody?
13          But anyways, so we continue to talk. So he
14      says, "So what are you going to -- What's going to
15      happen when you go back to work?" I said, "What do you
16      mean what am I -- what's going to happen?" I said, "I'm
17      going to go back to work and continue to do my job."
18      And he says, "Well, we feel that the people that you
19      work through -- with have already gone through enough
20      and they've been made to choose sides and we want to
21      offer you an opportunity, a once-in-a-lifetime
22      opportunity" -- No, he says, "You don't have to" -- He
23      says, "I don't know how much longer you're going to have
24      to work," and he says, "but this is a once-in-a-lifetime
25      opportunity for you to think about what it would take
```

64   (Pages 253 to 256)

Electronically signed by Lauri Sheldon (001-336-738-9633)                    a6c3207c-a588-4746-8455-daabafd5685d

Monica Rogers
3/8/2016

Page 257

1    for you to retire and drop all -- in lieu of dropping
2    all charges," he says, "or we have somebody that's going
3    to go out on a maternity leave and we need -- and work
4    is going to only have one person to do all the work, and
5    we need help here, so that will be a position, an HR
6    business partner position that -- open here at HAP for
7    you." And I said, "Are those all the options?" I
8    said -- You know, and he said, "Yeah." And Jan said,
9    "Yes, those are the only options you have. Either take
10   this job or a settlement." And I said, "Well" -- Jan
11   said, "Do you think that you would be able to be loyal
12   to the company?" I said "Yes, I would." I said, "This
13   has nothing to do with the company." I said, "These
14   people that I filed the charge against just happen to
15   work here." I said, "I love Henry Ford. Otherwise, you
16   know, I wouldn't still be here." And she said -- She
17   said that, "Well, you know, we're going to give you an
18   opportunity" -- I said to them rather that, "I'm not
19   prepared to give you an answer today," and they said,
20   "Well, take a couple days to think about it and let me
21   know, and if you need more time, call me back and I'll
22   be willing to extend that time."
23        So I thanked them for the meeting, they thanked
24   me, and I left. And then after the first day that he
25   suggested, I called him back. I called him back and

Page 258

1    told him that after thinking about what my
2    responsibilities were at home with my daughter that's in
3    the college and stuff, I called him back and told him
4    that I was -- needed more time to think about it with my
5    husband and I would get back to him. So I -- the second
6    date I called him back and told him that I'd made a
7    decision to take the job, and he said, "You are? You're
8    going to take the job?" And I said, "Yeah." I said, "I
9    need to be able to provide Health Insurance coverage for
10   Desteni." So he said, "Well, when are you able to come
11   to work?" I said, "I can come tomorrow." He said,
12   "Well, why don't we make it -- your start date on a
13   Monday?" And I came on that Monday, I think it was
14   October the 14th, to start that position.
15   Q    What position was that?
16   A    HR business partner.
17   Q    And during the time that you were considering what he
18        had said, what were the options that you were
19        considering precisely?
20   A    That they gave me to consider was how much money that --
21        to come up with a dollar amount in order to leave the
22        job or if I wanted to take the business partner
23        position.
24   Q    Wait. So now you're saying he said come up with a
25        number?

Page 259

1    A    Yeah. He didn't give me a number. He told me, "You
2         tell us what number and we'll respond to that number,
3         and we'll see if we can meet you."
4    Q    So you decided that, instead of giving him a number,
5         that you wanted to take the business partner position.
6    A    I wanted to work is what I decided, and was my only
7         option of a place to work was in that business partner
8         role.
9    Q    What are the requirements for the business partner
10        position?
11   A    They gave me a job description. You mean educational?
12   Q    Educational experience?
13   A    I don't know what the experience is, but I'm sure that
14        it says a bachelor's degree.
15             (Exhibit 42 marked.)
16   Q    (Continuing by Mr. Miglio:) Let me show you what's been
17        marked as Exhibit 42.
18   A    Hm-hmm.
19   Q    And if I understand this document correctly, this is a
20        letter that you wrote to the compliance officer of the
21        Department of Labor?
22   A    Yes.
23   Q    Attempting to clarify some of the questions or
24        statements that were on his previous interview form that
25        we marked as Exhibit 35.

Page 260

1    A    Yes.
2    Q    In paragraph 14 there it says, "My overall
3         performance -- annual performance score are weighted as
4         follows," and then you have 35, 30, 15 for these various
5         jobs. Where did you get that from, a performance
6         evaluation?
7    A    My manager and I together agreed that that's how the
8         position was weighted, my responsibilities were
9         weighted.
10   Q    Would we see this on a performance evaluation?
11   A    I would think so. Yes.
12   Q    I mean when you say "we agreed," I mean is that
13        agreement reduced to writing in some way, shape, or
14        form?
15   A    We have to put those weights on -- in the performance
16        measures, but I don't know when you print them off if
17        you will see those. That's what I'm . . .
18   Q    Well, when you wrote this letter, how could you remember
19        what these were?
20   A    Because it was my performance eval. I can see it. When
21        I go in there you can see it.
22   Q    So it's on your performance eval.
23   A    Yes, but what I'm saying to you is that I don't know if
24        when you print it off if it prints off the weighted
25        area, whether or not it just prints off goals.

Electronically signed by Lauri Sheldon (001-336-738-9633)                                    a6c3207c-a588-4746-8455-daabafd5685d

Monica Rogers
3/8/2016

---

Page 261

1    (Exhibit 43 marked.)
2  Q  (Continuing by Mr. Miglio:  Let me show you what's been
3     marked as Exhibit 43.
4  A  Okay.
5  Q  And tell me what this is.
6  A  It looks like what I wrote up on the day that I was put
7     on leave.
8  Q  So that would be what date exactly?
9  A  That would be on September the 11th, 2013.
10 Q  Okay.
11 A  That's when I started.
12 Q  And what about the subsequent entries?  You got one
13    for --
14 A  Yeah.
15 Q  -- 17 --
16 A  That was the beginning, so they're listed by dates of
17    what the conversations took place.
18 Q  So would you have made these entries on this document on
19    the date that the conversations took place?
20 A  Absolutely.
21 Q  Okay.  Where is this document -- Where was it generated?
22 A  At home.
23 Q  And did you have notes that you were relying on?
24 A  I wrote them immediately after they happened.
25 Q  So you typed this stuff in.

---

Page 262

1  A  Yes, I did.
2  Q  Now, this meeting that you had with Dr. Bodnar on
3     September 20th, 2013, I mean did you make notes right
4     when you were there?
5  A  No.
6  Q  Looks like it's a question-and-answer --
7  A  No.
8  Q  -- format.
9  A  I made this at home.
10    MR. WAHL:  It's on the last page.  Not on that
11    page.
12 Q  (Continuing by Mr. Miglio:  So if you look at the top of
13    page two, the first paragraph says, "Derick stated when
14    does this end?  I stated it ends when the government
15    completes the investigation."
16 A  Hm-hmm.
17 Q  "Derick stated you haven't moved at all from your
18    original position.  I stated this was something that I
19    about and will allow the process to work.  In the end,
20    if the government doesn't find anything, then that's the
21    end of it."
22 A  Right.
23 Q  So what was the government investigation that you were
24    talking about?
25 A  The EEOC claim.

---

Page 263

1  Q  Okay.  The EEOC claim that you hadn't been promoted.
2  A  The discrimination claim.
3  Q  What was the outcome of the investigation?
4  A  Is that they're -- They -- No similarly -- The
5     comparisons were not exact.
6  Q  So in the end the government didn't find anything.
7  A  The letter says that, as the statutes state, that they
8     couldn't find anything that fit the statutes, correct.
9  Q  So does that mean for you that's the end of it?
10 A  It's not the end of it, because they did find cause on
11    the second one, so -- and when that's -- so that was it.
12 Q  So what specific events or things that happened to you
13    do you believe was a result of retaliation for filing
14    the first EEOC charge -- Strike that.  For complaining
15    about not being promoted and filing the first EEOC
16    charge?
17 A  So repeat your question.
18    MR. MIGLIO:  Read it back, will you?
19    (Whereupon the following portion of the
20    transcript was read as follows:
21    "Q So what specific events or things that
22    happened to you do you believe was a result of
23    retaliation for filing the first EEOC charge -- Strike
24    that.  For complaining about not being promoted and
25    filing the first EEOC charge?")

---

Page 264

1     THE WITNESS:  What specific things --
2  Q  (Continuing by Mr. Miglio:  Yeah.  How do you feel you
3     were retaliated against for complaining about
4     discrimination?
5  A  I was denied job assignments.  My one-on-one meetings
6     were discontinued, so I wasn't included in meetings
7     where the other staff members were invited to.  In
8     addition to that, I got put out and not allowed to come
9     back to my job when I for -- and all I did was come
10    forward with a complaint, and I feel that it was all in
11    retaliation because as a black woman I was not afraid to
12    voice my concerns and I made them known.
13 Q  Okay.  So when you say, "I was denied job assignments,"
14    what job assignments were you denied?
15 A  Before all this happened with the Beaumont merger, since
16    I was responsible for the culture piece for the system,
17    there was a culture piece in team, work team that was
18    put together for Beaumont, and I started, I guess, in
19    December or Jan -- they started in January, I think it
20    was, is when we started having these conversations, and
21    at that time, you know, I was told I was going to be put
22    on the team, and it wasn't until -- in sometime in May
23    right before the Beaumont merger was canceled that I was
24    put on the team, but meanwhile everybody else in the
25    entire department had been put on Beaumont teams and

66 (Pages 261 to 264)

Electronically signed by Lauri Sheldon (001-336-738-9633)                    a6c3207c-a588-4746-8455-daabafd5685d

Monica Rogers
3/8/2016

|                          Page 265                          |
| --- |

1          were participate -- attending and participating in those
2          merger meetings.  I was not.
3     Q    All right.  So what teams are you saying you should have
4          been put on?
5     A    I'm saying Beaumont merger team meetings for culture.
6     Q    Okay.
7     A    Yes.
8     Q    And how long did these culture meetings go on for?
9     A    They went on until the Beaumont merger was canceled.
10    Q    Did you ever raise the fact that I'm not in a culture
11         meeting with anybody?
12    A    I talked to Laurie about it.
13    Q    And what did Laurie say?
14    A    "I'm going to put you on.  I'm going to bring you on."
15         When we get to another part I'm going to bring you on."
16         And that happened around in May, and I think that -- or
17         end of April maybe, but the culture team, the whole
18         Beaumont merger was off within a few weeks.
19    Q    So who were the people who were on the culture team?
20    A    Laurie and Amy, the ones -- and people from other
21         departments outside of HR.
22    Q    So just Laurie and Amy Schultz were on the culture team
23         from your department.
24    A    Yes.
25    Q    And did somebody originally tell you you would be on the

|                          Page 266                          |
| --- |

1          team before?
2     A    Laurie did.
3     Q    Okay.  And how often did the team meet?
4     A    A lot.  Sometimes two or three times a week.
5     Q    Okay.  So how long did that period last when you weren't
6          going to those meetings?
7     A    About five months or more.
8     Q    And you wanted to be there?
9     A    Absolutely.
10    Q    Okay.  What other assignments were you denied because of
11         what you claim was retaliation?
12    A    My one-on-one meetings that continued and took place for
13         every other person in the department, mine stopped.
14         Every time I had one it got canceled.
15    Q    And those one-on-one meetings were with who?
16    A    With Barbara.
17    Q    Okay.  So your testimony is from what period of time
18         until what period of time did you not have one-on-one
19         meetings with Barbara?
20    A    Oh, starting sometime probably from June or July until I
21         left I didn't have any.
22    Q    June and July of what year?
23    A    Of -- Sorry.  June and July of 2013 through September
24         11.
25    Q    And are they supposed to be monthly --

|                          Page 267                          |
| --- |

1     A    2013.
2     Q    -- weekly meetings?
3     A    Weekly.
4     Q    Your testimony is from July of -- June of 2013 till you
5          left the department you didn't have any one-on-one
6          meetings with Barbara?
7     A    If -- I am thinking about this because I noted this,
8          because I talked to Patti about it and approx -- those
9          are approximate dates, yes.
10    Q    No meetings, though.
11    A    In June.  Pardon me?
12    Q    No meetings you had during that time period.
13    A    I had a meeting which she -- with Laurie and Barbara the
14         day before I was terminated.  They wanted me to give
15         them all the stuff that I was working on.
16    Q    I'm not talking about that.  I'm asking you about
17         one-on-one meetings.
18    A    You said, "No meetings."  You didn't say no --
19    Q    I meant no one-on-one meetings at all during that period
20         of time.
21    A    As far as I recall, that's correct.
22    Q    Okay.  Would you have kept one-on-one meetings on your
23         calendar, on your computer?
24    A    Sometimes, but not -- since they were regular, they may
25         not have been on there.

|                          Page 268                          |
| --- |

1     Q    Were they at a regular date and time?
2     A    Most of the time.
3     Q    Okay.  So how would you receive notice from Barbara that
4          they would be canceled?
5     A    By email.
6     Q    So you're saying that every week that you had a meeting
7          scheduled she sent you an email or told you they were
8          canceled.
9     A    Or she wouldn't be there.
10    Q    So you showed up and they weren't there.
11    A    Yeah, she -- her office was like right next to mine.
12    Q    And did you go to her like after she missed or canceled
13         the first couple of meetings and say, "Hey, what's going
14         on?"
15    A    No, I didn't.
16    Q    Did you have trouble getting along with her?
17    A    Not at all.
18    Q    Okay.  Why didn't you ask her why she was canceling
19         meetings or not making them?
20    A    At this time there was so much.  I was so trying to just
21         do the right thing and not make waves.  I figured if she
22         canceled it, it was canceled.
23    Q    Wait.  During what period of time were you trying to do
24         the right thing and not create waves?
25    A    The whole period since January of 2013.

Tri-County Court Reporters
248-608-9250

Electronically signed by Lauri Sheldon (001-336-738-9633)                                    a6c3207c-a588-4746-8455-daabafd5685d

Monica Rogers
3/8/2016

Page 269

1  Q   Well, you filed how many complaints during that period
2       of time?
3  A   Three.
4  Q   Okay. And that's not making waves?
5  A   It's not, because it's my protected right to do so, so
6       no, it's not making waves at work.
7  Q   I'm asking you what you said you were trying to --
8  A   I was not -- What I do outside of work, I filed that
9       complaint, I was not making any waves at work. I was
10      not.
11 Q   Well, you filed an internal complaint about not getting
12      promoted.
13 A   Right.
14 Q   And you filed another internal complaint about being
15      retaliated against.
16 A   Yes.
17 Q   Went to the OFCCP.
18 A   Yes.
19 Q   And you went to the EEOC twice.
20 A   Yes, I did.
21 Q   And that is not what you -- that's what you consider
22      as -- Well, strike that.
23          MR. WAHL: You know, and you're mixing up the
24      dates. She --
25          MR. MIGLIO: We don't need it, really.

Page 270

1  Q   (Continuing by Mr. Miglio): All right. So why didn't you
2       just go to her if you were so focused on doing your job
3       and say, "Barbara, let's have a one-on-one meeting"?
4          MR. WAHL: I thought she said --
5          THE WITNESS: Why would I do that if she -- if
6       I felt that was intentionally not meeting with me? Why
7       would I do that?
8  Q   (Continuing by Mr. Miglio): You had a good relationship
9       with her.
10 A   I thought.
11 Q   So you never asked her at any point in time why she
12      canceled the one-on-one?
13 A   No, I didn't.
14 Q   Okay. So we'll be able to look through your emails to
15      see emails from her where she told you the meeting was
16      canceled.
17 A   You should be able to.
18 Q   Okay.
19 A   Or like I said, she wasn't there.
20 Q   Or did you ever cancel them?
21 A   Did I ever cancel a meeting? Not that I recall.
22 Q   Okay.
23          MR. WAHL: If you're looking through her
24      emails, produce them to us, too, or give us access at
25      some point.

Page 271

1  Q   (Continuing by Mr. Miglio): So in addition to the
2       assignment that you said you missed, which was not being
3       on the culture meeting -- in the culture meetings, you
4       missed the one-on-one meetings with Barbara Briassard
5       {sic}. How else were you -- did you feel you were
6       discriminated against, retaliated against?
7          MR. WAHL: Asked and answered. She already
8       told you, but go ahead.
9          MR. MIGLIO: Anything else?
10         MR. WAHL: She already told you. Go ahead.
11         THE WITNESS: That's it.
12         MR. WAHL: She also told you she got removed
13      from her job.
14         MR. MIGLIO: You know, really.
15         MR. WAHL: Well.
16         MR. MIGLIO: Is that a form of objection that
17      I'm not familiar with under the rules or is that
18      calling --
19         MR. WAHL: Well, it's asked and answered.
20         MR. MIGLIO: -- coaching your witness
21      improperly?
22         MR. WAHL: You know, you might be right.
23         MR. MIGLIO: Okay. We'll see -- I know I'm
24      right.
25 Q   (Continuing by Mr. Miglio): So did you think that sending

Page 272

1       you to -- for a fitness for duty was retaliation?
2  A   I did.
3  Q   And who did you think was responsible for that?
4  A   Laurie Jensen.
5  Q   Okay. Anybody else?
6  A   No.
7  Q   And how's your relationship been with Derick Adams?
8  A   Good.
9  Q   Do you get along with him?
10 A   Yes.
11 Q   Has he been a good manager for you?
12 A   Yes.
13 Q   Do you find him to be truthful?
14 A   Yes.
15 Q   Do you find Barbara Bressack to be a truthful person?
16 A   Yes.
17 Q   What about Jan Harrington-Davis?
18 A   I don't know her that well. I have {sic} worked that
19      close with her, so I can't answer that.
20 Q   Do you have any idea, other than Patrick Payne and maybe
21      Laurie Jensen and Barbara Bressack, who else might have
22      had concerns about your behavior, that you might not be
23      safe or you might be somebody who would be a safety
24      risk?
25         MR. WAHL: Objection to form, but go ahead.

68  (Pages 269 to 272)

Electronically signed by Lauri Sheldon (001-336-738-9633)                a6c3207c-a588-4746-8455-daabafd5685d

Monica Rogers
3/8/2016

---

Page 277

1  putting down the things that I felt that I needed to
2  remember.
3          (Exhibit 46 marked.)
4  Q  (Continuing by Mr. Miglio):  I show you what's been marked
5  as Exhibit 46.
6  A  Okay.
7  Q  What is this?
8  A  My notes on my first day of work as a business partner
9  at HAP.
10 Q  Why are you documenting your first day at work?
11 A  Because I was documenting everything.
12 Q  I see that.  But was there something in particular that
13 you were --
14 A  No.
15 Q  -- making note of when you made these documents?
16 A  No.
17 Q  Have you made documents of other things that have
18 happened to you since October 14th of 2013?  Because we
19 don't have them.
20 A  I don't recall documenting anything else as it relates
21 to this case, no.
22 Q  I mean anything that happened to you as a business
23 partner that you think is discrimination or retaliation
24 or anything like that?
25 A  I don't know if I documented the one thing or not.  I

---

Page 278

1  think that you have all the notes that I had.
2  Q  So you made no documents after starting your first day
3  as a business partner concerning any events that you
4  considered to be discriminatory or retaliatory?
5  A  There was, you know, one thing that happened, but I
6  don't think that I documented it.
7  Q  What is that one thing?
8  A  It was when I was required to take on the duties of a
9  full HR benefits person, payroll, time keeper and forego
10 vacations, work during the holidays, and for taking on
11 an interim position while we transitioned HAP Midwest
12 over to Henry Ford Health System, and I talked to Derick
13 about all these additional roles and I had asked him for
14 all these additional duties that I was performing would
15 I be -- would he consider an interim increase, and he
16 said that yes, that he would, and later after a couple,
17 probably a month or more when I asked him about it again
18 and he said that, yes, that I did ask about it and it
19 was denied.
20 Q  So you were asking for an increase?
21 A  For, yes, taking on a manager role.
22 Q  What was the manager role you were taking on?
23 A  We had to transition a non -- well, a company that Henry
24 Ford bought in 2011 that were currently on their same
25 benefit structure, pay structure, payroll, tracking

---

Page 279

1  system, and transition them over to our PeopleSoft
2  system and do, you know, benefit comparisons, integrate
3  that culture that they had over to Henry Ford and
4  basically be a one-person HR department.
5  Q  How was that a manager role?
6  A  Because it was a manager that was responsible for . . .
7  Q  Who was the manager?
8  A  It was originally Jolene Jacobson.  It got transitioned
9  to me.
10 Q  Well, HAP was integrating its -- I mean Henry Ford
11 Health System was integrating its human resources
12 function with Midwest, wasn't it?
13 A  Henry Ford Health System, yes.
14 Q  And Health Alliance Plan.
15 A  Yes.
16 Q  And you were assigned to handle the Midwest, right?
17 A  Yes.
18 Q  So are you saying that you just wanted a pay increase
19 for the time period that you were doing what you
20 considered to be a manager job?
21 A  It was, because that's who was doing it before.
22 Q  How long did you do that work for?
23 A  I did that work for probably seven months.
24 Q  Was that, in your mind, discrimination?
25 A  No, that was -- You asked me was there any other notes

---

Page 280

1  that I had ever taken, and I said no, that I don't think
2  that I would have and -- that was related to this case,
3  and you said, "No, were there any other notes that you
4  were taking?"  So I'm not saying it was related to
5  discrimination.
6  Q  I thought I asked you whether or not you made any other
7  notes about what you considered to be discrimination.
8  A  No, you didn't.  I said to you that there was no other
9  notes as it relates to discrimination, and you said,
10 "Well, what about any other notes?"
11 Q  Did you document this having to take on a manager role?
12 A  That was my thing that I said to you.  My response was I
13 don't believe that I documented, but I could have.
14 Q  When you took over the business partner position did
15 your pay change from what it was as an OHRD consultant?
16 A  No, it did not.
17 Q  Since you've been in that position have you gotten any
18 increases?
19 A  Yes.  All business partners did.
20 Q  Now, do you like your job?
21 A  This job is very stressful, business partners.  It's all
22 problems, you know, people are bringing problems and issues for
23 you to revolve, with unions and dealing with that, so
24 it's a very stressful position.
25 Q  Do you like it?

70 (Pages 277 to 280)

Tri-County Court Reporters
248-608-9250

Monica Rogers
3/8/2016

---

**Page 297**

1     to discuss with African-American employees'
2     opportunities in the department?
3  A   Yes.
4  Q   Okay.  Were you there?
5  A   Yes.
6  Q   Do you have notes of the meeting?
7  A   No.
8  Q   What was said at the meeting?
9  A   We talked about Kathy Oswald led the meeting and the
10    African-Americans employees were the only employees that
11    were invited to the meetings, and it was -- they talked
12    about promotions, job opportunities, and respect for the
13    African-Americans, and specifically Patty Durr and I
14    both had conversations with her about our -- how we felt
15    that Laurie Jensen did not respect diversity and some of
16    the things that she would say, like "Why can't you guys
17    just do what I say without asking me questions?"  And
18    Patty responded, said that -- she said to Kathy that,
19    "We're not slaves."  And so it was a meeting about
20    respecting diversity and diversity sensitivity.
21  Q   So is -- Are you saying that Patty Durr said this at the
22    meeting with Kathy --
23  A   At the meeting.
24  Q   And she specifically singled out Laurie Jensen.
25  A   She said, yes, "my manager."  That's who she was at the

---

**Page 298**

1     time.
2  Q   Okay.  And what did she say about her?
3     MR. WAHL:  Say it.  Go ahead.
4  Q   (Continuing by Mr. Miglio):  Said this in front of a group
5    of all these African-American employees?
6  A   Yes.
7  Q   And what precisely did she say?
8  A   She said, to my recollection, is that, "Laurie wants us
9    to be people who don't have a voice.  She has said to
10    us, 'Why can't you just do what I say without asking
11    questions?'"  And Patti said that, "We're not slaves."
12  Q   Okay.  Did anybody respond to that?
13  A   I responded in kind by saying or talking about the
14    difficulties that I had had with her as it relates to
15    when she said to me, "You girls always use that as a
16    cop-out" when I was telling her how racially insensitive
17    she was to say that.
18  Q   Did you ever hear her say anything else racially
19    insensitive in all the time that you've known her?
20  A   Who?  Patty?
21  Q   Laurie Jensen.
22  A   No.
23  Q   Do you feel that you were discriminated against because
24    of your age?
25  A   I do.

---

**Page 299**

1  Q   Okay.  And how were you discriminated against because of
2    your age?
3  A   On more than four -- at least four occasions my age or
4    retirement was referenced.
5  Q   Okay.  What were those four occasions?
6  A   In a meeting with Laurie Jensen right before the meeting
7    that Jan and I had with her, and it's in -- is it 28?
8     MR. WAHL:  It's in one of the documents.
9     THE WITNESS:  Yeah, 28.  I think that was
10    September the 20 -- I'm sorry, January 23rd.  Right
11    before that meeting, which was a few days before, so
12    sometime between January 15th and January 23rd.  It
13    should be right in here.  It was -- Laurie had said
14    that, "I don't know about you" . . . Here it is.
15     January 17th is when she first said it.  "I
16    don't know about you, but I feel like I only have one
17    good job left."  Then when we met with Jan and we were
18    talking about the job, she made the same statement and
19    the same words, "I don't know about you, but we probably
20    only have one good job left."  And then the twice when I
21    came back to work to talk to Derick and to Jan when they
22    were talking to me about retirement and to take a
23    settlement.  So for those four -- on four occasions.
24  Q   (Continuing by Mr. Miglio:  So when you say Laurie Jensen
25    said on, what, two occasions, "I don't know about you,

---

**Page 300**

1     but I have one good job left"?
2  A   Yeah.
3     MR. WAHL:  It says, "What I feel that at our
4    age."
5     THE WITNESS:  Yes.  "At our age we only have
6    one good job left."
7  Q   (Continuing by Mr. Miglio:  What did you take from that?
8  A   That I was -- should be close to retirement.
9  Q   That's what you took from that?
10  A   Yeah.  At our age, one more job.
11  Q   How old is Laurie Jensen?
12  A   I don't know how old she is.  I think she's -- I know
13    she is younger than me, but I don't know exactly how old
14    she is.
15  Q   What if she was 45?
16  A   What if.  I'm not sure what your question is.
17  Q   Well, does that suggest that "at our age" is the same
18    age as you?  I'm just wondering what you took away from
19    that conversation.  If she's 55, she's ten years younger
20    than you, does that make a difference in terms of what
21    you understood the conversation to be?
22     MR. WAHL:  Objection.  Form and foundation.
23     THE WITNESS:  I guess I'm not understanding
24    what you're trying to get at.
25  Q   (Continuing by Mr. Miglio):  Well, you say that that

---

75 (Pages 297 to 300)

Tri-County Court Reporters
248-608-9250

Electronically signed by Lauri Sheldon (001-336-738-9633)        a6c3207c-a588-4746-8455-daabafd5685d

Monica Rogers
3/8/2016

|  | Page 301 |
|---|---|

1    somehow suggested to you that you had one more good job
2    left.
3    A    She said "we," not "I."
4    Q    She said, "I don't know about you."
5    A    Right.
6    Q    So she said, "I don't know about you, but I have one
7    more good job left."
8              MR. WAHL:  That isn't what she said, but go
9    ahead.
10             MR. MIGLIO:  If you don't stop that.
11             MR. WAHL:  That isn't what she said.
12             MR. MIGLIO:  That's not an objection.  That's
13   you testifying for the witness.
14             MR. WAHL:  No, you're just wasting time.  And
15   by the way, we're going to stop pretty soon.  It's going
16   to be seven hours.
17             MR. MIGLIO:  Okay.  Well, I don't think you're
18   right, but go ahead.  Take you chances.
19             MR. WAHL:  We'll ask the court reporter to --
20   Q   (Continuing by Mr. Miglio):  So the other comment was the
21   retirement by what Derick said?
22   A    Yes.  And Jan.
23   Q    And they said you could retire?
24   A    No.  They said, "I don't know how much longer you plan
25   to work.  This is a once-in-a-lifetime opportunity.

|  | Page 302 |
|---|---|

1    Maybe you want to think about, you know, being able to
2    retire and, you know, come up with a figure that we can
3    respond to for a settlement in lieu of dropping the
4    charges."
5    Q    Okay.  So is there anything else that you heard in the
6    way of age-related comments that you thought were
7    discriminatory?
8    A    That's it.
9    Q    So you said about age-related comments, so the question
10   is do you think that you were treated differently by
11   anybody because of your age?
12   A    I do.
13   Q    What and how were you treated differently because of
14   your age?
15   A    Based off of the conversations that they had, if I had
16   have been 30, I don't think they would be saying how
17   much time do you have to work and use this as an
18   opportunity to retire if I had been 30, so yeah, I think
19   it had to do with my age.
20   Q    I know, but what did they do to you because of your age?
21   A    They offered -- They offered me a settlement to drop the
22   charges or -- and that was the option.
23   Q    Okay.  But did anything negative happen to you as a
24   result of your -- what you think is your age?  I mean
25   because they said you can take a settlement or we'll

|  | Page 303 |
|---|---|

1    give you this position, I mean did -- What I'm asking
2    you is how were you treated differently because of your
3    age?
4    A    I was treated differently because of my age because of
5    the fact that they even mentioned it as an option, that
6    why don't you take the money and run, basically.
7    Q    Well, wait a second.  You filed --
8    A    You're at retirement already.
9    Q    You filed an EEOC charge, correct?
10   A    Correct.
11   Q    Do you remember signing a request to mediate the case
12   indicating that you were agreeable to discuss with Henry
13   Ford Health System --
14   A    And I --
15   Q    Let me finish.
16   A    I'm sorry.
17   Q    That you were interested in reaching a settlement out of
18   your EEOC charge?
19   A    She told me you have to be agreeable to conciliation.
20   Q    Well, I'm not asking you about conciliation.  I'm asking
21   you when you first filed the charge.
22   A    Right.
23   Q    You signed an agreement to mediate before they've even
24   investigated.
25   A    Right.

|  | Page 304 |
|---|---|

1    Q    Do you remember indicating your agreement to that?
2    A    Yes, I do.
3    Q    And you know it's optional?
4    A    What?
5    Q    You can pursue the charge or you can attempt to settle
6    with the employer.
7    A    But the employer, as part of the conciliation agreement,
8    they attempted all that and they turned it down, so
9    Henry Ford had said -- basically said they weren't
10   interested in that.  So why would I think that them
11   asking me the same second time had anything to do with
12   EEOC?  I didn't connect those two.
13   Q    We're talking about two different things.  Do you
14   understand that there's an agreement to mediate at the
15   beginning of when you file the charge?
16   A    Yes.
17   Q    And then as the EEOC goes through its investigation,
18   later on they send -- if they determine there is
19   possible probable cause, then they prepare a
20   conciliation agreement.
21   A    Yes.
22   Q    Okay.  So my question is do you recall, and we can have
23   the EEOC records, you indicating to the EEOC that you
24   were interested in mediating your case, settling it?;
25   A    Yes.

76  (Pages 301 to 304)

Electronically signed by Lauri Sheldon (001-336-738-9633)                                    a6c3207c-a588-4746-8455-daabafd5685d

Monica Rogers
3/8/2016

---

## Page 305

1  Q   Negotiating it.
2  A   Yes.
3  Q   Okay.  And then at some point in time in one of the
4      charges they produced a conciliation agreement.
5  A   Correct.
6  Q   Were you interested in signing that conciliation
7      agreement?
8  A   That I wanted to conciliate?  I was -- Yes, I was
9      interested in exploring that.
10 Q   Okay.  Did you ever see the conciliation agreement they
11     put together?
12 A   Yeah.
13 Q   And were you agreeable to it?
14 A   No.
15 Q   Okay.  Why not?
16 A   I didn't have a chance to deny it in the first place,
17     because Henry Ford turned it down, so it didn't -- it
18     wouldn't matter.
19 Q   I didn't ask you that.
20 A   I didn't get a chance to -- I didn't have the
21     opportunity to respond to it, in other words.
22 Q   Well, didn't they talk to you before they sent it to
23     Henry Ford Health System?
24        MR. WAHL:  Objection to form and foundation.
25 Q   (Continuing by Mr. Miglio:  I mean you got a copy of

---

## Page 306

1      conciliation agreement.
2  A   I did.
3  Q   And you didn't look through it and say, "Hey, I'm
4      interested in this" or "I'm not"?
5  A   Based off of the conversation that I had with the
6      investigator, that that was part of the process that I
7      had to be willing to try to negotiate.
8         MR. WAHL:  Do you have to go back through the
9      transcript to determine time of deposition?
10        MR. MIGLIO:  She can tell you.  You can ask
11     her to go back.  Go ahead.  See how much time we have,
12     if you want me to use it all up.
13        (Exhibit 49 marked.)
14 Q   (Continuing by Mr. Miglio:  Let me show you what we've
15     marked as Exhibit 49.  Does that look familiar to you?
16 A   Is that the same thing?
17 Q   Yes.
18 A   Yes.
19 Q   So did you review it and indicate to the EEOC you were
20     agreeable to it?
21 A   Yes.  You know, I reviewed this, but we never got -- I
22     never had to sign it because it never got past Henry
23     Ford.
24        (Exhibit 50 marked.)
25 Q   (Continuing by Mr. Miglio:  I show you what's been marked

---

## Page 307

1      as Exhibit 50.  So I think you said, and it's in one of
2      your statements, that you told Derick Adams that you
3      were okay going for the fitness for duty exam.
4  A   I didn't have a --
5  Q   And you weren't angry.  You weren't upset.
6  A   Yeah.
7  Q   And then apparently at some time you must have changed
8      your mind and thought this was retaliation.
9  A   I didn't have a choice.  I had to go.  It wasn't an
10     option to go or not.  They weren't asking me if I wanted
11     to go for a fitness for duty.
12 Q   Well, when he told you that you were going for a fitness
13     for duty exam did you tell him, "This is retaliation"?
14 A   I told him it was ridiculous is what I told him.
15 Q   Did you tell him it was retaliation?
16 A   No, I did not tell him it was retaliation.  The EEOC
17     told me that it was.
18 Q   Did your husband own a business?
19 A   Did he own a business?  No.
20 Q   Does he own a business or affiliated with a business
21     called Gold Coast?
22 A   Oh, he used to.
23        (Exhibit 51 marked.)
24 Q   (Continuing by Mr. Miglio:  I show you what's been marked
25     as Exhibit 51.

---

## Page 308

1  A   Hm-hmm.
2  Q   Did you do work for that business?
3  A   No.
4  Q   What is this?
5  A   What is what this?
6         MR. WAHL:  By "this," he means 51.
7  Q   (Continuing by Mr. Miglio:  Exhibit 51.
8  A   Oh, it looks like the same document that you looked
9      at -- I looked at earlier.
10 Q   Well, it does, but it is different, and I'm wondering
11     where this one was produced and what it was used for.
12     Another complaint or what?
13 A   It looks the same as one of these.  Let me see.  This
14     says July 8th I filed that first one.  This may have
15     gone with the second complaint along with that notice to
16     Derick and Dan Champney.
17 Q   So the answer is you don't know.
18 A   It appears that this could have been used to go with the
19     complaint, the second one.
20        MR. WAHL:  That's what she just said.
21        (Exhibit 52 marked.)
22 Q   (Continuing by Mr. Miglio:  Let me show you what's been
23     marked as Exhibit 52.
24 A   Hm-hmm.
25 Q   What is this about?  Is this your handwriting at the

77  (Pages 305 to 308)

Electronically signed by Lauri Sheldon (001-336-738-9633)                                    a6c3207c-a588-4746-8455-daabafd5685d

Monica Rogers
3/8/2016

Page 345

1    Q    Okay.  So --
2    A    We may not tell them who, but we tell them what.
3    Q    All right.  So you would have expected Derick Adams to
4         tell you that somebody said you made this statement
5         about breaking windows with a baseball bat --
6    A    Absolutely.
7    Q    -- that you acted bizarrely in a meeting, that you
8         said --
9    A    Absolutely.
10   Q    -- justice will be served and so forth.
11   A    Absolutely.
12   Q    All right.  And that's the protocol that you should have
13        recommended managers to follow?
14   A    Yes, it is.
15   Q    And that would have been the protocol that you would
16        have recommended after looking at the Henry Ford Health
17        System policy?
18   A    Yes.  After applying the policy.
19   Q    So when Derick Adams started having this conversation
20        with -- about this --
21   A    Hm-hmm.
22   Q    -- afterwards you said something to the effect you
23        weren't here to defend yourself.  Do you remember saying
24        that?
25   A    Yes, I do.

Page 346

1    Q    And you said that in response to what?
2    A    When Derick said, "People said you hit the table and
3         that you took a baseball bat to someone's car that you
4         thought was having an affair with your husband," and I
5         said, "That is ridiculous, and I'm not here to try to
6         defend what these employees said.  That is so ridiculous
7         and" -- and that was basically it.  And he started off
8         with the rest of the conversation.
9    Q    See, now I didn't hear that as part of your answer to
10        Mr. Wahl's question or my earlier question.  So now
11        you're saying you told Derick Adams that that was
12        ridiculous --
13            MR. WAHL:  She said that both times.
14            MR. MIGLIO:  Don't interfere.
15   Q    (Continuing by Mr. Miglio:  As opposed to just saying,
16        "I'm not here to defend myself"?  So now you're saying
17        you told Derick, "That's ridiculous.  I've never done
18        that"?
19   A    I told Derick when he was in his office and he was --
20        Wait a minute.  Let me just --
21   Q    Just answer my question.
22   A    I told Derick that it was ridiculous.
23   Q    Okay.  And --
24   A    When -- Because I told him, I said, "This is ridiculous"
25        when he first called me in to take me off-line, and I

Page 347

1         told him, I said that, you know, "I'm laughing," and I
2         said, "not because I think it's funny.  I think this is
3         the most ridiculous thing I've ever heard of."  So yes,
4         I did tell Derick Adams that.
5    Q    Why would you be laughing?
6    A    Because it was the most ridiculous thing I've heard
7         that I've -- that somebody thinks that I'm a threat in
8         the workplace.  I am an opinionated person.  I am.  I'm
9         very passionate about those things that I believe in.
10        But I have never had an outburst in a meeting.  I've
11        never walked out and slammed the door or been in a --
12        acting in a threatening manner unless somebody thinks
13        that I'm talking at this level is threatening.  I'm --
14        That's -- That's it.
15   Q    Have you ever acted the way you just acted in a meeting?
16            MR. WAHL:  Wait a minute.  What do you mean by
17        "just acted"?
18            THE WITNESS:  How was I just acting?
19   Q    (Continuing by Mr. Miglio):  Have you ever acted in a
20        meeting with colleagues the way you just acted?
21   A    How was I acting?  Tell me how that was, and I can tell
22        you yes and no.
23   Q    Well, you know how you were just acting.
24   A    No, I -- How did you perceive me to act?
25   Q    I'm just asking you if you ever acted in the same manner

Page 348

1         that you did when you were giving me that answer.
2    A    I don't know how I was acting, because you can't
3         describe it to me.
4    Q    Didn't you tell Dr. Bodnar that you modified your
5         behavior after being sent to EAP the first time?
6    A    Yes, I did.
7    Q    That you learned to pause instead of getting, you know,
8         going forward and listening more and that kind of stuff?
9    A    What I -- Exactly.  To do less talking.
10   Q    When you were doing what you considered to be senior --
11        Strike that.
12            Did anybody ever give you any advice to
13        complete your degree so you could be promoted or rise
14        through the ranks of Henry Ford Health System?
15   A    I told you a long time ago Patrick Irwin talked about me
16        going back to school.
17   Q    Do you know of anyone -- anyone -- who was in a
18        position, the job description or the job requirements of
19        which called for a master's degree when they didn't even
20        have a bachelor's degree?  Anyone in any time in any
21        place at Henry Ford Health System.  Do you know anybody
22        who occupied that kind of a position that required a
23        master's degree when they didn't even have a bachelor's
24        degree?
25   A    Yes.

87  (Pages 345 to 348)

Electronically signed by Lauri Sheldon (001-336-738-9633)                    a6c3207c-a588-4746-8455-daabafd5685d

Monica Rogers
3/8/2016

Page 349

1  Q   Who was that?
2  A   Patti Sanburn.
3  Q   Patti Sanburn.
4  A   And --
5  Q   And her job required a master's degree?
6  A   The HR director -- All HR directors require a degree.
7      She didn't have any.
8  Q   I want to ask you about a master's degree, so that's
9      what I'm asking you.
10 A   So those -- No, I don't -- I can't tell you that I know
11     exactly, except for Nicole Logan, and that position was
12     originally a master's degree and it was changed.
13 Q   So now your lawyer's requested a number of documents,
14     lots of job description, personnel files and so forth.
15     So have you had an opportunity to look at these job
16     descriptions that we've produced?
17         MR. WAHL:  You didn't produce any.  I got one,
18     I think.  One or two.
19 Q  (Continuing by Mr. Miglio):  Have you had an opportunity
20     to produce --
21 A   I have not.
22 Q   To look at the job descriptions.
23 A   I haven't seen those.
24 Q   Okay.  And I just want to know, you're standing by your
25     testimony that these people, these six or seven that

Page 350

1      we've been talking about -- I don't need to repeat them.
2  A   Yeah.
3  Q   That they did not meet the requirements of those job
4      descriptions that they -- over the positions they held
5      or that in order for them to get into those positions
6      those job descriptions were, in fact, altered.  Is that
7      what your testimony is?
8  A   That's what my testimony is.
9  Q   And I also think that what you said, just to clarify,
10     you haven't looked at those job descriptions; that's
11     just a matter of what your general knowledge is for an
12     HR director and so forth, correct?
13 A   Correct.
14 Q   All right.  I don't have anything else.
15         MR. WAHL:  I just have a follow up.
16                 RE-EXAMINATION
17 BY MR. WAHL:
18 Q   You've produced your notes from your meeting with Derick
19     Adams from September 11 of 2013, did you not?
20 A   Yes.
21 Q   You produced them months ago, correct?
22 A   Yes.
23 Q   And you wrote in your notes -- And you understood that
24     these documents were being produced to Mr. Miglio,
25     correct?

Page 351

1  A   Yes.
2  Q   And you wrote in your notes for what occurred on
3      September 11 of 2013, "Derick stated that you know we
4      have a zero tolerance for violence.  I stated, wow, you
5      have got to be kidding."  Did you write that?
6  A   Yes.
7  Q   Is that what you said?
8  A   Yes.
9  Q   All right.  So you didn't use the word "ridiculous."
10     You told him "You've got to be kidding."
11 A   Right.
12 Q   And he's had this document for months now and suggested
13     he's been misled somehow by your testimony, right?
14 A   Yes.
15 Q   Nothing further.
16                 RE-EXAMINATION
17 BY MR. MIGLIO:
18 Q   Wait.  You said "wow" in response to him saying, "We
19     have a zero tolerance for anything"?  That's what you
20     were saying wow about?
21 A   That he was taking me off work because of violence in
22     the workplace.
23 Q   When you were receiving food stamps after you went back
24     to work --
25 A   Hm-hmm.

Page 352

1  Q   -- each time you receive an allotment of food stamps you
2      have to sign a certification that you meet the standards
3      for receiving food stamps, don't you?
4          MR. WAHL:  This goes beyond the scope of
5      direct.
6          THE WITNESS:  I'm -- I'm not sure if you have
7      to sign -- To use the food stamp?
8  Q  (Continuing by Mr. Miglio):  No, to receive the food
9      stamp, to be issued a food stamp, you have to sign a
10     government certification indicating that you meet the
11     qualifications for receiving --
12 A   I don't remember that part.  I don't think you'd sign it
13     each time.
14 Q   Well, you had to verify to the government that you
15     weren't working in order to receive food stamps.
16 A   I told you that.  I told you that I said that I
17     didn't -- I told him that -- I told you that I told them
18     that I didn't admit to them that I was working, so I
19     admitted that.
20 Q   Well, I'm asking you a different question.
21 A   What's the question?
22 Q   Didn't you lie to them that you were -- about you not
23     working?
24 A   Yes, I did.
25 Q   I don't have anything else.

88  (Pages 349 to 352)

Electronically signed by Lauri Sheldon (001-336-738-9633)                    a6c3207c-a588-4746-8455-daabafd5685d

Monica Rogers
3/8/2016

Page 353

1        MR. WAHL:  I have nothing further.  Thanks,
2    Lauri.
3           (Whereupon the deposition was concluded at or
4    about the hour of 7:57 p.m.)
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

Page 354

1    STATE OF MICHIGAN     )
                            )  ss:
2    COUNTY OF MACOMB       )
3
4
5        I hereby certify that the foregoing attached
6    pages are a full and complete transcript of the
7    proceedings held on the date and at the place
8    hereinbefore set forth.  I reported stenographically
9    the proceedings held in the matter hereinbefore set
10   forth, and the testimony so reported was
11   subsequently transcribed under my direction and
12   supervision, and the foregoing is a full, true and;
13   accurate transcript of my original stenotype notes.
14
15
16          Lauri A. Sheldon CSR-4045,RPR
17
18
     Notary Public
19   Macomb County, Michigan
     My Commission Expires:
20   February 8, 2022
21
22
23
24
25

89  (Pages 353 to 354)

Electronically signed by Lauri Sheldon (001-336-738-9633)                                    a6c3207c-a588-4746-8455-daabafd5685d