Exhibit 47

2016 WL 2609783
Only the Westlaw citation is currently available.
United States District Court,
E.D. Michigan, Southern Division.

Frank E. Knighten, Jr., Plaintiff,

v.

John M. McHugh, et al, Defendants.

Case No. 14-CV-12351
|
Signed 05/06/2016

ORDER GRANTING DEFENDANTS',
JOHN M. McHUGH AND UBT, MOTIONS
FOR SUMMARY JUDGMENT AS TO
PLAINTIFF'S CLAIMS AND DENYING AS
MOOT DEFENDANT JOHN M. McHUGH'S
MOTION FOR SUMMARY JUDGMENT AS TO
DEFENDANT UBT'S CROSS-CLAIM (DOC. 68)

GEORGE CARAM STEEH, UNITED STATES
DISTRICT JUDGE

 **\*1**  This matter is before the court on summary
judgment motions brought by co-defendants', John M.
McHugh (McHugh) and Unified Business Technologies,
Inc. (UBT). Plaintiff, Frank E. Knighten, Jr., brought
this case under the Age Discrimination in Employment
Act, 29 U.S.C. 633a (ADEA), the Michigan Elliot-Larsen
Civil Rights Act, M.C.L. § 372101 *et seq.* (ELCRA), and
42 U.S.C. 1981, *et seq.* against defendants McHugh and
UBT. Plaintiff alleges that both defendant McHugh, in
his position as Secretary of the United States Army, and
defendant UBT unlawfully retaliated against plaintiff by
refusing him employment because plaintiff engaged in the
protected activity of testifying at an Equal Employment
Opportunity (EEO) fact-finding hearing. Plaintiff further
alleges that defendant UBT denied plaintiff employment
based on his race. Both defendants McHugh and UBT
filed motions for summary judgment as to these claims,
and the court heard oral argument on April 14, 2016.

In addition, UBT previously filed a cross-claim against
McHugh claiming that if UBT is found liable to plaintiff
on all or part of his claims, McHugh should be held
equally liable. McHugh filed, as part of his consolidated

motion for summary judgment, a motion for summary
judgment as to UBT's cross-claim as well.

For the reasons stated in the court's opinion,
both defendants' motions for summary judgment are
GRANTED.

STATEMENT OF FACTS

Defendant John M. McHugh is the Secretary of the U.S.
Army. The Army contracted with Technical Professional
Services, Inc. (TPS) to place approximately a dozen
employees at the U.S. Army's Tank Automotive and
Armament Command in Warren, Michigan (TACOM).
Plaintiff, an African American man, was hired by TPS
as one of three welders on October 14, 2011. James
Douglas (Douglas) is an Army employee who oversaw the
three TPS welders. Douglas kept daily logs of significant
activities. Douglas managed plaintiff's workflow, but he
did not have the authority to discipline plaintiff.

Douglas recorded many instances of plaintiff's tardiness.
Douglas' records show that plaintiff was late 24 times
between October 2011 and October 2012, on one
occasion by one-half hour, on three occasions by one
hour, and once by two hours. Douglas' log shows
that he spoke with plaintiff about his attendance on
several occasions throughout that year. On October
11, 2012, Douglas and Robert Washburn (Washburn),
who oversaw Douglas' department, met with plaintiff to
discuss his attendance. Washburn spoke with plaintiff
about his attendance on another occasion as well. Both
Douglas and Washburn offered plaintiff the option to
start later, but plaintiff refused. Douglas also received
several complaints regarding plaintiff's attitude and verbal
confrontations between plaintiff and other workers.
Plaintiff says that he got his work done and that his
schedule was not a problem.

In July 2012, Charles McCleod (McCleod) filed an
EEO complaint with TACOM's EEO Office alleging that
Douglas retaliated against McCleod because of his age.
On October 24, 2012, Douglas was notified that plaintiff
would testify at McCleod's fact-finding conference. On
November 15, 2012, both plaintiff and Douglas testified
at McCleod's fact-finding conference, but neither heard
the testimony of the other. Plaintiff says that it was at
this point that his relationship with Douglas changed, and,

WESTLAW   © 2016 Thomson Reuters. No claim to original U.S. Government Works.

while his performance at work had not been a problem before, Douglas was now retaliating against plaintiff for his testimony.

**\*2** On October 12, 2012, TPS received documentation from the Unemployment Insurance Agency (UIA) that plaintiff had filed a claim on October 4, 2012, and TPS would be charged for the benefits. TPS wrote back to the UIA explaining that plaintiff was employed full-time with TPS and was therefore not eligible for the benefits. TPS president Arnie Rodriguez (Rodriguez) met with plaintiff on October 31, 2012. At that meeting, plaintiff denied filing the claim. Rodriguez then began investigating plaintiff. On November 2, 2012, Douglas spoke with Jim Soltez (Soltez), one of TPS's local representatives on the contract for which plaintiff was hired, about removing plaintiff for his poor attendance. Soltez told Douglas about Rodriguez's investigation into plaintiff's alleged false filing for UIA benefits and TPS may be letting plaintiff go for that anyway. On November 8, plaintiff filed a claim with the Michigan Department of Civil Rights claiming TPS was harassing him about the alleged false filing for UIA benefits. This claim was dismissed for insufficient evidence.

Plaintiff continued to work for TPS at TACOM until January 18, 2013 when TPS lost its 8A, minority owned business, status. All of the TPS employees on that contract, including plaintiff, were laid off. UBT then received the Army contract. Roy Riggleman was the Director of Recruiting for UBT at that time. In January 2013, Riggleman asked Paul Santarelli to hand out his business cards to TPS workers. Several TPS employees contacted Riggleman about returning to TACOM. When TPS appealed the decision to revoke their 8A status, Riggleman was told to cease communication with the TPS workers, and he did. On February 25, 2013, Riggleman was told that TPS lost their appeal and that he could start hiring for the TACOM contract. Riggleman reached out to those workers he had previously been in contact with and asked them to come in and fill out an application to begin work on February 26, 2013. Riggleman asked those employees to contact other former TPS employees they knew to also fill out applications and begin working. Plaintiff claims that he was the only TPS employee not hired back by UBT. Defendants respond that Luke Franklin and Don Kimberlin, two of the other TPS workers, were also not hired back because of performance problems.

On February 26, 2013, plaintiff learned from his former TPS co-worker Lou Frye that other former TPS workers were back to work at TACOM for UBT. Plaintiff called Riggleman to inquire about a job. Riggleman told plaintiff that Douglas did not want plaintiff back and that there were no welding positions currently available. Douglas had previously called Riggleman to express his dissatisfaction with plaintiff. Immediately after speaking with Riggleman, plaintiff sent a text message to Douglas asking if plaintiff could return to work. Douglas did not respond. On March 20, 2013, plaintiff sent a second text message to Douglas saying that, by not hiring him back, Douglas was in violation of the Federal Acquisition Regulations (FAR). Again, Douglas did not respond.

On May 29, 2013, plaintiff contacted the EEO at TACOM. He received a Notice of Right to File a Formal EEO Complaint on June 25, 2013 and filed a formal complaint against the Army on July 9, 2013. On February 17, 2014, plaintiff requested a final agency decision. The Army failed to issue that decision within 60 days, and, on June 16, 2014, plaintiff filed the instant suit.

## LEGAL STANDARD

Federal Rule of Civil Procedure 56(c) empowers the court to render summary judgment 'forthwith if the pleadings, depositions, answers to interrogatories and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law.' *See Redding v. St. Eward*, 241 F.3d 530, 532 (6th Cir. 2001). The Supreme Court has affirmed the court's use of summary judgment as an integral part of the fair and efficient administration of justice. The procedure is not a disfavored procedural shortcut. *Celotex Corp. v. Catrett*, 477 U.S. 317, 327 (1986); *see also Cox v. Kentucky Dept. of Transp.*, 53 F.3d 146, 149 (6th Cir. 1995).

**\*3** The standard for determining whether summary judgment is appropriate is ' 'whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law.' ' *Amway Distributors Benefits Ass'n v. Northfield Ins. Co.*, 323 F.3d 386, 390 (6th Cir 2003) (*quoting Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251-52 (1986)). The evidence and all reasonable inferences

must be construed in the light most favorable to the non-moving party. *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986); *Redding*, 241 F.3d at 532 (6th Cir. 2001). '[T]he mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact.' *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986) (emphasis in original); *see also National Satellite Sports, Inc. v. Eliadis, Inc.*, 253 F.3d 900, 907 (6th Cir. 2001).

If the movant establishes by use of the material specified in Rule 56(c) that there is no genuine issue of material fact and that it is entitled to judgment as a matter of law, the opposing party must come forward with 'specific facts showing that there is a genuine issue for trial.' *First Nat'l Bank v. Cities Serv. Co.*, 391 U.S. 253, 270 (1968); *see also McLean v. 988011 Ontario, Ltd.*, 224 F.3d 797, 800 (6th Cir. 2000). Mere allegations or denials in the non-movant's pleadings will not meet this burden, nor will a mere scintilla of evidence supporting the non-moving party. *Anderson*, 477 U.S. at 248, 252. Rather, there must be evidence on which a jury could reasonably find for the non-movant. *McLean*, 224 F.3d at 800 (*citing Anderson*, 477 U.S. at 252).

## ANALYSIS

### A. Retaliation Claim Against Defendant McHugh (Count I)

*1. Exhaustion of Administrative Remedies*
The ADEA makes it "unlawful for an employer to discriminate against any of his employees or applicants for employment [or] for an employment agency to discriminate against any individual...because such individual, member or applicant for membership has opposed any practice made unlawful by this section, or because such individual, member or applicant for membership has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or litigation under this chapter." 29 U.S.C.A. § 623(d). In defendant McHugh's motion for summary judgment, he argues several reasons why summary judgment is appropriate as to plaintiff's retaliation claim under the ADEA.

Defendant McHugh first argues that plaintiff was not an employee of the Army or applicant for employment with the Army under the ADEA. The court does not need to decide this question because, as set forth below, even if plaintiff was an Army employee for purposes of the ADEA, he did not exhaust his administrative remedies, and summary judgment should, therefore, be granted. Specifically, McHugh argues that plaintiff failed to initiate contact with a counselor within 45 days of the alleged discriminatory activity as required by 29 C.F.R. § 1614.105(a). [1] McHugh claims that plaintiff learned of the alleged discrimination on February 26, 2013 when he called Roy Riggleman and was told that he would not be returning to work on the TACOM project. (Doc. 62-3, Pg ID 1461). After that conversation plaintiff did not initiate contact with a counselor, the EEO office, until May 29, 2013, 92 days after learning of the alleged discrimination. (Doc. 48-34, Pg ID 618).

**\*4** Plaintiff agrees that 29 C.F.R. § 1614.105(a) governs this matter but insists that plaintiff did initiate contact with the EEO within 45 days of learning of the alleged discrimination. Plaintiff denies learning of the alleged discrimination on February 26, 2013. Rather, plaintiff argues that he merely learned that he would not be returning to work for the Army on that date, not that a discriminatory intent motivated that decision. Instead, plaintiff proffers a date of March 20, 2013 as the date he learned of the discriminatory motive. It was on that date that plaintiff contacted Douglas a second time to inform Douglas that the Army was obligated to rehire plaintiff under the Federal Acquisition Regulations (FAR). (Doc. 56-26, Pg ID 1399).

The 6th Circuit Court of Appeals has established that "[t]he 45–day period begins to run when an employee reasonably should have been aware of the employer's decision." *Lord v. Holder*, 568 Fed.Appx. 435, 437 (6th Cir. 2014) (citing *EEOC v. United Parcel Serv., Inc.*, 249 F.3d 557, 562 (6th Cir. 2001); *see also Amini v. Oberlin Coll.*, 259 F.3d 493, 499 (6th Cir. 2001)). On February 26, 2013, plaintiff was aware of the Army's position that he should not be hired when plaintiff spoke with Roy Riggleman who told him of UBT's decision not to hire him back. (Doc. 62-3, Pg ID 1461). The 45 day period, therefore, began running on February 26, 2013.

Plaintiff also disputes the day on which he initiated contact with the EEO official. Plaintiff points to a letter

from Mark E. Reed, the Director of the Department of the Army, which states that plaintiff made initial contact with the EEO on April 24, 2013. (Doc. 56-18, Pg ID 1358). The Army argues that April 24, 2013 was simply a typographical error, and plaintiff actually made first contact with the EEO on May 29, 2013 (Doc. 56, Pg ID 577). Again, it doesn't matter whether plaintiff's implausible suggestion is accurate. Even if plaintiff did contact the EEO on April 24, 2013, the clock started running on February 26, 2013. Using that time line, plaintiff did not contact the EEO until 57 days after learning of UBT's decision, which is outside of the 45 day period. Plaintiff did not timely exhaust his administrative remedies.

*2. The Federal Acquisition Regulations (FAR) Do Not Operate to Extend the Time Within Which Plaintiff had to Initiate Contact with the EEO*

Plaintiff proposes May 26, 2013 as an alternative date on which the 45 day clock started running. Plaintiff reasons that under 29 C.F.R. § 1614.105(a) he had 45 days from the "effective date" of a "personnel action" in which to initiate contact with the EEO. Under FAR, UBT had 90 days from the start of the contract to make an offer of employment to plaintiff. (Doc. 56-4, Pg ID 53). According to plaintiff, the last day of the 90 day period provided by FAR should be seen as the "effective date" of a "personnel action." The contract was awarded on February 25, 2013. Ninety days from that date is May 26, 2013. So, plaintiff argues UBT could have made an offer of employment to him any time before May 26, 2013, and the clock should not start running until this date expired. Importantly, plaintiff only raised this argument regarding FAR against McHugh, not UBT. There is no mention of FAR in the portion of plaintiff's brief addressing UBT's liability, even though UBT is the party who would be subject to FAR as it was the contractor hiring the former TPS employees. So, plaintiff effectively waived this argument as to UBT, and it clearly does not apply to McHugh. Nevertheless, as UBT noted during oral argument, under FAR, UBT should have been provided with a list of TPS employees by either TPS or the government. FAR 22.1204. UBT claims they never received a list of TPS employees, and plaintiff offered no evidence indicating otherwise. Moreover, FAR requires that plaintiff bring his complaint to the Department of Labor, which he has not. FAR 22.1206. FAR also allows a subsequent contractor, in this case UBT, to hire fewer employees if the contract so requires. FAR 22.1203-6. In this case,

the government contract that UBT bid on required only two welders. So, when UBT was awarded the contract, it hired two welders. On February 26, 2013, Riggleman specifically told plaintiff that UBT had filled all of the contract positions and would not be hiring plaintiff. The clock began running on that date because it was on that date that plaintiff "reasonably should have been aware of [UBT's] decision." *Lord*, 568 Fed.Appx. at 437.

*3. Equitable Tolling*

**\*5** Plaintiff also argues that, even if he did not initiate contact with EEO within the 45 day time limit, the time limit should be tolled pursuant to 29 C.F.R. § 1614.105(a)(2), which allows tolling when an employee

> was not notified of the time limits and was not otherwise aware of them, that he or she did not know and reasonably should not have been known that the discriminatory matter or personnel action occurred, that despite due diligence he or she was prevented by circumstances beyond his or her control from contacting the counselor within the time limits. *Id.*

Plaintiff, however, makes no attempt to establish facts that support the proposition that he was unaware of the time limit or was prevented from contacting the EEO despite due diligence and due to circumstances beyond his control. Additionally, as described above, it is clear that plaintiff was aware that the discriminatory matter or personnel action occurred on February 26, 2013 after his phone call with Roy Riggleman. So, tolling is not proper here. The court grants summary judgment as to this count. [2]

**B. Claims Against UBT**

*1. Elliott-Larsen Civil Rights Act Retaliation Claim Against UBT (Count III)*

ELCRA makes it illegal for two or more persons to:

> (a) Retaliate or discriminate against a person because the person has opposed a violation of this act, or because the person has made a charge, filed a complaint, testified, assisted, or participated in an investigation, proceeding, or hearing under this act.

....

(c) Attempt directly or indirectly to commit an act prohibited by this act.

....

(f) Coerce, intimidate, threaten, or interfere with a person in the exercise or enjoyment of, or on account of his or her having aided or encouraged any other person in the exercise or enjoyment of, any right granted or protected by this act. Mich. Comp. Laws Ann. § 37.2701 (West).

Plaintiff has the burden of establishing a prima facie case under ELCRA by showing 1) plaintiff engaged in the protected activity, 2) defendant knew of the plaintiff's involvement in the protected activity, 3) defendant then took an employment action adverse to plaintiff, and 4) there was a causal connection between the protected activity and the employment action. *Meyer v. City of Center Line*, 242 Mich. App. 560, 568-69 (2000).

Plaintiff claims that UBT violated ELCRA by refusing to hire him because of his participation in McCleod's EEO complaint, a protected activity. There is no dispute between the parties as to the first and third elements. UBT, however, argues that summary judgment is appropriate because plaintiff has not presented any evidence that UBT knew of plaintiff's participation in McCleod's EEO complaint when UBT made its decision not to hire plaintiff back, and plaintiff has, therefore, not satisfied the second element of this test.

**\*6** After examining the record, the court agrees with UBT that plaintiff does not allege any facts and the court finds no evidence in the record that UBT knew of plaintiff's involvement in McCleod's EEO complaint. Plaintiff testified several times that he did not know whether UBT knew of his participation in McCleod's EEO complaint. (Doc. 56-5, Pg ID 1092-92, 1104). Plaintiff did not allege any additional facts to support the claim that UBT acted with a discriminatory motive. In fact, plaintiff does not argue in his response to summary judgment that UBT knew of plaintiff's involvement in McCleod's EEO complaint when UBT was hiring TPS employees to work at TACOM. In his argument against McHugh, plaintiff admits that when "[t]he Army...told UBT that it did not want plaintiff back to work. UBT did not ask why," insinuating that UBT had no knowledge of

Douglas' alleged discriminatory motives. (Doc. 56, Pg ID 960).

Instead, plaintiff argues a "cat's paw" theory of liability. In other words, plaintiff alleges that UBT was simply acting as a rubber stamp for what was ultimately Douglas' decision. *Staub v. Proctor*, 562 U.S. 411, 416 (2011); *Wells v. New Cherokee Corp.*, 58 F.3d 233 (6th Cir. 1995). The "cat's paw" theory prevents an employer from insulating itself from discrimination claims by claiming that it was acting through a supposedly neutral decision maker. Here, UBT is not claiming that it was acting through a neutral decision maker. UBT admits that the decision whether or not to hire plaintiff was its own. Riggleman testified that there were no positions available when plaintiff contacted him regarding employment with UBT, and that is why *UBT* did not hire plaintiff. Plaintiff did not offer any evidence indicating that there were positions available when plaintiff applied. So, the "cat's paw" theory does not apply. Plaintiff has presented no evidence that UBT knew about plaintiff's participation in McCleod's EEO. Summary judgment is, therefore, appropriate as to this count because there is no genuine issue of material fact.

*2. Elliott-Larsen Civil Rights Act Race Discrimination Claim Against UBT (Count IV)*
M.C.L. 37.2202 provides as follows:

(1) An employer shall not do any of the following:

(a) Fail or refuse to hire or recruit, discharge, or otherwise discriminate against an individual with respect to employment, compensation, or a term, condition, or privilege of employment, because of religion, race, color, national origin, age, sex, height, weight, or marital status. Mich. Comp. Laws Ann. § 37.2202 (West).

Plaintiff may prove discrimination by direct or circumstantial evidence. *Sniecinski v. Blue Cross and Blue Shield of Michigan*, 469 Mich. 124, 132 (2003). Direct evidence is "'evidence which, if believed requires the conclusion that discrimination was at least a motivating factor in the employer's actions.'" *Id.* (quoting *Hazel v. Ford Motor Co.*, 464 Mich. 456, 462 (2001)). Where plaintiff's claim is based on circumstantial evidence, the court relies on the *McDonnell Douglas* burden shifting analysis. *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802-04 (1973). Under that analysis, plaintiff must

first establish a *prima facie* case under this statute by showing 1) he is a member of a protected class, 2) he was qualified for the job and performed it satisfactorily, 3) despite his qualifications and performance, he suffered an adverse employment action, and 4) he was replaced by a person outside the protected class or was treated less favorably than a similarly situated individual outside of his protected class. *Laster v. City of Kalamazoo*, 746 F.3d 714, 727 (6th Cir. 2014). Should plaintiff satisfy the above elements, defendant has the burden of proving a legitimate, nondiscriminatory business reason for rejecting plaintiff. *Id.* Then, if defendant meets this burden, plaintiff must prove by a preponderance of the evidence that the legitimate reasons offered by defendant were a pretext for discrimination. *Id.*

**\*7** Plaintiff claims that UBT refused to hire him, in violation of this statute, because he is African American. UBT seeks summary judgment arguing that UBT did not know that plaintiff was African American when it hired the other former TPS welders and not plaintiff. Riggleman testified that he had not heard of plaintiff before this suit was brought. (Doc. 56-10, 1258). Riggleman also testified that he knew Alexander Price, another African American employee, was African American "[j]ust by talking to him and by him sending his documentation to me, driver's license." (Doc. 56-10, 1244). Plaintiff argues that, from this testimony, it should be assumed that Riggleman also knew plaintiff was African American because Riggleman spoke to plaintiff over the phone. Plaintiff claims that Riggleman testified that he was often in the factory in which plaintiff worked and that "[t]he inference is that the two saw each other." (Doc. 56, Pg ID 964). Plaintiff cites to a portion of the record that is not relevant to the inference plaintiff is trying to draw. (*See* Doc. 56-5, Pg ID 1100). Contrary to what plaintiff claims, Riggleman testified that he only came to the factory once per month and did not keep a regular schedule. (Doc. 56-10, Pg ID 1244). Moreover, Riggleman was only at the factory to "troubleshoot, [if] somebody was getting in trouble...or if...one of the guys were... messing up." *Id.* Riggleman also testified that he "really didn't stay there too long because they frown upon me talking to all my guys and them not doing work." *Id.*

Plaintiff offers no testimony nor evidence that he met Riggleman in person or spoke to him on the phone before February 26, 2013 when Riggleman told plaintiff that no positions were available and UBT would not be hiring

plaintiff. (Doc. 56-5, Pg ID 1091-92). In addition, plaintiff has not produced evidence to contradict Riggleman's assertion that there were no positions available when plaintiff contacted him on February 26, 2013. So, even if Riggleman did learn because of plaintiff's voice that plaintiff was African American during that conversation, he could not have discriminated against him by not offering him a position because it is undisputed there were no positions available at that point.

As with Count III plaintiff simply does not offer any facts or evidence that lead the court to conclude that there is any basis for this Count. The inferences plaintiff asks the court to draw are based on a mere scintilla of evidence, which is not enough to support a claim. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252 (1986). Plaintiff also argues the same "cat's paw" theory in this Count that was argued in Count III, above, but for the same reasons, that is not applicable here either. Therefore, this Count is dismissed.

*3. 42 U.S.C. 1981 Race Discrimination Claim Against UBT ( Count IV ( sic ) )*
42 U.S.C. 1981 and the ELCRA are analyzed under the same framework. *See* Thompson v. City of Lansing, 410 Fed.Appx. 922, 933 (6th Cir. 2011) (unpublished) (citing Jackson v. Quanex Corp., 191 F.3d 647, 657 (6th Cir. 1999) ("We review claims of alleged race discrimination brought under § 1981 and the [ELCRA] under the same standards as claims for race discrimination brought under Title VII")).

Plaintiff claims that UBT violated 42 U.S.C. 1981 by discriminating against him on the basis of race. Again UBT argues that it did not discriminate because it did not know plaintiff was African American. For the reasons set forth in Count IV above, this claim is also dismissed.

**D. Cross-Claim by Defendant UBT Against Defendant McHugh**
On October 14, 2015, UBT filed a cross-claim against McHugh arguing that Douglas, an employee or agent of McHugh, was in a position of power over UBT and directed UBT not to hire plaintiff. Because of this relationship, UBT requests that, if a jury finds UBT liable to plaintiff for any amount, McHugh should be held liable in an equal amount. McHugh argues that he is immune from this cross-claim as a governmental entity. In reply, UBT argues that McHugh has waived his immunity as to

2016 WL 2609783

plaintiff's suit and should, therefore, also be understood to have waived any cross-claims arising out of that suit. The court has summarily dismissed all of plaintiff's claims, and these arguments are moot.

IT IS ORDERED that both defendants' motions for summary judgment are GRANTED.

IT IS FURTHER ORDERED that defendant McHugh's motion for summary judgment as to defendant UBT's cross-claim is denied as moot.

**All Citations**

Slip Copy, 2016 WL 2609783

Footnotes

1    Both parties agree that the "by-pass" option of 29 C.F.R. § 1614.201 does not apply because plaintiff did not file a notice of intent to sue.

2    The court does not need to decide whether plaintiff established a *prima facie* case for retaliation by demonstrating that there is a causal link between UBT's decision not to hire plaintiff and plaintiff's participation in McLeod's EEO hearing. Neither does the court have to decide whether the Army had legitimate business reasons to request that plaintiff not return in as much as plaintiff did not exhaust his administrative remedies.

---

End of Document

© 2016 Thomson Reuters. No claim to original U.S. Government Works.

94 Fed.Appx. 275
This case was not selected for
publication in the Federal Reporter.
Not for Publication in West's Federal Reporter
See Fed. Rule of Appellate Procedure 32.1
generally governing citation of judicial decisions
issued on or after Jan. 1, 2007. See also
Sixth Circuit Rule 28. (Find CTA6 Rule 28)
United States Court of Appeals,
Sixth Circuit.

Colleen A. SHEFFERLY, Plaintiff-Appellant,
v.
HEALTH ALLIANCE PLAN OF
MICHIGAN, Defendant-Appellee.

No. 02-2488.
|
April 5, 2004.

## Synopsis

**Background:** Former employee sued former employer,
alleging gender discrimination and retaliation in violation
of state and federal law and common-law intentional
infliction of emotional distress. The United States
District Court for the Eastern District of Michigan
granted summary judgment for former employer. Former
employee appealed.

**Holdings:** The Court of Appeals, Moore, Circuit Judge,
held that:

[1] coworker comments did not provide direct evidence of
disparate treatment based on gender;

[2] former employee was not replaced or demoted when
she returned from medical leave;

[3] reduction in former employee's responsibilities did not
support disparate treatment claim;

[4] former employee was not discharged based on gender
in violation of her state and federal rights;

[5] former employee failed to show that she was qualified
for broker position for which she applied;

[6] former employee failed to show that termination was
result of gender discrimination; and

[7] former employee did not suffer retaliation for filing
administrative charges.

Affirmed.

West Headnotes (10)

**[1]**  **Civil Rights**
    👈 Disparate Treatment
    That male coworker told female employee to
    "flirt and drink" at sales agent convention and
    that employer's vice-president of marketing
    and director of government programs told
    employee to be less aggressive toward
    male coworker did not establish disparate
    treatment claim via direct evidence of
    gender discrimination under state and federal
    law, given female employee's failure to
    link comments to any adverse employment
    actions. Civil Rights Act of 1964, § 701 et seq.,
    42 U.S.C.A. § 2000e et seq.

    1 Cases that cite this headnote

**[2]**  **Civil Rights**
    👈 Sex Discrimination
    Male coworker's comment that female
    employee should "flirt and drink" at sales
    agent convention and comments by vice-
    president of marketing and director of
    government programs that employee should
    be less aggressive toward male coworker were
    not direct evidence supporting employee's
    claims of gender discrimination resulting in
    transferring away of her job responsibilities,
    elimination of her position, termination, and
    denial of her application for new position,
    inasmuch as "flirt and drink" comment
    was ambiguous stray remark and coworker
    was not decision-maker as to elimination
    of employee's position, rejection of her
    application, or her termination, comments
    about being less aggressive did not compel

conclusion that vice-president or director were motivated by discrimination, and comment of director, who was not decision-maker for adverse actions, was irrelevant. Civil Rights Act of 1964, § 701 et seq., 42 U.S.C.A. § 2000e et seq.

2 Cases that cite this headnote

**[3]**  **Civil Rights**
👉 Particular Cases

Employee was not replaced, for purposes of demonstrating adverse employment action supporting her gender discrimination claims, even though nearly all of her job responsibilities had been transferred to another worker when employee returned from medical leave, given that employee received her full salary and remained responsible for supervising employer's service representatives upon returning from leave. Civil Rights Act of 1964, § 701 et seq., 42 U.S.C.A. § 2000e et seq.

Cases that cite this headnote

**[4]**  **Civil Rights**
👉 Particular Cases

Employee failed to establish that she was demoted when, upon her return from medical leave, her position was changed from "manager of agent sales" to "manager of agent relations," given that new position did not correspond to decrease in position level or salary, and therefore change did not amount to adverse employment action supporting employee's gender discrimination claims under state and federal law. Civil Rights Act of 1964, § 701 et seq., 42 U.S.C.A. § 2000e et seq.

Cases that cite this headnote

**[5]**  **Civil Rights**
👉 Disparate Treatment

Reduction in female employee's job responsibilities following her return from medical leave did not support claim of disparate treatment based on gender,

in violation of state and federal law, even assuming that reduction was adverse employment action, inasmuch as employer's legitimate, nondiscriminatory explanation that it reduced employee's responsibilities at her request was supported by employee's deposition testimony that she had complained about amount of time she was spending in office and indicated that she was happier not managing sales representatives, and employee provided no evidence that such explanation was pretextual. Civil Rights Act of 1964, § 701 et seq., 42 U.S.C.A. § 2000e et seq.

Cases that cite this headnote

**[6]**  **Civil Rights**
👉 Particular Cases

Former employee's position was eliminated as part of reduction in force when former employer provided uncontroverted evidence that person to whom former employee's duties were transferred performed additional duties beyond those assumed from former employee, and therefore former employee's failure to present evidence that she was singled out for discharge for impermissible reasons precluded determination that former employee was discharged based on gender in violation of her state and federal rights. Civil Rights Act of 1964, § 701 et seq., 42 U.S.C.A. § 2000e et seq.

1 Cases that cite this headnote

**[7]**  **Civil Rights**
👉 Educational Requirements;Ability Tests
**Civil Rights**
👉 Particular Cases

Employee failed to show that she was qualified for broker position for which she applied, in support of her gender discrimination claims under state and federal law, inasmuch as it was undisputed that position's written job description required candidates to have earned bachelor's degree, which employee did not have; that male worker was told he was good candidate and that employee was interviewed even though

they did not have required degree, and that degree requirement could be waived, did not establish that requirement was illusory. Civil Rights Act of 1964, § 701 et seq., 42 U.S.C.A. § 2000e et seq.

1 Cases that cite this headnote

**[8]    Civil Rights**

👉 Disparate Treatment

Former employee failed to show that she was treated differently from similarly situated, non-protected employees in support of claim that she was terminated due to gender discrimination in violation of state and federal law, given that former employee exceeded her federally protected medical leave under Family and Medical Leave Act (FMLA), company had policy of reserving right to fill positions of employees who exceeded their FMLA leave and of discharging employees who exceeded their FMLA leave if there was no position for which they were qualified when they were ready to return to work, former employee's management position was eliminated after she exceeded her leave but before she was released to return to work, and former employee did not show that other positions for which she was qualified were available or that she was treated differently from others who had exceeded their leave. Civil Rights Act of 1964, § 701 et seq., 42 U.S.C.A. § 2000e et seq.; Family and Medical Leave Act of 1993, § 2 et seq., 29 U.S.C.A. § 2601 et seq.

Cases that cite this headnote

**[9]    Civil Rights**

👉 Particular Cases

Former employee established prima facie claims of retaliation under Title VII and Michigan's Elliott-Larsen Civil Rights Act (ELCRA), given that former employee engaged in protected activity by filing charges with Equal Employment Opportunity Commission (EEOC) and Michigan Department of Civil Rights (MDCR), that

former employer knew of such activity and thereafter took adverse employment actions of rejecting former employee's application for broker position and terminating former employee, and that passage of less than three weeks between former employer's receipt of administrative charges and adverse actions gave rise to inference of discrimination. Civil Rights Act of 1964, § 701 et seq., 42 U.S.C.A. § 2000e et seq.; M.C.L.A. 37.2101 et seq.

16 Cases that cite this headnote

**[10]    Civil Rights**

👉 Motive or Intent;Pretext

Former employee did not suffer retaliation for filing administrative discrimination charges, in violation of Title VII and Michigan's Elliott-Larsen Civil Rights Act (ELCRA), when she failed to show that former employer's reason for rejecting her application for broker position, that she lacked required bachelor's degree, and for terminating her, that there were no available positions for which former employee was qualified when she returned from medical leave, were pretextual. Civil Rights Act of 1964, § 701 et seq., 42 U.S.C.A. § 2000e et seq.; M.C.L.A. 37.2101 et seq.

1 Cases that cite this headnote

**\*277** On Appeal from the United States District Court for the Eastern District of Michigan.

Before NELSON, MOORE, and FRIEDMAN, [*] Circuit Judges.

## OPINION

MOORE, Circuit Judge.

**\*\*1** Plaintiff-Appellant, Collen A. Shefferly ("Shefferly"), appeals the district court's grant of summary judgment to her former employer Defendant-Appellee, Health Alliance Plan of Michigan ("Health

Alliance"), on Shefferly's claims arising out of her employment and termination. On appeal, Shefferly argues that the district court erred by concluding that Health Alliance did not discriminate against her on the basis of gender. Shefferly also argues on appeal that the district court erred by concluding that Health Alliance did not retaliate against her for exercising her rights under various federal and state employment discrimination statutes.

**\*278** For the following reasons, we **AFFIRM** the district court's grant of summary judgment.


### I. BACKGROUND

Health Alliance is a non-profit HMO, and "Alliance Health and Life (AHL), [is] an affiliated profit company selling insurance products." Joint Appendix ("J.A.") at 444 (Shefferly Aff. ¶ 7). Shefferly was hired by Health Alliance in October 1993, as an account representative, but she resigned in July 1996. Shefferly was rehired by Health Alliance in December 1996, as the "manager of agent relations." In September 1997, Shefferly received a two-level position upgrade and $4,500 per year raise, and five agent sales reps and two agent service reps were placed under her supervision. According to Shefferly, the position upgrade and raise corresponded to her promotion to the position of "manager of agent sales." According to Health Alliance, however, the position upgrade and raise were the result of a reorganization of the marketing department and Shefferly was not made "manager of agent sales." Between January and March 1998, Shefferly noticed that her job responsibilities were being taken away. Shefferly also asserts that she was not given a role in a January 1998 agent convention, and that Mark Hall ("Hall"), who was then a director for AHL, told her that "he was handling the entire event and that she should attend the event to 'flirt and drink' with the agents." J.A. at 445 (Shefferly Aff. ¶ 12).

Shefferly contends, "That in late February or early March of 1998, she met with Steve Nelson [('Nelson')], the Vice-President of Marketing, [to report] that Hall was treating her in a demeaning fashion and was having a hard time working with her because of her gender." J.A. at 445 (Shefferly Aff. ¶ 13). According to Shefferly, "Nelson told her that Hall was intimidated by her knowledge and the fact that she was a woman of the same age, ... that she was bruising Hall's ego and that she should be less assertive

with Hall." J.A. at 445 (Shefferly Aff. ¶ 13). Shefferly also asserts that in March 1998, she met with Mike Rimes ("Rimes"), the director of government programs, and he told "her that she was acting too aggressively toward Hall and that she should pull back." J.A. at 445 (Shefferly Aff. ¶ 13). Shefferly contends that in March 1998, Doug Zielecki, an account representative, told her that Skaggs said, "Shefferly would be leaving the company soon and that many of her duties would be turned over to Chris Fanning [('Fanning')]." [1] J.A. at 446 (Shefferly Aff. ¶ 15).

**\*\*2** Shefferly began her first medical leave on March 26, 1998. When Shefferly returned from this leave on May 11, 1998, she resumed her position as "manager of agent sales," but noticed that she was being cut out of all future projects. Shefferly commenced her second medical leave on May 27, 1998. While Shefferly was on leave, Robert Skaggs ("Skaggs") was transferred to the position of director of commercial group services; Hall became the director of sales for Health Alliance; the sales reps were assigned to Fanning; and the service reps were temporarily assigned to another employee. When Shefferly returned from this leave on July 27, 1998, she was told that Skaggs (not Hall) was her supervisor, even though she was in sales, and that Hall was Fanning's supervisor. **\*279** Shefferly was also told that the sales reps were now reporting to Fanning and would continue to do so even though she had returned from leave,[2] but that Shefferly would resume supervision of the two service reps. Shefferly was also told that she had never held the position of "manager of agent sales." Shefferly stated that although she was getting paid her full base salary, she had virtually no job responsibilities from July 27, 1998 though September 9, 1998.

Shefferly began her third medical leave on September 15, 1998. On October 8, 1998, she received a letter from Carolyn Connors ("Connors"), an associate in the human resources department, informing Shefferly that her FMLA leave had expired on July 17, 1998 and of the following company policy:

> In conjunction with corporate and departmental needs, departments reserve the right to fill positions which are vacant beyond twelve (12) workweeks under FMLA guidelines. However, in accordance with corporate procedures related to

extended medical leaves, efforts will be made to place you in a position for which you are qualified when you are ready and able to return to work. If there is not a position available the earlier of (1) the date at which you are ready and able to return to work or (2) one year after the onset of your disability, you will be released from employment with HAP.

J.A. at 295. On October 27, 1998, Shefferly received a letter from Mario D'Agostino ("D'Agostino"), the manager of human resources, informing Shefferly that her "management position" had been eliminated,[3] but reaffirming that efforts would be made to find her a position when she was ready to return to work. On November 25, 1998, Shefferly sent D'Agostino a letter stating that she was able to return to work immediately.

In 1998, Health Alliance announced several new positions entitled Group Sales Executive ("GSE") broker. The GSE job description expressly required a bachelor's degree and "[a] valid Michigan Health and Life Insurance License," in addition to several years of sales and insurance work experience. J.A. at 304. Shefferly applied for a GSE position in November 1998, and Health Alliance interviewed her for that position on January 6, 1999 and February 2, 1999, even though it knew that Shefferly had not earned a bachelor's degree.[4] On December 8, 1998, Shefferly filed complaints with the Equal Employment Opportunity Commission ("EEOC") and the Michigan Department of Civil Rights ("MDCR"), and Health Alliance's human resources department received those charges via a staff secretary on January 21, 1999. Then, on February 4, 1999, Connors informed Shefferly by telephone that Health Alliance had rejected her application for the GSE position because she had not earned a bachelor's degree.

 **3  Everyone who was hired as a GSE broker had earned a bachelor's degree, but  *280  some of those hired did not possess a valid insurance license. According to Connors, however, offers for the GSE positions were conditioned upon the hires obtaining a license within ninety days. On February 9, 1999, Connors wrote Shefferly notifying her that she was terminated because her position as "manager of agent relations" was eliminated and she

was not qualified for the GSE position; therefore, there were no available positions for which Shefferly was qualified. On February 10, 1999, Shefferly filed additional complaints with the EEOC and the MDCR based upon the rejection of her application for the GSE position and her termination.

On December 21, 1999, Shefferly filed a complaint in the U.S. District Court for the Eastern District of Michigan asserting discrimination and retaliation claims under state and federal statutes, as well as a common law intentional infliction of emotional distress claim. On July 25, 2001, the district court partially granted Health Alliance's motion for summary judgment. Shefferly filed a motion for reconsideration of that order, which the district court denied on October 23, 2001. On November 12, 2002, the district court granted Health Alliance's motion for summary judgment on Shefferly's remaining claim. Shefferly timely appealed. The district court had jurisdiction pursuant to 28 U.S.C. 1331, 1343, and 1367(c). This court has jurisdiction pursuant to 28 U.S.C. § 1291.

## II. ANALYSIS

### A. Standard of Review

This court reviews de novo the district court's grant of summary judgment. *Waters v. City of Morristown,* 242 F.3d 353, 358 (6th Cir.2001). Summary judgment is proper when "there is no genuine issue as to any material fact and ... the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c). In ruling on a motion for summary judgment, the court must view the evidence and draw all reasonable inferences in favor of the nonmoving party. *Waters,* 242 F.3d at 358 (citing *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 587, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986)).

### B. Gender Discrimination Claims

### 1. Direct Evidence Claim

 [1]  Shefferly first argues that she sufficiently stated a disparate treatment claim via direct evidence. Shefferly points to the following as support for her claim that she was fired due to her gender: Hall told Shefferly that she should "flirt and drink" at the agent convention, and Nelson and Rimes told Shefferly to be less aggressive towards Hall.

In Title VII cases, to state a disparate treatment claim via direct evidence, an employee must produce " 'evidence which, if believed, requires the conclusion that unlawful discrimination was at least a motivating factor in the employer's actions.' " *DiCarlo v. Potter,* 358 F.3d 408, 415 (6th Cir.2004) (quoting *Jacklyn v. Schering-Plough Healthcare Prods. Sales Corp.,* 176 F.3d 921, 926 (6th Cir.1999)). "[I]solated and ambiguous comments are too abstract, in addition to being irrelevant and prejudicial, to support a finding of ... discrimination." *Phelps v. Yale Sec., Inc.,* 986 F.2d 1020, 1025 (6th Cir.), *cert. denied,* 510 U.S. 861, 114 S.Ct. 175, 126 L.Ed.2d 135 (1993) (internal quotation marks and citation omitted). Moreover, comments made long before the adverse employment action and comments made by persons other than the decision-maker are not probative of disparate treatment. *See id; Jacklyn,* 176 F.3d at 928. Michigan courts apply the same standards to direct evidence claims. *See* **\*281** *Krohn v. Sedgwick James of Mich., Inc.,* 244 Mich.App. 289, 624 N.W.2d 212, 216-19 (2001).

**\*\*4** In her appellate brief, Shefferly fails to link either Hall's "flirt and drink" comment or Nelson's and Rimes's comments about Shefferly's aggressiveness to any adverse employment actions; therefore, Shefferly has failed to establish a disparate treatment claim via direct evidence because she has not shown " 'that the challenged employment action was motivated at least in part by prejudice against members of the protected group.' " *DiCarlo,* 358 F.3d at 415 (quoting *Johnson v. Kroger Co.,* 319 F.3d 858, 865 (6th Cir.2003)).

**[2]** Even if we assume that Shefferly is arguing that these comments are direct evidence of the adverse actions she asserts in her circumstantial evidence claim, her direct evidence claim still fails. Although Hall may have been a decision-maker in the transfer of some of Shefferly's duties to Fanning and his "flirt and drink" comment was inappropriate and demeaning, the comment was an ambiguous stray remark. Hall was not a decision-maker in the adverse actions of the elimination of Shefferly's position, the rejection of Shefferly's application for the GSE position, or Shefferly's termination. Moreover, Hall made the "flirt and drink" comment in January 1998, but Shefferly was not rejected for the GSE position or terminated until February 1999; therefore, the comment is too far removed in time to be probative of disparate treatment. Nelson's comment that Shefferly should be less aggressive towards Hall does not compel the conclusion

that Nelson was motivated by unlawful discrimination. Similarly, Rimes's comment that Shefferly should be less aggressive towards Hall does not compel the conclusion that Rimes was motivated by unlawful discrimination, and is irrelevant because Rimes was not a decision-maker in any of the alleged adverse actions. Therefore, Shefferly has failed to state a disparate treatment claim via direct evidence for any of the adverse employment actions she asserts in her circumstantial evidence claim. [5]

## 2. Circumstantial Evidence Claim

Shefferly next argues that she sufficiently stated a disparate treatment claim via circumstantial evidence. Shefferly maintains that she established a prima facie case of gender discrimination because: (1) as a woman, she is a member of a protected class; (2) she was qualified for the position because she was the incumbent and received good performance evaluations; (3) she suffered adverse employment actions, in that she asserts that her job responsibilities were transferred to Fanning, her position was eliminated, her application for the GSE position was rejected, and she was terminated; (4) and she was replaced by Fanning - a member of a non-protected class. Shefferly also argues that the district court erroneously analyzed this case under the standards applicable to a reduction-in-force claim. Additionally, Shefferly asserts that the legitimate, nondiscriminatory explanations proffered by Health Alliance are pretextual. In response, Health Alliance argues that Shefferly failed to establish a prima facie case and also failed to demonstrate that the legitimate, nondiscriminatory reasons it proffered to justify the elimination of Shefferly's job, the rejection of Shefferly's application for the GSE position, and Shefferly's termination were pretextual.

**\*\*5** In Title VII cases, "When using circumstantial evidence to create an inference of discrimination, the [plaintiff] must carry **\*282** the initial burden of establishing by a preponderance of the evidence a prima facie case of discrimination by his or her employer." *DiCarlo,* 358 F.3d at 414. To establish a prima facie case in a replacement case, the plaintiff must produce evidence showing: "(1) he or she was a member of a protected class; (2) he or she suffered an adverse employment action; (3) he or she was qualified for the position; and (4) he or she was replaced by someone outside the protected class or was treated differently than similarly-situated, non-protected employees." *Id.* at 415. In a reduction-in-

force claim, however, to satisfy the fourth element of a prima facie case, the plaintiff must provide "additional direct, circumstantial, or statistical evidence tending to indicate that the employer singled out the plaintiff for discharge for impermissible reasons." *Barnes v. GenCorp Inc.,* 896 F.2d 1457, 1465 (6th Cir.), *cert. denied,* 498 U.S. 878, 111 S.Ct. 211, 112 L.Ed.2d 171 (1990). Once the plaintiff establishes a prima facie case, "The burden then shifts to the defendant to articulate some legitimate, nondiscriminatory reason for the employee's rejection. Finally, should the defendant carry this burden, the plaintiff must then have an opportunity to prove by a preponderance of the evidence that the legitimate reasons offered by the defendant were not its true reasons, but were a pretext for discrimination." *DiCarlo,* 358 F.3d at 414-15. (quoting *Texas Dep't of Cmty. Affairs v. Burdine,* 450 U.S. 248, 253, 101 S.Ct. 1089, 67 L.Ed.2d 207 (1981)) (internal quotation marks omitted). Michigan courts follow this same burden-shifting framework when analyzing circumstantial evidence claims brought under Michigan anti-discrimination statutes, and they have even employed the modified fourth element of the plaintiff's prima facie case in reduction-in-force claims. *Hazle v. Ford Motor Co.,* 464 Mich. 456, 628 N.W.2d 515, 520-22 (2001); *Lytle v. Malady,* 458 Mich. 153, 579 N.W.2d 906, 916-17 (1998).

It is undisputed that Shefferly satisfied the first two elements of her prima facie case for any adverse actions she may have suffered through September 1998. As a woman, Shefferly is a member of a protected class. Because she received satisfactory performance ratings, Shefferly was qualified for the management position she held at that time. The parties dispute, however, whether Shefferly satisfied the third element of her prima facie case by demonstrating that she suffered an adverse employment action.

[3] Shefferly argues that when she returned from her second medical leave in July 1998, she was replaced by Fanning, in that nearly all of her job responsibilities were transferred to Fanning. It is undisputed that Shefferly received her full salary and was responsible for supervising the service reps when she returned from this leave; therefore, her contention that she was replaced fails.

**6 [4] Shefferly also contends that when she returned from her second medical leave in July 1998, she was demoted from "manager of agent sales" to "manager of agent relations." While Shefferly has produced evidence indicating that her title was once "manager of agent sales," she has produced no evidence that her return to the position of "manager of agent relations" was a demotion, as it did not correspond to a decrease in position-level or salary. This court has indicated that semantic changes in title do not amount to an adverse employment action. *See Kocsis v. Multi-Care Mgmt., Inc.,* 97 F.3d 876, 886 (6th Cir.1996).

[5] Shefferly also argues that the reduction of her job responsibilities, alone, constitutes an adverse employment action. This court has specified that the following **283** can be materially adverse employment actions: "termination of employment, a demotion evidenced by a decrease in wage or salary, a less distinguished title, a material loss of benefits, *significantly diminished material responsibilities,* or other indices of that might be unique to a particular situation." *Id.* (emphasis added). While Shefferly was out on her second medical leave, the sales reps were transferred to Fanning's supervision and not returned to Shefferly's supervision when she came back to work. Shefferly also produced evidence that she was only working until between ten o'clock in the morning and noon for a period of several weeks. We will assume for purposes of this appeal that this constitutes "significantly diminished material responsibilities"; therefore, Shefferly has shown that she suffered an adverse employment action.

Even if we assume that Shefferly has established a prima facie case of discrimination in regards to the transfer of the sales reps to Fanning's supervision and the reduction of her other responsibilities, Health Alliance has articulated a legitimate, nondiscriminatory explanation. According to Health Alliance, it transferred the sales reps and reduced Shefferly's responsibilities at her request. This explanation is supported by the evidence because Shefferly admitted in her deposition that prior to the transfer of the sales reps, she complained to Skaggs about the amount of time she was spending in the office and told Skaggs that she was happier not managing the sales reps. Shefferly has provided no evidence that Health Alliance's explanation was pretextual. Therefore, Shefferly cannot withstand summary judgment on her disparate treatment claim for any of Health Alliance's actions through September 1998.

[6] Shefferly failed to satisfy the fourth element of her prima facie case in regards to the elimination of her

management position in October 1998, because she did not provide additional evidence demonstrating that she was singled out. When a plaintiff is terminated pursuant to a reduction in force, he or she must provide "additional direct, circumstantial, or statistical evidence tending to indicate that the employer singled out the plaintiff for discharge for impermissible reasons." *Barnes,* 896 F.2d at 1465. Shefferly contends that she was not discharged pursuant to a reduction in force because she was replaced by Fanning. Although this court has specified, "An employee is not eliminated as part of a work force reduction when he or she is replaced after his or her discharge," this court has also recognized that "a person is not replaced when another employee is assigned to perform the plaintiff's duties in addition to other duties, or when the work is redistributed among other existing employees already performing related work." *Id.* Health Alliance provided uncontroverted evidence that Fanning performed product development duties in addition to those duties that he assumed when Shefferly's position was eliminated. Therefore, Shefferly's position was eliminated as part of a reduction in force, and Shefferly was required to present additional evidence indicating that she was singled out but has not done so.

**\*\*7**  **[7]**  Shefferly failed to satisfy the second element of her prima facie case in regards to Health Alliance's rejection of her application for the GSE position because she has not shown that she was qualified for that position. It is undisputed that the written job description for the GSE position required applicants to have earned a bachelor's degree, and that Shefferly had not earned a degree. We reject Shefferly's argument that the bachelor's degree requirement was illusory. Shefferly presented evidence that Richard McHale **\*284** was told that he was a good candidate even though Health Alliance knew that he did not have a bachelor's degree, and that Shefferly was interviewed twice even though Health Alliance knew that she did not have a bachelor's degree. In *Kocsis,* 97 F.3d at 881, 883, however, we rejected the argument that a job requirement is illusory merely because an unqualified internal applicant was encouraged to apply. Additionally, Shefferly presented evidence that someone at Health Alliance had the authority to waive the bachelor's degree requirement. However, refusal to waive a requirement, alone, is not evidence that the requirement was illusory. Shefferly also presented evidence that Health Alliance bent the rule requiring an insurance license, but Health Alliance presented uncontroverted evidence that

the offers for GSE positions were conditioned upon the hires obtaining insurance licenses within ninety days and that all of the hires did obtain licenses. Moreover, bending the rule requiring an insurance license is not probative of the legitimacy of the bachelor's degree requirement because there is no evidence that Shefferly could have obtained a degree within a few months of being hired as a GSE broker. Although Shefferly points out that Health Alliance rushed to hire Mark Ely as a GSE broker, she presented no evidence that Ely had not earned a bachelor's degree. Therefore, Shefferly has not demonstrated that she was qualified for the GSE position.

**[8]**  Shefferly failed to prove the fourth element of her prima facie case in regards to her termination because she has not shown that she was "treated differently than similarly situated, non-protected employees." *DiCarlo,* 358 F.3d at 415. Shefferly exceeded her federally protected FMLA leave, and the company had a policy of reserving the right to fill positions of employees who exceeded their FMLA leave and of discharging employees who exceeded their FMLA leave if there was no position for which they were qualified when they were ready to return to work. Shefferly's "management position" was eliminated on October 27, 1999, after Shefferly exceeded her FMLA leave limit but before Shefferly was released to return to work. Shefferly was not qualified for the GSE position and has not provided any evidence that there were other available positions for which she was qualified. Moreover, Shefferly has provided no evidence that she was treated differently than other employees who exceeded their FMLA leave. Therefore, Shefferly cannot withstand summary judgment on her disparate treatment claim based upon the elimination of her position, the rejection of her application for the GSE position, or her termination.

## C. Retaliation Claims

**\*\*8**  As a threshold matter, Health Alliance argues that Shefferly has abandoned her Elliott-Larsen Civil Rights Act ("ELCRA") retaliation claim on appeal because she failed to identify it in the statement of issues section of her appellate brief. Because the standards for evaluating retaliation claims under Title VII, the ELCRA, the Americans with Disabilities Act ("ADA"), and the Michigan Persons with Disabilities Civil Rights Act ("PWDRCA") are identical and Shefferly referenced them in her appellate brief, we will not treat Shefferly's ELCRA, ADA, or PWDRCA retaliation claims as abandoned, but

rather we will address them simultaneously with her Title VII retaliation claim.

**[9]** Shefferly argues that she sufficiently stated a retaliation claim under both Title VII and the ELCRA via circumstantial evidence. Shefferly asserts that **\*285** she established a prima facie case of retaliation because: (1) she engaged in a protected activity by filing complaints with the EEOC and the MDCR; (2) the activity was known by Health Alliance because it received notice of her claims prior to rejecting her application for the GSE position and terminating her; (3) Health Alliance took adverse employment actions by rejecting her application and terminating her; (4) and the temporal proximity between Health Alliance receiving notice of the discrimination charges and taking the adverse employment actions demonstrates a causal connection between the protected activity and the adverse employment actions. Additionally, Shefferly asserts that the legitimate, nondiscriminatory explanations proffered by Health Alliance are pretextual.

To establish a prima facie case of retaliation under federal employment discrimination statutes, "a plaintiff must prove by a preponderance of the evidence: 1) plaintiff engaged in [protected activity]; 2) plaintiff's exercise of [such protected activity] was known by the defendant; 3) that, thereafter, the defendant took an employment action adverse to the plaintiff; and 4) that there was a causal connection between the protected activity and the adverse employment action." *DiCarlo,* 358 F.3d at 420 (quoting *Equal Employment Opportunity Comm'n v. Avery Dennison Corp.,* 104 F.3d 858, 860 (6th Cir.1997) (internal quotation marks omitted)). Michigan courts have applied this same framework to retaliation claims under state anti-discrimination statutes. *Roulston v. Tendercare ( Mich.), Inc.,* 239 Mich.App. 270, 608 N.W.2d 525, 529 (2000); *DeFlaviis v. Lord & Taylor, Inc.,* 223 Mich.App. 432, 566 N.W.2d 661, 663 (1997).

**[10]** In *DiCarlo,* we held that the passage of only twenty-one days between the plaintiff's filing of an EEOC charge and the plaintiff's termination gave rise to an inference of discrimination. *DiCarlo,* 358 F.3d at 421-22. Therefore, in this case, Shefferly has established a prima facie case of retaliation under federal law based upon the temporal proximity between her filing of discrimination charges, and the rejection of her application for the GSE position and her termination. Shefferly engaged in protected activity by filing charges with the EEOC and the MDCR; Health Alliance knew of this activity because the human resources department received the charges on January 21, 1999; thereafter Health Alliance took adverse employment actions by rejecting Shefferly's application for the GSE position on February 4, 1999, and terminating Shefferly on February 9, 1999; and the passage of less than three weeks between Health Alliance's receipt of the charges and the adverse actions gives rise to an inference of discrimination. Health Alliance, however, articulated legitimate, nondiscriminatory explanations for both of these employment actions. Health Alliance rejected Shefferly's application for the GSE position because she was not qualified and terminated Shefferly because there were no available positions for which she was qualified. As discussed above, Shefferly has not provided sufficient evidence to demonstrate that Health Alliance's proffered explanations were pretextual. [6] Therefore, the district court did not err by granting Health Alliance's motion for summary judgment on Shefferly's retaliation claims.

## III. CONCLUSION

**\*\*9** For the foregoing reasons, we **AFFIRM** the district court's grant of summary judgment **\*286** to Health Alliance on all of Shefferly's claims.

### All Citations

94 Fed.Appx. 275, 2004 WL 784117

Footnotes

\*  Judge Daniel M. Friedman, United States Circuit Judge for the Federal Circuit, sitting by designation.

1  According to Shefferly, after Health Alliance transitioned from direct sales to agent sales, Fanning, the manager of direct sales and product development, would no longer have any job responsibilities; therefore, to prevent Fanning's termination, Nelson and Hall gave Shefferly's responsibilities to Fanning.

2    Shefferly admitted in her deposition, however, that she had previously told Skaggs that she was "happier as the Agent Relations Manager not handling the reps," and also told him that "I need to be on the road for health reasons. If I have to demote position to do so, I will." J.A. at 191-92 (Shefferly Dep.).

3    Skaggs testified in his deposition that Nelson told him "that there were going to be more layoffs and that marketing would be [a]ffected," and that Skaggs made the decision to eliminate Shefferly's position. J.A. at 262-263 (Skaggs Dep.).

4    Connors testified in her deposition that all internal candidates were interviewed as a courtesy, regardless of whether they met all of the position requirements.

5    Moreover, these comments do not buttress Shefferly's circumstantial evidence claim sufficiently to enable her to withstand Health Alliance's motion for summary judgment.

6    This conclusion also disposes of Shefferly's state-law retaliation claims.

---

**End of Document**                             © 2016 Thomson Reuters. No claim to original U.S. Government Works.

1995 WL 469429

🔖 KeyCite Yellow Flag - Negative Treatment
Distinguished by Cicero v. Borg-Warner Automotive, Inc., 6th Cir. (Mich.), January 2, 2002

62 F.3d 1417
Unpublished Disposition
NOTICE: THIS IS AN UNPUBLISHED OPINION.
(The Court's decision is referenced in a "Table of Decisions Without Reported Opinions" appearing in the Federal Reporter. Use FI CTA6 Rule 28 and FI CTA6 IOP 206 for rules regarding the citation of unpublished opinions.)
United States Court of Appeals, Sixth Circuit.

Nancy ANDERSON, Plaintiff-Appellant,

v.

PREMIER INDUSTRIAL
CORP., Defendant-Appellee.

No. 94-3454.
|
Aug. 7, 1995.

On Appeal from the United States District Court for the Northern District of Ohio, No. 92-02125; John M. Manos, District Judge.

N.D.Ohio

AFFIRMED.

Before: JONES, GUY, and BOGGS, Circuit Judges.

**Opinion**

PER CURIAM.

**\*1** Nancy Anderson appeals from the district court's order granting a motion by Premier Industrial Corporation (Premier) for summary judgment. She raised federal sex and age discrimination counts against Premier, for failing to promote her and for dismissing her. She also raised Ohio age and sex discrimination, Ohio breach of contract, and Ohio promissory estoppel claims. The district court granted summary judgment for Premier on Anderson's federal and state law claims, and we affirm.

I

Premier distributes and manufactures electronic and industrial products. Anderson began working at Premier in 1969, and was promoted to the position of Business Systems Leader (BSL) in 1982. She held that job until she was fired in 1991, at age 56.

In 1980, she applied for the job of Director of Systems Development, but was told she needed more experience to qualify. In 1986, she was assigned to work in Europe. She initially was only to stay there two years, but Premier asked her to stay an additional 1 1/2 years. She objected at first, but ultimately agreed to stay.

Anderson returned to Premier's Cleveland office in 1989. At that time, there were six BSLs working in her department. She was the only woman, was the oldest, and had the most experience at Premier. However, four of the other BSLs managed the four operational teams at Premier. "Because all four teams were being satisfactorily managed by their respective Business Systems Leaders, there were no open Business Systems Leader positions for Anderson.... Therefore, Anderson was assigned minor assignments until a longer-term position could be found for her." Baskind Aff. J.A. at 148-49. The only BSLs not in charge of an operational team when Anderson returned were Anderson and Robert Berke. Anderson stated that she was concerned about the stability of her position when she returned from Europe, but that the Vice- President of her division, William Baskind, told her that Premier had plenty of work and that her job security was not something she needed to worry about. Anderson Aff., J.A. at 181; Anderson Depo., J.A. at 188.

In 1990, the director of Anderson's division, and the manager of these four teams, Lillian Drimmer, to whom Anderson reported, was reassigned due to poor performance. Instead of promoting from within, Premier sought someone from outside the business, even though this was the position Anderson applied for in 1980. Management determined that the person they needed should be more qualified than Drimmer, (and implicitly more qualified than the people Drimmer supervised), and so conducted an outside search. Employees within Premier were not notified of the job opening. Anderson eventually learned of the vacancy, applied for it, but was never contacted about her application. Instead, Premier

hired someone from outside the company, Thomas Wojnarowski.[1]

**\*2** In November 1990, Premier created the Strategic Planning group, with Drimmer in charge, staffed by Anderson and Robert Berke. Berke was to join the new group only after he completed a project he had been assigned previously. The group's purpose was to locate and assess the feasibility of future computer system products. However, in January 1991, Baskind decided to eliminate this group, as part of a Reduction in Force (RIF), after being ordered to find ways to cut costs. Baskind stated that he had four reasons for eliminating the group: (1) the recession; (2) the company's reduced emphasis on forward-looking strategic planning; (3) Drimmer's inability to locate and propose strategic planning projects, given (1) and (2); (4) Baskind's inability to justify the group given these circumstances. Baskind Aff., J.A. at 153-54.

Baskind terminated Drimmer and Anderson on April 17, 1991. Berke was not terminated.[2] Premier staff stated that they tried to find positions for Anderson and Drimmer, but could not, so the only alternative was to terminate both of them. Baskind Aff., J.A. at 154-55; Brunskill Aff., J.A. at 159. Baskind stated that Premier did not have a policy that would allow it to "bump" another BSL who was performing satisfactorily, by placing Anderson in that job and firing the incumbent. Baskind Depo, J.A. at 234.

Anderson filed her amended complaint October 21, 1992, arguing that Premier discriminated against her in violation of the Age Discrimination in Employment Act (ADEA), 29 U.S.C. § 626, and of Title VII of the Civil Rights Act of 1964, including its amendments in 1991, 42 U.S.C. § 2000e. She also claimed that Premier violated Ohio Rev. Code § 4112.02(A)[3] by discriminating against her based on her sex and age, breached its employment contract with her, and was liable to her under a promissory estoppel theory.

The district court granted Premier's motion for summary judgment. The court noted that Anderson bore the burden of establishing a prima facie claim under McDonnell Douglas Corp. v. Green, 411 U.S. 792, 802 (1973).[4] The district court found that Anderson failed to state a prima facie claim because she did not produce facts to show that a similarly situated person was treated differently,

and did not produce "additional direct, circumstantial, or statistical evidence tending to indicate that the employer singled out the plaintiff for discharge for impermissible reasons." Opinion, J.A. at 463. The district court stated that, while Anderson claimed Berke was a similarly situated employee, but younger than Anderson and male, Premier demonstrated that his assignment to the Strategic Planning team would only have taken effect after he finished another project. Since this never occurred, Berke was not similarly situated to Anderson.

**\*3** The court also found that Anderson could not claim that the other BSLs were similarly situated, because they were all "operation team leaders" who had job functions different from hers, although they shared the same title as Anderson. Although Anderson had been an operation team leader in Europe, she was not an operation team leader at the time she was fired. The court also found that Anderson's "statistical evidence" did not provide sufficiently compelling evidence to establish a prima facie discrimination claim.

The court also rejected Anderson's claim that Premier discriminated against her by failing to promote her instead of hiring Wojnarowski. It found that Anderson produced no operative facts to show that Premier discriminated against Anderson when it hired Wojnarowski.

The court also rejected Anderson's breach of contract claim, finding that she had signed a contract providing that Premier would give 14 days notice before terminating her, and that she was fired on April 17, 1991, yet continued to receive full pay and benefits to April 30, full pay until August 7, 1991, and half-pay through November 27, 1991. The court also held that Anderson could not rely on statements made in her employee handbook, because the handbook expressly stated that it was not a contract, and that the oral representations she raised were not sufficiently specific to create a contract, or to support her promissory estoppel claim.

## II

This court reviews de novo a decision granting summary judgment. Storer Communications, Inc. v. National Ass'n of Broadcast Employees and Technicians, 854 F.2d 144, 146 (6th Cir. 1988). Summary judgment is appropriate when there is no genuine issue of material fact and as a

Case 2:15-cv-12312-MOB-EAS ECF No. 48-48, PageID.1060 Filed 08/01/16 Page 21 of 98

Anderson v. Premier Indus. Corp., 62 F.3d 1417 (1995)

1995 WL 469429

matter of law the moving party is entitled to judgment. Celotex Corp. v. Catrett, 477 U.S. 317 (1986). Failure of proof concerning an essential element of a plaintiff's case "necessarily renders all other facts immaterial." Id. at 323.

To survive summary judgment, in the absence of direct proof of discrimination, Anderson must produce evidence to make a prima facie discrimination case under the four-part McDonnell Douglas test. McDonnell Douglas, 411 U.S. at 792; see also Texas Dep't of Community Affairs v. Burdine, 450 U.S. 248, 252-53 (1981) (sex discrimination); Gagné v. Northwestern Nat'l Ins. Co., 881 F.2d 309, 313 (6th Cir. 1989) (age discrimination).

Employees dismissed in a RIF cannot demonstrate facts supporting the fourth part of the McDonnell Douglas test, because they have not been replaced. In this situation, the employee must produce "additional direct, circumstantial, or statistical evidence tending to indicate that the employer singled out the plaintiff for discharge for impermissible reasons." Barnes, 896 F.2d at 1465; see also Ridenour v. Lawson Co., 791 F.2d 52, 57 (6th Cir. 1986). The Barnes court noted that a RIF plaintiff could state a prima facie claim by showing that he or she "possessed qualifications superior to those of a younger co-worker working in the same position" or "could show that the employer made statements indicative of a discriminatory motive." Id. at 1466.

**\*4** Anderson argues first that there is an issue of whether Premier actually had a RIF, because the record lacked evidence of economic necessity in Anderson's firing. She claims that in other RIF cases, the employer produced evidence that it suffered from severe economic difficulties, citing Hawley v. Dresser Indus., 958 F.2d 720, 722 (6th Cir. 1992); LaGrant v. Gulf & Western Mfg. Co., Inc., 748 F.2d 1087, 1089 (6th Cir. 1984); and Barnes, 896 F.2d at 1461-62. Therefore, since Premier did not show it was under severe economic stress, Anderson claims that the heavier burden applied to RIF plaintiffs should not be applied to her.

Whether Premier was under severe economic stress is irrelevant to whether Anderson must produce other evidence of discrimination to state a prima facie claim. Whatever Premier's condition, the fact remains that Anderson was not replaced, and must therefore produce other evidence that Premier discriminated against her. Anderson might use her allegation that Premier was

not experiencing economic stress to argue that the RIF was pretextual. Yet Anderson states in her brief that "[p]laintiff did not assert that the entire RIF itself was purely a pretext" and does not claim that she produced evidence of pretext. Anderson Br. at 14. We therefore determine that the district court properly required Anderson to produce additional evidence of discrimination to state a prima facie claim.

Anderson next argues that she raised issues of fact that indicated discrimination, which were improperly resolved against her. Anderson states there is a genuine issue of fact about whether the other BSLs were similarly situated to her. Anderson argues that Berke, a BSL, was similarly situated to her, but was transferred, not fired, and was male and younger. She states that there is a factual dispute over the composition of the Strategic Planning group, because she claims Berke was part of the group and Premier claims he had not yet been assigned to the group. She also claims that Berke was transferred from his BSL position to a position as Computer Systems Leader (without a change in job duties), while both Drimmer and Anderson, two older women, were not. She argues that the fact that Berke was retained when she was not provided proof of the fourth part of the prima facie test, citing Hawley, 958 F.2d at 724. She alternatively argues that she was similarly situated to the other four BSLs at Premier, because they held the "same job" as Anderson.

Premier counters that Anderson failed to demonstrate she was similarly situated to retained employees. First, Premier provided the affidavits of several employees to show that Berke was not yet assigned to the Strategic Planning unit when Anderson was dismissed. Therefore, Anderson could not claim that she was similarly situated to Berke. Nor could she show she was similarly situated to the other male or younger BSLs because each BSL was assigned specific responsibilities for a different functional area of the company. BSLs do not perform the same job, so the fact Premier retained male BSLs when it dismissed Anderson cannot support an inference of discrimination.

**\*5** While Premier provided detailed affidavits to support its assertions, of the voluminous papers Anderson provided to support her brief opposing Premier's motion for summary judgment, only her own affidavit and deposition transcript express the view that Berke was a member of the Strategic Planning group. She does not produce evidence to support her assertion that the other

BSLs were similarly situated to her, nor did she refute Premier's evidence that they were not. Anderson has not borne her burden of producing "specific facts showing that there is a genuine issue for trial," on this issue, and we hold that the district court did not err by determining that her allegations failed to raise any genuine issue of material fact. Fed. R. Civ. P. 56(e).

Anderson also argues that she produced evidence that Premier manipulated its workforce to her detriment, by requiring that she stay in Europe, so she was not made a "team leader" like the other BSLs. She also states that she was "far better" qualified than the other BSLs, and received far better performance reviews. She also states that Premier manipulated its workforce by forming the Strategic Planning group and then deciding to eliminate it just a few months later. From the record, it appears that Anderson's contentions regarding Premier's motives in requiring her to stay in Europe, and in forming a Strategic Planning group are not supported by any evidence.

However, Anderson does provide job assessments for the other BSLs in an effort to demonstrate her superior qualifications. It does not appear that these performance reviews establish that Anderson was a "far better" employee, who was nevertheless dismissed, which could create an inference of discrimination. These reviews therefore do not provide other evidence of discrimination that would allow Anderson to sustain a prima facie discrimination claim.

Anderson also argues that she produced statistics to show discrimination. Anderson states that Premier's Cleveland "management employees" before the RIF were 25.7% female (9 of 35 employees). Anderson continues:

> The percentage of women of the employees who were in the work force on April 17, 1991 and were terminated both voluntarily and involuntarily between January, 1991 and July, 1992 was 50% (i.e. 4 of 8 employees). The percentage of women who were involuntarily terminated from management as a result of the RIF was 75% (i.e. 3 of 4 employees). Finally, of those management employees who were terminated as a result of the RIF for non-performance reasons, 100% were women. (i.e. 2 of 2 employees,

Plaintiff and Drimmer) .... This is prima facie evidence of discrimination. Campbell v. Rust Engineering Co., 927 F.2d 603 (6th Cir. 1991) (Table) [1991 WL 27423]. [5]

**\*6** Anderson Br. at 26. Anderson also argues that she generated statistical evidence of age discrimination:

> The average age of all six BSLs in the Cleveland MIC System Development Group prior to Plaintiff's discharge was 45.7. After Plaintiff's discharge their average age dropped to 43.6. In addition the average age of upper level management in the Cleveland MIC Systems development Group ... was 43.8 prior to the RIF. It dropped to 42.4 after the RIF.

Anderson Br. at 27. Exhibits, J.A. at 257-62; Employee data, J.A. at 317-21.

While Anderson acknowledges that she has drawn these statistics from a small sample size, she argues that this court has recognized that small samples are sometimes acceptable in employment discrimination cases, and that coupled with her other evidence of discrimination, this court should find that she presented additional proof of discrimination sufficient to state a prima facie claim. McCabe v. Champion Intl. Corp., 916 F.2d 713 (6th Cir. 1990) (Table), 1990 WL 156104; EEOC v. New York Times Broadcasting Serv., 542 F.2d 356, 360 (6th Cir. 1976).

Premier counters that statistics involving small numbers of people, as here, are suspect, since only about eight people departed in the set of employees she analyzed. Simpson v. Midland-Ross Corp., 823 F.2d 937, 943 (6th Cir. 1987); New York Times Broadcasting, 542 F.2d at 360. Premier notes that Anderson cites New York Times Broadcasting for support, although in that case the plaintiff could supplement her small set of statistics with direct evidence of discriminatory intent, in that the hiring director in that case also stated that "he already had a woman reporter and did not expect to hire another." 542 F.2d at 358. Premier argues that Anderson's statistics do not demonstrate a disparity that would fall outside the

1995 WL 469429

expected statistical norms, given the small sample size, especially the age disparity statistic, which shows that the average age of BSLs declined only 2.1 years after Anderson's and Drimmer's termination, and the age of the nine "upper level management" employees declined only 1.4 years.

We agree. In Simpson, this court stated:
Statistical evidence, such as that offered by Simpson, does not differ greatly from other types of proof.... Statistics gain relevance in one of two ways: the statistics, standing alone, reasonably lead to a particular conclusion validated by human experience, or comparative statistics point out discrepancies in behavior that would cause the average person to scrutinize the employer's motives .... For statistics to be valid and helpful in a discrimination case, "both the methodology and the explanatory power of the statistical analysis must be sufficient to permit an inference of discrimination." Segar v. Smith, 738 F.2d 1249, 1274 (D.C. Cir. 1984). The facts cited by Simpson do not tell us anything about age other than that some people were of various ages, facts that in and of themselves are meaningless.

*7 Simpson, 823 F.2d at 944.

The weakness of Anderson's statistical assertions can be seen by examining her "proof" of sexual discrimination, based upon the fact that both of the two persons fired were women. As a purely statistical matter, the chance that both people terminated would be women, when chosen at random from a group of 26 men and 9 women, is about 6%.[6] While this is not the expected result, neither is it extremely unusual. It is what we would expect to happen on six occasions if 100 perfectly non-discriminating companies had to carry out the same reduction. We do not believe that a plaintiff in each of those six companies should automatically be able to get to a jury, based on no more evidence than is present here. Her other statistical examples are in the same range of statistical power and similarly unconvincing.

Therefore, Anderson's statistics do little more than demonstrate that the dismissal of two women in the RIF left the company with a higher concentration of male employees, and that the dismissal of an older employee reduces the average age of the remaining group. Without additional evidence of discriminatory animus,

Anderson's statistics fail to provide additional evidence of discrimination.

We find that the district court correctly determined that Anderson failed to present sufficient additional evidence of discrimination to state a prima facie sex or age discrimination claim. The two additional allegations she substantiates with some evidence -- that she was "far better qualified" than other BSLs, and her offer of statistical proof of discrimination -- do not suffice to provide the necessary additional evidence to raise a genuine issue of material fact.

Therefore, we hold that the district court properly granted Premier's motion for summary judgment on Anderson's sex and age discrimination claims related to her dismissal.

### III

To establish a discrimination claim based on Premier's failure to promote Anderson, she must show that she applied for an available position, for which she was qualified, but was rejected under circumstances giving rise to an inference of discrimination. Burdine, 450 U.S. at 253.

Premier argues that Anderson has not shown that Premier's stated reason for going outside the company for a new director -- that the present staff was not competent to do the job -- was pretextual. Premier admits that it hired Tom Wojnarowski in October 1990 to become Director of Systems Development, although it did not immediately tell its employees that he would be taking this position. Premier notes that Anderson applied for the position in March 1991, once she learned that Premier was filling the position, but after Wojnarowski was hired. Therefore, Premier also states that the position was not available, and Anderson cannot argue that Premier's failure to hire her was due to discrimination.

*8 We determine that the district court did not err by dismissing this claim. Anderson failed to bear her burden of producing evidence to state a discrimination claim for Premier's failure to promote her. Burdine, 450 U.S. 253-55.

1995 WL 469429

IV

Anderson also included a claim for age and sex discrimination, in violation of Ohio Rev. Code § 4112.02(A), under the civil action provision of § 4112.99. Under Ohio law, Anderson's age discrimination claim is barred by the 180- day statute of limitation in § 4112.02(N), but her sex discrimination claim is not, as a six-year limitation term applies to it under Cosgrove v. Williamsburg, 638 N.E.2d 991 (Ohio 1994).

Ohio courts apply the McDonnell Douglas/Burdine framework to claims under state law. See Mitchell v. Toledo Hosp., 964 F.2d 577, 582 (6th Cir. 1992); Plumbers & Steamfitters Joint Apprenticeship Comm. v. Ohio Civ. Rights Comm'n, 421 N.E.2d 128, 131-32 (Ohio 1981). Therefore, for the reasons previously stated, we affirm the district court's dismissal of Anderson state law sex discrimination claim.

We also find that the district court properly dismissed Anderson's breach of contract and promissory estoppel claims, for the reasons stated by that court.

AFFIRMED.

**All Citations**

62 F.3d 1417 (Table), 1995 WL 469429

Footnotes

1    Wojnarowski was first announced as a "special assistant" to Baskind, in October 1990, although he was hired to be Director of Systems Development. Letter, J.A. at 168. In March 1991, Wojnarowski was "publicly" named Director of Systems Development.

2    Wojnarowski noted that Berke was never transferred into Strategic Planning. Wojnarowski Aff., J.A. at 166. In fact, Berke did not complete work on his previous project until the first quarter of 1992. Baskind Aff., J.A. at 152; Berke Aff., J.A. at 170. Berke also stated that he did not meet with the Strategic Planning group on a regular basis. Berke Depo, J.A. at 205.

3    Section 4112.02(A) reads:

It shall be an unlawful discriminatory practice:

(A) For any employer, because of the race, color, religion, sex, national origin, handicap, age, or ancestry of any person, to discharge without just cause, to refuse to hire, or otherwise to discriminate against that person with respect to hire, tenure, terms, conditions, or privileges of employment, or any matter directly or indirectly related to employment.

4    To establish such a claim, Anderson must produce facts to show she (1) was a member of a protected class; (2) was subjected to adverse employment action; (3) was qualified for a particular position; and (4) either was replaced by a person not a member of the protected class or adverse employment action was not taken against a similarly situated person not a member of the protected class. McDonnell Douglas, 411 U.S. at 802; see also Barnes v. GenCorp. Inc., 896 F.2d 1457, 1464 n.6 (6th Cir.), cert. denied, 498 U.S. 878 (1990).

5    Although Anderson cites Campbell for support, the plaintiff in Campbell also produced direct evidence of discriminatory intent. The plaintiff testified that his manager told him that he "made a decision to go with Byrd as a younger person on my job." 1991 WL 27423 at **3. The court held that "[p]laintiff's testimony regarding his conversation with Morris and the circumstances surrounding his termination" provided the additional evidence required to state a prima facie discrimination claim in a work force reduction case. Id. at **4.

6    9/35 x 8/34 = .0605.

---

End of Document         © 2016 Thomson Reuters. No claim to original U.S. Government Works.

2016 WL 978390©

2015 WL 9487903
Only the Westlaw citation is currently available.
United States District Court,
W.D. Michigan, Southern Division.

Timika Foster, Plaintiff,
v.
Mary Free Bed Rehabilitation Hospital, Defendant.

Case No. 1:13-cv-1350
|
Signed 08/06/2015

**Attorneys and Law Firms**

Julie A. Gafkay, Gafkay Law, PLC, Frankenmuth, MI, for Plaintiff.

Annalise J. Buth, William H. Fallon, Miller, Johnson, Snell & Cummiskey, PLC, Grand Rapids, MI, for Defendant.

### OPINION AND ORDER

JANET T. NEFF, United States District Judge

**\*1** Plaintiff, an African–American nurse, filed this action against her former employer, Defendant Mary Free Bed Rehabilitation Hospital, alleging race discrimination based on a patient's family's request for no black nursing care, and alleging discrimination and retaliation based on Defendant's subsequent failure to promote Plaintiff to fill a Nursing Supervisor position. Defendant has filed a motion for summary judgment (Dkt 42); Plaintiff has filed a Response (Dkt 43); and Defendant has filed a Reply (Dkt 45). Having fully considered the parties' briefs and accompanying exhibits, the Court grants Defendant's motion. [1]

### I. Facts

The parties have filed a Joint Statement of Material Facts (JSMF) (Dkt 44), agreeing to certain underlying facts in numbered paragraphs, as follows:

I. PLAINTIFF'S EMPLOYMENT AS A REGISTERED NURSE AT MARY FREE BED

1. Mary Free Bed Rehabilitation Hospital is a non-profit corporation that provides rehabilitative care for patients with traumatic brain injuries, spinal cord injuries, stroke effect, and various pediatric conditions. Mary Free Bed provides this care at its 80–bed hospital in Grand Rapids and through network organizations across Michigan.

2. Plaintiff Timika Foster is a Registered Nurse ("RN").

3. She is African–American.

4. Mary Free Bed employed Plaintiff from February 2001 until May 2013, when Plaintiff resigned. Subsequently, Plaintiff began working in a clinical education position in Phoenix, Arizona.

5. In 2010, Plaintiff worked at Mary Free Bed as a full time floor nurse; she generally worked an eight-hour night shift from 11:00 pm to 7:00 am, Sunday through Thursday. Plaintiff also worked every other weekend. When she worked a weekend, her mid-week schedule was adjusted so that she worked a total of 80 hours during each two-week period.

6. Plaintiff was regularly assigned to Team 2, which provides care for brain-injured patients. Those patients stayed in rooms on the West half of the third floor at Mary Free Bed.

II. THE ALLEGED RACE–BASED CAREGIVER REQUEST

7. On Friday, December 3, 2010, near the beginning of Plaintiff's night shift, Plaintiff alleges that Dorothy Wiest, a second shift Nursing Supervisor who was finishing her shift, told Plaintiff, "You know, the people in 312 don't want any black people in there ... so just—for now just don't even worry about it. Don't go in there."

8. The patient in room 312 was being treated for a traumatic brain injury.

9. The patient was admitted to Mary Free Bed's inpatient unit on December 1, 2010 at 11:30 am. He was discharged at noon on December 10, 2010.

10. The next evening, Saturday, December 4, Plaintiff called Mary Free Bed's Director of Nursing, Connie

Brown–Olds, and told her about the alleged request. At the time, Brown–Olds was on leave.

### III. PLAINTIFF'S EMPLOYMENT DURING THE PATIENT'S INPATIENT STAY AT MARY FREE BED

**\*2** 11. From the night of December 3 when Plaintiff heard of the alleged request, until mid-day December 10 when the patient in Room 312 was discharged, Plaintiff worked four night shifts on 3–West: December 3, 4, 8, and 9.

12. During the patient's entire in-patient stay at Mary Free Bed, Plaintiff continued to work the same shifts and hours that she had regularly been assigned before December 3.

13. During the patient's entire in-patient stay, Plaintiff continued to perform the same duties with respect to all other patients that she was responsible for during her shifts. She was not given lowlier tasks or asked to do things beneath her qualifications as an RN.

### IV. PLAINTIFF APPLIES FOR A NIGHT SHIFT NURSING SUPERVISOR POSITION IN DECEMBER 2011

14. In December 2011, Plaintiff applied for an open third shift Nursing Supervisor position.

15. Mary Free Bed posted the third shift Nursing Supervisor position in order to replace a Nursing Supervisor whose employment had ended.

### V. MARY FREE BED'S DECISION TO OFFER THE NURSING SUPERVISOR TO DEBBRA EMPIE OVER THE OTHER FOUR CANDIDATES.

16. Mary Free Bed decided to offer the third-shift Nursing Supervisor position to Debbra Empie, a Caucasian RN, over the other four candidates, including Plaintiff Foster.

17. Mary Free Bed's job description for the Nursing Supervisor stated, "Bachelor's degree in nursing is preferred; Masters Degree in nursing, health care administration, business, or a related field is preferred." Empie was a Registered Nurse and had an associate's degree in nursing. Foster had a master's degree in nursing education.

### II. Summary Judgment Standard

Summary judgment is proper "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a). The court must consider the evidence and all reasonable inferences in favor of the nonmoving party. *Burgess v. Fischer,* 735 F.3d 462, 471 (6th Cir.2013); *U.S. S.E.C. v. Sierra Brokerage Servs., Inc.,* 712 F.3d 321, 327 (6th Cir.2013).

The moving party has the initial burden of showing the absence of a genuine issue of material fact. *Jakubowski v. Christ Hosp., Inc.,* 627 F.3d 195, 200 (6th Cir.2010). The burden then "shifts to the nonmoving party, who must present some 'specific facts showing that there is a genuine issue for trial.' " *Id.* (quoting *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248 (1986)). "There is no genuine issue for trial where the record 'taken as a whole could not lead a rational trier of fact to find for the non-moving party.' " *Burgess,* 735 F.3d at 471 (quoting *Matsushita Elec. Indus., Co. v. Zenith Radio Corp.,* 475 U.S. 574, 587 (1986)). "The ultimate inquiry is 'whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law.' " *Sierra Brokerage Servs.,* 712 F.3d at 327 (quoting *Anderson,* 477 U.S. at 251–52).

"[A] complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial." *Celotex Corp. v. Catrett,* 477 U.S. 317, 323 (1986); *see also Minadeo v. ICI Paints,* 398 F.3d 751, 761 (6th Cir.2005). The "mere existence of a scintilla of evidence" in support of the plaintiff's position is insufficient to survive summary judgment; "there must be evidence on which the jury could reasonably find for the plaintiff." *Anderson.,* 477 U.S. at 252.

### III. Analysis

**\*3** Plaintiff alleges claims of (1) race discrimination with respect to Defendant's nursing assignments under 42 U.S.C. § 1981 (Count I); and (2) race discrimination and retaliation with respect to the failure to promote under both 42 U.S.C. § 1981 (Count II) and Michigan's Elliot–Larsen Civil Rights Act (ELCRA), MICH. COMP.

2016 WL 978390©

LAWS § 37.2101 *et seq.* (Count IV). [2] The Court finds no jury-submissible question with respect to either the nursing assignment claim or the failure to promote claims. Defendant is entitled to judgment as a matter of law on the record before the Court.

### A. Nursing Assignment Claim

Plaintiff alleges that Defendant intentionally discriminated against African–American employees, including Plaintiff, when it required that no African–American employees care for a certain Caucasian patient in December of 2010. Further, such racial discrimination denied Plaintiff the enjoyment of all benefits, privileges, terms and conditions of her employment because of her race.

The parties do not dispute that to establish a *prima facie* claim of race discrimination, "a plaintiff must show that he has suffered an adverse employment action; that is, he must establish that he has suffered a 'materially adverse' change in the terms or conditions of employment because of the employer's actions." *Allen v. Michigan Dep't of Corr.,* 165 F.3d 405, 410 (6th Cir.1999). [3] Defendant argues that Plaintiff cannot show an adverse employment action with respect to the alleged race-based caregiver request, and thus, she cannot prove her claim of race discrimination. Plaintiff argues, however, that she was subjected to an adverse employment action by being denied the opportunity to perform her job duties despite the fact that she had the same rate of pay and benefits, and her duties were not changed (Pl. Resp., Dkt 43 at Page ID# 351).

Defendant sets forth case holdings from the Sixth Circuit further defining what constitutes an "adverse employment action," which Plaintiff does not challenge. "An adverse employment action 'constitutes a significant change in employment status, such as hiring, firing, failing to promote, reassignment with significantly different responsibilities, or a decision causing a significant change in benefits.' " *Laster v. City of Kalamazoo,* 746 F.3d 714, 727 (6th Cir.2014) (quoting *Burlington Indus., Inc. v. Ellerth,* 524 U.S. 742, 761 (1998)). "[R]eassignments without salary or work hour changes do not ordinarily constitute adverse employment decisions in employment discrimination claims." *Kocsis v. Multi–Care Mgmt., Inc.,* 97 F.3d 876, 885 (6th Cir.1996). " '[A] materially adverse change in the terms and conditions of employment must be more disruptive than a mere inconvenience or an alteration of job responsibilities.' " *Bowman v. Shawnee State Univ.,* 220 F.3d 456, 461 (6th Cir.2000) (quoting *Hollins v. Atlantic Co.,* 188 F.3d 652 (6th Cir.1999)). " 'The Sixth Circuit has consistently held that *de minimis* employment actions are not materially adverse and, thus, not actionable.' " *Id.* An employee's perception that he or she was shunned or ostracized is generally not a materially adverse action. *Wierengo v. Akal Sec., Inc.,* 580 F. App'x 364, 373 (6th Cir.2014).

**\*4** Thus, "[t]o determine whether an employment action is materially adverse, the Sixth Circuit focuses on five factors: (1) significant changes in responsibility; (2) decreased salary; (3) less distinguished title; (4) material loss in benefits; and (5) other indices that might be unique to a particular situation." *Lentz v. City of Cleveland,* 410 F.Supp.2d 673, 684 (N.D.Ohio 2006) (citing *Kocsis,* 97 F.3d at 886). Further, an adverse employment action "typically 'inflicts direct economic harm.' " *Laster,* 746 F.3d at 727 (quoting *Burlington Indus.,* 524 U.S. at 762).

Giving full consideration to these principles, the Court concludes that Plaintiff has failed to show an actionable adverse employment action with respect to the alleged race-based nursing assignment. Plaintiff's nursing reassignment pertained to a brain-injured patient in Defendant's facility from December 1 to December 10, 2010, during which time Plaintiff worked four night shifts: December 3, 4, 8 and 9. According to Plaintiff's deposition testimony, she was repeatedly told that she could not go into the patient's room because she is African–American (Pl. Resp. at Page ID# 344–45, citing Jt. Ex.1, Pl. Dep. at 66). Plaintiff contends she "was negatively impacted by being told not to care for a patient based on her race because she couldn't fully take care of the patient as needed; she felt humiliated and devalued; she had worked hard to be a good nurse and she should have been able to take care of anybody" (*id.* at Page ID# 345, citing Jt. Ex.1, Pl. Dep. at 92). No materially adverse employment action is made out on these facts.

As Defendant points out, and Plaintiff does not dispute, she continued to work her regularly-assigned shifts and hours (Def. Br., Dkt 42 at Page ID# 205, citing Jt. Ex.1, Pl. Dep. at 91–92). Her "job assignment" as a floor RN was not changed (*id.,* citing Pl. Dep. at 97). She continued to perform the same RN duties and tasks for

2016 WL 978390©

every patient for whom she was responsible (*id.,* citing Pl. Dep. at 96). She was not given lowlier tasks or asked to do anything beneath her qualifications as an RN (*id.*). Her pay and benefits were not affected (*id.,* citing Pl. Dep. at 91–92). There was no change in any aspect of her working conditions (*id.,* citing Pl. Dep. at 92). Also, Plaintiff continued to perform duties with respect to the patient at issue by charting detailed entries of nursing assessments and medication, as would be typical for her (*id.* at Page ID# 206, citing Pl. Dep. at 98–99, 102–03, 118–19, 125, 127 and Def. Ex. 1, Bustin Decl.¶¶ 12–14; Def. Reply, Dkt 45 at Page ID# 593). Because Plaintiff suffered no change in her shift, hours, position, title, duties, status, pay, benefits, or any other significant aspect of her employment, the alleged race-based nursing assignment was not materially adverse.

Plaintiff nonetheless contends that she was affected by Defendant's enforcement of the race-based care request because it resulted in a segregation of employees based on race. She asserts that she was explicitly told not to care for a patient based on race (Pl. Resp. at Page ID# 357) and that the reassignment of Plaintiff and other African–American employees was made specifically because of their race, which is prohibited under the Civil Rights Act, 42 U.S.C. § 2000e–2(a)(2) (*id.* at Page ID# 356–57). Plaintiff argues that despite records reflecting that African–American employees continued to care for the patient during his stay, she did not personally provide the care that she charted for the patient, and there remains a factual dispute as to race discrimination in assignments (*id.* at Page ID# 357).

**\*5** The Court is not persuaded by Plaintiff's arguments. While Defendant's acquiescence to a race-based care request appears inherently wrong and generally contrary to anti-discrimination law, the question in this case is whether *this* Plaintiff can recover for intentional discrimination under the legal theories presented. On the record before the Court, the answer is "no" because any effect on Plaintiff was *de minimus* and temporary. "Similar to cases where the employment action is not significant enough to rise to the level of a materially adverse employment action, cases where the employment action, while perhaps being materially adverse if permanent, is very temporary also do not constitute materially adverse employment actions." *Bowman,* 220 F.3d at 462. Defendant is entitled to summary judgment of the nursing assignment claim.

### B. Failure to Promote Claims

Plaintiff alleges that Defendant further discriminated and retaliated against her, because of her race discrimination complaints about the nursing assignments, when Plaintiff applied for a promotion to Nursing Supervisor in December 2011, and rather than promoting Plaintiff, Defendant hired a less qualified, Caucasian candidate, Debbra Empie. The Court concludes that Defendant is entitled to summary judgment of these claims.

#### 1. Discrimination

To establish a *prima facie* case of failure-to-promote discrimination based on circumstantial evidence, Plaintiff must show: (1) she belongs to a protected class; (2) she applied for and was qualified for the promotion; (3) she was considered for and denied the promotion despite her qualifications; and (4) an individual of similar qualifications who was not a member of the protected class received the promotion. *White v. Columbus Metro. Hous. Auth.,* 429 F.3d 232, 240 (6th Cir.2005). If Plaintiff satisfies these requirements, the burden shifts to Defendant to articulate a legitimate, nondiscriminatory reason for its action. *Chen v. Dow Chemical,* 580 F.3d 394, 400 (6th Cir.2009). The burden then shifts back to Plaintiff to establish that Defendant's stated reasons are a pretext for race discrimination, i.e. that the employer's explanation was fabricated to conceal an illegal motive. *Id.*

The parties dispute only the fourth element of the *prima facie* case, whether the job candidates were "similarly situated." "Similarly situated does not mean identical; it means that the plaintiff was 'similar in all of the *relevant* aspects.' " *Braithwaite v. Dep't of Homeland Sec.,* 473 F. App'x 405, 410 (6th Cir.2012) (quoting *Ercegovich v. Goodyear Tire & Rubber Co.,* 154 F.3d 344, 352 (6th Cir.1998) (emphasis in original) (quotation omitted)). Plaintiff argues that because she and Debbra Empie both met the minimum qualifications for the Nursing Supervisor position as far as knowledge, education and training requirements, they were "similar" in all relevant aspects (Pl. Resp. at Page ID# 361). Defendant argues, however, that Plaintiff's qualifications were not "similar" to those of Empie because Plaintiff had objectively less leadership and supervisory experience, which are

2016 WL 978390©

indisputably relevant qualifications (Def. Reply at Page ID# 594).

To satisfy the fourth element, a plaintiff must establish that she and the non-protected person who ultimately was hired for the desired position had similar qualifications. *White,* 429 F.3d at 24243. Management Experience is of one of four objective qualification categories on the Nursing Supervisor Candidate Qualification Chart used by Defendant in hiring. Plaintiff's only management experience was "Charge Nurse: 2011–current at outside facility" (Def. Ex. 4, Dkt 42–5 at Page ID# 270). Plaintiff had no supervisory experience. Defendant notes, and Plaintiff does not dispute, Empie had twelve years of nursing leadership experience (Def. Br. at Page ID# 215). Empie was a PM Supervisor for one year; Assistant Director of Nursing for more than three years; Acting Director of Nursing for one year; Director of Nursing for one year; Quality Improvement Nurse for two years; and Clinical Care Coordinator for four years (*id.*; Brown–Olds Dep., Jt. Ex. 7, Foster Application and Jt. Ex. 8, Empie Application). Plaintiff asserts only that she had "management experience as a charge nurse" (Pl. Resp. at Page ID# 363). Plaintiff had never disciplined or evaluated another employee (Jt. Ex. 1, Pl. Dep. at 141–43). Given the significant disparity in the two candidates' management and supervisory experience, Plaintiff has failed to show that she had similar qualifications to Empie with respect to the Nursing Supervisor position. She thus has failed to establish a *prima facie* case of discrimination.

**\*6** Even assuming a *prima facie* case, Plaintiff has failed to show that Defendant's legitimate, nondiscriminatory reason for hiring Empie was pretext. Defendant asserts that it hired Empie because of her superior qualifications for the Nursing Supervisor position. A plaintiff may rebut a defendant's legitimate, nondiscriminatory reason and demonstrate pretext by showing that "(1) the employer's stated reason for terminating the employee has no basis in fact, (2) the reason offered for terminating the employee was not the actual reason for the termination, or (3) the reason offered was insufficient to explain the employer's action." *Imwalle v. Reliance Med. Products, Inc.,* 515 F.3d 531, 545 (6th Cir.2008).

"Relative qualifications establish triable issues of fact as to pretext where the evidence shows that either (1) the plaintiff was a plainly superior candidate, such that no reasonable employer would have chosen the latter

applicant over the former, or (2) plaintiff was as qualified as if not better qualified than the successful applicant, and the record contains 'other probative evidence of discrimination.' " *Bartlett v. Gates,* 421 F. App'x 485, 490–91 (6th Cir.2010) (quoting *Bender v. Hecht's Dep't Stores,* 455 F.3d 612, 627–28 (6th Cir.2006)). Plaintiff argues a factual dispute "can be made that Plaintiff was a plainly superior candidate, such that no reasonable employer would have chosen the other candidate over her" (Pl. Resp. at Page ID # 362). Plaintiff cites the facts that she was an internal candidate with more than 10 years experience with Defendant, and she had a master's degree whereas Empie had only an associate's degree. Further, Jill Crane, an interviewer and African–American nursing supervisor with Defendant, believed Plaintiff was a victim of race discrimination. [4]

The evidence cited by Plaintiff fails to rebut Defendant's legitimate, nondiscriminatory reason for selecting Empie over Plaintiff, which has abundant support in the record. In addition to the management/supervisory disparity discussed above, Defendant determined Empie was the best candidate based on her experience, HSI (Healthcare Selection Inventory) [5] scores, interviews, and Candidate Evaluation form scores (Def. Br. at Page ID# 215–16). Empie's overall HSI score was the highest of the five candidates, at 84.2, while Plaintiff's was the lowest, at 49.2 (Def. Ex. 4, Hufnagel Decl., Ex. A). Empie's scores were higher in ten out of twelve categories, including performance, retention, service excellence, work ethic/attendance, energy, customer focus, compassion, multi-tasking, value diversity, and openness to learning (*id.*). Empie's interview ratings were consistently superior; every interviewer recommended hiring her for the position (*id.,* Ex. C). Plaintiff's interview scores were not as high, and only one interviewer recommended hiring Plaintiff (*id.,* Ex. B).

Empie had the highest Candidate Evaluation Scores of the five candidates, scoring 15, 14, 15, 14, and 14.125 out of 15 from the five interviewers (*id.,* Ex. B). Plaintiff scored 9, 11, 9.4, 11.5, and 11.5 (*id.,* Ex. B). Plaintiff's average score of 10.48 was much lower than Empie's average score of 14.425 (*id.,* Exs.B, C). A master's degree was preferred, not required for the Nursing Supervisor position. Finally, Crane's mere belief that Plaintiff was the victim of race discrimination carries little weight, if any, as other probative evidence of pretext. Contrary to Plaintiff's

Foster v. Mary Free Bed Rehabilitation Hospital, Not Reported in F.Supp.3d (2015)

2016 WL 978390©

contention, a triable issue of pretext is not made out on the record before the Court.

### 2. Retaliation

**\*7** Defendant argues that Plaintiff cannot prove retaliation because there is no evidence of a casual connection between protected activity and Defendant's hiring decision, and no evidence of pretext. The Court finds no triable issue of fact with respect to Plaintiff's retaliation claim, and Defendant is entitled to summary judgment.

To establish a circumstantial *prima facie* case of retaliation, Plaintiff must show: (1) she engaged in a protected activity, (2) Defendant knew of her protected activity, (3) Defendant took an employment action adverse to her, and (4) there was a causal connection between the protected activity and the adverse employment action. *See Little v. BP Exploration & Oil Co.,* 265 F.3d 357, 363 (6th Cir.2001). "To establish a causal connection, a plaintiff must proffer evidence sufficient to raise the inference that her protected activity was likely the reason for the adverse action." *Dixon v. Gonzales,* 481 F.3d 324, 333 (6th Cir.2007) (citations and quotations omitted).

Plaintiff cannot establish the required causal connection, because there is no evidence that her concern about the alleged patient treatment request in December 2010 was "likely the reason" she was not offered the Nursing Supervisor position. Fourteen months elapsed between the time of Plaintiff's alleged protected activity and the Nursing Supervisor hiring decision. This long temporal gap provides no basis for an inference of retaliation, and Plaintiff cites no other evidence of retaliatory conduct. *See Mickey v. Zeidler Tool & Die Co.,* 516 F.3d 516, 525 (6th Cir.2008) ("[w]here some time elapses between when the employer learns of a protected activity and the subsequent adverse employment action, the employee must couple temporal proximity with other evidence of retaliatory conduct to establish causality."). Plaintiff's citation to a couple personnel matters and the perceptions of an unnamed employee, and to Defendant's staff's purported angry or hostile reactions, are too isolated and remote to

establish the necessary causal connection for a *prima facie* case of retaliation.

Again, as with Plaintiff's claim of discrimination based on the failure to promote, even assuming a *prima facie* case, Plaintiff has failed to carry her burden of showing pretext. As discussed above, the record contains abundant, uncontroverted evidence supporting Defendant's nonretaliatory reason for hiring Empie instead of Plaintiff for the Nursing Supervisor position. Plaintiff has not presented evidence that rebuts Defendant's legitimate, nondiscriminatory reason for its hiring decision. *See Imwalle,* 515 F.3d at 545.

### IV. Conclusion

Even taking the facts in the light most favorable to Plaintiff, her discrimination and retaliation claims fail under the applicable legal standards. With regard to the alleged race-based nursing assignment, Plaintiff suffered no measurable adverse employment action such as loss of pay or quantifiable changes in the terms and conditions of her employment. Plaintiff is not entitled to recover for what is purely odious decisionmaking. Nor has Plaintiff shown that she was denied the Nursing Supervisor position because of her race or as retaliation for her complaints.

This decision is by no means intended to sanction any form of race-based decisionmaking with respect to employment in healthcare, for which employers may properly be held accountable under discrimination law. Discrimination law does not yield to accommodate patient or family preferences and prejudices. However, the facts here simply do not rise to the level of actionable discrimination or retaliation.

**\*8** Accordingly:

**IT IS HEREBY ORDERED** that Defendant's Motion for Summary Judgment (Dkt 42) is GRANTED.

### All Citations

Not Reported in F.Supp.3d, 2015 WL 9487903

Footnotes

2016 WL 978390©

1    Because the facts and arguments are well-presented in the materials submitted, the Court finds oral argument unnecessary to decide the motion. *See* W.D. Mich. LCivR 7.2(d).

2    The analytic framework and evidentiary burdens for the state and federal claims are essentially the same for purposes of this motion.

3    The elements of a *prima facie* case and the allocations of the burden of proof are the same for employment claims stemming from Title VII and § 1981. *Noble v. Brinker Int'l, Inc.,* 391 F.3d 715, 720 (6th Cir.2004). Plaintiff must show that (1) he is a member of a protected class; (2) he was qualified for the job and performed it satisfactorily; (3) despite his qualifications and performance, he suffered an adverse employment action; and (4) he was replaced by a person outside the protected class or was treated less favorably than a similarly situated individual outside of his protected class. *Laster v. City of Kalamazoo,* 746 F.3d 714, 727 (6th Cir.2014).

4    Crane likewise filed a discrimination lawsuit against Defendant. The court granted summary judgment in favor of Defendant. *See Crane v. Mary Free Bed Rehabilitation Hosp.,* Case No. 1:13–cv–1294–PLM (Dkt 48, Mar. 13, 2015). That case is currently on appeal.

5    A behavioral assessment tool Defendant uses in its hiring process that provides a numerical indication of the candidate's potential for success in the job based on each candidate's own responses.

---

**End of Document**         © 2016 Thomson Reuters. No claim to original U.S. Government Works.

Case 2:15-cv-12312-MOB-EAS   ECF No. 48-48, PageID.1071   Filed 08/01/16   Page 32 of 98

Johnson v. Metropolitan Government of Nashville and..., 502 Fed.Appx. 523...

502 Fed.Appx. 523
This case was not selected for
publication in the Federal Reporter.
Not for Publication in West's Federal Reporter.
See Fed. Rule of Appellate Procedure 32.1
generally governing citation of judicial decisions
issued on or after Jan. 1, 2007. See also
Sixth Circuit Rule 28. (Find CTA6 Rule 28)
United States Court of Appeals,
Sixth Circuit.

William L. JOHNSON, et al., Plaintiffs–Appellants,

v.

Middle METROPOLITAN GOVERNMENT
OF NASHVILLE AND DAVIDSON COUNTY,
TENNESSEE, et al., Defendants–Appellees.

Nos. 10–6102, 11–5174.
|
Oct. 18, 2012.

**Synopsis**

**Background:** Caucasian male police officers brought
action against police department and its former chief,
asserting reverse discrimination claims under Title VII
and Tennessee Human Rights Act (THRA). The United
States District Court for the District of Tennessee, Aleta
A. Trauger, J., 2010 WL 3342211, entered summary
judgment for department, and officers appealed.

**Holdings:** The Court of Appeals, Clay, Circuit Judge, held
that:

[1] department's destruction of promotion survey results
did not warrant spoliation sanctions;

[2] department spokesperson's statements about diversity
were not direct evidence of reverse discrimination under
Title VII;

[3] officers failed to establish a prima facie case of reverse
discrimination under Title VII; and

[4] officers failed to state a claim for disparate impact
discrimination.

Affirmed.

West Headnotes (10)

[1]     **Federal Civil Procedure**
        👉 Failure to Comply;Sanctions

        Police department's destruction of promotion
        survey results did not warrant spoliation
        sanctions in police officers' action alleging
        reverse discrimination in violation of
        Title VII and Tennessee Human Rights
        Act (THRA); although department was
        statutorily obligated to preserve surveys
        and police chief intentionally ordered
        their destruction, surveys were of minimal
        relevance to officers' claims, since they
        consisted only of supervisors' numerical
        scoring of promotion candidates and did not
        instruct supervisors to consider race, gender,
        or diversity in making their decisions. Civil
        Rights Act of 1964, § 701 et seq., 42 U.S.C.A. §
        2000e et seq.; West's T.C.A. § 4–21–101 et seq.

        9 Cases that cite this headnote

[2]     **Civil Rights**
        👉 Reverse Discrimination

        Memorandum written by police department's
        deputy chief urging promotion of a group of
        officers that included five minority candidates
        before next slate of officers, which contained
        no minority candidates, became eligible for
        promotion was not direct evidence of reverse
        discrimination in violation of Title VII, since
        deputy chief was not a decisionmaker in
        promotion process. Civil Rights Act of 1964,
        § 703, 42 U.S.C.A. § 2000e–2.

        Cases that cite this headnote

[3]     **Civil Rights**
        👉 Reverse Discrimination

        Police department spokesperson's alleged
        statements to local newspapers that
        department would consider diversity in
        making its promotion decisions was not direct

Case 2:15-cv-12312-MOB-EAS   ECF No. 48-48, PageID.1072   Filed 08/01/16   Page 33 of 98

Johnson v. Metropolitan Government of Nashville and..., 502 Fed.Appx. 523...

evidence of reverse discrimination in violation of Title VII; spokesperson's statements merely reflected department's awareness of a lack of minorities within its upper ranks and its desire to improve diversity. Civil Rights Act of 1964, § 703, 42 U.S.C.A. § 2000e–2.

1 Cases that cite this headnote

**[4]**   **Civil Rights**
👉 Discrimination against men;reverse discrimination

Police department commander's alleged statement that female officers received preferential treatment in department's promotion decisions was not direct evidence of reverse discrimination in violation of Title VII, since commander was not a decisionmaker in promotion process. Civil Rights Act of 1964, § 703, 42 U.S.C.A. § 2000e–2.

3 Cases that cite this headnote

**[5]**   **Civil Rights**
👉 Discrimination against men;reverse discrimination

Evidence that female officers received preferential treatment in police department's promotion process and that police chief was acutely conscious of department's long history of racial and gender imbalance was sufficient to show that department discriminated against the majority, as required to establish a prima facie case of reverse discrimination in violation of Title VII. Civil Rights Act of 1964, § 703, 42 U.S.C.A. § 2000e–2.

5 Cases that cite this headnote

**[6]**   **Civil Rights**
👉 Discrimination against men;reverse discrimination
**Civil Rights**
👉 Race, color, ethnicity, or national origin

Caucasian male police officers who were passed over for promotion failed to demonstrate that they were similarly situated

to minority officers who were chosen for promotion, as required to establish a prima facie case of reverse discrimination in violation of Title VII; officers' survey results fell below line for promotion. Civil Rights Act of 1964, § 703, 42 U.S.C.A. § 2000e–2.

2 Cases that cite this headnote

**[7]**   **Civil Rights**
👉 Discrimination against men;reverse discrimination
**Civil Rights**
👉 Race, color, ethnicity, or national origin

Even assuming caucasian male officers established a prima facie case of reverse discrimination against police department under Title VII, they failed to demonstrate that department's proffered legitimate, non-discriminatory reason for denying them promotions, specifically their poor survey results, was mere pretext for discrimination; officers' survey results fell below line for promotion, and minority officers with poor results also were not selected for promotion. Civil Rights Act of 1964, § 703, 42 U.S.C.A. § 2000e–2.

1 Cases that cite this headnote

**[8]**   **Federal Civil Procedure**
👉 Time for amendment
**Federal Civil Procedure**
👉 Pretrial Order

District court properly denied caucasian male officers' motion to amend their complaint to add allegations of disparate impact discrimination in their action against police department under Title VII; officers failed to show good cause for seeking an amendment more than two months after deadline in court's scheduling order. Civil Rights Act of 1964, § 703, 42 U.S.C.A. § 2000e–2.

6 Cases that cite this headnote

**[9]**   **Civil Rights**

Case 2:15-cv-12312-MOB-EAS ECF No. 48-48, PageID.1073 Filed 08/01/16 Page 34 of 98

Johnson v. Metropolitan Government of Nashville and..., 502 Fed.Appx. 523...

👉 Discrimination against men;reverse discrimination

**Civil Rights**

👉 Race, color, ethnicity, or national origin

Caucasian male officers' allegation that police department ignored objective criteria it gathered from written examinations and assessments in making its promotion decisions because of an intent to discriminate against majority candidates was insufficient to support a disparate impact claim under Title VII; officers' allegation was more akin to a disparate treatment claim. Civil Rights Act of 1964, § 703, 42 U.S.C.A. § 2000e–2.

Cases that cite this headnote

**[10]** **Civil Rights**

👉 Costs

**Civil Rights**

👉 Taxation

Police chief was not required to file a separate bill of costs from police department, which paid his legal fees, in order to be awarded attorneys' fees and costs as a prevailing party in caucasian male officers' action alleging reverse discrimination in violation of Title VII. Civil Rights Act of 1964, § 703, 42 U.S.C.A. § 2000e–2; Fed.Rules Civ.Proc.Rule 54(d)(1), 28 U.S.C.A.

1 Cases that cite this headnote

**\*525** On Appeal From The United States District Court For The District Of Tennessee.

BEFORE: CLAY and KETHLEDGE, Circuit Judges; DOW, District Judge.[*]

**Opinion**

CLAY, Circuit Judge.

**\*\*1** Plaintiffs William L. Johnson, Julian W. Moore, and Keith M. Holley, police officers employed by Defendant Metropolitan Police Department ("MNPD") of Nashville, Tennessee, appeal the district court's grant

of summary judgment on Plaintiffs' reverse discrimination claims. Plaintiffs were passed over for promotion as a result of a departmental policy that they allege favored minority and female candidates. They sued Defendants MNPD; Metropolitan Government of Nashville and Davidson County ("Metro"); MNPD's former chief, Ronal W. Serpas; and other MNPD personnel, alleging violations of 42 U.S.C. § 1983; Title VII of the 1964 Civil Rights Act, 42 U.S.C. § 2000e; and the Tennessee Human Rights Act ("THRA"), Tenn.Code Ann. §§ 4-21-401–4-21-408. The district court dismissed several of Plaintiffs' claims and, after the parties conducted discovery, granted Defendants' motion for summary judgment. Plaintiffs now appeal that judgment, several evidentiary rulings, and the district court's decision to tax costs against them. For the reasons that follow, we **AFFIRM** the district court's judgment in all respects.

**BACKGROUND**

**I. The MNPD Promotion Policy**

Prior to 2006, it was MNPD's policy to promote officers strictly through the use of standardized tests. An officer applying for a promotion completed a written civil service examination and took part in a performance assessment designed to evaluate the officer's skills and leadership ability. The score received by the officer on each examination was combined into a composite score. The candidates were ranked according to their composite scores, and the departmental chief was required to promote the officers according to ranking, even if the chief believed that a lower-ranked officer was more qualified than a higher-ranked officer.

This policy was the target of criticism in some corners. For one, an outside consultant performed an audit of the MNPD in 2002 and concluded that this method of promoting officers failed to take important criteria into consideration, such as each candidate's managerial skill and past performance. There was also concern about whether the policy inhibited minority candidates from earning promotions, an issue that the local media reported in news articles around 2003. In addition, there was a broader concern internally about the diversity of the MNPD's ranks. For example, Metro and MNPD officials complained to the attorney who represented the police officers union about a lack of diversity in the police force's upper ranks during a meeting regarding negotiations on

changes to the promotion policy. These officials **\*526** theorized that the testing scheme exacerbated the problem.

Well before changes were implemented to MNPD's testing system, MNPD officials made other attempts to increase the department's racial diversity. In December 2003, Deputy Chief Anderson wrote a memorandum to acting Chief of Police Deborah Faulkner urging her to promote fifteen officers to the rank of sergeant before the current slate of officers eligible for promotions expired on January 9, 2004 (the "Anderson memo"). According to the memorandum, the current slate of fifteen officers included five minority candidates, but the upcoming list did not include a single minority officer. As the memorandum further explained, because a list of candidates was effective for several years, and because minority candidates reached the candidate list in lower numbers than white candidates under the test-based promotions policy, it would be impossible for minority candidates to be promoted if they were not selected from the current slate. Faulkner announced the promotion of several officers shortly after the date of the memorandum, and the group included several minority candidates.

**\*\*2** Against this background, MNPD's promotion policy underwent significant change in 2004. Defendant Ronal W. Serpas, who was hired as the MNPD's permanent chief in 2004, shared the prevalent concerns about the test-based promotion policy's soundness. He and Metro's Human Resources Department ("Metro HR") recommended changing the policy, which the Metropolitan Civil Service Commission ("the Commission") did in 2006. Metro hired an outside contractor to design and implement a new policy to replace the test-based promotion policy.

The new policy continues to feature standardized tests, but now also gives the police chief a measure of discretion in deciding whom to promote. Under the new policy, officers must still complete the written civil service examination and skills and leadership assessment. The test results are again combined into a composite score, with the assessment counting for 80% of a lieutenant candidate's score, and 70% of a sergeant candidate's score. The candidates are then ranked according to their scores.

However, under the new policy, when the chief prepares to promote an officer, he is given an eligibility roster that lists the seven highest-scoring candidates eligible

for promotion to the rank of lieutenant or lists the nine highest-scoring candidates eligible for promotion to sergeant. The roster does not rank the candidates according to their composite scores. Rather, the roster simply lists the officers' names in alphabetical order and does not reveal their scores. Each officer on the list is considered equally qualified for promotion. The chief is not restricted in choosing among candidates from the list. If the chief has multiple vacancies to fill, he can fill them entirely from the roster given to him. If, however, the chief finds that none of the candidates are suitable for promotion, he may also choose to promote none of them, and he may instead request a new roster with the next tier of candidates. If the chief obtains another roster, the Commission removes the names of the candidates not selected and then adds the next highest-scoring candidates.

## II. The Disputed Promotions

This litigation concerns several lieutenant and sergeant vacancies that became available during 2006 and 2007. Plaintiffs Johnson and Moore applied for promotions to lieutenant, and Plaintiff Holley applied to become a sergeant. Each officer was passed over and now contends that considerations of race and gender improperly affected Serpas' promotion decisions.

**\*527** Serpas made his selections in three separate rounds between October 2006 and May 2007. Moore's composite test score ranked him seventh overall, and therefore his name appeared on the first roster submitted to Serpas. Moore was not selected, in spite of the fact that a commander allegedly invited Moore to a meeting of higher-ranked officers under the expectation that Moore would be promoted. Johnson was ranked ninth among the candidates and was therefore not on the first roster given to Serpas. Johnson's name appeared on the second roster that was submitted to Serpas, and Serpas did not select Johnson for promotion. According to Johnson and Moore, three female candidates and two black male candidates ranked lower than them were selected instead. Moore and Johnson contend that only race and gender can account for the fact that these candidates were selected in front of them. Defendants note, however, that three white male candidates who ranked below both Moore and Johnson also were selected for promotion.

**\*\*3** For his part, Holley was ranked as a "police officer II" and applied to become a sergeant around the same

period. Serpas made selections for the sergeant positions in three separate rounds between February and September 2007. Like Johnson, Holley was not on the first roster submitted to Serpas, because Holley's composite test score ranked him sixteenth among the sergeant candidates. In his affidavit testimony, Holley asserted his name eventually moved up into the roster for promotion, but that twenty-nine officers were eventually promoted to sergeant instead of him. Holley does not allege how many female and black male officers were promoted in front of him, but he contends that the highest-ranked black male officer in the initial rankings was ranked tenth and that the next-highest-ranked black male officer was ranked lower than twentieth. In their defense, Defendants assert that Serpas promoted eleven white males who obtained composite scores lower than Holley and declined to promote one white female who scored below Holley.

Plaintiffs nonetheless contend that Serpas and other MNPD supervisors abused the discretion granted them under the new promotion policy in order to favor promotions of minority and female candidates. In support of their contention, they cite, in addition to Serpas' selections noted above, several statements that MNPD officials made to local newspapers. For example, MNPD spokesperson Dan Aaron explained the department's rationale for the changes to the promotion policy to *The Tennessean* in October 2006. The article stated:

> Promoting the best candidates possible was the priority, and the chief was pleased there were diverse candidates to pick from near the top of the list, Aaron said.

> "The goal of this police department is to mirror the population of the city to the greatest extent possible," Aaron said. "When presented with the opportunity to promote bright, qualified minority candidates, you always give those persons consideration."

*The Tennessean* wrote another article about the promotions in April 2007, this time emphasizing non-minority officers' complaints about the policy. Aaron was again quoted, this time saying, "[i]f you have two candidates who are essentially equal and believe that both would make very good supervisors, and if your choice is to make the department more diverse, you would probably elect to include diversity in your choice." In an article from another local news agency, Aaron was quoted as saying that MNPD changed its promotion policy in order to increase diversity among MNPD leadership.

**\*528 III. The Anonymous Supervisor Surveys**

According to Plaintiffs, their claims of reverse discrimination gain further support by Serpas' decision to use anonymous surveys completed by the candidates' supervisors as part of his selection process. At some point in 2006 or 2007, Serpas directed Eric Cardinal, an MNPD technology analyst, to develop a computer-based survey for department supervisors to fill out in order to report their assessments of the various lieutenant and sergeant candidates. As we explain below, Cardinal developed the program and disbursed it digitally to the supervisors, who completed the surveys prior to each round of promotions. Serpas used the surveys as part of his decision about whom to promote. While the instructions for the surveys are in the record, the surveys themselves are not available to us, because Serpas directed Cardinal to dispose of them once Serpas was finished using them. Plaintiffs contend that in allowing the surveys to be deleted, Defendants violated federal law and breached their discovery obligations. Upon learning of the destruction of the surveys, Plaintiffs moved for a default judgment or, alternatively, a negative inference against Defendants. The district court denied both requests.

**\*\*4** Cardinal described the survey in his deposition testimony. Cardinal sent an email to the appropriate supervisors that contained an internet link, which, when clicked, opened a page on the MNPD's intranet. The supervisor was directed to fill in the log-in information and was then given a set of instructions (which are contained in the record). The supervisor then arrived at the survey form, titled "Promotion Readiness and Potential Ratings for Sergeant Candidates," with the lieutenant survey accompanied by a similar title. The survey form explained that the survey's purpose was "to seek the opinions of supervisory and management personnel who have worked directly with, or otherwise have personal awareness of the skills, abilities, and knowledge possessed by, candidates eligible for promotion to the rank of Sergeant [and Lieutenant] as to their overall readiness and skill." The instructions directed the supervisor to "consider the candidate's potential to lead, manage resources, and successfully perform the duties that he or she will be required to perform."

The supervisor was then asked to rate each candidate in several categories on a scale of 1 to 3, with 1 standing for "lowest potential" and 3 standing for "highest potential."

In the interest of creating a spread in the candidates' scores, the supervisor was only allowed to award a certain number of 3, 2, and 1 rankings. The supervisor was instructed not to complete a survey for a candidate with whom he was not sufficiently acquainted. When the supervisor completed the survey, the computer program added his ratings to those of other supervisors regarding a particular candidate. When all the supervisors had completed their surveys, the computer program generated an average score for that candidate, referred to by the parties as a "rollup" score. Supervisors at and above the rank of lieutenant completed surveys for the lieutenant candidates, and supervisors at and above the rank of sergeant completed surveys for the sergeant candidates.

After the supervisors completed each round of surveys, Serpas examined each candidate's rollup score. The rollup score showed each candidate's name, the number of supervisors who rated him, and the candidate's raw and average scores. After Serpas examined the rollups, Cardinal deleted the data and notified Serpas that he had done so. Cardinal could have designed the program to save the data, but **\*529** Serpas did not direct him to do so. Serpas did, however, save the rollup scores for each candidate, and Defendant turned that evidence over to Plaintiffs during discovery.

In his deposition testimony, Serpas testified that he requested the computerized survey because he had not personally met many of the promotion candidates in his three years of leading the MNPD. He testified that he made his promotion decisions after considering the candidates' employment, sick leave, and disciplinary records; their assignment positions; their educational and training experiences; and any citizen complaints filed against them. According to Serpas, the surveys added to the pool of information he used in his selections, and their simplified format allowed him to avoid the time required to personally interview each supervisor about each candidate. Serpas did not keep any notes documenting his promotion decisions. As Plaintiffs point out, the personnel files Serpas consulted disclosed the race and gender of each candidate. Nevertheless, Serpas testified that race and gender played no part in his decision and that he chose other candidates over Plaintiffs because he decided those candidates "were more likely to be successful" than Plaintiffs.

**\*\*5** As a general matter, Serpas did not promote any candidate with an average rollup score below 2.0, and each Plaintiff in the instant case scored below that threshold on each of the three supervisor surveys conducted on their performance. Moore received average scores of 1.58 from twelve supervisor surveys in the first round, 1.59 from seventeen supervisor surveys in the second round, and 1.61 from eighteen supervisors in the final round. Johnson received average scores of 1.56 from sixteen supervisors in the first round, 1.58 from twelve supervisor surveys in the second round, and 1.67 from twelve supervisor surveys in the third round. Holley was scored on only two rounds of surveys, and in both rounds thirty-three supervisors scored him for scores of 1.42 and 1.70. These scores placed each Plaintiff near the bottom of their candidate pools.

Nevertheless, Plaintiffs offer several reasons for which they believe that Serpas' use of the surveys was improper. First, Plaintiffs allege that they were not made aware that the surveys would be used as a basis of Serpas' decision, and they argue that it was unfair for Serpas to use the procedure when it had not been disclosed to the candidates. Plaintiffs also consider it improper that a different number of supervisors rated them during each round of surveys. In response, Defendants contend that this inconsistency was actually a virtue of the surveys, because, in their view, it demonstrates that the supervisors followed the survey directions not to rate the candidates with whom they were unacquainted. Finally, Plaintiffs contend that Serpas used the surveys as a subterfuge to favor minority and female candidates, and they argue that he allowed Cardinal to destroy the surveys in order to hide the department's reverse discrimination.

## IV. Plaintiffs' Meetings with their Supervisors and Human Resources

After Serpas made his selections, Moore, Johnson, and Holley sought explanations for their non-promotion from department officials. Moore and Johnson met separately with MNPD Deputy Chiefs Steve Anderson, Honey Pike, and Joseph Bishop. In his meeting, Johnson asked the deputy chiefs what information the department used to decide whom to promote. The deputy chiefs told him generally that they used many types of information. Johnson asked the panel whether his work history was used in the decision, and **\*530** he asserts that Deputy Chief Anderson answered in a manner suggesting that he did not know whether that information was considered. Johnson told the panel that he believed he was the victim

Case 2:15-cv-12312-MOB-EAS  ECF No. 48-48, PageID.1077  Filed 08/01/16  Page 38 of 98

Johnson v. Metropolitan Government of Nashville and..., 502 Fed.Appx. 523...

of reverse discrimination and asked the deputy chiefs to investigate his complaint, but he alleges that the deputy chiefs never did so.

Johnson also spoke with other MNPD officials and purportedly received information that supported his view that female and minority candidates received favorable treatment. He spoke with a commander who allegedly told him that "diversity issues needed to be dealt with" in the promotions process. Johnson also spoke with an official within Metro HR. When Johnson asked the official whether the candidates' race and gender affected the promotions decision, the official allegedly answered, "We all know what happened, if you know what I mean."

**6**  Moore also discussed his complaint with the deputy chiefs and recorded his conversation. Moore repeatedly raised the issue of race and its effect on the promotions decision, in response to which Deputy Chief Pike conceded that MNPD did not reflect the community's racial and gender diversity. However, Deputy Chief Pike also insisted that the promotion policy was aimed at identifying the most qualified candidates, regardless of minority status. According to Moore, Deputy Chief Pike urged Moore to examine his own performance, evaluate whether he deserved a promotion, and discuss his performance with his direct supervisors. Moore told the deputy chiefs that he had done so and concluded that he possessed the qualities required to serve as a lieutenant. Like Johnson, Moore expressed his belief that he was the victim of reverse discrimination, but the deputy chiefs allegedly did not investigate the complaint.

Finally, Holley discussed his failure to earn a promotion with the three deputy chiefs as well. According to Holley, none of the deputy chiefs offered him useful information about why he was not promoted. Holley explained that his direct supervisor urged him to reapply for a promotion. He also said that he was more involved in community affairs than other officers and was often approached by other officers for answers about departmental policy and the law. Nevertheless, according to Holley, the deputy chiefs simply gave him a piece of paper listing thirty-three names with his name thirty-second among the list.

### V. Procedural History

Dissatisfied with the department's promotion decisions, Plaintiffs filed two separate suits in federal district court. Johnson and Moore sued in September 2007, alleging

violations of the Equal Protection Clause of the United States Constitution, 42 U.S.C. § 1983, and the THRA. After Johnson and Moore received right-to-sue letters from the Equal Employment Opportunity Commission, they added claims of disparate impact and disparate treatment under Title VII. For his part, Holley filed a similar suit in January 2008, though his complaint contained no Title VII claims, and he did not sue the MNPD. The district court eventually consolidated the cases.

Defendants Pike, Bishop, Anderson, and MNPD filed successful motions to dismiss and all claims against them were dismissed on May 13, 2008.[1] *See Johnson v. Metro.* **\*531** *Gov't of Nashville & Davidson Cnty., Tenn.,* Nos. 3:07–0979, 3:08–0031, 2008 WL 2066475 (M.D.Tenn. May 13, 2008) ("*Johnson I* "). Plaintiffs do not appeal those rulings.

Shortly thereafter, Metro filed a separate motion to dismiss Johnson and Moore's disparate impact claim.[2] (RE 68, Mot. to Dismiss.) Plaintiffs filed a response and also sought leave to amend their complaint. The district court denied Plaintiffs' motion and dismissed the disparate impact claim. *Johnson v. Metro. Gov't of Nashville & Davidson Cnty.,* Nos. 3:07–0979, 3:08–0031, 2008 WL 3163531 (M.D.Tenn. Aug. 4, 2008) ("*Johnson II* ").

**7**  Following those rulings, Plaintiffs' remaining claims asserted that Metro and Serpas violated the Equal Protection Clause and Defendants' rights as protected by Title VII and the THRA. Defendants moved for summary judgment in June 2010. During the same month, Plaintiffs moved for a default judgment or, alternatively, for an adverse finding against Defendants, based upon Defendants' failure to completely preserve the records from the supervisor surveys.

On August 24, 2010, the district court denied Plaintiffs' motions for a default judgment and an adverse factual finding, granted summary judgment in favor of Defendants, and entered judgment on all claims in favor of Metro and Serpas. *Johnson v. Metro. Gov't of Nashville,* Nos. 3:07–0979, 3:08–0031, 2010 WL 3342211 (M.D.Tenn. Aug. 24, 2010) ("*Johnson III* ").

In November 2010, the clerk of the court taxed costs against Plaintiffs. The clerk awarded to Metro the costs of defending both Metro and Serpas. Plaintiffs challenged

Case 2:15-cv-12312-MOB-EAS   ECF No. 48-48, PageID.1078   Filed 08/01/16   Page 39 of 98

Johnson v. Metropolitan Government of Nashville and..., 502 Fed.Appx. 523...

the clerk's taxation of costs, but the district court upheld the award. *Johnson, et al. v. Metro. Gov't of Nashville,* Nos. 3:07–0979, 3:08–0031, 2011 WL 166320 (M.D.Tenn. Jan. 18, 2011) ("*Johnson IV* ").

Plaintiffs timely appealed the district court's rulings. Original jurisdiction exists pursuant to 28 U.S.C. §§ 1331 and 1367. This Court exercises jurisdiction pursuant to 28 U.S.C. § 1291.

## DISCUSSION

### I. Spoilation of Evidence
Before addressing the merits, we turn first to Plaintiffs' claim that the district court erred in refusing to impose sanctions against Defendants for spoilation of evidence. Plaintiffs contend that they are entitled an inference of discriminatory animus or to a directed verdict because Defendants failed to preserve the individual results of the supervisor surveys and thereby purposefully deprived Plaintiffs of valuable information supporting their claims of reverse discrimination.

This Court reviews a district court's decision regarding spoilation of evidence for abuse of discretion. *Beaven v. U.S. Dep't of Justice,* 622 F.3d 540, 553 (6th Cir.2010) (citing *Adkins v. Wolever,* 554 F.3d 650, 652 (6th Cir.2009) (en banc)). Federal law governs the determination of whether spoilation sanctions are appropriate. *Adkins,* 554 F.3d at 652. A proper spoilation sanction serves both fairness and punitive functions. *Id.* To accomplish these goals, a district court has "broad discretion" to order sanctions it deems appropriate, including dismissing the case, granting summary judgment, or imposing an adverse inference based on the lost or destroyed evidence. *Id.* Recently, this Court articulated a three-part standard for determining whether sanctions are appropriate:

> [A] party seeking an adverse inference instruction based on the destruction of evidence must establish (1) that the party **\*532** having control over the evidence had an obligation to preserve it at the time it was destroyed; (2) that the records were destroyed "with a culpable state of mind;" and (3) that the destroyed evidence was "relevant" to the party's claim or defense such that a reasonable trier of fact could find that it would support that claim or defense.

**\*\*8** *Beaven,* 622 F.3d at 553 (quoting *Residential Funding Corp. v. DeGeorge Fin. Corp.,* 306 F.3d 99, 107 (2d Cir.2002) (citation omitted)).

In applying this three-part standard, we explained that the obligation element is met where a defendant knows evidence might be relevant to future potential litigation. *Id.* Where, however, there is no notice of potential litigation, there is less cause to believe the evidence was destroyed intentionally or with the intent to cover up incriminating information. *See id.* Nevertheless, we also noted that the "culpable state of mind" element may be satisfied by showing only that "the evidence was destroyed 'knowingly, even if without intent to breach a duty to preserve it, or negligently.' " *Id.* (internal citation, brackets, quotations omitted).

**[1]** In the instant case, Plaintiffs argue that Metro was obligated to preserve the individual survey results scored by each supervisor, in addition to the averaged rollup scores. Plaintiffs cite several regulations promulgated by the Equal Employment Opportunity Commission ("EEOC") and pursuant to Title VII that obligate employers to preserve employment "records." *See* 42 U.S.C. §§ 2000(e) 8, 2000(e) 12; 29 C.F.R. § 1602.31. Defendants counter that employers are not required to keep every single piece of paper created during the employment process, *see Rummery v. Ill. Bell Tel. Co.,* 250 F.3d 553, 558 (7th Cir.2001), and that the rollup scores were sufficient to satisfy their statutory preservation obligations.

We agree with the district court that Defendants ought to have preserved the individual survey scores. The surveys were part of, and indeed played an integral role in, a significant change to an already controversial promotion system. Whether through formal litigation or otherwise, it was reasonably foreseeable that Defendants would face some sort of challenge to the new promotions system. Defendants should have anticipated that officers who were passed over for promotion might question that decision and that Defendants would need to defend their selections. By deleting the individual surveys, Defendants also deprived the officers of valuable information regarding their individual performance, their likelihood for future promotion, and information that might have been used in litigation. Regardless of whether the rollups were the most efficient way for Serpas to review the survey

WESTLAW  © 2016 Thomson Reuters. No claim to original U.S. Government Works.

Case 2:15-cv-12312-MOB-EAS   ECF No. 48-48,   PageID.1079   Filed 08/01/16   Page 40 of 98

Johnson v. Metropolitan Government of Nashville and..., 502 Fed.Appx. 523...

results, the individual scores had value warranting their preservation beyond his decision-making process.

Furthermore, Defendants were statutorily obligated to preserve the surveys under EEOC and Title VII regulations. The individual surveys are more properly viewed as records in and of themselves, rather than the "rough drafts" or "processes" used to create a final employment record. *See id.* at 558. Finally, it was technologically and logistically feasible to retain the survey data, and Defendants have provided no convincing explanation for why they failed to do so.

 **\*\*9** Having determined that Defendants were obligated to preserve the surveys, the next question is whether Defendants destroyed the evidence with requisite culpable state of mind. Plaintiffs contend that this element is satisfied because the records were destroyed "knowingly" or "negligently" even if the Chief acted "without [the specific] intent to breach [his] **\*533** duty" to preserve. *See Beaven,* 622 F.3d at 553. The district court rejected this argument, reasoning that Plaintiffs could not show that Serpas "acted in bad faith." *Johnson III,* 2010 WL 3342211, at \* 19.

The district court erred by injecting a bad faith component into its spoliation analysis. In *Adkins,* we recognized that there may be a "continuum of fault ranging from innocence through the degrees of negligence to intentionality." 554 F.3d at 652–53. To the extent bad faith is relevant in a spoliation decision, its most appropriately taken into consideration when adjusting the sanction imposed. In the instant case, the record shows that Serpas deliberately chose not to preserve the results and deliberately ordered the destruction of the individual surveys. Although there is no evidence to show that he acted out of bad faith, his conduct was nevertheless intentional and therefore meets the "culpable state of mind" element.

Finally, Plaintiffs must prove that the destroyed surveys are "relevant" to their claims of reverse discrimination. This, however, is where Plaintiffs' request for sanctions must fail. The information Plaintiffs wishes was preserved is of minimal relevance to proving their case for reverse discrimination. First, the surveys themselves were a rather blunt instrument for measuring the supervisors' opinions. The individual results would have consisted only of a string of each supervisor's scoring, rated on a simple 1–to–

3 scale, based on instructions which asked the supervisors to take into account a host of qualities demonstrating promotional readiness. The instructions did not tell the supervisors to consider race, gender, or diversity, and to the extent that such motives improperly influenced the scores, they likely would not be immediately apparent from the surveys' simplistic numerical system.

In order to link discriminatory intent to the surveys, Plaintiffs would have to examine each supervisor's rankings for patterns of race or gender discrimination. However, the record does not indicate that the program was enabled in such a way as to accomplish this. Although the supervisors used a log-in "name" and password to access the surveys, the record is unclear as to whether the supervisor's identity was saved alongside with the survey results. Moreover, even if that information was available, multiple inferences would be required to connect the individual surveys relevancy to Plaintiffs' claims. Plaintiffs would need to demonstrate not only an individual supervisor's pattern of discrimination, but also that the pattern of discrimination adversely affected the aggrieved candidate's averaged scores in comparison to his minority counterparts, and by consequence, Serpas' evaluation of the rollup scores. These serious hurdles attenuate the surveys from the ultimate promotion decision at multiple levels. As the proximate causation of the surveys weakens, so does their relevance. Moreover, as we mentioned above, Plaintiffs scored significantly below their promoted counterparts on the supervisor surveys. Accordingly, the likelihood that one or several supervisors' improper discrimination materially altered Plaintiffs' rollup scores is even less likely. The only other way Plaintiffs can conceivably prove the surveys' relevance is by claiming that the rollups were fabricated. Plaintiffs do not seriously press this argument.[3]

 **\*534** **\*\*10** Consequently, the district court did not abuse its discretion in denying sanctions.

## II. Reverse Discrimination Claims

### A. Standard of Review
We review a district court's grant of summary judgment *de novo. Wuliger v. Mfrs. Life Ins. Co.,* 567 F.3d 787, 792 (6th Cir.2009). Evidence in the record is viewed in the light most favorable to the nonmoving party, with all reasonable inferences drawn to that party's benefit. *Combs v. Int'l Ins. Co.,* 354 F.3d 568, 576–77 (6th Cir.2004)

Case 2:15-cv-12312-MOB-EAS   ECF No. 48-48, PageID.1080   Filed 08/01/16   Page 41 of 98

Johnson v. Metropolitan Government of Nashville and..., 502 Fed.Appx. 523...

(citing *Adickes v. S.H. Kress & Co.,* 398 U.S. 144, 157, 90 S.Ct. 1598, 26 L.Ed.2d 142 (1970)). Summary judgment is appropriate only where the evidence raises no genuine issues of material fact "such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986).

**B. Statutory Framework**

Title VII makes it unlawful for an employer "(1) to fail or refuse to hire or to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin; or (2) to limit, segregate, or classify his employees or applicants for employment in any way which would deprive or tend to deprive any individual of employment opportunities" on account of one of the same five grounds listed above. 42 U.S.C. § 2000e–2. There are two principal and distinct means of proving employer discrimination under Title VII: disparate treatment and disparate impact. *Griggs v. Duke Power Co.,* 401 U.S. 424, 431, 91 S.Ct. 849, 28 L.Ed.2d 158 (1971). We address Plaintiffs' claims of disparate treatment first.

**C. Disparate Treatment Claims**

**1. Direct Evidence of Reverse Discrimination**

Plaintiffs first contend that they offered direct evidence of discrimination proving that they were treated disparately from their minority counterparts. Specifically, Plaintiffs cite to (1) the 2003 Anderson memo; (2) Aaron's public remarks to *The Tennessean;* and (3) the comments made by Commander Nash, Deputy Chief Pike, and Metro HR representative Sinor in their meetings with Plaintiffs.

Direct evidence "is that evidence which, if believed, requires the conclusion that unlawful discrimination was at least a motivating factor in the employer's actions." *Amini v. Oberlin Coll.,* 440 F.3d 350, 359 (6th Cir.2006); *Grizzell v. City of Columbus Div. of Police,* 461 F.3d 711, 719 (6th Cir.2006) (quoting *Kocak v. Cmty. Health Partners of Ohio, Inc.,* 400 F.3d 466, 470 (6th Cir.2005)). Direct evidence must prove not only discriminatory animus, but also that the employer actually acted on that animus. *See Amini,* 440 F.3d at 359. For the following

reasons, none of Plaintiffs' proposed evidence meets this standard.

**[2]** The Anderson memo does not constitute direct evidence because it would require multiple inferences to reach a finding of discrimination. First, the memo is three years removed from the events of this case, and from it we would need to infer that Anderson's opinions in 2003 motivated his actions in 2005–2006. *See, e.g., Phelps v. Yale Sec., Inc.,* 986 F.2d 1020, 1025–26 (6th Cir.1993) (rejecting statements made about the plaintiff nearly a year prior to his layoff). Additionally, Deputy Anderson was not the decisionmaker in the promotions process. Rather, Serpas was responsible for the disputed promotions, and Deputy Anderson only participated in the process by completing **\*535** supervisor surveys. *See Smith v. Leggett Wire Co.,* 220 F.3d 752, 759 (6th Cir.2000) ("Statements by nondecisionmakers cannot suffice to satisfy the plaintiff's burden of demonstrating animus.") (quoting *Price Waterhouse v. Hopkins,* 490 U.S. 228, 277, 109 S.Ct. 1775, 104 L.Ed.2d 268 (1989) (O'Connor, J., concurring) (internal quotations omitted)).

**\*\*11 [3]** Next, Plaintiffs point to several statements allegedly made by MNPD spokesperson Don Aaron to local newspapers in 2006 and 2007. Aaron was quoted as stating, "If you have two candidates that are essentially equal and believe that both would make very good supervisors, and if your choice is to make the department more diverse, you would probably elect to include diversity in your choice." Aaron was also quoted as saying, "The goal of this police department is to mirror the population of the city to the greatest extent possible.... When presented with the opportunity to promote bright, qualified minority candidates, you always give those persons consideration."

The district court disregarded these statements as inadmissible hearsay. Plaintiff contends that the district court's evidentiary ruling was incorrect because Aaron's comments should have been considered a statement by a party-opponent. *See* Fed. R. Evid. 801(d)(2)(A) (a "party's own statement in either an individual or a representative capacity" is not hearsay if "offered [against] the party").

We need not consider the district court's evidentiary ruling, because even if admissible, Aaron's statements are not direct evidence of discrimination. Aaron's

Case 2:15-cv-12312-MOB-EAS   ECF No. 48-48, PageID.1081   Filed 08/01/16   Page 42 of 98

Johnson v. Metropolitan Government of Nashville and..., 502 Fed.Appx. 523...

first statement-answering a hypothetical question about "equally qualified candidates"—requires an inference because the statement did not refer to this employment decision.

Nor is Aaron's second comment direct evidence of discrimination, because it would require us to ignore the equally available inference that the department was simply aware of a lack of minorities within its upper ranks. As we have held, however, statements reflecting a desire to improve diversity do not equate to direct evidence of unlawful discrimination. *See Plumb v. Potter,* 212 Fed.Appx. 472, 477–78 (6th Cir.2007) ("[A] jury could find that [the employer] believed it was good to have more women working at the [company], yet still conclude that [the decisionmaker] did not let that personal belief interfere with her decision whether or not to promote a woman over [the plaintiff].")

**[4]** Finally, the statements allegedly made by Commander Nash, Deputy Chief Pike, and HR representative Sinor do not constitute evidence of direct discrimination because there is no evidence to show that these individuals were decisionmakers in the promotion process. *See Smith,* 220 F.3d at 759–60. Plaintiffs' attempt to raise a cat's-paw argument about these individuals is also ineffective, because it would require us to draw inferences that are inappropriate under direct discrimination analysis.[4] *See Ercegovich v. Goodyear Tire & Rubber Co.,* 154 F.3d 344, 355 (6th Cir.1998). Accordingly, Plaintiffs have failed to produce direct evidence of reverse discrimination.

## 2. Circumstantial Evidence of Reverse Discrimination

Because Plaintiffs cannot prove reverse discrimination by way of direct evidence, they must rely on circumstantial evidence. **\*536** This Circuit applies a modified version of the *McDonnell Douglas* framework in reverse discrimination cases. *See Leadbetter v. Gilley,* 385 F.3d 683, 690 (6th Cir.2004) (citing *McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973)). Claims of reverse employment discrimination brought under the THRA also apply our modified *McDonnell Douglas* standard. *See, e.g., Newman v. Federal Express Corporation,* 266 F.3d 401, 406 (6th Cir.2001).

**\*\*12**  First, Plaintiffs must present a *prima facie* case for reverse discrimination showing: (1) that the Defendant "is that unusual employer who discriminates against the majority;" (2) that they were qualified for the position in question; (3) that they suffered an adverse employment action when they were not promoted; and (4) that they were treated differently than other similarly situated employees. *Arendale v. City of Memphis,* 519 F.3d 587, 603–04 (6th Cir.2008). If Plaintiffs make out their *prima facie* case, the burden shifts to Defendants to show a legitimate, non-discriminatory reason behind their actions. *Id.* at 603. Once Defendants meet their burden, Plaintiffs must prove that the stated explanation was a pretext for discrimination. *Id.*

### a. Background Circumstances

Establishing the first prong of the *prima facie* case in a reverse discrimination claim requires Plaintiffs to show that Defendants are that "unusual employer who discriminates against the majority." *Id.* at 603–04. This requirement is not onerous, and can be met through a variety of means, such as statistical evidence; employment policies demonstrating a history of unlawful racial considerations; evidence that the person responsible for the employment decision was a minority; or general evidence of ongoing racial tension in the workplace. *See Treadwell v. Am. Airlines,* 447 Fed.Appx. 676, 678 (6th Cir.2011) (citing cases). Indeed, "the mere fact that a racial minority took an adverse action" against the employee is often sufficient to satisfy the background circumstances requirement. *Leavey v. City of Detroit,* 467 Fed.Appx. 420, 425 (6th Cir.2012) (citing *Arendale,* 519 F.3d at 603).

**[5]**  Plaintiffs allege that a background of reverse discrimination may be inferred from: (1) the 2003 Anderson memo; (2) the statements made by Commander Nash, Chief Pike, and HR representative Sinor in the meetings Plaintiffs requested after being passed over for promotion; (3) the fact that Serpas was "chief for a political entity" and motivated to "appease the population of Nashville"; and (4) two unrelated discrimination cases brought against Metro. The district court found this evidence insufficient to prove background circumstances, because there was no evidence to conclude that Defendants' actually unlawfully considered race or gender as factors in the making specific employment decisions. *Johnson III,* 2010 WL 3342211, at \*16.

Case 2:15-cv-12312-MOB-EAS ECF No. 48-48, PageID.1082 Filed 08/01/16 Page 43 of 98

Johnson v. Metropolitan Government of Nashville and..., 502 Fed.Appx. 523...

In so reasoning, the district court went too far. The background circumstances element only requires a plaintiff to *"support the suspicion* that the defendant is that unusual employer who discriminates against the majority;" a plaintiff need not prove that the employer's actions *actually* were illegally motivated. *Boger v. Wayne Cnty.,* 950 F.2d 316, 324–25 (6th Cir.1991) (emphasis added). Requiring Plaintiffs to show actual discrimination at this stage conflates the background circumstances element with the remainder of *McDonnell Douglas'* burden-shifting approach. *See Treadwell,* 447 Fed.Appx. at 679 (noting that requiring a plaintiff to produce both "the foreground and background evidence to reach a jury" incorrectly collapses the background circumstances prong into *McDonnell Douglas'* other elements).

**\*537 \*\*13** As is required on summary judgment, we must draw disputed inferences in Plaintiffs' favor and conclude that Plaintiffs have met the background circumstances element. Plaintiffs supplied sufficient evidence to raise at least a material issue of fact that there was ongoing racial tension within the MNPD, and particularly, tension surrounding the manner in which promotions were being awarded within the department's ranks. *See, e.g., id.* at 678; *Boger,* 950 F.2d at 324–25; *McCloud v. Testa,* 97 F.3d 1536, 1549 (6th Cir.1996); *Zambetti v. Cuyahoga Cmty. College,* 314 F.3d 249, 256 (6th Cir.2002). Plaintiffs presented depositions by persons at all levels of MNPD's hierarchy who testified that the department was interested in promoting diversity and that it was acutely conscious of its long history of racial and gender imbalance.[5] And while the district court was correct that such a focus may only reflect a legitimate desire to comply with equal opportunity requirements, it also presents a context sufficient to meet the background circumstances element.

### b. Qualifications and Similarly Situated Candidates

**[6]** As to the remaining prongs of Plaintiffs' *prima facie* case, Plaintiffs suffered an adverse employment decision when they were passed over for promotion, but Defendants dispute whether Plaintiffs were qualified for promotion and similarly situated to the promoted candidates. These prongs touch on essentially the same issues, so we address them together.

Whether Plaintiffs were qualified for promotion and similarly situated to the promoted candidates depends partly upon how we compare the candidates. The district court disregarded the surveys in deciding the qualification issue, but considered them in its similarly situated analysis. We agree with this approach.

Under the new scoring procedure, candidates who received the highest scores were placed on the eligibility roster in alphabetical order without revealing the composite scores. We agree with the district court that this procedure meant that all candidates whose names appeared on the roster were deemed qualified for promotion. *Johnson II,* 2010 WL 3342211, at \*3. Hence, we need not take into account the candidates' survey scores when considering the qualification element, and we conclude that Plaintiffs have met their burden to prove that they were qualified for promotion.

By contrast, a candidate's score is relevant in deciding whether Plaintiffs were similarly situated to the officers that were selected for promotion. Inclusion on the eligibility roster only qualified a candidate for promotion, but did not guarantee it. Because the chief had the discretion to choose among candidates, a candidate could be passed over for promotion entirely or promoted later than a comparatively lower-scored candidate.

Accordingly, the revised system established a two-stage promotions process. Scoring well on the written and assessment tests was not a guaranteed basis for **\*538** promotion; it only qualified a candidate for promotion. At the second stage, the chief held the sole discretion to choose among candidates. The system did not limit the considerations the chief could take into account, which could conceivably include a wide variety of qualities, including: education, training, length of service, readiness, ability to lead, disciplinary infractions, or a host of other factors. Any of these factors might distinguish Plaintiffs from their promoted peers and render Plaintiffs not similarly situated.

**\*\*14** We have explained that in failure-to-promote cases we only require a plaintiff to show that he possesses "similar qualifications" to the employee who received the promotion. *Provenzano v. LCI Holdings, Inc.,* 663 F.3d 806, 814 (6th Cir.2011). During the *prima facie* stage, our inquiry is not finely distinguished, given that it "is not realistic from a human standpoint" to expect the

Case 2:15-cv-12312-MOB-EAS ECF No. 48-48, PageID.1083 Filed 08/01/16 Page 44 of 98

Johnson v. Metropolitan Government of Nashville and..., 502 Fed.Appx. 523...

plaintiff to prove that he has identical qualifications to the chosen candidate. *Id.* Rather, we perform a "more searching evaluation of the relative qualifications of the two candidates" when examining pretext. *Id.* at 816. However, even if we granted leniency to Plaintiffs at the *prima facie* stage, they still have made no effort whatsoever to show that they were similarly situated to the chosen candidates on even the most basic level. Plaintiffs utter failure to address the similarly situated element fatally undercuts their *prima facie* case, as well as their argument for pretext.

Moreover and as noted above, the survey results are appropriately considered when evaluating the similarly situated element. In the instant case, the survey results render Plaintiffs dissimilar from the candidates who were selected for promotion. Serpas ordered the surveys in an effort to capture the supervisors' opinions as to which candidates were most suited for promotion. These opinions were considered, along with each candidate's personnel record and overall qualifications, when Serpas made his promotions decisions. And while Serpas did not take notes about his decisions, he testified that he did draw at least one clear line in his reasoning; he did not promote any candidate whose rollup score fell below a "2.0"

In fact, no candidate was promoted who fell below that line, and Plaintiffs concede that they scored well below this threshold. As such, they were not similarly situated to those candidates chosen for promotion. *See Gaffney v. Potter,* 345 Fed.Appx. 991, 993 (6th Cir.2009) (holding that differences in performance ratings render two employees not similarly situated). Accordingly, Plaintiffs' *prima facie* case fails because they have failed to show that they were similarly situated to the promoted candidates.

### c. Pretext

[7] Although Plaintiffs have not met their *prima facie* burden, we note that similar deficiencies prevent them from demonstrating pretext.

Serpas explained that he did not select Plaintiffs for promotion because of their poor survey results. He testified that the scores demonstrated that those who were familiar with Plaintiffs' qualifications did not believe they would be as "successful" or "ready" for promotion in comparison to the other candidates. Serpas averred

that he did not take race or gender into consideration when deciding whom to promote. Thus, Defendants have provided a permissible, non-discriminatory basis for the adverse employment decision, and Plaintiffs bear the burden of producing a triable issue of fact that the basis was a pretext for reverse discrimination.

**15 We have explained that a closer comparison of candidates is appropriate when the parties dispute whether an employee was *539 chosen for promotion based on qualifications versus discriminatory animus. *Provenzano,* 663 F.3d at 816. In conducting our evaluation, we do not act as a " 'super personnel department,' overseeing and second guessing employers' business decisions," *Bender v. Hecht's Dep't Stores,* 455 F.3d 612, 626 (6th Cir.2006), but rather simply compare characteristics such as "[d]ifferences in job title, responsibilities, experience, and work record," in order to make an informed determination about whether an employment decision was based on pretext, *Leadbetter,* 385 F.3d at 691.

As noted above, however, Plaintiffs have provided the Court with none of the information required to draw an informed comparison. Rather, the only pertinent information we have before us shows that both minority and majority candidates with better survey scores were promoted ahead of Plaintiffs. Likewise, candidates with lower survey scores of both races and genders were not selected for promotion. These facts render fatal Plaintiffs' claims of pretext.

Finally, we note that the move to the new promotions procedure was apparently based on a variety of factors. Plaintiffs concede that the test-based promotions method was criticized for a number reasons—one of which was the disadvantage it imposed on minority candidates— but also for other reasons that were not based on race or gender. The MNPD, its officers, and the consulting company that worked on the updated procedure all agreed that the old method did not take into account other factors that critically affected the candidate's suitability for promotion—including length of service, educational background and training, and the opinions of the candidates' supervisors. The fact that the survey instructions mentioned these permissible factors, and not those impermissible factors of race or gender, also undermines Plaintiffs' claims for pretext.

Case 2:15-cv-12312-MOB-EAS   ECF No. 48-48, PageID.1084   Filed 08/01/16   Page 45 of 98

Johnson v. Metropolitan Government of Nashville and..., 502 Fed.Appx. 523...

## D. Disparate Impact Claims

We turn next to Plaintiffs' claims of disparate impact brought under Title VII. "Disparate impact causes of action penalize employment practices that are 'fair in form but discriminatory in operation.' " *Phillips v. Cohen,* 400 F.3d at 388, 397 (6th Cir.2005) (quoting *Griggs,* 401 U.S. at 431, 91 S.Ct. 849). "Thus, disparate impact analysis is intended to make sure that employers do not use 'neutral' decision-making mechanisms that in fact work to eliminate a greater portion of otherwise-qualified protected group members than they do members of other groups." *Id.* Accordingly, a disparate impact claim does not require a showing of intent to discriminate. *Id.* Instead, the plaintiff must allege that a specific employment practice had an adverse effect on a group of employees, despite its facial neutrality. *Id.*

Disparate impact analysis requires the Plaintiff to identify —with specificity—the particular procedure having an adverse effect. *Dunlap v. TVA,* 519 F.3d 626, 629 (6th Cir.2008). A three-part burden-shifting test is then used to examine a disparate impact claim: (1) the plaintiff must establish a *prima facie* case for discrimination; (2) the employer may then show that the challenged procedure is justified by "business necessity"; and (3) the plaintiff can rebut the employer's justification by showing that other tests or selection protocols would serve the employer's interest without creating the undesirable discriminatory effect. *Albemarle Paper Co. v. Moody,* 422 U.S. 405, 425, 95 S.Ct. 2362, 45 L.Ed.2d 280 (1975).

### 1. Procedural Posture

**\*\*16** Before turning to the merits of Plaintiffs' disparate impact claim, we must consider **\*540** its procedural posture and Plaintiffs' argument that the district court improperly denied them leave to amend in order to supplement their disparate impact arguments.

In the instant case, there are three components of the new promotions procedure that Plaintiffs could have alleged caused a disparate impact: (1) the change from the test-based promotions procedure to the eligibility roster procedure; (2) Serpas' unilateral discretion to select candidates for promotion off the roster based on unspecified criteria; and (3) the introduction of the supervisors' subjective opinions by way of the survey

results. Of these, and as further explained below, Plaintiffs only alleged the first of the three had a disparate impact.

At the close of discovery, Plaintiffs moved to amend their complaint, in order to allege "all facts as known to the plaintiffs as of today with regard to these charges." The additional paragraphs detailed information Plaintiffs learned during the discovery process, including additional details about how the survey process was implemented. However, the motion to amend did not seek to add any additional charges of disparate impact beyond Plaintiffs' original challenge to the eligibility roster procedure.

Accordingly, Plaintiffs never sought to add a claim that Serpas' discretion caused a disparate impact. Likewise, Plaintiffs never claimed that the supervisor surveys caused a disparate impact. Plaintiffs however, did allege that these aspects of the promotions procedure caused a disparate impact in their response to Defendants' motion to dismiss. Plaintiffs' arguments, however, went beyond the strict allegations raised in their proposed amended complaint—that the "sliding-band" procedure caused a disparate impact—and went on to say that "the Captain's surveys and the input from Serpas caused a disparate impact on the promotions favoring minorities over white males."

The district court denied Plaintiffs' motion to amend, noting that the amendment deadline passed two months prior; that Plaintiffs had requested extensions on several other deadlines, but not on the amendment deadline; and that Plaintiffs' filing violated Federal Rule of Civil Procedure 16(b)(4) (requiring good cause to modify a scheduling order) and Local Rule 7.01(a) (requiring the filing of an accompanying memorandum of law where a motion "may require the resolution of an issue of law"). Finally, the court commented that Plaintiffs had already amended their claims multiple times and that the latest reason given—"to allege all facts as known to the plaintiffs as of today with regard to these charges"—was "insufficient to justify a fourth amendment."

Shortly thereafter, the district court granted Defendants' motion to dismiss the disparate impact claim. The district court noted the pleading errors described above and commented that, while "plaintiffs [ ] somewhat convincingly argue[d] a disparate impact claim related to the surveys, the argument could not be considered because Plaintiffs failed to raise it in their complaint. *See Johnson*

Case 2:15-cv-12312-MOB-EAS ECF No. 48-48, PageID.1085 Filed 08/01/16 Page 46 of 98

Johnson v. Metropolitan Government of Nashville and..., 502 Fed.Appx. 523...

*II,* 2008 WL 3163531, at *6 (citing *Kostrzewa v. City of Troy,* 247 F.3d 633, 643 (6th Cir.2001)).

### 2. Denial of Leave to Amend

**\*\*17** Rule 15(a)(2) of the Federal Rules of Civil Procedure provides that a court may freely grant leave to amend a pleading when justice so requires, in order to make certain that a case is tried on its merits "rather than [on] the technicalities of the pleadings." *Moore v. City of Paducah,* 790 F.2d 557, 559 (6th Cir.1986). "In deciding whether to grant a motion to amend, courts should consider undue delay in filing, lack of notice to the opposing **\*541** party, and futility of amendment." *Brumbalough v. Camelot Care Ctrs., Inc.,* 427 F.3d 996, 1001 (6th Cir.2005). Unless leave was denied on the basis of futility, this Court reviews the district court's decision for abuse of discretion. *Ziegler v. Aukerman,* 512 F.3d 777, 786 (6th Cir.2008).

Rule 15 provides that leave to amend "shall be freely given when justice so requires." Fed.R.Civ.P. 15(a). In the absence of reasons such as those listed above, leave should generally be granted. *Foman v. Davis,* 371 U.S. 178, 83 S.Ct. 227, 9 L.Ed.2d 222 (1962). Nevertheless, a district court retains its discretion on such matters, and provided that the court announces a clear reason for its decision, this Court will generally defer to its reasoning. *Id.*

Rule 15 is augmented by Rule 16, which states that the generally wide latitude to amend may be restricted by the court's other scheduling orders. *See* Fed.R.Civ.P. 16(b). Rule 16 requires that a party seeking to amend outside a scheduling order may do so only on a showing of "good cause." This limitation is "designed to ensure that 'at some point both the parties and the pleadings will be fixed.' " *Leary,* 349 F.3d at 906. In balancing Rules 15 and 16, this Court considers the movant's "diligence in attempting to meet the case management order's deadlines" and "whether the opposing party will suffer prejudice by virtue of the amendment." *Id.*

**[8]** Plaintiffs contend that the district court abused its discretion when it refused to grant their motion to amend. They contend that the district court unfairly denied the motion solely on procedural technicalities and that, by doing so, it denied them the opportunity to allege facts that "could not have been discovered [ ] without having

conducted written discovery." Given that the district court perceived some merit in a disparate impact claim based on the surveys, Plaintiffs contend the court's refusal to allow amendment was in error.

We disagree. Plaintiffs have made no real attempt, either before the district court or before us now, to argue that "good cause" supported an amendment sought over two months after the deadline in the court's scheduling orders. Plaintiffs simply perfunctorily allege that they could not have discovered the facts required to support their claims before written discovery was conducted. However, Plaintiffs never state with any specificity when the evidence was received or why they could not have met or sought an extension on the district court's original deadline.

**\*\*18** We note that the disparate impact claims Plaintiffs now put forth are largely based on information that Plaintiffs appear to have known from the outset of this suit. For instance, as Plaintiffs' own affidavits indicate, they knew that Serpas had total discretion to select candidates for promotions off the eligibility roster, and they knew, or at least discovered shortly after the disputed promotions were announced, that an anonymous supervisor survey had been conducted. Accordingly, Plaintiffs had access to the basic facts required to allege their new disparate impact claims, even if they lacked certain specifics.

Moreover, even if we were to consider the new evidence Plaintiffs sought to add by way of an amended complaint, the fact remains that Plaintiffs failed to expand the legal bases for their disparate impact claims. A close reading of the documents reveals that the district court was correct. Plaintiffs only properly alleged a disparate impact claim based on the eligibility roster method. Although Plaintiffs' response to the motion to dismiss expanded their disparate impact claims, the district court was limited, as are we, to the facts and legal claims as raised in the pleadings. *See* **\*542** Moore's Federal Practice § 12.34. ("The court may not ... take into account additional facts asserted in a memorandum opposing the motion to dismiss, because such memoranda do not constitute pleadings under Rule 7(a)."). Accordingly, the district court did not abuse its discretion in denying Plaintiffs leave to amend.

### 3. Merits Analysis

**[9]**     Thus, we are left only to consider the disparate impact claim that was properly before the court—whether the move to the eligibility roster imposed a disparate impact on non-minority, male candidates. The district court rejected the challenge, noting that the complaint "alleged that MNPD ignored the objective criteria it gathered from the written examination and the assessment *because of an intent to discriminate.*" *Johnson II,* 2008 WL 3163531, at *6 (emphasis added). The district court reasoned that this type of allegation was more akin to a disparate treatment claim than it was to a disparate impact claim. *Id.* We agree.

Finally, we briefly point out *Ricci v. DeStefano,* 557 U.S. 557, 129 S.Ct. 2658, 174 L.Ed.2d 490 (2009), a case issued by the Supreme Court about a year after the district court dismissed Plaintiffs' disparate impact claim. In *Ricci,* the Supreme Court found that the city of New Haven, Connecticut imposed a disparate impact on certain Caucasian firefighters when it refused to certify examination results used for making promotions when the results failed to produce any minority candidates. The fact that the City changed its procedures during the middle of the promotions process was a key factor in the Supreme Court's decision:

> [Once a promotion process is established] and employers make clear their selection criteria, they may not then invalidate the test results, thus upsetting an employee's legitimate expectation not to be judged on the basis of race. Doing so, absent a strong basis in evidence of an impermissible disparate impact, amounts to the sort of racial preference that Congress disclaims, and is antithetical to the notice of a workplace where individuals are guaranteed equal opportunity regardless of race.

**\*\*19** *Id.* at 585, 129 S.Ct. 2658.

To be sure, guidance from *Ricci* might have helped Plaintiffs plead their allegations with requisite specificity, had that case been available to them. However, the present case remains easily distinguishable from *Ricci,*

in that there is no evidence to show that Defendants disregarded any valid scores. And while Plaintiffs might have argued that their legitimate expectations were upset by the delayed introduction of the supervisor surveys, as explained above, they failed to properly allege this argument in their complaint.[6] Accordingly, we affirm the district court's decision dismissing Plaintiffs' disparate impact claim.

### III. Tennessee Human Rights Act

Citing *Gossett v. Tractor Supply Co.,* 320 S.W.3d 777, 779 (Tenn.2010), Plaintiffs next argue that the district court applied an incorrect summary judgment standard to their claims brought under the THRA. In *Gossett,* the Tennessee Supreme Court reasoned that it was inappropriate to use the *McDonnell Douglas* framework to decide summary judgment motions for claims brought under the THRA, inasmuch as the **\*543** *McDonnell Douglas* framework was incompatible with Tennessee's own summary judgment jurisprudence. However, shortly thereafter, the Tennessee legislature abrogated *Gossett* by statute. See Tenn.Code Ann. § 4–21–311(e); *see also Bobo v. UPS,* 665 F.3d 741, 757 (6th Cir.2012). Plaintiffs' argument on this point is therefore moot.

### IV. Costs

**[10]**     The district court awarded Metro the costs of defending both Serpas and Metro against this lawsuit. On appeal, Plaintiffs raise two challenges to this decision. First, Plaintiffs argue that, regardless of the fact that Metro actually paid for Serpas' costs and legal fees, Serpas should have filed a separate bill of costs. Second, they argue that the district court did not carefully scrutinize whether the cost of a second set of transcripts for Serpas' attorneys was truly "necessary."

This Court reviews a district court's award of attorneys costs for abuse of discretion. *Singleton v. Smith,* 241 F.3d 534, 538 (6th Cir.2001). Awards decisions are "fact-intensive" and a trial court's determination of those facts is entitled to substantial deference. *See Inwalle v. Reliance Med. Prods.,* 515 F.3d 531, 551 (6th Cir.2008). Applying this standard, neither of Plaintiffs' arguments have merit.

Federal Rule of Civil Procedure 54(d)(1) provides that "costs other than attorney's fees[ ] should be allowed to the prevailing party." The presumption in favor of awarding costs may only be reversed upon a "heavy showing" that

Case 2:15-cv-12312-MOB-EAS ECF No. 48-48, PageID.1087 Filed 08/01/16 Page 48 of 98

Johnson v. Metropolitan Government of Nashville and..., 502 Fed.Appx. 523...

the court abused its discretion. *Baji v. N.E. Reg'l Bd. of Dental Examiners, Inc.,* 3 Fed.Appx. 352, 360 (6th Cir.2001) (citing *White & White, Inc. v. Am. Hosp. Supply Corp.,* 786 F.2d 728, 730 (6th Cir.1986)). In order to award costs to a prevailing party, the court must determine that:

> the expenses are allowable cost items and that the amounts are reasonable and necessary. As long as statutory authority exists for a particular item to be taxed as a cost, [the court] shall not overturn a district court's determination that the cost is reasonable and necessary, absent a clear abuse of discretion. Thus, we shall review carefully whether an expense is recoverable, but once we determine that it is, we defer to the district court, which is in the best position to determine whether the cost is recoverable.

 **\*\*20** *Baker v. First Tenn. Bank Nat'l Assoc.,* 142 F.3d 431 (6th Cir.1998) (table) (citing *Northbrook Excess & Surplus Ins. Co. v. Procter & Gamble Co.,* 924 F.2d 633, 642 (7th Cir.1991)).

Rule 54(d) provides that costs "should be allowed to the prevailing party," but it does not specify how to file a bill of costs. The Middle District of Tennessee's Local Rule 54.01 is somewhat more specific and requires that

"a cost bill, with supporting documentation, shall be *filed by the prevailing party.*" (emphasis added). However, this rule does not provide that each prevailing party must file separately, and we have found no cases requiring that. Lastly, we note that Plaintiffs did not cite to Local Rule 54.01 before the district court. Accordingly, the district court did not abuse its discretion.

Plaintiffs next argue that the second set of transcripts was not reasonable or necessary, and they fault the district court for failing to carefully scrutinize whether Serpas' attorneys had an individual need for the transcripts. This claim is meritless. The depositions in question—those of Chief Serpas, Deputy Chiefs Pike and Anderson, and Eric Cardinal—were at the core of Plaintiffs' claims of reverse discrimination against Serpas and critical to his defense against those charges. Accordingly, **\*544** the deposition transcripts were necessary and the award of costs was appropriate.

### CONCLUSION

For the reasons stated above, we **AFFIRM** the district court's judgment in all respects.

### All Citations

502 Fed.Appx. 523, 2012 WL 4945607

### Footnotes

| | |
|---|---|
| \* | The Honorable Robert M. Dow, Jr., United States District Judge for the Northern District of Illinois, sitting by designation. |
| 1 | The federal claims against the officers were dismissed on the basis of qualified immunity. *Johnson I,* 2008 WL 2066475, at \*4. The state claims against the officers were dismissed for insufficiency of the allegations. *Id.* at \*8. The claims against MNPD were dismissed because it is not an entity capable of being sued under Tennessee law. *Id.* at \*8 n. 5. By state statute, all claims against the MNPD must be pursued against Metro. *Id.* |
| 2 | Holley did not assert a disparate impact claim. |
| 3 | Officer Holley argues that he was only supervised by ten supervisors in his direct chain of command; therefore, the rollup indicating that he was ranked by thirty-three supervisors is suspect. However, Officer Holley misconstrues the survey instructions, which asked the supervisors to rank any candidate whom they "worked directly with or otherwise [had] personal awareness of the skills, abilities, and knowledge of." |
| 4 | The "rubber-stamp" or "cat's paw" theory of liability involves a situation where a supervisor is influenced by another individual who was motivated by an impermissible bias. It is more appropriately dealt with in circumstantial evidence review. *See Arendale,* 519 F.3d at 604. |
| 5 | We note the same figure that the consulting company found troubling: that, as of 2003, there were a total of 29 African–American supervisors out of 1,300 sworn MNPD officers. Certainly such a statistic could prompt Defendants to be concerned about the need for greater diversity in the department's ranks. |

WESTLAW © 2016 Thomson Reuters. No claim to original U.S. Government Works.

Case 2:15-cv-12312-MOB-EAS   ECF No. 48-48, PageID.1088   Filed 08/01/16   Page 49 of 98

Johnson v. Metropolitan Government of Nashville and..., 502 Fed.Appx. 523...

To a lesser extent, we also take judicial notice of the newspaper articles reflecting dissatisfaction by both minority and majority officers with MNPD's promotions processes. *See* "Officers Say Metro Police Promotions Policy Unfair," *The Tennessean,* Apr. 2, 2007; "Racial Tensions Escalate—Black & White Cops Feud over Promotions, *Nashville Scene,* Oct. 2, 2003.

6    There remains an outstanding factual dispute as to when the supervisor surveys were introduced into the promotions process. Plaintiffs allege that the surveys were introduced during a delay that followed the announcement of the eligibility rosters; Serpas testified in his deposition, however, that he made the decision to conduct the surveys when the new promotions procedure was announced.

---

**End of Document**                               © 2016 Thomson Reuters. No claim to original U.S. Government Works.

67 Fed.Appx. 893
This case was not selected for
publication in the Federal Reporter.
Not for Publication in West's Federal Reporter
See Fed. Rule of Appellate Procedure 32.1
generally governing citation of judicial decisions
issued on or after Jan. 1, 2007. See also
Sixth Circuit Rule 28. (Find CTA6 Rule 28)
United States Court of Appeals,
Sixth Circuit.

Arzell GOODEN, Plaintiff-Appellant,

v.

CITY OF MEMPHIS POLICE
DEPARTMENT, Defendant,
R. Skelton, Officer, Defendant-Appellee.

No. 02-6170.
|
June 17, 2003.

Arrestee brought civil rights action against city, police
department, and police officer, arising out of his arrest
and subsequent dismissal of charges against him. The
United States District Court for the Western District
of Tennessee, Jon P. McCalla, J., sua sponte dismissed
action as frivolous, pursuant to in forma pauperis statute.
Arrestee appealed. The Court of Appeals, 29 Fed.Appx.
350, affirmed in part, vacated in part, and remanded.
On appeal after remand, the Court of Appeals held
that officer was entitled to judgment as a matter of
law, given that arrestee supported his claims only with
conclusory, unsworn statements unsupported by any
admissible evidence.

Affirmed.

West Headnotes (1)

[1]     **Civil Rights**
         👉 Criminal Law Enforcement;Prisons
         Police officer was entitled to judgment as
         matter of law on civil rights claims of arrestee,
         who alleged that police officer falsified arrest
         report, illegally searched his vehicle, robbed
         him of $230, falsely imprisoned him, and

prosecuted him maliciously, where officer
asserted he had probable cause to make
arrest, that the search was an inventory
search incident to a lawful arrest, and that
he did not take any money, and officer
offered his affidavit and those of two other
officers, and arrestee responded only with
conclusory, unsworn statements unsupported
by any admissible evidence. 42 U.S.C.A. §
1983.

11 Cases that cite this headnote

**\*894** Before: MARTIN, Chief Judge; KRUPANSKY
and COLE, Circuit Judges.

*ORDER*

**\*\*1** Arzell Gooden, a Tennessee resident proceeding pro
se, appeals the district court order dismissing his civil
rights action filed pursuant to 42 U.S.C. § 1983. This case
has been referred to a panel of the court pursuant to Rule
34(j)(1), Rules of the Sixth Circuit. Upon examination,
this panel unanimously agrees that oral argument is not
needed. Fed. R.App. P. 34(a).

This is Gooden's second appeal in this case. Seeking
monetary relief, Gooden sued the Memphis Police
Department, Officer Skelton, and the City of Memphis.
Gooden alleged that Officer Skelton had subjected him
to false arrest and confiscated $230 from him. The
district court ordered Gooden to amend his complaint. The
district court reviewed the amended complaint and
dismissed it as frivolous pursuant to 28 U.S.C. § 1915(e),
and Gooden appealed. A panel of this court affirmed
the district court's decision in part and vacated and
remanded it in part. *Gooden v. City of Memphis Police
Dep't,* 29 Fed.Appx. 350 (6th Cir.2002). On remand, the
case proceeded only on Gooden's claims against Skelton
in his individual capacity. Skelton moved to dismiss or for
summary judgment. The district court denied the motion
to dismiss but granted the motion for summary judgment.
The court held that Gooden had failed to come forward
with any evidence upon which a jury could reasonably find
for him. The district court also denied Gooden's motion
for reconsideration.

2003 WL 21421640

In his appeal, Gooden argues that Officer Skelton falsified an arrest report and gave an inconsistent account of the arrest in his affidavit.

This court reviews an order granting summary judgment de novo. *Holloway v. Brush,* 220 F.3d 767, 772 (6th Cir.2000). Summary judgment is proper "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c).

Upon review, we conclude that the district court properly granted summary judgment to Officer Skelton. In his complaint and amended complaint, Gooden alleged that Skelton falsified an arrest report, illegally searched his vehicle, robbed him of $230, falsely imprisoned him, and prosecuted him maliciously. The charges against Gooden were dismissed. Skelton moved for summary judgment on the grounds that he had probable cause to arrest Gooden, that the search of the truck was an inventory search incident to a lawful arrest, and that he did not take any money. In support of his motion, Skelton offered his affidavit and those of Officer Wooten and Lieutenant Jones of the Memphis Police Department. Skelton swore that on the night of the incident, he observed a man known to him as a drug user **\*895** and seller and male prostitute flag down Gooden's vehicle and reach in the window. Suspecting a drug transaction, Skelton approached the truck. According to Skelton, Gooden appeared nervous, his speech was confused, his eyes were bloodshot and glassy, and he performed very poorly on a field sobriety test. Skelton arrested Gooden for DUI, public intoxication, and disorderly conduct, and he and Wooten searched Gooden's vehicle. They recovered a gun and a purse. Wooten's affidavit corroborated Skelton's account. He also stated that he did not see any money in Gooden's purse. Jones swore that he came to the scene at Skelton's request after Gooden accused him of stealing his money. He advised Gooden to file a formal complaint with the police department.

**\*\*2** Skelton was entitled to a judgment as a matter of law. Faced with Skelton's affidavits and supporting facts, Gooden responded only with conclusory, unsworn statements unsupported by any admissible evidence. Significantly, Gooden did not present an affidavit from the only non-police witness at the scene. Conclusory allegations, speculation, and unsubstantiated assertions are not evidence, and are not enough to defeat a well-supported motion for summary judgment. *See Lujan v. Nat'l Wildlife Fed'n,* 497 U.S. 871, 888, 110 S.Ct. 3177, 111 L.Ed.2d 695 (1990); *Olabisiomotosho v. City of Houston,* 185 F.3d 521, 525 (5th Cir.1999). Gooden failed to present evidence on which a jury could reasonably find for him. *See Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 252, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986).

The district court also properly denied Gooden's motion for reconsideration. *See* Fed.R.Civ.P. 59(e). Gooden argued that he was unaware that he was supposed to respond to Skelton's motion with affidavits and attached his own affidavit for the first time. The affidavit disputed Skelton's and Wooten's version of the arrest and repeated the allegations from Gooden's amended complaint. The district court declined to consider the affidavit because Gooden failed to file it in response to Skelton's motion or the court's show-cause order. Because Gooden did not present any newly discovered evidence, we find no error. *See Emmons v. McLaughlin,* 874 F.2d 351, 359 (6th Cir.1989); *Harsco Corp. v. Zlotnicki,* 779 F.2d 906, 909 (3d Cir.1985).

Gooden's argument that Skelton falsified the arrest report and gave an inconsistent account of the arrest in his affidavit is without merit. The minor discrepancy Gooden identifies does not remedy his utter failure to come forward with substantial evidence in support of his claims.

For the foregoing reasons, we affirm the district court's order. Rule 34(j)(2)(C), Rules of the Sixth Circuit.

**All Citations**

67 Fed.Appx. 893, 2003 WL 21421640

---

© 2016 Thomson Reuters. No claim to original U.S. Government Works.

WESTLAW © 2016 Thomson Reuters. No claim to original U.S. Government Works.

1997 WL 33353649

1997 WL 33353649
Only the Westlaw citation is currently available.

UNPUBLISHED OPINION. CHECK
COURT RULES BEFORE CITING.

Court of Appeals of Michigan.

John F. SIRVINSKIS, Plaintiff-Appellant,
v.
ROSS ROY, INC., Defendant-Appellee.

No. 186655.
|
March 21, 1997.

Before: WAHLS, P.J., and HOOD and JANSEN, JJ.


UNPUBLISHED

PER CURIAM.

 *1  Plaintiff appeals as of right from the trial court's order granting summary disposition to defendant on plaintiff's age discrimination claim. We affirm.

Plaintiff began working for defendant agency in 1979 and remained employed with defendant until August 1982, when he left defendant's employ because of a better opportunity. In 1986, plaintiff's new employer merged with defendant and plaintiff accepted an offer to return to the agency. Plaintiff held various positions with the agency and, for the last five years of his employment, he held the position of associate creative director for the Chrysler Mopar Service and Chrysler Fleet Group.

In March 1992, plaintiff was given his annual performance evaluation and it was above average in most areas. Plaintiff, however, was advised that he needed to give his employees a freer rein. In March 1993, Mike Labiak, plaintiff's immediate supervisor, again conducted plaintiff's routine performance evaluation. Out of a possible seven point scale, he awarded plaintiff a four for leadership and people management. A four represented "meets requirements in most areas" and is the average mark. When plaintiff questioned Labiak about his rating, he was told that he supervised his employees too much and needed to give his employees more credit. Plaintiff testified

that he believed that he needed to supervise his employees more than usual because his employees were given lots of small jobs and if he did not constantly supervise, he would not stay on budget and meet deadlines. He further indicated that he became involved with his subordinate's work so that they could spend more time being creative and less time dealing with administrative details. He testified that, after his 1993 evaluation, he attempted to supervise less.

In November 1993, Gary Wolfson became the Executive Vice President and Chief Creative Officer for the agency. Wolfson claimed that he was instructed to implement a reduction of the workforce and to restructure communications in order to improve the overall creative production of the agency. In February 1994, plaintiff's group, the Mopar group, was combined with the training group. The combination of the two groups made it possible for defendant to eliminate a management position. As a result, plaintiff was terminated. He was fifty-six years old. Wolfson averred that plaintiff was chosen for termination because he was the less effective manager.

Steven Sarris, a younger associate creative director from the training group, became co-creative director of the new group and continued to perform his own duties plus those of plaintiff. The new group, which consisted of the art directors and copywriters from both of the previous groups, had thirteen employees. Plaintiff speculated that the group hired new personnel after he was terminated. Sarris, however, averred that the newly combined group did not add any additional personnel and that the only new employee was hired to replace a senior art director who resigned after the reorganization.

 *2  Plaintiff filed suit against defendant, alleging that he was fired because of age discrimination. Defendant moved for summary disposition, arguing that plaintiff failed to establish a prima facie case of age discrimination and that he was replaced by a younger worker. Defendant further argued that the agency underwent a work force reduction, and plaintiff was terminated because the consolidation of two groups allowed for the elimination of one manager and plaintiff was the less effective manager. The trial court granted summary disposition in favor of defendant, finding that plaintiff had failed to establish a prima facie case of age discrimination.

Sirvinskis v. Ross Roy, Inc., Not Reported in N.W.2d (1997)

1997 WL 33353649

We first consider plaintiff's claim that summary disposition was premature because discovery had not been completed. While plaintiff is correct that summary disposition under MCR 2.116(C)(10) ordinarily should not be granted before discovery is complete, it is proper before discovery is complete if further discovery does not stand a reasonable chance of uncovering factual support for the opposing party's position. *Hasselbach v. TG Canton, Inc,* 209 Mich.App 475, 481-482; 531 NW2d 715 (1994). In the instant case, the hearing for summary disposition occurred three weeks prior to the discovery cut-off. Plaintiff, however, does not disclose what evidence could have been discovered by plaintiff in those three weeks to create a genuine issue of material fact to save his age discrimination claim. Accordingly, we conclude that it was not premature for the trial court to grant summary disposition. Plaintiff also requests that we discuss the merits of this case, and we will do so.

Plaintiff claims that defendant was not entitled to summary disposition on plaintiff's age discrimination claim. We disagree. We review an order granting summary disposition de novo. *Plieth v. St Raymond Church,* 210 Mich.App 568, 571; 534 NW2d 164 (1995). A motion for summary disposition may be granted pursuant to MCR 2.116(C)(10) when, except with regard to the amount of damages, there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. *Id.* Giving the benefit of reasonable doubt to the nonmovant, the trial court must determine whether a record might be developed that would leave open an issue upon which reasonable minds might differ. *Id.*

Plaintiff's claim of age discrimination is based upon the Civil Rights Act, which provides in relevant part, that an employer shall not:

> (a) Fail or refuse to hire or recruit, discharge, or otherwise discriminate against an individual with respect to employment, compensation, or a term, condition, or privilege of employment, because of ... age. [MCL 37.2202; MSA 3.548(202).]

The burden of proof in an age discrimination case is allocated as follows: (1) the plaintiff has the burden of proving a prima facie case of discrimination by a preponderance of the evidence; (2) if the plaintiff is successful in proving a prima facie case, the burden shifts to the defendant to articulate a legitimate, nondiscriminatory reason for its actions; and (3) the plaintiff then has the burden of proving by a preponderance of the evidence that the legitimate reason offered by the defendant was merely a pretext. *Plieth, supra* at 571-572; *Barnell v. Taubman Co, Inc,* 203 Mich.App 110, 120; 512 NW2d 13 (1993).

**\*3** An age discrimination claim can be based on two theories: (1) disparate treatment, which requires a showing of either a pattern of intentional discrimination against protected employees, e.g., employees aged forty to seventy years, or against an individual plaintiff; or (2) disparate impact, which requires a showing that an otherwise facially neutral employment policy has a discriminatory effect on members of a protected class. *Farmington Ed Ass'n v. Farmington School Dist,* 133 Mich.App 566; 351 NW2d 242 (1984). In this case, plaintiff relies on the disparate treatment theory.

Plaintiff claims that he established his prima facie case under the four-part test set forth in *McDonnell Douglas Corp v. Green,* 411 U.S. 792, 802; 93 S Ct 1817; 36 L.Ed.2d 668 (1973), which requires a plaintiff to show that (1) he was a member of a protected class, (2) he was discharged, (3) he was qualified for the position, and (4) he was replaced by a younger person. See also *Barnell, supra.* Where, however, as here, a plaintiff is discharged as a result of an employer's economically motivated reduction in force, a prima facie case of disparate treatment requires a showing, by plaintiff, that age was a *determining* or a *significant* factor in the employer's decision to discharge or demote the plaintiff. *Matras v. Amoco Oil Co,* 424 Mich. 675, 683; 385 NW2d 586 (1986); *Plieth, supra.* Age need not be the only reason or the main reason for the discharge, but it must be one of the reasons that made a difference in determining whether to discharge a person. *Plieth, supra* at 121.

We find that plaintiff has not proved a prima facie case of age discrimination. Plaintiff was fifty-six years old when he was discharged and, considering plaintiff's employment evaluations and experience, he was qualified for his position at the agency. There, however, is no evidence that plaintiff was replaced by a younger worker. In fact, he was not replaced, but his position was eliminated when the two departments were consolidated. At that point, the associate creative director of the other group was retained

Case 2:15-cv-12312-MOB-EAS ECF No. 48-48, PageID.1093 Filed 08/01/16 Page 54 of 98
Sirvinskis v. Ross Roy, Inc., Not Reported in N.W.2d (1997)

1997 WL 33353649

to take over the leadership of the newly combined group. The fact that the retained director was younger does not, standing alone, establish plaintiff's prima facie case. *Matras, supra* at 684; *Featherly v. Teledyne Industries, Inc,* 194 Mich.App 352, 358; 486 NW2d 361 (1992). Plaintiff simply failed challenge that the younger retained worker was the more effective a manager. Although plaintiff claims that his skills and experience were better than those of the retained employee, he failed to offer any evidence comparing the younger worker's skills, experience, background or qualifications to his own. Unsupported allegations need not be considered by this Court. *Porter v. Royal Oak,* 214 Mich.App 478; 542 NW2d 905 (1995). A party may not merely announce his or her position and leave it to us to discover and rationalize the basis for the claim. *Goolsby v. Detroit,* 419 Mich. 651, 655, n 1; 358 NW2d 856 (1984); *In re Toler,* 193 Mich.App 474, 477; 484 NW2d 672 (1992).

**\*4** More importantly, we are not persuaded that plaintiff's age was a *significant* reason in determining whether to discharge him. The only relevant, admissible evidence plaintiff offered to show that age was a factor in his discharge was that the person who terminated him told him to "keep on being a grumpy old man in the performance of your job." Standing alone, the comment does not support plaintiff's claim for age discrimination. *Matras, supra* at 685. Review of the record reveals that this comment was made upon the first meeting of the two men and was made approximately three months prior to his termination. Furthermore, the comment was a descriptive way to identify plaintiff's management style. Moreover, the comment was isolated and ambiguous and such comments do not support age discrimination claims. See *Phelps v. Yale Security, Inc,* 986 F.2d 1020, 1025 (CA 6, 1993). Accordingly, plaintiff has made no showing that his age was the motivating factor in defendant's decision to terminate him.

We further note that plaintiff also has failed to establish a prima facie case that defendant engaged in a pattern of discharging older employees. Plaintiff was required to present evidence that he was qualified for the position and that there was a pattern of discharges of older employees, whose positions were then filled by younger employees. See *Foehr v Republic Automotive Parts, Inc,* 212 Mich.App 663, 671; 538 NW2d 420 (1995). A pattern of discharges of older employees while younger employees were retained could also establish a pattern of discrimination. *Id.* In

this case, plaintiff provided no evidence that there was a pattern of discharges based on age. In fact, the evidence on which plaintiff relies tends to indicate a discriminatory hiring policy, which did not affect plaintiff. The only evidence offered by plaintiff was the testimony of a co-employee who stated that many other employees felt they were separated from their employment, either by termination or early retirement, because of age. This testimony alone does not establish a pattern of age-related discharges. See *Bouwman v. Chrysler Corp,* 114 Mich.App 670, 682; 319 NW2d 621 (1982). Plaintiff also failed to provide any supporting evidence, by way of testimony or affidavits, from the individuals who believed there was discrimination by the agency even though he was provided with a list of names. Plaintiff's allegations, without supporting authority, are insufficient to survive summary disposition. See *Johnson v. Wayne Co,* 213 Mich.App 143, 149; 540 NW2d 66 (1995).

Even if we conclude that plaintiff met his burden and proved a prima facie case of age discrimination, the burden of production would shift to defendant to rebut the presumption of disparate treatment by articulating, *not proving,* a legitimate, nondiscriminatory reason for the adverse employment decision against plaintiff. In rebuttal, defendant states that it underwent a reduction in force and plaintiff was terminated because the consolidation of the groups allowed for the termination of one manager and plaintiff was the less effective manager.

**\*5** Defendant having carried its burden of production, plaintiff was required to prove by a preponderance of the evidence that the defendant's proffered reasons are a mere pretext. We first note that, contrary to plaintiff's assertion, defendant was not required to prove that the reduction in force was motivated by an economic *necessity. McDonald v. Stroh Brewery Co,* 191 Mich.App 601, 608; 478 NW2d 669 (1991). Furthermore, plaintiff failed to offer any evidence, beyond mere speculation and unsupported allegations, that defendant did not undergo a reduction in force. Likewise, he failed to offer any evidence that the associate creator director retained was not the more effective manager. A party has to rebut the legitimate, non-discriminatory reasons with supporting evidence to survive summary disposition. *Singal v. General Motors Corp,* 179 Mich.App 497, 500; 447 NW2d 152 (1989).

1997 WL 33353649

---

Affirmed. Defendant, being the prevailing party, may tax costs pursuant to MCR 7.219.

**All Citations**

Not Reported in N.W.2d, 1997 WL 33353649

---

**End of Document** © 2016 Thomson Reuters. No claim to original U.S. Government Works.

2015 WL 8593471, 128 Fair Empl.Prac.Cas. (BNA) 808

🚩 KeyCite Yellow Flag - Negative Treatment

Disagreed With by    Hinton v. Virginia Union University,    E.D.Va.,
May 5, 2016

634 Fed.Appx. 518
This case was not selected for
publication in West's Federal Reporter.
See Fed. Rule of Appellate Procedure 32.1
generally governing citation of judicial
decisions issued on or after Jan. 1, 2007.
See also U.S.Ct. of App. 6th Cir. Rule 32.1.
United States Court of Appeals,
Sixth Circuit.

Jill CRANE, Plaintiff–Appellant,

v.

MARY FREE BED REHABILITATION
HOSPITAL, Defendant–Appellee.

No. 15–1358.
|
Dec. 11, 2015.

**Synopsis**

**Background:** African–American employee brought action
against her employer, which provided acute care
rehabilitation for patients with brain and spinal injuries,
alleging, inter alia, that employer discriminated against
her when it granted request of Caucasian patient's family
that no African–American caregivers provide care for
patient. The United States District Court for the Western
District of Michigan granted employer's motion for
summary judgment. Employee appealed.

**Holdings:** The Court of Appeals, S. Thomas Anderson,
District Judge, sitting by designation, held that:

[1] employer's alleged granting of request did not have
materially adverse effect on employee;

[2] employee was less qualified than Caucasian candidate
for promotion;

[3] there was no evidence that decisionmaker with respect
to promotion knew of employee's protected activity;

[4] there was no causal connection between employee's
protected activity and employer's failure to promote
employee.

Affirmed.

West Headnotes (4)

**[1]**    **Civil Rights**
         👉 Particular cases

Healthcare employer's alleged granting
of patient's request not to have any
African-American caregiver did not have
materially adverse effect on African-
American employee, and thus employer
did not discriminate against employee in
violation of § 1981; employee worked only
one more shift during patient's stay after
learning of request, employee had no assigned
responsibility to care for patient who made
request, employee was not required to reassign
any nurses because of request, employee
was not personally reassigned because of
request, and employee's work hours, duties,
compensation, and benefits did not change
because of request. 42 U.S.C.A. § 1981.

2 Cases that cite this headnote

**[2]**    **Civil Rights**
         👉 Promotion, demotion, and transfer

**Civil Rights**
         👉 Educational requirements;ability tests

African-American employee was less qualified
than Caucasian candidate for promotion,
and thus healthcare employer's failure
to promote employee was not race
discrimination in violation of § 1981;
position sought by employee and candidate
required development and implementation
of multi-dimensional education programs
for all of employer's healthcare positions,
candidate had previously been responsible
for developing radiology studies program at
state university, candidate had worked with
professionals across variety of disciplines,

candidate had experience incorporating technology into education programs, and employee's education experience consisted of teaching nursing courses. 42 U.S.C.A. § 1981.

Cases that cite this headnote

**[3]**    **Civil Rights**
👉 Motive or intent;pretext

**Health**
👉 Adverse employment action;wrongful discharge

There was no evidence that health care provider's decisionmaker, with respect to promotion, knew of employee's objection to alleged racial discrimination or employee's assistance with co-worker's grievance, or that decisionmaker was influenced by other supervisors who might have held retaliatory animus toward employee, as required to support employee's § 1981 retaliation claim. 42 U.S.C.A. § 1981.

1 Cases that cite this headnote

**[4]**    **Civil Rights**
👉 Causal connection;temporal proximity

**Health**
👉 Adverse employment action;wrongful discharge

There was no causal connection between health care provider employee's protected activity, i.e., objecting to alleged racial discrimination and assisting with co-worker's grievance, and employer's failure to promote employee, and thus employer's promotion decision was not retaliation under § 1981; promotion decision occurred 22 months after employee's objection and seven months after co-worker filed grievance, and decisionmaker was not influenced by anyone who may have held retaliatory animus against employee. 42 U.S.C.A. § 1981.

2 Cases that cite this headnote

**\*519** On Appeal from the United States District Court for the Western District of Michigan.

BEFORE: GIBBONS and McKEAGUE, Circuit Judges; ANDERSON, District Judge. \*

**Opinion**

S. THOMAS ANDERSON, District Judge.

**\*\*1** Jill Crane brought employment discrimination and retaliation claims under the Civil Rights Act of 1866, 42 U.S.C. § 1981, and parallel discrimination and retaliation claims under Michigan's Elliot–Larsen Civil Rights Act ("ELCRA"), Mich. Comp. Laws § 37.2201, against her employer Mary Free Bed Rehabilitation Hospital ("Mary Free Bed"). [1] The district court granted Mary Free Bed's motion for summary judgment, and Crane appeals that decision.

For the reasons set forth below, we **AFFIRM** the decision of the district court.

**I.**

Mary Free Bed provides acute care rehabilitation for patients with brain and spinal **\*520** injuries. Crane, who is African–American, was employed by Mary Free Bed as a part-time nursing supervisor beginning in 2008. On either December 3 or 4, 2010, another nursing supervisor allegedly told Crane that a Caucasian patient's family had requested that no African–American caregivers provide care for the patient. Crane complained to Connie Brown–Olds, the Director of Nursing, about the request. Crane worked one more shift during the remaining seven days of the patient's stay.

Crane claims that Mary Free Bed's action in enforcing the race-based caregiver request constituted racial discrimination. Mary Free Bed denies that it honored the request. [2] However, Mary Free Bed contends that even if the request had been honored, no aspect of Crane's employment changed in any way because of the request. She had the same work hours, responsibilities, duties, status, pay, and benefits after she heard of the request as she did before and, thus, suffered no adverse action. Furthermore, as a supervisor, Crane was not responsible

for direct patient care, and Mary Free Bed reasons that any such policy would, therefore, have not affected her.

In August 2012, Crane applied for a newly-created Director of Education position at Mary Free Bed. The job was awarded to another candidate who is Caucasian. Mary Free Bed contends that the successful candidate's qualifications were objectively superior to Crane's qualifications, while Crane contends that she was denied the position because of her race and in retaliation for engaging in certain protected activities.

On appeal, Crane argues that the district court erred in granting Mary Free Bed's motion for summary judgment based on its determinations that: (1) Crane was not subjected to an adverse employment action even if Mary Free Bed did honor the caregiver request; (2) Crane could not establish that she was denied the Director of Education position for discriminatory reasons because her qualifications were not similar to those of the successful candidate; and (3) Crane could not show that she was retaliated against because there was no evidence of a causal connection between her protected activities and the selection of a different candidate for the Director of Education position.

## II.

We review de novo the grant of summary judgment by a district court. *See Dodd v. Donahoe,* 715 F.3d 151, 155 (6th Cir.2013). Summary judgment is proper "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(a). When deciding a motion for summary judgment, the court must review all the evidence and draw all reasonable inferences in favor of the nonmovant. *Matsushita Elec. Indus. Co.,* 475 U.S. at 587, 106 S.Ct. 1348. However, the "mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact." **\*521** *Anderson v. Liberty Lobby Inc.,* 477 U.S. 242, 247–48, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986).

## A.

**\*\*2** Section 1981 prohibits intentional race discrimination in the making and enforcing of contracts involving both public and private actors and provides a cause of action for both race-based employment discrimination and retaliation. 42 U.S.C. § 1981; *Christian v. Wal–Mart Stores, Inc.,* 252 F.3d 862, 867–68 (6th Cir.2001). Similarly, the ELCRA prohibits "discriminat [ing] against an individual with respect to employment, compensation, or a term, condition, or privilege of employment, because of ... race." Mich. Comp. Laws § 37.2202(1)(a).

Claims under these two statutes are analyzed under the framework developed for claims brought under Title VII of the Civil Rights Act, 42 U.S.C. § 2000e, thus, the same burden of proof and elements of a prima facie case apply. *See In re Rodriguez,* 487 F.3d 1001, 1008 n. 2 (6th Cir.2007) (citing *Hazle v. Ford Motor Co.,* 464 Mich. 456, 462, 628 N.W.2d 515, 520–21 (2001) (applying the Title VII burden-shifting model to ELCRA claims)); *see also Noble v. Brinker Int'l Inc.,* 391 F.3d 715, 720 (6th Cir.2004) (explaining that the elements of a prima facie case and the burden of proof are the same for claims arising under Title VII and § 1981).

"To show employment discrimination, the plaintiff must present either direct evidence of discrimination or circumstantial evidence that would allow an inference of discriminatory intent." *Ross v. Pfizer, Inc.,* 375 F. App'x. 450, 453 (6th Cir.2010). "[D]irect evidence is that evidence which, if believed, requires the conclusion that unlawful discrimination was at least a motivating factor in the employer's actions." *Jacklyn v. Schering–Plough Healthcare Prods. Sales Corp.,* 176 F.3d 921, 926 (6th Cir.1999); *see also Johnson v. Kroger Co.,* 319 F.3d 858, 865 (6th Cir.2003) (explaining that "direct evidence of discrimination does not require a factfinder to draw any inferences in order to conclude that the challenged employment action was motivated at least in part by prejudice against members of the protected group.") "[T]he evidence must establish not only that the plaintiff's employer was predisposed to discriminate on the basis of [race], but also that the employer acted on that predisposition." *Hein v. All Am. Plywood Co.,* 232 F.3d 482, 488 (6th Cir.2000).

A discrimination case relying on circumstantial evidence is analyzed under the burden-shifting framework delineated in *McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 93

2015 WL 8593471, 128 Fair Empl.Prac.Cas. (BNA) 808

S.Ct. 1817, 36 L.Ed.2d 668 (1973), and later clarified in *Texas Dep't of Community Affairs v. Burdine,* 450 U.S. 248, 101 S.Ct. 1089, 67 L.Ed.2d 207 (1981).[3] To establish a prima facie case for race discrimination under § 1981, a plaintiff must show that "(1) [s]he belongs to an identifiable class of persons who are subject to discrimination based on their race; (2) the defendant intended to discriminate against [her] on the basis of race; and (3) the defendant's discriminatory conduct abridged a right enumerated in section 1981(a)." *Amini v. Oberlin Coll.,* 440 F.3d 350, 358 (6th Cir.2006). Under the ELCRA, **\*522** a plaintiff may prove disparate treatment by showing that she was a member of a protected class and that she was treated differently than members of a different class for the same or similar conduct. *Reisman v. Regents of Wayne State Univ.,* 188 Mich.App. 526, 538, 470 N.W.2d 678, 685 (1991).

**\*\*3** "On a motion for summary judgment, a district court considers whether there is sufficient evidence to create a genuine dispute at each stage of the *McDonnell Douglas* inquiry." *Cline v. Catholic Diocese of Toledo,* 206 F.3d 651, 661 (6th Cir.2000) (applying the *McDonnell Douglas* framework to a sex-discrimination claim). "[A] plaintiff in a race discrimination action 'has the burden of proving by a preponderance of the evidence a prima facie case.' " *Nguyen v. City of Cleveland,* 229 F.3d 559, 562 (6th Cir.2000) (quoting *Burdine,* 450 U.S. at 252–53, 101 S.Ct. 1089). The key question is always whether the plaintiff has presented sufficient evidence to permit a reasonable jury to conclude that she suffered an adverse employment action under circumstances giving rise to an inference of unlawful discrimination. *Burdine,* 450 U.S. at 253, 101 S.Ct. 1089.

A plaintiff alleging discrimination with direct evidence is not subject to the *McDonnell Douglas* framework, although "she still must establish that she suffered an adverse employment action in order to state a claim." *Vredevelt v. GEO Group, Inc.,* 145 Fed.Appx. 122, 128 (6th Cir.2005). Accordingly, regardless of whether Crane proceeds on the basis of direct evidence or circumstantial evidence, she must demonstrate that she suffered an adverse employment action as a result of the alleged discrimination.

Crane contends that she has presented both direct and indirect evidence of racial discrimination. She argues that the mere fact that assignments were made by Mary Free Bed on the basis of race, regardless of the impact on her personally, violated her rights under § 1981 and the ELCRA. She also contends that, as a supervisor, she was responsible for all the patients on her shift and denying her the right to care for a particular patient as needed was discriminatory even if she did not in fact have to care for that patient.

Not every action taken by an employer that potentially affects an employee rises to the level of an adverse employment action. *White v. Burlington N. & Santa Fe Ry. Co.,* 364 F.3d 789, 796–97 (6th Cir.2004). Instead, a plaintiff must point to a materially adverse change in the terms or conditions of her employment. *Kocsis v. Multi–Care Mgmt., Inc.,* 97 F.3d 876, 885 (6th Cir.1996). Examples of a materially adverse change include "termination of employment, a demotion evidenced by a decrease in wage or salary, a less distinguished title, a material loss of benefits, or other indices that might be unique to a particular situation." *Id.* at 886. At a minimum, the change in employment conditions must be more than an inconvenience or an alteration of job responsibilities. *Id.*

**[1]**  Here, the district court found that an adverse employment action may be based on an employer's race-based assignment of duties even without a change in pay, prestige, or responsibilities. However, there was no adverse employment action in this case because, according to the district court, any impact on Crane was *de minimis* and temporary. In reaching this decision, the district court looked at the following facts: Crane worked only one more shift after learning of the request; she had no assigned responsibility to care for the patient who was the subject of the request; she was not required to reassign any nurses because of the request; **\*523** she was not personally reassigned because of the request; and her own work was not significantly impacted.[4]

**\*\*4** The district court's determination that an adverse employment action must be more than *de minimis* is in line with other cases from this Court. An adverse employment action is "a materially adverse change in the terms and conditions of [the plaintiff's] employment," *Hollins v. Atl. Co., Inc.,* 188 F.3d 652, 662 (6th Cir.1999), and generally involves material changes in employment status such as "hiring, firing, failing to promote, reassignment with significantly different responsibilities, or a decision causing a significant change in benefits." *Burlington*

*Indus., Inc. v. Ellerth,* 524 U.S. 742, 761, 118 S.Ct. 2257, 141 L.Ed.2d 633 (1998).

As this Court stated in *Bowman v. Shawnee State Univ.,* 220 F.3d 456 (6th Cir.2000):

> The Sixth Circuit has consistently held that *de minimis* employment actions are not materially adverse and, thus, not actionable. *See, e.g., Jacklyn v. Schering–Plough Healthcare Prod.,* 176 F.3d 921, 930 (6th Cir.1999) (holding that "neither requiring plaintiff to work at home while she was recovering from outpatient surgery, nor rejecting computer expenses that previously had been approved, were materially adverse employment actions"); *Jackson v. City of Columbus,* 194 F.3d 737 (6th Cir.1999) (holding that police chief's suspension with pay was not an adverse employment action); *Hollins,* 188 F.3d at 662 (6th Cir.1999) (holding that "[s]atisfactory ratings in an overall evaluation, although lower than a previous evaluation, will not constitute an adverse employment action where the employee receives a merit raise"); *Kocsis v. Multi–Care Management,* 97 F.3d 876, 885 (6th Cir.1996) (holding that "reassignments without salary or work changes do not ordinarily constitute adverse employment decisions in employment discrimination claims").

*Bowman,* 220 F.3d at 462. We further explained:

> Similar to cases where the employment action is not significant enough to rise to the level of a materially adverse employment action, cases where the employment action, while perhaps being materially adverse if permanent, is very temporary also do not constitute materially adverse employment actions. This principle was recognized in *Kauffman v. Allied Signal, Inc., Autolite Div.,* 970 F.2d 178 (6th Cir.1992), where the court indicated that even if a tangible job detriment has been suffered, there may be a *de minimis* exception for temporary actions or where further remedial action is moot and no economic loss occurred. *See id.* at 187. *See also Yates v. Avco Corp.,*

819 F.2d 630, 638 (6th Cir.1987) (holding that there was no adverse employment **\*524** action where temporary transfer did not result in loss of salary or benefits).

*Id.* ("Even if we assume that the [ten day] loss of the Coordinator position constitutes a significant change in employment status, there is no tangible employment action in this case because the very temporary nature of the employment action in question makes it a non-materially adverse employment action.").

**\*\*5** Likewise, Crane suffered no material change in the terms or conditions of her employment as a result of the alleged race-based request. It is undisputed that her work hours, duties, compensation, and benefits did not change in any way and that, after she learned of the request, she worked only one more shift. Any potential exclusion from the patient's room was not a removal of responsibilities because Crane was not responsible for direct patient care. Because Crane has not shown a materially adverse effect on her job, she cannot establish a claim of discrimination based on the race-based assignment.

### B.

With regard to Crane's claim that she was denied the Director of Education job because of her race, the district court found that Crane could not establish a prima facie case of discrimination because her qualifications for the job were not similar to those of the successful candidate, Bonita Pawloski. Crane has no direct evidence of race discrimination in connection with the decision to select Pawloski for the Director of Education position. Therefore, Crane must prove her claim with circumstantial evidence under the *McDonnell Douglas* framework.

To establish a prima facie case of discrimination for her failure to promote claim, Crane must show that: (1) she belongs to a protected class; (2) she applied for and was qualified for the position; (3) she was considered for and denied the position despite her qualifications; and (4) an individual of similar qualifications who was not a member of the protected class received the promotion. [5] *White v. Columbus Metro. Hous. Auth.,* 429 F.3d 232, 240 (6th Cir.2005); *see also White v. Baxter Healthcare*

2015 WL 8593471, 128 Fair Empl.Prac.Cas. (BNA) 808

*Corp.,* 533 F.3d 381, 391 (6th Cir.2008) ("Absent direct evidence of discrimination, claims brought pursuant to Title VII's antidiscrimination provision, § 1981, and the Elliot–Larsen Act are subject to the tripartite burden-shifting framework first announced by the Supreme Court in *McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973), and subsequently modified in *Texas Dept. of Comm. Affairs v. Burdine,* 450 U.S. 248, 101 S.Ct. 1089, 67 L.Ed.2d 207 (1981)."); *Jackson v. Quanex Corp.,* 191 F.3d 647, 616 (6th Cir.1999) ("We review claims of alleged race discrimination brought under § 1981 and the Elliot–Larsen Act under the same standards as claims of race discrimination brought under Title VII.").

 **[2]**   The district court granted Mary Free Bed's motion for summary judgment on this claim because it determined that Crane could not meet the fourth prong of *McDonnell Douglas,* i.e., that she and Pawloski had similar qualifications. In reaching its decision, the court looked at a **\*525** chart made by Francie Dietrich, the decision-maker, comparing each candidate to the requirements of the position. The chart showed that Pawloski's qualifications were superior to Crane's in numerous categories, including experience in educational program development; experience with multidisciplinary professionals; experience in technology; verbal communication; experience developing and coordinating continuing education; evaluation of educational programs; experience with customer service; and experience with educational affiliations and/or accreditation.

 **\*\*6**   Additionally, Pawloski was responsible for developing the radiology studies program at a state university. She created the program's curriculum and was involved in the program's budgeting process, academic advising, discipline, grievances, and continuing education. Crane's education experience consisted of teaching clinical nursing courses and supervising clinical rotations. She was responsible for developing course material and assessing the course needs of one class, but Crane could not recall whether she gave this information to Dietrich during her interview.

Pawloski had worked with professionals across a variety of disciplines developing education programs. Crane's experience working with multidisciplinary team members was as a registered nurse, not as an educator.

Pawloski also had experience incorporating technology into education programs, coordinating conferences, developing competencies, evaluating education programs and preceptors (i.e., instructors), negotiating clinical affiliation agreements, and achieving accreditation for an education program. Crane had minimal experience in these areas.

Crane admits that Dietrich told her during the interview that Pawloski was more qualified, and she does not dispute Dietrich's assessment of her own qualifications and experience in comparison to Pawloski's. Despite this, Crane claims that Pawloski is not qualified for the position because the job posting listed as an essential qualification a Master's degree in Nursing, a Master's degree in Healthcare Education, or a Master's degree in Healthcare Management. Crane has a Master's degree in Nursing while Pawloski has a Master's degree in Education. However, Dietrich, the author of the job posting, testified that the Master's degree requirement would be fulfilled by a Master's degree in Education, even if it was not in Healthcare Education.

Crane contends that, because she met the minimum qualifications for the position as far as knowledge, education, and training requirements, she and Pawloski were similar in all relevant aspects. She argues that the final prong of the prima facie case is met in a failure to promote case when the plaintiff can demonstrate that she and the other candidate had experience or qualifications which made them both viable candidates. Crane's argument is without merit.

Although Crane correctly points out that "similarly situated does not mean identical" and that, instead, the plaintiff must merely show that she was "similar in all of the *relevant* aspects," *Braithwaite v. Dep't of Homeland Sec.,* 473 Fed.Appx. 405, 410 (6th Cir.2012), a court must "conduct an independent review of the relative qualifications of the plaintiff and the person selected for the position based on the evidence presented in order to determine whether the plaintiff has satisfied the fourth prong of her prima facie burden." *White,* 429 F.3d at 243 ("Some comparison between Walker and White is therefore necessary in considering the fourth prong of the prima facie case."). Candidates do not have similar qualifications when one candidate has objectively "superior experience **\*526** in material and relevant

respects" of attributes associated with the position sought. *Id.* at 244.

**\*\*7** Crane's qualifications were not similar to Pawloski's, and, therefore, Crane has not satisfied the fourth prong of her prima facie burden. Although Crane had experience training nursing students, the Director of Education position required more than that. The successful candidate was required to develop and implement multi-dimensional educational programs for the staff at Mary Free Bed and its network partner organizations which included all healthcare professions, not just nursing. Pawloski had developed and led a variety of medical education programs, including a medical education program at a local university and a large medical conference. Crane had no similar qualifications or experience. Because Pawloski had objectively "superior experience in material and relevant respects" of the qualifications needed for the position, Crane cannot establish a prima facie case of discrimination in her failure to promote claim.

C.

Crane claims that she was not chosen for the Director of Education position in retaliation for her objection to the alleged race-based caregiver request and her assistance in helping an African–American co-worker file an internal grievance. She does not claim to have direct evidence of retaliation. Therefore, she must attempt to prove her claim with circumstantial evidence under *McDonnell Douglas.*

To establish a prima facie case of retaliation, Crane must show that: (1) she engaged in a protected activity, (2) Mary Free Bed knew of her protected activity, (3) it took an employment action adverse to her, and (4) there was a causal connection between the protected activity and the adverse employment action. *Mulhall v. Ashcroft,* 287 F.3d 543, 551 (6th Cir.2002). The ELCRA requires a showing that the plaintiff's protected activity was a significant factor in the employer's adverse action. *Mickey v. Zeidler Tool & Die Co.,* 516 F.3d 516, 527 (6th Cir.2008). To show that her activity was a significant factor, a "plaintiff must present evidence sufficient to raise the inference that [her] protected activity was the likely reason for the adverse action," *id.* at 527–28 (citing *In re Rodriguez,* 487 F.3d at 1011), "not just that there was a causal link between the

two." *Barrett v. Kirtland Cmty. Coll.,* 245 Mich.App. 306, 315, 628 N.W.2d 63, 70 (2001).

**[3]** The district court found that Crane could not show that Francie Dietrich, the decision-maker, knew of the alleged protected activity and she could not establish a causal connection between her protected activity and the decision not to award her the Director of Education position. Accordingly, Crane could not establish a prima facie case of retaliation, and Mary Free Bed was entitled to summary judgment on the retaliation claim.

Crane has presented no non-speculative evidence that Dietrich knew about her protected activity before she decided to hire Pawloski. In contrast, Dietrich testified that she had no knowledge of Crane's objections to the alleged race-based request or Crane's assistance with the grievance filed by Crane's co-worker. An employment decision cannot be caused by protected activity if the decision-maker did not know about the protected activity. *See Mulhall,* 287 F.3d at 554 (affirming summary judgment on retaliation claim because the plaintiff failed to produce evidence showing that the decision-makers knew of the plaintiff's protected activity). In this case, the undisputed evidence shows that Dietrich did not know of Crane's protected activity.

**\*527 \*\*8** Crane claims that Connie Brown–Olds, Director of Nursing, and Bruce Brasser, Brown–Olds' supervisor, showed retaliatory animus toward her and reasons that they must have influenced Dietrich's decision, even though there is no evidence that Dietrich communicated with either Brown–Olds or Brasser about Crane's application for the position. The only evidence that Crane points to in support of her argument is that she saw Brown–Olds speaking with Dietrich shortly before Dietrich interviewed Crane. However, Dietrich testified that Brown–Olds had no input into the selection of the Director of Education, and there is no evidence in the record that Brasser influenced Dietrich's selection of Pawloski over Crane.

Crane contends that she has established the second prong of her prima facie case by showing that Dietrich was influenced by Brown–Olds and Brasser under a "cat's paw" theory of liability. Under this theory, "if a supervisor performs an act motivated by [discriminatory] animus that is *intended* by the supervisor to cause an adverse employment action, and if that act is a proximate cause

Crane v. Mary Free Bed Rehabilitation Hosp., 634 Fed.Appx. 518 (2015)
2015 WL 8593471, 128 Fair Empl.Prac.Cas. (BNA) 808

of the ultimate employment action, then the employer is liable." *Staub v. Proctor Hosp.,* 562 U.S. 411, 422, 131 S.Ct. 1186, 179 L.Ed.2d 144 (2011); *see also Bobo v. United Parcel Service,* 665 F.3d 741, 755 (6th Cir.2012) (quoting *Cobbins v. Tennessee Dep't of Transp.,* 566 F.3d 582, 586 n. 5 (6th Cir.2009)) (explaining that the "cat's paw" theory of liability "refers to a situation in which a biased subordinate, who lacks decision-making power, influences the unbiased decisionmaker to make an adverse [employment] decision, thereby hiding the subordinate's discriminatory intent"). To prevail under this theory, Crane must show that by relying on a "discriminatory information flow [Dietrich] acted as the conduit of [Brown–Olds and Brasser's] prejudice—[their] cat's paw." *Madden v. Chattanooga City Wide Service Dep't.,* 549 F.3d 666, 678 (6th Cir.2008) (internal quotation marks omitted). The alleged racial animus of Brown–Olds and Brasser can be imputed to Dietrich if Crane can show that (1) Brown–Olds and Brasser "intended to cause an adverse employment action" and (2) their action was "a proximate cause of the ultimate employment action." *Staub,* 562 U.S. at 422, 131 S.Ct. 1186.

As noted above, there is no evidence in the record to support an inference that either Brown–Olds or Brasser influenced Dietrich's decision. Even if Brown–Olds spoke with Dietrich shortly before Crane's interview, there is no evidence that they were speaking about Crane or her application for the position. Dietrich denied that she spoke with Brown–Olds about Crane. Dietrich also denied that she had any knowledge of Crane's protected activity. As for Brasser, there is no evidence of any communication between him and Dietrich. Crane cannot establish a "cat's paw" theory of liability for unlawful retaliation based on her unsupported suspicions about Brown–Olds and Brasser.

**[4]** As for the fourth prong of Crane's retaliation claim —causation—temporal proximity between the protected activity and the adverse employment action may be sufficient to establish a causal connection for establishing a prima facie case in certain circumstances. *Mickey,* 516 F.3d at 523.

**9** Where an adverse employment action occurs very close in time after an employer learns of a protected activity, such temporal proximity between the events is significant enough to constitute evidence of a

causal connection for the purposes of satisfying a prima facie case of retaliation. But where some time elapses between when the employer learns of a protected activity and the **528** subsequent adverse employment action, the employee must couple temporal proximity with other evidence of retaliatory conduct to establish causality.

*Id.* at 525.

Here, the passage of time between Crane's protected activities and Dietrich's decision-twenty-two months and seven months [6]—and the promotion decision is not "very close" in time and without more cannot sustain an inference of a causal connection. *See Hafford v. Seidner,* 183 F.3d 506, 515 (6th Cir.1999) (finding that, because the alleged adverse employment action occurred two to five months after the protected activity, the "loose temporal proximity" is "insufficient to create a triable issue"); *see also Cooper v. City of N. Olmsted,* 795 F.2d 1265, 1272 (6th Cir.1986) (finding that four months between the protected activity and adverse action was insufficient to support an inference of retaliation).

Crane does not suggest that timing alone is sufficient to establish the last element of her prima facie case of retaliation. Instead, she argues that the timing coupled with other evidence creates a factual dispute as to whether there is a causal connection between her protected activity and her failure to be promoted. As "other evidence," Crane points to Brown–Olds' alleged involvement in the hiring process for the Director of Education position. However, it is undisputed that Dietrich made the hiring decision. She also points to the conversation between Brown–Olds and Dietrich immediately prior to her interview. As discussed above, there is no evidence Crane was discussed during that conversation. Because there is no evidence of a causal connection between Crane's protected activity and the selection of a different candidate, Crane cannot establish a retaliation claim.

### III.

For the above reasons, we affirm the judgment of the district court.

Crane v. Mary Free Bed Rehabilitation Hosp., 634 Fed.Appx. 518 (2015)
2015 WL 8593471, 128 Fair Empl.Prac.Cas. (BNA) 808

**All Citations**

634 Fed.Appx. 518, 2015 WL 8593471, 128 Fair Empl.Prac.Cas. (BNA) 808

Footnotes

\*  The Honorable S. Thomas Anderson, United States District Judge for the Western District of Tennessee, sitting by designation.

1  Crane agreed to the dismissal of her claim brought pursuant to Title VI of the Civil Rights Act of 1964, 42 U.S.C. § 2000d, and her state law claim of intentional infliction of emotional distress by the district court.

2  Although Mary Free Bed contends that there is a disputed issue of fact as to whether it has a policy of honoring race-based care requests, the district court determined that Mary Free Bed honored the request. Because in deciding a motion for summary judgment the court must view the evidence and all inferences drawn from underlying facts "in the light most favorable to the party opposing the motion," *Matsushita Elec. Indus. Co. v. Zenith Radio Corp., Ltd.,* 475 U.S. 574, 587, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986), this Court accepts the district court's determination that there was such a policy.

3  The district court did not reach the final stages of the burden shifting standard on any of Crane's claims because it concluded that Crane had failed to establish a prima facie case on those claims. *See Burdine,* 450 U.S. at 256, 101 S.Ct. 1089 (Upon making a prima facie showing of discrimination, the burden shifts to the defendant to show a non-discriminatory reason for its employment decision; if the defendant satisfies its burden, the plaintiff must then show by a preponderance of the evidence that the proffered reason is untrue, and in fact, a pretext for illegal discrimination.).

4  Crane cites three out-of-circuit cases in support of her argument that being told that she could not care for a particular patient because of her race violated her civil rights: *Chaney v. Plainfield,* 612 F.3d 908 (7th Cir.2010); *Ferrill v. Parker Group, Inc.,* 168 F.3d 468 (11th Cir.1999); and *Patterson v. UPMC South Hills Health System Home Health, L.P.,* No. 03–89, 2005 WL 6720844 (W.D.Pa. May 15, 2005). All three cases involved African–American employees who were reassigned by their employer based on a customer or patient's preference. However, as noted by the district court, the *Ferrill* and *Chaney* employees endured race-based work assignments throughout their employment instead of the two eight-hour shifts that Crane worked, *Ferrill,* 168 F.3d at 471; *Chaney,* 612 F.3d at 910, and the *Patterson* and *Ferrill* employees were personally reassigned because of their race in contrast to Crane, who had no direct care responsibilities for the patient. *Patterson,* 2005 WL 6720844, at \*2–3; *Ferrill,* 168 F.3d at 471.

5  The fourth prong of a prima facie case for claims under the ELCRA has been construed as requiring a plaintiff to show that she was rejected under circumstances giving rise to an inference of unlawful discrimination. *See, e.g., Sniecinski v. Blue Cross & Blue Shield of Mich.,* 469 Mich. 124, 134, 666 N.W.2d 186, 193 (2005) (reiterating elements of a prima facie case under the ELCRA). Crane has not asserted that any "other circumstances" give rise to an inference of race discrimination.

6  Dietrich selected Pawloski to become the Director of Education in October 2012–twenty–two months after Crane's objection to the race-based request in December 2010, and seven months after the co-worker filed her grievance in March 2012.

---

End of Document

© 2016 Thomson Reuters. No claim to original U.S. Government Works.

503 Fed.Appx. 449
This case was not selected for
publication in West's Federal Reporter.
See Fed. Rule of Appellate Procedure 32.1
generally governing citation of judicial
decisions issued on or after Jan. 1, 2007.
See also U.S.Ct. of App. 6th Cir. Rule 32.1.
United States Court of Appeals,
Sixth Circuit.

Rhonda C. FINLEY, Plaintiff–Appellant,

v.

CITY OF TROTWOOD; Michael Lucking,
Trotwood City Manager in his Individual and
Official Capacities, Defendants–Appellees.

No. 11–4277.
|
Nov. 1, 2012.

**Synopsis**

**Background:** City employee brought action against
city and city manager alleging race, gender, and age
discrimination, retaliation, hostile work environment, and
intentional infliction of emotional distress. The United
States District Court for the Southern District of Ohio
entered summary judgment in defendants' favor, and
employee appealed.

**Holdings:** The Court of Appeals, Cook, Circuit Judge,
held that:

[1] decision to demote employee was not result of race,
gender, or age discrimination;

[2] decisions to exclude employee from meetings and
to issue verbal warning were not materially adverse
employment actions;

[3] refusal to fund job related training was not materially
adverse employment action; and

[4] failure to pay its employee as much as other directors
did not violate Lilly Ledbetter Fair Pay Act, Age
Discrimination in Employment Act (ADEA), and Equal
Pay Act (EPA).

Affirmed.

West Headnotes (4)

**[1]**    **Civil Rights**
    ⚷ Promotion, demotion, and transfer
   **Civil Rights**
    ⚷ Public employment
   **Civil Rights**
    ⚷ Public employment

City's decision to demote African–American
female planning director was not result of
race, gender, or age discrimination, even
though city's finance director's position was
not eliminated, where planning director's
job responsibilities were distributed among
several employees, who continued to perform
their original responsibilities as well, planning
director's salary reduction was less than
that of other employees, and city's bylaws
specifically prohibited eliminating finance
director position. Age Discrimination in
Employment Act of 1967, § 2 et seq., 29
U.S.C.A. § 621 et seq.; Civil Rights Act of 1964,
§ 701 et seq., 42 U.S.C.A. § 2000e et seq.

Cases that cite this headnote

**[2]**    **Civil Rights**
    ⚷ Public Employment
   **Municipal Corporations**
    ⚷ Grounds
   **Public Employment**
    ⚷ Exercise of Rights;Retaliation

City's decisions to exclude employee from
meetings and to issue verbal warning were
not materially adverse employment actions
required to support employee's Title VII
retaliation claim. Civil Rights Act of 1964, §
701 et seq., 42 U.S.C.A. § 2000e et seq.

1 Cases that cite this headnote

**[3]**    **Civil Rights**

👈 Public Employment

**Municipal Corporations**

👈 Grounds

**Public Employment**

👈 Exercise of Rights;Retaliation

City's refusal to fund job-related training was not materially adverse employment action required to support employee's Title VII retaliation claim, where there was no evidence that course would have resulted in tangible employment benefits. Civil Rights Act of 1964, § 701 et seq., 42 U.S.C.A. § 2000e et seq.

1 Cases that cite this headnote

**[4]** **Civil Rights**

👈 Compensation;comparable worth

**Civil Rights**

👈 Disparate treatment

**Labor and Employment**

👈 Equal work;skill, effort, and responsibility

**Labor and Employment**

👈 Merit system;job rating system

City's failure to pay its planning director as much as some other directors did not violate Lilly Ledbetter Fair Pay Act, Age Discrimination in Employment Act (ADEA), and Equal Pay Act (EPA), where directors' work differed, city's uniform schedule compensated directors depending on their duties and responsibilities, and city paid director no less than at least two such directors. Fair Labor Standards Act of 1938, § 6, 29 U.S.C.A. § 206; Age Discrimination in Employment Act of 1967, § 2 et seq., 29 U.S.C.A. § 621 et seq.; Civil Rights Act of 1964, § 706(e)(3)(A), 42 U.S.C.A. § 2000e–5(e) (3)(A).

Cases that cite this headnote

***450** On Appeal from the United States District Court for the Southern District of Ohio.

Before: SILER and COOK, Circuit Judges; STEEH, District Judge. [*]

**Opinion**

***451** COOK, Circuit Judge.

****1** Plaintiff Rhonda C. Finley appeals the district court's order granting summary judgment to defendants, City of Trotwood, Ohio ("Trotwood"), and City Manager Michael Lucking ("Lucking"). Finley brings multiple discrimination claims, in addition to her claims of retaliation, hostile work environment, and intentional infliction of emotional distress. For the following reasons, we AFFIRM.

I.

Finley, a forty-eight-year-old African–American female, began her employment at Trotwood in 1997 as a part-time dispatch worker with the Trotwood Police Department. In 2005, Lucking became Trotwood's City Manager. Soon thereafter, Lucking promoted Finley to Acting/Interim Director of the Planning and Development Department. Effective July 5, 2006, Lucking selected Finley, over a Caucasian male candidate, for the position of Director of Planning and Development ("Director"). For this promotion, Finley received an unprecedented 21.27% pay increase, from $25.99 to $31.52 per hour.

In response to Trotwood's financial difficulties, the City Council directed Lucking to submit a budget proposal reducing the city's expenses. Lucking's cost-cutting measures included a vehicle-sharing program requiring all city employees, including Finley, to share their assigned vehicles. Additionally, Lucking reclassified a director, Terry Lodge, and reduced his salary from $39.25 to $21.97 per hour. Thus, Lodge, a sixty-one-year-old white male, had already undergone a reclassification before Finley's reclassification was even considered.

Trotwood later formed a budget committee composed of Lucking, Jon Stoops, [1] and Patricia Shively to address the city's fiscal problems. The committee proposed eliminating the Director of Planning and Development position ("Planning Director") and replacing it with the role of Economic Development Administrator ("Administrator"). Lucking agreed to assume any

residual duties of Planning Director without additional compensation. Trotwood also laid off four police officers and one maintenance technician, all of them male, and four of them Caucasian. Proposed budget cuts for the year exceeded $460,000.

The City Council members did not approve the budget proposal until February 16, 2009 ("2009 Budget"), which became effective thirty days later. Pursuant to the 2009 Budget, Trotwood reduced Finley's salary from $40.43 to $33.17 per hour. Additionally, she lost direct supervisory authority over her staff and was no longer authorized to serve on the Board of the Trotwood Chamber of Commerce. In mid–2009, as a secondary budget-cutting measure, Trotwood implemented a 7.5% salary reduction on all non-union employees, which applied to Finley.

Early December 2008, Finley submitted an absentee report requesting 160 vacation hours, from the end of December to late January 2009. Although Lucking denied this initial request, he granted her revised request of seventy-two hours.

Late December 2008, before her reclassification became effective, Finley filed employment discrimination and retaliation claims with the Equal Employment Opportunity Commission ("EEOC"). On December 30, 2008, she revised her EEOC **\*452** Charge ("Revised EEOC") to include age discrimination.

 **\*\*2** On April 23, 2009, Lucking gave Finley a verbal warning for her behavior at a City Council meeting conducted three days earlier. At that meeting, Finley directed any questions to Lucking and referred to him as the Planning Director, which Lucking perceived as disrespectful. Other City Council members—but not Councilwoman Mary McDonald—agreed the comments came across as disrespectful.

Lucking absorbed Finley's duties while she was on medical leave from July 2009 to September 2009. When Finley returned, Lucking issued a memorandum directing Finley to focus on developing a prospective tenant base for the Trotwood Commerce Park.

On April 26, 2010, Finley filed her Verified Complaint alleging race, gender, and age discrimination, as well as retaliation and creation of a hostile work environment. Two months later, Trotwood moved for summary

judgment on all claims. Lucking quickly followed, filing both an affidavit supporting Trotwood's motion and his own motion for summary judgment. The district court granted both motions and dismissed the case. Finley timely appealed. We affirm.

## II.

### A. Standard of Review

We review de novo a district court's grant of summary judgment. *Blair v. Henry Filters, Inc.,* 505 F.3d 517, 523 (6th Cir.2007), *overruled on other grounds by Gross v. FBL Fin. Servs., Inc.,* 557 U.S. 167, 129 S.Ct. 2343, 174 L.Ed.2d 119 (2009). Summary judgment is proper if, viewing the evidence in the light most favorable to the nonmoving party, no issues of material fact remain, and the moving party is entitled to judgment as a matter of law. *Hartsel v. Keys,* 87 F.3d 795, 799 (6th Cir.1996). The "mere possibility of a factual dispute is not enough." *Mitchell v. Toledo Hosp.,* 964 F.2d 577, 582 (6th Cir.1992) (internal quotation marks omitted). Accordingly, the district court must conduct "a preliminary assessment of the evidence" in order to determine whether the plaintiff presents a material issue of fact. *Hartsel,* 87 F.3d at 799. Although this case involves both Title VII and Ohio antidiscrimination law, the same analysis applies to both.[2] *See Plumbers & Steamfitters Joint Apprenticeship Comm. v. Ohio Civil Rights Comm'n,* 66 Ohio St.2d 192, 421 N.E.2d 128, 131 (1981).

Finley confuses our standard of review. We review whether Finley has met her burden, not whether Trotwood defeated Finley's claim. She cites to sections of the defendants' briefs where they highlight the lack of factual support for her claims. As this Court explained in *Hartsel,* "[t]he moving party need not support its motion with evidence disproving the nonmoving party's claim, but need only show ... that there is an absence of evidence to support the nonmoving party's case." *Hartsel,* 87 F.3d at 799 (citing *Celotex Corp. v. Catrett,* 477 U.S. 317, 325, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986)). Once the moving party meets this initial burden, the nonmovant must "designate specific facts showing that there is a genuine issue for trial." *Celotex Corp.,* 477 U.S. at 324, 106 S.Ct. 2548 (internal quotation marks omitted). Because the plaintiff in a discrimination case has the ultimate burden of proof, **\*453** "[t]he pivotal question" is whether

she "has presented a jury question as to each element of [the] case." *Hartsel,* 87 F.3d at 799.

## B. Federal Claims

### 1. Race, Gender, and Age Discrimination

**\*3** Under the *McDonnell Douglas* burden-shifting framework, a Title VII plaintiff utilizing circumstantial evidence must first make a prima facie case of discrimination. *Griffin v. Finkbeiner,* 689 F.3d 584, 592–93 (6th Cir.2012). Finley must show that (1) she is a member of the protected class; (2) she suffered adverse employment actions; (3) she was otherwise qualified for the position; and (4) following her rejection, the position was filled by a person outside the protected class. *McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 802, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973).

**[1]** Finley first argues that Carl Daugherty, a Caucasian male, replaced her as Planning Director and that she endured harsher treatment than four similarly situated individuals outside her protected class: Terry Lodge (Caucasian male), Patricia Shively (Caucasian female), Carl Daugherty (Caucasian male), and Thomas Odenigbo (African–American male). The only evidence that Daugherty replaced Finley comes from Councilwoman McDonald's deposition, where she testified that Daugherty had assumed "a number of Mrs. Finley's previous responsibilities." This evidence, however, aligns with Trotwood's stance that Finley was not "replaced," because her job responsibilities were merely distributed among several employees. When entities downsize, a plaintiff "is not replaced when another employee is assigned to perform the plaintiff's duties in addition to other duties." *Schoonmaker v. Spartan Graphics Leasing LLC,* 595 F.3d 261, 265 (6th Cir.2010). Here, several employees, including Lucking and Portia Hill, the department secretary, shouldered some of Finley's former responsibilities as Planning Director following her demotion. Furthermore, Daugherty continued to perform his original responsibilities after Finley's alleged "replacement."

Finley's "harsher treatment" argument also fails, as the record makes plain that she fared no worse than similarly situated employees. Not only was her salary reduction less than half Lodge's pay cut, but also her claim that Trotwood delayed Lodge's salary reduction until June 2009 lacks evidentiary support. Likewise, her final

two arguments involving Lodge—that his reclassification resulted from poor job performance and that the city gave him additional work in another department to "restore" his salary—contradict the record. McDonald testified that "[Lodge's reclassification] strictly had to do with balancing the budget" (R. 56, McDonald Dep. at 118), and Finley admitted she does not know Lodge's past or present salary (R. 49, Finley Dep. at 66–67). Further, Stoops's testimony directly contradicts Finley's assertions.

Finley also compares herself to Patricia Shively. She argues that Shively's promotion to Finance Director demonstrates harsher treatment because Trotwood "did not review its budget and try to determine a way to maintain [Finley's] salary" as it did for Shively. This claim overlooks the centrality of the Finance Director position; Trotwood's bylaws specifically prohibit eliminating it.

**\*\*4** In comparing her situation with Daugherty's, Finley bristles that she and Daugherty now occupy the same pay grade, gleaning unfairness because Daugherty "has never held a Director position or brought $50,000,000 in investments to the **\*454** City." As the district court correctly noted, however, "receiving the same salary, standing alone, is not discriminatory."

As the final comparator, Finley targets the better treatment Thomas Odenigbo, the African American Public Works Director and City Engineer, enjoyed. Any comparison to Odenigbo could not show race discrimination, of course. And regardless, her complaint comprises one occasion regarding disapproval of time off.

Assessing all the evidence Finley sought to muster, none undermines the judgment here. She offers no legitimate comparisons that present a genuine issue of material fact regarding race, gender, or age discrimination.

### 2. Retaliation and Creation of Hostile Work Environment

This Court also applies *McDonnell Douglas* to Finley's retaliation charge. *Chen v. Dow Chem. Co.,* 580 F.3d 394, 402 (6th Cir.2009). For a prima facie case of retaliation, Finley must present evidence that (1) she engaged in protected activity; (2) Trotwood was aware of the protected activity; (3) Trotwood took an adverse action against her; and (4) there was a causal connection between the protected activity and the alleged adverse employment action. *See Russell v. Univ. of Toledo,* 537

F.3d 596, 609 (6th Cir.2008) (citing *Morris v. Oldham Cnty. Fiscal Court,* 201 F.3d 784, 792 (6th Cir.2000)). The alleged adverse action must be materially adverse; that is, it would have dissuaded a reasonable worker from filing a charge of discrimination. *Burlington N. & Santa Fe Ry. Co. v. White,* 548 U.S. 53, 68, 126 S.Ct. 2405, 165 L.Ed.2d 345 (2006) (internal citations omitted).

**[2]** Finley claims unlawful retaliation based on four allegedly adverse actions that followed her filing an EEOC charge: "exclusion from meetings, weekly activity reports, and criticism; verbal warning; September 22, 2009 memorandum; and refusal to fund job related training." The district court correctly decided that her first two claimed acts of retaliation are not materially adverse actions under federal or state law. *See, e.g., Pettit v. Steppingstone, Ctr. for the Potentially Gifted,* 429 Fed.Appx. 524, 533 (6th Cir.2011) (reporting of hours worked not materially adverse as it "affected neither [plaintiff's] position nor compensation"); *Moore v. Abbott Labs.,* 780 F.Supp.2d 600, 620–21 (S.D.Ohio 2011) (exclusion from meetings not adverse employment action); *Taylor v. H.B. Fuller Co.,* No. 06cv854, 2008 WL 4647690, at *8–9 (S.D.Ohio Oct. 20, 2008) (verbal warning insufficient to show adverse employment action).

**[3]** Her other examples also fall short. First, narrowing of responsibilities without a corresponding decrease in pay or benefits, cannot be labeled an objectively adverse employment action. Second, though Trotwood denied Finley permission to take a particular course, it paid for her economic development certification. And Finley presents no evidence to suggest that the course she sought to take would have resulted in tangible employment benefits.

**\*\*5** Likewise, Finley cannot prove her hostile work environment claim, which requires that she show conduct that is severe and pervasive enough to create an abusive work environment. *See Randolph v. Ohio Dep't of Youth Servs.,* 453 F.3d 724, 733 (6th Cir.2006). We thus uphold summary judgment on Finley's retaliation and hostile work environment claims.

3. Wage Discrimination
Finley brings her wage-discrimination claims under the Lilly Ledbetter Fair Pay Act ("Ledbetter Act"), the Age Discrimination in Employment Act of 1967 **\*455** ("ADEA"), and the Equal Pay Act ("EPA"). Her two

claims correspond to two distinct time periods: first, her stint as Acting/Interim Director of Planning and Development; second, her tenure as Director of Planning and Development.

**[4]** The district court properly rejected Finley's first claim as time-barred and we adopt its reasoning. Finley's second claim, though timely, fails because, under the EPA, a plaintiff must show that an employer pays different wages to employees of opposite sexes for equal work. The record supports the conclusion that because directors' work differed, their salary differences alone could not support Finley's claims of age or gender discrimination. Trotwood's uniform schedule compensates directors depending on their duties and responsibilities, and it paid Finley no less than at least two such directors, Lodge and Stoops. Finley fails to make out a prima facie case of wage discrimination.

C. State Claims

1. Employment Discrimination, Retaliation, and Creation of Hostile Work Environment
Finley renews her claims under Title VII in her state actions against both Lucking and Trotwood. Because Finley's state claims for race and gender discrimination require the same prima facie evidentiary showing as her federal claims, her unmeritorious federal claims mean her state claims also fail. *See Knox v. Neaton Auto Prods. Mfg., Inc.,* 375 F.3d 451, 457 (6th Cir.2004). So too with her retaliation and hostile-work-environment claims. *See Baker v. The Buschman Co.,* 127 Ohio App.3d 561, 568, 713 N.E.2d 487 (1998) ("Federal Law provides the applicable analysis for reviewing Ohio retaliation claims"). Because Finley's claims against both Trotwood and Lucking involve the same law, evidence, and arguments, we affirm summary judgment for both, obviating any discussion of qualified immunity for Finley.

2. Intentional Infliction of Emotional Distress
We agree with the district court's treatment of this claim. Absent any evidence that Trotwood's actions were "extreme and outrageous," we affirm the district court's summary judgment on this claim, too.

III.

AFFIRMED.

**All Citations**

503 Fed.Appx. 449, 2012 WL 5359259

Footnotes

| | |
|---|---|
| * | The Honorable George C. Steeh, United States District Judge for the Eastern District of Michigan, sitting by designation. |
| 1 | Stoops was Trotwood's Director of Finance. He retired in early 2009 and was replaced by the Assistant Finance Director. |
| 2 | The only difference being that Ohio law permits individual liability, while Title VII does not. Therefore, when discussing the liability of the "defendants," collectively, we refer to Lucking's liability under the state claims and Trotwood's liability under both federal and state law. |

**End of Document**                                    © 2016 Thomson Reuters. No claim to original U.S. Government Works.

2006 Fed.App. 0680N

⚑ KeyCite Yellow Flag - Negative Treatment
Distinguished by    Nguyen v. City of Cleveland,    N.D.Ohio,
  November 14, 2006

202 Fed.Appx. 844
This case was not selected for
publication in West's Federal Reporter.
See Fed. Rule of Appellate Procedure 32.1
generally governing citation of judicial
decisions issued on or after Jan. 1, 2007.
See also U.S.Ct. of App. 6th Cir. Rule 32.1.
United States Court of Appeals,
Sixth Circuit.

Caroline WATSON, Plaintiff–Appellant,

v.

CITY OF CLEVELAND, Cleveland Civil Service
Commission, Jane Campbell, Eduardo Romero,
Jonalyn Krupka Defendants–Appellees.

No. 05–3519.
|
Sept. 8, 2006.

**Synopsis**
**Background:** Former city employee, an African-American
female who worked as Equal Employment Opportunity
(EEO) Manager, sued city, its mayor, its former Director
of Personnel, its Civil Service Commission (CSC),
and Secretary to CSC, alleging racial discrimination,
retaliation and constructive discharge in violation of
Title VII and Ohio antidiscrimination statute, as well
as denial of property right guaranteed by Fourteenth
Amendment in violation of § 1983. Employee also alleged
civil conspiracy, fraud and negligent hiring, retention and
supervision in violation of state law. The United States
District Court for the Northern District of Ohio denied
employee's motion to compel discovery and granted
summary judgment to defendants on all claims. Employee
appealed.

**Holdings:** The Court of Appeals, Julia Smith Gibbons,
Circuit Judge, held that:

[1] district court acted within its discretion to set scope
of discovery by refusing to force mayor to submit to
deposition;

[2] employee failed to establish she was subjected to an
adverse employment action, as required for prima facie
case of racial discrimination;

[3] employee's claim that she was denied the right to apply
for Labor Relations Officer (LRO) position could not be
treated as failure to promote claim;

[4] even treating employee's claim that she could not apply
for Chief of Personnel Management (CPM) as failure
to promote, she could not establish prima facie case of
discrimination in that regard;

[5] employee could not establish prima facie case of
retaliation;

[6] employee was not constructively discharged;

[7] employee did not prove § 1983 violation;

[8] employee did not prove civil conspiracy claim;

[9] employee could not prevail on common law fraud
claim; and

[10] employee did not prove claim for negligent hiring,
retention, and supervision of Director of Personnel.

Affirmed.

West Headnotes (26)

**[1]**    **Federal Courts**
      👉 Depositions and discovery

      On appeal, denials of motions to compel
      discovery are reviewed only for abuse of
      discretion.

      Cases that cite this headnote

**[2]**    **Federal Civil Procedure**
      👉 Persons Whose Depositions May Be
      Taken

      District court acted within its discretion to set
      scope of discovery by refusing to force mayor

to submit to deposition in city employee's suit alleging racial discrimination, retaliation, and constructive discharge; employee failed to demonstrate why deposing mayor was necessary to her case, which focused on actions undertaken by various members of mayor's administration and involved mayor only to extent that mayor supervised city employees. Fed.Rules Civ.Proc.Rules 26(c), 37(a), 28 U.S.C.A.

Cases that cite this headnote

**[3]** **Civil Rights**
👉 Practices prohibited or required in general;elements

**Courts**
👉 Construction of federal Constitution, statutes, and treaties

Standards for proving racial discrimination are the same under Ohio and federal law because Ohio applies the body of federal case law interpreting Title VII to determine if an allegedly discriminatory practice violates its antidiscrimination statute. Civil Rights Act of 1964, § 703(a)(1), 42 U.S.C.A. § 2000e-2(a)(1); Ohio R.C. § 4112.02.

1 Cases that cite this headnote

**[4]** **Civil Rights**
👉 Weight and Sufficiency of Evidence

**Civil Rights**
👉 Employment practices

To prove racial discrimination under Title VII or Ohio statute, employee may put forth direct evidence of discrimination or present circumstantial evidence that permits an inference of discrimination. Civil Rights Act of 1964, § 703(a)(1), 42 U.S.C.A. § 2000e-2(a)(1); Ohio R.C. § 4112.02.

1 Cases that cite this headnote

**[5]** **Civil Rights**
👉 Effect of prima facie case;shifting burden

**Civil Rights**

👉 Prima facie case

Employee attempting to prove discrimination case solely with circumstantial evidence must create a presumption of unlawful discrimination and challenge defendants to rebut the presumption by legitimating their actions.

Cases that cite this headnote

**[6]** **Civil Rights**
👉 Practices prohibited or required in general;elements

**Civil Rights**
👉 Effect of prima facie case;shifting burden

**Civil Rights**
👉 Prima facie case

To create presumption of discrimination, employee must prove prima facie case of employment discrimination by a preponderance of the evidence; employee must establish that (1) she was a member of a protected class, (2) she was subject to an adverse employment action, (3) she was qualified for the job, and (4) for the same or similar conduct, she was treated differently from similarly situated non-minority employees.

3 Cases that cite this headnote

**[7]** **Labor and Employment**
👉 What Constitutes Adverse Action

An "adverse employment action" requires a materially adverse change in the terms and conditions of employment.

7 Cases that cite this headnote

**[8]** **Civil Rights**
👉 Particular cases

African-American employee, an Equal Employment Opportunity (EEO) Manager for Ohio city who was seeking to establish prima facie case of racial discrimination, failed to establish she was subjected to

2006 Fed.App. 0680N

an adverse employment action; removal of employee from two EEO investigations to cure potential conflicts of interest was not a significant diminution in her job responsibilities because she remained responsible for investigating any new EEO complaints that were filed and completing any EEO investigations that were in process. Civil Rights Act of 1964, § 703(a)(1), 42 U.S.C.A. § 2000e-2(a)(1); Ohio R.C. § 4112.02.

Cases that cite this headnote

**[9]    Civil Rights**
👉 Promotion, demotion, and transfer

City employee's claim that she was denied the right to apply for Labor Relations Officer (LRO) position could not be treated as failure to promote claim because her job of Equal Employment Opportunity (EEO) Manager was better compensated than the LRO position.

Cases that cite this headnote

**[10]    Civil Rights**
👉 Promotion, demotion, and transfer

For a failure to promote to constitute an adverse employment action, employee must be (1) a member of a protected class, (2) who applied for and was qualified for a promotion, (3) who was considered for and denied a promotion, and (4) other similarly qualified employees who were not members of the protected class must have been given promotions.

Cases that cite this headnote

**[11]    Civil Rights**
👉 Promotion, demotion, and transfer

Even treating city employee's claim that she could not apply for Chief of Personnel Management (CPM) as failure to promote, she could not establish prima facie case of discrimination in that regard; employee never applied for CPM position but merely inquired about it, and she was not considered for and

denied CPM promotion because the position was never filled. Civil Rights Act of 1964, § 703(a)(1), 42 U.S.C.A. § 2000e-2(a)(1); Ohio R.C. § 4112.02.

2 Cases that cite this headnote

**[12]    Civil Rights**
👉 Retaliation claims

Employee who has no direct evidence of retaliation can establish retaliation with circumstantial evidence under the *McDonnell Douglas* framework.

4 Cases that cite this headnote

**[13]    Civil Rights**
👉 Practices prohibited or required in general;elements

Employee must make out prima facie case of retaliation by establishing four elements: (1) employee engaged in an activity protected by Title VII, (2) employer knew that employee exercised his or her rights, (3) employer took employment action against plaintiff that a reasonable employee would have found materially adverse, and (4) there was a causal connection between the protected activity and the adverse employment action. Civil Rights Act of 1964, § 704(a), 42 U.S.C.A. § 2000e-3(a).

12 Cases that cite this headnote

**[14]    Civil Rights**
👉 Public Employment

**Municipal Corporations**
👉 Grounds

**Public Employment**
👉 Exercise of Rights;Retaliation

City employee, an Equal Employment Opportunity (EEO) Manager, could not establish prima facie case of retaliation under Title VII, because she was not subjected to an adverse employment action; employee lost responsibility for two EEO investigations, was excluded from some meetings, and did not receive a raise and in context, these actions

Case 2:15-cv-12312-MOB-EAS   ECF No. 48-48, PageID.1113   Filed 08/01/16   Page 74 of 98
Watson v. City of Cleveland, 202 Fed.Appx. 844 (2006)
2006 Fed.App. 0680N

would not dissuade a reasonable employee from invoking the protections of Title VII. Civil Rights Act of 1964, § 704(a), 42 U.S.C.A. § 2000e-3(a).

8 Cases that cite this headnote

**[15]**    **Civil Rights**
    👉 Constructive discharge

Employee who resigns her post can recover from her former employer for constructive discharge under Title VII if employer engaged in conduct that forced employee to quit; employer must deliberately create intolerable working conditions, as perceived by a reasonable person, with intention of forcing the employee to quit and employee must actually quit, and to determine if there is a constructive discharge, both employer's intent and employee's objective feelings must be examined. Civil Rights Act of 1964, § 701 et seq., 42 U.S.C.A. § 2000e et seq.

Cases that cite this headnote

**[16]**    **Labor and Employment**
    👉 Constructive discharge

Sixth Circuit has adopted several factors to aid determination of whether employer created working conditions that a reasonable person would find intolerable, and presence of any combination of the following factors suggest constructive discharge, although whether working conditions are intolerable must be determined on a case-by-case basis: (1) demotion, (2) salary reduction, (3) reduction in job responsibilities, (4) reassignment to menial or degrading work, (5) reassignment to work under a younger supervisor, (6) badgering, harassment, or humiliation by the employer calculated to encourage the employee to resign, or (7) offers of early retirement or continued employment on less favorable terms.

3 Cases that cite this headnote

**[17]**    **Civil Rights**

**Constructive discharge**

African-American city employee, an Equal Employment Opportunity (EEO) Manager, was not constructively discharged in violation of Title VII by alleged reduction in her job responsibilities; she remained responsible for new EEO complaints and existing investigations, except for two that were transferred to independent investigators to avoid potential conflicts of interest created by her EEO complaint. Civil Rights Act of 1964, § 701 et seq., 42 U.S.C.A. § 2000e et seq.

Cases that cite this headnote

**[18]**    **Civil Rights**
    👉 Discrimination by reason of race, color, ethnicity, or national origin, in general
    **Civil Rights**
    👉 Public Employment
    **Civil Rights**
    👉 Motive or intent;pretext

Section 1983 affords remedies against discrimination in employment on the basis of race; these remedies are available only if employee proves intentional discrimination by a public employer that violates the Equal Protection Clause. U.S.C.A. Const.Amend. 14; 42 U.S.C.A. § 1983.

Cases that cite this headnote

**[19]**    **Civil Rights**
    👉 Employment practices
    **Constitutional Law**
    👉 Public Employees and Officials

Proving intentional discrimination for equal protection claim brought under § 1983 requires public employee to make the same showing required to prove a violation of Title VII; therefore, shifting evidentiary burdens set out in *McDonnell Douglas* and *Burdine* are applicable to § 1983 cases. U.S.C.A. Const.Amend. 14; 42 U.S.C.A. § 1983; Civil Rights Act of 1964, § 701 et seq., 42 U.S.C.A. § 2000e et seq.

7 Cases that cite this headnote

**[20]** **Constitutional Law**
👉 Public employees and officials

**Municipal Corporations**
👉 Removal, Discharge, Transfer or Demotion

**Public Employment**
👉 Discrimination in general

**Public Employment**
👉 Exercise of Rights;Retaliation

African-American city employee bringing § 1983 claim was not denied equal protection of the laws by city and individual defendants, absent showing she was subjected to adverse employment action; while her complaints that she did not receive a raise, was denied overtime, was prevented from applying for jobs, and generally was treated poorly because of her race could be indices of an adverse employment action if proven, her deposition testimony which merely reiterated her personal belief that she and others suffered from adverse employment actions motivated by racial discrimination was insufficient. U.S.C.A. Const.Amend. 14; 42 U.S.C.A. § 1983.

7 Cases that cite this headnote

**[21]** **Conspiracy**
👉 Nature and Elements in General

Ohio law provides for civil liability for perpetrators of civil conspiracies, which consist of the following: (1) a malicious combination (2) of two or more persons, (3) injury to person or property, and (4) existence of an unlawful act independent from the actual conspiracy.

Cases that cite this headnote

**[22]** **Conspiracy**
👉 Evidence

African-American city employee did not prove civil conspiracy by city and individual

defendants, absent proof that Civil Service Rules were violated or that defendants acted with malice; alleged denial of employee's right to apply for positions was not an injury to property because she had no property interest in prospective civil employment.

Cases that cite this headnote

**[23]** **Fraud**
👉 Elements of Actual Fraud

**Fraud**
👉 Fraudulent Concealment

Claims of common law fraud require proof of six elements in Ohio: (1) a representation or, where there is a duty to disclose, a concealment of fact (2) which is material to the transaction at hand (3) made falsely, with knowledge of its falsity, or with such utter disregard and recklessness as to whether it is true or false that knowledge may be inferred (4) with the intent of misleading another into relying upon it, (5) justifiable reliance upon the representation or concealment, and (6) an injury proximately caused by the reliance.

1 Cases that cite this headnote

**[24]** **Fraud**
👉 Intent

**Fraud**
👉 Injury and causation

African-American employee could not prevail on claim of common law fraud against Ohio city and various officials, where she failed to present evidence of intent to defraud beyond employee's conjecture that they were reserving posts for Caucasian supporters of mayor, and she had not alleged any injuries that she sustained as result of alleged misrepresentations about hiring by defendants.

1 Cases that cite this headnote

**[25]** **Labor and Employment**
👉 Negligent Hiring

**Labor and Employment**

2006 Fed.App. 0680N

👉 Negligent retention

**Labor and Employment**
👉 Negligent training and supervision

Negligent hiring, retention, and supervision claims under Ohio law require proof of five elements: (1) existence of an employment relationship, (2) employee's incompetence, (3) employer's actual or constructive knowledge of such incompetence, (4) employee's act or omission causing plaintiff's injuries, and (5) employer's negligence in hiring or retaining employee as the proximate cause of plaintiff's injuries.

7 Cases that cite this headnote

[26] **Municipal Corporations**
👉 Employment of incompetent agents or servants

City employee failed to state claim against city for negligent hiring, retention, and supervision of Director of Personnel; she had no evidence that Director was incompetent or that city and mayor knew of his incompetence and, more importantly, had not identified any injury she suffered at hands of Director or any harmful act he committed.

4 Cases that cite this headnote

**\*848** On Appeal from the United States District Court for the Northern District of Ohio.

Before: BOGGS, Chief Circuit Judge; GIBBONS and GRIFFIN, Circuit Judges.

**Opinion**

JULIA SMITH GIBBONS, Circuit Judge.

**\*\*1** Caroline Watson ("Watson") sued the City of Cleveland ("the City"); its mayor, Jane Campbell ("Campbell"); its former Director of Personnel, Eduardo Romero ("Romero"); its Civil Service Commission ("CSC"); and the Secretary to the CSC, Jonalyn Krupka ("Krupka"), in the United States District Court for the Northern District of Ohio. Watson alleged racial discrimination, retaliation, and constructive discharge in

violation of Title VII of the Civil Rights Act of 1964 and Ohio Rev.Code § 4112, as well as a denial of a property right guaranteed by the Fourteenth Amendment in violation of 42 U.S.C. § 1983. Watson also alleged civil conspiracy; fraud; and negligent hiring, retention, and supervision in violation of state law. The district court granted summary judgment to the defendants on all of Watson's claims, and she appealed. She also appealed the district court's denial of a motion to compel discovery. We affirm the district court for the following reasons.

I.

Watson, an African–American female, began working for the City in 1998. The City's former mayor, Michael White—who was also African–American—hired Watson as a Project Coordinator in the City's Department of Personnel ("Personnel") and charged her with various labor relations responsibilities. She functioned as an Equal Employment Opportunity ("EEO") Officer and later as the EEO Manager. Her primary job responsibility was investigating charges of discrimination and harassment leveled against the City by its employees.

A change in mayoral administration took place in Cleveland in 2001. Campbell, who is Caucasian, took office as mayor in January 2002. Prior to Campbell's inauguration, the Director of Personnel ("Director") during Mayor White's administration, Jeffrey K. Patterson, resigned. Accordingly, Mayor Campbell appointed a new Director.[1] She selected Romero,[2] **\*849** who had been a District Director for the Ohio Bureau of Worker's Compensation. Romero's appointment and his actions as Director precipitated Watson's complaint.

When Romero started as Director, Watson was absent from work, mourning the death of her grandmother. Watson testified in her deposition that "[she] came back and asked people had [Romero] met with them." Watson testified that she expected a meeting between Romero and the Personnel employees to have taken place because "[she] had never met a man to come in the office and assume a position, a high-level position, and didn't request to meet with the employees." According to Watson's deposition, the response she received from "[e]veryone" was "no, he didn't meet—he's sitting up in his office with the door closed, and the only persons that was

Case 2:15-cv-12312-MOB-EAS  ECF No. 48-48, PageID.1116  Filed 08/01/16  Page 77 of 98
Watson v. City of Cleveland, 202 Fed.Appx. 844 (2006)
2006 Fed.App. 0680N

running in there are the white employees, and he won't meet with people." Watson testified in her deposition that Romero "wouldn't meet with a lot of the black employees. For instance, he wouldn't meet with me." Romero, however, did meet with Watson when she requested it, and Watson acknowledged in her deposition testimony that this meeting took place.

**2** Nevertheless, Watson maintained in her deposition that Romero "didn't want anything to do with the black employees" because he and the Campbell administration "distrust[ed]" African–Americans because of their race and their perceived loyalty to the former mayor and wanted to "force them out." Watson testified that in her opinion "basically all the blacks in Mike White's cabinet level were fired[, and] Jane Campbell kept whites in Mike White's administration."

Employment data amassed by the City contradicts Watson's assertion that the Campbell administration did not want to employ African–Americans; fifty-four percent of the new employees hired by the Campbell administration were African–American.

Despite the numbers, Watson claims that the Campbell administration discriminated and points to the experiences of African–American employees in Personnel as evidence. Watson testified that she believed that Patterson was fired as Director, even though she does not know that for sure. Watson said she "look[ed] at it" as if Patterson was fired by the Campbell administration because "he wasn't retained by Jane Campbell as she had done with other whites and Hispanics, so [she] believe[d] he was fired." She acknowledged in her deposition that this was merely her belief and that she was "not sure" of the circumstances surrounding Patterson's resignation as Director. Watson also asserted in her deposition that Betsey McCafferty, the Chief of Personnel Management and the second-highest ranking employee in Personnel, was "forced out by the Campbell administration[, and] [e]veryone knows that." She claims that McCafferty left the City because she was "frazzled," treated poorly, and falsely accused of bringing a gun to work. The connection between McCafferty's leaving Personnel and the racial discrimination alleged by Watson is unclear, however, because Watson conceded in her deposition that, even though "[m]ost people thought [McCafferty] acted black, ... she was probably white." Further, Watson claimed in her deposition that Romero "took away

job responsibilities" from African–American employees, Tony Washington and Hernando Harge. These employees participated in union negotiations during the White administration, but Romero shifted that responsibility to the Law Department. Watson also testified that Romero eliminated her job responsibilities by directing EEO investigations to the Law Department.

***850** In addition to generally testifying that "Romero attempted to force out the black professional employees in the Department of Personnel and human resources" because they "got [sic] the big bucks, [and] got [sic] the big positions .... that [the Campbell administration] wanted" for white employees, Watson complained about four specific events in her complaint and deposition testimony. They are: (1) the failure to post vacancies and follow the Civil Service Rules; (2) Watson's exclusion from departmental and strategic planning meetings; (3) the raises given to some employees in Personnel; and (4) the City's response to her charges of discrimination against Romero.

**3** Watson claims that she was denied the opportunity to apply for two vacant positions. The positions were Labor Relations Officer ("LRO"), which had been held by Hernando Harge until he resigned and Chief of Personnel Management ("CPM"), which had been held by McCafferty until she resigned. Watson complains that Romero failed to post the vacancies on the City's job board and misled her about the availability of the CPM position. She further claims that Romero, with the help of Krupka, violated the Civil Service Rules [3] with respect to hiring for these positions.

Watson inquired of Romero about the vacancy for CPM, and according to her deposition testimony, he indicated that the position was filled. Watson believes that the position was filled by Genesis Brown even though he never assumed the title. Brown, who is Caucasian and campaigned for Campbell, was hired into the newly created position of Data Processing Supervisor on February 11, 2002. Brown testified that his civil service job consisted of training staff members in technology, completing public information requests, preparing weekly reports, "help[ing] with contracts," assisting with budgeting, and attending cabinet and operational group meetings. Brown moved into the office vacated by McCafferty. Three-to-four months after he began working for the City, Brown's title

Watson v. City of Cleveland, 202 Fed.Appx. 844 (2006)

2006 Fed.App. 0680N

was changed to Administrative Assistant to reflect the greater responsibilities he had assumed. Approximately six months after he began working for the City, Mayor Campbell appointed Brown Secretary to the Director or Assistant Director of Personnel.

Watson contends in her brief that Brown was the *de facto* CPM when he filled each of these positions. She claims he was not given that title because he lacked the civil service qualifications for the job. Romero testified, however, that CPM was never filled and that Data Processing Supervisor was an entirely new position with different responsibilities than the CPM position. Additionally, the Cleveland City Charter provides for the Assistant Director position, which is politically appointed and higher in the organizational chart than CPM, but it had not been filled in the White administration.

Watson never applied for the LRO position but testified that she would have if the vacancy had been posted and applications solicited. Instead of posting the vacancy and soliciting applications, as Watson claims the Civil Service Rules require, Romero hired Madeline Corchado. Corchado, **\*851** whom Romero testified he assumed was Hispanic, worked in the Labor Relations group for the City's Utilities Department and had expressed an interest in transferring to Labor Relations in Personnel. When the LRO position became vacant, Romero asked Corchado if she was interested in it. She was, and Romero hired her. Watson claims Corchado's hiring denied Watson her right to apply for the LRO job.

In addition to claiming that she was denied her right to apply for other positions within Personnel, Watson claims that Romero excluded her from meetings. Watson emailed Romero on May 29, 2002, complaining that he had not invited her to Personnel's weekly management meetings and strategic planning sessions. She identified employees whom she learned had participated in the strategic planning sessions—Tom Antonello, Genesis Brown, and Sue Rudman. Incidentally, none of these employees were African–American. Romero responded to her email on May 31, 2002. He told her that his failure to include her in the weekly management meetings was an oversight, which he had corrected. He also gave her a complete list of the employees who participated in the strategic planning sessions. Among them were Dennis Dove, Hernando Harge, and Tony Washington, all of whom were African–American employees hired by the White administration.

The email and the invitation to the weekly managers meetings did not appease Watson. In her deposition, she complained about not being invited to the strategic planning sessions and speculated that there were many other meetings to which she had not been invited.

**\*\*4** Watson also claims that she was improperly denied a raise because Romero increased employees' salaries in a discriminatory fashion. Romero, with the approval of Mayor Campbell and the City's Director of Finance, gave four employees raises from funds freed up when an employee retired. Genesis Brown received a $20,000 raise, which coincided with his promotion to Assistant Director. Maria Claudio and Susan Rudman each received a $5,000 raise, and Linda Steffen received a $10,000 raise. Romero told Watson he selected these employees for raises because they were (1) long-term City employees; (2) vitally important to Personnel; or (3) both. Romero aimed to bring their salaries in line with the pay they could receive in the private sector. When Watson heard about these raises, she emailed Romero to request a raise. She asked Romero to meet with her to discuss giving her a merit increase, which she felt she deserved. Romero met with her on September 26, 2002, to explain why she did not receive a raise. He indicated that raises were given based on the employees' long-term role in Personnel. Watson inferred from this that Romero did not "see [her] playing any role in the future of the department." She emailed him after the meeting to clarify his vision of her role in the department; it is unclear whether Romero and Watson ever discussed the Personnel raises again. Watson concluded that he gave the four employees raises "because they were white."

Finally, Watson complains about the City's response to her discrimination charges against Romero—a response she characterizes as retaliatory. Watson filed an EEO complaint against Romero after an incident in January 2003. Romero chastised Watson for requiring employees to submit their EEO complaints in writing and ordered her to begin accepting verbal complaints. Watson emailed Romero to explain that she encouraged written EEO complaints but did not require them. She also alleged that the Law Department had been taking away her job responsibilities by investigating EEO complaints and accused **\*852** Romero of treating her in a discriminatory fashion. Watson met with Mayor Campbell on January 21, 2003, to complain about Romero but refused to discuss her problems because representatives of the Law Department were present. She believed their presence

2006 Fed.App. 0680N

jeopardized her interests. Watson then filed a formal EEO complaint against Romero on March 10, 2003. The cluster-chief for the Personnel and Human Resources departments, Robert Baker, appointed an independent investigator to investigate Watson's allegations. Baker also removed Watson from two EEO investigations because of a conflict of interest. One of the EEO claims was a precursor to Watson's complaint, and the other EEO complaint was against the Law Department, which Watson believed operated contrary to her interests. Watson complained about her removal and described it as retaliatory. Baker emphasized that he removed her to appoint independent investigators, not to discipline her or criticize her work. He refused to meet with Watson to discuss the conflicts because she would not permit a member of the Law Department to be present. Watson continued to contest her removal from these investigations. She claims the City took away her primary job function, investigating EEO complaints, in retaliation for her complaint against Romero.

**5** Watson resigned from the City in August 2003 because her job was causing her stress, which manifested itself in hair loss, weight loss, insomnia, and anxiety.

She filed suit on November 23, 2003, in the United States District Court for the Northern District of Ohio, naming the City, Mayor Campbell, Romero, the Secretary to the CSC, and the CSC as defendants. Watson asked to depose Mayor Campbell, and the defendants sought a protective order. Their protective order was granted, and Watson's motion to compel was denied. Later, the defendants moved for summary judgment, and the district court granted their motion. Watson timely appealed both the summary judgment order and the denial of the motion to compel discovery.

II.

[1]  [2]  Watson appeals the district court's denial of her motion to compel Mayor Campbell's deposition. On appeal, denials of motions to compel discovery are reviewed only for an abuse of discretion. *Chrysler Corp. v. Fedders Corp.,* 643 F.2d 1229, 1240 (6th Cir.1981). We conclude that the district court acted within its discretion to set the scope of discovery by refusing to force Mayor Campbell to submit to a deposition. We find no abuse of discretion because Watson fails to

demonstrate why deposing Mayor Campbell is necessary to her case. Her case focuses on actions undertaken by various members of the Campbell administration and involves Mayor Campbell only to the extent that the Mayor supervises city employees. Mayor Campbell has very little information related to Watson's claims and indeed none that is unavailable from another source. Watson claims that she needs to depose Mayor Campbell to learn the results of a probe Mayor Campbell launched to investigate Watson's discrimination claims. The results of the investigation, however, could be obtained through a form of discovery less burdensome to a city executive —namely, interrogatories and requests for production. Given that Watson can obtain the information she seeks through other forms of discovery, the district court did not abuse its discretion in denying her motion to compel Mayor Campbell's deposition.

III.

In addition to appealing the district court's refusal to compel Mayor Campbell's **\*853** deposition, Watson appeals the district court's grant of summary judgment to the defendants on all her claims.

Summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits, if any, show that there is no genuine issue of material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c). Although all "inferences to be drawn from the underlying facts ... must be viewed in the light most favorable to the party opposing the motion," *United States v. Diebold, Inc.,* 369 U.S. 654, 655, 82 S.Ct. 993, 8 L.Ed.2d 176 (1962), summary judgment must be entered against the opposing party if it "fails to make a showing sufficient to establish the existence of an element essential to ... [its] case, and on which ... [it] will bear the burden of proof at trial." *Celotex Corp. v. Catrett,* 477 U.S. 317, 322, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). If "a reasonable jury could return a verdict for the nonmoving party," summary judgment must be denied. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). This court reviews the grant of summary judgment *de novo. Williams v. Mehra,* 186 F.3d 685, 689 (6th Cir.1999) (en banc).

2006 Fed.App. 0680N

**\*\*6** On *de novo* review, we conclude that the district court properly granted the defendants' motion for summary judgment. As discussed below, Watson failed to raise genuine issues of material fact, and the defendants are entitled to judgment as a matter of law.

### A. Racial Discrimination

[3] [4] Ohio and federal anti-discrimination laws prohibit employers from discriminating on account of race in hiring as well as in setting the terms, conditions, and privileges of employment. 42 U.S.C. § 2000e–2(a)(1); Ohio Rev.Code § 4112.02. The standards for proving racial discrimination are the same under Ohio and federal law because Ohio applies the body of federal case law interpreting Title VII to determine if an allegedly discriminatory practice violates its anti-discrimination statute. *Plumbers & Steamfitters Joint Apprenticeship Comm. v. Ohio Civil Rights Comm'n,* 66 Ohio St.2d 192, 421 N.E.2d 128, 131 (1981). To prove racial discrimination, a plaintiff may put forth direct evidence of discrimination or present circumstantial evidence that permits an inference of discrimination. *See Johnson v. Kroger Co.,* 319 F.3d 858, 864–65 (6th Cir.2003) (identifying methods of proof for a Title VII claim premised on racial discrimination).

[5] [6] Watson attempts to prove her case solely with circumstantial evidence. Therefore, she must create a presumption of unlawful discrimination and challenge the defendants to rebut the presumption by legitimating their actions. *See Texas Dep't of Cmty. Affairs v. Burdine,* 450 U.S. 248, 252, 101 S.Ct. 1089, 67 L.Ed.2d 207 (1981); *McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 802, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973). To create the presumption of discrimination, Watson must prove a prima facie case of employment discrimination by a preponderance of the evidence. *Burdine,* 450 U.S. at 252–53, 101 S.Ct. 1089. She must establish that 1) she was a member of a protected class; 2) she was subject to an adverse employment action; 3) she was qualified for the job; and 4) for the same or similar conduct, she was treated differently than similarly situated non-minority employees. *Perry v. McGinnis,* 209 F.3d 597, 601 (6th Cir.2000).

[7] [8] Watson fails to establish her prima facie case of racial discrimination at step two. She has put forth no evidence that the defendants subjected her to an **\*854** adverse employment action. An adverse employment action requires a materially adverse change in the terms and conditions of employment. *Allen v. Mich. Dep't of Corrections,* 165 F.3d 405, 410 (6th Cir.1999). A materially adverse employment action

> must be more disruptive than a mere inconvenience or an alteration of job responsibilities. A materially adverse change might be indicated by a termination of employment, a demotion evidenced by a decrease in wage or salary, a less distinguished title, a material loss of benefits, significantly diminished material responsibilities, or other indices that might be unique to a particular situation.

*Kocsis v. Multi–Care Mgmt. Inc.,* 97 F.3d 876, 886 (6th Cir.1996), *citing Crady v. Liberty Nat. Bank & Trust Co. of Ind.,* 993 F.2d 132, 136 (7th Cir.1993). Watson has put forth no evidence that she was subjected to an adverse employment action under any of these factors. She remained EEO Manager until she chose to quit, and the defendants did not reduce her compensation or benefits or demote her. She claims that the defendants diminished her job responsibilities by removing her from EEO investigations and directing EEO complaints to the Law Department. The record, however, does not indicate that such an adverse employment action took place. Watson was removed only from two EEO investigations and then only to cure potential conflicts of interest. This was not a significant diminution in her job responsibilities because she remained responsible for investigating any new EEO complaints that were filed and completing any EEO investigations that were in progress.

**\*\*7** Watson tries to prove that she was the victim of an adverse employment action by pointing to "other indices that [were] unique to the particular situation." She complains that she did not receive a raise, was denied overtime, was prevented from applying for jobs, and generally was treated poorly because of her race. These could be indices of an adverse employment action had Watson raised a genuine issue of material fact about their occurrence. Instead, she relied on her deposition testimony, which merely reiterated her belief that she was a victim of racial discrimination. This deposition testimony is insufficient to raise a genuine issue of material fact because it contains no more than "[m]ere personal beliefs,

2006 Fed.App. 0680N

conjecture and speculation." Watson's personal belief that she and others suffered from adverse employment actions motivated by racial discrimination cannot help Watson avoid summary judgment. *See Chappell v. GTE Prods. Corp.,* 803 F.2d 261, 268 (6th Cir.1986) (holding that an inference of discrimination cannot be supported merely by the plaintiff's personal beliefs and speculation that the defendant impermissibly discriminated).

 **[9]** Watson also claims that the defendants subjected her to an adverse employment action by preventing her from applying for the CPM and LRO positions. This claim can be recast as a failure to promote claim with respect to the CPM position because that position is higher on the organizational chart than Watson's EEO Manager position. But Watson's claim that she was denied the right to apply for the LRO position cannot be treated as a failure to promote claim because her job of EEO Manager was better compensated than the LRO position.

 **[10]**  **[11]**  Even treating Watson's claim that she could not apply for the CPM as a failure to promote, she cannot establish her prima facie case. For a failure to promote to constitute an adverse employment action, the plaintiff must be (1) a member of a protected class; (2) who applied for and was qualified for a promotion; (3) who was considered for and denied a  **\*855**  promotion; and (4) other similarly qualified employees who were not members of the protected class were given promotions. *Allen,* 165 F.3d at 410. Watson never applied for the CPM position. She merely inquired about it. Moreover, Watson was not considered or denied the CPM promotion because the position was never filled. Although Watson asserts that Genesis Brown filled the position, she put forth no evidentiary support for her theory.

Because Watson was not considered for and denied a promotion, she cannot establish a prima facie case. Consequently, the defendants are entitled to summary judgment on her racial discrimination claim.

B. Retaliation

 **[12]**  **[13]**  Title VII prohibits an employer from retaliating against an employee "because [the employee] has opposed [violations of Title VII], or because [the employee] has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under [Title VII]." 42 U.S.C. § 2000e–3(a). A plaintiff, who has no direct evidence of

retaliation, can establish retaliation with circumstantial evidence under the *McDonnell Douglas* framework. *DiCarlo v. Potter,* 358 F.3d 408, 420 (6th Cir.2004). The plaintiff must make out a prima facie case of retaliation by establishing four elements: (1) the plaintiff engaged in an activity protected by Title VII; (2) the defendant knew that the plaintiff exercised his or her rights; (3) the defendant took an employment action against the plaintiff that a reasonable employee would have found materially adverse; and (4) there was a causal connection between the protected activity and the adverse employment action. *Burlington N. & Santa Fe Rwy. Co. v. White,* 548 U.S. 53, 126 S.Ct. 2405, 2415, 165 L.Ed.2d 345 (2006); *DiCarlo,* 358 F.3d at 420.

 **\*\*8**  **[14]**  Once again, Watson cannot make out a prima facie case because she was not subjected to an adverse employment action. The Supreme Court recently defined what constitutes an adverse employment action in the retaliation context. *Burlington N.,* 126 S.Ct. at 2414–16. In *Burlington N.,* the Supreme Court held that an adverse employment action is any action, which might dissuade "a reasonable worker from making or supporting a charge of discrimination." *Id.* at 2415 (internal quotations omitted). Whether an employment action is materially adverse to a reasonable employee depends on the context in which the action takes place. Under the circumstances in this case, Watson was not subjected to an adverse employment action. Watson lost responsibility for two EEO investigations, was excluded from some meetings, and did not receive a raise. [4] In context, these actions would not dissuade a reasonable employee from invoking the protections of Title VII. A reasonable employee would not have found these actions materially adverse. A reasonable employee would have realized that Watson's responsibility for the two EEO investigations was taken away to prevent a conflict of interest and that Watson's exclusion from meetings was an oversight or reflected that the meetings were unrelated to Watson's work for the City. Likewise, a reasonable employee would have realized that Watson did not receive a raise because raises were given in conjunction with promotions or in commemoration of long-term service to the City. Given that a reasonable employee would not have found the actions Watson complains of materially adverse, the defendants are entitled to summary judgment on her retaliation claim.

Case 2:15-cv-12312-MOB-EAS ECF No. 48-48, PageID.1121 Filed 08/01/16 Page 82 of 98
Watson v. City of Cleveland, 202 Fed.Appx. 844 (2006)
2006 Fed.App. 0680N

**\*856** C. Constructive Discharge

**[15]** Under Title VII, an employee who resigns her post can recover from her former employer for constructive discharge under Title VII if the employer engaged in conduct that forced the employee to quit. "[T]he employer must deliberately create intolerable working conditions, as perceived by a reasonable person, with the intention of forcing the employee to quit and the employee must actually quit. To determine if there is a constructive discharge, both the employer's intent and the employee's objective feelings must be examined." *Moore v. KUKA Welding Sys. & Robot Corp.,* 171 F.3d 1073, 1080 (6th Cir.1999).

**[16]** Our Circuit has adopted several factors to aid the determination of whether the employer created working conditions that a reasonable person would find intolerable. *Logan v. Denny's Inc.,* 259 F.3d 558, 569 (6th Cir.2001). The presence of any combination of the following factors suggest constructive discharge, although whether working conditions are intolerable must be determined on a case-by-case basis: "(1) demotion; (2) salary reduction; (3) reduction in job responsibilities; (4) reassignment to menial or degrading work; (5) reassignment to work under a younger supervisor; (6) badgering, harassment, or humiliation by the employer calculated to encourage the employee to resign; or (7) offers of early retirement or continued employment on less favorable terms." *Id.* (quoting *Brown v. Bunge Corp.,* 207 F.3d 776, 782 (5th Cir.2000)).

**\*\*9** **[17]** Considering these factors and the severity of the conduct that they are designed to capture, we conclude that Watson was not constructively discharged. The only factor that Watson claims to have been involved is reduction in job responsibilities. As noted above, however, Watson's job responsibilities were not reduced. She remained responsible for new EEO complaints and existing investigations, except for the two that were transferred to independent investigators. Those investigations were not transferred to independent investigators to reduce Watson's job responsibilities or force her to resign. They were transferred to avoid potential conflicts of interest created by Watson's EEO complaint. The defendants neither created working conditions that were intolerable to a reasonable person nor intended to force Watson to resign. Accordingly, the defendants are entitled to summary judgment on her constructive discharge claim.

D. § 1983

**[18]** **[19]** Section 1983 "afford[s] remedies against discrimination in employment on the basis of race." *Daniels v. Bd. of Educ. of Ravenna City Sch. Dist.,* 805 F.2d 203, 207 (6th Cir.1986). These remedies are available only if the plaintiff proves intentional discrimination by a public employer that violates the Equal Protection Clause. *Gutzwiller v. Fenik,* 860 F.2d 1317, 1325 (6th Cir.1988); *Kitchen v. Chippewa Valley Schs.,* 825 F.2d 1004, 1011 (6th Cir.1987). Proving intentional discrimination for an equal protection claim brought under § 1983 requires the plaintiff to make the same showing required to prove a violation of Title VII. *Gutzwiller,* 860 F.2d at 1325. Therefore, "the shifting evidentiary burdens set out in the leading Title VII cases of *McDonnell Douglas* and *Burdine* are applicable to § 1983 cases." *Kitchen,* 825 F.2d at 1011.

**[20]** The application of the *McDonnell Douglas* framework to Watson's § 1983 claim prevents her from proving that she was denied equal protection of the laws by the defendants. She can no better make the evidentiary showings required for *McDonnell Douglas* for the purposes of this claim than she could for her Title VII claim.

**\*857** E. Civil Conspiracy

**[21]** Ohio law provides for civil liability for perpetrators of civil conspiracies. "[A] civil conspiracy consists of the following: (1) a malicious combination; (2) of two or more persons; (3) injury to person or property; and (4) existence of an unlawful act independent from the actual conspiracy." *Universal Coach, Inc. v. New York City Transit Auth., Inc.,* 90 Ohio App.3d 284, 629 N.E.2d 28, 33 (1993).

**[22]** Watson has not introduced evidence to support her claim of civil conspiracy. Beyond her testimony, which alone will not preclude summary judgment, *Trs. of the Painters Union Deposit Fund v. Ybarra Construction Company,* 113 Fed.Appx. 664, 668 (6th Cir.2004), she has no proof that the Civil Service Rules were violated or that they were violated by the defendants with malice. Watson also has not alleged any actual damages that she suffered. Without an injury to her person or property, she cannot make out a claim for civil conspiracy. Presumably, Watson is relying on what she cast as denial of her right to apply for the LRO and CPM positions as her injury. This,

Case 2:15-cv-12312-MOB-EAS ECF No. 48-48, PageID.1122 Filed 08/01/16 Page 83 of 98
Watson v. City of Cleveland, 202 Fed.Appx. 844 (2006)
2006 Fed.App. 0680N

however, does not constitute an injury to property because Watson had no property interest in prospective civil service employment. *See Howard v. City of Southfield,* 97 F.3d 1452 (Table), 1996 WL 518062, at *6 (6th Cir.1996). ("[E]ven applicants who successfully completed all of the requirements and therefore remained on the eligibility list had no property right in the position since the number of qualified applicants significantly exceeded the number of available positions.").

F. Fraud

**10 [23]** Claims of common law fraud require proof of six elements in Ohio: (1) a representation or, where there is a duty to disclose, a concealment of fact; (2) which is material to the transaction at hand; (3) made falsely, with knowledge of its falsity, or with such utter disregard and recklessness as to whether it is true or false that knowledge may be inferred; (4) with the intent of misleading another into relying upon it; (5) justifiable reliance upon the representation or concealment; and (6) an injury proximately caused by the reliance. *Russ v. TRW, Inc.,* 59 Ohio St.3d 42, 570 N.E.2d 1076, 1083 (1991).

**[24]** Watson has brought forth insufficient evidence to support her claim of fraud. Specifically, she presented no evidence that the defendants had an intent to defraud beyond her conjecture that they were reserving posts for Caucasian supporters of Mayor Campbell. Moreover, Watson has not alleged any injuries that she sustained as a result of the alleged misrepresentations about hiring by the defendants. Without some evidence, which Watson has failed to amass, her fraud claim cannot survive summary judgment.

G. Negligent Hiring, Retention, and Supervision

**[25]** Negligent hiring, retention, and supervision claims under Ohio law require proof of five elements: (1)

the existence of an employment relationship; (2) the employee's incompetence; (3) the employer's actual or constructive knowledge of such incompetence; (4) the employee's act or omission causing plaintiff's injuries; and (5) the employer's negligence in hiring or retaining the employee was the proximate cause of the plaintiff's injuries. *Linder v. Am. Nat'l Ins. Co.,* 155 Ohio App.3d 30, 798 N.E.2d 1190, 1197 (2003).

**[26]** Watson's claim that Romero was negligently hired, retained, and supervised cannot survive summary judgment because Watson only has evidence to support the first element of the cause of action. She has no evidence to suggest that Romero *858 was incompetent or that the City and Mayor Campbell knew of his incompetence. More importantly, Watson has not identified any injury she suffered at the hands of Romero or any harmful act that he committed. From her complaint it appears that Watson is alleging that she was injured when Romero discriminated against her, but she never substantiates this allegation. Moreover, she cannot substantiate this allegation because she failed to prove that Romero discriminated against her when her Title VII and § 1983 claims required it. Apart from her failure of proof on the other elements of her claim, Watson's negligent hiring, retention, and supervision claim cannot survive summary judgment because she has not put forth evidence of harmful discrimination by Romero.

VI.

For the foregoing reasons, we affirm the district court.

**All Citations**

202 Fed.Appx. 844, 2006 WL 2571948, 2006 Fed.App. 0680N

Footnotes

1   Appointment power is given to the mayor by the Cleveland City Charter. The Charter permits the mayor to appoint heads of departments and commissions. These political appointments are made outside the normal hiring process for the City, which is dictated by the CSC. Ordinarily, the CSC compiles lists of employees who have taken the Civil Service exams required for specific positions. These lists rank the employees by their scores on the exams. When there is a vacancy, the CSC identifies the top three candidates on the list for interviews if a list exists for the open position. If there is no list, Personnel selects interview candidates by reviewing the resumes of people who have applied for City positions.

WESTLAW   © 2016 Thomson Reuters. No claim to original U.S. Government Works.

2006 Fed.App. 0680N

2    Watson describes Romero as "a Hispanic male" in her brief, but the appellees contend in their brief that the term Hispanic does not accurately describe Romero's race. The Appellee's Brief states that "Director Romero was of mixed race, because of his North and South American indigenous Indian and Caucasian ancestry. He did not consider Hispanic a descriptive term of his race." The record, however, contains no evidence of Romero's ethnicity.

3    Watson claims that the Civil Service Rules require the City to make the hiring process competitive, which she interprets as advertising the jobs, posting vacancies, and actively seeking candidates. The summary of the hiring process introduced as an exhibit at Watson's deposition indicates otherwise. According to a flow chart that depicts the City's hiring procedure, job vacancies do not have to be posted and open positions do not have to be advertised. For nonunion positions, such as the ones Watson claims she was denied the opportunity to apply for, the City must consult the Civil Service list if it exists. If no list exists, the City hires from the pool of applicants who have submitted resumes.

4    Watson's claim that she was constructively discharged cannot establish the adverse employment action required for the prima facie case because Watson has not demonstrated that she was constructively discharged. *See supra* Part I.C.

---

**End of Document** © 2016 Thomson Reuters. No claim to original U.S. Government Works.

Case 2:15-cv-12312-MOB-EAS ECF No. 48-48, PageID.1124 Filed 08/01/16 Page 85 of 98
Choulagh v. Holder, Not Reported in F.Supp.2d (2012)
2012 6 W2L911LL

2012 WL 2891188
Only the Westlaw citation is currently available.
United States District Court,
E.D. Michigan,
Southern Division.

Hany G. CHOULAGH, Plaintiff,
v.
Eric H. HOLDER, Jr., Attorney General,
Department of Justice, Defendant.

No. 10–14279.
|
July 16, 2012.

**Attorneys and Law Firms**

Jeffrey S. Sherbow, Sherbow & Associates, PLC, Sylvan Lake, MI, for Plaintiff.

Andrew J. Lievense, U.S. Attorney's Office, Detroit, MI, for Defendant.

*OPINION AND ORDER GRANTING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT*

MARIANNE O. BATTANI, District Judge.

**\*1** This matter is before the Court on Defendant's Motion for Summary Judgment. (Doc. 29). The Court heard oral argument on May 17, 2012, and at the conclusion of the hearing took the motion under advisement. For the reasons that follow, the Court **GRANTS** Defendant's motion.

**I. STATEMENT OF FACTS**

**A. The Parties**

Plaintiff Hany Choulagh is sixty-four year old man of Iraqi national origin who began working for Defendant Federal Bureau of Investigation ("FBI"), Detroit Division, as a Language Analyst ("LA") contractor in October 2005. LA's provide translation services to the FBI. He ultimately joined the FBI as a direct hire in March 2007. Michael Boyden, a white American male, became Plaintiff's supervisor in December 2008.

**B. Plaintiff's April 2009 EEO Testimony**

On March 24, 2009, Plaintiff received an email from the FBI's Office of the General Counsel advising him that he had been approved to testify in early April on behalf of a former employee Kinana Jacobs regarding her EEO complaint against the FBI. (Doc. 31 Ex. 9). Plaintiff advised Jean Younes, a LA supervisor not in his chain of command, that he was going to present testimony in favor of Jacobs. Plaintiff says Younes told him that if he testified, he should expect consequences. Younes denies discouraging Plaintiff from testifying. (Doc. 29 Ex. 3 at p. 9).

**C. Plaintiff's First Alleged Sleeping Incident**

On March 30, 2009, Boyden observed Plaintiff sleeping at his desk. (Doc. 29 Ex. 8 at p. 3–4). Nazih Moaikel, an LA whose desk was near Plaintiff's, also observed Plaintiff asleep at his desk. (Doc. 29 Ex. 8 at p. 4; Ex. 9, ¶ 3). Plaintiff denied he was sleeping and explained that he had bronchitis and was on medication that might have made him drowsy. (Doc. 29 Ex. 1 at pp. 7–8).

On April 1, 2009, while Plaintiff was out on sick leave, Boyden sent Plaintiff an email about the alleged sleeping event. (Doc. 29 Ex. 10). When Plaintiff read this email after returning to work, he became upset and demanded an apology from Boyden. (Doc. 29 Ex. 12). After this confrontation, Plaintiff sought treatment for bronchitis and was out of the office on sick leave from April 6 to 8.

**D. Boyden Refers Plaintiff to the EAP**

In addition the alleged sleeping incident, throughout early April 2009, Boyden noticed a change in Plaintiff's physical appearance and stress levels. He discussed these observations with his then-supervisor, Assistant Special Agent in Charge Walter Reynolds. Reynolds concurred with Boyden's assessment and suggested to Boyden that he possibly refer Plaintiff to the Employee Assistance Program ("EAP"), a confidential program to help federal employees with personal problems.

In a memorandum dated April 9, 2009, given to Plaintiff on April 10, 2009, Boyden referred Plaintiff to the EAP by stating:

    The Purpose of the memorandum is to express my personal concern for your welfare, and to address your

recent irritability, agitated demeanor and trouble with sleep in the Detroit Field Office/Language Services Section, which I feel indicate a need for professional counseling. Combining this with your documented medical issues, I am convinced this assistance is important for your well-being.

**\*2** You have been under my direct supervision for approximately four months. During this time I have had some issues with you getting along with other employees to include a request by you and two of your three cubicle mates for a move to a different desk.

During the past two weeks you have complained openly to employees inside and outside of the language unit regarding your interactions with me and my attempts to address issues raised by your behavior. I have tried on multiple occasions in writing and in-person over the past two weeks to address these issues with you has not been effective and that the problem emanates from an external factor.

I feel that my personal involvement is not of help and I strongly recommend that you seek counseling assistance through EAP....

(Doc. 29 Ex. 17).

Plaintiff states that Boyden wrongfully accused him of having personal problems. However, he decided to go to the EAP as requested. EAP coordinator RN Rita Harrington met with Plaintiff on two separate occasions and concluded he would not benefit from joining the program. (Doc. 32 Ex. 12). Two weeks after Harrington told Boyden that Plaintiff did not need the EAP, Todd Mayberry, a different Assistant Special Agent in Charge, informed the Detroit Division that Harrington will no longer serve in the EAP and that she was replaced by SA Gwen Rosenthal. (Doc. 32 Ex. 13).

### E. Plaintiff's Second Alleged Sleeping Incident and the Desk Move
On May 18, 2009, Boyden again allegedly observed Plaintiff sleeping at his desk. The next day, Boyden met with Younes and Reynolds to discuss Plaintiff's workplace behavior issues. They decided to move Plaintiff's desk closer to Boyden's office so that Boyden could monitor Plaintiff throughout the day. Plaintiff refused to move his desk, and other employees heard him yelling at Boyden.

(Doc. 32 Ex. 19). Plaintiff said this move would put him near a common work area where other employees signed in, gathered to mingle and get their coffee, make copies, and generally congregate to talk. As a result, it would be distracting and difficult for him to concentrate while translating. On May 20, 2009, with Reynolds' assistance, Boyden ultimately moved Plaintiff's desk closer to his office.

### F. Boyden Limits Plaintiff to On–Site Duties
Also on May 20, 2009, Boyden told Plaintiff that he was limiting Plaintiff to on-site duties. (Doc. 29 Ex. 22). This meant that Plaintiff could not apply for temporary duty assignments ("TDY"), off-site assignments which were outside of the Detroit Division. Boyden stated "this was a result of [Plaintiff's] inappropriate and disruptive behavior and his insubordination." (Doc. 29 Ex. 8 at p. 8). In a memo to Reynolds, Boyden said that he told Plaintiff that "his recent demeanor and refusal to follow directions from management made it inappropriate for him to represent the unit" outside of the Detroit Division. (Doc. 29 Ex. 18 at p. 2). Plaintiff states Boyden's actions modified the terms of his employment and damaged his advancement opportunities because off-site duties and appointments are necessary for promotions and superior job performance ratings.

### G. Boyden's Denial of Temporary Duty Assignment # 1
**\*3** In late May 2009, FBI HQ sent a canvas regarding a one-year TDY to a foreign country ("TDY# 1"). (Doc. 29 Ex. 23). Plaintiff sought Boyden's approval to apply for TDY# 1; Boyden denied the request because he had just restricted Plaintiff to on-site duties. Boyden approved the request of another LA, who was of Iraqi national origin, to apply for that post.

To circumvent Boyden's restrictions and avoid the chain of command, it appears Plaintiff asked Younes to approve his request to apply to other TDYs while Boyden was out of the office. Boyden discovered Plaintiff's actions, and reminded Plaintiff that he was ineligible to apply to any TDYs in an email and a phone call. (Doc. 32 Ex. 19).

### H. Boyden Places Plaintiff on a Performance Improvement Plan
Also in late May 2009, Boyden sent a detailed memo to FBI HQ requesting approval to place Plaintiff on a

Performance Improvement Plan ("PIP"). (Doc. 29 Ex. 32). FBI HQ approved the request and on June 23, 2009, Boyden placed Plaintiff on a PIP. (Doc. 29 Ex. 29). The six-page, single-spaced PIP outlined Plaintiff's behavior problems and set forth the steps he must take to improve performance.

As part of the PIP, Boyden required Plaintiff to account for his daily activities and imposed telephone use and other limitations. (Doc. 29 Ex. 31). Boyden instituted these requirements because he observed, and received information from others, that Plaintiff was disrupting co-workers and he was often away from his desk unrelated to his work. Boyden also believed that Plaintiff's telephone use was excessive and disruptive because his translation work did not require frequent telephone use.

Plaintiff states, without citation, that no other employee in the "entire FBI" was required to keep such detailed worklogs. He also suggests Boyden made Plaintiff file these logs so that he could gather "ammunition" to support Plaintiff's termination.

In September 2009, Boyden believed Plaintiff's job performance rating for "relating with others and providing professional services" had improved one level from "unacceptable" to "minimally successful." (Doc. 29 Ex. 1 at p. 12.). As a result, on September 23, 2009, Boyden decided to "pass" Plaintiff on the PIP. (Doc. 29 Ex. 36). Plaintiff claims that despite passing the PIP, its "restrictions" were never removed.

### I. Plaintiff's August 2009 EEO Complaint

In August 2009, Plaintiff filed the first EEO complaint giving rise to this case. (Doc. 29 Ex. 7). Plaintiff states: "I am filing a complaint of discrimination because of my Iraqi national origin and because of reprisal of my prior EEO activity." (*Id.*). Plaintiff claimed Boyden's disciplinary actions were motivated by national origin discrimination and retaliation for Plaintiff's EEO activity, i.e., his testimony in the Jacobs matter and some unidentified unfair labor practice charge that was apparently withdrawn.

### J. Plaintiff's "Not Satisfactory" Quality Control Ratings in Fall 2009

**\*4** In October 2009, an FBI quality control reviewer rated Plaintiff's translation as "Not Satisfactory." (Doc.

29 Ex. 40). The FBI's quality control program is "double blind in that the reviewer does not know who the linguist is ... and the linguist is unaware of who the reviewer is or the field office they work in." (Doc. 29 Ex. 37 at p. 6; Ex. 38 at p. 4). In other words, Boyden did not perform the quality control review or otherwise rate Plaintiff's translation work. Plaintiff signed this review, which stated that he "accepts that some of it could have been done better ." (Doc. 29 Ex. 41).

On November 3, 2009, Boyden gave Plaintiff a memo stating that a quality control reviewer had rated his work "Not Satisfactory" two consecutive times, once in July 2009 and most recently in October 2009. (Doc. 29 Ex. 40). In that memo, Boyden notified Plaintiff that further quality issues might lead to the issuance of a "warning" performance appraisal report. Boyden avers that Plaintiff reacted angrily to this memo. (Doc. 29 Ex. 37 at p. 4).

### K. Boyden's December 2009 Termination Memo

On December 1, 2009, Boyden prepared a draft memo summarizing the difficulties he had with Plaintiff to determine whether he should be terminated. (Doc. 29 Ex. 35). In addition to the quality control incidents, Plaintiff continued to have problems with excessive personal telephone use and Boyden had observed Plaintiff sleeping at his desk on two additional occasions. (Doc. 29 Ex. 26 ¶ 4; Ex. 34; Ex. 35 at pp. 2–3). Defendant states Boyden never formally submitted the memo to FBI HQ and Plaintiff remains employed with the FBI.

### L. The February 2010 Doctor's Note Incident

Plaintiff was on sick leave from February 2–4, 2010. On February 5, 2010, Plaintiff brought in a doctor's note and gave it to Boyden. (Doc. 29 Ex. 43 at p. 3). Boyden initially accepted the note as legitimate. Later, however, he had second thoughts and conducted a closer examination. According to Boyden, the doctor's note appeared to describe medical care for two days beyond the date of the note. (Doc. 29 Ex. 43 at p. 4; Ex. 44). He also saw the note had white-out on it and thought it contained inconsistent handwriting from two different people. Boyden told Plaintiff he intended to call Plaintiff's doctor to verify the authenticity of the note; Boyden verified the note and approved Plaintiff's sick leave for February 2–4, 2010. (Doc. 29 Ex. 42 at p. 3).

Chouhan v. Holder, Not Reported in F.Supp.2d (2012)

2012 6 W2L911LL

## M. Boyden's Denial of Other Off–Site Duties

On February 12, 2010, FBI HQ sought LAs to participate in a High–Value Interrogation Group ("HIG"). (Doc. 29 Ex. 45). The HIG was an interagency team being created to deploy worldwide with little or no notice when a high-value target was in custody. Boyden denied Plaintiff's request to apply because he had requested sick leave on 21 occasions in less than a year and also due to the fact that HIG was a collateral duty in addition to his regular translation work. Instead, Boyden recommended LA Elie Sassine, who is of Lebanese national origin, and LA Vian Raikany, who is of Iraqi national origin, for the HIG; FBI HQ selected Sassine.

**\*5** In March 2010, FBI HQ canvassed the LAs regarding two other TDYs. (Doc. 29 Ex. 46; Ex. 47). Plaintiff emailed Boyden and expressed an interest in applying to both. Boyden again denied Plaintiff's request to apply because (1) the Special Agent in Charge said no one could apply for any TDYs without prior authorization from the front office; (2) too many LAs from Detroit were already serving TDYs and (3) Plaintiff still had had problems with absenteeism and work performance. (Doc. 29 Ex. 45).

## N. Plaintiff's Personal Phone Use in March 2010

Also in March 2010, Boyden received additional complaints about Plaintiff from his coworkers. (Doc. 29 Ex. 49). They, and Boyden, both observed excessive personal telephone use and frequent absences from his desk. Boyden ultimately directed Plaintiff to keep his cell phone in his desk drawer and document his time away in excess of fifteen minutes (not counting breaks and lunch).

## O. Plaintiff's April 2010 EEO Complaint

In April 2010, Plaintiff filed the second EEO complaint giving rise to this case. (Doc. 29 Ex. 50). Plaintiff states: "I am filing a complaint of discrimination because of perception of disability (I got punished for using earned sick time) and because of reprisal because of my prior EEO activity which is still going on ." (*Id.*). He essentially claimed that the events from December 2009 through March 19, 2010, constituted retaliation for him having filed the first EEO complaint in August 2009.

## P. The Federal Suit

On October 25, 2010, Plaintiff filed the instant action against Defendant for national origin discrimination and Title VII retaliation. (Doc. 1). Plaintiff subsequently filed an amended complaint. (Doc. 5). Defendant filed a motion for summary judgment on Plaintiff's entire amended complaint. (Doc. 29). The Court heard oral argument on May 17, 2012. Defendant's motion is now before the Court.

## II. STANDARD OF REVIEW

Summary judgment is appropriate only when there is "no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." *Fed.R.Civ.P.* 56(a). The central inquiry is "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 251–52, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). Rule 56 mandates summary judgment against a party who fails to establish the existence of an element essential to the party's case and on which that party bears the burden of proof at trial. *Celotex Corp. v. Catrett,* 477 U.S. 317, 322–23, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986).

The moving party bears the initial burden of showing the absence of a genuine issue of material fact. *Id.,* 477 U.S. at 323. Once the moving party meets this burden, the non-movant must come forward with specific facts showing that there is a genuine issue for trial. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 587, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986). In evaluating a motion for summary judgment, the evidence must be viewed in the light most favorable to the non-moving party. *Adickes v. S.H. Kress & Co.,* 398 U.S. 144, 157, 90 S.Ct. 1598, 26 L.Ed.2d 142 (1970). The Court "must lend credence" to the non-moving party's interpretation of the disputed facts. *Marvin v. City of Taylor,* 509 F.3d 234, 238 (6th Cir.2007) (citing *Scott v. Harris,* 550 U.S. 372, 127 S.Ct. 1769, 1775, 167 L.Ed.2d 686 (2007)). The non-moving party may not rest upon its mere allegations, but rather must set out specific facts showing a genuine issue for trial. *Fed.R.Civ.P.* 56(c)(1). The mere existence of a scintilla of evidence in support of the non-moving party's position will not suffice. Rather, there must be evidence on which the jury could reasonably find for the non-moving party. *Hopson v. DaimlerChrysler Corp.,* 306 F.3d 427, 432 (6th Cir.2002).

2012 6 W2L911LL

## III. ANALYSIS

**\*6** Plaintiff brings one count of national origin discrimination under Title VII and three counts of Title VII retaliation against Defendant. "In Title VII actions it is important to distinguish between harassment and discriminatory harassment in order to ensure that Title VII does not become a general civility code." *Bowman v. Shawnee State Univ.,* 220 F.3d 456, 464 (6th Cir.2000) (citations omitted). A court properly applies Title VII to employment claims by filtering out complaints attacking the ordinary tribulations of the workplace. *Swanson v. Livingston County,* 270 F.Supp.2d 887, 899 (E.D.Mich.2003). "[F]ederal law does not guarantee a utopian workplace or even a pleasant one. Personality conflicts between employees are not the business of the federal courts." *Michael v. Caterpillar Fin. Services Corp.,* 496 F.3d 584, 600 (6th Cir.2007) With these principles in mind, the Court begins its analysis with Plaintiff's national origin discrimination claim.

### A. National Origin Discrimination

Title VII of the Civil Rights Act of 1964 prohibits an employer from making an adverse employment decision based on an individual's race, color, religion, sex, or national origin. 42 U.S.C. § 2000e–2. A plaintiff can bring two types of claims for discrimination under Title VII: (1) claims based on "discrete discriminatory acts," and (2) claims alleging a "hostile work environment." *Hunter v. Sec'y of the Army,* 565 F.3d 986, 993–94 (6th Cir.2009) (citations omitted). Plaintiff advances a "hostile work environment" theory in this case. (Doc. 5 at ¶ 59).

To establish a prima facie hostile work environment claim, a plaintiff must show that: (1) he is a member of a protected class, (2) he was subjected to unwelcome verbal or physical conduct related to his membership in that class, (3) the harassment was based on his membership in that class, (4) the harassment had the purpose of creating an intimidating, hostile, or offensive work environment that is severe or pervasive, and (5) the employer knew or should have known about the harassment, but failed to take any action to prevent it. *Barrett v. Whirlpool Corp.,* 556 F.3d 502, 515 (6th Cir.2009).

If a prima facie case has been established, the burden then shifts to the defendant to articulate a legitimate, non-discriminatory reason for the adverse action, i.e., the creation of a hostile work environment. *McDonnell*

*Douglas Corp. v. Green,* 411 U.S. 792, 802, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973). If the defendant meets this burden, the plaintiff must then show that the defendant's articulated reason is a pretext for discrimination. *Id.,* at 804. A court need not apply the burden shifting analysis if the plaintiff has direct evidence that the employer acted with discriminatory motive. *See Ang v. Proctor & Gamble Co.,* 932 F.2d 540 (6th Cir.1991).

Here, the Court finds that Plaintiff cannot establish the prima facie case because there is no evidence that the complained of disciplinary incidents upon which his hostile work environment claim is based were related to Plaintiff's Iraqi national origin. The well-developed factual record does not contain any evidence to support Plaintiff's assertion that Boyden considered his national origin when issuing discipline during the relevant timeframe. To the contrary, Boyden's disciplinary actions were justified in light of Plaintiff's workplace behavior.

**\*7** Plaintiff offers no evidence to dispute that: Boyden and a witness observed Plaintiff sleeping at his desk in March 2009; that Boyden has never observed one of his other supervisees sleeping at their desks; that Boyden and Reynolds observed a deterioration in Plaintiff's workplace attitude and appearance; that Boyden received complaints about Plaintiff from other LAs; that Boyden observed Plaintiff sleeping at his desk in May 2009; that Plaintiff was insubordinate, yelled at Boyden, and refused to follow orders to move his work station and follow the chain of command; that Plaintiff received consecutive "not satisfactory" quality control ratings following a double-blind review; that Plaintiff had excessive absenteeism during the relevant time period; and that Boyden and other employees observed Plaintiff engaging in excessive personal telephone use. Plaintiff cannot create a genuine issue of material fact by ignoring the absence of any discriminatory animus in the record and constructing the prima facie case with his subjective belief that Defendant considered his national origin a material factor in issuing discipline. The evidence of record prevents a reasonable jury from concluding that Defendant's discipline decisions were based on, or related to Plaintiff's Iraqi national origin.

Further, even if the Court assumes Defendant's disciplinary actions were based on Plaintiff's national origin, these actions do not amount to a hostile work environment. To carry the burden of establishing a hostile

2012 6 W2L911LL

work environment, Plaintiff must show that his workplace was " 'permeated with discriminatory intimidation, ridicule, and insult that is sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment ....' " *Barrett,* 556 F.3d at 514 (quoting *Harris v. Forklift Sys., Inc.,* 510 U.S. 17, 21, 114 S.Ct. 367, 126 L.Ed.2d 295 (1993)). The employer's conduct " 'must be severe or pervasive enough to create an environment that a reasonable person would find hostile or abusive, and the victim must subjectively regard that environment as abusive.' " *Id.* (quoting *Jackson v. Quanex Corp.,* 191 F.3d 647, 658 (6th Cir.1999)). Here, although Plaintiff believed the environment was abusive, the complained of disciplinary actions, from an objective perspective, are not severe or pervasive enough to constitute a work environment that is permeated with harassment based on Plaintiff's national origin. *See McCombs v. Meijer, Inc.,* 395 F.3d 346, 357 (6th Cir.2005) Accordingly, Defendant is entitled to summary judgment on Plaintiff's national origin discrimination claim.

## B. Title VII Retaliation

In Counts I, II, and IV, Plaintiff alleges Defendant retaliated against him for engaging in three different types of Title VII protected activity during three separate time periods. To establish a prima facie case of Title VII retaliation, Plaintiff must prove that: (1) he participated in an activity protected by Title VII; (2) the employer knew of his participation; (3) following his participation, an adverse employment action occurred or Plaintiff was subjected to severe or pervasive retaliatory harassment by a supervisor; and (4) there was a causal link between the protected expression and the adverse action or harassment. *Hunter,* 565 F.3d at 995–996 (citations omitted). If this showing is made, Defendant "must articulate a legitimate nonretaliatory reason for its action before the burden shifts back to plaintiff to show that the proffered reason was not its true reason but merely a pretext for retaliation," and that retaliation was the real reason. *Harris v. Metro. Gov't of Nashville,* 594 F.3d 476, 485–86 (6th Cir.2010).

**\*8** In Count I, Plaintiff alleges he was retaliated against for having engaged in some unidentified Title VII protected activity. (Doc. 5 at ¶¶ 47–49). At the hearing, Plaintiff explained that his agreement or authority to participate in Jacobs' EEO case on March 24, 2009, as distinguished from his actual testimony in that case,

constitutes the protected activity in Count I. As such, Count I captures a short timeframe because Count II addresses Defendant's alleged retaliation for Plaintiff's actual testimony in the Jacobs' EEO case on April 9, 2009. In other words, Count I is based on the alleged retaliation which occurred only because of Plaintiff's agreement to testify rather than his actual testimony.

During the timeframe that Count I covers, the record reveals two alleged retaliatory actions: (1) Boyden's confrontation with Plaintiff regarding the March 30, 2009 sleeping incident and the April 9, 2009 memo referring Plaintiff to the EAP program. Regarding the sleeping incident, assuming Boyden knew Plaintiff was going to testify in Jacobs' EEO case, and even assuming Boyden wrongfully accused Plaintiff of sleeping at his desk because of his agreement to testify, the complained of retaliation, i.e., an email reprimanding Plaintiff for sleeping at his desk and a private meeting with Boyden regarding the incident, cannot reasonably be considered an adverse employment action or severe or pervasive retaliatory harassment. Boyden's actions are of a "de minimis nature and amount to nothing more than petty slights and minor annoyances." *Hunter,* 565 F.3d at 995–97. No sensible jury would conclude otherwise.

Similarly, Boyden's April 9, 2009 memorandum recommending that Plaintiff explore an EAP referral cannot be view as an adverse employment action nor is it sufficient evidence of severe or pervasive retaliatory harassment by a supervisor. The Sixth Circuit has made clear that to show an adverse employment action, a plaintiff must identify a "materially adverse change" in the terms of his employment situation, *Kocsis v. Multi–Care Mgt., Inc.,* 97 F.3d 876, 885 (6th Cir.1996); *Bowman,* 220 F.3d at 461–62, and the complained of conduct must be "extreme" to constitute severe or pervasive retaliatory harassment. *Ceckitti v. City of Columbus, Dept. of Pub. Safety, Div. of Police,* 14 F. App'x 512, 518 (6th Cir.2001) (citing *Faragher v. City of Boca Raton,* 524 U.S. 775, 788, 118 S.Ct. 2275, 141 L.Ed.2d 662 (1998)). Boyden's EAP referral simply does not meet either standard. Accordingly, Defendant is entitled to summary judgment on Count I.

Defendant is also entitled to summary judgment on Count II. In this Count, Plaintiff alleges retaliation based on his testimony in Jacobs' EEO case. (Doc. 5 at ¶¶ 50–54). Although Boyden knew Plaintiff testified, Plaintiff

2012 6 W2L911LL

proffers no evidence that Boyden knew whether Plaintiff gave a statement in support of or opposed to Jacobs, and Plaintiff admits that he and Boyden never discussed the content of his testimony. (Doc. 29 Ex. 2 at pp. 10–11; Ex. 16 at pp. 18–19, 22–23, 29). Additionally, other than attenuated temporal proximity, there is no evidence linking Plaintiff's protected activity to the subsequent discipline, i.e., the second alleged sleeping incident, the desk move and duty restriction (almost six weeks later), the PIP (approximately two months later), or the double-blind translation work review (more than six months later). Plaintiff cannot base the prima facie case of retaliation on temporal proximity alone. *See Spengler v. Worthington Cylinders,* 615 F.3d 481, 494 (6th Cir.2010) (citing *Tuttle v. Metro. Gov't of Nashville,* 474 F.3d 307, 321 (6th Cir.2007). The Court therefore finds that Plaintiff has failed to present sufficient evidence from which a reasonably jury could conclude that Defendant retaliated against Plaintiff for testifying in Jacobs' EEO case.

**\*9** In Plaintiff's response brief, he attempts to include Boyden's EAP referral in Count II. This alleged retaliation arguably remains in Count I because the observations upon which Boyden based the referral occurred *before* Plaintiff testified in Jacobs' EEO case and thus should not be considered in Plaintiff's claim for retaliation *after* he testified. However, given that: (1) it is unclear whether Boyden drafted the April 9, 2009 referral memorandum before or after Plaintiff testified on that same date and (2) that Boyden presented the referral to Plaintiff the day after he testified, Plaintiff can make the argument that the EAP referral should be included in Count II as well. Assuming as much, while temporal proximity is strong, this incident cannot be view as an adverse employment action nor is it sufficient evidence of severe or pervasive retaliatory harassment for the reasons stated in the analysis of Count I.

The Court will also grant Defendant summary judgment on Count IV. Here, Plaintiff alleges that from December 2009 through March 19, 2010, he was retaliated against for having filed his August 2009 EEO complaint. (Doc. 5 at ¶ ¶ 61–63). The alleged retaliations at issue include: Boyden's termination memo from December 2009; the sick leave incident in early February 2010; Boyden's denial of Plaintiff's request for the HIG and TDY assignments in March 2010; and Boyden's counseling of Plaintiff regarding his excessive personal telephone use and frequent absences from his desk in March 2010.

In light of the record presented, a reasonable jury could not conclude that Boyden's actions were caused by Plaintiff's protected activity or that those disciplinary incidents amounted to an adverse employment action or severe or pervasive harassment. Boyden never submitted the termination memo to FBI HQ and Plaintiff remains employed with the FBI despite the events of this case. Boyden acted within his discretion by investigating a suspicious doctor's note, *see* (Doc. 29 Ex. 53 at pp. 23–24), and in any event, ultimately granted Plaintiff paid sick leave during this time. Although Plaintiff was prohibited for applying for TDYs, his normal onsite LA duties remained unchanged and Defendant set forth reasons to deny Plaintiff's requests to apply to offsite jobs that were unrelated to his protected activity. *See* (Doc. 29 Ex. 43 at pp. 5–6; Ex. 45 at p. 2; Ex. 47 at p. 2). Lastly, Boyden's discussions regarding Plaintiff's excessive personal telephone use and frequent absences from his desk occurred after Boyden received additional complaints about Plaintiff from other LAs and observed problems with Plaintiff himself; there is no reasonable inference that the August 2009 EEO complaint was the likely reason for this incident which occurred nearly six months after Plaintiff engaged in protected activity. Other than conclusory speculation and temporal proximity, which is particularly weak given that complained of incidents began four months after Plaintiff filed his August 2009 EEO complaint, the record contains no evidence that Defendant's disciplinary actions had anything to do with his EEO filing.

**\*10** Moreover, even if the Court were to find a prima facie case established as to all three retaliation Counts, Plaintiff offers no legitimate response to Defendant's nonretaliatory reasons for discipline. The record clearly sets forth Defendant's rationale behind its disciplinary decisions. Plaintiff has no evidence that these reasons are pretextual. The Court will therefore grant Defendant's motion for summary judgment.

### IV. CONCLUSION
For the reasons stated above, the Court **GRANTS** Defendants' Motion for Summary Judgment (Doc. 29).

**IT IS SO ORDERED.**

2012 6 W2L911LL

**All Citations**

Not Reported in F.Supp.2d, 2012 WL 2891188

---

                © 2016 Thomson Reuters. No claim to original U.S. Government Works.

KeyCite Yellow Flag - Negative Treatment

Distinguished by Gordon v. U.S. Capitol Police, D.C.Cir.,
February 20, 2015

35 Fed.Appx. 193
This case was not selected for
publication in the Federal Reporter.
Not for Publication in West's Federal Reporter
See Fed. Rule of Appellate Procedure 32.1
generally governing citation of judicial decisions
issued on or after Jan. 1, 2007. See also
Sixth Circuit Rule 28. (Find CTA6 Rule 28)
United States Court of Appeals,
Sixth Circuit.

Delores J. STONE, Plaintiff-Appellant,

v.

BOARD OF DIRECTORS OF THE TENNESSEE
VALLEY AUTHORITY, Defendant-Appellee.

No. 00-6328.
|
May 15, 2002.

Female employee at nuclear power plant brought Title
VII action against employer, alleging sex discrimination
and retaliation. The United States District Court for
the Eastern District of Tennessee, Collier, J., granted
summary judgment for employer, and employee appealed.
The Court of Appeals held that: (1) employer proffered
legitimate, non-sex based and non-retaliatory reasons for
its delay in promoting plaintiff, and such reasons were not
pretext for sex discrimination or retaliation in violation of
Title VII; (2) positive review that employee received was
not adverse employment action, as would support prima
facie case of retaliation under Title VII; (3) fitness-for-
duty examination that employee was forced to undergo
was not adverse employment action, as would support
prima facie case of retaliation under Title VII; and (4)
employee did not establish that she was subjected to
retaliatory hostile work environment in violation of Title
VII.

Affirmed.

West Headnotes (5)

**[1]** **Civil Rights**
🔑 Particular Cases

**Civil Rights**
🔑 Motive or Intent;Pretext

Policy requiring that promotions at nuclear
power facility be based on seniority from
last date of hire, as well as fact that
all employees being promoted to position
that female employee sought had to receive
specialized training, were legitimate, non-
sex based and non-retaliatory reasons for
delay in promoting plaintiff, and such reasons
were not pretext for sex discrimination or
retaliation in violation of Title VII. Civil
Rights Act of 1964, § 701 et seq., 42 U.S.C.A.
§ 2000e et seq.

Cases that cite this headnote

**[2]** **Civil Rights**
🔑 Particular Cases

Positive review that employee of nuclear
power plant received was not adverse
employment action, as would support prima
facie case of retaliation under Title VII,
even though review was not accompanied by
supporting comments. Civil Rights Act of
1964, § 701 et seq., 42 U.S.C.A. § 2000e et seq.

3 Cases that cite this headnote

**[3]** **Civil Rights**
🔑 Particular Cases

Fitness-for-duty examination that employee
of nuclear power plant was forced to undergo
was not adverse employment action, as
would support prima facie case of retaliation
under Title VII; fitness examination did not
affect employee's terms and conditions of
employment, in that she received positive
annual review and was promoted shortly after
the examination. Civil Rights Act of 1964, §
701 et seq., 42 U.S.C.A. § 2000e et seq.

2 Cases that cite this headnote

**[4]** **Civil Rights**
👉 Motive or Intent;Pretext

Inappropriate expressions of anger by female employee of nuclear power plant constituted legitimate, non-retaliatory reason for requirement that employee undergo fitness-for-duty examination, and such reason was not pretext for retaliation under Title VII. Civil Rights Act of 1964, § 701 et seq., 42 U.S.C.A. § 2000e et seq.

Cases that cite this headnote

**[5]** **Civil Rights**
👉 Harassment;Work Environment

Female employee of nuclear power plant did not establish that she was subjected to retaliatory hostile work environment in violation of Title VII, arising out of her receipt of positive annual performance evaluation, which did not contain supporting comments, and requirement that employee undergo fitness for duty examination; reasonable person in employee's position would not have believed that annual evaluation or fitness examination were sufficiently severe or pervasive to create retaliatory hostile environment. Civil Rights Act of 1964, § 701 et seq., 42 U.S.C.A. § 2000e et seq.

Cases that cite this headnote

**\*194** On Appeal from the United States District Court for the Eastern District of Tennessee.

**\*195** Before GUY and CLAY, Circuit Judges; COHN, District Judge. \*

**Opinion**

PER CURIAM.

**\*\*1** Plaintiff, DeLores J. Stone, appeals from the summary judgment granted to defendant, Board of Directors of the Tennessee Valley Authority (TVA), on her Title VII sex discrimination and retaliation claims. 42 U.S.C. § 2000e. Plaintiff argues that there are material issues of fact precluding summary judgment. After review of the record and consideration of the arguments presented on appeal, we affirm.

I.

Plaintiff was hired at the TVA's Sequoyah Nuclear Plant in 1978 as an instrument mechanic. After completing training, she worked as a senior instrument mechanic (SIM) from 1982 to 1988, when she lost her job through a reduction in force. From 1990 until 1995, plaintiff worked as a contract employee for TVA. On March 6, 1995, plaintiff was hired at TVA's Widows Creek Fossil Plant as an instrument mechanic.

TVA also hired Ronald J. Wells on February 10, 1995, Jerome W. Shulock on February 10, 1995, and Mark Thomas on March 13, 1995, as instrument mechanics at Widows Creek. Wells and Shulock, like plaintiff, had worked as SIMs for TVA in the 1980s. In addition, Brian Bradford transferred from Sequoyah, where he was a SIM, to work as an instrument mechanic at Widows Creek. There were no openings for SIMs at Widows Creek at this time.

Instrument mechanics and SIMs calibrate and repair instruments that measure and regulate the pressures, temperatures, flows, and other aspects of the operation of equipment at a power plant. SIMs perform more complex work with digital electronic controls and computers, and are paid more than instrument mechanics. Both types of mechanics are represented by the International Brotherhood of Electrical Workers (IBEW). The IBEW is a member of the Tennessee Valley Trades and Labor Council (Council), an association of labor organizations representing TVA employees in trades and labor bargaining units under the General Agreement Between TVA and the Council.

In the early 1980s, all SIM training was done centrally at a training center near Sequoyah. In 1988, the TVA began separate training programs at the fossil plants because the new systems at the fossil plants differed from those in the nuclear plants. In 1991, TVA and IBEW agreed to Bulletin SIM-08, which outlined a two-track SIM

training program at fossil and hydro plants. Employees with previous SIM training had to complete an eight-week course. Those employees with no previous training had to complete six self-study modules as well as the eight-week course. The eight-week course was offered only when there was a vacant SIM position. TVA claims that all the new hires and transfers in 1995 were told that they would have to complete SIM training before they could be promoted from instrument mechanic to SIM, but plaintiff denies being told this.

In 1997, Widows Creek had two SIM vacancies. Eligibility for SIM training was determined by a joint union/management committee at the plant and approved by a TVA-wide joint union/management committee. Over the years, eligibility was always based on seniority in the instrument **\*196** mechanic classification from the date of last hire. Brian Bradford and David K. Blizzard were chosen because their seniority based on the date of last hire was greater than that of the other instrument mechanics at Widows Creek, including plaintiff. Bradford had previously worked as a SIM, but Blizzard had no previous SIM training or experience. Plaintiff filed a formal EEO administrative complaint on June 13, 1997, alleging discrimination in being passed over for SIM training and promotion.

**\*\*2** Plaintiff also complained to management about performing SIM duties while being paid as an instrument mechanic. She had several meetings with management. On February 20, 1998, plaintiff met with Jerald T. Smith, plaintiff's production supervisor; Steven Baugh, production manager for Widows Creek; and Lee Boggs, a TVA human resources consultant. Plaintiff claims she left the meeting when Baugh raised his voice and shook his fist at her. After plaintiff left the room, Boggs suggested plaintiff should be sent for a fitness-for-duty evaluation because of anger management issues. Thomas W. Sajwaj, Ph.D., the psychologist who manages TVA's fitness-for-duty program, told Boggs that an examination is appropriate when an employee appears hostile, combative, and angry.

TVA presented evidence that prior to and at this meeting, plaintiff was hostile and exhibited inappropriate signs of anger toward her supervisors and others. Plaintiff states that she was always professional and denies exhibiting inappropriate anger. Prior to the February 20 meeting, however, plaintiff decided to stop paying union dues.

It is undisputed that in January 1998 while talking to a payroll clerk in Knoxville about stopping the payroll deductions for her union dues, plaintiff called the clerk a bitch. Later that same day she asked another clerk, "Why the hell can't I get any help from you damn people." Both clerks complained, and these complaints were conveyed to Widows Creek management. The clerks characterized plaintiff's behavior as hostile and offensive. Plaintiff's husband also testified that plaintiff's accumulated frustration and stress caused her to be angry all the time. He stated: "[Y]ou couldn't talk to her." Plaintiff argues that her husband was testifying about her behavior after the fitness-for-duty examination. But Robert Stone clearly identified the time period for her angry behavior as six months prior to March 1998. This period would predate the fitness-for-duty examination in February 1998.

On February 23, 1998, plaintiff was examined by Dr. Sajwaj and subsequently an independent psychologist. Dr. Sajwaj determined that plaintiff could safely return to work. Plaintiff states she was so humiliated by the examination, her doctor placed her on medical leave. On April 1, 1998, plaintiff filed a formal administrative complaint with TVA's EO compliance staff alleging retaliation.

In March 1998, Widows Creek decided to promote all remaining instrument mechanics to SIMs as part of a new organizational structure for the plant. The remaining five instrument mechanics were scheduled for SIM training in two groups. Wells, Shulock, and Roden were to begin March 30, and the second group, composed of plaintiff and another male, Glen Hagan, were to begin after the first group completed training. TVA states that it divided the training for workload considerations to make sure mechanics were available to work on the plant floor at all times. The groups were chosen on the basis of seniority from date of last hire. Plaintiff filed a formal EEO administrative complaint on May 5, 1998, alleging retaliation in being **\*197** placed in the second training group. Plaintiff began her training on June 22, 1998, and was promoted to SIM on September 4, 1998.

**\*\*3** In the Spring of 1998, plaintiff's production supervisor decided he would no longer include written comments on annual service reviews if the overall rating was fully adequate. Supporting comments are required by the TVA service review procedures only when the overall

rating is better or less than fully adequate. In April 1998, plaintiff received a service report with a fully adequate overall rating and no supporting comments. During the same period, Smith reviewed approximately ten other employees and provided no supporting comments on their service reports. Plaintiff complained to management, and on May 19, 1998, she contacted a TVA EO counselor alleging retaliation. In order to resolve the matter, Smith revised the review to include comments similar to those provided in previous years. On July 15, 1998, plaintiff filed a formal complaint with the TVA compliance office alleging retaliation based on the lack of comments.

On July 14, 1999, plaintiff filed her complaint alleging that she was discriminated against on the basis of sex when she was passed over for promotion in 1997 and 1998. She also alleged illegal retaliation in failing to place her in the first SIM training group in 1998, ordering a fitness-for-duty examination, and failing to include comments on her positive annual review. All of plaintiff's formal EEO administrative complaints were pending at the time the lawsuit was filed. The district court granted summary judgment for the TVA on August 31, 2000. Plaintiff appealed.

II.

We review the district court's grant of summary judgment *de novo. Smith v. Ameritech,* 129 F.3d 857, 863 (6th Cir.1997). Summary judgment is appropriate when there are no issues of material fact in dispute, and the moving party is entitled to judgment as a matter of law. FED. R. CIV. P. 56(c). In deciding a motion for summary judgment, the court must view the factual evidence and draw all reasonable inferences in favor of the non-moving party. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 587, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986).

A. Sex Discrimination
Discrimination may be proven by direct or circumstantial evidence. When relying on circumstantial evidence, the plaintiff must prove by a preponderance of the evidence a *prima facie* case of discrimination by introducing evidence sufficient to support a finding that (1) plaintiff was a member of a protected class, (2) plaintiff suffered an adverse employment action, (3) plaintiff was qualified for the position not gained, and (4) a person not of

the protected class was selected over plaintiff. *McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 802, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973). Once the plaintiff has made a *prima facie* case, the employer must rebut the presumption of discrimination by producing evidence that someone was preferred over plaintiff for a legitimate, nondiscriminatory reason. *Manzer v. Diamond Shamrock Chems. Co.,* 29 F.3d 1078, 1082 (6th Cir.1994). The plaintiff then bears the burden of producing evidence from which a jury may reasonably reject the employer's explanation. The plaintiff must show that (1) the proffered reasons have no basis in fact, (2) the proffered reasons did not actually motivate the employer, or (3) the proffered reasons were insufficient to motivate the employer. The first type of showing consists of evidence that the employer's explanation had no factual basis. In the second, the **\*198** plaintiff admits the factual basis underlying the employer's proffered explanation, but shows circumstances which tend to prove that an illegal motivation was more likely than that offered by the defendant. The third type ordinarily consists of evidence that other employees were not treated similarly. *Id.* at 1084.

**\*\*4** **[1]** The district court found that plaintiff established a *prima facie* case of discrimination, but that plaintiff failed to present evidence to refute TVA's legitimate nondiscriminatory reasons for not promoting plaintiff earlier. Those legitimate reasons were that promotions were based on seniority from date of last hire, and that all instrument mechanics received SIM training before being promoted.

Plaintiff argues that the General Agreement did not require that seniority be determined from the date of last hire for promotion purposes. Paragraph B-III.2.d.1 of the General Agreement states that preference is given to *qualified* employees for promotions based on the "length of TVA service." Paragraph III-B.2.d.3 states that when there are no qualified employees applying for a position, seniority is determined based on the last employment date. Plaintiff argues that since she was qualified, her seniority should not have been based on her date of last hire. Plaintiff proffered Alvin Rosamond's affidavit stating that plaintiff needed no additional training, and that people who previously worked as SIMs but were rehired as instrument mechanics were traditionally promoted automatically to SIM after one year of service. Plaintiff argues that the district court improperly weighed evidence and judged credibility while ignoring this evidence.

The issue, however, is not whether Widows Creek violated the General Agreement or failed, contrary to past TVA practices, to recognize previous SIM experience. The question is whether plaintiff was passed over for promotion based on her sex. Scott Bynum told Rosamond that Widows Creek would require SIM training for not only plaintiff, but also Wells and Bradford, all of who had previous SIM experience. Wells and Shulock were passed over for promotion in 1997 even though they had SIM experience before their last date of hire. Blizzard, one of the instrument mechanics trained and promoted in 1997, had no previous SIM experience. Wells, Bradford, and Shulock all had to take SIM training before being promoted. The undisputed evidence shows that TVA decided to promote instrument mechanics based on seniority from the date of last hire; and that all instrument mechanics, including male instrument mechanics who, like plaintiff, previously worked as SIMs, had to undergo new training.

Plaintiff argues that the district court improperly ignored the evidence that Wells had only three weeks of training, as opposed to the entire eight weeks that plaintiff was required to complete. TVA presented evidence that Wells underwent eight weeks of training. While there may be a question of fact as to actual number of weeks of training, it is undisputed that Wells was not promoted to SIM until June 1, 1998, a little more than eight weeks after he began training on March 30, 1998. Plaintiff began training on June 22, 1998, and was also promoted a little more than eight weeks later on September 7, 1998. The mere existence of *some* alleged factual dispute does not defeat an otherwise properly supported motion for summary judgment. There must be no *genuine* issue of *material* fact. A fact is "material" only if its resolution will affect the outcome of the lawsuit. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). Wells did not receive **\*199** his promotion in a shorter time period than plaintiff. The fact that he might not have sat in the classroom as long as plaintiff and the other instrument mechanics is *de minimus* employment action. This discrepancy cannot support a discrimination claim.

 **\*\*5** Plaintiff finally argues that TVA's proffered reasons have no basis in fact because she claims that it was not necessary to train the instrument mechanics in stages in 1998 to provide continuous coverage on the plant floor. According to plaintiff, the mechanics were readily available on the floor as needed while they were in training. But speculation that there were better or other ways to provide coverage on the floor does not show that the proffered justification was merely a pretext for discrimination. *See Furnco Constr. Corp. v. Waters,* 438 U.S. 567, 577-78, 98 S.Ct. 2943, 57 L.Ed.2d 957 (1978).

Plaintiff failed to present any evidence upon which a jury could reasonably conclude that TVA's decision to require training and choose instrument mechanics on the basis of seniority from the date of last hire was a pretext for treating plaintiff differently from other similarly situated, male instrument mechanics at Widows Creek.

B. Retaliation

To establish a *prima facie* case of retaliation, plaintiff must show that (1) she engaged in protected activity, (2) defendants knew of the protected activity, (3) defendants took an adverse employment action or plaintiff was subjected to severe or pervasive retaliatory harassment by a supervisor, and (4) there was a causal connection between the protected activity and the adverse employment action or harassment. If plaintiff establishes this *prima facie* case, the burden shifts to defendants to articulate legitimate, nondiscriminatory reasons for its actions. Plaintiff must then demonstrate that the proffered reasons were "not the true reason" for the employment decision. The plaintiff bears the burden of persuasion throughout the entire process. *Morris v. Oldham County Fiscal Court,* 201 F.3d 784, 793 (6th Cir.2000).

Summary judgment was proper on plaintiff's claim that the failure to train her in the first group in 1998 was retaliation. As discussed above, plaintiff failed to show that seniority from the date of last hire and continuous floor coverage were not the "true reasons" for placing her in the second training group.

 **[2]**  **[3]** The district court granted summary judgment on her remaining retaliation claims, finding neither the fitness examination nor the positive review were adverse employment actions. An adverse employment action is a materially adverse change in the terms or conditions of the plaintiff's employment caused by the employer's actions. *Hollins v. Atl. Co.,* 188 F.3d 652, 662 (6th Cir.1999). The materially adverse change must be "more disruptive than a mere inconvenience or an alteration of job responsibilities." *Id.* (citation omitted). It may be indicated by termination, demotion through a decrease in

wage or salary, a material loss of benefits, significantly diminished material responsibilities, or other indices that might be unique to a particular situation. *Id. De minimus* employment actions are not materially adverse employment actions. *Bowman v. Shawnee State Univ.,* 220 F.3d 456, 462 (6th Cir.2000).

**6 Clearly a positive review, with or without supporting comments, is not an adverse employment action. *See Primes v. Reno,* 190 F.3d 765, 767 (6th Cir.1999) (a mid-range performance evaluation is not an adverse employment action); **200** *Hollins,* 188 F.3d at 662 (lowered performance evaluation was not an adverse employment action where it did not affect wages paid). Plaintiff proffered no evidence showing that her annual review affected the terms and conditions of her employment.

**[4]** The same is true with the fitness examination. There was no evidence that the fitness examination affected the terms and conditions of plaintiff's employment. Plaintiff received a positive annual review and was promoted to SIM shortly after the fitness examination. Not everything that makes an employee unhappy is an adverse employment action. *Primes,* 190 F.3d at 767. [1]

**[5]** While plaintiff argues that the evaluation and the fitness examination were adverse employment actions, she also seems to characterize them as harassment. To establish that an employer's conduct constitutes severe or pervasive retaliatory harassment, the plaintiff must show that the "workplace is permeated with discriminatory intimidation, ridicule, and insult that is sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment." *Harris v. Forklift Sys., Inc.,* 510 U.S. 17, 21, 114 S.Ct. 367, 126 L.Ed.2d 295 (1993) (internal

quotation marks and citations omitted). *See also Morris,* 201 F.3d at 790. We approach the question from both an objective and subjective perspective. We look both to whether a reasonable person in plaintiff's position would find that the alleged conduct constitutes severe or pervasive retaliation and to whether the plaintiff subjectively perceived the employer's actions as being severe and pervasive retaliation. *See Harris,* 510 U.S. at 21, 114 S.Ct. 367. Appropriate factors to consider "include the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance." *Id.* at 23, 114 S.Ct. 367.

Plaintiff had a strong subjective belief that she was a victim of retaliatory harassment as a result of the lack of comments on her review and the fitness-for-duty examination. Yet from an objective perspective, a positive annual review, even one without comments, is not hostile or abusive, particularly when ten other employees receive reviews without comments. The fitness-for-duty examination was an isolated incident that was conducted pursuant to TVA policy after plaintiff exhibited signs of anger management problems. The examination had no effect on her employment status or her ability to perform her job. Viewing the evidence as a whole, a reasonable person in plaintiff's position would not have believed that the annual evaluation or the fitness examination were sufficiently severe or pervasive to create a retaliatory hostile environment.

**7 AFFIRMED.

**All Citations**

35 Fed.Appx. 193, 2002 WL 1001031

---

Footnotes

\* The Honorable Avern Cohn, United States District Judge for the Eastern District of Michigan, sitting by designation.

1 Summary judgment may also be appropriate on alternative grounds. TVA offered evidence that other employees were asked to undergo an examination for inappropriate expressions of anger. Plaintiff does not dispute her statements to the Knoxville payroll clerks. That behavior demonstrated inappropriate expressions of anger. Thus, even if the examination is an adverse action, the examination was ordered because of her inappropriate behavior-a legitimate nondiscriminatory reason-which plaintiff did not refute.

---

End of Document

© 2016 Thomson Reuters. No claim to original U.S. Government Works.