Exhibit A

Nassif Ins. Agency, Inc. v. Civic Property and Cas. Co., Slip Copy (2005)

2005 WL 712578, 2005 Fed.App. 0227N

2005 WL 712578

This case was not selected for
publication in the Federal Reporter.

Not for Publication in West's Federal Reporter
See Fed. Rule of Appellate Procedure 32.1
generally governing citation of judicial decisions
issued on or after Jan. 1, 2007. See also
Sixth Circuit Rule 28. (Find CTA6 Rule 28)
United States Court of Appeals, Sixth Circuit.

NASSIF INSURANCE AGENCY,
INC., Plaintiff-Appellant,

v.

CIVIC PROPERTY AND CASUALTY
COMPANY; Neighborhood Spirit Property and
Casualty Company, Defendants-Appellees.

No. 03-2618.
|
March 30, 2005.

On Appeal from the United States District Court for the
Eastern District of Michigan.

**Attorneys and Law Firms**

Jamal J. Hamood, Hamood & Fergestrom, Troy, MI, for
Plaintiff-Appellant.

Kevin S. Hendrick, Clark Hill, Detroit, MI, for
Defendants-Appellees.

Before BOGGS, Chief Judge; KENNEDY and
MARTIN, Circuit Judges.

**Opinion**

PER CURIAM.

 **\*1** Appellant Nassif Insurance Agency (hereinafter NIA)
appeals a grant of summary judgment for Appellees, Civic
Property and Casualty Company and Neighborhood
Spirit Property and Casualty Company (hereinafter the
Companies) on the ground that disputed questions
of fact remained concerning NIA's termination as an
insurance agent for the Companies. Because the district
court correctly concluded that NIA failed to rebut
the Companies' evidence that NIA was terminated for
legitimate business reasons, we affirm the ruling.

I

NIA is an independent insurance agency owned by Walid
Nassif and located in Dearborn, Michigan. At the time
of the dispute, NIA's clientele was composed primarily of
members of the large Arab-American community living
in East Dearborn. NIA was a non-exclusive agent of the
Companies, which specialized in providing insurance to
businesses and homeowners in underserved urban areas.
At the time the dispute arose, the Companies had four
agents serving the Dearborn area and more policyholders
in East Dearborn than in any other part of Michigan
except the City of Detroit.

NIA became a non-exclusive agent of the Companies
in 1997. The agency agreement Walid Nassif signed
gave him the authority to execute insurance policies
"in accordance with the Company's underwriting rules
and regulations...." Either party could terminate the
relationship on 90 days' written notice for any reason and
without stating a reason.

In Fall 2001, the Companies identified seven or eight
agencies, including NIA, which were not complying with
the underwriting guidelines and other rules and which
were experiencing high loss ratios on the policies they
wrote. Each of these agencies was offered the opportunity
to correct its practices under the Unprofitable Agency
Rehabilitation Plan. This plan primarily required the
agencies to make proper inspections of new properties
and to improve their loss ratios-a result that would presumably
follow from insuring only properties that met the
Companies' standards. Upon signing the Rehabilitation
Plan, the agent's authority to bind policies was suspended.
The agent was also warned that "failure to meet all of the
conditions of this plan could result in the termination of
their appointment with the company."

NIA apparently did not sign the Rehabilitation Plan. Still
trying to bring NIA into compliance, the Companies sent
Walid Nassif a letter in mid-October 2001 notifying him
that his authority to bind policies had been suspended and
outlining the procedure to rehabilitate his agency. The
letter stated that the suspension would continue until
he was notified otherwise in writing. The procedure for
bringing the agency into compliance was the same as that
provided in the Rehabilitation Plan. Nassif claims not
to have received the letter. However, in early November

2005 WL 712578, 2005 Fed.App. 0227N

2001, the Companies' representatives met with Nassif in person, told him that his authority had been suspended, explained what steps he needed to take to improve his agency, and gave him another copy of the October letter. Nassif claims that this meeting was the first he heard of his suspension and that at the end of the meeting he was told he could have his authority to bind policies back. He has produced no written evidence that his suspension was lifted.

**\*2** NIA not only continued to bind policies after the suspension but its salesmen also continued to fail to meet the Companies' inspection requirements. At least three of the properties for which NIA wrote policies were determined by later inspectors not to meet the Companies' guidelines. As Appellant was already suspended, the Companies were unwilling to accept even a single non-complying policy from NIA. On April 18, 2002, the Companies notified Appellant that they were terminating the agency, effective August 18, 2002, "for failure to comply with your business plan and violation of your binding authority."

NIA sued the Companies, claiming 1) that they terminated NIA because of its high loss ratios in violation of the Michigan Essential Insurance Act, Mich. Comp. Laws § 500.1209; 2) that they terminated Nassif's customers after his termination; and 3) that they failed to pay him commissions on policies he had written. NIA acknowledged prior to the hearing on the motion for summary judgment that it had no evidence on issue two, and NIA does not appeal issue three.

At the close of discovery, the Companies filed a motion for summary judgment. The sum total of NIA's rebuttal evidence was an unsigned, unnotarized "affidavit" by Walid Nassif. The district judge granted summary judgment for the Companies. NIA timely filed this appeal.

## II

We review a grant of summary judgment *de novo. Summers v. Leis,* 368 F.3d 881, 885 (6th Cir.2004). Summary judgment is appropriate where the evidence offered by the parties in the form of "pleadings, depositions, answers to interrogatories, ... admissions on file, [and] affidavits" demonstrates no genuine issue of material fact such that the moving party is entitled to

judgment as a matter of law. Fed.R.Civ.P. 56(c). In deciding a motion for summary judgment, the court considers all factual evidence and draws all reasonable inferences in favor of the non-moving party. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 587, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986). Once the moving party has met its burden of persuasion, the non-moving party must offer more than a mere scintilla of evidence in rebuttal. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 252, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986); *accord Liberty Mut. Fire Ins. Co. v. Massarone,* 326 F.3d 813, 815 (6th Cir.2003). That evidence must be of the kind admissible at trial. Fed.R.Civ.P. 56(e).

Under Section 500.1209(2)-(3) of the Michigan Essential Insurance Act (MEIA), insurance companies cannot terminate non-exclusive agents "primarily" because of the location in which they sell insurance or because of a high actual or expected loss ratio, if that ratio is "related in whole or in part to the geographical location of that business." Mich. Comp. Laws § 500.1209(3)(a)-(b). The purpose of the statute is to prevent so-called "redlining." *Novak v. Nationwide Mut. Ins. Co.,* 235 Mich.App. 675, 599 N.W.2d 546, 551 (Mich.1999). It does not prevent the termination of agents who fail "to perform as provided by the contract between the parties." Mich. Comp. Laws § 500.1209(2)(d).

**\*3** NIA claimed that it was terminated in violation of the MEIA because it sold policies in a geographic region with high loss ratios. The Companies argued that they ended their relationship with NIA not because of the location in which the Agency sold its policies but rather because NIA failed to abide by the Companies' rules and guidelines. [1] The Companies offered admissible evidence in the form of depositions, internal business documents, contracts, and affidavits to buttress their claims.

In rebuttal, Appellant offered only the unsigned, unnotarized "affidavit" of Walid Nassif, which made the following conclusory assertions: (1) that his authority to bind policies was restored to him at the November 7, 2001 meeting; (2) that he "followed all of the Defendants' recommendations;" (3) that he obtained prior approval for all policies he wrote even though there was no requirement that he do so; and (4) that the Companies told him he was being terminated due to his high loss ratio.

2005 WL 712578, 2005 Fed.App. 0227N

Unsigned affidavits do not comply with Fed.R.Civ.P. 56(e). *See DeBruyne v. Equitable Life Assurance Soc'y,* 920 F.2d 457, 471 (7th Cir.1990); *Mason v. Clark,* 920 F.2d 493, 495 (8th Cir.1990); *Wright v. Asset Acceptance Corp.,* No. C-3-97-375, 2000 WL 33216031, at *5 (S.D.Ohio 2000) ("it is axiomatic that an 'affidavit' which is unsigned and not notarized cannot qualify as proper Rule 56 evidence."). However, even if Nassif's affidavit were admissible, under Fed.R.Civ.P. 56(e), an affidavit offered in response to a motion for summary judgment must "set forth specific facts" and not rest on "mere allegations." Nassif's affidavit does not give specific facts. Furthermore, conspicuously absent from NIA's case is any written evidence to support his claims. He does not, for instance, provide a letter reauthorizing him to bind policies after his suspension, nor does he rebut the Companies' documents showing that he sold policies on unacceptable properties. The fact that he might only have done so several times is irrelevant since the Companies gave him ample warning that *any* further breaches of policy could be grounds for termination.

NIA failed to produce a scintilla of evidence that the Companies had terminated his agency contract for anything other than failure to follow the proper underwriting guidelines and rules. We therefore AFFIRM the judgment of the district court.

**All Citations**

Slip Copy, 2005 WL 712578, 2005 Fed.App. 0227N

Footnotes

1    NIA cites the dissent in *Beydoun v. Republic Ins. Co.,* a case that also deals with an Arab-American insurance agent who sells insurance in East Dearborn being terminated for malfeasance, as evidence that NIA cannot be terminated because of its high loss ratios. No. 96-1292, 1997 LEXIS 12018 (6th Cir. May 21, 1997). However, the majority's interpretation of the MEIA says exactly the opposite:

When an agent handles only a particular circumscribed territory such as East Dearborn and suffers huge losses over a long period of time, the losses-literally speaking-bear some 'relationship' to the 'location' of the risks underwritten. But firing an agent with huge losses that are clearly related to flawed business practices is not redlining, and there is no Michigan case suggesting that it is. GNB's termination under these circumstances clearly does not constitute redlining and is not in violation of the Michigan Essential Insurance Law [sic].

*Id.* at *10.

End of Document                    © 2016 Thomson Reuters. No claim to original U.S. Government Works.

481 Fed.Appx. 244
This case was not selected for
publication in the Federal Reporter.
Not for Publication in West's Federal Reporter.
See Fed. Rule of Appellate Procedure 32.1
generally governing citation of judicial decisions
issued on or after Jan. 1, 2007. See also
Sixth Circuit Rule 28. (Find CTA6 Rule 28)
United States Court of Appeals,
Sixth Circuit.

Carolyn A. SFAKIANOS, Plaintiff–Appellant,

v.

SHELBY COUNTY GOVERNMENT,
Defendant–Appellee.

No. 11–5658.
|
June 6, 2012.

**Synopsis**

**Background:** Employee brought action against county under Title VII alleging reverse race discrimination. The United States District Court for the Western District of Tennessee entered summary judgment in county's favor, and denied employee's motion for relief from judgment. Employee appealed.

**Holdings:** The Court of Appeals, Cook, Circuit Judge, held that:

[1] unsigned affidavit submitted by employee could not be considered in ruling on employer's motion for summary judgment, and

[2] district court did not abuse its discretion in denying employee's motion for relief from judgment.

Affirmed.

West Headnotes (2)

[1]    **Federal Civil Procedure**
       👉 Form and requisites

Unsigned affidavit submitted by employee in her employment discrimination case could not be considered in ruling on employer's motion for summary judgment. 28 U.S.C.A. § 1746(2); Fed.Rules Civ.Proc.Rule 56(e), 28 U.S.C.A.

2 Cases that cite this headnote

[2]    **Federal Civil Procedure**
       👉 Further evidence or argument

District court did not abuse its discretion in denying employee's motion for relief from judgment after entry of summary judgment in employer's favor in her employment discrimination case, even though court had refused to consider her unsigned summary judgment affidavit, and she subsequently submitted signed affidavit, where district court's summary judgment order explained why it would have granted employer's motion even if it had considered contents of affidavit. Fed.Rules Civ.Proc.Rule 60(b), 28 U.S.C.A.

7 Cases that cite this headnote

**\*244** On Appeal from the United States District Court for the Western District of Tennessee.

**\*245** Before: COOK and STRANCH, Circuit Judges; LAWSON, District Judge. [*]

**Opinion**

COOK, Circuit Judge.

**\*\*1** Carolyn Sfakianos appeals the district court's grant of summary judgment in favor of Shelby County Government ("SCG") on her Title VII reverse race discrimination claims. Sfakianos also appeals the district court's denial of her Federal Rule of Civil Procedure 60(b) motion for relief from judgment. We affirm.

In both her summary judgment brief before the district court and her appellate briefs, Sfakianos relies heavily on a document labeled "Affidavit of Carolyn A. Sfakianos" that accompanied her opposition to SCG's motion for summary judgment. The district court ruled that Federal

Rule of Civil Procedure 56(e)[1] foreclosed reliance on this document to oppose SCG's motion because it did not include a properly attested signature. *See, e.g., Alexander v. CareSource,* 576 F.3d 551, 558–59 (6th Cir.2009) ( "[U]nauthenticated documents do not meet the requirements of Rule 56(e)."); *Nassif Ins. Agency, Inc. v. Civic Prop. & Cas. Co.,* No. 03–2618, —— Fed.Appx. ——, ——, 2005 WL 712578, at *3 (6th Cir. Mar. 30, 2005) ("Unsigned affidavits do not comply with Fed.R.Civ.P. 56(e)."). After the district court entered judgment in favor of SCG, Sfakianos sought relief from judgment under Rule 60(b), attaching a new, signed copy of the disputed document. The district court denied Sfakianos's motion as futile, noting that even if it granted the motion and considered the contents of the affidavit it nonetheless would reach the same conclusion. Sfakianos appeals both the summary judgment and the district court's denial of 60(b) relief.

**[1]** The district court properly declined to consider Sfakianos's affidavit in ruling on SCG's summary judgment motion. Sfakianos cannot dispute that she failed to provide the district court with a proper affidavit prior to entry of judgment. She doesn't quarrel with the principle that affidavits must be signed and properly attested to be cognizable under Rule 56. *See, e.g., Nassif,* 2005 WL 712578, at *3. As the Eighth Circuit explains, "an 'unsigned affidavit' is a contradiction in terms. By definition an affidavit is a 'sworn statement in writing made ... under an oath or on affirmation before ... an authorized officer.' " *Mason v. Clark,* 920 F.2d 493, 495 (8th Cir.1990) (quoting Webster's Third New International Dictionary 35 (1965)). As the district court noted, an unsworn declaration may satisfy Rule 56(e) if

it is signed, dated, and recites that it was signed "under penalty of perjury that the foregoing is true and correct." 28 U.S.C. § 1746(2). However, Sfakianos's filing did not comply with section 1746, either.

**[2]** The district court also properly exercised its discretion in denying as futile Sfakianos's 60(b) motion. Rule 60(b) accords district courts wide discretion in accepting and considering new versions of previously submitted documents post-judgment. *See Gumble v. Waterford Twp.,* 171 Fed.Appx. 502, 505 (6th Cir.2006). In this case, where the district court's summary judgment order explains why the court would grant SCG's motion even if it considered the contents of Sfakianos's affidavit, **\*246** declining to reopen the case easily falls within the court's sound discretion.[2]

**\*\*2** Given the absence of support for Sfakianos's claims beyond her inadmissible affidavit, the district court properly granted SCG's motion for summary judgment. After carefully reviewing the record, the applicable law, and the parties' briefs, we find that the district court's 63–page opinion correctly sets forth the governing law and background of the case as described in admissible documents, including the complaint, SCG's statement of facts, and several depositions. As to each claim, the district court examined the admissible evidence and correctly found it insufficient to survive summary judgment. We adopt these portions of the district court's analysis and affirm its judgment.

**All Citations**

481 Fed.Appx. 244, 2012 WL 2044372

---

Footnotes

\*   The Honorable David M. Lawson, United States District Judge for the Eastern District of Michigan, sitting by designation.

1   Amendments effective as of December 2010 reorganized Rule 56 and moved the relevant portion of 56(e) to 56(c)(4). Because the district court's opinion refers to "56(e)," we will do the same for the sake of consistency.

2   We observe that the affidavit that Sfakianos attached to her Rule 60(b) motion similarly would fail Rule 56(e) review because the witnessing notary's commission expired more than two weeks before Sfakianos swore the affidavit.

---

    © 2016 Thomson Reuters. No claim to original U.S. Government Works.

  © 2016 Thomson Reuters. No claim to original U.S. Government Works.

Case 2:15-cv-12312-MOB-EAS ECF No. 58-2, PageID.1665 Filed 10/17/16 Page 7 of 71
Iron Workers' Local 25, Pension Fund v. Sova Steel, Inc., Not Reported in F.Supp.2d...
2010 WL 3123277

2010 WL 3123277
Only the Westlaw citation is currently available.

**This decision was reviewed by West editorial
staff and not assigned editorial enhancements.**

United States District Court,
E.D. Michigan,
Southern Division.

IRON WORKERS' LOCAL 25,
PENSION FUND, et al., Plaintiffs,
v.
SOVA STEEL, INC. and Alex M. Sova, Defendants.

Civil Case No. 08–13074.
|
Aug. 9, 2010.

**Attorneys and Law Firms**

David J. Selwocki, Sullivan, Ward, Southfield, MI, for
Plaintiff.

David G. Gorcyca, Flood Lanctot Connor Stablein
PLLC, Royal Oak, MI, Gerald W. Van Wyke, Ufer &
Spaniola, Troy, MI, for Defendants.

*OPINION & ORDER DENYING DEFENDANTS'
MOTION FOR REHEARING [Doc. No. 40]*

SEAN F. COX, District Judge.

**\*1** Plaintiff Iron Workers' Local 25 Pension Fund *et
al.* ("the Plaintiffs") filed this action against Defendants
Sova Steel, Inc. ("Sova Steel") and Alex M. Sova ("Sova")
on July 16, 2008. On November 18, 2009, the Court
granted the Plaintiffs' motions for summary judgment and
to amend complaint [*See* Doc. No. 35]. The matter is
currently before the Court on the Defendants' motion for
rehearing [Doc. No. 40]. The Court declines to hear oral
argument pursuant to E.D. MICH. L.R. 7.1(h)(2). For
the reasons below, the Court **DENIES** the Defendants'
motion [Doc. No. 40].

STANDARD OF REVIEW

The Court's local rule regarding motions for rehearing
states as follows, in pertinent part:

> Generally, and without restricting
> the court's discretion, the court will
> not grant motions for rehearing or
> reconsideration that merely present
> the same issues ruled upon by
> the court, either expressly or by
> reasonable implication. *The movant
> must not only demonstrate a palpable
> defect by which the court and the
> parties have been misled but must also
> show that correcting the defect will
> result in a different disposition of the
> case.*

E.D. MICH. L.R. 7.1(h)(3) (emphasis added).

Motions for reconsideration or rehearing "not properly
used as a vehicle to re-hash old arguments or to
advance positions that could have been argued earlier
but were not." *Fish v. Home Depot,* 2010 WL 419980, *4
(E.D.Mich. Feb.1, 2010), citing *Smith v. Mount Pleasant
Schools,* 298 F.Supp.2d 636, 637 (E.D.Mich.2003).

ANALYSIS

In their motion, the Defendants advance six arguments:
1) that the Sixth Circuit's holding in *Grimaldi Concrete,*
30 F.3d 692 (6th Cir.1994) is inapplicable in this matter;
2) that the Court should have considered the affidavit of
Mark Weisberg in support of its arguments in the prior
motions; 3) that Mr. Sova should not have been found
personally liable; 4) that the Defendants counterclaim
should not have been dismissed; 5) that the Court erred
in granting the Plaintiffs' motion to amend; and 6) that
the Court erred in striking the Defendants' supplemental
brief.

At the outset, the Court notes that the Defendants' motion
for rehearing is in violation of the page limitations for
motions filed with the Court under E.D. MICH. L.R. 7.
1(d)(3)(A). That rule provides that briefs for motions—
including motions for rehearing-may not exceed twenty
pages without prior approval from the Court. No written
request to file a brief in excess of the twenty page limit—
another requirement of the local rules—was received by
the Court from the Defendants. As such, the Defendants'

Case 2:15-cv-12312-MOB-EAS  ECF No. 58-2, PageID.1666  Filed 10/17/16  Page 8 of 71
Iron Workers' Local 25 Pension Fund v. Sova Steel, Inc., Not Reported in F.Supp.2d...

2010 WL 3123277

entire brief in support of its motion for rehearing, by rights, could be stricken by the Court. Nevertheless, the Court will consider the merits of the Defendants' arguments.

As all of the arguments advanced by the Defendants in this motion were either expressly or impliedly considered by the Court in its November 18, 2009 Opinion & Order [Doc. No. 35], or are new arguments which lack merit, the Court **DENIES** the Defendants' motion for rehearing [Doc. No. 40]. [1]

I. *Applicability of Grimaldi to the Prior Motions.*

**\*2** The Defendants' first argument for rehearing centers around the Court's reliance upon the Sixth Circuit's holding in *Mich. Laborers' Health Care Fund v. Grimaldi Concrete, Inc.,* 30 F.3d 692 (6th Cir.1994). Under *Grimaldi,* where employers do not maintain adequate records, under the provisions of ERISA "the burden thus shift[s] to [the employer] to prove what work was covered and what was not covered." *Grimaldi,* 30 F.3d at 696. In reliance upon *Grimaldi,* this Court found as follows:

> In conclusion, the Court finds that, under *Grimaldi,* the Defendants have come forward with inadequate records to dispute the validity of the November 10, 2008 audit[.]

[November 18, 2009 Opinion & Order, Doc. No. 35, p. 6].

The Court notes that the Plaintiffs cited—and relied extensively upon—the *Grimaldi* holding in their briefs in support of the prior motions. [*See, e.g.,* Doc. No. 14, pp. 6–8; Doc. No. 29, pp. 3–4]. In light of this extensive reliance upon *Grimaldi* by the Plaintiffs, the Defendants had ample opportunity to dispute the applicability of *Grimaldi* if they so chose. No such argument was made by the Defendants in the prior motions, however.

Now, after losing on the merits of their arguments in the prior motions, the Defendants—for the first time in this litigation—dispute the applicability of *Grimaldi* to the facts of this case. [*See* Defs.' Br., Doc. No. 40, pp. 12–14]. As this issue was impliedly considered by the Court in the prior motions, this argument by the Defendants is an attempt "to advance positions that could have been argued earlier but were not." *Fish v. Home Depot,* 2010

WL 419980, \*4 (E.D.Mich. Feb.1, 2010). The Defendants, therefore, have waived this argument.

On the merits of Defendants' argument, the Court also disagrees with the Defendants on the applicability of *Grimaldi* for the reasons stated in its November 18, 2009 Opinion & Order [Doc. No. 35]. The Defendants' arguments to the contrary are without merit.

II. *The Weiseberg Affidavit.*

In support of their prior opposition to the Plaintiffs' motions, the Defendants attached an *unsigned, un-notarized* "affidavit" of Sova Steel's Controller, Mark Weisberg. [*See* Def.'s Ex. A, Doc. No. 24]. In support of their instant motion for rehearing, the Defendants concede that no signed copy of the Weisberg Affidavit was submitted with their brief, and further state as follows:

> At the time the [affidavit] was signed, it could not be delivered to counsel in time for the filing; in the case of the Weiseberg affidavit, it was signed, but not notarized in time for filing. Thus, a note was included on the signature lines stating that the originals would be supplied at the time of hearing. Defendants acknowledge that this is not in accordance with the [federal rules], and that Defendants counsel did not have the originals of those Affidavits with him at the hearing.

[Def.'s Br., Doc. No. 40, pp. 14–15].

**\*3** Sixth Circuit case law is clear that federal courts cannot consider the contents of unsigned affidavits. *See, e.g., United States v. Walls,* 546 F.3d 728, 740 (6th Cir.2008); *Nassif Ins. Agency, Inc. v. Civic Prop. & Cas. Co.,* 2005 WL 712578, \*3 (6th Cir. Mar.30, 2005). The Defendants were given every opportunity to produce a *signed* and *notarized* affidavit comporting with the requirements of FED. R. CIV. P. 56 prior to—indeed, even *during*—the hearing, and no such affidavit was produced by the Defendants.

The Defendants are correct that the Court, in its November 18, 2009 Opinion & Order [Doc. No. 35], did not formally strike the Weisberg Affidavit. Candidly, the

Case 2:15-cv-12312-MOB-EAS  ECF No. 58-2, PageID.1667  Filed 10/17/16  Page 9 of 71

Iron Workers' Local 25, Pension Fund v. Sova Steel, Inc., Not Reported in F.Supp.2d...

2010 WL 3123277

Court considered that step unnecessary at the time, as the *contents* of that affidavit were insufficient to support the merits of the Defendants' arguments. To the extent that the Defendants seek guidance on whether the Court considered the Weisberg Affidavit in the November 18, 2009 Opinion & Order, however, the Court did *not*—and now **STRIKES** the Weisberg Affidavit [Defs.' Ex. A, Doc. No. 24] **AS IMPROPER UNDER FED. R. CIV. P. 56.**

In their instant motion [Doc. No. 40]—notwithstanding the procedural deficiencies of the Weisberg Affidavit—the Defendants argue that the document should have been considered by the Court "in the interests of justice, taking into account the large amount of money involved and the significant amount of factual issues demonstrated." [Doc. No. 40, p. 15]. The Court disagrees. No legal justification has been provided by the Defendants for such an extraordinary remedy. Furthermore, as the Court noted in its November 18, 2009 Opinion & Order, the Weisberg Affidavit merely contained unsupported assertions devoid of any documentary support. [*See* Doc. No. 35, pp. 5–7]. The Defendants' arguments to the contrary are without merit.

### III. *Personal Liability for Alex Sova.*

In the November 18, 2009 Opinion & Order, the Court found Mr. Sova liable for the unpaid funds as a matter of law, as Ms. Sova was a "fiduciary" over plan assets as outlined in *Brock v. Henderson,* 840 F.3d 339 (6th Cir.1988). In so holding, the Court noted that "[t]he Defendants do not offer any argument or direct the Court to any evidence indicating that Alex Sova is not a fiduciary, or that he did not breach his fiduciary duties." [Doc. No. 35, p. 8].

Arguing that this holding by the Court was "simply an error," the Defendants now raise several arguments why this Court should *not* find Mr. Sova personally liable. [*See* Defs.' Br., Doc. No. 40, pp. 17–19]. As these arguments "advance positions that could have been argued earlier but were not," *Fish v. Home Depot,* 2010 WL 419980, *4 (E.D.Mich. Feb.1, 2010), the Court will not consider them now. Defendants' arguments to the contrary are without merit.

### IV. *The Defendants' Counterclaim.*

The Defendants argue that the Court erred in granting the Plaintiffs' motion for summary judgment on the

Defendants' counterclaim—relying primarily upon their contention that the Court misapplied the Fifth Circuit's holding in *Jamail, Inc. v. Carpenter's Dist. Council of Houston,* 954 F.2d 299 (5th Cir.1992). [*See* Doc. No. 40, pp. 19–21]. The Court disagrees.

**\*4** First and foremost, the entirety of the Court's discussion in the November 18, 2009 Opinion & Order assumed, *arguendo,* that the Defendants' counterclaim *could* otherwise evidence that the funds' refund denial under 29 U.S.C. § 1103 was "arbitrary and capricious as measured by equitable principles." [*See* Doc. No. 35, p. 10, citing *B & B Elec. Co., Inc. v. Electrical Workers Local Union No. 369 Retirement Fund,* 249 F.Supp.2d 865, 868 (W.D.Ky.2003) ]. No evidence was shown by the Defendants, however, that the Plaintiffs' decision to deny refunding overpayments was arbitrary or capricious, however.

Further, as the Court noted in its November 18, 2009 Opinion & Order, the Fifth Circuit's holding in *Jamail* is not necessarily binding on this Court. [*See* Doc. No. 35, p. 11]. Further, under the merits of *Jamail* 's arguments, the Court found that the equities of this case did not merit relief for the Defendants:

> This case does not raise such [equitable] concerns. Here, by contrast [to the scenario in *Jamail* ], Sova Steel had an ongoing dispute with the Plaintiffs for *years* about alleged overpayments before Sova Steel decided to file this lawsuit. No equitable reason exists in this matter to disregard Michigan's six-year statute of limitations under M.C.L. § 600.5807(8).

[Doc. No. 35, p. 11].

Further, for the first time in this motion, the Defendants contend that Michigan's six-year statute of limitations does not apply to this case. [*See* Defs.' Br., Doc. No. 40, p. 21]. Again, this argument is simply an attempt to "advance positions that could have been argued earlier but were not." *Fish v. Home Depot,* 2010 WL 419980, *4 (E.D.Mich. Feb.1, 2010). The Court's November 18, 2009 Opinion & Order laid out exactly why the six-year statute of limitations applies to this matter, and the Defendants offer no convincing argument evidencing an error in that

Case 2:15-cv-12312-MOB-EAS ECF No. 58-2, PageID.1668 Filed 10/17/16 Page 10 of 71
*Iron Workers' Local 25, Pension Fund v. Sova Steel, Inc., Not Reported in F.Supp.2d...*
2010 WL 3123277

holding. The Defendants' arguments to the contrary are without merit.

### V. *The Plaintiffs' Motion to Amend.*

In the November 18, 2009 Opinion & Order, the Court granted the Plaintiffs leave to amend their complaint to add causes of action against two additional corporate entities: Sova Group, LLC and SSI Contracting, LLC, as well as an additional cause of action against Mr. Sova under a theory of liability for piercing the corporate veil. The Court held as follows:

> In the instant case, there is evidence to suggest that [Mr.] Sova was operating at least two steel erection entities: Sova Steel and Sova Group, and that these entities both bid the same type of work, have the same contractors, and work out of the same location with the same or similar management personnel. Further, [Mr.] Sova is involved with SSI Contracting as its president, and SSI Contracting handles the payroll obligations for Sova Group. Given these facts, the Court finds that the Plaintiffs' motion to amend is not futile.

[Doc. No. 35, pp. 13–14].

In their motion for rehearing, the Defendants argue that the Court erroneously found that "Sova Steel [and Sova Group] bid on steel erection projects, but Sova Steel only bids on jobs requiring union labor while Sova Group bids on projects not requiring union labor." [Defs.' Br., Doc. No. 40, p. 21]. While the Court finds that, upon review of Mr. Sova's deposition testimony [*see* Pl.'s Ex.

E, Doc. No. 20, pp. 10–12] that the above quote was an accurate statement of Mr. Sova's testimony, even assuming *arguendo* that this *was* a mischaracterization of Mr. Sova's testimony, such would not warrant a different outcome to the Court's holding granting Plaintiffs' motion to amend. The Defendants' arguments to the contrary are without merit.

### VI. *The Defendants' Stricken Supplemental Brief.*

**\*5** The Defendants' sixth and final argument for rehearing centers around the Court's failure to consider the Defendants' October 19, 2009 supplemental brief [Doc. No. 32]. While the Court did not formally strike this supplemental brief, it did not rely upon the brief in its November 18, 2009 Opinion & Order as it was untimely and not proper for consideration under the Court's Local Rules. [2]

The Defendants themselves concede that it was within the Court's discretion to disregard this untimely-filed material. [*See* Defs .' Br., Doc. No. 40, p. 22]. Nothing in the Defendants' current argument for rehearing demonstrates an abuse of the Court's discretion to disregard the supplemental brief [Doc. No. 32], and the Defendants' arguments to the contrary are without merit.

### CONCLUSION

For the reasons explained *supra,* the Defendants' motion for rehearing [Doc. No. 40] is **DENIED.**

**IT IS SO ORDERED.**

### All Citations

Not Reported in F.Supp.2d, 2010 WL 3123277

### Footnotes

1    The Plaintiffs have filed a "motion to file response to Defendants' motion for rehearing." [Doc. No. 42]. As the Court ultimately denies the Defendants' motion for rehearing, the Court **DENIES** the Plaintiffs' motion [Doc. No. 42] **AS MOOT.**

2    Upon review of the docket, the Court notes that, on October 20, 2009, the Plaintiffs filed a motion to strike this supplemental brief filed by the Defendants. [*See* Doc. No. 34]. The Court has not, to date, ruled upon this motion. As the Court has discretion to consider documents filed outside the Court's timetable for motion practice [*See* E.D. Mich. L.R. 7.1], and because the Defendants' supplemental brief [Doc. No. 32] was untimely and not in accordance with the Court's Local Rules, the Court **GRANTS** the Plaintiffs' motion to strike [Doc. No. 34], and **STRIKES** the Defendants supplemental brief [Doc. No. 32] from the record.

Case 2:15-cv-12312-MOB-EAS ECF No. 58-2, PageID.1669 Filed 10/17/16 Page 11 of 71

Iron Workers' Local 25, Pension Fund v. Sova Steel, Inc., Not Reported in F.Supp.2d...
2010 WL 3123277

---

**End of Document**                              © 2016 Thomson Reuters. No claim to original U.S. Government Works.

547 Fed.Appx. 766 (Mem)
This case was not selected for
publication in the Federal Reporter.
Not for Publication in West's Federal Reporter.
See Fed. Rule of Appellate Procedure 32.1
generally governing citation of judicial decisions
issued on or after Jan. 1, 2007. See also
Sixth Circuit Rule 28. (Find CTA6 Rule 28)
United States Court of Appeals,
Sixth Circuit.

WINGZ AND THINGZ 1, dba Papa
Chef, Inc., Plaintiff–Appellant,
v.
PENN–STAR INSURANCE
COMPANY, Defendant–Appellee.

No. 13–1241.
|
Dec. 9, 2013.

On appeal from the United States District Court for the
Eastern District of Michigan.

Before: COOK and STRANCH, Circuit Judges; CARR,
District Judge. [*]

**Opinion**

COOK, Circuit Judge.

Plaintiff-appellant Wingz and Thingz 1, a Michigan
corporation run by Angela Suleiman, sued Penn–
Star Insurance Company seeking coverage under its
commercial-peril policy for fire damage to one of
Suleiman's Detroit restaurants in 2008. Penn–Star voided
the policy for fraud and moved for summary judgment,
pointing to four allegedly false invoices submitted as
proof of the property damage. With regard to two of
the invoices, [1] deposition testimony from the companies
allegedly selling the goods and services flatly denied
plaintiff's purchases. (R. 35–11, Shamoun Dep. at 9–
10; R. 35–15, Deininger Dep. at 24–29.) When plaintiff
responded with only unsigned **\*767** and unsworn
"affidavits"—one of which contradicted plaintiff's pre-
suit examination-under-oath testimony—the district
court granted summary judgment to Penn–Star, finding
that plaintiff's fraud voided the policy. Though plaintiff
attempted to cure its proffer with proper (though still

undated) affidavits in a motion for reconsideration,
significant differences between Suleiman's draft and final
affidavit, and between the affidavit and her pre-suit
testimony, led the court to deny the motion. Plaintiff
appeals both orders, as well as the district court's implicit
denial of its cross-motion for summary judgment. We
affirm.

The district court properly rejected plaintiff's unsigned
and unsworn "affidavits." *See, e.g., Sfakianos v. Shelby
Cnty. Gov't,* 481 Fed.Appx. 244, 245 (6th Cir.2012)
(affirming district court judgment discarding unsigned,
unsworn affidavits and denying plaintiff's post-judgment
attempt to cure these deficiencies). Admittedly, plaintiff's
summary judgment briefing cites language from the signed
affidavit, giving the impression that counsel mistakenly
filed the draft affidavits. But Suleiman "cannot dispute
that she failed to provide the district court with a proper
affidavit prior to entry of judgment." *Sfakianos,* 481
Fed.Appx. at 245. Without the defective affidavit, nothing
remained to dispute Penn–Star's fraud showing regarding
these two invoices—testimony from the putative vendor
and service-provider refuting the claimed purchases. This
evidentiary default alone justified summary judgment
against the plaintiff. *See Anderson v. Liberty Lobby,
Inc.,* 477 U.S. 242, 250, 106 S.Ct. 2505, 91 L.Ed.2d 202
(1986) (explaining that, to survive summary judgment,
"the adverse party 'must set forth specific facts showing
that there is a genuine issue for trial' "); Fed.R.Civ.P. 56(c)
(1).

Furthermore, given the unexplained substantive
differences between Suleiman's signed affidavit and both
the unsigned affidavit and her prior statements under
oath, the district court did not abuse its discretion in
denying her motion for reconsideration. *See Sfakianos,*
481 Fed.Appx. at 245–46; *Bonds v. Cox,* 20 F.3d 697, 703
(6th Cir.1994) ("We do not believe that the standard of
review for summary judgment ... requires us to ignore
a party's own conflicting statements in construing a fact
to her best advantage."). For instance, despite pre-suit
testimony claiming to have paid approximately $30,000 in
cash for *finished* remodeling work, and a corroborating
invoice for $35,650, Suleiman's signed affidavit concedes
that she paid only $17,825 (half of the contract price) and
that the fire prevented completion of the work. (*Compare*
R. 35–8, Suleiman EUO Tr. at 153–54, *and* R. 35–10,
Construction Invoice, *with* R. 45–1, Suleiman Aff. at 3.)
Still, her affidavit admits submitting a nearly $36,000–

invoice in support of her property-damage claim. Plaintiff offers no explanation for these divergent accounts.

As another example of revisionary history, Suleiman's affidavit disclaims knowledge about the origin of an $8,500 computer system she purchased from a Chicago restaurant, in stark contrast to her pre-suit testimony about finding the system on eBay and traveling to Chicago to test and retrieve it. (*Compare* R. 45–1, Suleiman Aff. at 3, *with* R. 35–14, Suleiman EUO Tr. at 72–73.) Again, she offers no explanation for these inconsistencies,[2] but now **\*768** denies claiming this loss as part of the 2008 fire claim. (Ostensibly, she lost the computer equipment in a different fire at one of her restaurants in 2009.) Suffice to say the affidavit tells a very different story than the pre-suit testimony, despite Suleiman having an opportunity to correct it. The district court properly declined to use it as a basis for reconsidering its grant of summary judgment to Penn–Star. *See Sfakianos,* 481 Fed.Appx. at 245–46.

Even allowing the affidavit, Suleiman effectively *admits* presenting inflated losses to the insurance company. (*See* R. 45–1, Suleiman Aff. at 3 (conceding use of the nearly $36,000 invoice to support her insurance claim, but stating that she paid only half that price and that the fire prevented completion); *id.* at 4 (acknowledging that some of her statements to the insurance company "could have been material but there has been no fraud, nor misrepresentation").) Appellant argues that minor inconsistencies concerning specific losses should not negate the entire claim for the more than $300,000

damage caused by the fire. Yet, as the district court explained, the plain language of the policy "void[s]" coverage "in *any case of fraud* by [the insured] as it relates to this Coverage Part at any time," or if the insured "*at any time,* intentionally conceal[s] or misrepresent[s] a material fact concerning ... [t]he Covered Property ... or ... [a] claim under this Coverage Part." The district court's construction of the contract comports with Michigan law. *See, e.g., Home Owners Ins. Co. v. Selfridge,* No. 280112, 2008 WL 5273418, at *2 (Mich.Ct.App. Dec. 18, 2008) (per curiam); *Mich. Basic Prop. Ins. Ass'n v. Wasarovich,* 214 Mich.App. 319, 542 N.W.2d 367, 370 n. 2 (1995) ( "In cases where policy language voids the policy because of 'any' or 'an' insured's fraudulent conduct, no other insured, including innocent coinsureds, may recover under that policy."). Penn–Star's evidence of fraudulent invoices, corroborated by plaintiff's unexplained overstatement of construction costs, demonstrates that plaintiff intentionally misrepresented the restaurant's losses with regard to this insurance claim. Under Michigan law, the policy required nothing more to invalidate the coverage, and the district court properly granted summary judgment.

We affirm.

## All Citations

547 Fed.Appx. 766 (Mem)

Footnotes

* The Honorable James G. Carr, United States District Judge for the Northern District of Ohio, sitting by designation.

1 The other two invoices related to the restaurant's security system and neon signs. The district court found a genuine dispute regarding the neon-sign invoice, and declined to revisit the security-system invoice in its reconsideration opinion. We do likewise.

2 Though not mentioned in her appellate briefing, Suleiman's affidavit asserts that, at the time of her testimony, she "was confused and in distress from what had happened, raising a daughter on [her] own, and being pregnant and separated." It also faults the insurance company for asking her to document her losses, despite knowing that she lost most of her files in the fire. We reject these vague and self-serving statements as irrelevant, as they fail to explain Suleiman's contrary assertions of loss.

Case 2:15-cv-12312-MOB-EAS ECF No. 58-2, PageID.1672 Filed 10/17/16 Page 14 of 71
Zdunowski v. Chrysler Group LLC, Slip Copy (2016)

201 WL 3 W277 ©7

2016 WL 627757
Only the Westlaw citation is currently available.
United States District Court,
E.D. Michigan, Southern Division.

Marie Zdunowski, Plaintiff,

v.

Chrysler Group LLC, Defendant.

Case No. 14-12213
|
Signed 02/17/2016

## OPINION AND ORDER GRANTING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT [15]

LAURIE J. MICHELSON, UNITED STATES DISTRICT JUDGE

**\*1** In 2013, Defendant Chrysler Group LLC terminated Plaintiff Marie Zdunowski's employment. Zdunowski claims that Chrysler did so because she was 59 years old or because she was female. Chrysler claims that Zdunowski has no evidence to back her claims. The Court agrees with Chrysler that no genuine issue of material fact exists as to Zdunowski's claims of discrimination and so it will grant Chrysler's motion for summary judgment.

### I.

### A.

Because Chrysler has moved for summary judgment, the following fact summary is based on a review of the record in the light most favorable to Zdunowski. *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).

For the better part of 14 years, Zdunowski worked for Chrysler, primarily as an assembler. (Zdunowski Dep. at 20, 35.) She began working for the automaker in 1999 and, until 2011, had only four issues triggering disciplinary action. (*See* Zdunowski Dep. at 20; Def.'s Mot. Ex. C at Pg ID 136.)

But between February 2011 and February 2012, Zdunowski received 10 disciplinary actions, with increasing severity. (*See* Def.'s Mot. Ex. C at Pg ID 136.) As examples, Zdunowski received one day of disciplinary layoff in February 2011 for being "shy" on heaters and "underhood lamp wire"; she got five days of disciplinary layoff in April 2011 for not installing a "left kickpad"; she received another 10 days in August 2011 for failing to "fully secure tie straps"; and, in January 2012, Zdunowski got 30 days of disciplinary layoff for failing to have her "garnish" ready (which caused operators not to build 12 trucks). (Def.'s Mot. Ex. C at Pg ID 129, 131, 133, 135.)

In March 2012, Chrysler granted Zdunowski's request to move to a different facility. But, just a few months later, Zdunowski received 30 days of disciplinary layoff for producing excessive scrap and threatening others. (Def.'s Mot. Ex. C at Pg ID 136.) And, in April 2013, Zdunowski received a written warning for again producing too much scrap. (*Id.*)

In Zdunowski's opinion, Chrysler's disciplinary actions were unjustified:

> They can't justify any of the things they've said in those disciplining's. They can't go back and pull that and say we have that documented, that we know for a fact that—they can't say that's a poor quality. They can't say that I'm not pulling that pull string. They can't say that they saw me not pulling, they have that— I was on that job. Okay. I'm sorry, it's just not adding up. You don't harass. You don't—I mean, I mean, nobody else was being harassed. Nobody else was going through this. Nobody else was getting this type of disciplinary measures.

(Zdunowski Dep. at 85; *see also id.* at 82–83.) Zdunowski grieved some of the disciplinary actions through her union but none were resolved in her favor. (*Id.* at 85–86.) Zdunowski thought that she was not receiving union support, citing as an example that a union official inappropriately "pulled [a] grievance out of the grievance system...because he said it had no merit." (*Id.* at 44–45, 86.)

**\*2** In the summer of 2013, Zdunowski was working at Station 155 at the Trenton Engine facility. Only one person worked at that station at a time, with the shifts lasting between two and three hours. (*See* Def.'s Mot. Ex. D.) Zdunowski worked at Station 155 for seven of the approximately 75 shifts between June 20 and July 6, 2013. (*See id.*; Dkt. 15, Def.'s Stmt. of Undisputed Facts ¶¶ 16–18; Dkt. 16, Pl.'s Resp. to Stmt. of Undisputed Facts ¶ 18.)

Upon her return from a one-week vacation on July 15, 2013, a foreman informed Zdunowski that she needed to meet with human resources. (Zdunowski Dep. at 71–72, 76.) When she met with human resources later that day, Zdunowski was told that she was being suspended indefinitely pending an investigation into damaged cranks. (*Id.* at 74; *see also id.* at 125.)

According to Chrysler, the investigation revealed that 14 engines had problems with their bearings and that "the misassembled parts came from Station 155 during the time period when [Zdunowski] was working at that station." (Def.'s Stmt. of Undisputed Facts ¶ 23.) In support of this claim, however, Chrysler cites an email that nowhere mentions Station 155 or Zdunowski. (Def.'s Mot. Ex. E.) Zdunowski thus claims that Chrysler's evidence does not show that the defective engines are attributable to her work. (Pl.'s Stmt. of Disputed Facts ¶¶ 20–24.)

In a letter dated July 23, 2013, Chrysler terminated Zdunowski's employment:

> On July 15, 2013 you were suspended pending further investigation for violation of Chrysler Standards of Conduct #9 – "Production of excessive scrap or inferior work".
>
> The investigation is complete and the Company has concluded that your actions were in direct violation of Chrysler Standards of Conduct #9. As such, your suspension that was effective July 15, 2013 has been converted to discharge effective that same date.

(Def.'s Mot. Ex. F.)

### B.

Count I of Zdunowski's two-count complaint asserts sex discrimination. Although the count is less than clear, Zdunowski apparently alleges that some of the defective engines were attributable to others working at Station 155 and that most of those assemblers were male. (*See* Compl. ¶¶ 9–15.) Yet, says Zdunowski, she was the only one punished. (*Id.* ¶ 16.) She thus claims that Chrysler violated Title VII of the Civil Rights Act of 1964. (*Id.* ¶ 17–19.)

Count II is similar but based on the fact that Zdunowski was 59 years old when she was terminated. (Compl. ¶ 21.) Zdunowski asserts that the majority of the people who rotated through Station 155 at the time in question were younger than her and that Chrysler did not discipline them for conduct like hers. (*Id.* ¶¶ 21–24.) She thus claims that Chrysler violated the Age Discrimination in Employment Act of 1967. (*Id.* ¶¶ 20–25.)

Chrysler moves for summary judgment on both counts. (Dkt. 15, Def.'s Mot.) After thoroughly reviewing the parties' briefs, the Court finds that oral argument will not aid in the resolution of the motion. *See* E.D. Mich. LR 7.1(f)(2).

### II.

"The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).

### III.

### A.

The Age Discrimination in Employment Act makes it unlawful for an employer to "discriminate against any individual with respect to [her] compensation, terms, conditions, or privileges of employment, because of such individual's age." 29 U.S.C. § 623(a)(1). The phrase "because of" means that "[a] plaintiff must prove by a preponderance of the evidence (which may be direct or circumstantial) that age was the 'but-for' cause of the challenged employer decision." *Gross v. FBL Fin. Servs., Inc.*, 557 U.S. 167, 177–78 (2009).

**\*3** Chrysler asserts that Zdunowski "clearly has no evidence to suggest that 'but for' her age, her employment

would not have been terminated." (Def.'s Mot. at 11.) The company points out that when Zdunowski was asked if she had "any evidence" that her age factored into her termination, she testified, "No, I don't." (Def.'s Mot. at 11; Zdunowski Dep. at 163–64.) Chrysler acknowledges that, during her deposition, Zdunowski implied that Chrysler prefers lower-paid, younger workers to higher-paid, older workers. (*See* Def.'s Mot. at 12.) But Chrysler argues that it is still entitled to summary judgment because Zdunowski lacks any evidence of this preference or that this preference was a factor in her termination. (*See id.*)

The foregoing discharges Chrysler's initial summary-judgment burden. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). In particular, the Court agrees with Chrysler that Zdunowski merely speculated that Chrysler had a preference for lower-paid, younger workers:

> Q....With respect to the claims in your lawsuit, did anyone tell you, you know, come out and tell you that your age was a factor in your termination?
>
> A. I can't specifically pinpoint anything. But there have been references made to that, okay. I can't tell you who made them or at what time all right?....And I can't tell you [what the references] were. I mean yes. When you have somebody who's 21 coming in at $14 an hour, and you have somebody who's 58 that's making [$]28.13, who do you want to see excel?

(Zdunowski Dep. at 167–68; *see also id.* at 164.) Zdunowski's question can be answered in a number of ways; perhaps, for example, Chrysler highly values experience and loyalty. As such, Zdunowski merely speculates as to Chrysler's preference. And speculation is not grounds to send a case to a jury. *Shafer Redi-Mix, Inc. v. Chauffeurs, Teamsters & Helpers Local Union #7*, 643 F.3d 473, 477 (6th Cir. 2011). And even if it were, Zdunowski's testimony would not permit a reasonable jury to find that Chrysler's preference was the but-for cause of *her* termination.

Because Chrysler has discharged its initial summary-judgment burden, Zdunowski must come forth with evidence showing that there is a genuine dispute that must be resolved by a jury. *Matsushita*, 475 U.S. at 587. She has not. Her summary-judgment response brief does not even mention age discrimination and, in fact, treats as undisputed Chrysler's assertion that she has no evidence to support an age-discrimination claim. (*Compare* Def.'s

Stmt. of Undisputed Facts ¶ 31, *with* Pl.'s Stmt. of Disputed Facts at ¶ 31.) And Zdunowski cannot merely rest on the allegations of her complaint. *Celotex*, 477 U.S. at 324; Fed. R. Civ. P. 56 advisory committee's note to 1946 amendment ("The very mission of the summary judgment procedure is to pierce the pleadings and to assess the proof in order to see whether there is a genuine need for trial.").

Summary-judgment in favor of Chrysler on Zdunowski's ADEA claim is thus warranted.

**B.**

Title VII makes it unlawful for an employer "to discriminate against any individual with respect to [her] compensation, terms, conditions, or privileges of employment, because of such individual's sex[.]" 42 U.S.C. § 2000e–2(a)(1). A plaintiff can prove discrimination by either direct or circumstantial evidence. *Ondricko v. MGM Grand Detroit, LLC*, 689 F.3d 642, 648–49 (6th Cir. 2012). Zdunowski has taken the circumstantial route (*see* Pl.'s Resp. at 6–11), and so the Court applies the three-step framework of *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973).

Chrysler says that the Court need not proceed past the first step because Zdunowski cannot establish a *prima facie* case of sex discrimination. (*See* Def.'s Mot. at 9–10.) To establish a *prima facie* case of sex discrimination through circumstantial evidence, Zdunowski must show, among other things, that "she was replaced by a person outside the protected class, or similarly situated non-protected employees were treated more favorably." *Regan v. Faurecia Auto. Seating, Inc.*, 679 F.3d 475, 481 (6th Cir. 2012) (internal quotation marks omitted). Chrysler claims that "[Zudnowski] has failed to present <u>any</u> evidence that male employees engaged in similar conduct." (Def.'s Mot. at 9.)

**\*4** Zdunowski responds that she "has produced the affidavit of Jerry Sanster, a union representative at the Trenton Engine Plant...[who] states that there were three male employees that had scrap bearings in the past that were not discharged." (Pl.'s Resp. at 6.) Zdunowski says that she "can make a prima facie case with the affidavit of Jerry Sanster." (*Id.*)

The Court disagrees. As Chrysler points out, the Sanster "affidavit" is not an affidavit for summary-judgment purposes because it is unsigned and unsworn. *See* (Pl.'s Resp. Ex. 1 at Pg ID 166); *Sfakianos v. Shelby Cty. Gov't*, 481 F. App'x 244, 245 (6th Cir. 2012) ("[A]n unsigned affidavit is a contradiction in terms. By definition an affidavit is a sworn statement in writing made under an oath or on affirmation before an authorized officer." (internal quotation marks omitted)); *Nassif Ins. Agency, Inc. v. Civic Prop. & Cas. Co.*, No. 03-2618, 2005 WL 712578, at *3 (6th Cir. Mar. 30, 2005) ("Unsigned affidavits do not comply with Fed. R. Civ. P. 56(e)."). As such, the Court cannot consider Sanster's statements in deciding Chrysler's motion.

Zdunowski's attempt to use Rule 56(d) to get around the fact that Sanster did not sign his "affidavit" is unavailing. (Pl.'s Resp. at 7.) (Counsel actually cites Rule 56(f), but it is apparent that he is referring to Rule 56(d).) Under Rule 56(d), if a party opposing summary judgment "shows by affidavit or declaration that, for specified reasons, it cannot present facts essential to justify its opposition," a court may deny the motion or give more time for discovery. As the quoted language indicates, Rule 56(d) does not permit just any showing, but requires a "show[ing] by affidavit or declaration." While Zdunowski's counsel has signed his explanation for why Sanster's signature could not be secured, counsel's statements are neither sworn nor signed under penalty of perjury. So they do not suffice for purposes of Rule 56(d). *Cf. Sfakianos*, 481 F. App'x at 245. [1]

And even if the Court were to treat Sanster's statements as proper Rule 56 evidence, they do not establish that similarly-situated males were treated better than Zdunowski. In relevant part, he says:

> 7. Chrysler has indicated that Marie Zdunowski was responsible for running defective bearings on over 160 engines in one day. This would be almost every engine produced for the day. Since Ms. Zdunowski only worked for three hours other individuals also ran defective bearings that day.

> 8. I know of three cases where male employees allegedly placed scratched bearings in engines during assembly.

> 9. The male employees were given punishment less than discharge.

> 10. Ms. Zdunowski was the only employee terminated for running defective bearings on the engine line B.

(Dkt. 16 at Pg ID 166.) As Chrysler points out, these statements do not satisfy the similarly-situated element because nothing indicates that any of the three (unidentified) male employees had a discipline history similar to Zdunowski's. It is uncontroverted that Zdunowski received discipline on more than 10 occasions prior to her discharge. Indeed, Zdunowski twice received a 30-day disciplinary layoff, and Zdunowski does not dispute Chrysler's claim that "[t]ypically, the next step after a 30 day disciplinary layoff is termination." (Def.'s Mot. at 3 n.3.) Nothing indicates that Chrysler thought that the three male employees were walking on comparably thin ice. As such, even taking Sanster's statements as evidence, Zdunowski has not established a *prima facie* case of sex discrimination. *See Parries v. Makino, Inc.*, 148 F. App'x 291, 299 (6th Cir. 2005) ("Farmer was not similarly situated, however, because Farmer did not have the history of disciplinary problems that Parries had and was not subject to a 'last chance' warning."); *Tkacz v. Sears, Roebuck & Co.*, 932 F.2d 969 (table), 1991 WL 71396, at *4 (6th Cir. 1991) ("The most persuasive reason given [by the district court] for the finding that Tkacz and Birk were not similarly situated was Tkacz's rather extensive disciplinary history.").

 **\*5** Chrysler is thus entitled to summary judgment on Zdunowski's Title VII claim.

## IV.

For the reasons given, Chrysler's motion for summary judgment (Dkt. 15) is GRANTED. As this opinion and order resolves this case, a separate judgment will follow.

SO ORDERED.

**All Citations**

Slip Copy, 2016 WL 627757

Footnotes

1       Counsel states that Sanster called him and told him about male employees who were treated differently than Zdunowski, that Sanster agreed to sign an affidavit to that effect, that he faxed the affidavit to Sanster, and that Sanster texted back saying that "someone at Chrysler" was preventing him from signing the affidavit. (Pl.'s Resp. Ex. 2 at Pg ID 172–73.)

**End of Document**                                      © 2016 Thomson Reuters. No claim to original U.S. Government Works.

2014 WL 5073680
Only the Westlaw citation is currently available.
United States District Court,
W.D. Michigan,
Southern Division.

Arthur JACKSON, Plaintiff,

v.

William NELSON, et al., Defendants.

No. 1:13–cv–827.
|
Signed Sept. 30, 2014.

**Attorneys and Law Firms**

Arthur Jackson, Munising, MI, pro se.

Kimberley A. Koester, Chapman and Associates PC, Bloomfield Hills, MI, Allan J. Soros, MI Dept. Attorney General, Lansing, MI, for Defendants.

*OPINION AND ORDER*

JANET T. NEFF, District Judge.

**\*1** This is a prisoner civil rights action filed pursuant to 42 U.S.C. § 1983. This Court previously dismissed Plaintiff's claims save his denial of medical treatment claims asserted against Defendants Nelson, Wilkinson, and Burdette. Defendants each moved for summary judgment on the ground that Plaintiff has failed to properly exhaust his administrative remedies, and the matter was referred to the Magistrate Judge. On August 6, 2014, the Magistrate Judge issued a Report and Recommendation (R & R, Dkt 54), recommending that this Court grant the motions. The Magistrate Judge indicated that objections to the Report and Recommendation "must be filed with the Clerk of Court within fourteen (14) days of the date of service of this notice" and that "[f]ailure to file objections within the specified time waives the right to appeal the District Court's order" (*id.* at 9).

On August 25, 2014, Plaintiff filed a "Motion for Enlargement" (Dkt 56), seeking an unspecified extension of time to file a response to the Report and Recommendation. The Court granted the request "to

the extent that Plaintiff will be given an extension of time, until September 12, 2014, to file his response, if any, to the Report and Recommendation" (Dkt 57). On September 17, 2014, Plaintiff filed twelve objections to the Report and Recommendation (Dkt 60). Plaintiff also filed a "Second Notice for Enlargement," seeking an unspecified extension of time "due to this plaintiff making some objections but failing to raise others" (Dkt 62). Defendants did not file a response to Plaintiff's objections or motion.

In accordance with 28 U.S.C. § 636(b)(1) and FED. R. CIV. P. 72(b)(3), the Court has performed de novo consideration of those portions of the Report and Recommendation to which objections have been made. The Court denies the objections, denies the motion for a second extension of time, and issues this Opinion and Order.

**I. Plaintiff's Objections**

The Magistrate Judge examined evidence of thirty-two grievances that Plaintiff pursued through all three steps of the prison grievance process and concluded that Defendants carried their burden of demonstrating that Plaintiff has failed to properly exhaust any of his remaining claims in this case (R & R, Dkt 54 at 5, 9). The Magistrate Judge found that the majority of the grievances could not serve to exhaust any of the claims asserted in the present action because Plaintiff initiated the present action on July 27, 2013, before receiving a Step III grievance response and before the expiration of the 120–day grievance response period (*id.* at 6–7). The Magistrate Judge found that the remaining grievances either were not asserted against Defendants Wilkinson, Burdette, or Nelson or did not concern Plaintiff's denial of medical treatment claims against these Defendants (*id.* at 8). Last, given that Plaintiff initiated the present action on July 27, 2013, the Magistrate Judge rejected as "legally irrelevant" Plaintiff's argument that his obligation to pursue all available administrative remedies was somehow excused because he was on modified grievance access from August 1, 2013, through November 1, 2013 (R & R, Dkt 54 at 8).

**\*2** Plaintiff makes twelve objections to the Report and Recommendation, the majority of which are one-sentence objections. First, Plaintiff argues that the Magistrate

2014 WL 5073680

Judge erred in failing to give him an opportunity to amend his complaint (Objs., Dkt 60 at 1). However, Plaintiff did not move to amend his complaint and does not, even in his objections, indicate how he proposes to amend his complaint to cure the exhaustion deficiencies. Therefore, Plaintiff's Objection I is denied.

Next, Plaintiff argues that the Magistrate Judge "failed to acknowledge the facts [sic] that I did not mail my civil complaint until I had been placed on 'Modified Grievance Status' " (Objs., Dkt 60 at 1). However, as the Magistrate Judge explained, "even if subsequently being placed on modified grievance status prevented Plaintiff from pursuing grievances, something Plaintiff has not established, such would nevertheless be irrelevant as it concerns the period of time after Plaintiff initiated the present action" (R & R, Dkt 54 at 8). Therefore, Plaintiff's Objection II is denied.

Next, Plaintiff asserts that there are "genuine issues of material fact as to whether state inmate exhausted his administrative remedies and whether prison officials prevented inmate from filing grievances and exhausting his administrative remedies" (Objs., Dkt 60 at 2, citing *Surles v. Andison,* 678 F.3d 452 (6th Cir.2012)). Plaintiff's mere quotation of the editor's head note from *Surles* does not serve to point the Court to any issues of material fact precluding summary judgment in this case, nor does the quotation serve to "specifically identify the portions of the proposed findings, recommendations or report to which objections are made and the basis for such objections," as required by this Court's local rules. *See* W.D. Mich. LCivR 72.3(b). Therefore, Plaintiff's Objection III is denied.

Next, citing *Lawrence v. Goord,* 238 F.3d 182 (2d Cir.2001), Plaintiff points out that "[t]his plaintiff/inmate objected to the defendants' dispute of material fact existing as to whether defendants and other MDOC employees prevented this prisoner from filing grievances and exhausting his administrative remedies" (Objs ., Dkt 60 at 2). In *Lawrence,* the Second Circuit Court of Appeals held that "inmates need not exhaust their administrative remedies before bringing suit for particularized instances of retaliation." *Id.* at 186. However, the United States Supreme Court vacated the Second Circuit's decision in light of its decision in *Porter v. Nussle,* 534 U.S. 516, 532, 122 S.Ct. 983, 152 L.Ed.2d 12 (2002), where the Supreme Court held that the PLRA's exhaustion

requirement "applies to all inmate suits about prison life, whether they involve general circumstances or particular episodes, and whether they allege excessive force or some other wrong." 535 U.S. 901, 122 S.Ct. 1200, 152 L.Ed.2d 139 (2002). Therefore, Plaintiff's Objection IV is denied.

Next, Plaintiff argues that "the record/complaint shows genuine issue of material fact as to this inmate being subjected to imminent danger via subjective recklessness" (Objs., Dkt 60 at 2–3). However, as the Magistrate Judge explained, "a prisoner asserting an action with respect to prison conditions under 42 U.S.C. § 1983 must first exhaust all available administrative remedies" (R & R, Dkt 54 at 4, citing *Porter,* 534 U.S. at 524). Plaintiff's argument fails to demonstrate any factual or legal error by the Magistrate Judge in deciding, as a threshold matter, that Plaintiff has failed to properly exhaust his remaining claims in this case. Therefore, Plaintiff's Objection V is denied.

**\*3** Next, Plaintiff argues the Grievance Coordinator violated relevant policy in "refusing to file, delaying the process and retaliatory [sic] subjecting this inmate to 'Grievance Restriction' " (Objs., Dkt 60 at 3). Again, the exhaustion requirement applies to all inmate suits about prison life, including alleged instances of retaliation, *Porter,* 534 U.S. at 532, and the Magistrate Judge expressly rejected as "legally irrelevant" Plaintiff's argument that his obligation to pursue all available administrative remedies was somehow excused because he was on modified grievance access (R & R, Dkt 54 at 8). Plaintiff's Objection VI is therefore denied.

Next, Plaintiff asserts that he filed "grievances to address and expose Defendants' corruptional [sic] cruel and retaliatory acts or omissions," "a complaint with the State Police," and "complaints to the Ombudsman Keith Barber" (Objs., Dkt 60 at 3). Plaintiff does not address the purported import of these filings or identify the portions of the Report and Recommendation to which these "objections" are made or the bases for such objections, *see* W.D. Mich. LCivR 72.3(b), and the Court declines to speculate or piece together an argument for Plaintiff. *See InterRoyal Corp. v. Sponseller,* 889 F.2d 108, 111 (6th Cir.1989) ("A district court is not required to speculate on which portion of the record the nonmoving party relies, nor is it obligated to wade through and search the entire record for some specific facts that might support the nonmoving party's claim."); *Guarino v. Brookfield Twp.*

2014 WL 5073680

*Trustees,* 980 F.2d 399, 404 n. 5 (6th Cir.1992) (collecting cases). Plaintiff's Objections VII, VIII and IX are denied.

Next, Plaintiff contends that the Magistrate Judge "consented with the defendants, even in the face of 'imminent danger' and 'the fear of death' and 'pain and suffering' ... while disregarding plaintiff's affidavit of grievances" (Objs., Dkt 60 at 4). Plaintiff's contention fails to demonstrate any factual or legal error in the Magistrate Judge's analysis or conclusion. As for the apparent charge of bias, "judicial rulings alone almost never constitute a valid basis for a bias or partiality motion." *Liteky v. United States,* 510 U.S. 540, 555, 114 S.Ct. 1147, 127 L.Ed.2d 474 (1994). *See, e.g., Traficant v. C.I.R.,* 884 F.2d 258, 267 (6th Cir.1989) (holding that the plaintiff failed to demonstrate bias where the plaintiff pointed to episodes that were "nothing more than the Judge's rulings against Traficant on the merits"). Therefore, Plaintiff's Objection X is denied.

Next, Plaintiff argues that the Magistrate Judge "mistakenly disregarded the law" regarding the date on which his complaint is deemed filed (Objs., Dkt 60 at 4). Plaintiff's argument is unavailing. The Magistrate Judge expressly noted that while the Court received and docketed Plaintiff's complaint on August 1, 2013, "Plaintiff signed his complaint (and presumably submitted it for mailing) on July 27, 2013" (R & R, Dkt 54 at 1 n. 1). Thus, the Magistrate Judge concluded that Plaintiff's complaint was deemed filed as of July 27, 2013 (*id.,* citing *Brand v. Motley,* 526 F.3d 921, 925 (6th Cir.2008) (stating the "prison mailbox rule")). Plaintiff's Objection XI is therefore denied.

**\*4** Last, Plaintiff opines that "[t]he issues raised supported a continual aiding and abet [sic] of the claims raised in 2:13–cv–17 exhausted per retaliations, cruelty, deliberate indifferent [sic], imminent danger, loss of blood and possibly cancer" (Objs., Dkt 60 at 4). Plaintiff's reference to a case he filed last November does not serve to identify the portions of the Report and Recommendation in this case to which his objection is made or the basis for such objection. *See* W.D. Mich. LCivR 72.3(b). Therefore, Plaintiff's Objection XII is denied.

In sum, Plaintiff's twelve objections fail to demonstrate that a disposition different from the Magistrate Judge's recommendation is warranted.

### II. Plaintiff's "Second Notice for Enlargement"

This Court may, in its discretion and upon a showing of "good cause," extend the time for a party to file objections. *See* FED. R. CIV. P. 6; *Chandler v. Jackson,* 132 F.3d 32 (6th Cir.1997). As noted, this Court granted Plaintiff's first request for an extension of time and extended the deadline for filing objections. This is Plaintiff's second request for an additional unspecified amount of time to supplement the twelve objections he filed. Plaintiff does not indicate the substance of his proposed additional objections. Moreover, Plaintiff has failed to explain or identify any reason why he was precluded from filing all of his objections to the Report and Recommendation on the deadline previously extended by the Court. Indeed, his ability to file the present twelve objections to the Magistrate Judge's Report and Recommendation belies the presence of any obstacle that prevented him from filing all of his objections at one time. In short, having considered Plaintiff's request and the circumstances of this case, the Court discerns no good cause for an additional delay and therefore denies Plaintiff's "Second Notice for Enlargement." *See, e.g., Erby v. Nobles,* 932 F.2d 967, at *1 (6th Cir.1991) (holding the district court did not abuse its discretion in denying the plaintiff's motion for an extension of time where the plaintiff "did not even attempt to show cause").

Accordingly, this Court adopts the Magistrate Judge's Report and Recommendation as the Opinion of this Court. Because this Opinion and Order resolves the last pending claim in this case, the Court will enter a Judgment. *See* FED. R. CIV. P. 58. This action was filed *in forma pauperis,* and this Court certifies, pursuant to 28 U.S.C. § 1915(a)(3), that an appeal of the Judgment would not be taken in good faith. *See McGore v. Wrigglesworth,* 114 F.3d 601, 610 (6th Cir.1997), overruled on other grounds by *Jones v. Bock,* 549 U.S. 199, 206, 211–12, 127 S.Ct. 910, 166 L.Ed.2d 798 (2007). Therefore:

**IT IS HEREBY ORDERED** that Plaintiff's Objections (Dkt 60) are DENIED, Plaintiff's "Second Notice for Enlargement" (Dkt 62) is DENIED, and the Report and Recommendation (Dkt 54) is APPROVED and ADOPTED as the Opinion of the Court.

2014 WL 5073680

**\*5** **IT IS FURTHER ORDERED** that Defendant Wilkinson's Motion for Summary Judgment (Dkt 20) is GRANTED.

**IT IS FURTHER ORDERED** that Defendant Burdette's Motion for Summary Judgment (Dkt 24) is GRANTED.

**IT IS FURTHER ORDERED** that Defendant Nelson's Motion for Summary Judgment (Dkt 27) is GRANTED.

**IT IS FURTHER ORDERED** that the Court certifies pursuant to 28 U.S.C. § 1915(a) that an appeal of the Judgment would not be taken in good faith.

### *REPORT AND RECOMMENDATION*

ELLEN S. CARMODY, United States Magistrate Judge.

This matter is before the Court on *Defendant Wilkinson's Motion for Summary Judgment,* (Dkt.# 20); *Defendant Burdette's Motion for Summary Judgment,* (Dkt. # 24); and *Defendant Nelson's Motion for Summary Judgment,* (Dkt.# 27). Pursuant to 28 U.S.C. § 636(b) (1)(B), the undersigned recommends that Defendants' motions be **granted** and this matter **terminated.**

### *BACKGROUND*

Plaintiff initiated the present action on July 27, 2013,[1] against sixteen (16) individuals alleging various claims that his constitutional rights had been violated. On November 19, 2013, the Honorable Janet T. Neff dismissed all of Plaintiff's claims, save his denial of medical treatment claims asserted against Defendants Nelson, Wilkinson, and Burdette. Plaintiff's claims against Defendants Nelson, Wilkinson, and Burdette all concern events which occurred subsequent to Plaintiff's December 17, 2012, transfer to the Muskegon Correctional Facility (MCF). Defendants Nelson, Wilkinson, and Burdette now move for summary judgment on the ground that Plaintiff has failed to properly exhaust the claims against them.

### *SUMMARY JUDGMENT STANDARD*

Summary judgment "shall" be granted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(a). A party moving for summary judgment can satisfy its burden by demonstrating "that the respondent, having had sufficient opportunity for discovery, has no evidence to support an essential element of his or her case." *Minadeo v. ICI Paints,* 398 F.3d 751, 761 (6th Cir.2005); *see also, Amini v. Oberlin College,* 440 F.3d 350, 357 (6th Cir.2006) (quoting *Celotex Corp. v. Catrett,* 477 U.S. 317, 325, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986)). The fact that the evidence may be controlled or possessed by the moving party does not change the non-moving party's burden "to show sufficient evidence from which a jury could reasonably find in her favor, again, so long as she has had a full opportunity to conduct discovery." *Minadeo,* 398 F.3d at 761 (quoting *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 257, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986)).

Once the moving party demonstrates that "there is an absence of evidence to support the nonmoving party's case," the non-moving party "must identify specific facts that can be established by admissible evidence, which demonstrate a genuine issue for trial." *Amini,* 440 F.3d at 357 (citing *Anderson,* 477 U.S. at 247–48; *Celotex Corp. v. Catrett,* 477 U.S. at 324). While the Court must view the evidence in the light most favorable to the non-moving party, the party opposing the summary judgment motion "must do more than simply show that there is some metaphysical doubt as to the material facts." *Amini,* 440 F.3d at 357. The existence of a mere "scintilla of evidence" in support of the non-moving party's position is insufficient. *Daniels v. Woodside,* 396 F.3d 730, 734–35 (6th Cir.2005) (quoting *Anderson,* 477 U.S. at 252). The non-moving party "may not rest upon [his] mere allegations," but must instead present "significant probative evidence" establishing that "there is a genuine issue for trial." *Pack v. Damon Corp.,* 434 F.3d 810, 813–14 (6th Cir.2006) (citations omitted).

**\*6** Moreover, the non-moving party cannot defeat a properly supported motion for summary judgment by "simply arguing that it relies solely or in part upon credibility determinations." *Fogerty v. MGM Group Holdings Corp., Inc.,* 379 F.3d 348, 353 (6th Cir.2004). Rather, the non-moving party "must be able to point to some facts which may or will entitle him to judgment, or refute the proof of the moving party in some material

Jackson v. Nelson, Not Reported in F.Supp.3d (2014)

2014 WL 5073680

portion, and ... may not merely recite the incantation, 'Credibility,' and have a trial on the hope that a jury may disbelieve factually uncontested proof." *Id.* at 353–54. In sum, summary judgment is appropriate "against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial ." *Daniels,* 396 F.3d at 735.

While a moving party without the burden of proof need only show that the opponent cannot sustain his burden at trial, *see Morris v. Oldham County Fiscal Court,* 201 F.3d 784, 787 (6th Cir.2000); *Minadeo,* 398 F.3d at 761, a moving party with the burden of proof faces a "substantially higher hurdle." *Arnett v. Myers,* 281 F.3d 552, 561 (6th Cir.2002); *Cockrel v. Shelby County Sch. Dist.,* 270 F.3d 1036, 1056 (6th Cir.2001). "Where the moving party has the burden—the plaintiff on a claim for relief or the defendant on an affirmative defense—his showing must be sufficient for the court to hold that no reasonable trier of fact could find other than for the moving party." *Calderon v. United States,* 799 F.2d 254, 259 (6th Cir.1986) (quoting W. SCHWARZER, *Summary Judgment Under the Federal Rules: Defining Genuine Issues of Material Fact,* 99 F.R.D. 465, 487–88 (1984)). The Sixth Circuit has repeatedly emphasized that the party with the burden of proof "must show the record contains evidence satisfying the burden of persuasion and that the evidence is so powerful that no reasonable jury would be free to disbelieve it." *Arnett,* 281 F.3d at 561 (quoting 11 JAMES WILLIAM MOORE, ET AL., MOORE'S FEDERAL PRACTICE § 56.13[1], at 56–138 (3d ed.2000); *Cockrel,* 270 F.2d at 1056 (same). Accordingly, summary judgment in favor of the party with the burden of persuasion "is inappropriate when the evidence is susceptible of different interpretations or inferences by the trier of fact." *Hunt v. Cromartie,* 526 U.S. 541, 553, 119 S.Ct. 1545, 143 L.Ed.2d 731 (1999).

## *ANALYSIS*

Pursuant to 42 U.S.C. § 1997e(a), a prisoner asserting an action with respect to prison conditions under 42 U.S.C. § 1983 must first exhaust all available administrative remedies. *See Porter v. Nussle,* 534 U.S. 516, 524, 122 S.Ct. 983, 152 L.Ed.2d 12 (2002). Prisoners are no longer required to demonstrate exhaustion in their complaints. *See Jones v. Bock,* 549 U.S. 199, 216, 127

S.Ct. 910, 166 L.Ed.2d 798 (2007). Instead, failure to exhaust administrative remedies is "an affirmative defense under the PLRA" which the defendant bears the burden of establishing. *Id.* With respect to what constitutes proper exhaustion, the Supreme Court has stated that "the PLRA exhaustion requirement requires proper exhaustion" defined as "compliance with an agency's deadlines and other critical procedural rules." *Woodford v. Ngo,* 548 U.S. 81, 90–93, 126 S.Ct. 2378, 165 L.Ed.2d 368 (2006). In *Bock,* the Court reiterated that

> **\*7** Compliance with prison grievance procedures, therefore, is all that is required by the PLRA to 'properly exhaust.' The level of detail necessary in a grievance to comply with the grievance procedures will vary from system to system and claim to claim, but it is the prison's requirements, and not the PLRA, that define the boundaries of proper exhaustion.

*Bock,* 549 U.S. at 218.

According to MDOC policy, "[t]he total grievance process from the point of filing a Step I grievance to providing a Step III response shall generally be completed within 120 calendar days unless an extension has been approved in writing by the Grievance Coordinator at Step I and/or Step II." Mich. Dep't. of Corr., Policy Directive 03.02.130 ¶ S (effective July 9, 2007). MDOC policy further provides that if prison officials fail to timely respond to a grievance, the inmate may proceed to the next step in the grievance process. *See* Mich. Dep't. of Corr., Policy Directive 03.02.130 ¶ T.

In support of their motion, Defendants have submitted evidence that since being transferred to MCF, Plaintiff has pursued thirty-two (32) grievances through all three steps of the prison grievance process. (Dkt. # 21, Exhibit B at ID# 252–59). Plaintiff has not challenged this evidence. For purposes of the present analysis, these various grievances can be placed into one of two categories: (1) grievances that were not pursued to completion prior to the initiation of the present action; and (2) grievances that were pursued to completion prior to the initiation of the present action.

2014 WL 5073680

### I. Grievances Not Pursued to Completion
### Prior to Initiation of the Present Action

As Defendants correctly assert, many of the grievances Plaintiff pursued following his transfer to MCF were not properly completed prior to the initiation of the present action. As the Sixth Circuit has made clear, such attempts at exhaustion are insufficient.

Where an inmate files a civil action in federal court before completing the available administrative processes, his complaint (or certain claims therein) must be dismissed for failure to properly exhaust administrative remedies. *See, e.g., Freeman v. Francis,* 196 F.3d 641, 645 (6th Cir.1999) ("we must dismiss plaintiff's complaint because he filed his federal complaint before allowing the administrative process to be completed"); *Larkins v. Wilkinson,* 1998 WL 898870 at *2 (6th Cir., Dec.17, 1998) (inmate's "attempt to exhaust his available administrative remedies only after filing suit in federal court ignores the clear mandate of § 1997e(a)"); *Hopkins v. Ohio Department of Corrections,* 84 Fed. Appx. 526, 527 (6th Cir., Dec.4, 2003) ("[w]hen a prisoner fails to exhaust his administrative remedies before filing a civil rights complaint in federal court, or only partially exhausts administrative remedies, dismissal of the complaint is appropriate" because "[e]xhaustion may not be completed after a federal complaint has been filed").

**\*8** This does not mean, however, that simply because the response to a Step III grievance issues after the initiation of legal action that the grievance in question cannot serve to exhaust claims asserted therein. In circumstances in which a prisoner initiates legal action prior to receiving a response to his Step III grievance, but after the expiration of the aforementioned 120 day period, the Court has previously determined that such constitutes proper exhaustion of available administrative remedies. As the Court has observed, to conclude otherwise would permit MDOC officials to easily obtain the dismissal of *every* lawsuit filed by a prisoner who properly complies with the MDOC's grievance policies. MDOC officials would need only ignore every Step III grievance until after the expiration of the 120 day period and simply wait until the prisoner files a lawsuit. Once the prisoner files a lawsuit, MDOC officials could then issue a response to the Step III grievance and claim that the lawsuit must be dismissed because it was filed before the inmate completed the administrative process.

In sum, the administrative grievance process is not properly completed until the sooner of the following: (1) the prisoner receiving a response to his Step III grievance, or (2) the expiration of the 120–day grievance response period. The following twenty-five (25) grievances cannot serve to exhaust any of the claims asserted in the present action because Plaintiff initiated the present action, on July 27, 2013, before receiving a Step III grievance response and before the expiration of the 120–day grievance response period:

1. MCF–13–07–1120–17z

2. MCF–13–07–1122–01z

3. MCF–13–07–1165–14e

4. MCF–13–07–1072–12z1

5. MCF–13–07–1073–12z

6. MCF–13–07–1051–12z4

7. MCF–13–07–1052–12z

8. MCF–13–07–1053–03z

9. MCF–13–06–1002–12z

10. MCF–13–06–0930–17z

11. MCF–13–06–0950–28d

12. MCF–13–05–0872–28a

13. MCF–13–06–0949–28e

14. MCF–13–06–0929–28a

15. MCF–13–06–0927–12f

16. MCF–13–06–0928–12f

17. MCF–13–06–1001–28a

18. MCF–13–05–0830–12z1

19. MCF–13–04–0720–12z

20. MCF–13–04–0721–12z

21. MCF–13–05–0870–12e4

22. MCF–13–05–0871–12e4

23. MCF–13–04–0723–12z

Case 2:15-cv-12312-MOB-EAS ECF No. 58-2, PageID.1683 Filed 10/17/16 Page 25 of 71
Jackson v. Nelson, Not Reported in F.Supp.3d (2014)
2014 WL 5073680

24. MCF–13–04–0654–12z

25. MCF–13–04–0722–12z

(Dkt. # 21, Exhibit B).

To reiterate, when Plaintiff initiated the present action, the MDOC grievance process had not been completed as to any of the aforementioned grievances. Moreover, the fact that prison officials did not provide a response to any particular Step III grievance until after the expiration of the 120–day period is irrelevant. As the Sixth Circuit has made clear, whether the grievance process is properly completed after the initiation of legal action is irrelevant. Instead, the relevant question is whether the grievance process was properly completed at the moment legal action is initiated.

Plaintiff responds to Defendants' motion by asserting that because he was on modified grievance access from August 1, 2013, through November 1, 2013, his obligation to pursue all available administrative remedies was somehow excused. Whether Plaintiff was placed on modified grievance access subsequent to the initiation of this action is irrelevant. Plaintiff was required to properly exhaust his various claims prior to initiating this action on July 27, 2013. Thus, even if subsequently being placed on modified grievance status prevented Plaintiff from pursuing grievances, something Plaintiff has not established, such would nevertheless be irrelevant as it concerns the period of time after Plaintiff initiated the present action.

### II. Grievances Pursued to Completion
### Prior to Initiation of the Present Action

*9 The remaining seven (7) grievances that Plaintiff pursued through all three steps of the prison grievance process following his transfer to MCF, likewise fail to exhaust any of Plaintiff's remaining claims against Defendants Wilkinson, Burdette, or Nelson. Specifically, the grievances in question are neither asserted against Defendants Wilkinson, Burdette, or Nelson nor concern Plaintiff's denial of medical treatment claims asserted against these Defendants. The seven (7) grievances in question are as follows:

1. MCF–13–02–0440–15z

2. MCF–13–02–0272–03h

3. MCF–13–02–0244–28a

4. MCF–13–01–0082–28e

5. MCF–13–02–0233–28a

6. MCF–13–01–0095–28c

7. MCF–13–01–0083–01z

(Dkt. # 21, Exhibit B).

Again, Plaintiff's only response to Defendants' motions is that because he was on modified grievance access from August 1, 2013, through November 1, 2013, his obligation to pursue all available administrative remedies was somehow excused. As discussed above, this argument is without merit. The Court concludes, for the reasons discussed above, that Defendants have carried their burden of demonstrating that Plaintiff has failed to properly exhaust any of his remaining claims. Accordingly, the undersigned recommends that Defendants' motions be granted.

### CONCLUSION

For the reasons articulated herein, the undersigned recommends that *Defendant Wilkinson's Motion for Summary Judgment,* (Dkt.# 20), be **granted;** *Defendant Burdette's Motion for Summary Judgment,* (Dkt.# 24), be **granted;** *Defendant Nelson's Motion for Summary Judgment,* (Dkt.# 27), be **granted;** and this matter **terminated.** The undersigned further recommends that appeal of this matter would not be taken in good faith. *See McGore v. Wrigglesworth,* 114 F.3d 601, 611 (6th Cir.1997); 28 U.S.C. § 1915(a)(3).

OBJECTIONS to this Report and Recommendation must be filed with the Clerk of Court within fourteen (14) days of the date of service of this notice. 28 U.S.C. § 636(b)(1)(C). Failure to file objections within the specified time waives the right to appeal the District Court's order. *See Thomas v. Arn,* 474 U.S. 140, 106 S.Ct. 466, 88 L.Ed.2d 435 (1985); *United States v. Walters,* 638 F.2d 947 (6th Cir.1981).

Date: August 6, 2014.

2014 WL 5073680

**All Citations**

Not Reported in F.Supp.3d, 2014 WL 5073680

Footnotes

1    The Court received and docketed Plaintiff's complaint on August 1, 2013, however, Plaintiff signed his complaint (and
     presumably submitted it for mailing) on July 27, 2013. (Dkt.# 1). Thus, pursuant to the "prison mailbox rule," Plaintiff's
     complaint is deemed filed as of July 27, 2013. *See Brand v. Motley,* 526 F.3d 921, 925 (6th Cir.2008) ("a pro se prisoner's
     complaint is deemed filed when it is handed over to prison officials for mailing").

---

**End of Document**                                          © 2016 Thomson Reuters. No claim to original U.S. Government Works.

Case 2:15-cv-12312-MOB-EAS ECF No. 58-2, PageID.1685 Filed 10/17/16 Page 27 of 71

Johnson v. Metropolitan Government of Nashville and..., 502 Fed.Appx. 523...

502 Fed.Appx. 523
This case was not selected for
publication in the Federal Reporter.
Not for Publication in West's Federal Reporter.
See Fed. Rule of Appellate Procedure 32.1
generally governing citation of judicial decisions
issued on or after Jan. 1, 2007. See also
Sixth Circuit Rule 28. (Find CTA6 Rule 28)
United States Court of Appeals,
Sixth Circuit.

William L. JOHNSON, et al., Plaintiffs–Appellants,
v.
Middle METROPOLITAN GOVERNMENT
OF NASHVILLE AND DAVIDSON COUNTY,
TENNESSEE, et al., Defendants–Appellees.

Nos. 10–6102, 11–5174.
|
Oct. 18, 2012.

**Synopsis**
**Background:** Caucasian male police officers brought action against police department and its former chief, asserting reverse discrimination claims under Title VII and Tennessee Human Rights Act (THRA). The United States District Court for the District of Tennessee, Aleta A. Trauger, J., 2010 WL 3342211, entered summary judgment for department, and officers appealed.

**Holdings:** The Court of Appeals, Clay, Circuit Judge, held that:

[1] department's destruction of promotion survey results did not warrant spoliation sanctions;

[2] department spokesperson's statements about diversity were not direct evidence of reverse discrimination under Title VII;

[3] officers failed to establish a prima facie case of reverse discrimination under Title VII; and

[4] officers failed to state a claim for disparate impact discrimination.

Affirmed.

**West Headnotes (10)**

**[1]** **Federal Civil Procedure**
&#128073; Failure to Comply;Sanctions

Police department's destruction of promotion survey results did not warrant spoliation sanctions in police officers' action alleging reverse discrimination in violation of Title VII and Tennessee Human Rights Act (THRA); although department was statutorily obligated to preserve surveys and police chief intentionally ordered their destruction, surveys were of minimal relevance to officers' claims, since they consisted only of supervisors' numerical scoring of promotion candidates and did not instruct supervisors to consider race, gender, or diversity in making their decisions. Civil Rights Act of 1964, § 701 et seq., 42 U.S.C.A. § 2000e et seq.; West's T.C.A. § 4–21–101 et seq.

9 Cases that cite this headnote

**[2]** **Civil Rights**
&#128073; Reverse Discrimination

Memorandum written by police department's deputy chief urging promotion of a group of officers that included five minority candidates before next slate of officers, which contained no minority candidates, became eligible for promotion was not direct evidence of reverse discrimination in violation of Title VII, since deputy chief was not a decisionmaker in promotion process. Civil Rights Act of 1964, § 703, 42 U.S.C.A. § 2000e–2.

Cases that cite this headnote

**[3]** **Civil Rights**
&#128073; Reverse Discrimination

Police department spokesperson's alleged statements to local newspapers that department would consider diversity in making its promotion decisions was not direct

Case 2:15-cv-12312-MOB-EAS ECF No. 58-2, PageID.1686 Filed 10/17/16 Page 28 of 71

Johnson v. Metropolitan Government of Nashville and..., 502 Fed.Appx. 523...

evidence of reverse discrimination in violation of Title VII; spokesperson's statements merely reflected department's awareness of a lack of minorities within its upper ranks and its desire to improve diversity. Civil Rights Act of 1964, § 703, 42 U.S.C.A. § 2000e–2.

2 Cases that cite this headnote

**[4]** **Civil Rights**
    👉 Discrimination against men; reverse discrimination

Police department commander's alleged statement that female officers received preferential treatment in department's promotion decisions was not direct evidence of reverse discrimination in violation of Title VII, since commander was not a decisionmaker in promotion process. Civil Rights Act of 1964, § 703, 42 U.S.C.A. § 2000e–2.

6 Cases that cite this headnote

**[5]** **Civil Rights**
    👉 Discrimination against men; reverse discrimination

Evidence that female officers received preferential treatment in police department's promotion process and that police chief was acutely conscious of department's long history of racial and gender imbalance was sufficient to show that department discriminated against the majority, as required to establish a prima facie case of reverse discrimination in violation of Title VII. Civil Rights Act of 1964, § 703, 42 U.S.C.A. § 2000e–2.

5 Cases that cite this headnote

**[6]** **Civil Rights**
    👉 Discrimination against men; reverse discrimination
**Civil Rights**
    👉 Race, color, ethnicity, or national origin

Caucasian male police officers who were passed over for promotion failed to demonstrate that they were similarly situated

to minority officers who were chosen for promotion, as required to establish a prima facie case of reverse discrimination in violation of Title VII; officers' survey results fell below line for promotion. Civil Rights Act of 1964, § 703, 42 U.S.C.A. § 2000e–2.

2 Cases that cite this headnote

**[7]** **Civil Rights**
    👉 Discrimination against men; reverse discrimination
**Civil Rights**
    👉 Race, color, ethnicity, or national origin

Even assuming caucasian male officers established a prima facie case of reverse discrimination against police department under Title VII, they failed to demonstrate that department's proffered legitimate, non-discriminatory reason for denying them promotions, specifically their poor survey results, was mere pretext for discrimination; officers' survey results fell below line for promotion, and minority officers with poor results also were not selected for promotion. Civil Rights Act of 1964, § 703, 42 U.S.C.A. § 2000e–2.

1 Cases that cite this headnote

**[8]** **Federal Civil Procedure**
    👉 Time for amendment
**Federal Civil Procedure**
    👉 Pretrial Order

District court properly denied caucasian male officers' motion to amend their complaint to add allegations of disparate impact discrimination in their action against police department under Title VII; officers failed to show good cause for seeking an amendment more than two months after deadline in court's scheduling order. Civil Rights Act of 1964, § 703, 42 U.S.C.A. § 2000e–2.

7 Cases that cite this headnote

**[9]** **Civil Rights**

Case 2:15-cv-12312-MOB-EAS ECF No. 58-2, PageID.1687 Filed 10/17/16 Page 29 of 71

Johnson v. Metropolitan Government of Nashville and..., 502 Fed.Appx. 523...

👉 Discrimination against men; reverse discrimination

**Civil Rights**
👉 Race, color, ethnicity, or national origin

Caucasian male officers' allegation that police department ignored objective criteria it gathered from written examinations and assessments in making its promotion decisions because of an intent to discriminate against majority candidates was insufficient to support a disparate impact claim under Title VII; officers' allegation was more akin to a disparate treatment claim. Civil Rights Act of 1964, § 703, 42 U.S.C.A. § 2000e–2.

Cases that cite this headnote

[10] **Civil Rights**
👉 Costs

**Civil Rights**
👉 Taxation

Police chief was not required to file a separate bill of costs from police department, which paid his legal fees, in order to be awarded attorneys' fees and costs as a prevailing party in caucasian male officers' action alleging reverse discrimination in violation of Title VII. Civil Rights Act of 1964, § 703, 42 U.S.C.A. § 2000e–2; Fed.Rules Civ.Proc.Rule 54(d)(1), 28 U.S.C.A.

1 Cases that cite this headnote

**\*525** On Appeal From The United States District Court For The District Of Tennessee.

BEFORE: CLAY and KETHLEDGE, Circuit Judges; DOW, District Judge.[*]

**Opinion**

CLAY, Circuit Judge.

**\*\*1** Plaintiffs William L. Johnson, Julian W. Moore, and Keith M. Holley, police officers employed by Defendant Metropolitan Police Department ("MNPD") of Nashville, Tennessee, appeal the district court's grant

of summary judgment on Plaintiffs' reverse discrimination claims. Plaintiffs were passed over for promotion as a result of a departmental policy that they allege favored minority and female candidates. They sued Defendants MNPD; Metropolitan Government of Nashville and Davidson County ("Metro"); MNPD's former chief, Ronal W. Serpas; and other MNPD personnel, alleging violations of 42 U.S.C. § 1983; Title VII of the 1964 Civil Rights Act, 42 U.S.C. § 2000e; and the Tennessee Human Rights Act ("THRA"), Tenn.Code Ann. §§ 4-21-401–4-21-408. The district court dismissed several of Plaintiffs' claims and, after the parties conducted discovery, granted Defendants' motion for summary judgment. Plaintiffs now appeal that judgment, several evidentiary rulings, and the district court's decision to tax costs against them. For the reasons that follow, we **AFFIRM** the district court's judgment in all respects.

**BACKGROUND**

**I. The MNPD Promotion Policy**
Prior to 2006, it was MNPD's policy to promote officers strictly through the use of standardized tests. An officer applying for a promotion completed a written civil service examination and took part in a performance assessment designed to evaluate the officer's skills and leadership ability. The score received by the officer on each examination was combined into a composite score. The candidates were ranked according to their composite scores, and the departmental chief was required to promote the officers according to ranking, even if the chief believed that a lower-ranked officer was more qualified than a higher-ranked officer.

This policy was the target of criticism in some corners. For one, an outside consultant performed an audit of the MNPD in 2002 and concluded that this method of promoting officers failed to take important criteria into consideration, such as each candidate's managerial skill and past performance. There was also concern about whether the policy inhibited minority candidates from earning promotions, an issue that the local media reported in news articles around 2003. In addition, there was a broader concern internally about the diversity of the MNPD's ranks. For example, Metro and MNPD officials complained to the attorney who represented the police officers union about a lack of diversity in the police force's upper ranks during a meeting regarding negotiations on

Case 2:15-cv-12312-MOB-EAS  ECF No. 58-2, PageID.1688  Filed 10/17/16  Page 30 of 71

Johnson v. Metropolitan Government of Nashville and..., 502 Fed.Appx. 523...

changes to the promotion policy. These officials **\*526** theorized that the testing scheme exacerbated the problem.

Well before changes were implemented to MNPD's testing system, MNPD officials made other attempts to increase the department's racial diversity. In December 2003, Deputy Chief Anderson wrote a memorandum to acting Chief of Police Deborah Faulkner urging her to promote fifteen officers to the rank of sergeant before the current slate of officers eligible for promotions expired on January 9, 2004 (the "Anderson memo"). According to the memorandum, the current slate of fifteen officers included five minority candidates, but the upcoming list did not include a single minority officer. As the memorandum further explained, because a list of candidates was effective for several years, and because minority candidates reached the candidate list in lower numbers than white candidates under the test-based promotions policy, it would be impossible for minority candidates to be promoted if they were not selected from the current slate. Faulkner announced the promotion of several officers shortly after the date of the memorandum, and the group included several minority candidates.

**\*\*2** Against this background, MNPD's promotion policy underwent significant change in 2004. Defendant Ronal W. Serpas, who was hired as the MNPD's permanent chief in 2004, shared the prevalent concerns about the test-based promotion policy's soundness. He and Metro's Human Resources Department ("Metro HR") recommended changing the policy, which the Metropolitan Civil Service Commission ("the Commission") did in 2006. Metro hired an outside contractor to design and implement a new policy to replace the test-based promotion policy.

The new policy continues to feature standardized tests, but now also gives the police chief a measure of discretion in deciding whom to promote. Under the new policy, officers must still complete the written civil service examination and skills and leadership assessment. The test results are again combined into a composite score, with the assessment counting for 80% of a lieutenant candidate's score, and 70% of a sergeant candidate's score. The candidates are then ranked according to their scores.

However, under the new policy, when the chief prepares to promote an officer, he is given an eligibility roster that lists the seven highest-scoring candidates eligible for promotion to the rank of lieutenant or lists the nine highest-scoring candidates eligible for promotion to sergeant. The roster does not rank the candidates according to their composite scores. Rather, the roster simply lists the officers' names in alphabetical order and does not reveal their scores. Each officer on the list is considered equally qualified for promotion. The chief is not restricted in choosing among candidates from the list. If the chief has multiple vacancies to fill, he can fill them entirely from the roster given to him. If, however, the chief finds that none of the candidates are suitable for promotion, he may also choose to promote none of them, and he may instead request a new roster with the next tier of candidates. If the chief obtains another roster, the Commission removes the names of the candidates not selected and then adds the next highest-scoring candidates.

## II. The Disputed Promotions

This litigation concerns several lieutenant and sergeant vacancies that became available during 2006 and 2007. Plaintiffs Johnson and Moore applied for promotions to lieutenant, and Plaintiff Holley applied to become a sergeant. Each officer was passed over and now contends that considerations of race and gender improperly affected Serpas' promotion decisions.

**\*527** Serpas made his selections in three separate rounds between October 2006 and May 2007. Moore's composite test score ranked him seventh overall, and therefore his name appeared on the first roster submitted to Serpas. Moore was not selected, in spite of the fact that a commander allegedly invited Moore to a meeting of higher-ranked officers under the expectation that Moore would be promoted. Johnson was ranked ninth among the candidates and was therefore not on the first roster given to Serpas. Johnson's name appeared on the second roster that was submitted to Serpas, and Serpas did not select Johnson for promotion. According to Johnson and Moore, three female candidates and two black male candidates ranked lower than them were selected instead. Moore and Johnson contend that only race and gender can account for the fact that these candidates were selected in front of them. Defendants note, however, that three white male candidates who ranked below both Moore and Johnson also were selected for promotion.

**\*\*3** For his part, Holley was ranked as a "police officer II" and applied to become a sergeant around the same

Case 2:15-cv-12312-MOB-EAS ECF No. 58-2, PageID.1689 Filed 10/17/16 Page 31 of 71

Johnson v. Metropolitan Government of Nashville and..., 502 Fed.Appx. 523...

period. Serpas made selections for the sergeant positions in three separate rounds between February and September 2007. Like Johnson, Holley was not on the first roster submitted to Serpas, because Holley's composite test score ranked him sixteenth among the sergeant candidates. In his affidavit testimony, Holley asserted his name eventually moved up into the roster for promotion, but that twenty-nine officers were eventually promoted to sergeant instead of him. Holley does not allege how many female and black male officers were promoted in front of him, but he contends that the highest-ranked black male officer in the initial rankings was ranked tenth and that the next-highest-ranked black male officer was ranked lower than twentieth. In their defense, Defendants assert that Serpas promoted eleven white males who obtained composite scores lower than Holley and declined to promote one white female who scored below Holley.

Plaintiffs nonetheless contend that Serpas and other MNPD supervisors abused the discretion granted them under the new promotion policy in order to favor promotions of minority and female candidates. In support of their contention, they cite, in addition to Serpas' selections noted above, several statements that MNPD officials made to local newspapers. For example, MNPD spokesperson Dan Aaron explained the department's rationale for the changes to the promotion policy to *The Tennessean* in October 2006. The article stated:

> Promoting the best candidates possible was the priority, and the chief was pleased there were diverse candidates to pick from near the top of the list, Aaron said.

> "The goal of this police department is to mirror the population of the city to the greatest extent possible," Aaron said. "When presented with the opportunity to promote bright, qualified minority candidates, you always give those persons consideration."

*The Tennessean* wrote another article about the promotions in April 2007, this time emphasizing non-minority officers' complaints about the policy. Aaron was again quoted, this time saying, "[i]f you have two candidates who are essentially equal and believe that both would make very good supervisors, and if your choice is to make the department more diverse, you would probably elect to include diversity in your choice." In an article from another local news agency, Aaron was quoted as saying that MNPD changed its promotion policy in order to increase diversity among MNPD leadership.

**\*528  III. The Anonymous Supervisor Surveys**

According to Plaintiffs, their claims of reverse discrimination gain further support by Serpas' decision to use anonymous surveys completed by the candidates' supervisors as part of his selection process. At some point in 2006 or 2007, Serpas directed Eric Cardinal, an MNPD technology analyst, to develop a computer-based survey for department supervisors to fill out in order to report their assessments of the various lieutenant and sergeant candidates. As we explain below, Cardinal developed the program and disbursed it digitally to the supervisors, who completed the surveys prior to each round of promotions. Serpas used the surveys as part of his decision about whom to promote. While the instructions for the surveys are in the record, the surveys themselves are not available to us, because Serpas directed Cardinal to dispose of them once Serpas was finished using them. Plaintiffs contend that in allowing the surveys to be deleted, Defendants violated federal law and breached their discovery obligations. Upon learning of the destruction of the surveys, Plaintiffs moved for a default judgment or, alternatively, a negative inference against Defendants. The district court denied both requests.

**\*\*4**  Cardinal described the survey in his deposition testimony. Cardinal sent an email to the appropriate supervisors that contained an internet link, which, when clicked, opened a page on the MNPD's intranet. The supervisor was directed to fill in the log-in information and was then given a set of instructions (which are contained in the record). The supervisor then arrived at the survey form, titled "Promotion Readiness and Potential Ratings for Sergeant Candidates," with the lieutenant survey accompanied by a similar title. The survey form explained that the survey's purpose was "to seek the opinions of supervisory and management personnel who have worked directly with, or otherwise have personal awareness of the skills, abilities, and knowledge possessed by, candidates eligible for promotion to the rank of Sergeant [and Lieutenant] as to their overall readiness and skill." The instructions directed the supervisor to "consider the candidate's potential to lead, manage resources, and successfully perform the duties that he or she will be required to perform."

The supervisor was then asked to rate each candidate in several categories on a scale of 1 to 3, with 1 standing for "lowest potential" and 3 standing for "highest potential."

Case 2:15-cv-12312-MOB-EAS ECF No. 58-2, PageID.1690 Filed 10/17/16 Page 32 of 71

Johnson v. Metropolitan Government of Nashville and..., 502 Fed.Appx. 523...

In the interest of creating a spread in the candidates' scores, the supervisor was only allowed to award a certain number of 3, 2, and 1 rankings. The supervisor was instructed not to complete a survey for a candidate with whom he was not sufficiently acquainted. When the supervisor completed the survey, the computer program added his ratings to those of other supervisors regarding a particular candidate. When all the supervisors had completed their surveys, the computer program generated an average score for that candidate, referred to by the parties as a "rollup" score. Supervisors at and above the rank of lieutenant completed surveys for the lieutenant candidates, and supervisors at and above the rank of sergeant completed surveys for the sergeant candidates.

After the supervisors completed each round of surveys, Serpas examined each candidate's rollup score. The rollup score showed each candidate's name, the number of supervisors who rated him, and the candidate's raw and average scores. After Serpas examined the rollups, Cardinal deleted the data and notified Serpas that he had done so. Cardinal could have designed the program to save the data, but **\*529** Serpas did not direct him to do so. Serpas did, however, save the rollup scores for each candidate, and Defendant turned that evidence over to Plaintiffs during discovery.

In his deposition testimony, Serpas testified that he requested the computerized survey because he had not personally met many of the promotion candidates in his three years of leading the MNPD. He testified that he made his promotion decisions after considering the candidates' employment, sick leave, and disciplinary records; their assignment positions; their educational and training experiences; and any citizen complaints filed against them. According to Serpas, the surveys added to the pool of information he used in his selections, and their simplified format allowed him to avoid the time required to personally interview each supervisor about each candidate. Serpas did not keep any notes documenting his promotion decisions. As Plaintiffs point out, the personnel files Serpas consulted disclosed the race and gender of each candidate. Nevertheless, Serpas testified that race and gender played no part in his decision and that he chose other candidates over Plaintiffs because he decided those candidates "were more likely to be successful" than Plaintiffs.

**\*\*5** As a general matter, Serpas did not promote any candidate with an average rollup score below 2.0, and each Plaintiff in the instant case scored below that threshold on each of the three supervisor surveys conducted on their performance. Moore received average scores of 1.58 from twelve supervisor surveys in the first round, 1.59 from seventeen supervisor surveys in the second round, and 1.61 from eighteen supervisors in the final round. Johnson received average scores of 1.56 from sixteen supervisors in the first round, 1.58 from twelve supervisor surveys in the second round, and 1.67 from twelve supervisor surveys in the third round. Holley was scored on only two rounds of surveys, and in both rounds thirty-three supervisors scored him for scores of 1.42 and 1.70. These scores placed each Plaintiff near the bottom of their candidate pools.

Nevertheless, Plaintiffs offer several reasons for which they believe that Serpas' use of the surveys was improper. First, Plaintiffs allege that they were not made aware that the surveys would be used as a basis of Serpas' decision, and they argue that it was unfair for Serpas to use the procedure when it had not been disclosed to the candidates. Plaintiffs also consider it improper that a different number of supervisors rated them during each round of surveys. In response, Defendants contend that this inconsistency was actually a virtue of the surveys, because, in their view, it demonstrates that the supervisors followed the survey directions not to rate the candidates with whom they were unacquainted. Finally, Plaintiffs contend that Serpas used the surveys as a subterfuge to favor minority and female candidates, and they argue that he allowed Cardinal to destroy the surveys in order to hide the department's reverse discrimination.

### IV. Plaintiffs' Meetings with their Supervisors and Human Resources

After Serpas made his selections, Moore, Johnson, and Holley sought explanations for their non-promotion from department officials. Moore and Johnson met separately with MNPD Deputy Chiefs Steve Anderson, Honey Pike, and Joseph Bishop. In his meeting, Johnson asked the deputy chiefs what information the department used to decide whom to promote. The deputy chiefs told him generally that they used many types of information. Johnson asked the panel whether his work history was used in the decision, and **\*530** he asserts that Deputy Chief Anderson answered in a manner suggesting that he did not know whether that information was considered. Johnson told the panel that he believed he was the victim

Case 2:15-cv-12312-MOB-EAS  ECF No. 58-2, PageID.1691  Filed 10/17/16  Page 33 of 71

Johnson v. Metropolitan Government of Nashville and..., 502 Fed.Appx. 523...

of reverse discrimination and asked the deputy chiefs to investigate his complaint, but he alleges that the deputy chiefs never did so.

Johnson also spoke with other MNPD officials and purportedly received information that supported his view that female and minority candidates received favorable treatment. He spoke with a commander who allegedly told him that "diversity issues needed to be dealt with" in the promotions process. Johnson also spoke with an official within Metro HR. When Johnson asked the official whether the candidates' race and gender affected the promotions decision, the official allegedly answered, "We all know what happened, if you know what I mean."

**6** Moore also discussed his complaint with the deputy chiefs and recorded his conversation. Moore repeatedly raised the issue of race and its effect on the promotions decision, in response to which Deputy Chief Pike conceded that MNPD did not reflect the community's racial and gender diversity. However, Deputy Chief Pike also insisted that the promotion policy was aimed at identifying the most qualified candidates, regardless of minority status. According to Moore, Deputy Chief Pike urged Moore to examine his own performance, evaluate whether he deserved a promotion, and discuss his performance with his direct supervisors. Moore told the deputy chiefs that he had done so and concluded that he possessed the qualities required to serve as a lieutenant. Like Johnson, Moore expressed his belief that he was the victim of reverse discrimination, but the deputy chiefs allegedly did not investigate the complaint.

Finally, Holley discussed his failure to earn a promotion with the three deputy chiefs as well. According to Holley, none of the deputy chiefs offered him useful information about why he was not promoted. Holley explained that his direct supervisor urged him to reapply for a promotion. He also said that he was more involved in community affairs than other officers and was often approached by other officers for answers about departmental policy and the law. Nevertheless, according to Holley, the deputy chiefs simply gave him a piece of paper listing thirty-three names with his name thirty-second among the list.

### V. Procedural History

Dissatisfied with the department's promotion decisions, Plaintiffs filed two separate suits in federal district court. Johnson and Moore sued in September 2007, alleging

violations of the Equal Protection Clause of the United States Constitution, 42 U.S.C. § 1983, and the THRA. After Johnson and Moore received right-to-sue letters from the Equal Employment Opportunity Commission, they added claims of disparate impact and disparate treatment under Title VII. For his part, Holley filed a similar suit in January 2008, though his complaint contained no Title VII claims, and he did not sue the MNPD. The district court eventually consolidated the cases.

Defendants Pike, Bishop, Anderson, and MNPD filed successful motions to dismiss and all claims against them were dismissed on May 13, 2008.[1] *See Johnson v. Metro.* **\*531** *Gov't of Nashville & Davidson Cnty., Tenn.,* Nos. 3:07–0979, 3:08–0031, 2008 WL 2066475 (M.D.Tenn. May 13, 2008) ("*Johnson I*"). Plaintiffs do not appeal those rulings.

Shortly thereafter, Metro filed a separate motion to dismiss Johnson and Moore's disparate impact claim.[2] (RE 68, Mot. to Dismiss.) Plaintiffs filed a response and also sought leave to amend their complaint. The district court denied Plaintiffs' motion and dismissed the disparate impact claim. *Johnson v. Metro. Gov't of Nashville & Davidson Cnty.,* Nos. 3:07–0979, 3:08–0031, 2008 WL 3163531 (M.D.Tenn. Aug. 4, 2008) ("*Johnson II*").

**7** Following those rulings, Plaintiffs' remaining claims asserted that Metro and Serpas violated the Equal Protection Clause and Defendants' rights as protected by Title VII and the THRA. Defendants moved for summary judgment in June 2010. During the same month, Plaintiffs moved for a default judgment or, alternatively, for an adverse finding against Defendants, based upon Defendants' failure to completely preserve the records from the supervisor surveys.

On August 24, 2010, the district court denied Plaintiffs' motions for a default judgment and an adverse factual finding, granted summary judgment in favor of Defendants, and entered judgment on all claims in favor of Metro and Serpas. *Johnson v. Metro. Gov't of Nashville,* Nos. 3:07–0979, 3:08–0031, 2010 WL 3342211 (M.D.Tenn. Aug. 24, 2010) ("*Johnson III*").

In November 2010, the clerk of the court taxed costs against Plaintiffs. The clerk awarded to Metro the costs of defending both Metro and Serpas. Plaintiffs challenged

Case 2:15-cv-12312-MOB-EAS   ECF No. 58-2, PageID.1692   Filed 10/17/16   Page 34 of 71

Johnson v. Metropolitan Government of Nashville and..., 502 Fed.Appx. 523...

the clerk's taxation of costs, but the district court upheld the award. *Johnson, et al. v. Metro. Gov't of Nashville,* Nos. 3:07–0979, 3:08–0031, 2011 WL 166320 (M.D.Tenn. Jan. 18, 2011) ("*Johnson IV* ").

Plaintiffs timely appealed the district court's rulings. Original jurisdiction exists pursuant to 28 U.S.C. §§ 1331 and 1367. This Court exercises jurisdiction pursuant to 28 U.S.C. § 1291.

### DISCUSSION

### I. Spoilation of Evidence

Before addressing the merits, we turn first to Plaintiffs' claim that the district court erred in refusing to impose sanctions against Defendants for spoilation of evidence. Plaintiffs contend that they are entitled an inference of discriminatory animus or to a directed verdict because Defendants failed to preserve the individual results of the supervisor surveys and thereby purposefully deprived Plaintiffs of valuable information supporting their claims of reverse discrimination.

This Court reviews a district court's decision regarding spoilation of evidence for abuse of discretion. *Beaven v. U.S. Dep't of Justice,* 622 F.3d 540, 553 (6th Cir.2010) (citing *Adkins v. Wolever,* 554 F.3d 650, 652 (6th Cir.2009) (en banc)). Federal law governs the determination of whether spoilation sanctions are appropriate. *Adkins,* 554 F.3d at 652. A proper spoilation sanction serves both fairness and punitive functions. *Id.* To accomplish these goals, a district court has "broad discretion" to order sanctions it deems appropriate, including dismissing the case, granting summary judgment, or imposing an adverse inference based on the lost or destroyed evidence. *Id.* Recently, this Court articulated a three-part standard for determining whether sanctions are appropriate:

[A] party seeking an adverse inference instruction based on the destruction of evidence must establish (1) that the party **\*532** having control over the evidence had an obligation to preserve it at the time it was destroyed; (2) that the records were destroyed "with a culpable state of mind;" and (3) that the destroyed evidence was "relevant" to the party's claim or defense such that a reasonable trier of fact could find that it would support that claim or defense.

**\*\*8** *Beaven,* 622 F.3d at 553 (quoting *Residential Funding Corp. v. DeGeorge Fin. Corp.,* 306 F.3d 99, 107 (2d Cir.2002) (citation omitted)).

In applying this three-part standard, we explained that the obligation element is met where a defendant knows evidence might be relevant to future potential litigation. *Id.* Where, however, there is no notice of potential litigation, there is less cause to believe the evidence was destroyed intentionally or with the intent to cover up incriminating information. *See id.* Nevertheless, we also noted that the "culpable state of mind" element may be satisfied by showing only that "the evidence was destroyed 'knowingly, even if without intent to breach a duty to preserve it, or negligently.' " *Id.* (internal citation, brackets, quotations omitted).

[1] In the instant case, Plaintiffs argue that Metro was obligated to preserve the individual survey results scored by each supervisor, in addition to the averaged rollup scores. Plaintiffs cite several regulations promulgated by the Equal Employment Opportunity Commission ("EEOC") and pursuant to Title VII that obligate employers to preserve employment "records." *See* 42 U.S.C. §§ 2000(e) 8, 2000(e) 12; 29 C.F.R. § 1602.31. Defendants counter that employers are not required to keep every single piece of paper created during the employment process, *see Rummery v. Ill. Bell Tel. Co.,* 250 F.3d 553, 558 (7th Cir.2001), and that the rollup scores were sufficient to satisfy their statutory preservation obligations.

We agree with the district court that Defendants ought to have preserved the individual survey scores. The surveys were part of, and indeed played an integral role in, a significant change to an already controversial promotion system. Whether through formal litigation or otherwise, it was reasonably foreseeable that Defendants would face some sort of challenge to the new promotions system. Defendants should have anticipated that officers who were passed over for promotion might question that decision and that Defendants would need to defend their selections. By deleting the individual surveys, Defendants also deprived the officers of valuable information regarding their individual performance, their likelihood for future promotion, and information that might have been used in litigation. Regardless of whether the rollups were the most efficient way for Serpas to review the survey

Case 2:15-cv-12312-MOB-EAS ECF No. 58-2, PageID.1693 Filed 10/17/16 Page 35 of 71

Johnson v. Metropolitan Government of Nashville and..., 502 Fed.Appx. 523...

results, the individual scores had value warranting their preservation beyond his decision-making process.

Furthermore, Defendants were statutorily obligated to preserve the surveys under EEOC and Title VII regulations. The individual surveys are more properly viewed as records in and of themselves, rather than the "rough drafts" or "processes" used to create a final employment record. *See id.* at 558. Finally, it was technologically and logistically feasible to retain the survey data, and Defendants have provided no convincing explanation for why they failed to do so.

 **\*\*9** Having determined that Defendants were obligated to preserve the surveys, the next question is whether Defendants destroyed the evidence with requisite culpable state of mind. Plaintiffs contend that this element is satisfied because the records were destroyed "knowingly" or "negligently" even if the Chief acted "without [the specific] intent to breach [his] **\*533** duty" to preserve. *See Beaven,* 622 F.3d at 553. The district court rejected this argument, reasoning that Plaintiffs could not show that Serpas "acted in bad faith." *Johnson III,* 2010 WL 3342211, at * 19.

The district court erred by injecting a bad faith component into its spoliation analysis. In *Adkins,* we recognized that there may be a "continuum of fault ranging from innocence through the degrees of negligence to intentionality." 554 F.3d at 652–53. To the extent bad faith is relevant in a spoliation decision, its most appropriately taken into consideration when adjusting the sanction imposed. In the instant case, the record shows that Serpas deliberately chose not to preserve the results and deliberately ordered the destruction of the individual surveys. Although there is no evidence to show that he acted out of bad faith, his conduct was nevertheless intentional and therefore meets the "culpable state of mind" element.

Finally, Plaintiffs must prove that the destroyed surveys are "relevant" to their claims of reverse discrimination. This, however, is where Plaintiffs' request for sanctions must fail. The information Plaintiffs wishes was preserved is of minimal relevance to proving their case for reverse discrimination. First, the surveys themselves were a rather blunt instrument for measuring the supervisors' opinions. The individual results would have consisted only of a string of each supervisor's scoring, rated on a simple 1–to–

3 scale, based on instructions which asked the supervisors to take into account a host of qualities demonstrating promotional readiness. The instructions did not tell the supervisors to consider race, gender, or diversity, and to the extent that such motives improperly influenced the scores, they likely would not be immediately apparent from the surveys' simplistic numerical system.

In order to link discriminatory intent to the surveys, Plaintiffs would have to examine each supervisor's rankings for patterns of race or gender discrimination. However, the record does not indicate that the program was enabled in such a way as to accomplish this. Although the supervisors used a log-in "name" and password to access the surveys, the record is unclear as to whether the supervisor's identity was saved alongside with the survey results. Moreover, even if that information was available, multiple inferences would be required to connect the individual surveys relevancy to Plaintiffs' claims. Plaintiffs would need to demonstrate not only an individual supervisor's pattern of discrimination, but also that the pattern of discrimination adversely affected the aggrieved candidate's averaged scores in comparison to his minority counterparts, and by consequence, Serpas' evaluation of the rollup scores. These serious hurdles attenuate the surveys from the ultimate promotion decision at multiple levels. As the proximate causation of the surveys weakens, so does their relevance. Moreover, as we mentioned above, Plaintiffs scored significantly below their promoted counterparts on the supervisor surveys. Accordingly, the likelihood that one or several supervisors' improper discrimination materially altered Plaintiffs' rollup scores is even less likely. The only other way Plaintiffs can conceivably prove the surveys' relevance is by claiming that the rollups were fabricated. Plaintiffs do not seriously press this argument.[3]

 **\*534** **\*\*10** Consequently, the district court did not abuse its discretion in denying sanctions.

## II. Reverse Discrimination Claims

### A. Standard of Review

We review a district court's grant of summary judgment *de novo. Wuliger v. Mfrs. Life Ins. Co.,* 567 F.3d 787, 792 (6th Cir.2009). Evidence in the record is viewed in the light most favorable to the nonmoving party, with all reasonable inferences drawn to that party's benefit. *Combs v. Int'l Ins. Co.,* 354 F.3d 568, 576–77 (6th Cir.2004)

Case 2:15-cv-12312-MOB-EAS   ECF No. 58-2, PageID.1694   Filed 10/17/16   Page 36 of 71

Johnson v. Metropolitan Government of Nashville and..., 502 Fed.Appx. 523...

(citing *Adickes v. S.H. Kress & Co.,* 398 U.S. 144, 157, 90 S.Ct. 1598, 26 L.Ed.2d 142 (1970)). Summary judgment is appropriate only where the evidence raises no genuine issues of material fact "such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986).

**B. Statutory Framework**

Title VII makes it unlawful for an employer "(1) to fail or refuse to hire or to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin; or (2) to limit, segregate, or classify his employees or applicants for employment in any way which would deprive or tend to deprive any individual of employment opportunities" on account of one of the same five grounds listed above. 42 U.S.C. § 2000e–2. There are two principal and distinct means of proving employer discrimination under Title VII: disparate treatment and disparate impact. *Griggs v. Duke Power Co.,* 401 U.S. 424, 431, 91 S.Ct. 849, 28 L.Ed.2d 158 (1971). We address Plaintiffs' claims of disparate treatment first.

**C. Disparate Treatment Claims**

**1. Direct Evidence of Reverse Discrimination**

Plaintiffs first contend that they offered direct evidence of discrimination proving that they were treated disparately from their minority counterparts. Specifically, Plaintiffs cite to (1) the 2003 Anderson memo; (2) Aaron's public remarks to *The Tennessean;* and (3) the comments made by Commander Nash, Deputy Chief Pike, and Metro HR representative Sinor in their meetings with Plaintiffs.

Direct evidence "is that evidence which, if believed, requires the conclusion that unlawful discrimination was at least a motivating factor in the employer's actions." *Amini v. Oberlin Coll.,* 440 F.3d 350, 359 (6th Cir.2006); *Grizzell v. City of Columbus Div. of Police,* 461 F.3d 711, 719 (6th Cir.2006) (quoting *Kocak v. Cmty. Health Partners of Ohio, Inc.,* 400 F.3d 466, 470 (6th Cir.2005)). Direct evidence must prove not only discriminatory animus, but also that the employer actually acted on that animus. *See Amini,* 440 F.3d at 359. For the following

reasons, none of Plaintiffs' proposed evidence meets this standard.

**[2]**   The Anderson memo does not constitute direct evidence because it would require multiple inferences to reach a finding of discrimination. First, the memo is three years removed from the events of this case, and from it we would need to infer that Anderson's opinions in 2003 motivated his actions in 2005–2006. *See, e.g., Phelps v. Yale Sec., Inc.,* 986 F.2d 1020, 1025–26 (6th Cir.1993) (rejecting statements made about the plaintiff nearly a year prior to his layoff). Additionally, Deputy Anderson was not the decisionmaker in the promotions process. Rather, Serpas was responsible for the disputed promotions, and Deputy Anderson only participated in the process by completing **\*535** supervisor surveys. *See Smith v. Leggett Wire Co.,* 220 F.3d 752, 759 (6th Cir.2000) ("Statements by nondecisionmakers cannot suffice to satisfy the plaintiff's burden of demonstrating animus.") (quoting *Price Waterhouse v. Hopkins,* 490 U.S. 228, 277, 109 S.Ct. 1775, 104 L.Ed.2d 268 (1989) (O'Connor, J., concurring) (internal quotations omitted)).

**\*\*11   [3]**   Next, Plaintiffs point to several statements allegedly made by MNPD spokesperson Don Aaron to local newspapers in 2006 and 2007. Aaron was quoted as stating, "If you have two candidates that are essentially equal and believe that both would make very good supervisors, and if your choice is to make the department more diverse, you would probably elect to include diversity in your choice." Aaron was also quoted as saying, "The goal of this police department is to mirror the population of the city to the greatest extent possible.... When presented with the opportunity to promote bright, qualified minority candidates, you always give those persons consideration."

The district court disregarded these statements as inadmissible hearsay. Plaintiff contends that the district court's evidentiary ruling was incorrect because Aaron's comments should have been considered a statement by a party-opponent. *See* Fed. R. Evid. 801(d)(2)(A) (a "party's own statement in either an individual or a representative capacity" is not hearsay if "offered [against] the party").

We need not consider the district court's evidentiary ruling, because even if admissible, Aaron's statements are not direct evidence of discrimination. Aaron's

WESTLAW   © 2016 Thomson Reuters. No claim to original U.S. Government Works.

Case 2:15-cv-12312-MOB-EAS ECF No. 58-2, PageID.1695 Filed 10/17/16 Page 37 of 71

Johnson v. Metropolitan Government of Nashville and..., 502 Fed.Appx. 523...

first statement-answering a hypothetical question about "equally qualified candidates"—requires an inference because the statement did not refer to this employment decision.

Nor is Aaron's second comment direct evidence of discrimination, because it would require us to ignore the equally available inference that the department was simply aware of a lack of minorities within its upper ranks. As we have held, however, statements reflecting a desire to improve diversity do not equate to direct evidence of unlawful discrimination. *See Plumb v. Potter,* 212 Fed.Appx. 472, 477–78 (6th Cir.2007) ("[A] jury could find that [the employer] believed it was good to have more women working at the [company], yet still conclude that [the decisionmaker] did not let that personal belief interfere with her decision whether or not to promote a woman over [the plaintiff].")

[4]    Finally, the statements allegedly made by Commander Nash, Deputy Chief Pike, and HR representative Sinor do not constitute evidence of direct discrimination because there is no evidence to show that these individuals were decisionmakers in the promotion process. *See Smith,* 220 F.3d at 759–60. Plaintiffs' attempt to raise a cat's-paw argument about these individuals is also ineffective, because it would require us to draw inferences that are inappropriate under direct discrimination analysis.[4] *See Ercegovich v. Goodyear Tire & Rubber Co.,* 154 F.3d 344, 355 (6th Cir.1998). Accordingly, Plaintiffs have failed to produce direct evidence of reverse discrimination.

### 2. Circumstantial Evidence of Reverse Discrimination

Because Plaintiffs cannot prove reverse discrimination by way of direct evidence, they must rely on circumstantial evidence. **\*536** This Circuit applies a modified version of the *McDonnell Douglas* framework in reverse discrimination cases. *See Leadbetter v. Gilley,* 385 F.3d 683, 690 (6th Cir.2004) (citing *McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973)). Claims of reverse employment discrimination brought under the THRA also apply our modified *McDonnell Douglas* standard. *See, e.g., Newman v. Federal Express Corporation,* 266 F.3d 401, 406 (6th Cir.2001).

**\*\*12**  First, Plaintiffs must present a *prima facie* case for reverse discrimination showing: (1) that the Defendant "is that unusual employer who discriminates against the majority;" (2) that they were qualified for the position in question; (3) that they suffered an adverse employment action when they were not promoted; and (4) that they were treated differently than other similarly situated employees. *Arendale v. City of Memphis,* 519 F.3d 587, 603–04 (6th Cir.2008). If Plaintiffs make out their *prima facie* case, the burden shifts to Defendants to show a legitimate, non-discriminatory reason behind their actions. *Id.* at 603. Once Defendants meet their burden, Plaintiffs must prove that the stated explanation was a pretext for discrimination. *Id.*

#### a. Background Circumstances

Establishing the first prong of the *prima facie* case in a reverse discrimination claim requires Plaintiffs to show that Defendants are that "unusual employer who discriminates against the majority." *Id.* at 603–04. This requirement is not onerous, and can be met through a variety of means, such as statistical evidence; employment policies demonstrating a history of unlawful racial considerations; evidence that the person responsible for the employment decision was a minority; or general evidence of ongoing racial tension in the workplace. *See Treadwell v. Am. Airlines,* 447 Fed.Appx. 676, 678 (6th Cir.2011) (citing cases). Indeed, "the mere fact that a racial minority took an adverse action" against the employee is often sufficient to satisfy the background circumstances requirement. *Leavey v. City of Detroit,* 467 Fed.Appx. 420, 425 (6th Cir.2012) (citing *Arendale,* 519 F.3d at 603).

[5]    Plaintiffs allege that a background of reverse discrimination may be inferred from: (1) the 2003 Anderson memo; (2) the statements made by Commander Nash, Chief Pike, and HR representative Sinor in the meetings Plaintiffs requested after being passed over for promotion; (3) the fact that Serpas was "chief for a political entity" and motivated to "appease the population of Nashville"; and (4) two unrelated discrimination cases brought against Metro. The district court found this evidence insufficient to prove background circumstances, because there was no evidence to conclude that Defendants' actually unlawfully considered race or gender as factors in the making specific employment decisions. *Johnson III,* 2010 WL 3342211, at \*16.

Case 2:15-cv-12312-MOB-EAS ECF No. 58-2, PageID.1696 Filed 10/17/16 Page 38 of 71

Johnson v. Metropolitan Government of Nashville and..., 502 Fed.Appx. 523...

In so reasoning, the district court went too far. The background circumstances element only requires a plaintiff to *"support the suspicion* that the defendant is that unusual employer who discriminates against the majority;" a plaintiff need not prove that the employer's actions *actually* were illegally motivated. *Boger v. Wayne Cnty.,* 950 F.2d 316, 324–25 (6th Cir.1991) (emphasis added). Requiring Plaintiffs to show actual discrimination at this stage conflates the background circumstances element with the remainder of *McDonnell Douglas*' burden-shifting approach. *See Treadwell,* 447 Fed.Appx. at 679 (noting that requiring a plaintiff to produce both "the foreground and background evidence to reach a jury" incorrectly collapses the background circumstances prong into *McDonnell Douglas*' other elements).

**\*537 \*\*13** As is required on summary judgment, we must draw disputed inferences in Plaintiffs' favor and conclude that Plaintiffs have met the background circumstances element. Plaintiffs supplied sufficient evidence to raise at least a material issue of fact that there was ongoing racial tension within the MNPD, and particularly, tension surrounding the manner in which promotions were being awarded within the department's ranks. *See, e.g., id.* at 678; *Boger,* 950 F.2d at 324–25; *McCloud v. Testa,* 97 F.3d 1536, 1549 (6th Cir.1996); *Zambetti v. Cuyahoga Cmty. College,* 314 F.3d 249, 256 (6th Cir.2002). Plaintiffs presented depositions by persons at all levels of MNPD's hierarchy who testified that the department was interested in promoting diversity and that it was acutely conscious of its long history of racial and gender imbalance.[5] And while the district court was correct that such a focus may only reflect a legitimate desire to comply with equal opportunity requirements, it also presents a context sufficient to meet the background circumstances element.

#### b. Qualifications and Similarly Situated Candidates

**[6]** As to the remaining prongs of Plaintiffs' *prima facie* case, Plaintiffs suffered an adverse employment decision when they were passed over for promotion, but Defendants dispute whether Plaintiffs were qualified for promotion and similarly situated to the promoted candidates. These prongs touch on essentially the same issues, so we address them together.

Whether Plaintiffs were qualified for promotion and similarly situated to the promoted candidates depends partly upon how we compare the candidates. The district court disregarded the surveys in deciding the qualification issue, but considered them in its similarly situated analysis. We agree with this approach.

Under the new scoring procedure, candidates who received the highest scores were placed on the eligibility roster in alphabetical order without revealing the composite scores. We agree with the district court that this procedure meant that all candidates whose names appeared on the roster were deemed qualified for promotion. *Johnson II,* 2010 WL 3342211, at \*3. Hence, we need not take into account the candidates' survey scores when considering the qualification element, and we conclude that Plaintiffs have met their burden to prove that they were qualified for promotion.

By contrast, a candidate's score is relevant in deciding whether Plaintiffs were similarly situated to the officers that were selected for promotion. Inclusion on the eligibility roster only qualified a candidate for promotion, but did not guarantee it. Because the chief had the discretion to choose among candidates, a candidate could be passed over for promotion entirely or promoted later than a comparatively lower-scored candidate.

Accordingly, the revised system established a two-stage promotions process. Scoring well on the written and assessment tests was not a guaranteed basis for **\*538** promotion; it only qualified a candidate for promotion. At the second stage, the chief held the sole discretion to choose among candidates. The system did not limit the considerations the chief could take into account, which could conceivably include a wide variety of qualities, including: education, training, length of service, readiness, ability to lead, disciplinary infractions, or a host of other factors. Any of these factors might distinguish Plaintiffs from their promoted peers and render Plaintiffs not similarly situated.

**\*\*14** We have explained that in failure-to-promote cases we only require a plaintiff to show that he possesses "similar qualifications" to the employee who received the promotion. *Provenzano v. LCI Holdings, Inc.,* 663 F.3d 806, 814 (6th Cir.2011). During the *prima facie* stage, our inquiry is not finely distinguished, given that it "is not realistic from a human standpoint" to expect the

Case 2:15-cv-12312-MOB-EAS ECF No. 58-2, PageID.1697 Filed 10/17/16 Page 39 of 71

Johnson v. Metropolitan Government of Nashville and..., 502 Fed.Appx. 523...

plaintiff to prove that he has identical qualifications to the chosen candidate. *Id.* Rather, we perform a "more searching evaluation of the relative qualifications of the two candidates" when examining pretext. *Id.* at 816. However, even if we granted leniency to Plaintiffs at the *prima facie* stage, they still have made no effort whatsoever to show that they were similarly situated to the chosen candidates on even the most basic level. Plaintiffs utter failure to address the similarly situated element fatally undercuts their *prima facie* case, as well as their argument for pretext.

Moreover and as noted above, the survey results are appropriately considered when evaluating the similarly situated element. In the instant case, the survey results render Plaintiffs dissimilar from the candidates who were selected for promotion. Serpas ordered the surveys in an effort to capture the supervisors' opinions as to which candidates were most suited for promotion. These opinions were considered, along with each candidate's personnel record and overall qualifications, when Serpas made his promotions decisions. And while Serpas did not take notes about his decisions, he testified that he did draw at least one clear line in his reasoning; he did not promote any candidate whose rollup score fell below a "2.0"

In fact, no candidate was promoted who fell below that line, and Plaintiffs concede that they scored well below this threshold. As such, they were not similarly situated to those candidates chosen for promotion. *See Gaffney v. Potter,* 345 Fed.Appx. 991, 993 (6th Cir.2009) (holding that differences in performance ratings render two employees not similarly situated). Accordingly, Plaintiffs' *prima facie* case fails because they have failed to show that they were similarly situated to the promoted candidates.

### c. Pretext

[7] Although Plaintiffs have not met their *prima facie* burden, we note that similar deficiencies prevent them from demonstrating pretext.

Serpas explained that he did not select Plaintiffs for promotion because of their poor survey results. He testified that the scores demonstrated that those who were familiar with Plaintiffs' qualifications did not believe they would be as "successful" or "ready" for promotion in comparison to the other candidates. Serpas averred

that he did not take race or gender into consideration when deciding whom to promote. Thus, Defendants have provided a permissible, non-discriminatory basis for the adverse employment decision, and Plaintiffs bear the burden of producing a triable issue of fact that the basis was a pretext for reverse discrimination.

**\*\*15** We have explained that a closer comparison of candidates is appropriate when the parties dispute whether an employee was **\*539** chosen for promotion based on qualifications versus discriminatory animus. *Provenzano,* 663 F.3d at 816. In conducting our evaluation, we do not act as a " 'super personnel department,' overseeing and second guessing employers' business decisions," *Bender v. Hecht's Dep't Stores,* 455 F.3d 612, 626 (6th Cir.2006), but rather simply compare characteristics such as "[d]ifferences in job title, responsibilities, experience, and work record," in order to make an informed determination about whether an employment decision was based on pretext, *Leadbetter,* 385 F.3d at 691.

As noted above, however, Plaintiffs have provided the Court with none of the information required to draw an informed comparison. Rather, the only pertinent information we have before us shows that both minority and majority candidates with better survey scores were promoted ahead of Plaintiffs. Likewise, candidates with lower survey scores of both races and genders were not selected for promotion. These facts render fatal Plaintiffs' claims of pretext.

Finally, we note that the move to the new promotions procedure was apparently based on a variety of factors. Plaintiffs concede that the test-based promotions method was criticized for a number reasons—one of which was the disadvantage it imposed on minority candidates—but also for other reasons that were not based on race or gender. The MNPD, its officers, and the consulting company that worked on the updated procedure all agreed that the old method did not take into account other factors that critically affected the candidate's suitability for promotion—including length of service, educational background and training, and the opinions of the candidates' supervisors. The fact that the survey instructions mentioned these permissible factors, and not those impermissible factors of race or gender, also undermines Plaintiffs' claims for pretext.

Case 2:15-cv-12312-MOB-EAS   ECF No. 58-2, PageID.1698   Filed 10/17/16   Page 40 of 71

Johnson v. Metropolitan Government of Nashville and..., 502 Fed.Appx. 523...

### D. Disparate Impact Claims

We turn next to Plaintiffs' claims of disparate impact brought under Title VII. "Disparate impact causes of action penalize employment practices that are 'fair in form but discriminatory in operation.' " *Phillips v. Cohen,* 400 F.3d at 388, 397 (6th Cir.2005) (quoting *Griggs,* 401 U.S. at 431, 91 S.Ct. 849). "Thus, disparate impact analysis is intended to make sure that employers do not use 'neutral' decision-making mechanisms that in fact work to eliminate a greater portion of otherwise-qualified protected group members than they do members of other groups." *Id.* Accordingly, a disparate impact claim does not require a showing of intent to discriminate. *Id.* Instead, the plaintiff must allege that a specific employment practice had an adverse effect on a group of employees, despite its facial neutrality. *Id.*

Disparate impact analysis requires the Plaintiff to identify —with specificity—the particular procedure having an adverse effect. *Dunlap v. TVA,* 519 F.3d 626, 629 (6th Cir.2008). A three-part burden-shifting test is then used to examine a disparate impact claim: (1) the plaintiff must establish a *prima facie* case for discrimination; (2) the employer may then show that the challenged procedure is justified by "business necessity"; and (3) the plaintiff can rebut the employer's justification by showing that other tests or selection protocols would serve the employer's interest without creating the undesirable discriminatory effect. *Albemarle Paper Co. v. Moody,* 422 U.S. 405, 425, 95 S.Ct. 2362, 45 L.Ed.2d 280 (1975).

### 1. Procedural Posture

**\*\*16** Before turning to the merits of Plaintiffs' disparate impact claim, we must consider **\*540** its procedural posture and Plaintiffs' argument that the district court improperly denied them leave to amend in order to supplement their disparate impact arguments.

In the instant case, there are three components of the new promotions procedure that Plaintiffs could have alleged caused a disparate impact: (1) the change from the test-based promotions procedure to the eligibility roster procedure; (2) Serpas' unilateral discretion to select candidates for promotion off the roster based on unspecified criteria; and (3) the introduction of the supervisors' subjective opinions by way of the survey

results. Of these, and as further explained below, Plaintiffs only alleged the first of the three had a disparate impact.

At the close of discovery, Plaintiffs moved to amend their complaint, in order to allege "all facts as known to the plaintiffs as of today with regard to these charges." The additional paragraphs detailed information Plaintiffs learned during the discovery process, including additional details about how the survey process was implemented. However, the motion to amend did not seek to add any additional charges of disparate impact beyond Plaintiffs' original challenge to the eligibility roster procedure.

Accordingly, Plaintiffs never sought to add a claim that Serpas' discretion caused a disparate impact. Likewise, Plaintiffs never claimed that the supervisor surveys caused a disparate impact. Plaintiffs however, did allege that these aspects of the promotions procedure caused a disparate impact in their response to Defendants' motion to dismiss. Plaintiffs' arguments, however, went beyond the strict allegations raised in their proposed amended complaint—that the "sliding-band" procedure caused a disparate impact—and went on to say that "the Captain's surveys and the input from Serpas caused a disparate impact on the promotions favoring minorities over white males."

The district court denied Plaintiffs' motion to amend, noting that the amendment deadline passed two months prior; that Plaintiffs had requested extensions on several other deadlines, but not on the amendment deadline; and that Plaintiffs' filing violated Federal Rule of Civil Procedure 16(b)(4) (requiring good cause to modify a scheduling order) and Local Rule 7.01(a) (requiring the filing of an accompanying memorandum of law where a motion "may require the resolution of an issue of law"). Finally, the court commented that Plaintiffs had already amended their claims multiple times and that the latest reason given—"to allege all facts as known to the plaintiffs as of today with regard to these charges"—was "insufficient to justify a fourth amendment."

Shortly thereafter, the district court granted Defendants' motion to dismiss the disparate impact claim. The district court noted the pleading errors described above and commented that, while "plaintiffs [ ] somewhat convincingly argue[d]" a disparate impact claim related to the surveys, the argument could not be considered because Plaintiffs failed to raise it in their complaint. *See Johnson*

Case 2:15-cv-12312-MOB-EAS   ECF No. 58-2, PageID.1699   Filed 10/17/16   Page 41 of 71

Johnson v. Metropolitan Government of Nashville and..., 502 Fed.Appx. 523...

*II,* 2008 WL 3163531, at \*6 (citing *Kostrzewa v. City of Troy,* 247 F.3d 633, 643 (6th Cir.2001)).

### 2. Denial of Leave to Amend

**\*\*17**  Rule 15(a)(2) of the Federal Rules of Civil Procedure provides that a court may freely grant leave to amend a pleading when justice so requires, in order to make certain that a case is tried on its merits "rather than [on] the technicalities of the pleadings." *Moore v. City of Paducah,* 790 F.2d 557, 559 (6th Cir.1986). "In deciding whether to grant a motion to amend, courts should consider undue delay in filing, lack of notice to the opposing  **\*541**  party, and futility of amendment." *Brumbalough v. Camelot Care Ctrs., Inc.,* 427 F.3d 996, 1001 (6th Cir.2005). Unless leave was denied on the basis of futility, this Court reviews the district court's decision for abuse of discretion. *Ziegler v. Aukerman,* 512 F.3d 777, 786 (6th Cir.2008).

Rule 15 provides that leave to amend "shall be freely given when justice so requires." Fed.R.Civ.P. 15(a). In the absence of reasons such as those listed above, leave should generally be granted. *Foman v. Davis,* 371 U.S. 178, 83 S.Ct. 227, 9 L.Ed.2d 222 (1962). Nevertheless, a district court retains its discretion on such matters, and provided that the court announces a clear reason for its decision, this Court will generally defer to its reasoning. *Id.*

Rule 15 is augmented by Rule 16, which states that the generally wide latitude to amend may be restricted by the court's other scheduling orders. *See* Fed.R.Civ.P. 16(b). Rule 16 requires that a party seeking to amend outside a scheduling order may do so only on a showing of "good cause." This limitation is "designed to ensure that 'at some point both the parties and the pleadings will be fixed.' " *Leary,* 349 F.3d at 906. In balancing Rules 15 and 16, this Court considers the movant's "diligence in attempting to meet the case management order's deadlines" and "whether the opposing party will suffer prejudice by virtue of the amendment." *Id.*

**[8]**  Plaintiffs contend that the district court abused its discretion when it refused to grant their motion to amend. They contend that the district court unfairly denied the motion solely on procedural technicalities and that, by doing so, it denied them the opportunity to allege facts that "could not have been discovered [ ] without having

conducted written discovery." Given that the district court perceived some merit in a disparate impact claim based on the surveys, Plaintiffs contend the court's refusal to allow amendment was in error.

We disagree. Plaintiffs have made no real attempt, either before the district court or before us now, to argue that "good cause" supported an amendment sought over two months after the deadline in the court's scheduling orders. Plaintiffs simply perfunctorily allege that they could not have discovered the facts required to support their claims before written discovery was conducted. However, Plaintiffs never state with any specificity when the evidence was received or why they could not have met or sought an extension on the district court's original deadline.

**\*\*18**  We note that the disparate impact claims Plaintiffs now put forth are largely based on information that Plaintiffs appear to have known from the outset of this suit. For instance, as Plaintiffs' own affidavits indicate, they knew that Serpas had total discretion to select candidates for promotions off the eligibility roster, and they knew, or at least discovered shortly after the disputed promotions were announced, that an anonymous supervisor survey had been conducted. Accordingly, Plaintiffs had access to the basic facts required to allege their new disparate impact claims, even if they lacked certain specifics.

Moreover, even if we were to consider the new evidence Plaintiffs sought to add by way of an amended complaint, the fact remains that Plaintiffs failed to expand the legal bases for their disparate impact claims. A close reading of the documents reveals that the district court was correct. Plaintiffs only properly alleged a disparate impact claim based on the eligibility roster method. Although Plaintiffs' response to the motion to dismiss expanded their disparate impact claims, the district court was limited, as are we, to the facts and legal claims as raised in the pleadings. *See*  **\*542**  Moore's Federal Practice § 12.34. ("The court may not ... take into account additional facts asserted in a memorandum opposing the motion to dismiss, because such memoranda do not constitute pleadings under Rule 7(a).").  Accordingly, the district court did not abuse its discretion in denying Plaintiffs leave to amend.

Case 2:15-cv-12312-MOB-EAS   ECF No. 58-2, PageID.1700   Filed 10/17/16   Page 42 of 71

Johnson v. Metropolitan Government of Nashville and..., 502 Fed.Appx. 523...

### 3. Merits Analysis

**[9]**    Thus, we are left only to consider the disparate impact claim that was properly before the court—whether the move to the eligibility roster imposed a disparate impact on non-minority, male candidates. The district court rejected the challenge, noting that the complaint "alleged that MNPD ignored the objective criteria it gathered from the written examination and the assessment *because of an intent to discriminate.*" *Johnson II,* 2008 WL 3163531, at *6 (emphasis added). The district court reasoned that this type of allegation was more akin to a disparate treatment claim than it was to a disparate impact claim. *Id.* We agree.

Finally, we briefly point out *Ricci v. DeStefano,* 557 U.S. 557, 129 S.Ct. 2658, 174 L.Ed.2d 490 (2009), a case issued by the Supreme Court about a year after the district court dismissed Plaintiffs' disparate impact claim. In *Ricci,* the Supreme Court found that the city of New Haven, Connecticut imposed a disparate impact on certain Caucasian firefighters when it refused to certify examination results used for making promotions when the results failed to produce any minority candidates. The fact that the City changed its procedures during the middle of the promotions process was a key factor in the Supreme Court's decision:

> [Once a promotion process is established] and employers make clear their selection criteria, they may not then invalidate the test results, thus upsetting an employee's legitimate expectation not to be judged on the basis of race. Doing so, absent a strong basis in evidence of an impermissible disparate impact, amounts to the sort of racial preference that Congress disclaims, and is antithetical to the notice of a workplace where individuals are guaranteed equal opportunity regardless of race.

**\*\*19**  *Id.* at 585, 129 S.Ct. 2658.

To be sure, guidance from *Ricci* might have helped Plaintiffs plead their allegations with requisite specificity, had that case been available to them. However, the present case remains easily distinguishable from *Ricci,*

in that there is no evidence to show that Defendants disregarded any valid scores. And while Plaintiffs might have argued that their legitimate expectations were upset by the delayed introduction of the supervisor surveys, as explained above, they failed to properly allege this argument in their complaint.[6] Accordingly, we affirm the district court's decision dismissing Plaintiffs' disparate impact claim.

### III. Tennessee Human Rights Act

Citing *Gossett v. Tractor Supply Co.,* 320 S.W.3d 777, 779 (Tenn.2010), Plaintiffs next argue that the district court applied an incorrect summary judgment standard to their claims brought under the THRA. In *Gossett,* the Tennessee Supreme Court reasoned that it was inappropriate to use the *McDonnell Douglas* framework to decide summary judgment motions for claims brought under the THRA, inasmuch as the **\*543** *McDonnell Douglas* framework was incompatible with Tennessee's own summary judgment jurisprudence. However, shortly thereafter, the Tennessee legislature abrogated Gossett by statute. See Tenn.Code Ann. § 4–21–311(e); *see also Bobo v. UPS,* 665 F.3d 741, 757 (6th Cir.2012). Plaintiffs' argument on this point is therefore moot.

### IV. Costs

**[10]**    The district court awarded Metro the costs of defending both Serpas and Metro against this lawsuit. On appeal, Plaintiffs raise two challenges to this decision. First, Plaintiffs argue that, regardless of the fact that Metro actually paid for Serpas' costs and legal fees, Serpas should have filed a separate bill of costs. Second, they argue that the district court did not carefully scrutinize whether the cost of a second set of transcripts for Serpas' attorneys was truly "necessary."

This Court reviews a district court's award of attorneys costs for abuse of discretion. *Singleton v. Smith,* 241 F.3d 534, 538 (6th Cir.2001). Awards decisions are "fact-intensive" and a trial court's determination of those facts is entitled to substantial deference. *See Imwalle v. Reliance Med. Prods.,* 515 F.3d 531, 551 (6th Cir.2008). Applying this standard, neither of Plaintiffs' arguments have merit.

Federal Rule of Civil Procedure 54(d)(1) provides that "costs other than attorney's fees [ ] should be allowed to the prevailing party." The presumption in favor of awarding costs may only be reversed upon a "heavy showing" that

the court abused its discretion. *Baji v. N.E. Reg'l Bd. of Dental Examiners, Inc.,* 3 Fed.Appx. 352, 360 (6th Cir.2001) (citing *White & White, Inc. v. Am. Hosp. Supply Corp.,* 786 F.2d 728, 730 (6th Cir.1986)). In order to award costs to a prevailing party, the court must determine that:

> the expenses are allowable cost items and that the amounts are reasonable and necessary. As long as statutory authority exists for a particular item to be taxed as a cost, [the court] shall not overturn a district court's determination that the cost is reasonable and necessary, absent a clear abuse of discretion. Thus, we shall review carefully whether an expense is recoverable, but once we determine that it is, we defer to the district court, which is in the best position to determine whether the cost is recoverable.

 **\*\*20** *Baker v. First Tenn. Bank Nat'l Assoc.,* 142 F.3d 431 (6th Cir.1998) (table) (citing *Northbrook Excess & Surplus Ins. Co. v. Procter & Gamble Co.,* 924 F.2d 633, 642 (7th Cir.1991)).

Rule 54(d) provides that costs "should be allowed to the prevailing party," but it does not specify how to file a bill of costs. The Middle District of Tennessee's Local Rule 54.01 is somewhat more specific and requires that

"a cost bill, with supporting documentation, shall be *filed by the prevailing party.*" (emphasis added). However, this rule does not provide that each prevailing party must file separately, and we have found no cases requiring that. Lastly, we note that Plaintiffs did not cite to Local Rule 54.01 before the district court. Accordingly, the district court did not abuse its discretion.

Plaintiffs next argue that the second set of transcripts was not reasonable or necessary, and they fault the district court for failing to carefully scrutinize whether Serpas' attorneys had an individual need for the transcripts. This claim is meritless. The depositions in question—those of Chief Serpas, Deputy Chiefs Pike and Anderson, and Eric Cardinal—were at the core of Plaintiffs' claims of reverse discrimination against Serpas and critical to his defense against those charges. Accordingly, **\*544** the deposition transcripts were necessary and the award of costs was appropriate.

## CONCLUSION

For the reasons stated above, we **AFFIRM** the district court's judgment in all respects.

### All Citations

502 Fed.Appx. 523, 2012 WL 4945607

Footnotes

\*      The Honorable Robert M. Dow, Jr., United States District Judge for the Northern District of Illinois, sitting by designation.

1      The federal claims against the officers were dismissed on the basis of qualified immunity. *Johnson I,* 2008 WL 2066475, at \*4. The state claims against the officers were dismissed for insufficiency of the allegations. *Id.* at \*8. The claims against MNPD were dismissed because it is not an entity capable of being sued under Tennessee law. *Id.* at \*8 n. 5. By state statute, all claims against the MNPD must be pursued against Metro. *Id.*

2      Holley did not assert a disparate impact claim.

3      Officer Holley argues that he was only supervised by ten supervisors in his direct chain of command; therefore, the rollup indicating that he was ranked by thirty-three supervisors is suspect. However, Officer Holley misconstrues the survey instructions, which asked the supervisors to rank any candidate whom they "worked directly with or otherwise [had] personal awareness of the skills, abilities, and knowledge of."

4      The "rubber-stamp" or "cat's paw" theory of liability involves a situation where a supervisor is influenced by another individual who was motivated by an impermissible bias. It is more appropriately dealt with in circumstantial evidence review. *See Arendale,* 519 F.3d at 604.

5      We note the same figure that the consulting company found troubling: that, as of 2003, there were a total of 29 African–American supervisors out of 1,300 sworn MNPD officers. Certainly such a statistic could prompt Defendants to be concerned about the need for greater diversity in the department's ranks.

To a lesser extent, we also take judicial notice of the newspaper articles reflecting dissatisfaction by both minority and majority officers with MNPD's promotions processes. *See* "Officers Say Metro Police Promotions Policy Unfair," *The Tennessean,* Apr. 2, 2007; "Racial Tensions Escalate—Black & White Cops Feud over Promotions, *Nashville Scene,* Oct. 2, 2003.

6     There remains an outstanding factual dispute as to when the supervisor surveys were introduced into the promotions process. Plaintiffs allege that the surveys were introduced during a delay that followed the announcement of the eligibility rosters; Serpas testified in his deposition, however, that he made the decision to conduct the surveys when the new promotions procedure was announced.

---

**End of Document** <span style="float:right">© 2016 Thomson Reuters. No claim to original U.S. Government Works.</span>

302 Fed.Appx. 386
This case was not selected for
publication in West's Federal Reporter.
See Fed. Rule of Appellate Procedure 32.1
generally governing citation of judicial
decisions issued on or after Jan. 1, 2007.
See also U.S.Ct. of App. 6th Cir. Rule 32.1.
United States Court of Appeals,
Sixth Circuit.

Carolyn R. RUSSELL, Plaintiff–Appellant,

v.

State of OHIO, DEPARTMENT OF
ADMINISTRATIVE SERVICES;
George Hess, Defendants–Appellees.

No. 07–3808.
|
Dec. 3, 2008.

**Synopsis**

**Background:** State employee brought employment
discrimination suit against Ohio Department of
Administrative Services (ODAS) and her supervisor,
alleging that her employer failed to reclassify or promote
her because of her race, retaliated against her for filing
an Equal Employment Opportunity Commission (EEOC)
claim, and fostered an environment of hostility and social
ostracism in the workplace. The United States District
Court for the Southern District of Ohio, George C. Smith,
J., 2007 WL 1731200,granted summary judgment in favor
of defendants. Employee appealed.

**Holdings:** The Court of Appeals, Rogers, Circuit Judge,
held that:

[1] state employee failed to demonstrate employment
discrimination;

[2] employee failed to establish retaliation; and

[3] employee failed to establish a hostile work
environment.

Affirmed.

**West Headnotes (7)**

**[1]** **Civil Rights**
👉 Continuing violations;serial, ongoing, or
related acts
**Limitation of Actions**
👉 Liabilities Created by Statute
Continuing violation doctrine did not operate
to toll statute of limitations on state
employee's employment discrimination claims
under Title VII or § 1983, because employee
alleged discrete acts of discrimination. 42
U.S.C.A. § 1983; Civil Rights Act of 1964, §
701 et seq., 42 U.S.C.A. § 2000e et seq.

5 Cases that cite this headnote

**[2]** **Civil Rights**
👉 Disparate treatment
None of the non-minority comparators
offered by state employee were similarly
situated, as required to show that a person
outside her class was treated more favorably
than she was as to reclassification and thereby
establish prima facie case of employment
discrimination. 42 U.S.C.A. § 1983; Civil
Rights Act of 1964, § 701 et seq., 42 U.S.C.A.
§ 2000e et seq.

4 Cases that cite this headnote

**[3]** **Civil Rights**
👉 Motive or intent;pretext
Supervisor's explanation for not posting
job to which state employee desired a
promotion, based upon the fact that the
revised description used by supervisor better
matched the duties another employee already
performed, was not pretext for employment
discrimination under Title VII or § 1983. 42
U.S.C.A. § 1983; Civil Rights Act of 1964, §
701 et seq., 42 U.S.C.A. § 2000e et seq.

2 Cases that cite this headnote

**[4]** **Civil Rights**

Public Employment

**Public Employment**
Exercise of Rights;Retaliation

**States**
Appointment or employment and tenure of agents and employees in general

Investigation and issuance of a report by Ohio Department of Administrative Services (ODAS) was not an action adverse to state employee, as required to establish prima facie case of retaliation for filing an Equal Employment Opportunity Commission (EEOC) claim.

2 Cases that cite this headnote

[5] **Civil Rights**
Public Employment

**Public Employment**
Exercise of Rights;Retaliation

**States**
Appointment or employment and tenure of agents and employees in general

Performance expectations memo, which responded to state employee's various concerns about her work environment but evaluated the problem differently, was not materially adverse to employee, as required to establish prima facie case of retaliation, since a reasonable employee would not be dissuaded from making a charge of discrimination by the knowledge that her employer might evaluate her situation and respond.

Cases that cite this headnote

[6] **Civil Rights**
Causal connection;temporal proximity

No causal connection existed between allegedly negative performance review given to state employee and her filing of Equal Employment Opportunity Commission (EEOC) claim, as required to establish prima facie case of retaliation.

1 Cases that cite this headnote

[7] **Civil Rights**
Hostile environment;severity, pervasiveness, and frequency

**Civil Rights**
Harassment;work environment

Co-workers' alleged avoidance of state employee, without more, did not constitute a hostile work environment, absent any indication that the conduct was based upon or motivated by race or religion.

Cases that cite this headnote

**\*387** On Appeal from the United States District Court for the Southern District of Ohio.

Before: NORRIS, ROGERS, and KETHLEDGE, Circuit Judges.

**Opinion**

ROGERS, Circuit Judge.

**\*\*1** Carolyn Russell, proceeding pro se, appeals the district court's grant of summary judgement in her employment discrimination suit against the Ohio Department of Administrative Services ("ODAS") and her supervisor George Hess. Russell brought this civil rights suit under 42 U.S.C. § 1983 and Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e, alleging that her employer failed to reclassify or promote her because of her race, retaliated against her for filing an EEOC claim, and fostered an environment of hostility and social ostracism in the workplace. Although Russell appears to have had a number of disappointing, negative, and even unfair experiences in her workplace, she did not demonstrate that similarly situated individuals of other races were treated differently from her. She also did not demonstrate that the conditions in her workplace were sufficiently objectionable or racially motivated to constitute retaliation or a hostile work environment. Summary judgment in favor of the defendants was appropriate in this case.

**I.**

Ms. Russell is a high school graduate with two years of post-secondary education in business management and accounting. She began her career with the State of Ohio in 1962 performing various clerical functions. She began working for the Division of Equal Employment Opportunity, a division of ODAS, in 1972 and was promoted to Administrative Assistant 2 ("AA2") in 1973. Russell was still classified as an AA2 at the time of this suit. Russell began working for Ohio's Minority Set Aside Review Board in 1986, and in 1995 came under the direct supervision of the Board's director, Sandra Drabik. Russell, believing her job responsibilities to be more extensive that those of an AA2, made several unsuccessful requests that Drabik reclassify her. Some time thereafter, Joyce Tyler–Craddock, an African–American, began supervising Russell. Russell again made an unsuccessful request for reclassification.

In 1997, Russell filed a complaint against Drabik and Craddock with the EEOC. After the EEOC denied relief, Russell unsuccessfully pursued her claim in the federal district and appellate courts. Russell was transferred from the Minority Set Aside Review Board to the Division of Computer Services several weeks after she **\*388** filed her EEOC complaint. Russell still works for that division, currently known as the Office of Technology Services Delivery Division ("ITSD").

Defendant George Hess began supervising Russell in 2000. According to Russell, Hess put her in charge of all personnel functions, which involved coordinating the hiring process, being a liaison between managers and the department's personnel office, and responding to questions from bargaining unit employees. Hess updated Russell's position description on June 19, 2002, but Russell alleges that he excluded the higher-level functions she performed.

In July 2002, Hess consolidated five divisions, including Russell's, into a single division. Russell continued to perform the same duties for the combined division under the classification AA2. Around this time, she once again began to work under Joyce Tyler–Craddock, who had since become the Assistant Deputy Director of ITSD. In early 2003, Russell began seeking an upgraded classification within her AA class series. Craddock sent Russell's position description to the Office of Employment Services for review, and that office notified Craddock that Russell was properly classified. Craddock presented the

results of the review to Hess, and they determined that Russell should not be reclassified. Hess met with Russell on April 4, 2003, to discuss the decision not to upgrade her. Russell sent Hess an e-mail the same day expressing her belief that she had not been advanced for the past thirty years because of racial discrimination. Ohio law provides that a state employee may request an audit of her classification. Ohio Admin. Code 123:1–3–01(J); Ohio Rev.Code § 124.14(D). Russell said she did not pursue this avenue because she felt it would be futile to expect a job analyst to disagree with the Deputy Director and because she knew of audits that had resulted in downward reclassification.

**\*\*2** In July 2002, Lisa Barbee, a white female, was reclassified from Training Supervisor to AA4. The reclassification was lateral and did not affect Barbee's pay range. The AA4 position was specifically in the area of security coordination and construction. According to Hess, Barbee was reclassified so that her job description would more accurately match her actual duties. Russell admits that she would not have received that AA4 position as described, because she was not qualified. She alleges, however, that Barbee's new position description did not match her actual duties and that Russell was competent to perform Barbee's actual duties. Russell believes that reclassifying Barbee's position without posting the position for competitive bid denied Russell an opportunity for a promotion.

Around May 2003, Angela Weis, a white female, joined ITSD as an AA3. Weis formerly held an AA3 position in a different division that was experiencing layoffs. Weis transferred to Russell's division, although no open AA3 position had been posted. Hess approved the transfer. Russell believes that if the position had been posted for application, she would have been qualified to apply. She therefore sees Weis's transfer as another missed opportunity for promotion.

Russell alleges that in July 2003, Hess again revised Barbee's position description and made her his personal assistant—a job Russell had repeatedly expressed interest in and believed she was qualified to perform. She was not, however, given a chance to bid for the position, because Hess did not post it.

On September 29, 2003, ODAS posted an opening in ITSD for a Management Analyst Supervisor 2. The

job included position specific minimum qualifications **\*389** ("PSMQs"). Russell was interested in the job, but she did not apply because the PSMQs disqualified her. Russell believes the PSMQs were extraneous to the job and that Hess added them specifically to prevent her from applying. Craddock stated that she worked with the Office of Employee Services to add the PSMQs in order to narrow what was otherwise a very broad job description to a description more tailored to the requirements of the position. Craddock and Hess selected Patty Magazine, a white female, for the position in January 2004. Russell alleges that after Magazine was hired, Craddock transferred all of Russell's higher-level duties to Magazine. Russell claims that she thereafter worked under Magazine performing clerical functions that were below Russell's AA2 classification.

Russell filed a formal complaint with the EEOC on June 2, 2004, accusing ODAS of racial discrimination and retaliation, and naming Hess and Craddock in the body of the complaint. Around the same time, she noted several occurrences which she believes were further instances of discrimination and/or retaliation for filing her claim. Since 1997, Russell had worked four ten-hour days per week. In May 2004, Magazine informed Russell that Russell's schedule was being changed to five eight-hour days. When Russell requested to keep her former schedule, Magazine explained that all Business Support Services personnel were now required to work during regular business hours. Russell informed Magazine, Craddock, and Hess that she believed the treatment was inequitable, because several other employees with whom Russell worked were allowed to maintain their non-standard schedules. Various superiors responded to Russell's requests by telling her that those other employees were not Business Support Services personnel.

**\*\*3** During the summer of 2004, Russell wrote three letters concerning Craddock—two to the Office of the Ohio Inspector General and one to the EEOC. On July 23, 2004, prior to Russell's second letter to the Inspector General, Craddock sent a memorandum to the ODAS Human Resources Administrator asking for "appropriate action to put a stop to this harassment." ODAS issued a finding on January 26, 2005, that Russell had a right to file complaints with the Office of the Inspector General and the EEOC. The Deputy State Chief Information Officer also issued a memo to both women on April 20, 2005, regarding "performance expectations," urging them

to treat each other professionally and to perform their jobs in a manner consistent with the company's policy that managers should treat employees fairly and that employees should obey the instructions of managers.

Several other occurrences have made Russell uncomfortable in her workplace. The ODAS investigation report revealed that several of Russell's co-workers avoid her. On January 10, 2007, Magazine issued a written memorandum with the title "verbal reprimand" to be placed in Russell's file because Russell completed an assignment late. Russell suggests that this level of discipline for missing a deadline is not typical for the office. Russell also alleges that Magazine requires Russell to leave the office precisely at the end of her workday, but that Magazine does not place such a condition on any other employee.

The EEOC dismissed Russell's charges on November 15, 2004, and she filed suit in the district court on February 11, 2005. She also petitioned for injunctive relief on January 11, 2007, based on allegations of continuing harassment and retaliation in the workplace. The district court granted ODAS's motion for summary judgment **\*390** and denied Russell's petition on June 14, 2007. Russell now appeals.

## II.

As an initial matter, some of Russell's claims are time barred. Russell filed her action with the EEOC on June 2, 2004. In a "deferral" state such as Ohio, any instance giving rise to a Title VII claim must have occurred within 300 days of that date, meaning after August 7, 2003. *See Amini v. Oberlin College* 259 F.3d 493, 498 (6th Cir.2001). Russell filed her suit in federal court on February 11, 2005. Any instance giving rise to a 42 U.S.C. § 1983 claim must have occurred within two years of that date, meaning after February 11, 2003. Therefore, Russell's claims stemming from Barbee's reclassification as an AA4 in July 2002 are time barred under both statutes. Russell's claims stemming from her denied reclassification in April 2003, Weis's transfer as an AA3 in June 2003, and Barbee's revised position description in July 2003 may only proceed as § 1983 claims against Hess. All the other claims that are not based on retaliation may proceed as § 1983 claims against Hess and as Title VII claims against ODAS. Claims based on retaliation for filing an EEOC charge may only proceed

under Title VII. *Day v. Wayne County Bd. of Auditors,* 749 F.2d 1199, 1204 (6th Cir.1984).

**\*\*4** **[1]** The continuing violation doctrine cannot be used to extend the statute of limitations in this case, because Russell alleges discrete acts of discrimination. Russell has not alleged a past violation that continues into the present, such as unequal pay that continues to be paid unequally. *See EEOC v. Penton Indus. Publ'g. Co.,* 851 F.2d 835, 838 (6th Cir.1988). Rather, she has alleged a number of discrete situations where her employer made an adverse decision regarding her employment status. She cannot use the fact that some of the claims fall within the statute of limitation to redeem those claims that do not. Courts have recognized "two narrowly limited exceptions" to the general policy that the statute of limitations for an act of employment discrimination runs from the time the act occurred: (1) where some present discriminatory action gives rise the claim and (2) where the employer has a long-standing policy of discrimination. *Id.* at 837–38. Regarding the first exception, the Supreme Court cautions that "discrete discriminatory acts are not actionable if time barred, even when they are related to acts alleged in timely filed charges." *National R.R. Passenger Corp. v. Morgan,* 536 U.S. 101, 113, 122 S.Ct. 2061, 153 L.Ed.2d 106 (2002). In other words, Russell cannot use the continuing violation doctrine to extend the statute of limitations on discrete, defaulted claims. As for the second exception, Russell is not challenging an official policy of her employer.

Discrimination under § 1983 and discrimination under Title VII are both proved through the *McDonnell Douglas* framework, so the claims will be addressed together. *See Gutzwiller v. Fenik,* 860 F.2d 1317, 1325 (6th Cir.1988).

### A.

Russell does not survive summary judgment on any of her discrimination claims, because she does not demonstrate several necessary elements. Most significantly, she does not demonstrate that any of the actions taken by her employer or conditions present in her office were linked to her race. We review the district court's grant of summary judgment de novo, drawing all inferences in favor of Russell. *Johnson v. Karnes,* 398 F.3d 868, 873 (6th Cir.2005). Summary judgment is appropriate **\*391** where "the pleadings, the discovery and disclosure materials on

file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c). Summary judgment must be entered against a party who, like Russell, "fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett,* 477 U.S. 317, 322, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986).

In her failure to reclassify claim, Russell may be able to show that her job duties qualified her for reclassification, but she does not present appropriate comparators to show that similarly situated non-minorities were treated differently. To establish a prima facie case of employment discrimination under the familiar *McDonnell Douglas* standard, Russell must show: "(1) [s]he was a member of a protected class; (2) that [s]he suffered an adverse employment action; (3) that [s]he was qualified for the position; and (4) that a person outside the protected class was treated more favorably than [she was]." *Braithwaite v. Timken Co.,* 258 F.3d 488, 493 (6th Cir.2001). Although Russell satisfies the first two prongs and may be able to establish a genuine issue of fact as to the third, she does not satisfy the fourth prong.

**\*\*5** Applying the third prong to the specific situation of reclassification, Russell may be able to show that she performed job duties more advanced than those covered by her job description and, therefore, that she was qualified for reclassification. Russell, who is classified as an AA2, alleges that she performed various high-level tasks, first under Hess and later under Craddock, that exceeded the level of responsibility appropriate for an AA2. According to Hess, Russell's job description was reviewed through the proper channels and was determined to be appropriate. The job descriptions for the various levels of administrative assistants are sufficiently open to interpretation to create an issue of fact about whether Russell was working above her classification.

**[2]** Russell does not, however, show that the decision not to reclassify her was based on racial discrimination, because none of the non-minority comparators she offers qualify as similarly situated. Russell names a number of white employees whom she believes Hess reclassified or otherwise advanced, but she does not specify how they were similarly situated to her other than that they were supervised by Hess. Although "[t]he plaintiff need

not demonstrate an exact correlation with the employee receiving more favorable treatment in order for the two to be considered similarly-situated ... the employee with whom the plaintiff seeks to compare himself or herself must be similar in all of the *relevant* aspects." *Ercegovich v. Goodyear,* 154 F.3d 344, 352 (6th Cir.1998) (internal citations and quotations omitted) (emphasis in original). Although Russell need not demonstrate that these employees were similarly situated to her in every respect, she would need to show that they performed tasks roughly similar to her own and that they were given classifications higher than hers.

Russell does supply details about Barbee's reclassification, a circumstance Russell is time barred from raising. Even so, the facts she recounts indicate that Barbee was not similarly situated to Russell. Prior to her reclassification, Barbee was a Training Supervisor and had duties distinctly different from Russell's. Moreover, Barbee's reclassification was lateral, while Russell sought an upward reclassification.

 **\*392** Although Russell may have been entitled to a reclassification, she has not shown that her employer's failure to reclassify her was based on race because she has not identified any similarly situated non-minority employees who were treated differently.

Russell also faces difficulties in her failure-to-promote claim, because she did not apply for any of the positions for which she was passed over. Russell objects to the circumstances under which three women in her office were hired for jobs Russell would have liked to fill, but none of the situations allows her to make a clear case under the four-prong test. Applying the *McDonnell Douglas* standard to a failure to promote claim, the plaintiff must show that: "(1) [s]he is a member of a protected class; (2)[s]he applied and was qualified for a promotion; (3) [s]he was considered for and denied the promotion; and (4) other employees of similar qualifications who were not members of the protected class received promotions." *Dews v. A.B. Dick Co.,* 231 F.3d 1016, 1020–21 (6th Cir.2000).

 **\*\*6** Russell's allegations do not fit neatly within the *McDonnell Douglas* framework because she never applied for or was considered for any of the positions. However, the facts which she alleges do raise the possibility that her employer intentionally avoided posting jobs for which

Russell would have been qualified. But even under a version of the *McDonnell Douglas* test appropriate to the facts of Russell's situation, she would not be able to make out of claim of discrimination. For each of her allegations, Russell either fails to show that she was qualified for the job, fails to show that she was similarly situated to the person who received the job, or fails to show that the nondiscriminatory reasons given for her employer's actions were pretextual.

In July 2002, Barbee was reclassified from Training Supervisor to AA4. Russell alleges that Barbee's reclassification placed Barbee in a role that Russell could have filled had the position been posted for competitive bid. Russell admits that she was not qualified for the AA4 position as described, but she alleges that she was qualified to perform the duties Barbee actually performed, duties which Russell claims differed substantially from the duties put forth in the position description.

Russell's claim hangs on establishing either that Hess made Barbee's job description intentionally inaccurate in order to exclude Russell or that Hess did not post the position in order to exclude Russell. She does not establish either point. Russell's assertions—that Barbee's real duties were not those listed in her position description and that Russell herself was qualified to perform Barbee's actual duties—are conjectural and conclusory, and Russell "cannot rely on conjecture or conclusory accusations" to survive summary judgment. *See Arendale v. City of Memphis,* 519 F.3d 587, 605 (6th Cir.2008).

 **[3]** Even if Russell were to establish a prima facie case with regard to Hess's decision not to post the job, nothing in the record, other than Russell's conclusory allegations, suggests that Hess's explanation for the decision is pretextual. If Russell establishes a prima facie case, the burden shifts to her employer to give a nondiscriminatory reason for its actions. *Dews,* 231 F.3d at 1021. The burden then shifts back to Russell to show that her employer's proffered reasons are pretextual. *Id.* With regard to his decision not to post the AA4 position for application, Hess explained that the reason for reclassifying Barbee was not that the division needed a new employee with the revised position description but that the revised description better matched the duties Barbee already  **\*393** performed. Russell does not present evidence to cast doubt on this plausible explanation.

Similar analysis applies to Russell's claims about Weis's AA3 position. Even if Russell were to establish a prima facie case, she does not establish that Hess's explanation for Weis's transfer—that it was made as part of a general effort to save the jobs of employees in a downsizing division—is pretextual.

**\*7** Neither does Russell overcome summary judgment with regard to her employer's decision to hire Magazine for the Management Analysts Supervisor 2 position. Even assuming Russell was otherwise qualified for the position, she does not show that Hess's reason for adding the disqualifying PSMQs had anything to do with her race. Craddock, the African–American woman primarily responsible for adding the PSMQs, explained how these specific qualifications related to the job function. Russell's conclusory assertion that the real reason for the PSMQs was to exclude her based on her race is not sufficient to overcome summary judgment.

Fundamentally, Russell does not show that race motivated any of the workplace decisions of which she complains. In each situation, either she does not show that those treated differently from her were similarly situated to her, or her employer can offer a valid, race-neutral reason for the decision. Summary judgment was appropriate on Russell's discrimination claims.

### B.

**[4]** None of Russell's claims of retaliation are sufficient to make out a prima facie case. She either fails to establish that her employer actually took any adverse action against her or fails to establish that the adverse action was causally linked to her EEOC claim. Russell first mentions Craddock's harassment complaint. Craddock's complaint ultimately resulted in an investigation by ODAS and a finding that Russell was within her rights to file various charges and complaints against Craddock. Russell was not harmed but rather was vindicated by this process. To establish a prima facie case of retaliation, Russell must show not only that she "engaged in a protected activity" and that her "employer knew of the exercise of the protected right," but also that "an adverse employment action was subsequently taken against" her and that "there was a causal connection between the protected activity and the adverse employment action." *Niswander v. Cincinnati Ins. Co.,* 529 F.3d 714, 720 (6th Cir.2008).

Conducting an investigation and issuing a report in Russell's favor is not an action adverse to Russell.

**[5]** Russell next points to the Deputy State CIO's "performance expectations" memo. Russell, who repeatedly contacted management with various complaints about her work environment, can hardly complain that her employer issued a response addressing some of the very concerns she raised. The fact that her employer's evaluation of the problem differed from Russell's does not make her employer's action materially adverse. In order to establish an adverse employment action, "a plaintiff must show that a reasonable employee would have found the challenged action materially adverse, which ... means it well might have dissuaded a reasonable worker from making or supporting a charge of discrimination." *Burlington Northern and Sante Fe Ry. Co.,* 548 U.S. 53, 68, 126 S.Ct. 2405, 165 L.Ed.2d 345 (2006). A reasonable employee would not be dissuaded from making a charge of discrimination by the knowledge that her employer might evaluate her situation and **\*394** respond, albeit in a manner not fully to the employee's liking.

**\*8 [6]** Finally, Russell alleges that Magazine gave her a negative performance review. Russell asserts, but does not attempt to demonstrate, that this review was linked to her EEOC claim. While Russell may have been dismayed by the review, the act of filing an EEOC claim does not immunize her from all negative feedback in her workplace. To survive summary judgment, she must show a causal connection between the EEOC claim and the action that she alleges was retaliatory.

Summary judgment is appropriate on the issue of retaliation.

### C.

**[7]** Summary judgment is also appropriate on the issue of hostile work environment. Russell's claim stems from the fact that the ODAS investigation of Craddock's complaint revealed that several of Russell's co-workers avoid speaking to her. Russell has not alleged that her co-workers' comments were based upon or motivated by race or religion, an element of any hostile work environment claim. *Hafford,* 183 F.3d at 512 (enumerating the elements of a prima facie case). Moreover, mere social avoidance

without more is not the kind harm that gives rise to a claim. Court's are instructed to examine the "severity" of the allegedly hostile behavior, including "whether it is physically threatening or humiliating." *Hafford,* 183 F.3d at 512. The circumstances Russell asserts are mild when evaluated by this standard.

### D.

The nature of Russell's harms do not make her a candidate for injunctive relief. Russell alleges a number of harms—for instance, that her employer exposes her to disproportionate discipline and refuses to allow her to remain in her workspace after the end of her workday—all of which are harms remediable through damages. "The basis of injunctive relief in the federal courts has always been irreparable harm and inadequacy of legal remedies." *Beacon Theatres v. Westover,* 359 U.S. 500, 506–07, 79 S.Ct. 948, 3 L.Ed.2d 988 (1959). The decision to grant or deny injunctive relief is within the sound discretion of the district court. *Kallstrom v. City of Columbus,* 136 F.3d 1055, 1067 (6th Cir.1998). The district court correctly noted that Russell's alleged harms could be fully addressed through standard Title VII remedies and therefore that injunctive relief was not appropriate.

### III.

For the foregoing reasons, we AFFIRM the district court's order granting summary judgment to ODAS and George Hess and denying injunctive relief to Carolyn Russell.

**All Citations**

302 Fed.Appx. 386, 2008 WL 5099697

---

**End of Document**     © 2016 Thomson Reuters. No claim to original U.S. Government Works.

320 Fed.Appx. 356
This case was not selected for
publication in the Federal Reporter.
Not for Publication in West's Federal Reporter.
See Fed. Rule of Appellate Procedure 32.1
generally governing citation of judicial decisions
issued on or after Jan. 1, 2007. See also
Sixth Circuit Rule 28. (Find CTA6 Rule 28)
United States Court of Appeals,
Sixth Circuit.

Hector GARCIA, Plaintiff–Appellant,

v.

DAIMLER CHRYSLER CORP., United
Auto Workers Local No. 12, and Dan
Henneman, Defendants–Appellees.

No. 08–3844.
|
April 7, 2009.

**Synopsis**

**Background:** Employee brought action against employer, union, and union chairman for retaliation under Title VII and Ohio unlawful discriminatory practices statute. The United States District Court for the Northern District of Ohio entered summary judgment in defendants' favor, 2008 WL 2323773, and employee appealed.

**Holdings:** The Court of Appeals, Griffin, Circuit Judge, held that:

[1] employee failed to show that employer's reason for his suspension pending investigation was pretext for retaliation;

[2] employee failed to show that employer's reason for transferring employee to different department was pretext for retaliation; and

[3] Ohio unlawful discriminatory practices statute, which provided for joint and several liability for managers or supervisors, did not create separate liability against chairman after employer was found not liable.

Affirmed.

West Headnotes (5)

**[1]    Civil Rights**
    👉 Motive or intent;pretext

Even assuming that employee established a prima facie case of retaliation for having reported an incident of sexual harassment by union secretary against female coworker, employee failed to show that employer's reason for his suspension pending investigation, namely, that employee had been dishonest and evasive regarding manner in which he impermissibly obtained private addresses of union representatives, was pretext for retaliation, where employee admitted that he was untruthful about how obtained addresses, and he presented no evidence that such dishonesty and evasiveness was not motivation for suspension.

Cases that cite this headnote

**[2]    Civil Rights**
    👉 Motive or intent;pretext

Employee failed to show that employer's reason for transferring employee to different department, namely, that department employee was working in was "over roll, meaning that they had more workers than necessary to fill available positions," was pretext for retaliation for having reported incident of sexual harassment by union secretary; statement of union representative that he "[could not] think of any other reason" for employer's action other than retaliation, was simply statement based on representative's impression, not personal knowledge, and in any case could not be imputed to employer, and employee presented no other evidence that would be admissible to show that reason for transfer was pretext.

Cases that cite this headnote

**[3]    Federal Courts**

## [4] Failure to mention or inadequacy of treatment of error in appellate briefs

Employee waived claim on appeal from summary judgment that employer, union, and union representatives engaged in retaliatory harassment against him, where claim was not raised in opening brief, and he cited no authority to excuse waiver merely because issue was "nearly the same" as claim he did raise.

Cases that cite this headnote

## [4] Federal Courts
### Failure to mention or inadequacy of treatment of error in appellate briefs

Employee waived claim on appeal from summary judgment that district court violated his Seventh Amendment right to jury trial in action against employer, union, and union representatives for retaliation, where he cited no authority in support of claim. U.S.C.A. Const.Amend. 7.

Cases that cite this headnote

## [5] Civil Rights
### Employment practices

Even assuming that union chairman was union employee's supervisor or manager, Ohio unlawful discriminatory practices statute, which provided for joint and several liability for managers or supervisors, did not create separate liability against chairman for alleged retaliatory conduct once employer was found not liable. Ohio R.C. § 4112.01(A)(2).

1 Cases that cite this headnote

**\*357** On Appeal from the United States District Court for the Northern District of Ohio.

BEFORE: KEITH, SUTTON, and GRIFFIN, Circuit Judges.

**Opinion**

GRIFFIN, Circuit Judge.

**\*\*1** After allegedly overhearing a harassing comment made by one unionized employee to another, plaintiff Hector Garcia reported the incident by sending letters to his employer and to the home addresses of various union officials. Garcia lied about how he obtained the private home contact information, and defendant Daimler Chrysler suspended him pending an investigation. Plaintiff sued his employer, the union, and the union chairman for retaliation. The district court granted summary judgment in favor of defendants, and we affirm.

I.

Garcia is an hourly employee of defendant Daimler Chrysler Corporation and a member of defendant United Auto Workers **\*358** Local No. 12 ("UAW" or "Union"). Garcia works in Chrysler's Toledo, Ohio plant as a "floater," meaning that he is assigned to various positions within the plant depending on the company's needs. Floaters are frequently transferred to different departments to cover for permanent employees who are sick or on vacation, or to fill other temporary vacancies. Because of the temporary nature of their work, these employees cannot use their seniority to displace permanent workers who are returning to their permanent positions.

Due to a previous injury, Garcia has a permanent medical restriction that prevents him from performing activities requiring "repetitive gripping" or from doing much lifting with his right hand. As a result of his injury, Garcia was placed within Chrysler's "PQX" system, meaning that he was physically qualified with restrictions and could only be assigned to jobs that he was capable of performing with his restrictions. If an employee within the PQX system was assigned to a job that he believed violated his medical restriction, he could request that the plant doctor make an evaluation. Chrysler, not the Union, was in charge of making PQX assignments.

The controversy leading to the instant case began on August 19, 2004, when Garcia allegedly overheard a conversation between Union secretary/treasurer Mark Epley and employee Connie Ramirez that occurred in the

break room. According to plaintiff, Epley told Ramirez that he would send her to a Hispanic conference in Chicago if she would spend a night with him in a hotel and another night with defendant Dan Henneman, chairman of the UAW Jeep unit. Bob Morrissey and Richard Lott, both of whom were Union officials, were also in the break room.

Garcia reported the conversation to Union steward Bill McCullough, who said that he would tell UAW Vice Chairman Daryl Peterson. McCullough asked Ramirez about the conversation. She did not confirm or deny it; she merely "put her head down," a gesture that McCullough assumed meant that it either happened or that she was embarrassed. McCullough told Garcia that there was nothing he could do if Ramirez was not going to complain, and he later told Ramirez that if she had been sexually harassed, or if she were to be sexually harassed in the future, that she should tell the person to stop and then tell an advisor, Union representative, or someone in labor relations.

 **2  Plaintiff alleges that he told Bruce Baumhower, the UAW President, about the incident and Baumhower believed him. Baumhower disputes this and testified that he called Epley about the Ramirez conversation, Epley denied it, and Baumhower reported this denial to Garcia. Garcia also claims to have contacted Dan Twiss, UAW's International Representative, although Twiss denies that he was contacted.

Garcia mailed a letter to Thomas Maxon, the Senior Manager of Human Resources at the Chrysler plant, and to the home addresses of a number of Union representatives. Garcia obtained the addresses from Fred Muir, his union steward. The letter stated:

Labor Relations, and UAW Union Local 12

I would like to file charges against Union Brother Mark Epley, for using his job as a tool for sexual harrassment [sic]. Mark Epley needs to be removed from his Union job, and discipline [sic].

On August 19, 2004 I went on my break because I knew Connie Ramirez was working in the committee room. She was at the coffee pot, and did not see me walk in. Mark Epley was sitting in his office with the door open. I heard Mark  *359  Epley discussing a trip to Chicago for the Hispanic conference with her. He said I'll pay

your room for 3 days, and I'll pay your expenses, but he said you have to spend one night in a room with me because I'm sending you to Chicago.

She walked back to her desk and sat down. I looked at her and she shook her head. I rolled my chair over to her and whispered that Mark Epley had no right talking to her like that. She said, Hector, I just came back to work and I'm only part time, I might loose [sic] my job. I said it doesn't matter if you are full time or part time, you are not a whore and he can not use his job for sex. By that time my break was over and I went back to work.

On October 1, 2004 I approached Union Rep. Dan Twiss about the matter, and he said why are you telling me there is nothing I can do? I stopped and thought to myself, he doesn't want to help a minority because anoter [sic] Union Brother Rep. was involved. At this point I wiil [sic] file charges with labor relations at work and with the Hispanic Council.

Mark Epley should be removed from his Union job for trying to use his power to have sex.

Local 12 Member, Hispanic Member

Hector Garcia [1]

Garcia did not mention anything about Henneman in the letter because, unlike Epley, he believed that Henneman "wasn't a person like that," meaning a person who would take advantage of Ramirez.

Garcia's letter was the first time that he notified Chrysler management about Epley's comments. A number of Union representatives were concerned that Garcia mailed his letter to their home addresses because, in many cases, their home addresses were not public information. Both Chrysler and the UAW kept these addresses confidential to prevent the representatives from being harassed at home and to protect their privacy. Disclosure of such information violates company policy; abuse of private information had recently resulted in episodes of identity theft. Chrysler policy allows it to discipline employees "up to and including discharge" for failure to provide information or for providing false information.

 **3  Chrysler formed an investigative team comprised of Maxon, labor relations supervisor Jean Hathaway, and Henneman. The investigation team interviewed Ramirez,

who denied that she had been sexually harassed and provided a written statement to that effect. The team also interviewed Lott and Morrissey, both of whom denied that Epley had harassed Ramirez. The team questioned Garcia about how he obtained the addresses. At Garcia's request, his union representative, Raul Ledesma, was present. Garcia gave conflicting explanations regarding how he obtained the addresses. His answers ranged from finding them on the internet, to driving to the individuals' houses, to claiming that his wife found them. Eventually Garcia admitted that he obtained the addresses from Muir. Maxon described his confusion following this discussion with Garcia: "I still to this day don't know where they came from." The team then questioned Muir about the addresses, to which he repeatedly responded, "I plead the Fifth."

Chrysler suspended Garcia without pay pending its investigation into how he obtained the addresses. Maxon later explained **\*360** that he believed the suspension was necessary because of Garcia's conflicting explanations:

> [W]e had such a difficult time—and I'll be very candid with you, I don't have any clue, didn't at the time as to what was true and what wasn't. So it had taken an inordinate amount of time and there was more that was going to have to take place, so his suspension was necessary in my opinion so that we could continue with the investigation.

Henneman confronted Garcia about the Epley incident and called him a liar. Plaintiff alleges that Henneman also swore at him.

Garcia filed a grievance with the UAW, and Chrysler reinstated him with backpay. Nevertheless, he filed a discrimination complaint with the EEOC, alleging that Chrysler and the UAW retaliated against him for reporting Epley's conversation with Ramirez.

Two weeks later, Chrysler Area Manager Brian Tringali transferred Garcia from the material handling department back to his home department because the material handling department "was over roll," meaning that it had more employees than it needed. He was sent home on several occasions because there was no work for him.

He returned to work but was assigned to a position that violated his medical restrictions, so Chrysler transferred him back to his previous job as a forklift operator.

The EEOC issued a determination letter stating that it found sufficient evidence to support a retaliation claim. Garcia then brought the present action in the United States District Court for the Northern District of Ohio, claiming retaliation in violation of Title VII and OHIO REV.CODE § 4112. The district court ultimately granted summary judgment in favor of defendants, and Garcia appealed.

## II.

We review a district court's grant of a motion for summary judgment de novo. *Williamson v. Aetna Life Ins. Co.,* 481 F.3d 369, 374 (6th Cir.2007). Summary judgment is proper "if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." FED.R.CIV.P. 56(c). The moving party has the burden of proving the absence of genuine issues of material fact and its entitlement to judgment as a matter of law. *Celotex Corp. v. Catrett,* 477 U.S. 317, 323, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). When determining whether the movant has met this burden, we must view the evidence in the light most favorable to the nonmoving party. *Smith Wholesale Co. v. R.J. Reynolds Tobacco Co.,* 477 F.3d 854, 861 (6th Cir.2007).

## III.

**\*\*4** Garcia argues that defendants retaliated against him for reporting Epley's conversation with Ramirez. To establish a prima facie claim of retaliation under Title VII and Ohio law,[2] Garcia must show that: (1) he engaged in protected activity; (2) defendants knew that he engaged in the protected activity; (3) defendants subjected him to an adverse employment action; and (4) the adverse employment action was causally connected to the protected activity. *Ladd v. Grand Trunk Western R.R., Inc.,* 552 F.3d 495, 502 (6th Cir.2009). If **\*361** plaintiff can establish a prima facie case, the burden shifts to defendants to articulate a "legitimate, nondiscriminatory reason" for their actions. *McDonnell Douglas Corp. v.*

*Green,* 411 U.S. 792, 802, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973); *Russell v. Univ. of Toledo,* 537 F.3d 596, 604 (6th Cir.2008). If defendants make this showing, the burden shifts back to plaintiff to show that defendants' proffered reason is merely "a pretext to hide unlawful discrimination." *Russell,* 537 F.3d at 604.

### A.

Plaintiff argues that Chrysler retaliated against him by suspending him pending an investigation into how he obtained the addresses and by transferring him to a job that violated his medical restrictions.

### 1.

**[1]** Garcia asserts that he met the prima facie elements of a retaliation claim regarding Chrysler's suspension of him pending its investigation. Chrysler argues that plaintiff has failed to establish a causal connection between the protected act and the suspension pending investigation. However, we need not resolve this matter because, even assuming that plaintiff met his prima facie case, he cannot show that Chrysler's suspension of him was a pretext for retaliation. Thus, he has failed to carry his ultimate burden of persuasion in a manner that would allow for a reasonable juror to find in his favor. *See Ladd,* 552 F.3d at 502 (concluding that it was unnecessary to analyze a prima facie case when a plaintiff cannot establish pretext).

Assuming arguendo that plaintiff could establish a prima facie case, the burden of production shifts to Chrysler to offer a non-retaliatory reason for the adverse employment action. *Id.* Chrysler asserts that its non-retaliatory purpose for suspending Garcia was his dishonesty and evasion in answering questions regarding how he obtained the addresses. In order to prevail, Garcia must show that this proffered reason either: "(1) has no basis in fact; (2) did not actually motivate the adverse employment action; or (3) was insufficient to warrant the adverse action." *Id.* (citing *Manzer v. Diamond Shamrock Chems. Co.,* 29 F.3d 1078, 1084 (6th Cir.1994)). Plaintiff cannot make this showing.

Garcia concedes that Chrysler's proffered reason for suspending him had a basis in fact; he admits that he was not truthful in responding to questions about how he obtained the addresses. Plaintiff offers no

admissible evidence that his evasiveness did not motivate his suspension or that it was insufficient to warrant a suspension. Plaintiff argues further that Chrysler retaliated against him, not only by suspending him during its investigation, but by the mere act of conducting an investigation. We disagree. Garcia cannot create the need for an investigation by his own evasive conduct and then claim that the investigation itself was retaliatory. *See Driggers v. City of Owensboro, Ky.,* 110 Fed.Appx. 499, 508 (6th Cir.2004) (holding that an investigation into the facts surrounding plaintiff's complaints did not constitute improper conduct). The district court properly granted summary judgment in favor of Chrysler on this issue.

### 2.

**\*\*5** **[2]** Garcia's claim that Chrysler retaliated against him by transferring him to a different department fails for similar reasons. Chrysler asserts that it transferred Garcia, a floater, because the department he was working in "was over roll, meaning that it had more employees than necessary to fill the available positions." Plaintiff has failed to present any *admissible* evidence to show that Chrysler's explanation **\*362** lacked a basis in fact, did not actually motivate the transfer, or was insufficient to warrant the transfer. Garcia proffers two reasons— Ledesma's statement and the EEOC letter—but neither is admissible for purposes of opposing a motion for summary judgment.

Ledesma, whom plaintiff describes as "a tried and true union official," stated that he "can't think of any other reason" for Chrysler's action other than retaliation. Garcia argues that "Ledesma's testimony was based on personal knowledge. He knew from experience how people are normally reassigned." The district court rejected the testimony because Ledesma admitted that his testimony was based on his "impression" of the events, rather than on specific information. We agree with the district court. Rule 56 requires "personal knowledge," and a statement that one cannot "think of any other reason" is not the same as a statement that one actually knew of the reason. Even if Ledesma knew "how people are normally reassigned," Garcia has not shown that Ledesma knew anything about this particular reassignment. Garcia argues further that Ledesma's statement is admissible as a statement by a party opponent. However, even if Ledesma's statement

could be imputed to the Union, Garcia has not shown how it could be imputed to Chrysler. The district court properly excluded this statement.

Regarding the admissibility of the EEOC letter, Garcia relies upon the Ninth Circuit case of *Gifford v. Atchison, Topeka & Santa Fe Ry. Co.,* 685 F.2d 1149 (9th Cir.1982). In *Gifford,* the Ninth Circuit held that an EEOC investigation into whether the plaintiff had been treated differently than her male coworkers was sufficient to create an issue of fact in that case. *Id.* at 1156. However, Garcia has not identified any cases where the Sixth Circuit has made a similar determination. *See Williams v. Nashville Network,* 132 F.3d 1123, 1129 (6th Cir.1997) (ruling that a district court did not abuse its discretion in refusing to admit an EEOC probable cause determination letter). Garcia argues that the trial court has broader discretion to exclude an EEOC letter at trial than at the summary judgment stage, but offers no legal support for this proposition.

Garcia has not shown that Chrysler's reason for transferring him was a pretext for illegal retaliation.

B.

Garcia alleges that the Union retaliated against him by encouraging Chrysler's suspension of him and concurring in his transfer. The Union argues that it could not have retaliated against plaintiff by suspending him because it was Chrysler, not the Union, that issued the suspension. In fact, it was Henneman, on behalf of the Union, who persuaded Chrysler to reimburse Garcia for the time that he was suspended. Even if, for the sake of argument, the Union was responsible for suspending plaintiff, Garcia's claim of retaliatory suspension fails when applied to the Union for the same reason that it fails as applied to Chrysler. Garcia's evasiveness when questioned about how he obtained the addresses prevents him from being able to show that the suspension was pretextual.

**6 Plaintiff has also failed to show that the Union, as opposed to Chrysler, was responsible for his transfer, other than by proffering Ledesma's statement, which we have already determined to be inadmissible. However, even if the Union's role in the transfer was coterminous with Chrysler's role, Garcia is still unable to show that the

reason given for the transfer—his department being "over roll"—was pretextual.

*363 The district court ruled that plaintiff's claim against the Union for retaliatory transfer failed, but it based its conclusion on Garcia's inability to make his prima facie case, rather than on his inability to establish pretext. Specifically, the district court determined that Garcia could not show that his transfer "was causally connected to his report as opposed to overstaffing in the stock department." Holding that Garcia's claim fails because he cannot show that his transfer was connected to his report, or holding that it fails because he cannot show that being "over roll" was a pretext for retaliation, are simply two ways of saying the same thing: Garcia cannot succeed on his claim against the Union because he cannot show that it retaliated against him. Whether we hold that Garcia cannot demonstrate the elements for his prima facie case, or show that the proffered nondiscriminatory reason was pretextual, the result is the same. Thus, we affirm the district court's grant of summary judgment in favor of the Union.

C.

[3] Garcia argued in his complaint and in his opposition to summary judgment below that defendants engaged in retaliatory harassment against him. However, he did not raise this issue in his opening brief on appeal. In his reply brief, he argued that the various incidents about which he complained in his opening brief amounted to retaliatory harassment in their totality. He also argued, apparently for the first time, that "the legal review for retaliation and retaliatory harassment are nearly the same."

We have held that "[a]n argument raised for the first time in a reply brief will not be considered by this Court." *Overstreet v. Lexington–Fayette Urban County Gov't,* 305 F.3d 566, 578 (6th Cir.2002) (citing *Wright v. Holbrook,* 794 F.2d 1152, 1156 (6th Cir.1986)); *Wu v. Tyson Foods, Inc.,* 189 Fed.Appx. 375, 381 (6th Cir.2006) (refusing to consider an issue not raised in appellant's opening brief even though the issue was preemptively raised in appellee's brief). Garcia did not raise this issue in his opening brief and has cited no authority that would excuse this waiver merely because the issue is "nearly the same" as one that he did raise.

186 L.R.R.M. (BNA) 2251, 106 Fair Empl.Prac.Cas. (BNA) 226

## D.

**[4]** Garcia asserts, without citation to authority, that the district court violated his Seventh Amendment right to a trial by jury. He argues that "[i]n this case, where various witnesses disagreed with each other about key facts and where affidavits were submitted at summary judgment specifically to challenge facts set forth by Garcia, the lower court should not have ignored the constitutional mandate to allow a jury to try Garcia's claims." This is nothing more than an attempt to recycle Garcia's summary judgment arguments as somehow being Seventh Amendment arguments. Garcia does not cite any authority supporting his Seventh Amendment argument, and the perfunctory manner with which he has addressed this issue amounts to a waiver. *See United States v. Villareal,* 491 F.3d 605, 611 (6th Cir.2007) ("[I]t is a settled appellate rule that issues adverted to in a perfunctory manner, unaccompanied by some effort at developed argumentation, are deemed waived.") (citation omitted).

## IV.

**\*\*7** **[5]** Finally, Garcia sued Henneman under both Title VII and OHIO REV. CODE § 4112.02(I). The district court cited *Wathen v. Gen. Elec. Co.,* 115 F.3d 400, 405 (6th Cir.1997), for the proposition that a plaintiff "cannot hold an individual liable for illegal retaliation under Title VII." Accordingly, the district court dismissed **\*364** the claims against Henneman. On appeal, Garcia does not challenge the dismissal of the Title VII claim against Henneman but argues that the district court erred in dismissing the state law claim against him. Plaintiff cites *Genaro v. Cent. Transp., Inc.,* 84 Ohio St.3d 293, 703 N.E.2d 782 (1999) for the proposition that Ohio law allows liability to attach to individuals.

In *Genaro,* the Ohio Supreme Court held that "individual supervisors and managers are accountable for their own discriminatory conduct occurring in the workplace environment." 703 N.E.2d at 787. The court based its decision on the language of OHIO REV.CODE § 4112.01(A)(2), which defines the term "employer" as: "the state, any political subdivision of the state, any person employing four or more persons within the state, and any person acting directly or indirectly in the interest of an employer." Thus, in order for liability to attach to Henneman, the local UAW leader, Garcia would have to show that Henneman met the statutory definition of "employer."

Even if plaintiff could make this showing, *Genaro* does not create a separate liability standard; it merely states that "for purposes of [§ 4112], a supervisor/manager may be held jointly and/or severally liable with her/his employer for discriminatory conduct...." 703 N.E.2d at 787–88. Under *Genaro,* a supervisor's liability is joint and several with his employer. Therefore, because neither Chrysler nor the Union are liable for the reasons explained above, there is no liability to attach jointly or severally to Henneman.

## V.

For these reasons, we affirm the judgment of the district court.

## All Citations

320 Fed.Appx. 356, 2009 WL 928576, 186 L.R.R.M. (BNA) 2251, 106 Fair Empl.Prac.Cas. (BNA) 226

---

Footnotes

1    The original letter was written entirely in capital letters. For the sake of readability, we have changed the case.

2    Ohio courts apply Title VII jurisprudence to the interpretation of OHIO REV.CODE § 4112. *Ohio Civ. Rights Comm'n v. David Richard Ingram, D.C., Inc.,* 69 Ohio St.3d 89, 630 N.E.2d 669, 674 (1994).

---

    © 2016 Thomson Reuters. No claim to original U.S. Government Works.

    © 2016 Thomson Reuters. No claim to original U.S. Government Works.

99 Fair Empl.Prac.Cas. (BNA) 246, 2006 Fed.App. 0733N

200 Fed.Appx. 439
This case was not selected for
publication in the Federal Reporter.
Not for Publication in West's Federal Reporter
See Fed. Rule of Appellate Procedure 32.1
generally governing citation of judicial decisions
issued on or after Jan. 1, 2007. See also
Sixth Circuit Rule 28. (Find CTA6 Rule 28)
United States Court of Appeals,
Sixth Circuit.

Jerry P. FREEMAN, Plaintiff-Appellant,

v.

John E. POTTER, Postmaster General, United
States Postal Service, Defendant-Appellee.

No. 05-6311.
|
Oct. 4, 2006.

**Synopsis**

**Background:** Postal employee sued employer alleging
that employer discriminated against him by failing to
transfer him to another position, in violation of the
Age Discrimination in Employment Act (ADEA) and
Title VII. The United States District Court for the
Middle District of Tennessee, Wiseman, Senior District
Judge, 2005 WL 1862304, granted employer's motion for
summary judgment, and appeal was taken.

**Holding:** The Court of Appeals, McKeague, Circuit Judge,
held that employer's decision not to transfer postal
employee to postmaster position was not an adverse
employment action.

Affirmed.

Clay, Circuit Judge, dissented and filed opinion.

West Headnotes (1)

**[1]**    **Civil Rights**
         👉 Discrimination Against Men; Reverse
         Discrimination

**Civil Rights**
👉 Public Employment

Postal Service's decision not to transfer 52-
year-old male postal employee to postmaster
position was not an adverse employment
action, as required for employee's age
and gender discrimination claims under the
Age Discrimination in Employment Act
(ADEA) and Title VII, absent showing
that his current position as a supervisor
was less prestigious than the postmaster
position or that the experience of being a
postmaster would significantly enhance his
career opportunities more than his current
position. Age Discrimination in Employment
Act of 1967, § 15, 29 U.S.C.A. § 633a; Civil
Rights Act of 1964, § 717(a), 42 U.S.C.A. §
2000e-16(a).

42 Cases that cite this headnote

**\*440** On Appeal from the United States District Court
for the Middle District of Tennessee.

**Attorneys and Law Firms**

David G. Karro, U.S. Postal Service, Washington, DC,
for defendant-appellee.

BEFORE: SILER, CLAY, and McKEAGUE, Circuit
Judges.

**OPINION**

McKEAGUE, Circuit Judge.

**\*\*1** Plaintiff Jerry Freeman sued the Postmaster General
of the United States Postal Service (the "Postal Service"),
alleging that the Postal Service discriminated against him
by failing to transfer him to another position, in violation
of the Age Discrimination in Employment Act of 1967
("ADEA"), 29 U.S.C. § 633a, and Title VII of the Civil
Rights Act of 1964, 42 U.S.C. § 2000e-16. The district
court granted summary judgment in favor of the Postal
Service, finding that Freeman did not suffer an adverse
employment action, and therefore did not carry his *prima
facie* burden. Freeman appealed.

For the reasons set forth below, we affirm.

## I.

Freeman was Supervisor of Customer Service at the Murfreesboro, Tennessee Post Office and had worked for the Postal Service for more than twenty-five years when he applied for the position of Postmaster of Sewanee, Tennessee. He was fifty-two years old at the time.

Salaried employees of the Postal Service each have a ranking on the "Executive and Administration Schedule" or "EAS," a pay and duty schedule. As a Supervisor in Murfreesboro, Freeman held a ranking of EAS-16. The Sewanee position was ranked as an EAS-15. This meant that the salary for the Postmaster position was lower than the salary he received in his current Supervisor position.

In his application for the Postmaster position, Freeman listed the following highlights of his duties as a Supervisor:

• supervise and schedule thirty-nine rural carriers on a daily basis;

• supervise five full-time and five part-time window clerks;

• supervise several Special Event Programs, including special cancellations for the Civil War, the Stones River National Battlefield, and the Uncle Dave Macon Days stamps; and

• was responsible for bar code sorter machines, qualifying part-time distribution clerks, and various educational tours.

During his deposition, Freeman estimated that an EAS-15 Postmaster might have responsibility for two rural carriers, a box section, and two or three window clerks.

Freeman grew up ten or twelve miles from Sewanee and knew many of the people who lived there. He testified that he sought the lower-paying position because it would give him better advancement opportunities in the future. He noted that Postmasters have their own meetings, and, if selected, he would be able to participate in **\*441** those meetings. He also wanted the opportunity to run his own office, explaining that it would have less pressure. He

testified that he had planned to apply for a higher-level Postmaster position within a couple of years of becoming the Sewanee Postmaster.

Bonnie Layne, a Postmaster near Sewanee, testified by affidavit that the Sewanee Postmaster position was "a unique and desirable position." She further testified:

> In general, postmaster positions in the United States Postal Service are considered desirable and are sought after even in preference to supervisor positions. This is because as a postmaster you are the on site person responsible for running the location and have no supervisor on site to whom you must report. Further, in my experience, being a postmaster is considered prestigious. Because of this, it does not surprise me that a supervisor in the United States Postal Service would be willing to take an initial marginal decrease in salary to obtain a postmaster position.

 **\*\*2** She also noted that the proximity to a small university made the position "unique and more prestigious."

Another applicant for the Sewanee position, Wanda Eisler (also an EAS-16 at the time), testified that she wanted the job because being a Postmaster was her ultimate goal. She explained that she wanted a small office.

The Postal Service did not select Freeman or Eisler for the Postmaster position, offering it instead to a thirty-one year old female. Freeman filed an administrative complaint, alleging age and reverse-sex discrimination. The ALJ determined that the Postal Service did not discriminate against him based on his sex, but agreed with Freeman that it discriminated against him based on his age. As the remedy, the ALJ required that the Postal Service offer Freeman the Sewanee Postmaster position. It did so, but Freeman declined the position, opting instead to sue the Postal Service, alleging workplace discrimination and seeking back pay and benefits, front pay, compensatory damages for emotional and reputational injury, attorney fees, and expenses.

99 Fair Empl.Prac.Cas. (BNA) 246, 2006 Fed.App. 0733N

## II.

### A. *Fed. R. Civ. P. 56*

The court reviews *de novo* the district court's grant of summary judgment. *Rowan v. Lockheed Martin Energy Sys., Inc.,* 360 F.3d 544, 547 (6th Cir.2004) (citations omitted). Summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). The court reviews the evidence and draws all reasonable inferences in favor of the nonmoving party. *Rowan,* 360 F.3d at 547 (citation omitted). "That is not to say that it only reviews evidence favorable to the non-moving party. Instead, it must review all the evidence in the record." *Id.* (citation omitted).

### B. *Adverse Employment Actions-In General*

The ADEA prohibits federal employers, including the Postal Service, from discriminating against an employee "based on age." 29 U.S.C. § 633a. Title VII likewise prohibits discrimination based on, among other things, an individual's gender. 42 U.S.C. § 2000e-16(a). The legal standards governing both types of discrimination are similar. *See Kocsis v. Multi-Care Mgmt., Inc.,* 97 F.3d 876, 885 (6th Cir.1996).

A plaintiff may establish age- or gender-based discrimination in two different **\*442** ways. He may offer direct evidence of the employer's discriminatory motive by producing "evidence, which, if believed, requires the conclusion that unlawful discrimination was at least a motivating factor in the employer's actions." *Mitchell v. Vanderbilt Univ.,* 389 F.3d 177, 181 (6th Cir.2004) (quoting *Wexler v. White's Fine Furniture, Inc.,* 317 F.3d 564, 570 (6th Cir.2003) (en banc)). If he cannot come forward with direct evidence of a discriminatory motive, he may offer indirect and circumstantial evidence of such a motive under the familiar *McDonnell Douglas* burden-shifting approach. *Id.* (citation omitted). Under the latter approach, the employee must show that (1) he is a member of a protected class; (2) he was subjected to an adverse employment action; (3) he was qualified for the position sought; and (4) he was treated differently from similarly situated employees outside the protected class. *McClain v. NorthWest Cmty. Corr. Ctr. Judicial Corr. Bd.,* 440 F.3d

320, 332 (6th Cir.2006). The elements of a *prima facie* case are fact-specific and differ from case to case. *Jones v. Sch. Dist. of Philadelphia,* 198 F.3d 403, 411 (3d Cir.1999).

**\*\*3** The sole issue presented to us on appeal is whether Freeman has offered sufficient evidence to create a genuine issue of material fact that he suffered an adverse employment action. An adverse employment action "constitutes a significant change in employment status, such as hiring, firing, failing to promote, reassignment with significantly different responsibilities, or a decision causing a significant change in benefits." *Burlington Indus., Inc. v. Ellerth,* 524 U.S. 742, 761, 118 S.Ct. 2257, 141 L.Ed.2d 633 (1998) (citations omitted). Such action usually "inflicts direct economic harm." *Id.* at 762, 118 S.Ct. 2257. An employment action must amount to "a materially adverse change" in the terms or conditions of employment to be actionable. *Kocsis,* 97 F.3d at 885; *see also Mitchell,* 389 F.3d at 182. The action "must be more disruptive than a mere inconvenience or an alteration of job responsibilities." *Kocsis,* 97 F.3d at 886 (internal quotations omitted). A "*de minimis*" employment" action is "not materially adverse and, thus, not actionable." *Bowman v. Shawnee State Univ.,* 220 F.3d 456, 462 (6th Cir.2000). In other words, a "bruised ego" caused by trivial employment actions is not sufficient. *Kocsis,* 97 F.3d at 886 (citing *Flaherty v. Gas Research Inst.,* 31 F.3d 451, 456 (7th Cir.1994)).

Yet, an employee need not have suffered one of the "ultimate employment actions" listed above (e.g., termination, demotion, failure to promote, etc.) to have a viable claim of discrimination. A material adverse action may consist of a less distinguished title, diminished options for advancement, or other unique indices. *Bowman,* 220 F.3d at 461-62; *Hollins v. Atl. Co.,* 188 F.3d 652, 662 (6th Cir.1999). Importantly, however, an individual's "subjective impression concerning the desirability of one position over another" is insufficient to render an employer's action materially adverse. *Mitchell,* 389 F.3d at 183; *see also Policastro v. Nw. Airlines, Inc.,* 297 F.3d 535, 539 (6th Cir.2002). Rather, we determine whether a particular employment action was "objectively intolerable to a reasonable person." *Policastro,* 297 F.3d at 539; *see also O'Neal v. City of Chicago,* 392 F.3d 909, 913 (7th Cir.2004) (explaining that an employee's "purely subjective preferences for one position over another" does not "justify trundling out the heavy artillery of federal antidiscrimination law" (internal quotations omitted));

*Brown v. Brody,* 199 F.3d 446, 457 (D.C.Cir.1999) (explaining that an employee must suffer "objectively tangible harm" to have a viable discrimination claim).

In short, the action must have a "significant detrimental effect" on the employee's **\*443** status, *Boone v. Goldin,* 178 F.3d 253, 256 (4th Cir.1999), as evidenced by objective factors, not subjective impressions.

### C. *Did Freeman Suffer an Adverse Employment Action?*

To support his claim, Freeman points to a single action by the Postal Service: its decision not to transfer him to the Sewanee Postmaster position. As in prior cases involving a request for a new position within the same employer organization, we view Freeman's claim as one grounded on a failure to promote/transfer, as opposed to one based on a failure to hire. [1] *See, e.g., Browning v. Dep't of Army,* 436 F.3d 692, 695-96 (6th Cir.2006); *White v. Columbus Metro. Hous. Auth.,* 429 F.3d 232, 240 (6th Cir.2005); *Mitchell,* 389 F.3d at 183.

**\*\*4** In general, a lateral transfer, or the refusal to make a lateral transfer, is not a materially adverse action. *Mitchell,* 389 F.3d at 183. [2] Freeman offers no evidence **\*444** that the refusal-to-transfer denied him a promotion, at least in any official sense. He points to no policy or procedure of the Postal Service suggesting that it would consider a move from an EAS-16 Supervisor to an EAS-15 Postmaster a promotion. The Sewanee Postmaster position paid less, and thus, from a purely financial perspective, the transfer would have been a demotion. Freeman argues, however, that in spite of the loss of pay, the Sewanee Postmaster position was unique for two main reasons: (1) it was prestigious; and (2) the experience would have given him opportunities for higher-paying Postmaster positions. The two factors are analyzed in turn.

#### 1. *Prestige*

Freeman cites this court's statement in *Mitchell* that "[i]n cases where the sought position is a lateral transfer, without additional material benefits *or prestige,* it would be improper to conclude that a denial of such a transfer would be a materially adverse action." 389 F.3d at 183 (citation omitted, emphasis added). Other courts have similarly noted that "prestige" and "loss of title" can amount to adverse employment action under some

circumstances. *See, e.g., Bryson,* 96 F.3d at 916; *de la Cruz,* 82 F.3d at 21.

"Prestige," much like beauty, is in the eye of the beholder. It is the "standing or estimation in the eyes of people." WEBSTER'S THIRD NEW INTERNATIONAL DICTIONARY (1986). Yet, because we rely upon objective factors, rather than subjective impressions, we must look underneath an assertion of "prestige" to determine whether there is anything concrete to substantiate it. For example, **\*445** does a particular title entail greater responsibilities, have unique characteristics, or require special training or education? *See, e.g., White v. Burlington N. & Santa Fe Ry. Co.,* 364 F.3d 789, 803 (6th Cir.2004) (en banc) (noting that the higher level of qualifications needed for a position was an indication of the position's prestige), *aff'd,* 548 U.S. 53, 126 S.Ct. 2405, 165 L.Ed.2d 345 (2006); *Ledergerber v. Stangler,* 122 F.3d 1142, 1144 (8th Cir.1997) (explaining that negative public perception alone does not amount to an adverse employment action). Further, an employee must show that the target position had, in some sense, *more* prestige than the employee's current position. If the two positions have the same level of prestige, the refusal to transfer the employee from one prestigious position to an equally prestigious position cannot have an actionable effect on the employee's career. *See Kocsis,* 97 F.3d at 887 (noting the failure of the employee "to make a real attempt to compare the two positions" before filing suit).

Here, Freeman offers several reasons why the Postmaster position in general, and the one in Sewanee in particular, was prestigious. He testified that as a Postmaster, he would be "in the limelight" in terms of controlling the office, making budgets and plans, and increasing revenues. Layne reiterated this, as well as stating that the position's proximity to a small university also made it prestigious.

**\*\*5** Being the head of an office with responsibility for its budget and plans can be prestigious. Of course, so can being a supervisor in a large office with responsibility for thirty-nine carriers, ten window clerks, and various special event programs and educational tours. Moreover, the fact that he was paid more as a Supervisor in Murfreesboro is at least some evidence of its prestige vis-à-vis the Sewanee Postmaster position. While Layne testified that Postmaster positions are considered desirable and are sought after even in preference to supervisor positions,

*Freeman v. Potter,* 200 Fed.Appx. 439 (2006)

99 Fair Empl.Prac.Cas. (BNA) 246, 2006 Fed.App. 0733N

this is simply a statement about postmaster positions *in general.* She did not offer any specific comparison between the prestige of the two particular positions at issue here-Freeman's Supervisor position (or one similar to it in terms of size of office and responsibilities/qualifications) against the Sewanee Postmaster position.

The evidence that the Sewanee Postmaster position is prestigious because it is located near a small university is entirely conclusory. Freeman provides no evidence or explanation of why a Postmaster who works in an office serving a university is more prestigious than the same position in a neighboring town or city without a university. There is no description of additional or special tasks the Postmaster must perform for the school, special access the Postmaster might have to school facilities, or any other objective indicia of prestige bestowed upon the Postmaster by the Postal Service, university, or community. Moreover, unlike a typical vendor for a college or university, the Postmaster cannot tout its office's selection by the school as some sign of excellence, given that the Postal Service has a federally-chartered monopoly in delivering mail. The position may be more *desirable* because it is located in a university town with, for example, ready access to collegiate athletic events, arts, community lectures, etc., but simply because a position is desirable to someone does not make the failure to get it actionable. *Mitchell,* 389 F.3d at 183.

It is Freeman's burden to show that the refusal-to-transfer resulted in him having to stay in a less prestigious position. He has not met his burden.

### 2. *Experience*

Freeman also argues that the experience he would have gained as the Sewanee **\*446** Postmaster would have given him more opportunities for future promotion. The refusal to transfer, like an involuntary transfer, can amount to an adverse employment action if it significantly reduces the employee's career prospects. *See, e.g., O'Neal,* 392 F.3d at 911. The Postal Service provided numerous examples of Supervisors at or below Freeman's EAS rank moving to the position of Postmaster. Freeman admitted during his deposition that his belief that the Sewanee Postmaster position would have given him an opportunity to advance was speculation. Furthermore, as explained above, Layne's testimony does not evidence that Freeman's own prospects for advancement were hindered in any non-trivial way. Again, it was Freeman's burden to

compare the two positions and offer objective indications of the superiority of one over the other. *Kocsis,* 97 F.3d at 887. He did not do so.

### 3. *Freeman Has Not Shown a Non-Trivial Impact on his Career*

**\*\*6** In sum, Freeman has provided some evidence that a Postmaster is generally considered a prestigious position in the Postal Service, and that the Sewanee Postmaster position is a desirable one. What he has not done is come forward with evidence of objective indicia which would show: (a) that the Sewanee Postmaster position was more prestigious than his own position; or (b) that the experience of being a Sewanee Postmaster would significantly enhance his career opportunities more than his current position. Accordingly, Freeman has not made his *prima facie* case of discrimination.

### III.

For the foregoing reasons, we AFFIRM summary judgment in favor of the Postal Service.

CLAY, Circuit Judge, dissenting.
**\*\*6** Plaintiff has carried his burden on summary judgment of presenting evidence that he suffered an actionable adverse employment action. Contrary to what the majority opinion avers, a company's refusal to hire a current employee into a posted, open position, for which the company is actively evaluating candidates, raises the necessary inference of discrimination to satisfy the *prima facie* case. The Postal Service's refusal to hire Plaintiff constitutes the adverse employment action in the instant case. In the alternative, even under the majority's formulation of the rule, I would find that Plaintiff has carried his burden on summary judgment because he has presented objective evidence from which a rational trier of fact could conclude that a Postmaster position in a small office is objectively more prestigious than a supervisor position in a larger office.

### 1. Plaintiff Has Raised the Necessary Inference of Discrimination

99 Fair Empl.Prac.Cas. (BNA) 246, 2006 Fed.App. 0733N

The majority avers that Plaintiff has failed to show that he can meet the second prong, the "adverse employment action" requirement, of the four-factor *prima facie* test, as this Circuit requires under the *McDonnell Douglas* burden-shifting evidentiary approach. The majority reaches its conclusion because it views this case as a failure to transfer case, in light of Plaintiff's current employment with the Postal Service. In failure to transfer cases, this Court has held that the employer "action"-either effecting an involuntary transfer or denying a request to transfer-must somehow result in a materially adverse effect on the plaintiff's employment. This case is not, however, a failure to transfer case. Rather, the Postal Service was actively seeking candidates for the position of Sewanee, Tennessee postmaster. Plaintiff underwent a formal application **\*447** and evaluation process, and instead of hiring Plaintiff, the Postal Service hired a much younger, female applicant with much less experience than Plaintiff. The adverse employment action is therefore the refusal to hire, and the majority's attempt to hold Plaintiff to a higher evidentiary threshold ignores Supreme Court direction that the *prima facie* test is meant as a flexible standard comprised only of those elements which, absent explanation, raises an inference of discrimination. Moreover, the majority's approach belies Supreme Court pronouncements on failures to transfer and what constitutes a "materially adverse" action under Title VII.

### a. *The Prima Facie Test Is a Flexible Standard*

**\*\*7** The *McDonnell Douglas* Court was faced with an employer who refused to rehire a layed-off machinist who had engaged in civil rights protests against the employer. *See McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973). The Court held that to survive summary judgment, a plaintiff had to present a *prima facie* case of discrimination. *Id.* at 802, 93 S.Ct. 1817. The Court set fourth a four-factor test for the *prima facie* case:

The complainant in a Title VII trial must carry the initial burden under the statute of establishing a *prima facie* case of racial discrimination. This may be done by showing

(i) that he belongs to a racial minority;

(ii) that he applied and was qualified for a job for which the employer was seeking applicants;

(iii) that, despite his qualifications, he was rejected; and

(iv) that, after his rejection, the position remained open and the employer continued to seek applicants from persons of complainant's qualifications.

*Id.* (formatting added).

The Supreme Court further explained that the elements necessary for the *prima facie* case are not inflexible, as "[the] facts necessarily will vary in Title VII cases, and the specification above of the *prima facie* proof required ... is not necessarily applicable in every respect in differing factual situations." *Id.* at 802 n. 13, 93 S.Ct. 1817. The Supreme Court has since repeated that "[t]he *prima facie* case method established in *McDonnell Douglas* was 'never intended to be rigid, mechanized, or ritualistic. Rather it is merely a sensible, orderly way to evaluate the evidence in light of common experience as it bears on the critical question of discrimination.' " *U.S. Postal Service Bd. of Governors v. Aikens,* 460 U.S. 711, 715, 103 S.Ct. 1478, 75 L.Ed.2d 403 (1983) (quoting *Furnco Constr. Corp. v. Waters,* 438 U.S. 567, 577, 98 S.Ct. 2943, 57 L.Ed.2d 957 (1978)). Moreover, the Supreme Court has emphasized that the presentation of a *prima facie* case is not meant to be "onerous," *Tex. Dep't of Cmty. Affairs v. Burdine,* 450 U.S. 248, 253, 101 S.Ct. 1089, 67 L.Ed.2d 207 (1981), and is generally satisfied upon a showing of "actions taken by the employer from which one can infer, if such actions remain unexplained, that it is more likely than not that such actions were based on a discriminatory criterion illegal under the Act," *Furnco,* 438 U.S. at 576, 98 S.Ct. 2943 (internal quotations omitted); *see also Daniels v. Bd. of Educ.,* 805 F.2d 203, 207 (6th Cir.1986). "Thus, 'the central inquiry in evaluating whether the plaintiff has met his initial burden is whether the circumstantial evidence presented is sufficient to create an inference [of discrimination].' " *Shah v. Gen. Elec. Co.,* 816 F.2d 264, 268 (6th Cir.1987) (quoting B. Schlei and P. Grossman, *Employment Discrimination Law* 247 (Supp. 1983-84)).

### **\*448** b. *Supreme Court Direction on "Materially Adverse" Employment Actions*

In addition to the Supreme Court's direction that the *prima facie* test is meant as a flexible standard, the Supreme Court has issued other directives relevant to Title VII and discrimination law that counsel against adopting

99 Fair Empl.Prac.Cas. (BNA) 246, 2006 Fed.App. 0733N

the majority's approach. First, the Supreme Court has continued to treat failure to promote claims with the *McDonnell Douglas* formulation of the *prima facie* case, requiring only that a plaintiff show that she was qualified for an available position, applied for the position, did not get the position, and that the position remained open or was filled by someone outside the plaintiff's protected class. *See Patterson v. McLean Credit Union,* 491 U.S. 164, 186-87, 109 S.Ct. 2363, 105 L.Ed.2d 132 (1989). Were the Supreme Court inclined to agree with the majority's approach, the Court would most likely inquire into whether the disputed position was somehow a better position than the plaintiff's extant job, rather than merely asking whether the plaintiff applied for a job for which he or she was qualified.

 **8 Second, the Supreme Court has held that "Title VII is not limited to 'economic' or 'tangible' discrimination. The phrase 'terms, conditions, or privileges of employment' evinces a congressional intent to 'strike at the entire spectrum of disparate treatment ...' in employment." *Meritor Sav. Bank, FSB v. Vinson,* 477 U.S. 57, 64, 106 S.Ct. 2399, 91 L.Ed.2d 49 (1986) (quoting *Los Angeles Dep't of Water & Power v. Manhart,* 435 U.S. 702, 707 n. 13, 98 S.Ct. 1370, 55 L.Ed.2d 657 (1978)). The majority's conclusion that an employer's failure to hire an internal candidate is not "materially adverse" to the employee seems to contradict this expansive interpretation of Title VII, an interpretation recently reaffirmed in *Burlington N. & Santa Fe Ry. Co. v. White,* 548 U.S. 53, 126 S.Ct. 2405, 165 L.Ed.2d 345 (2006).

The *White* Court was asked to decide what types of employer actions were prohibited under Title VII's anti-retaliation provision. In reaching its decision, the Supreme Court reasoned that, unlike the substantive discrimination provision, the anti-retaliation provision of Title VII reached "beyond workplace-related or employment-related retaliatory acts and harms." *Id.* at 2414. The Supreme Court maintained, however, that whatever the challenged action might be, it must still be "materially adverse" to the plaintiff. *Id.* at 2415. This is the same "material adversity" that is required to trigger Title VII protections under the civil rights act's substantive discrimination provision, the provision at issue in the instant case.[3] Moreover, in discussing material adversity in *White,* the Supreme Court looked to examples which *were* "employment related." The

discussion and application of the "materially adverse" test in *White,* therefore, is instructive for the case at bar.

In defining "materially adverse" in the retaliation context, the Supreme Court noted that things like "petty slights," "snubbing" and "general antipathy" could not be construed as materially adverse. *Id.* The Court noted, however, that under the right circumstances, even a scheduling change or the denial of "flex time" could be a "materially adverse" action-for example, when done with respect to a worker with school-age children. The Court therefore recognized that although a judgment of whether an action is materially adverse must be made from an objective standpoint, such a judgment must be made  **449** from the perspective of a reasonable person *in the plaintiff's position. See id.* In addition, the Court reemphasized the need for standards suited to the varying circumstances inherently implicated in Title VII cases: "We phrase the standard in general terms because the significance of any give act of retaliation will often depend upon the particular circumstances. Context matters." *Id.* This direction from the Supreme Court appears to strongly counsel against a mechanistic and wholesale application of the constituent elements of an "adverse employment action" from one case to the next. Rather, the Court has instructed us that "context matters," and we should instead look to the situation before the Court, asking only what circumstances give rise to an inference of discrimination.

 **9 The Supreme Court's examples of what could constitute a materially adverse employment action in *White* are consistent with the Court's past treatment of failures to transfer as discrete employment actions implicating Title VII concerns. In *Clark County Sch. Dist. v. Breeden,* 532 U.S. 268, 273, 121 S.Ct. 1508, 149 L.Ed.2d 509 (2001), the Supreme Court addressed a plaintiff's allegations of retaliation, in part, through a unilateral transfer. The Supreme Court focused on whether the alleged transfer was causally linked to the plaintiff's protected Title VII activity, and not whether the new position was somehow "better" or "worse" than the employee's old position. *Id.* In the very next term, in *National Railroad Passenger Corp. v. Morgan,* 536 U.S. 101, 114, 122 S.Ct. 2061, 153 L.Ed.2d 106 (2002), a hostile environment case, the Supreme Court again indicated that a transfer is akin to a failure to hire or promote: "Discrete acts such as termination, failure to promote, denial of transfer, or refusal to hire are easy

99 Fair Empl.Prac.Cas. (BNA) 246, 2006 Fed.App. 0733N

to identify. Each incident of discrimination and each retaliatory adverse employment decision constitutes a separate actionable 'unlawful employment practice.' " *Id.* [4] These cases indicate that the Supreme Court would view a company's failure to hire an internal candidate into an open and advertised position as a "materially adverse" employment action under Title VII, an action which, if left unexplained, could be construed as an act of prohibited discrimination affecting the "terms, conditions, or privileges of employment." 42 U.S.C. § 2000e-2; *White,* 126 S.Ct. at 2410 (defining "discriminate against" in § 2000e-2 as "distinctions or differences in treatment that injure protected individuals"). [5]

### c. The "Materially Adverse" Action in the Case at Bar is the Failure to Hire

As the Supreme Court has made clear, the *sin qua non* of the *prima facie* case is evidence that, absent explanation, raises an inference of discrimination. An employer's failure to hire an internal candidate into a posted position, which the employer advertised as open and ready to be **\*450** filled, is analogous to an employer's failure to hire an external candidate as treated by the Supreme Court in *McDonnell Douglas.* The failure to hire is the "adverse employment action" in the plaintiff's *prima facie* case. When an employer fails to hire an external candidate who is otherwise qualified for the position, and the position is either left open or is filled by a candidate outside of the protected class, then the initial showing of discrimination is made, and the *prima facie* case is completed. *McDonnell Douglas,* 411 U.S. at 802 n. 13, 93 S.Ct. 1817. This same inference of discrimination arises when an employer rejects an otherwise qualified internal candidate for an open, posted position and instead hires someone outside of the plaintiff's protected class.

It is incongruous to argue, as the majority does, that the Postal Service's refusal to hire Plaintiff for the postmaster position cannot be the adverse employment action in the instant case. The majority reaches this conclusion because it reasons, incorrectly, that the refusal to hire cannot be materially adverse because the Postal Service was not refusing Plaintiff an objectively "better" position. The Postal Service advertised the position as open to applications by all qualified personnel. Ostensibly, only internal personnel could be considered for the job, inasmuch as the postal service is a unique operation with a

partial monopoly over the mails, authorized by the federal government. The parties agree that job opportunities within the Postal Service are available on a merit basis, thereby constituting a "privilege" of employment. When Plaintiff was denied the postmaster position, he was being denied a "privilege" of his employment, *i.e.,* access to job opportunities on the basis of merit. Moreover, because the postmaster position is objectively distinct from Plaintiff's current supervisor position, there is no doubt that the Postal Service's refusal to hire Plaintiff into the position affected his "conditions" of employment. These effects are "materially adverse" to Plaintiff's interests to the same extent had the Postal Service refused to hire Plaintiff in the first instance as an entry-level mail carrier.

**\*\*10** In the instant case, Plaintiff has shown: 1) that he belongs to a protected class under Title VII and the ADEA; 2) that Plaintiff was qualified for the postmaster position; 3) that Plaintiff applied for and did not receive the position; and 4) that a much younger, female applicant (with much less experience) was hired instead. Absent some rational explanation by the Postal Service, these facts raise the inference that the successful applicant received the job because of either her gender or her age. These facts therefore produce the same inference of discrimination that the Supreme Court held was sufficient to satisfy *the prima facie* case in *McDonnell Douglas.*

### d. Practical Deficiencies in the Majority's Approach

This Circuit has come to use the "adverse employment action" phrase as a placeholder for the employer action which, when taken in context, gives rise to an inference of discrimination. It is important, however, when this Court uses the adverse employment action language, that we remain cognizant of the various situation in which we have chosen to apply the term. The definition and components of an adverse employment action from one set of circumstances-for example, an involuntary transfer-will not necessarily serve to describe a suspicious employer action in a different factual context. Rather, we need to remember the Supreme Court's admonition that the *prima facie* case will vary according to the facts before the Court, *McDonnell Douglas,* 411 U.S. at 802, 93 S.Ct. 1817, and that "an act that would be immaterial in some situations is **\*451** material in others." *White,* 126 S.Ct. at 2416 (internal quotation and citation omitted). Instead of following the Supreme Court's direction to fashion and apply a flexible *prima facie* test, the majority

99 Fair Empl.Prac.Cas. (BNA) 246, 2006 Fed.App. 0733N

has mechanistically relied on a formulation of adverse employment action which has developed over time in circumstances highly dissimilar to the case at bar. Indeed, the development of the "adverse employment action" requirement in our Circuit demonstrates this Court's overreliance on language and test formulations articulated in prior cases without inquiring into whether such wholesale application serves the purpose the *prima facie* test is meant to serve for the case at hand: facts and evidence which suggest discrimination-no more, and no less. [6]

The majority's version of the "adverse employment action" largely relies on a supporting definition for the phrase developed in response to involuntary transfer scenarios. [7] This Court then expanded the use of the "adverse employment action" as defined in involuntary transfers to situations involving denials of *ad-hoc*, voluntary transfer requests. *See, e.g., Kocsis v. Multi-Care Mgt., Inc.,* 97 F.3d 876, 885 (6th Cir.1996) (involuntary lateral transfer) (requiring involuntary transfer to be "materially adverse" to plaintiff in order to constitute an adverse employment actins); *Strouss v. Mich. Dep't of Corrs.,* 250 F.3d 336, 343 (6th Cir.2001) (involuntary lateral transfer) ("[P]urely personal reasons for turning down a transfer are not sufficient to render a transfer an adverse employment action."); *Reese v. State of Mich. Family Indep. Agency,* 31 Fed.Appx. 172, 174 (6th Cir.2002) (unpublished opinion) (holding that the employer's rejection of *ad hoc* transfer request could not amount to an adverse employment action). Today, the majority imports wholesale the elements of the adverse employment action in these involuntary and *ad-hoc* transfer circumstances into a failure to hire situation.

**11** The definitional components of the adverse employment action in the above types of transfer contexts, however, do not necessarily translate to the case at bar. With an involuntary transfer, whether the transfer is to a job which is somehow worse than the employee's current position certainly seems to serve the Supreme Court's direction that the *prima facie* case requires a showing of "actions taken by the employer from which one can infer, if such actions remain unexplained, that it is more likely than not that such actions were based on a discriminatory criterion illegal under the Act." *Furnco,* 438 at 576, 98 S.Ct. 2943 (internal quotations omitted); *see also Daniels,* 805 F.2d at 207. In contrast, when an employer advertises an **\*452** open position, whether that position

is somehow a "better" job than an employee's current position, does not inform the inquiry of whether the employer's actions were based on discriminatory intent. Instead, those circumstances which raise the inference of discrimination are precisely those circumstances from which a factfinder could legitimately infer discriminatory intent in a failure to hire case: 1) a plaintiff in a protected class; 2) a posted, open position for which the plaintiff is qualified; 3) a rejection by the employer; and 4) the position either remaining open or going to someone outside the protected class.

The majority's standard presents unacceptable implications. Under the majority's formulation, an internal candidate for a posted, advertised position has a higher evidentiary threshold under Title VII and ADEA than an external candidate for the same position. An external candidate for an advertised position can make a *prima facie* case of discrimination merely by showing that the employer failed to hire the candidate. This is a direct application the *McDonnell Douglas* case. The failure to hire is the "adverse employment action" in the language of this Circuit. The internal candidate, however, must show that the position was somehow objectively better (more money, better benefits, more prestige, etc.) than the position which the internal candidate already filled. The external candidate has no such additional requirement. One might ask why an employer's failure to hire an external candidate constitutes the "adverse employment action" for that candidate, but the same failure to hire does not constitute the "adverse employment action" for the internal candidate. The courts do not ask whether the external candidate would be leaving a position which is just as objectively "good" as the position being sought. The internal candidate should be treated the same.

Finally, the majority's decision aligns this Court with only one other circuit court of appeals. Four other Circuits have addressed the question of whether an employer's failure to hire an internal candidate can constitute an adverse employment action absent some additional showing. The First, Ninth, and Tenth Circuits have indicated that an employer's failure to transfer an employee into a open, posted position, for which the employee applied, constitutes an "adverse employment action" on the same basis as a failure to hire an external candidate. *See Amro v. The Boeing Co.,* 232 F.3d 790, 797-98 (10th Cir.2000) (treating a failure to transfer claim as a failure to hire claim); *Randlett v. Shalala,* 118 F.3d

99 Fair Empl.Prac.Cas. (BNA) 246, 2006 Fed.App. 0733N

857, 862 (1st Cir.1997) (finding a refusal to transfer an actionable Title VII action when such transfers were common enough to support a finding that they were "privileges" of employment; *Bouman v. Block,* 940 F.2d 1211, 1229 (9th Cir.1991) ("The fact that the position was not made available to [plaintiff] ... is sufficient [to establish an adverse employment action].") In contrast, only one other circuit has applied the majority's standard to an employer's denial of a plaintiff's request to transfer/ be hired into a open, posted position. *Brown v. Brody,* 199 F.3d 446, 455-56 (D.C.Cir.1999). Today's decision aligns the Sixth Circuit with the D.C. Circuit and not the majority of our sister circuit courts of appeals.

**\*\*12** I would therefore treat this case as a failure to hire case and find that Plaintiff has shown that he has suffered an adverse employment action.

### IV. As a Failure to Transfer Claim, Plaintiff Has Carried His *Prima Facie* Burden

Under the majority's formulation of the *prima facie* case, Defendant's denial of **\*453** Plaintiff's application for the postmaster position must amount to a failure to promote Plaintiff-*i.e.,* a denial of increased pay, benefits, prestige, or opportunity for advancement. *See Mitchell v. Vanderbilt Univ.,* 389 F.3d 177, 183 (6th Cir.2004). Therefore, the denial of a transfer is an adverse employment action if the transfer would have resulted in "an increased salary, significantly changed responsibilities, a more distinguished title, or a gain in benefits." *Id.* However, again under the majority's formulation, "a plaintiff's subjective impression concerning the desirability of one position over another generally does not control with respect to the existence of an adverse employment action." *Id.*

In the instant case, Plaintiff presents more than his subjective impression that the postmaster position was more prestigious than his current supervisor position.[8]

Plaintiff presents testimony from third parties that a postmaster position is generally more sought after than a supervisor position because of its unique attributes. A postmaster is in charge of his office. This is an objective distinction from a supervisory position in a larger office, in which authority is exercised only over one aspect of operations. Even were the total number of employees supervised by a postmaster the same or fewer than the number supervised by a supervisor in a larger office, the postmaster position may still be sufficiently unique inasmuch as the postmaster is the final authority on site, which is a significant distinguishing factor from merely being a supervisor in a larger office.

Defendant's counterarguments as to level of pay and number of supervised staff do not cancel out Plaintiff's evidence of enhanced prestige. Pay and number of employees supervised are not dispositive with respect to the level of prestige a position holds. Although these factors may be typically indicative of higher-level positions, they are not the only factors determining a position's prestige. Common experience teaches us that independence is a highly desirable employment condition. The objective desirability of being in charge of an entire post office is a sufficient distinguishing factor for a postmaster to make the position more prestigious than the supervisor position already held by Plaintiff. Plaintiff has presented sufficient evidence such that a reasonable jury could infer that Plaintiff has suffered an adverse employment action under the majority's formulation of the test.

**\*454** Therefore, even under the majority's formulation of the adverse employment action test to be applied in the instant case, I would find that Plaintiff has carried his burden on summary judgment.

### All Citations

200 Fed.Appx. 439, 2006 WL 2860604, 99 Fair Empl.Prac.Cas. (BNA) 246, 2006 Fed.App. 0733N

### Footnotes

1    In his dissent, Judge Clay suggests that we are breaking new ground by requiring that Freeman present evidence that the Postal Service denied him a promotion or took some other tangible action that had a significant detrimental effect on him, and not just that it denied him a transfer. On the contrary, it is Judge Clay who proposes, in effect, that we depart from this circuit's precedent, as well as the guidance provided by the Supreme Court.

    In *Mitchell,* an earlier, published decision of this court to which we are bound to follow, a medical school professor sued his university employer for age discrimination. As part of his *prima facie* case, the plaintiff relied upon, among other

things, his non-selection for an internal transfer to become the medical director of a laboratory. The court found the plaintiff's evidence to be insufficient to establish his *prima facie* case, explaining:

> Non-selection for a position of employment is not always an adverse employment action. In cases where the sought position is a lateral transfer, without additional material benefits or prestige, it would be improper to conclude that a denial of such a transfer would be a materially adverse action. *See Sherman v. Chrysler Corp.,* 47 Fed.Appx. 716, 721-22 (6th Cir.2002) (holding that an employee who failed to introduce evidence showing that denials of lateral transfer requests resulted in materially adverse changes in terms of employment could not establish adverse employment action).

*Mitchell,* 389 F.3d at 183. Simply put, the *Mitchell* decision cannot be squared with the dissent's approach.

Even if we were not bound by *Mitchell,* the proper approach would still be the one we employ here. The Supreme Court has provided guidance to lower courts on what constitutes an adverse employment action. In *Ellerth,* the Supreme Court did not limit the category of such actions to the obvious ones of "hiring" and "firing," but also, among other actions, "failing to promote." 524 U.S. at 761, 118 S.Ct. 2257. As a textual matter, the Court's inclusion of "failing to promote" in this category would have been superfluous if it intended for lower courts to treat all claims involving the denial of a requested internal transfer as simply "hiring" claims. Moreover, it would breed considerable confusion in the law to conflate external hiring and internal transfers into one broad "hiring" camp, especially when the Supreme Court has counseled (at least implicitly) otherwise.

Thus, we agree with the dissent that the *prima facie* test is a "flexible" one, and must be applied in an "orderly way to evaluate the evidence." Dis. at 2-3. The test must be tailored to meet the demands of the particular claim before the court. In the instant action, we have tailored the *prima facie* test to the claim before us, using our own precedent and the Supreme Court's guidance on what constitutes an adverse employment action. To try to consider Freeman's claim under some broad, rigid "hiring" framework would, in effect, be to force a square peg into a round hole.

Finally, we note that Freeman did not argue on appeal that his was a failure to hire claim. Rather, he repeatedly referred to the "unique" and "prestigious" nature of the position, and cited several transfer-related cases in support.

2    Given the fact-specific nature of the inquiry, there are a number of cases that have concluded that a transfer or refusal-to-transfer did not constitute an adverse employment action, and a number that have found such employer action was adverse. *Compare O'Neal,* 392 F.3d at 912 (rejecting for lack of "objective evidence" the employee's claims that her involuntary transfer resulted in a less prestigious job and negatively affected her advancement opportunities); *Mitchell,* 389 F.3d at 182 (finding no adverse action from a professor's allegations that the university "deprived him of a graduate research assistant during one summer, revoked his mentor status in the M.D./Ph.D graduate program, and removed him from his position of Medical Director of Pathology Laboratory Services"); *Williams v. R.H. Donnelley, Corp.,* 368 F.3d 123, 128 (2d Cir.2004) (finding no adverse action when employee wanted transfer for personal reasons and transfer would have resulted in lower pay); *Banks v. E. Baton Rouge Parish Sch. Bd.,* 320 F.3d 570, 575 (5th Cir.2003) ("[A] decision made by an employer that only limits an employee's opportunities for promotion or lateral transfer does not qualify as an adverse employment action under Title VII."); *Momah v. Dominguez,* 175 Fed.Appx. 11, 21-22 (6th Cir.2006) (finding no adverse action when requested transfer would have been a demotion and was sought for personal reasons); *Wanchik v. Great Lakes Health Plan, Inc.,* 6 Fed.Appx. 252, 258-59 (6th Cir.2001) (finding no adverse action when corporate acquisition resulted in the employee transferring from CEO of the target company to vice president of the acquiring company), *with Jones,* 198 F.3d at 411-12 (finding an adverse employment action when a teacher was transferred to a "difficult school" teaching "less desirable science classes" and was passed over for promotion); *Davis v. City of Sioux City,* 115 F.3d 1365, 1369 (8th Cir.1997) (upholding jury verdict, explaining that "[t]he jury apparently put more weight on Davis's evidence that the new position lacked supervisory status, had fewer opportunities for salary increases, and offered Davis little opportunities for advancement."); *Bryson v. Chicago State Univ.,* 96 F.3d 912, 916 (7th Cir.1996) (concluding that an employee's "sudden loss" of the title Special Assistant to the Dean and her banishment from university committee work could constitute adverse employment action); *de la Cruz v. N.Y. City Human Res. Admin. DSS,* 82 F.3d 16, 21 (2d Cir.1996) (finding that the involuntary transfer of a caseworker from the adoption unit to the foster care unit could be an adverse employment action because of the lower prestige and "little opportunity for professional growth" in the new unit, but also noting that the employee's case was "quite thin").

3    In substantive discrimination cases, such as the case at bar, the materially adverse action must relate to the "compensation, terms, conditions, or privileges of employment." *White,* 126 S.Ct. at 2414; 42 U.S.C. § 2000e-2.

4    Although these decisions predate *White,* the *White* decision does not call into question their continuing applicability to cases dealing with employment-related actions, insofar as *White* merely *expanded* the scope of redressable behavior

99 Fair Empl.Prac.Cas. (BNA) 246, 2006 Fed.App. 0733N

beyond these employment-related actions under the Title VII retaliation provision. To the extent that these cases address materially adverse employment actions, they remain good law as applied to Title VII substantive discrimination cases.

5    This reading of *Clark County* and *National Railroad* is buttressed by the Supreme Court's treatment of hiring, promotion, transfer, and recall decisions as equivalent employment actions in the First Amendment context. *See Rutan v. Republican Party,* 497 U.S. 62, 79, 110 S.Ct. 2729, 111 L.Ed.2d 52 (1990) (holding unconstitutional a state law which imposed party affiliation requirements on lower level state employees).

6    The "adverse employment action" was first articulated by this Court as variation of the "did not get hired" prong of the *McDonnell Douglas prima facie* test to serve the Court's evaluation of a plaintiff's evidence in Title VII retaliation cases. *See Brown v. Marks,* 709 F.2d 1499 (6th Cir.1983) (unpublished opinion). This variation made sense, as the adverse employer action is the *sin qua non* in the retaliation context, just as the failure to get the job is the *sine qua non* in the hiring context. As case law developed, however, this Court has come to use "adverse employment action" as a placeholder phrase for an employment action which, when taken in context, gives rise to an inference of discrimination. *See Simpson v. Midland-Ross Corp.,* 823 F.2d 937, 940 (6th Cir.1987) (using the "adverse employment action" language for the first time in the articulation of the *prima facie* case requirements outside of the retaliation context).

7    The Court first applied the adverse employment action requirement to an involuntary transfer case in *Yates v. Avco Corp.,* 819 F.2d 630, 638 (6th Cir.1987) (reasoning that the plaintiff's involuntary transfer could not be an adverse employment action because she "continued to receive the same salary and benefits" as she had prior to the transfer).

8    The majority opinion relies on *Mitchell v. Vanderbilt Univ.,* 389 F.3d 177 (6th Cir.2004), for the proposition that there was no adverse employment action against Plaintiff. This reliance is misplaced. In *Mitchell,* this Court found that a plaintiff alleging age discrimination did not experience an adverse employment action where the defendant articulated a legitimate and nondiscriminatory reason for not hiring the plaintiff for the position he sought. 389 F.3d at 181-82. The Court found "nothing to indicate that the appointment would have provided an increased salary, significantly changed responsibilities, a more distinguished title, or a gain in benefits." *Id.* at 183. "Mitchell was not the best qualified applicant for the position because of his dislike of administrative duties, his apparent disinterest in clinical work, and his tendency to arrive late to meetings." *Id.* at 184. The instant case is distinguishable from *Mitchell* because Plaintiff has presented sufficient evidence from which a rational trier of fact could conclude that the Postmaster position which he sought-and qualified for-is objectively more prestigious than a supervisor position. The precedential import of *Mitchell* is also undermined by the fact that the case was decided prior to *Burlington Northern and Santa Fe Ry. Co. v. White,* 548 U.S. 53, 126 S.Ct. 2405, 165 L.Ed.2d 345 (2006). Moreover, the majority's reliance on *Burlington Industries, Inc. v. Ellerth,* 524 U.S. 742, 761, 118 S.Ct. 2257, 141 L.Ed.2d 633 (1998), is also inapposite because *Ellerth* is a sexual harassment hostile work environment case and is, therefore, distinguishable from the instant case.

---

**End of Document**                      © 2016 Thomson Reuters. No claim to original U.S. Government Works.

WESTLAW    © 2016 Thomson Reuters. No claim to original U.S. Government Works.      12