Exhibit A

323 Fed.Appx. 496
This case was not selected for
publication in the Federal Reporter.
Not for Publication in West's Federal Reporter
See Fed. Rule of Appellate Procedure 32.1
generally governing citation of judicial decisions
issued on or after Jan. 1, 2007. See also Ninth
Circuit Rule 36-3. (Find CTA9 Rule 36-3)
United States Court of Appeals,
Ninth Circuit.

Teresa L. LUKE, individually and on behalf of their
marital community and as Guardian ad Litem for
her minor children; Andrew R. Luke, individually
and on behalf of their marital community; Hayden
R. Luke; Riley A. Luke, Plaintiffs-Appellants,
v.
FAMILY CARE AND URGENT MEDICAL CLINICS,
a Corporation of Washington State; Robert D.
Thornton; Howard Bruce Goodwin Pa-C; Family
Urgency Care Clinics Minnehaha; Emergency
Rooms, PS; Jerry J. Fisher, Defendants-Appellees.

No. 08-35192.
|
Argued and Submitted Jan. 22, 2009.
|
Filed March 30, 2009.

**Synopsis**
**Background:** Patient and patient's husband, along
with their minor children, brought medical negligence
action against, among others, physician's assistant, his
supervising physicians, and the medical clinic at which
they all worked, arising from patient's prescribed use
of alcohol treatment drug and resulting liver damage.
After having its decision, 2005 WL 3533616, granting
defendants' motion for summary judgment affirmed in
part, vacated in part, and remanded, 246 Fed.Appx. 421,
the United States District Court for the Western District
of Washington, Franklin D. Burgess, J., 2008 WL 410672,
granted defendants' motion to strike supplemental expert
witness declarations and defendants' motion for summary
judgment. Plaintiffs appealed.

**Holdings:** The Court of Appeals held that:

[1] district court did not abuse its discretion in excluding
as untimely expert declarations submitted by plaintiffs;

[2] plaintiffs established prima facie case supporting
breach of the requisite standard of care;

[3] plaintiffs failed to establish prima facie case of
causation; and

[4] untimely expert declarations were not admissible under
rule requiring supplementation of witness disclosures.

Affirmed.

M. Smith, Circuit Judge, filed a dissenting opinion.

West Headnotes (4)

**[1]**   **Federal Civil Procedure**
       👉 Failure to Respond;Sanctions
       District court did not abuse its discretion
       in excluding as untimely expert declarations
       submitted by plaintiffs, who were bringing
       medical negligence action, in response to
       clinic defendants' summary judgment motion,
       where the plaintiffs disclosed the declarations
       more than three months after the district
       court's deadline for initial expert disclosures,
       and more than two months after the deadline
       for rebuttal disclosures, and the declarations,
       which were filed only four days before the
       close of discovery and ten weeks before trial,
       presented a new theory as to a key element of
       plaintiffs' medical negligence claim. Fed.Rules
       Civ.Proc.Rule 26(a)(2)(C), 28 U.S.C.A.

       17 Cases that cite this headnote

**[2]**   **Federal Civil Procedure**
       👉 Tort Cases in General
       Patient, and her family, moving for summary
       judgment in their medical negligence action
       against clinic defendants arising from patient's
       prescribed use of alcohol treatment drug
       and resulting liver damage, established prima

facie case supporting breach of the requisite standard of care through their initial expert witness reports, which showed that, in order to ensure that patient did not suffer an adverse reaction to alcohol treatment drug, physician's assistant should have ordered baseline liver function tests when he first saw patient, and also should have ordered follow-up liver function tests between two and four weeks later.

Cases that cite this headnote

**[3]**   **Federal Civil Procedure**
   👉 Tort Cases in General

Initial expert witness disclosures of patient and her family, moving for summary judgment in their medical negligence action against clinic defendants arising from patient's prescribed use of alcohol treatment drug and resulting liver damage, created an ambiguity as to whether baseline liver function testing performed prior to the last day of specified two to four week window after patient first ingested the drug would have revealed abnormally elevated results in patient's liver function studies, and therefore expert witness disclosures did not establish, prima facie, that clinic defendants' failure to order the testing caused patient's liver damage, as the experts opined that an adverse reaction would have first been detectable at some point "within" two to four weeks, which left open the possibility, for example, that no abnormality would have been detected by a liver function test performed three weeks after patient first ingested the drug.

2 Cases that cite this headnote

**[4]**   **Federal Civil Procedure**
   👉 Failure to Respond;Sanctions

Untimely expert declarations submitted by plaintiffs, who were bringing medical negligence action, in response to clinic defendants' summary judgment motion, were not admissible under rule requiring supplementation of witness disclosures based

on a party learning the disclosure was incomplete or incorrect; declarations asserted a new theory of causation, which did not correct an inaccuracy in plaintiffs' original disclosures, or fill in a gap based on information previously unavailable, but instead attempted to fix weakness, identified by the defendants in their summary judgment motion, in plaintiffs' ability to establish causation. Fed.Rules Civ.Proc.Rule 26(e), 28 U.S.C.A.

29 Cases that cite this headnote

**Attorneys and Law Firms**

**\*498**   Christopher Otorowski, Esquire, Susan Carol Eggers, Esquire, Otorowski Johnston Diamond & Golden PLLC, Bainbridge Island, WA, for Plaintiffs-Appellants.

Michael D. Hoffman, Esquire, Janet M. Schroer, Hoffman Hart & Wagner, LLP, Portland, OR, for Defendants-Appellees.

Appeal from the United States District Court for the Western District of Washington, Franklin D. Burgess, District Judge, Presiding. D.C. No. 3:04-cv-05759-FDB.

Before: REAVLEY,[*] Senior Circuit Judge, and TALLMAN and M. SMITH, Circuit Judges.

MEMORANDUM [**]

**\*\*1**   Teresa Luke ("Luke"), Andrew Luke, and their minor children (collectively, "Plaintiffs") appeal the district court's rulings in favor of physician's assistant H. Bruce Goodwin ("Goodwin"), his supervising physicians, and the medical clinic at which they all worked (collectively, the "Clinic Defendants"). The district court excluded as untimely expert declarations submitted by Plaintiffs in response to the Clinic Defendants' motion for summary judgment. Concluding that Plaintiffs' remaining expert disclosures failed to create a genuine issue of material fact regarding causation, the district court then granted summary judgment in favor of the Clinic Defendants. We have jurisdiction under 28 U.S.C. § 1291, and we affirm.

## I

We previously remanded this case to the district court to determine the admissibility of the expert declarations submitted by Plaintiffs in response to the Clinic Defendants' summary judgment motion. On remand, the district court granted the Clinic Defendants' motion to strike the declarations. We review the imposition of discovery sanctions for abuse of discretion, "giv[ing] particularly wide latitude to the district court's discretion to issue sanctions under Rule 37(c)(1)." *Yeti by Molly Ltd. v. Deckers Outdoor Corp.,* 259 F.3d 1101, 1105-06 (9th Cir.2001).

A party must submit its expert witness disclosures "at the times and in the sequence that the court orders." Fed.R.Civ.P. 26(a)(2)(C). "Rule 37(c)(1) gives teeth to th[is] requirement[ ]" by automatically excluding any evidence not properly disclosed under Rule 26(a). *Yeti,* 259 F.3d at 1106. Moreover, where a discovery sanction is properly entered, Rule 37(b)(2)(A)(ii) provides that a court may "prohibit[ ] the disobedient party from supporting or opposing designated claims or defenses, or from introducing designated matters in evidence." Nonetheless, exclusion of evidence under Rule 37(c)(1) is not appropriate if the failure to disclose was either substantially justified or harmless. *Yeti,* 259 F.3d at 1106.

[1] The district court did not abuse its discretion in excluding as untimely the expert declarations submitted by Plaintiffs in response to the Clinic Defendants' **\*499** summary judgment motion. Plaintiffs disclosed these declarations more than three months after the district court's deadline for initial expert disclosures, and more than two months after the deadline for rebuttal disclosures. Accordingly, these declarations were not timely under Rule 26(a)(2)(C). As Plaintiffs provided no justification-let alone substantial justification-for the untimely submission, this exception to Rule 37(c)(1) automatic exclusion is inapplicable. Nor did Plaintiffs satisfy their burden of proving harmlessness. *See Yeti,* 259 F.3d at 1107. Not only were the disputed declarations filed only four days before the close of discovery and ten weeks before trial, but, as explained *infra,* they presented a new theory as to a key element of Plaintiffs' medical negligence claim. They were properly excluded.

## II

**\*\*2** To overcome the Clinic Defendants' motion for summary judgment, Plaintiffs had to establish through admissible evidence that, pursuant to Washington Revised Code § 7.70.040, a genuine issue of material fact existed for each of the two elements of their medical negligence claim: (1) that the Clinic Defendants "failed to exercise that degree of care, skill, and learning expected of a reasonably prudent health care provider at that time in the profession or class to which he belongs, in the state of Washington, acting in the same or similar circumstances"; and (2) that the Clinic Defendants' failure to exercise this degree of care "was a proximate cause of Luke's liver failure. We review *de novo* a district court's grant of" summary judgment. *United States v. City of Tacoma,* 332 F.3d 574, 578 (9th Cir.2003).

[2] As to the first element, the Plaintiffs' initial expert witness reports, whose admissibility is not challenged, establish a *prima facie* case supporting breach of the requisite standard of care by the Clinic Defendants. According to these reports, in order to ensure that his patient did not suffer an adverse reaction to Antabuse, Goodwin should have ordered baseline liver function tests when he first saw Luke on March 12, 2002, and he should also have ordered follow-up liver function tests between two and four weeks later. Unfortunately, Goodwin did neither.

[3] Plaintiffs failed, however, to establish a genuine issue of material fact regarding causation. The initial expert reports stated that had "Goodwin obtained a follow-up liver function study within two to four weeks after prescribing Antabuse, more likely than not Teresa Luke's liver function studies would have been abnormally elevated." Because the experts opined that an adverse reaction would first be detectable at some point "within" two to four weeks, their disclosures create an ambiguity as to whether testing performed prior to the last day of the specified window would have revealed abnormally elevated results. For example, the statement leaves open the possibility that no abnormality would have been detected by a liver function test performed three weeks after Luke first ingested Antabuse. Only after the summary judgment motion had been filed did Plaintiffs' experts state that the abnormality would have presented itself ten days after Luke started on Antabuse.

Accordingly, the district court did not err in entering summary judgment against Plaintiffs on the issue of causation.

## III

Plaintiffs nonetheless argue that the district court should have admitted the untimely expert declarations pursuant to Federal Rule of Civil Procedure 26(e), which requires supplementation of an initial **\*500** expert disclosure "if the party learns that in some material respect the disclosure ... is incomplete or incorrect, and if the additional or corrective information has not otherwise been made known to the other parties during the discovery process or in writing." But Rule 26(e) creates a "duty to supplement," not a right. Nor does Rule 26(e) create a loophole through which a party who submits partial expert witness disclosures, or who wishes to revise her disclosures in light of her opponent's challenges to the analysis and conclusions therein, can add to them to her advantage after the court's deadline for doing so has passed. Rather, "[s]upplementation under the Rules means correcting inaccuracies, or filling the interstices of an incomplete report based on information that was not available at the time of the initial disclosure." *Keener v. United States,* 181 F.R.D. 639, 640 (D.Mont.1998).

**\*\*3** **[4]** The district court did not err in concluding that the Plaintiffs' untimely expert declarations were not admissible under Rule 26(e). These new declarations asserted a new theory of causation: "more likely than not, that had [liver function tests] been obtained at anytime beginning *10* days after initiating Antabuse ..., the [liver function tests] would have been abnormally elevated." This new theory did not correct an inaccuracy in the Plaintiffs' original disclosures, nor did it fill in a gap based on information previously unavailable to the Plaintiffs. By offering this new theory advancing an earlier date on which liver function abnormality would have been revealed, the untimely declarations instead impermissibly attempted to fix the weakness, identified by the Clinic Defendants in their summary judgment motion, in Luke's ability to establish causation.

## IV

The district court did not abuse its discretion in excluding Plaintiffs' untimely expert declarations and properly entered summary judgment in favor of the Clinic Defendants for failing to establish a *prima facie* case of causation.

**AFFIRMED.**

M. SMITH, Circuit Judge, dissenting:
**\*\*3** I respectfully dissent.

The law is well established that, in reviewing a motion for summary judgment, the court must construe all facts and inferences in the light most favorable to the non-moving party. *See Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 255, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986) ("The evidence of the nonmovant is to be believed, and all justifiable inferences are to be drawn in his favor."); *Agosto v. Immigration & Naturalization Serv.,* 436 U.S. 748, 773 n. 10, 98 S.Ct. 2081, 56 L.Ed.2d 677 (1978) (Powell, J., dissenting) (viewing the facts in the light most favorable to the non-moving party means that the party opposing the summary judgment is to be given the benefit of all reasonable doubts and inferences in determining whether a genuine issue exists); *see also Hunt v. Cromartie,* 526 U.S. 541, 552, 119 S.Ct. 1545, 143 L.Ed.2d 731 (1999) (same).

Under this standard, I believe the court is obligated to interpret the evidence presented as proof that the defendant's failure to perform liver tests two to four weeks after Luke began taking Antabuse was the proximate cause of her liver failure. Luke's initial expert testimony, submitted into evidence far in advance of the discovery deadline, indicated that she would more probably than not have shown abnormal liver functions two to four weeks after she began taking the drug, which, we must reasonably infer, would more probably than not have been manifest in the tests that should have been given during that time period of two to four weeks.

The majority's conclusion that summary judgment is appropriate because the statement **\*501** presented by the experts "leaves open the possibility that no abnormality would have been detected" is erroneous as a matter of law, because it fails to give the non-moving party the benefit of all reasonable doubts and inferences. It is reasonable to infer that a test given two to four weeks after a certain

date will reflect the abnormalities experts have testified will manifest themselves within that same two to four week time period. This inference can be drawn without consulting the untimely expert declarations excluded by the district court.

**\*\*4** Accordingly, summary judgment is inappropriate even in light of our decision that the untimely expert declarations were properly excluded. I would therefore reverse the district court's ruling and remand for trial.

**All Citations**

323 Fed.Appx. 496, 2009 WL 886350

Footnotes

\*        The Honorable Thomas M. Reavley, Senior United States Circuit Judge for the Fifth Circuit, sitting by designation.

\*\*       This disposition is not appropriate for publication and is not precedent except as provided by 9th Cir. R. 36-3.

---

**End of Document**                               © 2017 Thomson Reuters. No claim to original U.S. Government Works.

478 Fed.Appx. 961
This case was not selected for
publication in the Federal Reporter.
Not for Publication in West's Federal Reporter
See Fed. Rule of Appellate Procedure 32.1
generally governing citation of judicial decisions
issued on or after Jan. 1, 2007. See also
Sixth Circuit Rule 28. (Find CTA6 Rule 28)
United States Court of Appeals,
Sixth Circuit.

Nicholas Scott SAPP, Plaintiff–Appellant,

v.

CSX TRANSPORTATION,
INC., Defendant–Appellee.

No. 10–6391.
|
April 19, 2012.

**Synopsis**
**Background:** Employee filed action against employer
under Federal Employers Liability Act (FELA), asserting
claims of negligence per se and negligence. The United
States District Court for the Middle District of Tennessee,
William J. Haynes, Jr., J., 2010 WL 4055951, granted
summary judgment for employer. Plaintiff appealed.

**Holdings:** The Court of Appeals, Dan Aaron Polster,
District Judge, sitting by designation, held that:

[1] employer was not per se negligent under federal
vegetation control regulation;

[2] employer did not have general duty to control
vegetation around third-party industry track that had
been red-tagged as out-of-service and that was not being
used by system railroad to pick up or drop off freight; and

[3] employee's stumble and subsequent injury were not
within risk created by employer's failure to maintain
vegetation.

Affirmed.

West Headnotes (4)

**[1]** **Labor and Employment**
👉 Railroad tracks and roadbeds
In action under FELA, railroad employer was
not per se negligent under federal vegetation
control regulation by not controlling
vegetation around industry track, since that
track was not part of general railroad
system of transportation to which vegetation
regulation applied; although there was
possibility that track might be used in future,
track had been red-tagged as out-of-service
and system railroad was not using that track
to pick up or drop off freight. Federal
Employers' Liability Act, § 1 et seq., 45
U.S.C.A. § 51 et seq.; 49 C.F.R. § 213.37.

2 Cases that cite this headnote

**[2]** **Labor and Employment**
👉 Railroad tracks and roadbeds
To provide reasonably safe workplace for
its employees, railroad employer did not
have general duty under FELA to control
vegetation around third-party industry track
that had been red-tagged as out-of-service and
that was not being used by system railroad
to pick up or drop off freight; although it
may have been "a good idea" to remove
that vegetation due to its foreseeable use
by railroad employees, that did not rise to
level of a legal duty, particularly where track
was not defective and it did not provide any
particular danger to workers walking on it.
Federal Employers' Liability Act, § 1 et seq.,
45 U.S.C.A. § 51 et seq.

2 Cases that cite this headnote

**[3]** **Labor and Employment**
👉 Railroad tracks and roadbeds
Railroad employer did not breach its duty
under FELA to provide reasonably safe
workplace for its maintenance employees
by not controlling vegetation around third-

party industry track which led maintenance employee to walk down train track and then to stumble and suffer injury as he was stepping over rail, where there was no defect in track or any hazard that caused him to fall, walking down train track was not inherently dangerous, and injured employee was not required to use that track to access system track for maintenance. Federal Employers' Liability Act, § 1 et seq., 45 U.S.C.A. § 51 et seq.

Cases that cite this headnote

[4]     **Labor and Employment**
&#128073; Negligence
**Labor and Employment**
&#128073; Nature and scope of duty owed by employer

Relaxed causation standard under FELA did not affect employee's obligation to prove that railroad employer was in fact negligent, and duty to provide reasonably safe workplace did not mean that railroad had duty to eliminate all workplace dangers. Federal Employers' Liability Act, § 1 et seq., 45 U.S.C.A. § 51 et seq.

2 Cases that cite this headnote

**\*962**  Appeal from the United States District Court for the Middle District of Tennessee.

Before: MERRITT, ROGERS, Circuit Judges; and POLSTER, District Judge. *

**Opinion**

DAN AARON POLSTER, District Judge.

**\*\*1**  Plaintiff–Appellant Nicholas Sapp, a foreman for Defendant–Appellee CSX Transportation, Inc. ("CSX"), was injured following repair of a CSX railroad switch. He subsequently filed an action against CSX under the Federal Employers Liability Act, 45 U.S.C. §§ 51 *et seq.* ("FELA"), asserting claims of negligence *per se* and negligence. Sapp claimed that he was injured due to CSX's failure to remove vegetation adjacent to its railroad track

in violation of 49 C.F.R. § 213.37(c), and in violation of its duty to provide a reasonably safe workplace. Following discovery, the district court denied in part Sapp's motion to strike the declarations of two railroad experts and granted summary judgment in favor of CSX. It is from these rulings that Sapp timely appealed.

**I.**

On July 25, 2006, Roadmaster Willard Price assigned Sapp and his crew[1] to perform maintenance on the switch from CSX's mainline to the Ozburn–Hessey Storage Company's out-of-service industry track, otherwise known as the old Hoskins track.[2] Sapp parked his truck in the Ozburn–Hessey parking lot adjacent to the old Hoskins track. There, Sapp and his crew loaded their "track jacks" and other tools onto a backhoe to be transported to the work site.

During maintenance, the backhoe backed up over a spike, causing a flat tire. As a result, upon completion of the assignment, Sapp and his crew, carrying the jacks and other tools, returned to the Ozburn–Hessey parking lot via the old Hoskins track. They walked down the middle of the track because the vegetation outside the track was so thick. When they neared the parking lot, Sapp, who was carrying a 55–pound jack, looked up at the 18–wheelers in the parking lot as he was stepping over the rail. There was no vegetation along the track at this particular point. Sapp, nonetheless, tripped over the rail and lurched forward, catching himself from falling completely. That motion was significant enough to cause injury to Sapp's back, requiring surgical repair.

Shortly after the accident, Sapp completed an incident report in which he checked a box indicating that he had a safe place to work. A week after the accident,  **\*963** CSX Manager of Field Investigations Lee Miller and Sapp conducted a recorded interview at the site of the injury. At that time, Sapp explained that he was looking up, not down, when he tripped. He admitted that the ground conditions outside the track at that time were pretty good when he tripped over the rail. When asked whether there was anything he could have done to prevent the injury, Sapp responded, "Uh, it's just a freak accident, or just an accident, I mean, maybe pick my feet up, a little bit better, when I stepped over the rail ... And this never would have happened, but it's just one of those things,

you know." (R.34–1 at 41.) When asked if there was something CSX could have done to prevent the injury from happening, he responded, "Probably not, I mean, probably find a lighter jack maybe, or something." (*Id.*) Yet, he admitted that it was not unusual to carry jacks that distance.

**\*\*2** In Plaintiff's Response to Defendant's Statement of Undisputed Facts, Sapp admitted, among other things, that the rail on which he tripped was no higher than any other rail on which he worked in the past, and he could have avoided walking between the rails of the old Hoskins track by either driving his work truck to the area where the tools were found, or walking to the nearby road crossing.

In a deposition of Sapp conducted over four years later, Sapp was asked to describe what happened when he was trying to step over the rail the day he was injured. He responded,

> I had to walk down the middle of the track. It was growed up all the way around it with thistles and briars and limbs. So I walked down the middle of the track and I just—I don't know, stepped over it. I looked up because I was stepping over to make sure which one of the 18–wheelers I needed to go through and the trailers, and just tripped up a little.

(R. 34–1 at 5.)

Sapp filed a complaint alleging that CSX caused his injury by breaching both its statutory and common-law duty to remove vegetation adjacent to the old Hoskins track. Specifically, Sapp contended that CSX had a statutory duty, under track safety standard 49 C.F.R. § 213.37, to control the vegetation immediately adjacent to the track —and that its failure to do so constituted a breach of that duty, or negligence *per se.* Sapp also contended that CSX had a common-law duty to maintain a reasonably safe workplace, and that its failure to control the vegetation adjacent to the old Hoskins track constituted a breach of that duty since it forced him to walk down the middle of the track—which, he contends, inherently poses a trip hazard. If he hadn't been forced to walk down the track, the injury would not have occurred. Thus, the failure to maintain the vegetation caused his injury.

Following discovery, CSX filed a motion for summary judgment,[3] while Sapp filed a motion for partial summary judgment and a motion to strike the declarations of CSX witnesses Mark Gennette, Roy Dean, and Edward English. In the motion for summary judgment, CSX contended that the federal vegetation regulation did not apply to out-of-service industry track such as the old Hoskins track; CSX did not owe Sapp a general duty to maintain vegetation alongside out-of-service industry track; and the vegetation did not cause Sapp to trip. In the motion for partial summary judgment, Sapp contended that his injury was caused by CSX's failure to remove **\*964** vegetation adjacent to its track, in violation of 49 C.F.R. § 213.37(c) and CSX's duty to maintain a reasonably safe workplace. Sapp also asked the court to strike as untimely the declaration of Mark Gennette regarding ownership of the old Hoskins track. Sapp asked the court to strike the declarations of Roy Dean and Edward English as they improperly relied upon Gennette's declarations, contained improper interpretations of Federal Railway Administration ("FRA") regulations, constituted advocacy reports, and did not qualify as expert opinions.

**\*\*3** The district court granted Sapp's motion to strike the declaration of Mark Gennette, and it granted Sapp's motion to strike only those portions of the Dean and English declarations that relied on Gennette's declarations. The district court also granted summary judgment in favor of CSX. Sapp challenges these rulings on appeal.

## II.

The district court's ruling on a motion to strike is reviewed on appeal for an abuse of discretion. *Seay v. Tenn. Valley Auth.,* 339 F.3d 454, 480 (6th Cir.2003).

We review the district court's ruling granting CSX's summary judgment motion de novo. *Cockrel v. Shelby Cnty. Sch. Dist.,* 270 F.3d 1036, 1048 (6th Cir.2001).

Section 51 of FELA imposes liability upon any common carrier engaged in interstate commerce for:

> damages to any person suffering injury while he is employed by

such carrier ... and for such
injury or death resulting in whole
or in part from the negligence
of any of the officers, agents,
or employees of such carrier,
or by reason of any defect or
insufficiency, due to its negligence,
in its cars, engines, appliances,
machinery, track, roadbed, works,
boats, wharves, or other equipment.

45 U.S.C. § 51.

To make a prima facie showing under FELA, a
plaintiff must sufficiently demonstrate that: (1) he
was injured within the scope of his employment; (2)
his employment was in furtherance of the defendant's
interstate transportation business; (3) the defendant
was negligent; and (4) the defendant's negligence played some
part in causing the injury for which the plaintiff seeks
compensation under FELA. *Van Gorder v. Grand Trunk
W. R. R.,* 509 F.3d 265, 269 (6th Cir.2007). A plaintiff must
"present more than a scintilla of evidence in order to create
a jury question on the issue of employer liability, but not
much more." *Aparicio v. Norfolk & W. Ry.,* 84 F.3d 803,
810 (6th Cir.1996) (overruled on other grounds). While
CSX did not contest the first two elements of plaintiff's
prima facie case, it contended that Sapp could not show
that CSX was negligent or that its conduct caused his
injury.

"Negligence under FELA is a question of federal law,
which generally turns on common law principles of
negligence and injury." *Wilhelm v. CSX Transp., Inc.,* 65
Fed.Appx. 973, 976 (6th Cir.2003). Thus, a FELA plaintiff
must prove "the traditional common law elements of
negligence: duty, breach, foreseeability, and causation."
*Adams v. CSX Transp., Inc.,* 899 F.2d 536, 539 (6th
Cir.1990) (citation omitted). Under FELA, a relaxed
standard of causation applies, under which the test
is simply "whether the proofs justify with reason the
conclusion that employer negligence played any part, even
the slightest, in producing the injury or death for which
damages are sought." *Wilhelm,* 65 Fed.Appx. at 976 (inner
quotation omitted). The relaxed causation standard does
not affect the plaintiff's obligation to prove the defendant
was in fact negligent. *Van Gorder,* **\*965** 509 F.3d at
269 (citation omitted). Furthermore, a plaintiff may not
recover under FELA simply because he was injured in the
course of his employment on the railroad. *Consol. Rail*

*Corp. v. Gottshall,* 512 U.S. 532, 543, 114 S.Ct. 2396, 129
L.Ed.2d 427 (1994) ("FELA does not make the employer
the insurer of the safety of [its] employees while they are
on duty. The basis of [its] liability is [its] negligence, not
the fact that injuries occur.").

**\*\*4** Under FELA, a railroad has a duty to provide
its employees with a reasonably safe workplace; this
does not mean that a railroad has the duty to eliminate
all workplace dangers, but only the "duty of exercising
reasonable care to that end."

A railroad breaches its duty to its employees when it
fails to use ordinary care under the circumstances or
fails to do what a reasonably prudent person would
have done under the circumstances to make the working
environment safe. That is, a railroad breaches its duty
when it " 'knew, or by the exercise of due care should
have known' that prevalent standards of conduct
were inadequate to protect [the plaintiff] and similarly
situated employees." A railroad must act reasonably
and use ordinary care to protect its employees.

*Van Gorder,* 509 F.3d at 269–70.

### III.

#### A. Negligence Per Se Claim

[1] Sapp argues that CSX had a statutory duty under 49
C.F.R. § 213.37 to remove the vegetation alongside the
old Hoskins track, CSX's breach of that duty constituted
negligence *per se,* and the breach caused his injury.
Sapp contends that the track is part of the "general
railroad system of transportation" subject to the Track
Safety Standards set forth in Chapter 213 of Title 49
of the U.S.Code, and specifically 49 C.F.R. § 213.37(c)
(otherwise known as "the vegetation regulation"). Sapp
also argues that the district court incorrectly concluded
that the old Hoskins track was not part of the general
railroad system and that the district court ignored his
evidence that the track was in service at the time of his
injury.

The district court held that, while Sapp was undisputedly
injured on industry track, 49 C.F.R. § 213.37 applies only
to the general railroad system of transportation, not to
industry track red-tagged as out-of-service such as the

old Hoskins track. Since there was no statutory duty to maintain the vegetation alongside the old Hoskins track, Sapp could not show that the failure to maintain that vegetation constituted negligence *per se.* We agree.

Under the pertinent provision of § 213.37, "Vegetation on railroad property which is on or immediately adjacent to roadbed shall be controlled so that it does not ... [i]nterfere with railroad employees performing normal trackside duties." 49 C.F.R. § 213.37(c). On its face, this regulation appears to create a statutory duty on the part of CSX to control vegetation alongside the old Hoskins track. However, a review of the statutes, regulations, and FRA policy indicates otherwise.

The Federal Railroad Safety Act ("FRSA") authorizes the Secretary of Transportation to prescribe regulations and to issue orders for every area of "railroad safety supplementing laws and regulations" in effect at the time of the FRSA's enactment. 49 U.S.C. § 20103(a). Under delegation from the Secretary, the FRA proposes and enforces the federal railroad safety statutes. 49 C.F.R. pt. 209, App. A. Regulations implementing the statutes are located at Chapters 213 and 236 of Title 49 of the Code of Federal Regulations. *Id.* The regulations prescribe "minimum safety requirements for railroad track that is **\*966** part of the general railroad system of transportation." 49 C.F.R. § 213.1. They expressly do not apply to railroad track "[l]ocated inside an installation which is not part of the general railroad system of transportation." 49 C.F.R. § 213.3(b)(1).

**\*\*5** Although the FRA has broad jurisdiction over anything that can be construed as a railroad (with the exception of self-contained urban rapid transit systems), it has chosen, for practical purposes, to regulate "something less than the total universe of railroads." 49 C.F.R. pt. 209, App. A.

> For example, all of FRA's regulations exclude from their reach railroads whose entire operations are confined to an industrial installation (i.e., "plant railroads"), such as those in steel mills that do not go beyond the plant's boundaries.... Other regulations exclude not only plant railroads but all other railroads that are not operated as a part of, or over the lines of, the general railroad system of transportation....

> By "general railroad system of transportation," FRA refers to the network of standard gage track over

which goods may be transported through the nation and passengers may travel between cities and within metropolitan and suburban areas. Much of this network is interconnected, so that a rail vehicle can travel across the nation without leaving the system. However, mere physical connection to the system does not bring the trackage within it. For example, *trackage within an industrial installation that is connected to the network only by a switch for the receipt of shipments over the system is not a part of the system.*

*Id.* (citations omitted) (emphasis added). On the other hand:

> even where a railroad operates outside the general system, other railroads that are definitely part of that system may have occasion to enter the first railroad's property (e.g., a major railroad goes into a chemical or auto plant to pick up or set out cars). In such cases, *the railroad that is part of the general system remains part of that system while inside the installation; thus, all of its activities are covered by FRA's regulations during that period.*

*Id.* (emphasis added). Since it is undisputed that the old Hoskins track is industry track, and there is no evidence in the record that a general system railroad was using the track for the movement of freight, the district court correctly concluded that the vegetation statute did not cover that track.

Although Sapp argues that the district court ignored evidence showing that the track was in service at the time of his injury, the record shows otherwise. The district court discussed all of Sapp's evidence and found that, although there was evidence that employees used the old Hoskins track to access system track for maintenance purposes and for periodically tying up equipment, Sapp failed to show that the old Hoskins track was in service for receipt of freight at the time of his injury.

Sapp argues that the FRA's 1997 Proposed Track Safety Standard Rules support his proposed extension of the vegetation regulation to the old Hoskins track. To the contrary, the proposed rules support the lower court's interpretation of the vegetation regulation.

FRA has elected not to exercise jurisdiction over the safety of railroads that conduct their operations exclusively within an industrial or military installation. Such operations have not demonstrated the same degree and frequency of track problems found on tracks in the general system which are subject to heavier tonnages and more frequent use. **967** Nevertheless, FRA recognizes its responsibility for the safety of railroad employees and operations inside such facilities where a general system railroad provides service on the property, *either by picking up and placing cars for transportation in interstate commerce or by switching for the plant....*

**\*6** The applicability of section of the current Track Safety Standards (§ 213.3) excludes track "located inside an installation which is not part of the general railroad system of transportation." This broad statement implies that the track standards do not apply anywhere inside a plant, regardless of who operates there or the type of operations that occur on the plant track. However, § 213.3 must be read in conjunction with 49 CFR Part 209, Appendix A, which explains that any plant railroad trackage over which a general system railroad operates becomes subject to FRA regulations. *With the entrance of a general system railroad,* the plant loses its insularity.

62 Fed.Reg. 36138, 36142 (emphasis added). Also, the Safety Advisory Committee's Track Working Group did not propose amending the regulation that excludes plant tracks from the federal safety regulations, by referencing Appendix A of Part 209 in that regulation, because it:

> could have the effect of making all provisions of Part 213 enforceable against thousands of plant owners, at least to the extent over which general system railroads operate within plant borders. *Such a result would be more far-reaching than intended by the Rail Safety Advisory Committee.* Even while FRA declines to apply Part 213 to plant railroads, the agency continues to have safety jurisdiction over those railroads and may invoke its statutory emergency authority if it deems it necessary in order to

safeguard anyone from the hazard of death or personal injury.

*Id.* at 36145 (emphasis added).

Sapp argues that the old Hoskins track became part of the general railroad system because, just prior to his injury, his boss (Price) poisoned the vegetation alongside the track. Price testified, however, that the track was ineligible for use by CSX because it had been red-tagged as out-of-service, and the reason he poisoned the vegetation "was to keep it from growing completely up, to keep it to where we could keep it cleared off to where we could use it without having to cut trees off of it *in years to come* " and "to provide a safe work environment *should we decide to use the track.*" (R. 34–2 at 2–3 (emphases added).) There is nothing in the federal regulations or the FRA's policy statement that supports including the old Hoskins track within the confines of § 213.37 just because a CSX employee poisons the vegetation because of the possibility that CSX might use the track in the future.

Finally, Sapp argues that the district court abused its discretion when it struck some, but not all, of the declarations of railroad experts Roy Dean and Edward English—and then relied on their unexcluded declarations to support its summary judgment decision. CSX had filed the declaration of Mark Gennette, CSX Director of Contract Management, along with three documents, to support its summary judgment motion. Gennette declared that, in early 2003, CSX's duty to maintain the industry track ended when Ozburn–Hessey failed to renew a contract that had required CSX to maintain the first 157 feet of track to Ozburn–Hessey's facilities. The district court granted Sapp's motion to strike the declaration and attachments as untimely under Fed.R.Civ.P. 26(a)(1) and its Case Management **\*968** Order. The district court then granted Sapp's motion to strike the declarations of railroad experts Dean and English only to the extent that they relied upon Gennette's declarations and documents. The question is whether the district court abused its discretion by declining to exclude the remainder of Dean's and English's declarations, upon which it purportedly relied. Sapp's argument lacks merit.

**\*\*7** Since the district court did not rely on the balance of the declarations of Dean and English, we need not decide whether it was an abuse of discretion not to strike them. The district court first concluded that the old Hoskins track was not a part of the railroad system to which the

vegetation regulation applied based on a plain reading of the regulatory scheme. The district court next concluded that the evidence conclusively established that the old Hoskins track was not a part of the general railroad system, despite Sapp's contention that the track was in service, because Sapp's boss testified that the track had been red-tagged as out-of-service at the time of Sapp's injury and Sapp failed to present any expert evidence establishing that the track was considered part of the general railroad system.

Because a plain reading of the regulatory scheme shows that the old Hoskins track was not a part of the general railroad system of transportation to which the vegetation regulation applies, and there is no evidence that a system railroad was using the track to pick up or drop off freight at the time of Sapp's injury, the district court properly granted summary judgment on the negligence *per se* claim.

### B. Negligence Claim

[2] Sapp next argues that CSX's failure to maintain the vegetation alongside the old Hoskins track violated its duty under FELA to provide a reasonably safe workplace for its employees. According to Sapp, CSX owed a duty to remove the vegetation from alongside the old Hoskins track because it was foreseeable that its employees would use the same parking lot Sapp used, and walk down the middle of the same track where Sapp walked, to perform maintenance on CSX track near the Ozburn–Hessey switch. Given the foreseeability of this oft-used access to a worksite, and assuming one is less likely to trip on a flat surface than walking down the middle of train tracks, CSX had an obligation to control the vegetation.

The district court rejected Sapp's argument that CSX had a general duty under FELA to maintain the vegetation on the old Hoskins track. Furthermore, even if Sapp could establish that CSX owed, and breached, a general duty to remove the vegetation, the district court concluded that the negligence claim would still fail because Sapp failed to show that the breach caused his injury.

Sapp again argues that the district court ignored the evidence (specifically, the deposition testimony of Willard Price, track inspector Mike Dimitre, and backhoe operator Larry Peacock) he relied upon to show that CSX had a general duty to remove the vegetation. In fact, the

record shows that the court expressly discussed Sapp's evidence but considered it insufficient to establish a duty.

Despite Sapp's characterization of Price's testimony, Price made it quite clear at deposition that CSX had a statutory duty to control the vegetation on the system track, but that it had no duty to control the vegetation alongside the old Hoskins track, which he acknowledged was industry track that had been taken out of service. Price testified that CSX would have the duty to control that vegetation if the track was ever designated for use in the future, which was the only reason he poisoned the vegetation in that area. **\*969** Price also testified that it was foreseeable that workers would park in the Ozburn–Hessey lot and walk up the old Hoskins track to work on system track, but there was other parking available.

**\*\*8** Mike Dimitre also testified that the track had been red-tagged as out of service at the time Sapp was injured. Dimitre testified that he parked in the Ozburn–Hessey lot and used the old Hoskins track to inspect system track; he would walk down the middle of the track due to vegetation alongside the track; he did not think it was unsafe to walk down the track; there's nothing in the safety rules about walking down the middle of track; he did not think that walking in the middle of the track presented a trip hazard; and he thought it would be a good policy to remove the vegetation alongside the Hoskins track if an employee could not walk down the middle of the track. He also testified that he thought it was a good idea to clear vegetation adjacent to tracks and it would be a good idea to clear a towpath to prevent workers from walking down the middle of the track.

Larry Peacock agreed that there should not be vegetation along the rail as it posed a safety hazard, and deemed CSX responsible for maintaining a towpath for workers to walk safely along the rails. He agreed that the rails and wooden ties between the rails presented a trip hazard, but testified that it was not unusual for a worker to walk down the center of the track.

This testimony is, at best, equivocal in establishing a duty on the part of CSX to control vegetation alongside industry track that has been designated out of service. While it may be "a good idea" to remove that vegetation, this does not rise to the level of a legal duty—particularly where there is no evidence that the track was defective or provided any particular danger to workers walking on it.

Sapp argues that CSX owed him a duty to remove the vegetation from the sidetrack if it was foreseeable that a FELA-covered worker was going to be on the third-party's property. In support of this position, he cites *Shenker v. Baltimore & Ohio R. Co.,* 374 U.S. 1, 83 S.Ct. 1667, 10 L.Ed.2d 709 (1963), *Payne v. Baltimore and Ohio R.R. Co.,* 309 F.2d 546 (6th Cir.1962), and *Empey v. Grand Trunk W. R.R.,* 869 F.2d 293 (6th Cir.1989).

In *Empey,* a railroad employee, who was on layover awaiting his next assignment, injured his back when he slipped on water while exiting the shower in his hotel room. Evidence showed that a faulty latch on the shower door allowed water to escape the shower stall and accumulate on the floor (i.e., negligence on the part of the hotel). Following the presentation of evidence at trial, the railroad filed a motion for directed verdict. The trial court denied the motion, finding that Empey was within the scope of his employment when injured, and that the hotel's negligence could be imputed to the railroad. On appeal, this court affirmed. Because there was a statute requiring the railroad to provide rooms for its off-duty training crew, the railroad had a contract with the hotel to board its employees who were on layover, and the employer would not have reimbursed him for the expenses of staying at another facility, the court found that the injury occurred within the scope of his employment. More importantly, the court next concluded that the negligence of the hotel could be imputed to the railroad because:

> **\*\*9** a railroad has the non-delegable duty to provide an employee with a safe place to work. This is so despite the fact that it may not own, control or be under a primary obligation to maintain the premises on which the employee is injured. A railroad is not relieved from liability because such premises are unsafe or because of the existence of an **\*970** unsafe condition brought about through the act of another and without fault on the railroad's part.

869 F.2d at 296. This particular ruling relies upon the *Payne* and *Shenker* decisions.

There is no question that Sapp was injured within the scope of his employment. The only question is whether Ozburn–Hessey's negligence can be imputed to CSX. Sapp has made no allegation, let alone provided any evidence, that third-party Ozburn–Hessey was negligent for failing to maintain the vegetation along its sidetrack. Thus, there is no negligence on the part of Ozburn–Hessey to impute to CSX. *See also Shenker,* 374 U.S. at 2–3, 83 S.Ct. 1667 (1963) (injury to railroad employee, caused by defective door of third party where employee was required to work, imputed to railroad); *Payne,* 309 F.2d at 549–50 (death of railroad employee was caused by third party's negligence in using track to dump ashes, causing the accident and imputing liability to the railroad); *Rannals v. Diamond Jo Casino,* 265 F.3d 442, 453 (6th Cir.2001) (in a Jones Act case, negligence of third-party training center may be imputed to riverboat casino when riverboat deckhand, who was required to obtain training at third-party facility, slipped on ice in third-party's parking lot). In short, these cases do not provide a basis for finding negligence on the part of CSX.

**[3]** Even if Sapp could establish such a duty, we agree with the district court that Sapp failed to show that a breach of that duty caused his injury. Sapp's position is that, but for the excessive vegetation alongside the old Hoskins track, he would not have been forced to walk down the middle of the track, which is inherently dangerous, and would not have injured himself. He argues that the district court's interpretation of the FELA causation standard was too restrictive.

**[4]** Sapp is correct in asserting that a relaxed standard of causation applies under FELA. *CSX Transp., Inc. v. McBride,* —— U.S. ——, 131 S.Ct. 2630, 2636, 180 L.Ed.2d 637 (2011) (citing *Consol. Rail Corp. v. Gottshall,* 512 U.S. 532, 542, 114 S.Ct. 2396, 129 L.Ed.2d 427 (1994)); *Richards v. Consol. Rail Corp.,* 330 F.3d 428, 433 (6th Cir.2003). Under FELA, the plaintiff must provide sufficient evidence to show that "employer negligence played any part, even the slightest, in producing the injury or death for which damages are sought." *Rogers v. Mo. Pac. R. Co.,* 352 U.S. 500, 506, 77 S.Ct. 443, 1 L.Ed.2d 493 (1957). In recently affirming the *Rogers* test in *McBride,* the Supreme Court noted that if negligence is proved, "the carrier is answerable in damages even if 'the extent of the [injury] or the manner in which it occurred' was not '[p]robable' or 'foreseeable.' " *McBride,* 131 S.Ct. at 2643 (quoting *Gallick v. Baltimore & Ohio R.R.*

*Co.,* 372 U.S. 108, 120–21, 83 S.Ct. 659, 9 L.Ed.2d 618 (1963)). *But see McBride,* 131 S.Ct. at 2645 (Roberts, C.J., dissenting) (noting that the majority's test is simply "but for" causation and creates a boundless theory of liability). However, we have held that the relaxed causation standard does not affect the employee's obligation to prove that the employer was in fact negligent, and the duty to provide a reasonably safe workplace does not mean that a railroad has the duty to eliminate all workplace dangers. *Van Gorder,* 509 F.3d at 269.

**\*\*10** Sapp cites *Richards v. Consol. Rail Corp* in support of his position. In *Richards,* a conductor brought an action against the railroad for back injuries he sustained when he fell while inspecting the train unexpectedly braking. *Richards,* 330 F.3d at 431. Once the court found that the conductor provided sufficient evidence of a defective control valve, the court then decided **\*971** that the focus should be on whether a reasonable jury could find that the plaintiff's injury "was within the risk created by" the defect. *Id.* at 437. If, as a result of a defect, a plaintiff was required to take certain actions during which he was injured, the issue of causation should go to the jury. *Id.*

In a more recent case, *Szekeres v. CSX Transp., Inc.,* we concluded that the district court improperly granted summary judgment on the plaintiff's negligence claim. 617 F.3d 424, 425 (6th Cir.2010). The plaintiff was injured when he walked up a muddy embankment to privately relieve himself because the train restroom was unsanitary. *Id.* We held that the plaintiff provided a sufficient factual basis for a reasonable jury to conclude that the injury "was within the risk created by the unsanitary toilet facility." *Id.* at 430 (internal quotations omitted). An expert stated in an affidavit that railroad employees typically "walk[ ] up the incline to seek privacy to relieve [themselves]"

when other "toilet facilities are unavailable." *Id.* The court reasoned that the plaintiff slipped from accumulated mud on his boots from climbing the embankment, creating a "direct tie between his inability to use the onboard toilet facility and his accident." *Id.* The court also agreed with the plaintiff that whether "mud is recognized as a slipping hazard in the railroad industry" was a triable issue of material fact. *Id.* at 430–31.

*Richards* and *Szekeres* are distinguishable from the instant case for several reasons. First, Sapp has shown no defect in the track or any hazard that caused him to fall. In fact, his testimony is that the condition of the ground at the site of the injury was "pretty good"; he was looking up, not down, when he fell; he could have prevented the fall by lifting his foot a little higher when stepping over the track; and he stated that the only thing CSX could have done to prevent the accident was maybe give him a lighter jack to carry. Second, there is no evidence that walking down a train track is inherently dangerous. Walking on track is something railroad maintenance workers do every day, and Price testified that the main reason for controlling vegetation along system tracks was so that workers could avoid getting hit by moving trains. There had been no freight-moving trains on the old Hoskins track for years. Third, Sapp was not required to park in the Ozburn-Hessey parking lot and use the old Hoskins track to access the system track for maintenance. Thus, even with the vegetation alongside the out-of-service track, Sapp's stumble and subsequent injury were not within the risk created by CSX's failure to maintain the vegetation.

**\*\*11** For these reasons, we affirm.

**All Citations**

478 Fed.Appx. 961, 2012 WL 1345733

Footnotes

\*     The Honorable Dan Aaron Polster, United States District Judge for the Northern District of Ohio, sitting by designation.

1     Sapp's crewmates were Tim Fan, Tommy Pewitt, and Larry Peacock.

2     According to Sapp, the switch maintenance required jacking the switch up, dumping rocks underneath it, and using the backhoe to tamp the earth down to achieve the correct elevation.

3     CSX also filed a motion for permission to respond to the issue of mitigation of damages. The ruling on this issue is not before us on appeal.

      © 2017 Thomson Reuters. No claim to original U.S. Government Works.

   © 2017 Thomson Reuters. No claim to original U.S. Government Works.

Case 2:15-cv-12312-MOB-EAS ECF No. 62-2, PageID.1895 Filed 03/01/17 Page 16 of 42

Visteon Global Technologies, Inc. v. Garmin International, Inc., Not Reported in...

2014 WL 1028927
Only the Westlaw citation is currently available.
United States District Court,
E.D. Michigan,
Southern Division.

VISTEON GLOBAL TECHNOLOGIES, INC.
and Visteon Technologies, LLC, Plaintiffs,
v.
GARMIN INTERNATIONAL, INC., Defendant.

No. 10−cv−10578.
|
Signed March 17, 2014.

**Attorneys and Law Firms**

Anthony J. Kochis, Wolfson Bolton PLLC, Troy, MI, Jitendra Malik, Alston & Bird, LLP, Charlotte, NC, for Plaintiffs.

Scott A. Wolfson, Wolfson Bolton PLLC, Troy, MI, for Plaintiffs/Defendant.

Deborah J. Swedlow, J. Michael Huget, Honigman Miller Schwartz and Cohn LLP, Ann Arbor, MI, Eric A. Buresh, Erise Ip, P.A., Leawood, KS, for Defendant.

*OPINION AND ORDER (1) ADOPTING THE SPECIAL MASTER'S OCTOBER 25, 2013 REPORT AND RECOMMENDATION RE: DEFENDANT GARMIN'S MOTION FOR LEAVE TO AMEND RESPONSES TO REQUESTS FOR ADMISSION AND TO CORRECT SUMMARY JUDGMENT RECORD (ECF NO. 205), (2) DENYING PLAINTIFFS' OBJECTIONS TO THE SPECIAL MASTER'S REPORT (ECF NO. 208) AND (3) GRANTING DEFENDANT GARMIN'S MOTION FOR LEAVE TO AMEND RESPONSES TO REQUESTS FOR ADMISSION AND TO CORRECT SUMMARY JUDGMENT RECORD (ECF NO. 186 )*

PAUL D. BORMAN, District Judge.

**\*1** This matter is before the Court on Plaintiff Visteon Global Technologies, Inc. and Visteon Technologies, LLC's ("Visteon") Objections to the Special Master's October 25, 2013 Report and Recommendation Re: Defendant Garmin International Inc.'s ("Garmin")

Motion for Leave to Amend Responses to Requests For Admission and to Correct Summary Judgment Record. (ECF No. 208, Objections; ECF No. 205, Report and Recommendation.) Defendant Garmin filed a Response to Plaintiff's Objections. (ECF No. 210.) Pursuant to Fed.R.Civ.P. 53(f), the Court held a hearing on Plaintiff's Objections on March 14, 2013. Having conducted a *de novo* review of the matters addressed in the Objections, and having fully considered the parties' submissions and oral arguments, the Court ADOPTS the Report and Recommendation, DENIES Plaintiff's Objections and GRANTS Garmin's Motion for Leave to Amend and to Correct the Summary Judgment Record.

**I. BACKGROUND**
By Order dated July 11, 2013 (ECF No. 197), the Court referred to Special Master Gaynell Methvin Garmin's Motion for Leave to Amend Responses to Requests for Admission and to Correct Summary Judgment Record (the "RFA Motion"). On October 25, 2013, the Special Master issued his Report and Recommendation (the "RFA Report"), to which Visteon now objects. Visteon requested a hearing on the Objections, pursuant to Fed.R.Civ.P. 53(f)(1), which the Court held on Friday, March 14, 2014.

**II. STANDARD OF REVIEW**
Fed.R.Civ.P. 53 sets forth the appropriate standard of review for a district court in reviewing findings of fact and conclusions of law made or recommended by a Special Master. Rule 53(f)(3) provides as follows:

*Reviewing Factual Findings.* The court must decide de novo all objections to findings of fact made or recommended by a master, unless the parties, with the court's approval, stipulate that:

　(A) the findings will be reviewed for clear error; or

　(B) the findings of a master appointed under Rule 53(a)(1)(A) or (C) will be final.

Fed.R.Civ.P. 53(f)(4) provides as follows:

*Reviewing Legal Conclusions.* The court must decide de novo all objections to conclusions of law made or recommended by a master.

Fed.R.Civ.P. 53(f)(5) provides as follows:

Case 2:15-cv-12312-MOB-EAS ECF No. 62-2, PageID.1896 Filed 03/01/17 Page 17 of 42

Visteon Global Technologies, Inc. v. Garmin International, Inc., Not Reported in...

*Reviewing Procedural Matters.* Unless the appointing order establishes a different standard of review, the court may set aside a master's ruling on a procedural matter only for an abuse of discretion.

*See also Hochstein v. Microsoft Corp.,* 730 F.Supp.2d 714, 717 (E.D.Mich.2010), *aff'd* 430 F. App'x 898 (Fed.Cir.2011) ("The Court reviews *de novo* factual findings and legal conclusions of the Special Master to which a specific objection has been made. *See* Fed.R.Civ.P. 53(f).") The parties have not stipulated to the finality of the Special Master's Report and have not agreed to clear error review. The Court may "adopt or affirm, modify, wholly or partly reject or reverse, or resubmit to the master with instructions." Fed.R.Civ.P. 53(f)(1).

## III. ANALYSIS

 **\*2** Defendant Garmin's RFA Motion seeks to correct what it submits was a "clerical error" contained in Garmin's Responses to Visteon's Amended First Set of Requests for Admission (ECF No. 186–4, "Original RFA Responses"). In sum, Visteon originally served its First set of RFAs on February 7, 2012 but quickly informed Garmin that it was submitting an amended set of RFAs, which it did on February 29, 2012. Garmin agreed to treat the First set of RFAs as withdrawn and to respond instead to the amended RFAs. Garmin explains that in responding to the Amended Requests for Admission (ECF No. 186–2, "Amended RFAs"), Garmin inadvertently used the template from Visteon's Original Requests for Admission (ECF No. 186–1, "Original RFAs"). As a result, Garmin's Original RFA Responses did not track to the Amended RFAs. The Original RFAs were numbered 1–149 and the Amended RFAs were numbered 1–158, adding nine (9) new RFAs on the issue of inducement and amending slightly the language of various of the Original RFAs. The lack of congruity is apparent from a cursory reading of the Amended RFAs and Garmin's Original RFA Responses. When Garmin realized its mistake, it served Amended Responses to the Amended RFAs on January 23, 2013. (ECF No. 186–7, "Amended RFA Responses;" ECF No. 186–6, Letter from Mudd to Malik attaching Amended Responses). On January 30, 2013, Visteon responded that it would oppose Garmin's attempt to amend its responses and would force Garmin to file the motion for leave to amend that is the

subject of these Objections. (ECF No. 186–8, Letter from Malik to Mudd.)

Support for the apparent innocence of Garmin's mistake is found in its Brief in opposition to Visteon's motion for partial summary judgment, in which Garmin expressly stated its "understanding" of the text of RFA No. 43 which, according to Garmin, never mentioned the word "induce." (ECF No. 170 at 16 n. 6.) It is clear that at this point, Garmin still read the RFAs as they appeared in the Original RFAs-and indeed there was no reference to inducement in Original RFA 43. Again, according to Garmin, Visteon made no effort to disabuse Garmin of its misinterpretation and apparent continued confusion.

Garmin claims that it first learned of its error after reading Visteon's reply brief in support of Visteon's motion for partial summary judgment, in which Visteon stated in a footnote that Garmin's response regarding user expectation did not correspond to Visteon's RFA regarding inducement. (ECF No. 174 at 5 n. 5.) After reading this reply brief which was filed on January 11, 2013, Garmin for the first time recognized its error and promptly prepared a set of amended responses and attached them to an email to opposing counsel explaining the "clerical error." (ECF No. 186, Ex. F, Letter from Mudd to Malik dated Jan. 23, 2013.) In the letter Garmin asked that Visteon agree to permit the filing of the Amended RFA Responses and to correct the Summary Judgment record accordingly. *Id.* Visteon did not agree and Garmin filed the motion that is the subject of these Objections.

 **\*3** Visteon maintains that Garmin was apprised in no uncertain terms that it had failed to respond to the Amended RFAs by the Report of Plaintiff's Expert, Dr. Anatole Lokshin, which was served on Garmin on September 28, 2012. (ECF No. 157–07.) Dr. Lokshin made more than one reference in his Expert Report to the fact that Garmin had "admitted inducement" of the #060 Patent, expressly referring to Garmin's failure to respond to Visteon's Amended RFAs which addressed inducement. (ECF No. 162–1, Sealed Report of Anatole Lokshin p. 31, ¶¶ 63–65.) Indeed, according to Visteon, not only did Dr. Lokshin refer to the Garmin's failure to respond on the issue of inducement but he also attached the Original RFA Responses to his Report. Garmin states that it did find Dr. Lokshin's statements in his report "odd at the time, but Garmin reviewed its response to RFA

Case 2:15-cv-12312-MOB-EAS ECF No. 62-2, PageID.1897 Filed 03/01/17 Page 18 of 42

Visteon Global Technologies, Inc. v. Garmin International, Inc., Not Reported in...

No. 43 [as it understood the request at that time] and concluded that it had not failed to respond." (ECF No. 186, Garmin's Mot. at 6.)

Visteon further submits that even Garmin's expert, John Lavrakas, in his report filed on November 30, 2012, acknowledged that there was a "legal" problem regarding the issue of inducement, referring directly to the statements made by Dr. Lokshin in his report that Garmin had "admitted inducement." (ECF No. 162–7, Sealed Report of John Lavrakas, p. 38.) Yet, Visteon submits, Garmin sought no clarification, either from counsel or from Lokshin or Lavrakas in their depositions.

On November 30, 2012, Visteon submits, it filed its motion for partial summary judgment and again stated that Garmin had ignored Visteon's RFA regarding inducement. Finally, when Visteon stated in its reply brief on January 11, 2013, that Garmin had "admitted inducement" by failing to respond, Garmin apparently recognized the error and in January, 2013, began contacting Visteon's counsel to address and correct the "clerical error," ultimately serving its Amended RFA Responses on January 23, 2013, which Garmin refused to accept.

But this dispute over the Inducement RFAs has been fully resolved by the Special Master's Report. Belatedly, Visteon now concedes to Garmin on this point and states that Visteon "does not object to the Special Master's Report to the extent it allows Garmin to respond to the nine Requests for Admission ("RFAs") related to Garmin's inducement of certain infringing functionalities in the Accused products, specifically RFA Nos. 7, 16, 25, 34, 43, 52, 61, 69 and 78." (ECF No. 208, Visteon's Objs. 1.) Visteon states further that: "With respect to the Inducement RFAs, Visteon accepts the Special Master's ruling and stands down." (*Id.* at 10.)

As the Court indicated to the parties at the March 14, 2013 hearing on Visteon's objections, it is unimaginable that Visteon ever believed it was justified in relying on Garmin's mismatched, unintelligible Original RFA Responses and even more difficult to fathom that it encouraged its expert to incorporate those responses into his analysis. It is unconscionable that Visteon did not reconcile this obvious mistake more than a year ago in a 10 minute phone call, instead of forcing hours of attorney,

Special Master and Court time to be invested, only to finally concede the obvious sensible resolution.

**\*4** Having settled the Inducement RFA issue, Visteon now complains, for the first time in these Objections, that its Amended RFAs "also inadvertently included typographical errors in certain of its RFAs related to Garmin's user expectations (specifically, RFA Nos. 30, 39, 48, 57, 66, 74 and 8[3],)." (ECF No. 208, Visteon's Objs. 2.) (The "Expectation RFAs"). Visteon apparently now wants the result of these typographical errors, *i.e.* Garmin's admittedly reasonable response that they are "nonsensical," corrected by way of a limiting order that would permit Garmin to amend *only* its Inducement RFA Responses, while leaving the remainder of Garmin's mismatched Original RFA Responses intact. This issue was never put before the Special Master and consequently never addressed by him.

At the March 14, 2013 hearing before this Court on Visteon's Objections, counsel for Visteon explained that Visteon never raised the issue regarding the typographical errors in the Expectation RFAs with the Special Master because it construed Garmin's briefing on the motion as seeking relief only with regard to correcting the Inducement RFAs. While it is true that discussion in both Visteon's and Garmin's briefings, and the Special Master's Report, focus on the error with the Inducement RFAs, there was nothing ambiguous about the breadth of the relief that Garmin was seeking, nor about the complete relief recommended by the Special Master. Garmin submitted as an attachment to its motion for leave to amend the entire set of the January 23, 2013 Amended RFA Responses. (ECF No. 186–7.) Specifically, Garmin requested as follows:

> Visteon has taken steps to substantively rely on Garmin's mistake-both in the expert report of Visteon's technical expert, Dr. Lokshin, and in Visteon's motion for partial summary judgment. *See* Sec. I, *supra.* Accordingly, Garmin respectfully asks that the Court hold that Visteon may not continue to rely on Garmin's original, erroneous Responses to Visteon's Amended First Set of RFAs. And Garmin respectfully requests that the Court instruct Special Master Methvin

Case 2:15-cv-12312-MOB-EAS   ECF No. 62-2, PageID.1898   Filed 03/01/17   Page 19 of 42

Visteon Global Technologies, Inc. v. Garmin International, Inc., Not Reported in...

to disregard Garmin's original, erroneous responses (Ex. D [ECF No. 186–4] ) in favor of relying on Garmin's amended responses (Ex. G [ECF No. 186–7] ). Second, Garmin respectfully requests that the Court hold that neither Visteon nor Dr. Lokshin shall be allowed to rely on or present Garmin's original erroneous Responses to Visteon's Amended First Set of RFAs (Ex. D [ECF No. 186–4] ), though Visteon and Dr. Lokshin may rely on Garmin's Amended Responses to Visteon's Amended First Set of RFAs (Ex. G [ECF No. 186–7] ). Both of these corrective measures are necessary at this point to effectuate Garmin's amendment and to remedy the confusion that Visteon has propagated.

ECF No. 186 at 13–14. There is nothing ambiguous about this request for relief, which is in no way limited to correcting the Inducement RFAs. Nor is there any ambiguity in the Special Master's recommendation that Garmin's "Motion to Amend be granted, that Garmin be allowed to amend its RFA responses and that its prior erroneous responses be found to be null and void." (ECF No. 205, RFA Report at 23.) It is clear that both Garmin and the Special Master referred to the entirety of the attached Amended Responses to Visteon's Amended RFAs that had been served on Visteon on January 23, 2013, not to some portion thereof.

**\*5** Visteon offers no credible or reasonable excuse for having failed to raise the issue of the typographical errors in these Amended Expectation RFAs in the briefing on Garmin's motion. There is no question that Visteon was aware of this error and, for whatever reason, made the tactical decision not to raise the issue when responding to Garmin's request for leave to submit an entire set of amended responses to those RFAs. Nothing prevented Visteon from raising the issue of the typographical errors in the Expectation RFAs at an earlier point in time with Garmin's counsel or in the briefing before the Special Master. As is the case with objections to a magistrate judge's report and recommendation, the Court is not obligated to consider arguments that appear for the first time in the objections to a special master's report and the Court will not do so here. *See, e.g., Biolumix, Inc. V. Centrus Int'l Inc.,* No. 08–11418, 2012 WL 6015896, at *12 (E.D.Mich. Aug.20, 2013) (finding that the well established principle that a party waives arguments raised for the first time in objections to a magistrate judge's report and recommendation "applies in equal force to the report of the Special Master"). The Court will not permit Visteon to profit from its decision not to raise this obvious error in a timely fashion. Visteon is not precluded from attempting to establish at a trial on the merits, through appropriate witnesses, the facts it sought to establish through its Expectation RFAs.

## IV. CONCLUSION

For the foregoing reasons, the Court ADOPTS the Special Master's Report and Recommendation, GRANTS Garmin's Motion for Leave to Amend Responses to Requests For Admission and To Correct Summary Judgment Record, ACCEPTS Garmin's January 23, 2013 Amended Response to Visteon's Amended First Set of Requests for Admissions as the operative RFA responses, and ORDERS that the summary judgment record, and the record going forward in this case, be corrected to comport with the terms of this Order.

IT IS SO ORDERED.

**All Citations**

Not Reported in F.Supp.3d, 2014 WL 1028927

**End of Document**                    © 2017 Thomson Reuters. No claim to original U.S. Government Works.

2007 WL 2875283
Only the Westlaw citation is currently available.
United States District Court,
E.D. Michigan,
Southern Division.

Stephney LEININGER, Plaintiff,

v.

RELIASTAR LIFE INSURANCE CO., Defendant.

No. 2:06-cv-12249.
|
Sept. 28, 2007.

**Attorneys and Law Firms**

J. Michael Southerland, J. Michael Southerland Assoc.,
Plymouth, MI, for Plaintiff.

Eric J. Pelton, William B. Forrest, Robert B. Brown,
Kienbaum, Opperwall, Birmingham, MI, for Defendant.

### ORDER ACCEPTING REPORT
### AND RECOMMENDATION

DENISE PAGE HOOD, United States District Judge.

## I. INTRODUCTION

**\*1** This matter is before the Court on Magistrate
Judge Paul Komives' Report and Recommendation dated
August 21, 2007. Plaintiff filed an Objection to the
Magistrate Judge's Report and Recommendation. The
Magistrate Judge recommended that Defendant's January
3, 2007 Motion for Summary Judgment be granted.

## II. STANDARD OF REVIEW

The standard of review to be employed by the Court when
examining a Report and Recommendation is set forth
in 28 U.S.C. § 636. This Court "shall make a *de novo*
determination of those portions of the report or specified
proposed findings or recommendations to which objection
is made." 28 U.S.C. § 636(B)(1). This Court "may accept,
reject or modify, in whole or in part, the findings or
recommendations made by the magistrate." *Id.*

## III. LAW & ANALYSIS

This Court agrees with the Magistrate Judge that
Defendant's January 3, 2007 Motion for Summary
Judgment should be granted for the reasons set forth in
the Report and Recommendation and below.

With regard to Plaintiff's claim for sex discrimination, this
Court agrees with the Magistrate's recommendation that
Plaintiff has failed to meet her burden under *McDonnell
Douglas Corp. v. Green,* 411 U.S. 792, 93 S.Ct. 1817,
36 L.Ed.2d 668 (1973). Plaintiff has failed to satisfy
the third and fourth elements of the *McDonnell* test for
proving discrimination, as she has offered as evidence
only her subjective belief that she was "set up to fail"
because of her sex. Defendant has presented evidence
that the employees identified by Plaintiff as "similarly
situated" were not in fact similarly situated. Plaintiff
identified Bryan Anderson, Jeff Stuhr, and Christopher
Beck as comparables. (Mot.S.J.Resp.Br., p. 9) As noted
by the Magistrate Judge, Anderson was not subject
to the ING Employee Benefits Bonus Agreement for
Sales Representatives since he left ReliaStar/ING in
November 2000, prior to the effective date of the ING
Bonus Agreement in 2001 and left five years prior to
Plaintiff's firing. Anderson was not in the same situation as
Plaintiff, especially since ING acquired ReliaStar. Stuhr
cannot be a comparable since Stuhr was the decision
maker over Plaintiff at the time Stuhr was transferred in
November 2002, as noted by Plaintiff in her response brief.
(Mot.S.J.Resp.Br., p. 1) (Plaintiff reported to Stuhr from
March 2000 to October 2000). As such, Stuhr and Plaintiff
did not report to the same decision maker. Beck also
cannot be a comparable since he was hired in September
2006, nine months after Plaintiff was terminated and has
a different educational and sales experience than Plaintiff
at the time Plaintiff was hired seven years earlier. Plaintiff
has failed to create a genuine issue of fact as to whether
she has stated a *prima facie* case of sex discrimination.

As to Plaintiff's claim for age discrimination, this
Court agrees with the Magistrate's recommendation
that Plaintiff has failed to establish a genuine issue of
material fact with respect to her prima facie case of age
discrimination. Plaintiff alleges that a younger employee
was treated more favorably than she, but fails to offer any
evidence that supports this claim. Further, Plaintiff claims
that she was terminated instead of receiving a transfer
because she was close to age 55, but fails to offer anything
more than temporal proximity to establish the claimed
discriminatory animus.

Leininger v. Reliastar Life Ins. Co., Not Reported in F.Supp.2d (2007)

**\*2** Addressing Plaintiff's contract and related equitable claims, this Court agrees with the Magistrate that Defendant is entitled to summary judgment on Plaintiff's contract and related equitable claims. First, there is no genuine issue of material fact that the Agreement constitutes an implied-in-fact contract with respect to Plaintiff's entitlement to bonuses and commissions. Second, Plaintiff does not allege in her Complaint that her *termination,* as opposed to Defendant's failure to pay commissions, constituted a breach of contract. Plaintiff's claim that Defendant's reliance on the ambiguous Improvement Plan in terminating her employment created a genuine issue of material fact as to whether Defendant breached the contract is without merit since Plaintiff was an at will employee. Third, Plaintiff has presented no evidence that she satisfied the condition precedent required for her entitlement to severance benefits. Fourth, although Defendant voluntarily elected to pay Plaintiff her Holdback Bonus, this does not impose a contractual obligation on Defendant to provide the Bonus that would entitle Plaintiff to summary judgment in her favor.

The Court agrees with the Magistrate's recommendation that Plaintiff's fraud claim fails as a matter of law, because she has failed to set forth a *prima facie* case of fraud.

Plaintiff's claims for accounting and exemplary damages must also fail, as these claims are for remedies which are derivative of her substantive claims for relief.

With regard to Plaintiff's claim brought under the Bullard-Plawecki Employee Right to Know Act, the Court agrees with the Magistrate's recommendation that the Defendant is entitled to summary judgment as a matter of law, because the Plaintiff has failed to establish a violation of the Act.

This Court agrees with the Magistrate's recommendation that the Defendant is entitled to summary judgment on Plaintiff's claim that Defendant violated § 510 of the Employee Retirement Income Security Act (ERISA), as Plaintiff has not established a *prima facie* case of ERISA interference.

## IV. CONCLUSION
For the reasons set forth above,

IT IS ORDERED that the Report and Recommendation of Magistrate Judge Paul Komives **[Docket No. 38 dated August 2, 2007]** is **ACCEPTED** and **ADOPTED** as this Court's findings and conclusions of law.

IT IS FURTHER ORDER that Defendant's Motion for Summary Judgment **[Docket No. 20 filed January 3, 2007]** is GRANTED and this case is DISMISSED with prejudice.

### *REPORT AND RECOMMENDATION*

PAUL J. KOMIVES, United States Magistrate Judge.

I. RECOMMENDATION .................... 2

II. REPORT ........................ 2

    A. Procedural Background ................... 2

    B. Factual Background .................... 2

    C. Legal Standard ...................... 5

    D. Preliminary Matters ................... 7

        1. Sufficiency of Defendant's Declarations ............... ................ 7

        2. Choice of Law .................... ................ 8

    E. Age and Sex Discrimination (Count I of Plaintiff's Complaint) .............. 11

        1. Discrimination Claims Under ELCRA Generally ............... .............. 11

|   |   | 2. | Analysis .................... |   |   | .............. 13 |
|   |   |   | a. | Sex Discrimination........................................................................... | 14 |
|   |   |   | b. | Age Discrimination........................................................................... | 19 |
|   | F. | Contract and Related Equitable Claims (Counts II-V) .......... |   |   | 21 |
|   |   | 1. | Bonuses and Commissions .............. |   |   | .............. 21 |
|   |   | 2. | Termination ................. |   |   | .............. 27 |
|   |   | 3. | Severance ................. |   |   | .............. 28 |
|   |   | 4. | Holdback Bonus ............... |   |   | .............. 29 |
|   | G. | Fraud (Count VI) .................... |   |   | 30 |
|   | H. | Accounting and Exemplary Damages (Counts VII-VIII) .............. |   |   | 33 |
|   | I. | Right to Know Act (Count IX) .............. |   |   | 33 |
|   | J. | ERISA Interference (Count X) ............... |   |   | 35 |
|   | K. | Conclusion .................... |   |   | 38 |
| III. |   | NOTICE TO PARTIES REGARDING OBJECTIONS ............... |   |   | 38 |

I. *RECOMMENDATION:* The Court should grant defendant's motion for summary judgment.

II. *REPORT:*

A. *Procedural Background*

**\*3** Plaintiff Stephney Leininger commenced this action in the Wayne County Circuit Court against defendant Reliastar Life Insurance Company, her former employer, on April 16, 2006.[1] On May 17, 2006, defendant removed the matter to this Court pursuant to 28 U.S.C. §§ 1332, 1441(a)(1), based on the diverse citizenship of the parties. Subsequent to defendant's removal, plaintiff filed an amended complaint. Plaintiff's amended complaint asserts ten causes of action arising from defendant's termination of her employment: (1) age and sex discrimination in violation of the Michigan Elliot-Larsen Civil Rights Act (ELCRA), MICH. COMP. LAWS §§ 37.2101 *et seq.;* (2) breach of contract; (3) unjust enrichment; (4) procuring cause doctrine; (5) promissory estoppel; (6) fraud; (7) accounting; (8) exemplary damages; (9) violation of the Bullard Plawecki Right to Know Act, MICH. COMP. LAWS §§ 435.501 *et seq .;* and (10) interference with ERISA benefits, 29 U.S.C. § 1140. The matter is currently before the Court on defendant's motion for summary

judgment filed on January 3, 2007. Plaintiff filed a response to the motion on April 17, 2007, and defendant filed a reply on April 30, 2007. Plaintiff filed a letter of supplemental authority on June 12, 2007, arguing that a recent Michigan Supreme Court decision entitles her to severance benefits. Defendant filed a response on July 6, 2007.

B. *Factual Background*

Although the parties dispute a number of factual issues and the legal implications of the facts, the basic facts relating to the parties' relationship is not in dispute.[2] Plaintiff began working in Illinois as a Customer Sales Representative for Northwestern National Life Insurance Company, defendant's predecessor-in-interest, in 1981. *See* Def.'s Br., Ex. A, Dep. Tr. of Pl., at 35-37 [hereinafter "Pl.'s Dep."]. In 1999, plaintiff accepted a position as a commissioned Sales Representative ("SR") with defendant's Employee Benefits Group, and transferred to Michigan. *See id.* at 44. At the time of plaintiff's transfer, defendant's Michigan sales office consisted of, beside plaintiff, District Manager ("DM") Dave Lockhart, to whom plaintiff reported, and SR Bryan Anderson. *See id.* at 51; Pl.'s Br., Ex. A, Aff. of Pl., ¶ 3 [hereinafter "Pl.'s

Aff."]. In 2000, defendant was acquired by ING. Prior to the acquisition, Lockhart transferred to California and was replaced as the Michigan DM by Jeff Stuhr. *See* Pl.'s Dep., at 53; Pl;'s Aff., ¶ 3; Def .'s Br., Ex. B, Decl. of ING Employee Benefits Sales Administration Manager Gwen Wood, ¶¶ 3-4.

On January 8, 2001, following ING's acquisition of defendant, Leininger executed ING's Employee Benefits Bonus Agreement for Sales Representatives. *See* Def.'s Br., Ex. C (the Agreement); *see also, id.,* Exs. D-E (Bonus Schedule and Sales Management Policy for 2005 and 2004, respectively). This agreement governed plaintiff's employment relationship with defendant for the duration of her employment. *See* Pl.'s Dep., at 190-91. Plaintiff's compensation under the Agreement consisted of three components: (1) a base annual salary; (2) a production bonus, or commission, constituting a percentage of net premiums earned and paid, as determined by performance goals and other factors set forth in the Bonus Schedule; and (3) a profit sharing incentive calculated on the basis of a variety of factors. *See* Pl.'s Dep., at 191-94; Def.'s Br., Ex. C, §§ 2.1-4.3. The Agreement defines the commissions that are due and not due upon termination of employment, *see* Def.'s Br., Ex. C, § 10.2(A), and the Bonus Schedule sets forth defendant's policies with respect to sales representatives who fail to achieve designated goals, *see id.,* Ex. D, at 27.

**\*4** In November 2002, Stuhr transferred to Boston, and defendant did not fill the Michigan DM position. At that point, plaintiff became the only remaining Employee Benefits representative in Michigan, and began reporting directly to Regional Vice President/General Manager Jack Femrite in Chicago. *See* Pl.'s Dep., at 56-59; Def.'s Br., Ex. B, Wood Decl., ¶ 4. Plaintiff achieved 164.21% of her $914,000 production goal for 2003. *See* Pl.'s Br., Ex. H, ING Detroit Sales & Quota; Def.'s Br., Ex. F, Decl. of ING HR Resolution Consultant Mikki Kremer, ¶ 5. Effective January 1, 2004, plaintiff was promoted from sales representative to Regional Director (RD). The promotion [3] included a $15,000 increase in plaintiff's annual base salary, but also required plaintiff to meet increased production quotas. Plaintiff advised Femrite that she did not want the change in job responsibilities and asked instead for a lateral transfer, but Femrite told plaintiff that no lateral positions were available and that she had no choice but to accept the move to the RD position. *See* Pl.'s Dep., at 61-63, 83-85, 88-89, 92-93,

109. Plaintiff believed that the "promotion" was merely a trap designed to set her up to fail, so that she could be terminated. *See id.* at 85. [4] Plaintiff was given a pro-rated production goal of only $2,076,505 for 2004 (the goal for incumbent RD's was $3,101,900). *See* Def.'s Br., Ex. B, Wood Decl., ¶ 7; Ex. F, Kremer Decl., ¶ 5; Ex. E, at 3.

Although the parties dispute the cause of plaintiff's low performance numbers, there is no dispute that in 2004, plaintiff achieved only $403,916 in sales, or 19.45% of her production goal. *See id.,* Ex. B, Wood Decl., ¶ 8. Femrite resigned effective January 4, 2005, and was replaced as the Regional Vice President by Lockhart, plaintiff's former Michigan DM. *See id.,* Ex. F, Kremer Decl., ¶4(C). Some time in the first half of 2005, Lockhart placed plaintiff a formal written notice that she was being placed on "Phase I" probation in accordance with the Bonus Agreement. *See id.,* Ex. G. [5] Although the parties again dispute the cause, there is no dispute that plaintiff's sales production for 2005 was $216,531, or 5.26% of her production goal. *See id.,* Ex. B, Wood Decl., ¶ 9; Ex. F., Kremer Decl., ¶ 5.

On December 30, 2005, defendant, through Lockhart, terminated plaintiff's employment. *See* Pl.'s Dep., at 23-24, 234-35; Def.'s Br., Ex. F, Kremer Decl., ¶ 3. Plaintiff claims that she asked Lockhart for a transfer, and that a position in Cleveland was available, but her request was denied. *See* Pl.'s Dep., at 108, 110-11. Based on its interpretation of the Agreement, defendant has not paid commissions or bonuses to plaintiff based on 2005 sales, for which premiums were not paid until after her employment was terminated. Plaintiff alleges that she sold $1,768,115 in premiums which did not become due until January 2006. Plaintiff further alleges that she is covered by defendant's severance policy. Finally, plaintiff alleges that she was 2 years, 3 months from fully vesting to her pension, and that as a result of her termination she lost $525,747 in future monthly pension payments.

## C. *Legal Standard*

**\*5** Under Rule 56, summary judgment should be granted "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue of material fact and that the moving party is entitled to judgment as a matter of law." FED. R. CIV. P. 56(c). "An issue of fact is 'genuine' if the evidence is such that a reasonable jury could return a verdict for the non-moving party."

*Hedrick v. Western Reserve Care Sys.,* 355 F.3d 444, 451 (6th Cir.2004) (citing *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986)). "A fact is material only if its resolution will affect the outcome of the lawsuit." *Hedrick,* 355 F.3d at 451-52 (citing *Anderson,* 477 U.S. at 248). In deciding a motion for summary judgment, the Court must view the evidence in a light most favorable to the non-movant as well as draw all reasonable inferences in the non-movant's favor. *See Sutherland v. Michigan Dep't of Treasury,* 344 F.3d 603, 613 (6th Cir.2003); *Rodgers v. Banks,* 344 F.3d 587, 595 (6th Cir.2003).

"The moving party has the initial burden of showing the absence of a genuine issue of material fact as to an essential element of the non-moving party's case." *Hedrick,* 355 F.3d at 451 (citing *Celotex Corp. v. Catrett,* 477 U.S. 317, 323, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986)). To meet this burden, the moving party need not produce evidence showing the absence of a genuine issue of material fact. Rather, "the burden on the moving party may be discharged by 'showing'-that is, pointing out to the district court-that there is an absence of evidence to support the non-moving party's case." *Celotex Corp.,* 477 U.S. at 325. "Once the moving party satisfies its burden, 'the burden shifts to the nonmoving party to set forth specific facts showing a triable issue.' " *Wrench LLC v. Taco Bell Corp.,* 256 F.3d 446, 453 (6th Cir.2001) (quoting *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 587, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986)); *see also,* FED. R. CIV. P. 56(e).

To create a genuine issue of material fact, however, the non-movant must do more than present some evidence on a disputed issue. As the Supreme Court has explained:

> There is no issue for trial unless there is sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party. If the [non-movant's] evidence is merely colorable, or is not significantly probative, summary judgment may be granted.

*Anderson,* 477 U.S. at 249-50. (citations omitted); *see Celotex Corp.,* 477 U.S. at 322-23; *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 586-87, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986). Thus, "[t]he existence of a mere scintilla of evidence in support of the non-

moving party's position will not be sufficient; there must be evidence on which the jury could reasonably find for the non-moving party." *Sutherland,* 344 F.3d at 613.

### D. *Preliminary Matters*

#### 1. *Sufficiency of Defendant's Declarations*

**\*6** Plaintiff raises a preliminary matter regarding the sufficiency of defendant's evidence. Specifically plaintiff contends that the declarations of Gwen Wood, Mikki Kremer, Sande Sheppard, and David Lockhart are not notarized, nor do they state that they are made under penalty of perjury as required by 28 U.S.C. § 1746. *See* Def.'s Br., Exs. B, F, I & N. Thus, plaintiff argues, the declarations should be stricken and should not be considered by the Court. However, defendant has since filed amended declarations for each of these individuals which contain the language required by § 1746. *See* Def.'s Reply Br., Exs. O-R. Defendant's submission of these corrected declarations moots plaintiff's request that they be stricken, and the declarations may be considered because plaintiff had notice of their contents. *See Story v. Sunshine Foliage World, Inc.,* 120 F.Supp.2d 1027, 1031-32 (M.D.Fla.2000); *United States v. Gritz Bros. Partnership,* 155 F.R.D. 639, 644 (E.D.Wis.1994). Accordingly, the Court should consider the declarations in resolving defendant's motion for summary judgment. [6]

#### 2. *Choice of Law*

As another preliminary matter, the Court must decide what law governs plaintiff's state law claims. Both parties proceed on the assumption that Michigan law applies. This assumption is generally correct, with one caveat.

In resolving the parties' state law claims, the Court must apply the substantive law of the state. 28 U.S.C. § 1652 ("The laws of the several states ... shall be regarded as rules of decisions in civil actions in the courts of the United States, in cases where they apply."); *see also, Erie R.R. Co. v. Tompkins,* 304 U.S. 64, 58 S.Ct. 817, 82 L.Ed. 1188 (1938). In determining the appropriate source of law, the Court applies the choice of law rules of Michigan, the state in which this Court sits. *See Klaxon v. Stentor Elec. Mfg. Co., Inc.,* 313 U.S. 487, 496, 61 S.Ct. 1020, 85 L.Ed. 1477 (1941) ( "The conflict of laws rules to be applied by the federal court in Delaware must conform to those prevailing in Delaware's state courts."); *International Ins. Co. v. Stonewall Ins. Co.,* 86 F.3d 601, 604 (6th Cir.1996)

("A federal court exercising diversity jurisdiction must apply the choice of law rules of the forum state."); *Security Ins. Co. v. Kevin Tucker & Assocs. ., Inc.,* 64 F.3d 1001, 1005 (6th Cir.1995) (same).

Under Michigan choice of law rules, a court "will apply Michigan law unless a 'rational reason' to do otherwise exists. In determining whether if any foreign state has an interest in having its law applied. If no state has such an interest, the presumption that Michigan law will apply cannot be overcome. If a foreign state does have an interest in having its law applied, we must then determine if Michigan's interests mandate that Michigan law be applied, despite the foreign interests." *Sutherland v. Kennington Truck Serv., Ltd.,* 454 Mich. 274, 286, 562 N.W.2d 466, 471 (1997). No state has an interest with respect to plaintiff's tort (including discrimination) claims; the effects of defendant's actions were felt by plaintiff solely in Michigan and affect Michigan public policy. Thus, plaintiff's tort and discrimination claims are governed by Michigan law. *See Foster v. Federal Express Corp.,* No. 04-10325-BC, 2005 WL 3369484, at *3 (E.D.Mich. Dec.12, 2005) (Lawson, J.).

 **\*7** Plaintiff's contract and quasi-contract claims would likewise be governed by Michigan law. The parties entered into a contract in Michigan for work to be performed in Michigan, and no other state has an interest in having its law applied to the contract at issue. Thus, under Michigan choice of law rules, Michigan law governs this action. *See* RESTATEMENT (SECOND) OF CONFLICTS OF LAW § 188(3); *Kipin Indus., Inc. v. Van Deilen Int'l, Inc.,* 182 F.3d 490, 493 (6th Cir.1999) (noting that Michigan choice of law rules follow §§ 187 and 188 of the *Restatement* ). The parties assume that this general rule controls. However, in so doing the parties fail to take account of the contractual choice-of-law provision in the Agreement, which provides that "[t]his Agreement will be governed by the laws of the State of Minnesota." Def.'s Br., Ex. C, § 11.7. In *Chrysler Corp. v. Skyline Indus. Servs.,* 448 Mich. 113, 528 N.W.2d 698 (1995), the Michigan Supreme Court explicitly adopted the approach of the *Restatement (Second) of Conflicts of Laws.* The *Restatement* approach notes that the "[p]rime objectives of contract law are to protect the justified expectations of the parties and to make it possible for them to foretell with accuracy what will be their

rights and liabilities under the contract." RESTATMENT (SECOND) OF CONFLICTS OF LAWS § 187 cmt. e (Supp.1988) [hereinafter "RESTATEMENT"]. Thus, as a general matter, "[t]he law of the state chosen by the parties to govern their contractual rights and duties will be applied[.]" *Id.* § 187(1); *see Chrysler Corp.,* 448 Mich. at 125, 528 N.W.2d at 703.

Thus, with respect to the contract and quasi-contract claims, the Court is faced with a seemingly valid contractual choice-of-law provision which neither party mentions, and with parties who assume that Michigan law applies. Ordinarily, questions of law are determined by the Court, and parties may not stipulate to the law. Choice of law issues, however, do not involve a court's subject matter jurisdiction, and may be stipulated to by parties as a matter of contract. For these reasons, there is substantial authority for the proposition that parties may stipulate during litigation the source of law governing their dispute. *See Cates v. Morgan Portable Bldg. Corp.,* 780 F.2d 683, 687 (7th Cir .1985); *Doe v. Nevada Crossing, Inc.,* 920 F.Supp. 164, 167 (D.Utah 1996); *Van Deurzen v. Yamaha Motor Corp. USA,* 276 Wis.2d 815, 688 N.W.2d 777, 781-82 (Wis.Ct.App.2004). [7]  By arguing solely in terms of Michigan law and failing to invoke the contractual choice of law provision, the parties have implicitly stipulated that Michigan law is controlling. *See In re Apex Automotive Warehouse, L.P.,* No. 96 B 04594, 1999 WL 132849, at *3 (Bankr.N.D.Ill. Mar.9, 1999); *cf. Columbia v. Prudential Ins. Co.,* No. 96-1521, 1997 WL 345728, at *2 (6th Cir. June 20, 1997) (party waived right to challenge applicability of Michigan law, notwithstanding contractual choice-of-law provision selecting New York law, where party argued merits in district court under Michigan law and failed to raise the contractual choice-of-law provision). *See generally, Cates,* 780 F.2d at 687 ("[T]he parties to a lawsuit can, within broad limits, stipulate to the law governing their dispute; and an implied stipulation is good enough."). Stated another way, "[w]here neither party argues that the forum state's choice of law rules require the court to apply the substantive law of another state, the court should apply the forum state's substantive law." *ECHO, Inc. v. Whitson Co.,* 52 F.3d 702, 707 (7th Cir.1995); *see also, BBSerCo, Inc. v. Metrix Co.,* 324 F.3d 955, 960 n. 3 (8th Cir.2003); *Carbonic Prods. Co. v. Welding & Cutting Supply Co.,* No. 86-1730, 1987 WL 38061, at *1 (6th Cir. July 17, 1987) (per curiam); *Wilkes Assocs. v. Hollander Indus. Corp.,* 144 F.Supp.2d 944, 949 n. 4 (S.D.Ohio 2001).

**\*8** Accordingly, the Court should conclude that the parties have stipulated to the applicability of Michigan law, and therefore should apply Michigan law to plaintiff's contract and quasi-contract claims.

### E. *Age and Sex Discrimination (Count I of Plaintiff's Complaint)*

Plaintiff first brings claims for age and sex discrimination under Michigan's Elliot-Larsen Civil Rights Act (ELCRA). [8] The Court should grant defendant's motion for summary judgment with respect to these claims.

#### 1. *Discrimination Claims Under ELCRA Generally*

Section 202 of the ELCRA provides, in relevant part, that "[a]n employer shall not ... [f]ail or refuse to hire or recruit, discharge, or otherwise discriminate against an individual with respect to employment, compensation, or a term, condition, or privilege of employment, because of religion, race, color, national origin, age, sex, height, weight, or marital status." MICH. COMP. LAWS § 37.2202(1)(a). Section 801 of the Act provides for a civil damages remedy for persons aggrieved by a violation of the Act. *See* MICH. COMP. LAWS § 37.2801(1).

A plaintiff bringing a disparate treatment discrimination claim under the ELCRA may prove her case either through direct or circumstantial evidence of discrimination. "In cases involving direct evidence of discrimination, a plaintiff may prove unlawful discrimination in the same manner as a plaintiff would prove any other civil case." *Sniecinski v. Blue Cross & Blue Shield of Mich.,* 469 Mich. 124, 132, 666 N.W.2d 186, 192 (2003). If, as is usually the case, a plaintiff has no direct evidence of discrimination, she must prove her case through circumstantial evidence. "In cases involving indirect or circumstantial evidence, a plaintiff must proceed by using the burden shifting approach set forth in *McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973)." *Sniecinski,* 469 Mich. at 133-34, 666 N.W.2d at 193. As explained by the Michigan Supreme Court:

> This approach allows a plaintiff to present a rebuttable prima facie case on the basis of proofs from which a factfinder could infer that the plaintiff was the victim of unlawful discrimination. To establish a rebuttable prima facie case of discrimination, a plaintiff must present evidence that (1) she belongs to a protected class, (2) she suffered an adverse employment action, (3) she was qualified for the position, and (4) her failure to obtain the position occurred under circumstances giving rise to an inference of unlawful discrimination. Once a plaintiff has presented a prima facie case of discrimination, the burden then shifts to the defendant to articulate a legitimate, nondiscriminatory reason for the adverse employment action. If a defendant produces such evidence, the presumption is rebutted, and the burden shifts back to the plaintiff to show that the defendant's reasons were not the true reasons, but a mere pretext for discrimination.

*Id.* at 134, 666 N.W.2d at 193 (internal citations, quotation, and footnote omitted). [9]

**\*9** Regardless of whether discrimination is shown by direct or circumstantial evidence, the plaintiff must show a causal link between the discriminatory animus and the adverse employment action. *See id.* at 134-35, 666 N.W.2d at 193. Further, notwithstanding the burden-shifting framework described above, " '[t]he ultimate burden of persuading the trier of fact that the defendant intentionally discriminated against the plaintiff remains at all times with the plaintiff.' " *Hazle v. Ford Motor Co.,* 464 Mich. 456, 464 n. 8, 628 N.W.2d 515, 522 n. 8 (2001) (quoting *Texas Dep't of Community Affairs v. Burdine,* 450 U.S. 248, 253, 101 S.Ct. 1089, 67 L.Ed.2d 207 (1981)). Because ELCRA is similar to analogous federal anti-discrimination laws such as Title VII and the Age Discrimination in Employment Act, federal cases applying those laws are persuasive in applying ELCRA, *see Radtke v. Everett,* 442 Mich. 368, 381-82, 501 N.W.2d 155, 162 (1993); *Pena v. Ingham County Road Comm'n,* 255 Mich.App. 299, 311 n. 3, 660 N.W.2d 351, 359 n. 3 (2003), although they are not binding, *see Elezovic v. Ford Motor*

*Co.,* 472 Mich. 408, 422, 697 N.W.2d 851, 859 (2005); *Pena,* 255 Mich.App. at 311 n. 3, 660 N.W.2d at 359 n. 3.

#### 2. *Analysis*

Here, plaintiff does not present direct evidence of sex or age discrimination, and thus must prove her claims through circumstantial evidence. There is no question that plaintiff satisfies the first and second elements of her *prima facie* case. At the time she was terminated, she was a 52-year-old female, placing her in a protected class with respect to both the age and sex discrimination claims, and there is no doubt that termination constitutes an adverse employment action. Thus, the validity of plaintiff's claims turns on the third and fourth elements-namely, whether she was qualified for her position and whether the circumstances regarding her firing give rise to an inference of discrimination.

At the outset, I note that the third and fourth elements of plaintiff's *prima facie* case merge in this case. To be considered qualified for the position, "plaintiff must show that she was performing at a level which met defendant's legitimate expectations." *Jacklyn v. Schering-Plough Healthcare Prods. Sales Corp.,* 176 F.3d 921, 929 (6th Cir.1999); *Town v. Michigan Bell Tel. Co.,* 455 Mich. 688, 699, 568 N.W.2d 64, 69 (1997). There is no question that plaintiff failed to come close to meeting her sales quotas for 2004 and 2005, and thus that she was failing to meet defendant's expectations concerning her performance. However, plaintiff essentially argues that those expectations were not legitimate ones because she was set up to fail and treated differently than male employees, factors which go to the inference of discrimination element of her *prima facie* case. Thus, the third and fourth elements merge into one question.

#### a. *Sex Discrimination*

In her deposition testimony and interrogatory answers, plaintiff identified three circumstances which give rise to an inference of discrimination. First, she argues that she was given only a 20% production credit on "paid-up certificates" for purposes of calculating her annual profit sharing incentive, while male sales representatives received 100% credit, *see* Pl.'s Dep., at 26; Def .'s Br., Ex. H, Interrogatory Answer 3(1). Second, she claims that she, along with other female sales representatives, were "set up

to fail" by being promoted to RD with higher production quotas, while similar male representatives were not terminated or were allowed to transfer, *see* Pl.'s Dep., at 94-98, 102-08, 113-14, 118-22, 263-64; Def.'s Br., Ex. H, Interrogatory Answers 2, 3(3), and 3(4). Third, she claims that she and other female representatives frequently had trouble getting the Underwriting Department to support or approve participation rates and price quote variations that the female representatives attempted to offer potential customers. *See* Pl.'s Dep., at 122-23, 136-50. To support her claim, plaintiff contrasts the treatment given to male employees Lockhart, Anderson, Stuhr, Kenney Bennett, Justin Hansen, David Braxton, Greg Retzlaff, and Chris Beck (who replaced her as RD), with the treatment given to herself and female employees Lisa Spredemann, Colleen McDaniel-Blaize, and Grace Tallarico. Plaintiff also contends that Lockhart provided support to male employees who were placed on Phase I probation, but did not provide similar support to her. Defendant's change in policy to provide for only a 20% production credit on paid-up certificates does not provide any evidence of discrimination. It is true that prior sales reps and regional directors had received a 100% production credit, and that in plaintiff's case her predecessors were males. However, defendant has presented evidence that this policy change was made based upon an assessment that it was more accurate as a fiscal matter to amortize this credit over five-years, and that the policy change was applied across the board and equally affected male and female sales representatives. *See* Def.'s Br., Ex. B, Wood Decl., ¶ 12 and Tab 1. Plaintiff has presented no evidence to rebut the fact that this change was a company-wide policy change which equally impacted male and female employees, and thus the policy change provides no evidence of discrimination. *See Nichols v. Billington,* 402 F.Supp.2d 48, 67 (D.D.C.2005); *Keelan v. Majesco Software, Inc.,* No. 3:02-CV-1670L, 2004 WL 370225, at *6 (N.D.Tex. Feb. 26, 2004); *Nichols v. Comcast Cablevision of Md.,* 84 F.Supp.2d 642, 653 n. 15 (D.Md.), *aff'd,* 217 F.3d 840 (4th Cir.2000). [10]

**\*10** Likewise, plaintiff's alleged problems with the Underwriting Department do not provide evidence of discrimination. As plaintiff noted in her deposition, he frustrations with the Underwriting Department were primarily directed at Vice President Sande Sheppard and Lead Underwriter Lori Jungbauer-both females. She also conceded that she had no evidence that her problems with the Department were gender-based, other than gossip

and speculation. Finally, plaintiff admitted that many male representatives also complained about problems with the Underwriting Department. *See* Pl.'s Dep., at 138, 147-51, 154-55, 167-68, 171-74. In light of plaintiff's own testimony, her subjective belief-based on rumors and speculation-that Underwriting was discriminating against her on the basis of her gender is insufficient to establish a genuine issue of material fact on that issue. *See Hein v. All American Plywood Co., Inc.,* 232 F.3d 482, 488 (6th Cir.2000); *Comiskey v. Automotive Industry Action Group,* 40 F.Supp.2d 877, 894-95 (E.D.Mich.1999) (Rosen, J.).

Thus, plaintiff's *prima facie* case succeeds or fails on her assertion that other similarly situated male employees were treated better than she was treated. In order to show that she was similarly situated to any male employee, plaintiff must show that " 'all of the relevant aspects' of her employment situation were 'nearly identical' to those of" the supposedly similarly situated employee. *See Town,* 455 Mich. at 700, 568 N.W.2d at 70 (quoting *Pierce v. Commonwealth Life Ins. Co.,* 40 F.3d 796, 802 (6th Cir.1994)); *see also, Smith v. Goodwill Indus. of W. Mich., Inc.,* 243 Mich.App. 438, 449, 622 N.W.2d 337, 343 (2000). In other words, plaintiff must show that the male employees with whom she seeks to compare herself "dealt with the same supervisor, [were] subject to the same standards and ... engaged in the same conduct without such differentiating or mitigating circumstances that would distinguish their conduct or the employer's treatment of them for it." *Loper v. Computer Network Tech. Corp.,* 128 F.Supp.2d 1061, 1067 (E.D.Mich.2001) (Feikens, J.).

Under this standard, plaintiff has failed to offer any evidence that she was treated differently than similarly situated male employees. Anderson was not similarly situated to plaintiff. He resigned shortly after ING's acquisition of defendant, and thus was never subject to the ING Bonus Agreement which governed plaintiff's performance. *See* Def.'s Br., Ex. B, Wood Decl., ¶ 2. Lockhart, a management level employee, was likewise not similarly situated to plaintiff because his position is explicitly exempted from the performance improvement and probation provisions of the Bonus Agreement. *See* Def.'s Br., Ex. D, at 27. There is no evidence that Stuhr was similarly situated to plaintiff. Although Stuhr was allowed to transfer, unlike plaintiff, defendants have presented evidence that Stuhr had never had two consecutive years of production below 50% of quota, qualifying him

for probation. *See* Def.'s Br., Ex. B, Wood Decl., ¶¶ 4, 6. Plaintiff argues that Stuhr would have had two consecutive years of below 50% performance if he were given only 20% credit on paid-up certificates for the years 2001 and 2002, rather than 100%, but at that time the company police was to give 100% credit. And, as discussed above, there is no evidence that the change in policy was applied in a discriminatory fashion, or that defendant's change in policy was anything other than a legitimate, non-discriminatory change in business practice.

**\*11** Likewise, defendant's evidence establishes that Retzlaff was on a performance improvement plan for having failed to meet his 2004 goal, and that he qualified for Phase I probation at the end of 2005, but that his performance was not so low as to qualify him for termination. *See* Def.'s Br., Ex. F, Kremer Decl., Tab 1. Bennett, like plaintiff, was placed on probation and was facing termination at the end of 2005 but, unlike plaintiff, he qualified for the Bonus Agreement's express exception to termination by booking sales for 2006 that exceeded 50% of his goal for that year prior to the end of 2005. *See* Def.'s Br., Ex. B, Wood Decl., ¶ 11; Ex. F, Kremer Decl., ¶ 5. Further, defendant has presented evidence that other employees-Assistant Regional Manager Andrew Gambardella, Senior SR A.J. Huessein-were terminated for poor performance under the Bonus Agreement, and two other employees resigned while on probation and facing year-end termination. *See id.,* Ex. F, ¶ 5 and Tab 1. Chris Beck, plaintiff's replacement, did receive an annual allowance when he was hired, but so did plaintiff. *See* Pl.'s Dep., at 195-97; Def.'s Br., Ex. T. Although Beck's allowance was higher than plaintiff's he was hired seven years later and, unlike plaintiff, he had a business degree and prior insurance sales experience at the time of his hiring. *See* Def.'s Reply Br., Ex. V, Beck Dep., at 14-15, 27-28. Further, female sales representatives hired since plaintiff's termination have received annual allowances comparable to the allowance given to Beck. *See id.,* Ex. U, Supp. Decl. of Gwen Wood, ¶ 3. Nor does defendant's treatment of the female employees identified by plaintiff support an inference that defendant discriminated against her on the basis of her gender. Grace Tellarico, an Assistant Regional Manager, was terminated for poor performance, but so was male ARM Andrew Gambardella, as noted above. Lisa Spredemann and Maria Flynn both voluntarily resigned their positions, and neither was on probation or facing year-end termination at the time of her resignation.

*See* Pl.'s Dep., at 95, 96; Def.'s Br., Ex. F, Kremer Decl., at Tab 1.

In short, defendant's evidence establishes that it applied its objectively measured performance requirements to male and female sales representatives alike. Plaintiff has presented no evidence that she was treated differently from any other sales representative because of her sex or that she was set up to fail because of her sex apart from her own subjective belief that this is what happened. Defendant has presented evidence that the employees identified by plaintiff were either not similarly situated to her or were not subject to different treatment, and plaintiff has presented no objective evidence to rebut the defendant's evidence. She thus has failed to raise a genuine issue of material fact with respect to the third and fourth elements of her *prima facie* case. *See Terwilliger v. GMRI, Inc.,* 952 F.Supp. 1224, 1230 (E.D.Mich.1997) (Gadola, J.).

**\*12** It may be that, in plaintiff's view, defendant treated her poorly or set unrealistic sales goals for her position. But plaintiff has presented no evidence that defendant did so because of her sex. The employment discrimination laws prohibit discrimination on the basis of race, sex, and the like; they do not establish general civility codes nor require that employers make competent business decisions. *See Davis v. Town of Lake Park, Fla.,* 245 F.3d 1232, 1239 (11th Cir.2001) (internal quotation omitted) (Title VII is "neither a general civility code nor a statute making actionable the ordinary tribulations of the workplace."); *May berry v. Endocrinology-Diabetes Ass'n,* 926 F.Supp. 1315, 1323-24 (M.D.Tenn.1996) ("Discrimination statutes ... do not require that employers make fair or accurate assessments of employees abilities or that they assign employees to appropriate positions, absent discriminatory intent or impact."); *Town,* 455 Mich. at 704, 568 N.W.2d at 72 (internal quotation omitted) (question under ELCRA "is whether discriminatory animus motivated the employer, not whether the employer is wise, shrewd, prudent, or competent."). "Unfairness will not afford a plaintiff a remedy unless the unfair treatment was because of ... discrimination." *Meagher v. Wayne State Univ.,* 222 Mich.App. 700, 712, 565 N.W.2d 401, 411 (1997). Accordingly, the Court should grant defendant's motion for summary judgment on this claim.

### b. Age Discrimination

Plaintiff also asserts a claim of age discrimination. Plaintiff's brief focuses on her sex discrimination claim, and does not explicitly address her age discrimination claim apart from her ERISA interference claim. In her interrogatory answers and deposition, plaintiff identified two bases for her age discrimination claim: (1) Allison Shors, a younger employee, was not give the increased quota and responsibility as an RD that she, McDaniel-Blaize, and Spredemann were, *see* Def.'s Br., Ex. H, Interrogatory No. 3(2); and (2) she was terminated instead of being given a transfer because she was close to attaining the age of 55, which would have required defendant to pay greater pension benefits, *see* Pl.'s Dep., at 176-78.

As to Shors, defendant's unrebutted evidence establishes that, in 2004, she was in fact promoted to ARM and given a production goal that was over 20% higher than that of plaintiff or Spredemann. *See* Def.'s Br., Ex. F, Kremer Decl., Tab 1. Further, unlike plaintiff, Shors never produced less than 50% of the production goal (58.46% in 2005), and she exceeded her goal in 2004 and 2006. *See id.,* Ex. B, Wood Decl., ¶ 16. Thus, plaintiff cannot show that Shors was treated more favorably than was she. Further, any favorable treatment that Shors may have received is explained not by age, but by the fact that, in plaintiff's own words, Shors was an "exception" because she was related to a ReliaStar executive. *See* Pl.'s Dep., at 99. Thus, a comparison of the treatment afforded plaintiff and Shors provides no evidence of discriminatory animus.

**\*13** With respect to the proximity between her termination and the vesting of her pension benefits, plaintiff offers nothing to show discriminatory animus beyond the proximity alone. Temporal proximity alone is insufficient to establish discriminatory animus. *Cf. West v. General Motors Corp.,* 469 Mich. 177, 186, 665 N.W.2d 468, 472-73 (2003). More fundamentally, an employer's desire to avoid pension liabilities does not, in itself, constitute discrimination on the basis of age. As the Supreme Court has explained in the context of the ADEA:

It is the very essence of age discrimination for an older employee to be fired because the employer believes that productivity and competence decline with old age. As we explained in *EEOC v. Wyoming,* 460 U.S. 226, 103 S.Ct. 1054, 75 L.Ed.2d 18 (1983), Congress'

promulgation of the ADEA was prompted by its concern that older workers were being deprived of employment on the basis of inaccurate and stigmatizing stereotypes.

> "Although age discrimination rarely was based on the sort of animus motivating some other forms of discrimination, it was based in large part on stereotypes unsupported by objective fact.... Moreover, the available empirical evidence demonstrated that arbitrary age lines were in fact generally unfounded and that, as an overall matter, the performance of older workers was at least as good as that of younger workers." *Id.,* at 231, 665 N.W.2d 468, 103 S.Ct., at 1057-1058.

Thus the ADEA commands that "employers are to evaluate [older] employees ... on their merits and not their age." *Western Air Lines, Inc. v. Criswell,* 472 U.S. 400, 422, 105 S.Ct. 2743, 2756, 86 L.Ed.2d 321 (1985). The employer cannot rely on age as a proxy for an employee's remaining characteristics, such as productivity, but must instead focus on those factors directly.

When the employer's decision is wholly motivated by factors other than age, the problem of inaccurate and stigmatizing stereotypes disappears. This is true even if the motivating factor is correlated with age, as pension status typically is. Pension plans typically provide that an employee's accrued benefits will become nonforfeitable, or "vested," once the employee completes a certain number of years of service with the employer. See 1 J. Mamorsky, Employee Benefits Law § 5.03 (1992). On average, an older employee has had more years in the work force than a younger employee, and thus may well have accumulated more years of service with a particular employer. Yet an employee's age is analytically distinct from his years of service. An employee who is younger than 40, and therefore outside the class of older workers as defined by the ADEA, see 29 U.S.C. § 631(a), may have worked for a particular employer his entire career, while an older worker may have been newly hired. Because age and years of service are analytically distinct, an employer can take account of one while ignoring the other, and thus it is incorrect to say that a decision based on years of service is necessarily "age based."

**\*14**  *Hazen Paper Co. v. Biggins,* 507 U.S. 604, 610-11, 113 S.Ct. 1701, 123 L.Ed.2d 338 (1993). The Michigan courts have adopted this reasoning in interpreting the ELCRA. *See Plieth v. St. Raymond Church,* 210 Mich.App. 568, 573-74, 534 N.W.2d 164, 167-68 (1995).

For these reasons, the Court should conclude that plaintiff has failed to establish a genuine issue of material fact with respect to her *prima facie* case of age discrimination. Accordingly, the Court should grant defendant's motion for summary judgment on this claim.

### F. *Contract and Related Equitable Claims (Counts II-V)*

#### 1. *Bonuses and Commissions*
Plaintiff alleges that defendant breached its contract with her by failing to pay bonuses and commissions due to her following her termination. There is no dispute that plaintiff seeks bonuses and commissions relating to sales made in 2005, but for which the premiums were not paid until 2006, following her termination. Further, there is no dispute that the plain language of the Agreement provides that a sales representative "will not be entitled to bonus on any Net Premiums received by the Company after the Termination Date." Def.'s Br., Ex. C, § 10.2. In order to overcome this language, plaintiff argues that defendant cannot rely on the Agreement for several reasons, and that in the absence of an express agreement there is a genuine issue of material fact with respect to whether she is entitled to recover the equitable quasi-contract theories of implied contract, unjust enrichment, procuring cause, and promissory estoppel. Plaintiff's quasi-contract claims, and hence her right to recover the bonuses and commissions she seeks, depends on her overcoming the language of the Agreement because "a contract cannot be implied in law while an express contract covering the same subject matter is in force between the parties." *H.J. Tucker & Assocs., Inc. v. Allied Chucker & Eng'g Co.,* 234 Mich.App. 550, 573, 595 N.W.2d 176, 188 (1999); *see also, Johnson Controls, Inc. v. Jay Industries, Inc.,* 459 F.3d 717, 730 (6th Cir.2006). The Court should conclude that defendant is entitled to summary judgment on plaintiff's contract and related equitable claims. [11]

Plaintiff first contends that § 10.2, by requiring forfeiture of commissions earned prior to termination, violates Michigan public policy and thus is unenforceable. This argument is without merit. In support of her claim,

plaintiff relies on the Michigan Court of Appeals's decision in *Hill v. IKON Office Solutions, Inc.,* No. 263147, 2006 WL 3524069 (Mich.Ct.App. Dec.7, 2006). In *Hill,* the court held that a contract which provided that a terminated employee was not entitled to commissions was void pursuant to the Sales Representative Commissions Act (SRCA), which in relevant part provides that "[a]ll commissions that are due at the time of termination of a contract between a sales representative and principal shall be paid within 45 days after the date of termination. Commissions that become due after the termination date shall be paid within 45 days after the date of which the commission became due." MICH. COMP. LAWS § 600.2961(4). The court concluded that this language superseded a contractual provision which precluded the payment of commissions which otherwise would have been "due" at the time of termination but for the provision preventing payment of any commissions to a terminated employee. *See Hill,* 2006 WL 3524069, at *9- *10. Although the SRCA does not apply to commissioned insurance sales representatives, *see Klapp v. United Ins. Group Agency,* 259 Mich.App. 467, 474, 674 N.W.2d 736, 740 (2003), plaintiff claims that *Hill* establishes a public policy voiding provisions such as that at issue here.

**\*15** Plaintiff's reliance on *Hill* is misplaced. As noted above, in *Hill* the court concluded that the commissions had otherwise become "due," and that the only basis asserted by the defendant was that the plaintiff had been terminated and no commissions, whether due or not, were paid to terminated employees. Here, however, defendant makes no similar argument. Rather, defendant argues, and the contractual language confirms, that the commissions were not yet "due" at the time of termination because commissions are determined due based on the date of the premium payment. Nothing in *Hill* establishes that contract language of this type violates either the SRCA specifically or Michigan public policy generally. On the contrary, Michigan "caselaw is replete with examples of valid contracts concerning the payment of commissions." *Stann v. Compuware, Inc.,* No. 219329, 2001 WL 710165, at * (Mich.Ct.App. June 22, 2001); *see Clark Brothers Sales Co. v. Dana Corp.,* 77 F.Supp.2d 837, 852 (E.D.Mich.1999); *Barber v. SMH (US), Inc.,* 202 Mich.App. 366, 374, 508 N.W.2d 791, 796 (1993). Further, the SRCA itself provides that "[t]he terms of the contract ... shall determine when a commission becomes due." MICH. COMP. LAWS § 600.2961(2). "The purpose of the Act is to ensure that post-termination commissions

are fully and promptly paid when due. The Act does not expand the scope of contractual obligations to pay post-termination commissions." *Muqtadir v. Micro Contacts, Inc.,* 148 Fed. Appx. 348, 352 (6th Cir.2005); *see also, Clark Bros. Sales,* 77 F.Supp.2d at 852 (the SRCA "does not create a new obligation or impose a new duty to pay sales commissions."). In other words, the SRCA requires only that the defendant pay all commissions that have become "due" under the terms of the parties' contract. *See APJ Assocs., Inc. v. North American Phillips Corp.,* 317 F.3d 610, 616 (6th Cir.2003). Thus, the public policy of the SRCA, even if applicable here, does not preclude the contractual provision upon which defendant relies. Defendant's duty was to pay commissions to plaintiff that were due at the time she was terminated pursuant to the terms of the Agreement, and the Agreement provided that commissions did not become "due" until the premiums were paid. This contractual provision does not conflict with the SRCA or any other provision of Michigan public policy, and thus is valid.

Plaintiff next contends that defendant cannot rely on the Bonus Agreement because the preamble to the agreement states that "[t]his Agreement is not an employment contract of any kind. All ING Benefits Sales Representatives are employed are at-will[.]" Def.'s Br., Ex. C, at 1. In support of this argument, plaintiff relies on *McGough v. Broadwing Communications, Inc.,* 177 F.Supp.2d 289 (D.N.J.2001) (applying Pennsylvania law). However, *McGough* does not stand for the proposition, implicit in plaintiff's argument, that language disavowing an intent to create a contract requires the Court to simply disregard the Agreement and determine plaintiff's entitlement to commissions and bonuses from scratch. On the contrary, *McGough* supports the conclusion that the terms of the Agreement are binding on the parties here.

**\*16** In *McGough,* the plaintiffs claimed that they were entitled to post-termination commissions pursuant to the defendant's compensation plan. The plan explicitly disclaimed an intent to create a binding contract or any employment other than at-will and, unlike the contract at issue here, even explicitly disclaimed any intent to give the plaintiffs any right to receive compensation. *See id.* at 295. The court agreed with the defendant that the compensation plan did not, in itself, constitute a contract or alter the plaintiffs' status as at-will employees. *See id.* at 296. The court held, however, that this fact did

not relieve the defendant of its contractual obligation to compensate plaintiffs for their services, and that "while the language of the Plan's disclaimer may reserve [defendant's] right to alter the nature and extent of Plaintiffs' compensation for future services, it cannot and does not permit [defendant] to retroactively modify the terms of Plaintiffs' compensation for work performed prior to such modifications." *Id.* Thus, the plaintiffs were entitled to compensation pursuant to the terms of the plan. *See id.*

Here, of course, the position of the parties is reversed: defendant seeks to enforce the terms of the plan, while plaintiff seeks to avoid those terms. To the extent that *McGough* is applicable here, however, it supports defendant's position. Under the reasoning of *McGough,* even if the Agreement is not a binding contract, it provides the terms for evaluating plaintiff's right to compensation. Stated another way, the terms of the Agreement, even if not sufficient to constitute an express contract, become the terms of an implied-in-fact contract. *See id.* at 297. As the Michigan Court of Appeals has recently explained:

> Michigan recognizes two kinds of implied contracts: those implied in fact and those implied in law. *Wrench LLC v. Taco Bell Corp.,* 256 F.3d 446, 456 (C.A.6, 2001), citing *Cascaden v. Magryta,* 247 Mich. 267, 270, 225 N.W. 511 (1929). Under Michigan law, "[a] contract will be implied only if there is no express contract .... [and][t]here cannot be an express and implied contract covering the same subject matter at the same time." *Burton v. William Beaumont Hosp.,* 373 F.Supp.2d 707, 722 (E.D.Mich., 2005) (citing *Campbell v. City of Troy,* 42 Mich.App. 534, 537, 202 N.W.2d 547 (1972)).
>
> .... A contract implied in fact arises between parties "when those parties show a mutual intention to contract," *Kingsley Assoc., Inc. v. Moll PlastiCrafters, Inc.,* 65 F.3d 498, 504 (C.A.6, 1995), citing *Erickson v. Goodell Oil Co.,* 384 Mich. 207, 211-212, 180 N.W.2d 798 (1970), and it is "founded upon a meeting of the minds that, although not embodied in an express contract, is inferred, as a fact from the conduct of the parties showing, in the light of the surrounding circumstances, their tacit understanding." *Hercules Inc. v. United States,* 516 U.S. 417, 424, 116 S.Ct. 981, 134 L.Ed.2d 47 (1996). Conversely, a claim of unjust enrichment is based on a contract implied in law, *Liggett Restaurant Group, Inc. v. City of Pontiac,* 260 Mich.App. 127, 137, 676 N.W.2d 633 (2003), which

does not require mutual assent, "but is imposed by fiction of law" even if no contract is intended. *Wrench LLC, supra* at 456.

**\*17** *Complete Auto & Truck Parts, Inc. v. City of Flint,* No. 268485, 2007 WL 1934792, at \*1 (Mich.Ct.App. July 3, 2007) (per curiam). Here, even if the Agreement does not constitute an express contract, there is no genuine issue of material fact that the Agreement constitutes an implied-in-fact contract with respect to plaintiff's entitlement to bonuses and commissions. Plaintiff executed the Agreement in writing, indicating her assent to be bound by its terms, and plaintiff has presented no evidence that the parties' course of dealing with respect to the payment of bonuses and commissions differed from the terms of the Agreement at any time during the parties' relationship. And the existence of an implied-in-fact contract precludes plaintiff's equitable and implied-in-law claims the same as would an express contract. *See Kingsley Assocs., Inc. v. Moll PlastiCrafters, Inc.,* 65 F.3d 498, 506 (6th Cir.1995) (applying Michigan law) ("Any additional recovery under the theory of unjust enrichment is precluded by our finding of an implied-in-fact contract because the existence of an implied-in-fact contract, which provides a legal remedy, will bar a claim of unjust enrichment, which seeks an equitable remedy.").

In short, plaintiff's right to commissions and bonuses is governed by the language of the Agreement to which she assented, whether the agreement is viewed as an express contract or a contract implied-in-fact. Because commissions did not become due under the Agreement until the premiums were paid by the insured, and because the commissions which plaintiff seeks to recover are based on premiums paid after her termination, she is not entitled to the commissions she seeks. Accordingly, the Court should grant defendant's motion for summary judgment.

#### 2. *Termination*

Plaintiff also argues that the language of defendant's 2005 Performance Improvement Plan is ambiguous with respect to whether she was a "new sales rep" or "newly hired sales rep." She argues that, because defendant relies on the Improvement Plan as the basis for its termination of her employment, this ambiguity creates a genuine issue of material fact with respect to whether defendant breached the contract. This claim is without merit, however, for two reasons.

First, plaintiff has not raised a claim in her complaint that her *termination,* as opposed to defendant's failure to pay commissions, constituted a breach of contract. *See* Amended Compl., ¶¶ 15-19. Plaintiff's termination is cited only as a basis for her discrimination claims. She does not allege in the complaint that her termination constituted a breach of contract. A plaintiff may not "avoid summary judgment based on a claim that is not pled in her complaint." *Patrick v. Northwest Airlines, Inc.,* No. 00-554-JD, 2002 WL 467126, at *3 (D.N.H. Mar.27, 2002); *see also, Perdue v. Union City, Ga.,* No. 1:05CV00753, 2006 WL 2523094, at *9 (N.D.Ga. Aug. 28, 2006). In any event, this claim is without merit. Plaintiff was an at-will employee. While defendant's reliance on the Improvement Plan, or its failure to follow that plan, may be relevant in examining its motives for terminating plaintiff in connection with plaintiff's discrimination claims, as a matter of contract law defendant was free to terminate plaintiff for any reason or no reason whatsoever. *See Rood v. General Dynamics Corp.,* 444 Mich. 107, 116, 507 N.W.2d 591, 597 (1993). And, defendant's promulgation of disciplinary procedures did not obligate defendant to follow those procedures before terminating plaintiff; defendant could terminate plaintiff at-will notwithstanding its Improvement Plan or any other disciplinary policies. *See Baggs v. Eagle-Picher Indus., Inc.,* 957 F.2d 268, 271-72 (6th Cir.1992); *Stopczynski v. Ford Motor Co.,* 200 Mich.App. 190, 194-95, 503 N.W.2d 912, 914 (1993); *Biggs v. Hilton Hotel Corp.,* 194 Mich.App. 239, 241-42, 486 N.W.2d 61, 62-63 (1992). Accordingly, to the extent plaintiff asserts a breach of contract claim based on her termination, the claim is without merit and defendant is entitled to summary judgment.

### 3. *Severance*

**\*18** Plaintiff next contends that she was entitled to severance under the ING Severance Benefits plan, *see* Pl.'s Br., Ex. K, and that there is a genuine issue of material fact with respect to whether she is entitled to severance benefits. Defendant responds that the Severance Benefits plan is not a contract, and that plaintiff's termination was not a "qualified termination" under the plan. However, the Court need not resolve these issues because even if the Severance Benefits plan is a contract, as defendant argues plaintiff has presented no evidence that she satisfied a condition precedent to her receipt of severance benefits.

"A condition precedent is something that must occur before there is a right to performance." *Lee v. Auto-Owners Ins. Co.,* 201 Mich.App. 39, 43, 505 N.W.2d 866, 868 (1993), *vacated on other grounds,* 445 Mich. 908, 519 N.W.2d 890 (1994); *see also, HyKing Assocs., Inc. v. Versatech Mfg. Indus. Co.,* 826 F.Supp. 231, 238 (E.D.Mich.1993) (Gadola, J.) (citing *MacDonald v. Perry,* 342 Mich. 578, 70 N.W.2d 721 (1955)). Here, the Severance Benefits plan explicitly requires, as a condition precedent to the payment of benefits, that the employee execute a waiver and release within 45 days of termination. *See* Pl.'s Br., Ex. K, at 3, 4. Plaintiff has presented no evidence that she satisfied this condition precedent, and her failure to do so is fatal to her breach of contract claim. *See Scherer v. Hellstrom,* 270 Mich.App. 458, 464, 716 N.W.2d 307, 311 (2006) ("Generally, if performance is dependent on a condition precedent, the cause of action does not accrue until the condition is fulfilled *and* the promise is not performed."); *Berkel & Co. Contractors v. Christman Co.,* 210 Mich.App. 416, 420, 533 N.W.2d 838, 840 (1995) ("Failure to satisfy a condition precedent prevents a cause of action for failure of performance.").[12] Accordingly, the Court should conclude that defendant is entitled to summary judgment on this claim.

### 4. *Holdback Bonus*

Finally, plaintiff contends that it is undisputed that defendant owes her $2,028.16 for holdback of bonuses earned before defendant fired her. This claim is based on an exchange between plaintiff and counsel for defendant during plaintiff's deposition, in which counsel indicated that he had sent a check covering the remainder of plaintiff's hold-back, and a cover letter explaining the check. Plaintiff indicated that she had received the letter, but not the check. Counsel for defendant indicated that he would inquire about the matter with defendant and his office. *See* Pl.'s Dep., at 275-76. Therefore, plaintiff contends, she is entitled to summary judgment in her favor with respect to this amount. Defendant contends that although it voluntarily elected to pay plaintiff her holdback and intends to do so, it is not contractually obligated to do so and thus plaintiff is not entitled to summary judgment in her favor or to avoid summary judgment against her. The Court should agree.

**\*19** The Bonus Schedule explicitly provides that "[i]f the sales representative resigns or is terminated during Phase I or Phase II, the Company reserves the right to retain his/

her holdback." Def.'s Br., Ex. D, at 27. There is no dispute that plaintiff was terminated while on Phase I probation, and thus plaintiff has no *contractual* right to the holdback bonuses. Accordingly, the Court should grant summary judgment to defendant on this claim.

G. *Fraud (Count VI)*

Plaintiff also brings a claim of fraud based on Lockhart's assurance to her, sometime in 2005, that "she would be taken care of for her efforts as she always had been." Pl.'s Aff., ¶ 8. To prove fraud, plaintiff must prove the following elements:

> (1) that the charged party made a material representation; (2) that it was false; (3) that when he or she made it he or she knew it was false, or made it recklessly, without any knowledge of its truth and as a positive assertion; (4) that he or she made it with the intention that it should be acted upon by the other party; (5) that the other party acted in reliance upon it; and (6) that the other party thereby suffered injury.

*City of Novi v. Robert Adell Children's Funded Trust,* 473 Mich. 242, 253 n. 8, 701 N.W.2d 144, 152 n. 8 (2005); *see also, Belle Isle Grill Corp. v. City of Detroit,* 256 Mich.App. 463, 477, 666 N.W.2d 271, 280 (2003). The Court should conclude that defendant is entitled to summary judgment on this claim.

Here, plaintiff's right to post-termination commissions was governed by the contract between her and defendant. Under the economic loss rule, as reflected in Michigan law, "a tort claim of fraud cannot be based solely on the parties' contractual relationship, but must rest upon the breach of a duty separate from the parties' contractual obligation." *Rainbow Nails Enters., Inc. v. Maybelline, Inc.,* 93 F.Supp.2d 808, 831 (E.D.Mich.2000) (Rosen, J.); *see also, Sherman v. Sea Ray Boats, Inc.,* 251 Mich.App. 41, 52, 649 N.W.2d 783, 789 (2002). Here, plaintiff's fraud claim relates to the subject matter of the contract between herself and defendant. The claim is thus solely one for breach of contract, and thus cannot constitute actionable fraud.

Further, plaintiff has failed to provide sufficient evidence to withstand summary judgment on the misrepresentation and reliance elements of her fraud cause of action. With respect to misrepresentation, the Michigan courts have held that a misrepresentation must be a statement of past or existing fact; future promises are contractual in nature and breaching such a promise constitutes "neither fraud nor evidence of fraud." *Michael v. Amway Corp.,* 206 Mich.App. 644, 652, 522 N.W.2d 703, 707 (1994); *see also, Marrero v. McDonnell Douglas Capital Corp.,* 200 Mich.App. 438, 444, 505 N.W.2d 275, 279 (1993), *modified on other grounds by Patterson v. Kleiman,* 447 Mich. 429, 526 N.W.2d 879 (1994). There is an exception to this rule for promises made in bad faith with no intention on the part of the promisor to perform. *See Derderian v. Genesys Health Care Sys.,* 263 Mich.App. 364, 378, 689 N.W.2d 145, 156 (2004). However, "[e]vidence of fraudulent intent, to come within the exception, must relate to conduct of the actor at the very time of making the representation, or almost immediately thereafter." *Id.* at 379, 689 N.W.2d at 156 (internal quotation omitted). Here, Lockhart's allege statement to plaintiff was vague. It could have meant, as she claims, that Lockhart was promising that she would receive commissions for her 2005 sales regardless of the Bonus Schedule; however, it equally could have meant simply that she would continue to be compensated in accordance with the Bonus Schedule, as always had been. *Cf. Liberty Heating & Cooling, Inc. v. Builders Square, Inc.,* 788 F.Supp. 1438, 1446 (E.D.Mich.1992) (Edmunds, J.) (vague and indefinite statements insufficient to support promissory estoppel claim). More importantly, there is no evidence that, at the time Lockhart made the statement, he did not intend to perform. Plaintiff has provided no evidence regarding when the statement was made in relation to her ultimate termination, or the context in which the statement was made. The mere fact that Lockhart's alleged promise was breached is "neither fraud nor evidence of fraud." *Michael,* 206 Mich.App. at 652, 522 N.W.2d at 707. Thus, plaintiff has failed to raise a genuine issue of material fact with respect to whether Lockhart made a misrepresentation of past or existing fact which is actionable in a fraud cause of action.

**\*20** Further, plaintiff cannot establish the reliance element of her fraud claim. In order to establish this element, plaintiff must show not only that she actually relied on the alleged misrepresentation, but also that her reliance was reasonable. *See Foreman v. Foreman,*

266 Mich.App. 132, 141-42, 701 N.W.2d 167, 175 (2005); *Bergen v. Baker,* 264 Mich.App. 376, 389, 691 N.W.2d 770, 778 (2004); *Novak v. Nationwide Mut. Ins. Co.,* 235 Mich.App. 675, 690-91, 599 N.W.2d 546, 554 (1999). Here, plaintiff could not reasonably have relied on Lockhart's alleged misrepresentation which conflicted with the terms of her written contract with defendant. *See McCreery v. Seacor,* 921 F.Supp. 489, 493 (W.D.Mich.1996); *Kovacs v. Electronic Data Sys. Corp.,* 762 F.Supp. 161, 166-67 (E.D.Mich.1990) (Suhrhenrich, J.); *Novak,* 235 Mich.App. at 689-91, 599 N.W.2d at 554; *Nieves v. Bell Indus., Inc.,* 204 Mich.App. 459, 464, 517 N.W.2d 235, 237 (1994).

For these reasons, plaintiff's fraud claim fails as a matter of law.[13] Accordingly, the Court should grant defendant's motion for summary judgment with respect to this claim.

H. *Accounting and Exemplary Damages (Counts VI-VIII)*
In Counts VII and VIII of her amended complaint, plaintiff asserts causes of action for an accounting and exemplary damages. These claims are for remedies which are derivative of her substantive claims for relief. Because, as explained throughout this Report, defendant is entitled to summary judgment on plaintiff's underlying substantive claims, defendant is also entitled to summary judgment on these counts of plaintiff's amended complaint. In passing, I note that, even if the underlying claims survived summary judgment, an accounting would not be an appropriate remedy. Plaintiff's damages claims relating to her commissions seek a contractual damage remedy, and there is no indication that the ordinary discovery process is insufficient to ascertain her damages. In these circumstances, an equitable accounting is not an appropriate remedy. *See Boyd v. Nelson Credit Ctrs., Inc.,* 132 Mich.App. 774, 779, 348 N.W.2d 25, 27 (1984).

I. *Right to Know Act (Count IX)*
Plaintiff next brings a claim under the Bullard-Plawecki Employee Right to Know Act. The Act provides, in relevant part, that "[a]n employer, upon written request which describes the personnel record, shall provide the employee with an opportunity to periodically review at reasonable intervals ... the employee's personnel record if the employer has a personnel record for that employee." MICH. COMP. LAWS § 423.503. The Act also provides that, after the review called for in § 423.503, the employee

may obtain a copy of the personnel record. *See* MICH. COMP. LAWS § 423.504. The Act provides a right of action in circuit court to compel compliance with the Act, and provides that upon finding a violation the circuit shall award either (a) actual damages and costs, or (b) in the case of a willful violation, $200.00 plus actual damages, costs, and attorney fees. *See* MICH. COMP. LAWS § 423.511. Finally, the Act provides that "[p]ersonnel record information which was not included in the personnel record but should have been as required by this act shall not be used by an employer in a judicial or quasi-judicial proceeding." MICH. COMP. LAWS § 423 .502.

**\*21** Plaintiff claims that she requested her personnel records in a January 25, 2006, e-mail to Lockhart. She contends that although defendant produced some records, it did not produce the Bonus Agreement until the status conference with this Court on July 17, 2006. Plaintiff argues that this failure to disclose the Agreement mandates exclusion of the Agreement in this proceeding under § 423.502, thus enabling her to proceed on her quasi-contract theories, and entitles her to damages, costs, and attorney fees under § 423.511. The Court should conclude that defendant is entitled to summary judgment on this claim.[14]

The Act defines "personnel record" as "a record kept by the employer that identifies the employee, to the extent that the record is used or has been used, or may affect or be used relative to that employee's qualifications for employment, promotion, transfer, additional compensation, or disciplinary action[.]" MICH. COMP. LAWS § 423.501(2)(c). However, the Act explicitly excludes from the definition of "personnel record" any "[m]aterials relating to the employer's staff planning with respect to more than 1 employee, including salary increases, management bonus plans, promotions, and job assignments." *Id.* § 423.501(2)(c)(ii). The Bonus Agreement establishes a commission and bonus plan applicable to all ING employees, and thus does not constitute a "personnel record" under § 423.501(2)(c)(ii). *Cf. Muskovitz v. Lubbers,* 182 Mich.App. 489, 497, 452 N.W.2d 854, 858 (1990). Further, plaintiff was presented the Agreement and signed it, and thus was aware of its existence. *See Toolanen v. Lear Corp.,* No. 272056, 2007 WL 189650, at *2 (Mich.Ct.App. Jan.25, 2007) (per curiam). Finally, it does not appear that plaintiff complied with the requirements of the Act in making her request. Plaintiff's e-mail to Lockhart simply requested copies of

personal records and pension information. *See* Def.'s Br., Ex. K. Plaintiff did not request to review the records pursuant to § 423.503 or explain why she could not review the records at the place of employment pursuant to § 423.504, and her failure to do so is fatal to her claim under the Act. *See Betzgold v. Saginaw Cooperative Hosp.,* No. 251258, 2005 WL 356696, at *5 (Mich.Ct.App. Feb.15, 2005) (per curiam).

For these reasons, the Court should grant defendant's motion for summary judgment with respect to plaintiff's Bullard-Plawecki Act claims.

## J. *ERISA Interference (Count X)*

Finally, plaintiff contends that defendant terminated her employment in order to save on pension benefits in which she would have been vested a little over two years after she was terminated, in violation of § 510 of the Employee Retirement Income Security Act (ERISA). The Court should conclude that defendant is entitled to summary judgment on this claim.

Section 510 of ERISA provides, in relevant part: "It shall be unlawful for any person to discharge, fine, suspend, expel, discipline, or discriminate against a participant or beneficiary ... for the purpose of interfering with the attainment of any right to which such participant may become entitled under the plan[.]" 29 U.S.C. § 1140. Under § 510, it is not enough for a plaintiff to show that an employer's decision affected the plaintiff's entitlement to plan benefits. Rather, "[t]o state a claim under § 510, the plaintiff must show that an employer had a specific intent to violate ERISA." *Smith v. Ameritech,* 129 F.3d 857, 865 (6th Cir.1997) (internal quotation omitted); *accord Majewski v. Automatic Data Processing, Inc.,* 274 F.3d 1106, 1113 (6th Cir.2001) (plaintiff "must demonstrate not only that he lost the opportunity to accrue new benefits, but also that [defendant] had the specific intent of avoiding ERISA liability when it discharged him."). Where there is no direct evidence of intent to interfere with ERISA benefits, the Court applies the *McDonnell Douglas* burden-shifting framework. *See Shahid v. Ford Motor Co.,* 76 F.3d 1404, 1410 (6th Cir.1996). To establish a *prima facie* case of ERISA interference, a plaintiff must present evidence "showing existence of (1) prohibited employer conduct (2) taken for the purpose of interfering (3) with the attainment of any right to which the employee may be entitled." *Smith,* 129 F.3d at 865 (internal quotation omitted).

**\*22** In this case Lockart, the decision maker who terminated plaintiff, avers that at the time of the decision he had no knowledge of plaintiff's age or the circumstances relating to her present or future entitlement to pension benefits. *See* Def.'s Br., Ex. N., Decl. of Dave Lockhart, ¶ 2. Plaintiff has presented no direct or circumstantial evidence which rebuts this assertion, instead arguing that defendant's intent to interfere with her ERISA benefits may be inferred from the fact that she would have vested within 27 months of her termination, and her vesting would have cost defendant over $500,000 in pension benefits. *See* Pl.'s Dep., at 178, 185-88. This is insufficient to raise a genuine issue of material fact with respect to defendant's intent to interfere.

Although temporal proximity coupled with significant liabilities can standing alone constitute sufficient evidence to infer intent in some circumstances, those circumstances involve a temporal proximity that is much shorter than that alleged here. Thus, in *Humphreys v. Bellaire Corp.,* 966 F.2d 1037 (6th Cir.1992), the court allowed an interference claim to proceed where the only evidence of intent was that a substantial amount in benefits would have vested two months after the termination. The court explained, however, that the plaintiff's allegations in that case constituted "no more than the bare minimum that a plaintiff must show to meet the *prima facie* case threshold." *Id.* at 1043-44.

The courts have consistently refused to find an inference of interference based on much longer gaps. *See Almond v. ABB Industrial Sys., Inc.,* 56 Fed. Appx. 672, 681 (6th Cir.2003) (18 months); *Hanifen v. Ball Corp.,* No. 1:98cv972, 2005 WL 1712004, at *5-*6 (S.D.Ohio July 21, 2005) (15 months); *Massachusetts v. Bull HN Information Sys., Inc.,* 143 F.Supp.2d 134, 160-61 (18 months).

This conclusion is buttressed by the courts' interpretation of the various civil rights retaliation provisions. Under these provisions, an adverse employment action taken in retaliation for an employee's exercise of rights under a civil rights law is unlawful. Although temporal proximity alone can suffice to establish the retaliatory intent, "[t]he cases that accept mere temporal proximity between an employer's knowledge of protected activity and an adverse employment action as sufficient evidence of causality to establish a *prima facie* case uniformly held that the temporal proximity must be 'very close.' " *Clark County*

*Sch. Dist. v. Breeden,* 532 U.S. 268, 273, 121 S.Ct. 1508, 149 L.Ed.2d 509 (2001) (quoting *O'Neal v. Ferguson Constr. Co.,* 237 F.3d 1248, 1253 (10th Cir.2001)). In support of this proposition, the Court cited cases holding that lapses of even three months between the protected activity and the adverse employment action are too long to support an inference of discrimination. *See id.* (citing *Richmond v. ONEOK, Inc.,* 120 F.3d 205, 209 (10th Cir.1997) (3 month period insufficient); *Hughes v. Derwinski,* 967 F.2d 1168, 1174-75 (7th Cir.1992) (4 month period insufficient)). As the Sixth Circuit has observed, "cases that have permitted a *prima facie* case to be made based on the proximity of time have all been short periods of time, usually less than six months." *Nguyen v. City of Cleveland,* 229 F.3d 559, 566-67 (6th Cir.2000); *see also, Lentz v. City of Cleveland,* 410 F.Supp.2d 673, 691 (N.D.Ohio 2006).

**\*23** Thus, the gap of 27 months between plaintiff's termination and the time she would have vested, standing alone, insufficient to raise an inference that defendants intended to interfere with plaintiff's ERISA benefits, particularly in light of the absence of any evidence contradicting Lockhart's declaration that he had no knowledge of the circumstances relating to the vesting of plaintiff's retirement benefits. *See Libel v. Adventure Lands of Am., Inc.,* 482 F.3d 1028, 1035 & n. 8 (8th Cir.2007). [15] Accordingly, the Court should conclude that defendant is entitled to summary judgment on plaintiff's ERISA benefits claim.

K. *Conclusion*
In view of the foregoing, the Court should conclude that plaintiff has failed to establish a genuine issue of material fact with respect to any of the claims asserted in her amended complaint, and that defendant is entitled to judgment on these claims as a matter of law. Accordingly, the Court should grant defendant's motion for summary judgment.

III. *NOTICE TO PARTIES REGARDING OBJECTIONS:*
The parties to this action may object to and seek review of this Report and Recommendation, but are required to act within ten (10) days of service of a copy hereof as provided for in 28 U.S.C. § 636(b)(1) and E.D. Mich. LR 72.1(d)(2). Failure to file specific objections constitutes a waiver of any further right of appeal. *Thomas v. Arn,* 474 U.S. 140, 106 S.Ct. 466, 88 L.Ed.2d 435 (1985); *Howard v. Secretary of Health & Human Servs.,* 932 F.2d 505 (6th Cir.1991); *United States v. Walters,* 638 F.2d 947 (6th Cir.1981). Filing of objections which raise some issues but fail to raise others with specificity, will not preserve all the objections a party might have to this Report and Recommendation. *Willis v. Secretary of Health & Human Servs.,* 931 F.2d 390, 401 (6th Cir.1991); *Smith v. Detroit Federation of Teachers Local* 231, 829 F.2d 1370, 1373 (6th Cir.1987). Pursuant to E.D. Mich. LR 72.1(d)(2), a copy of any objections is to be served upon this Magistrate Judge.

Within ten (10) days of service of any objecting party's timely filed objections, the opposing party may file a response. The response shall be not more than five (5) pages in length unless by motion and order such page limit is extended by the Court. The response shall address specifically, and in the same order raised, each issue contained within the objections.

All Citations

Not Reported in F.Supp.2d, 2007 WL 2875283

Footnotes

1    Plaintiff's initial complaint included other parties as defendants. These other parties were parent companies of defendant Reliastar.

2    This section discusses the background facts relating to plaintiff's employment with defendant. More specific facts relating to plaintiff's claims, in particular facts relating to other employees, are discussed in the sections which analyze plaintiff's claims.

3    The parties dispute whether the move was in fact a "promotion" and whether plaintiff viewed it as such. This semantic dispute does not affect the merits of plaintiff's claims.

4    Plaintiff avers that Femrite approached her at the company's 2004 Christmas party and told her "to watch her back because the Defendant was trying to get rid of her." Pl.'s Aff., ¶ 5.

5   The original memorandum is dated April 18, 2005. *See* Def.'s Br., Ex. G. Plaintiff disputes having received this memorandum; however, there is no dispute that she received it by, at the latest, May 31, 2005. *See id.;* Pl.'s Dep., at 293-95.

6   The amended declarations are identical to the original declarations but for the addition of the language required by § 1746 in the final paragraph of each declaration. For ease of reference, I cite throughout this Report to the declarations by the exhibit designation as originally filed.

7   A number of cases also note that the parties stipulated to the governing law and assume that the stipulation is controlling, without discussing the matter in detail. *See, e.g., National Union Fire Ins. Co. v. Emhart Corp.,* 11 F.3d 1524, 1528-29 (10th Cir.1993); *Wagenheim v. Natural Science Indus., Ltd.,* No. 1:04CV0239, 2006 WL 2794790, at *3 (N.D.Ohio Sept.27, 2006); *Ethicon, Inc. v. Aetna Cas. & Surety Co.,* 805 F.Supp. 203, 204 n. 1 (S.D.N.Y.1992), *aff'd,* 993 F.2d 1532 (2d Cir.1993); *Mariculture Prods. Ltd. v. Those Certain Underwriters at Lloyd's of London Individually Subscribing to Certificate No. 1395/91,* 84 Conn.App. 688, 854 A.2d 1100, 1103 n. 2 (Conn.Ct.App.2004)

8   Some cases use the term "gender discrimination" as opposed to "sex discrimination." The ELCRA, however, uses the term "sex discrimination," *see* MICH. COMP. LAWS § 37.2202(1)(a), and that term is more accurate as a linguistic matter. *See J.E.B. v. Alabama ex rel. T.B.,* 511 U.S. 127, 157 n. 1, 114 S.Ct. 1419, 128 L.Ed.2d 89 (1994) (Scalia, J., dissenting).

9   Although original adopted for claims of race discrimination under the ELCRA, this framework applies equally to claims of age and sex discrimination. *See Hazle v. Ford Motor Co.,* 464 Mich. 456, 462-63, 628 N.W.2d 515, 521 (2001).

10  Further, even if the change in policy were sufficient to satisfy plaintiff's *prima facie* case, Wood's declaration provides evidence of a legitimate, nondiscriminatory reason for the change in policy, and plaintiff has presented no evidence to show that defendant's business reason for this change was mere pretext for unlawful discrimination. *See Dozier v. Potter,* No. CCB-06-2273, 2007 WL 2332320, at *9 (D.Md. July 20, 2007); *Schultes v. Naylor,* 195 Mich.App. 640, 646, 491 N.W.2d 240, 243 (1992).

11  In addition to the arguments addressed in this section, plaintiff also argues that defendant is precluded from relying on the Agreement because of its violation of the Bullard-Plawecki Right to Know Act. This argument is addressed in part I, *infra.*

12  *Oser v. Clear!Blue Mgmt., Inc.,* 478 Mich. 889, 731 N.W.2d 774 (2007), upon which plaintiff relies on her letter of supplemental authority, does not alter this conclusion. The court's summary order in *Oser* merely concluded that, in that case, the plaintiff has presented sufficient evidence to withstand summary disposition with respect to whether her firing was not for just cause so that she became entitled to contractual severance benefits. *Oser* does not address the condition precedent issue.

13  Plaintiff points to *Coffel v. Stryker Corp.,* 284 F.3d 625 (5th Cir.2002), as a case which is factually indistinguishable from her case and in which the court permitted the fraud claim to proceed. While *Coffel* is factually similar to this case, it is legally distinguishable. In the first place, the *Coffel* court considered only whether the plaintiff's fraud claims satisfied the elements of fraud under Texas law. The court did not consider specifically the economic loss rule-requiring a separation of contractual and tort claims-applied here as the principal basis for rejecting plaintiff's claim. *See id.* at 631-37. Moreover, it appears that Texas law differs significantly from Michigan law when it comes to the viability of fraud claims predicated upon promises of future performance. *Compare Gilmartin v. KVTV-Channel 13,* 985 S.W.2d 553, 557-58 (Tex.Ct.App.1998) (allowing claim of fraud by at-will employee based on promise that he would not be terminated if he performed satisfactorily), *with Novak,* 235 Mich.App. at 689-91, 599 N.W.2d at 554 (reaching contrary result) *and Nieves,* 204 Mich.App. at 464, 517 N.W.2d at 237 (same). Thus, *Coffel* is not persuasive authority for plaintiff's argument.

14  It is questionable whether the evidentiary exclusion set forth in § 423.502 is applicable in this federal court proceeding. *See Burke v. Health Plus of Mich., Inc.,* No. 01-10335-BC, 2003 WL 102800, at *8 (E.D.Mich. Jan.7, 2003) (Lawson, J.). Because plaintiff has failed to establish a violation of the Act, the Court need not resolve this issue.

15  Plaintiff's reliance on *Asmo v. Keane, Inc.,* 471 F.3d 588 (6th Cir.2006), is misplaced. In that case, there was only a two month gap between the decision maker's learning of the plaintiff's pregnancy, qualifying her for ERISA health benefits, and the decision to terminate her, and there was other evidence of the defendant's discriminatory animus. *See id.* at 595-98. Here, the gap is much longer, and there is no other evidence supporting an inference of ERISA discrimination. Plaintiff's evidence of discriminatory animus, even if it were otherwise sufficient to raise a genuine issue of material fact, does not relate to her ERISA benefits, but her gender. Accordingly, *Asmo* is inapposite.

**End of Document**                                        © 2017 Thomson Reuters. No claim to original U.S. Government Works.

2015 WL 4429686
Only the Westlaw citation is currently available.
United States District Court,
E.D. Michigan,
Southern Division.

Robyn HENRY, Plaintiff,

v.

STATE FARM FIRE AND
CASUALTY COMPANY, Defendants.

No. 14–12004.
|
Signed July 20, 2015.

**Attorneys and Law Firms**

Christopher J. Ebbott, Morrissey, Bove, Ebbott, Flint, MI, for Plaintiff.

Paul H. Johnson, Jr., Cary R. Berlin, Patrick, Johnson & Mott, P.C., Southfield, MI, for Defendant.

*OPINION AND ORDER DENYING PLAINTIFFS MOTION FOR RECONSIDERATION (ECF NO. 17)*

PAUL D. BORMAN, District Judge.

**\*1** On June 18, 2015, Plaintiff filed a Motion for Reconsideration, requesting this Court to reconsider its June 5, 2015 decision granting Defendant's motion for summary judgment and dismissing Plaintiff's Complaint without prejudice. (ECF No. 17, Mot. for Reconsideration; ECF No. 15, 6/5/15 Opinion and Order.) On July 2, 2015, Defendant State Farm Fire and Casualty Company ("State Farm") filed a response, as requested by the Court. For the reasons that follow, the Court DENIES the motion for reconsideration.

**I. INTRODUCTION**

In its June 5, 2015 Opinion and Order, the Court determined that there was no genuine issue of material fact that Plaintiff failed to substantially comply with the Duties of Loss provision of her State Farm policy by refusing at her Examination Under Oath ("EUO") to sign an IRS Form 4506–T that would have enabled State Farm to obtain Plaintiff's tax records, which were material to its investigation of Plaintiff's claim, and thereafter failing to

produce on her own those tax records and other financial documents that were requested by State Farm prior to Plaintiff's filing suit against State Farm. The Court found that Plaintiff's failure to substantially comply with the Duties of Loss provision of the policy prior to filing suit on her fire loss claim entitled State Farm to dismissal of the action because Plaintiff had failed to satisfy the Suits Against Us provision of the policy, which precludes an insured from filing suit against State Farm unless there has been compliance with the policy provisions. The Court ordered, however, that the dismissal be without prejudice because it found insufficient evidence that Plaintiff's failure to comply was willful.

Plaintiff now argues, submitting two pieces of evidence not previously submitted in support of her response to State Farm's motion for summary judgment, that the Court committed a palpable error in finding no genuine issue of material fact on the issue of substantial compliance and submits that a different result would obtain with correction of that error. For the reasons that follow, the Court disagrees and DENIES the motion for reconsideration.

**II. STANDARD OF REVIEW**

"A motion for reconsideration is governed by the local rules in the Eastern District of Michigan, which provide that the movant must show both that there is a palpable defect in the opinion and that correcting the defect will result in a different disposition of the case." *Indah v. U.S. S.E.C.,* 661 F.3d 914, 924 (6th Cir.2011). Eastern District of Michigan Local Rule LR 7.1(h)(3) provides in pertinent part:

> Generally, and without restricting the court's discretion, the court will not grant motions for rehearing or reconsideration that merely present the same issues ruled upon by the court, either expressly or by reasonable implication. The movant must not only demonstrate a palpable defect by which the court and the parties and other persons entitled to be heard on the motion have been misled but also show that correcting the defect will result in a different disposition of the case.

**\*2** E.D. Mich. L.R. 7.1(h)(3). "A 'palpable defect' is a defect which is obvious, clear, unmistakable, manifest, or plain." *Ososki v. St. Paul Surplus Lines Ins. Co.,* 162 F.Supp.2d 714, 718 (E.D.Mich.2001). "A motion for reconsideration which presents the same issues already ruled upon by the court, either expressly or by reasonable implication, will not be granted." *Ford Motor Co. v. Greatdomains.Com, Inc.,* 177 F.Supp.2d 628, 632 (E.D.Mich.2001). "A motion for reconsideration should not be used liberally to get a second bite at the apple, but should be used sparingly to correct actual defects in the court's opinion." *Oswald v. BAE Industries, Inc.,* No. 10–cv–12660, 2010 WL 5464271, at \*1 (E.D.Mich. Dec.30, 2010). *See also Maiberger v. City of Livonia,* 724 F.Supp.2d 759, 780 (E.D.Mich.2010) ("It is an exception to the norm for the Court to grant a motion for reconsideration.... [A]bsent a significant error that changes the outcome of a ruling on a motion, the Court will not provide a party with an opportunity to relitigate issues already decided."). "[A] motion for reconsideration is not properly used as a vehicle to re-hash old arguments or to advance positions that could have been argued earlier but were not." *Smith v. Mount Pleasant Public Schools,* 298 F.Supp.2d 636, 637 (E.D.Mich.2003). *See also Allen v. Henry Ford Health Sys.,* No. 08–14106, 2010 WL 653253, at \*1 (E.D.Mich. Feb.19, 2010) (holding that motions for reconsideration do not permit a party to "to raise new legal theories that should have been raised earlier" or "attempt to supplement the record with previously available evidence").

The Sixth Circuit has affirmed these standards, which govern the Court's consideration of Plaintiff's motion for reconsideration:

> It is well-settled that "parties cannot use a motion for reconsideration to raise new legal arguments that could have been raised before a judgment was issued." *Roger Miller Music, Inc. v. Sony/ATV Publ'g,* 477 F.3d 383, 395 (6th Cir.2007). Additionally, reconsideration motions cannot be used as an opportunity to re-argue a case. Furthermore, a party may not introduce evidence for the first time in a motion for reconsideration where that evidence could have been presented earlier.

*Bank of Ann Arbor v. Everest Nat. Ins. Co.,* 563 F. App'x 473, 476 (6th Cir.2014).

## III. ANALYSIS

Plaintiff's motion for reconsideration asserts that the Court palpably erred in finding no genuine issue of material fact on the issue of substantial compliance because: (1) Plaintiff signed a general "Authorization" to release records to State Farm on March 15, 2013, a document she presents to the Court for the first time in support of her motion for reconsideration, and this somehow met her obligation to State Farm under the policy to provide her tax records and other financial information; and (2) Plaintiff was distraught and sought psychiatric treatment following the fire at her home and was unable to participate in legal proceedings or assist State Farm by providing testimony or documents, as allegedly demonstrated by a June 26, 2012 letter from a social worker that Plaintiff presents to the Court for the first time in support of her motion for reconsideration.

**\*3** The Court addresses Plaintiff's second ground for reconsideration first. The argument regarding Plaintiff's psychological limitations, and the June 26, 2012 letter from Hillside Center regarding Plaintiff's psychological issues offered in support of that argument, are presented to the Court for the first time in support of Plaintiff's motion for reconsideration. This issue, and this June 26, 2012 letter which clearly was available to Plaintiff at the time she responded to State Farm's motion, were not even referred to in Plaintiff's summary judgment response or at oral argument and are just now submitted for the Court to consider. A motion for reconsideration is directed to errors in the Court's ruling and is not a platform for Plaintiff to present new arguments and evidence that could have been, but were not, presented earlier. The Court declines to consider at this late stage any argument or evidence related to Plaintiff's alleged inability to comply with the Duties of Loss provision of the policy due to her claimed psychological deficits. [1]

With regard to Plaintiff's reliance on an "Authorization" that she signed on March 15, 2013, which purports to grant State Farm general access to a host of categories of records, the Court finds no palpable error by which the Court and the parties have been misled, the correction of which would change the Court's disposition of this matter. Plaintiff never argued the significance of this "Authorization" in her summary judgment Response and never provided the Court, or supplemented the record, with a copy of the "Authorization" prior to

filing this motion for reconsideration. Indeed, in her Response to Defendant's motion for summary judgment, Plaintiff made specific reference to several items that were contained in her State Farm claim file in an effort to demonstrate her substantial compliance, including "items 123–125" and "items 127–128." Significantly, Plaintiff made no reference in her Response brief to "item 126," the "Authorization" on which she now relies to demonstrate a palpable error. Item 126 is a single line item in Plaintiff's claim file which states: "126. Authorization, 3/15/13, 1 pg, (Bates 000183)." (ECF No. 11, Pl.'s Resp. Ex. B, p. 8.) Even had Plaintiff directed the Court's attention to this line item in her claim file in her summary judgment Response, the Court would have been unable to glean anything about the nature of item 126 from this cryptic entry. Plaintiff cannot premise her motion for reconsideration on this Authorization, which was clearly in existence at the time that Plaintiff responded to State Farm's motion for summary judgment but was never provided to the Court prior to the filing of this motion for reconsideration. A motion for reconsideration is directed to errors in the Court's ruling and is not a platform for Plaintiff to present new evidence that could have been, but was not, presented earlier.

The fact that Plaintiff's counsel mentioned the Authorization at oral argument does not alter the Court's conclusion. At the hearing on the motion for summary judgment, for the first time, Plaintiff's counsel made specific reference to this general "Authorization," but still never produced it or supplemented the record to provide it to the Court. Nonetheless, counsel suggested that somehow this undisclosed document authorized State Farm to obtain Plaintiff's tax returns and therefore satisfied Plaintiff's obligations under the Duties of Loss provision of the policy despite her blatant refusal to authorize State Farm to obtain those records at her EUO, just three weeks after signing that general "Authorization." Plaintiff urges the Court conclude that it palpably erred in failing to find that this undisclosed Authorization excused or trumped Plaintiff's outright refusal at her EUO to sign IRS Form 4506–T, which State Farm explained to Plaintiff at her EUO was necessary to authorize State Farm to obtain her tax records and which Plaintiff's own attorney encouraged her to sign at the EUO. Additionally, Plaintiff suggests that the Court palpably erred in failing to find that this Authorization also excused Plaintiff's subsequent and repeated failures to provide her tax records and other requested financial

information to State Farm herself, which she had agreed at her EUO that she would do after she refused to sign the IRS Form 4506–T.

**\*4** The Court rejects these arguments. Plaintiff's counsel's mention of the undisclosed Authorization *for the first time* at oral argument was totally insufficient to sustain Plaintiff's burden under Fed.R.Civ.P. 56 to support with record evidence the factual assertion that the March 15, 2013 Authorization enabled State Farm to obtain Plaintiff's tax records and therefore satisfied Plaintiff's compliance obligations under the policy. Fed.R.Civ.P. 56 requires the non-moving party to introduce "evidence of evidentiary quality" demonstrating the existence of a material fact. *Bailey v. Floyd County Bd. of Educ.,* 106 F.3d 135, 145 (6th Cir.1997). The failure to produce, refer to or in any way rely on the Authorization in the summary judgment briefing deprived State Farm of any meaningful opportunity to reply to an argument based on the Authorization and deprived the Court of the opportunity to definitively evaluate any argument based on the Authorization, beyond considering the remarks made by counsel at the hearing. Submission of the March 15, 2013 Authorization, like submission of the June 6, 2012 letter from Plaintiff's psychologist, is an improper attempt to introduce evidence for the first time in a motion for reconsideration when that evidence could have been presented earlier. For this reason alone, the Court declines to consider it.

Even were the Court to consider the untimely submission of the Authorization, it fails to demonstrate a palpable error by which the Court and the parties have been misled. As an initial matter, the Court finds it particularly disingenuous that Plaintiff would seriously suggest now that State Farm was entitled all along to obtain her tax records and other financial information based on this "Authorization" when the record clearly demonstrates Plaintiff's belief that State Farm was *not authorized* to obtain her tax records without her further consent and steadfastly refused to authorize State Farm to obtain those records on her behalf. Plaintiff's counsel acknowledged at the summary judgment hearing his understanding that a more specific form would be required to authorize State Farm to obtain Plaintiff's tax records and admitted that he did not know whether the general "Authorization" that Plaintiff signed on March 15, 2013 (a copy of which had not been provided for the Court's review)

would have authorized State Farm to obtain tax returns. Plaintiff's counsel never attempted to supplement the summary judgment record, either with the March 15, 2013 Authorization itself, or with evidence to rebut State Farm's assertion, both at Plaintiff's EUO and at the summary judgment hearing, that the IRS Form 4506–T was necessary in order for State Farm to obtain the records. In fact, Plaintiff clearly took the position, both in her EUO when she refused to sign the IRS Form 4506–T, and in her summary judgment Response when she stated that she refused to sign the IRS Form 4506–T because she did "not trust State Farm," that she had no intention of allowing State Farm to obtain her tax returns.

 **\*5** Apart from being disingenuous, Plaintiff's argument regarding the March 15, 2013 Authorization, even were the Court to consider it, fails to demonstrate a palpable error in the Court's ruling that Plaintiff failed to substantially comply with the Duties of Loss provision of her State Farm policy. Plaintiff's motion for reconsideration fails to establish any genuine issue of material fact that the March 15, 2013 Authorization was sufficient to authorize State Farm to obtain Plaintiff's tax returns. Plaintiff's counsel conceded as much at the hearing on the motion for summary judgment and Plaintiff's conduct at her EUO, just a few weeks following her execution of the March 15, 2013 Authorization, demonstrates that she never understood that the March 15, 2013 Authorization permitted State Farm to obtain her tax returns. At no time during her EUO, or at anytime thereafter when she continued to refuse to produce the requested financial documentation, did Plaintiff suggest that State Farm was already entitled to obtain them by virtue of the March 15, 2013 Authorization. Indeed

her testimony at her EUO and her conduct thereafter demonstrate unequivocally that she never believed that State Farm was so entitled. State Farm presented Plaintiff with the IRS Form necessary for State Farm to obtain her tax records—she refused to sign it and refused thereafter to produce her tax records and other financial information demanded by State Farm. The March 15, 2013 "Authorization," even were the Court to consider it, does not demonstrate a genuine issue of material fact regarding Plaintiff's failure to substantially comply with the Duties of Loss provision of the State Farm policy.

The Court rejects Plaintiff's untimely and disingenuous attempt to now suggest that State Farm had the authority all along to obtain these records by virtue of the March 15, 2013 Authorization and that therefore Plaintiff substantially complied with State Farm's multiple requests that Plaintiff provide her tax records, despite her outright refusal at her April 12, 2013 EUO to allow State Farm to obtain them on her behalf and her subsequent failures to produce them herself as she had agreed. The Court finds no palpable error in its June 5, 2015 ruling.

### IV. CONCLUSION

For the foregoing reasons, the Court DENIES Plaintiff's motion for reconsideration.

IT IS SO ORDERED.

**All Citations**

Not Reported in F.Supp.3d, 2015 WL 4429686

Footnotes

1      The Court does note that whatever psychological limitations Plaintiff was suffering from on June 26, 2012, she appears to have sufficiently recovered from, at least as of April 12, 2013, when she fully participated in her Examination Under Oath and competently responded to questions and requests for documents.

---

**End of Document**                                                    © 2017 Thomson Reuters. No claim to original U.S. Government Works.