# UNITED STATES COURT OF APPEALS
## FOR THE SIXTH CIRCUIT

Deborah S. Hunt
Clerk

100 EAST FIFTH STREET, ROOM 540
POTTER STEWART U.S. COURTHOUSE
CINCINNATI, OHIO 45202-3988

Tel. (513) 564-7000
www.ca6.uscourts.gov

Filed: July 31, 2018

Ms. Barbara Eckert Buchanan
Mr. Terrence J. Miglio
Varnum, 160 W. Fort Street, Fifth Floor
Detroit, MI 48226

Ms. Anne Noel Occhialino
U.S. Equal Employment Opportunity Commission
Office of General Counsel
131 M Street, N.E., 5SW20L
Washington, DC 20507

Mr. Gerald D. Wahl
33 Bloomfield Hills Parkway, Suite 250
Bloomfield Hills, MI 48304

Re:  Case No. 17-1998, *Monica Rogers v. Henry Ford Health System*
     Originating Case No. : 2:15-cv-12312

Dear Counsel,

The court today announced its decision in the above-styled case.

Enclosed is a copy of the court's opinion together with the judgment which has been entered in conformity with Rule 36, Federal Rules of Appellate Procedure.

Yours very truly,

Deborah S. Hunt, Clerk

Cathryn Lovely
Deputy Clerk

cc: Mr. David J. Weaver

Enclosures

Mandate to issue.

RECOMMENDED FOR FULL-TEXT PUBLICATION
Pursuant to Sixth Circuit I.O.P. 32.1(b)

File Name: 18a0157p.06

# UNITED STATES COURT OF APPEALS

### FOR THE SIXTH CIRCUIT

───────────────

MONICA J. ROGERS,

*Plaintiff-Appellant*,

┐

*v.*

> No. 17-1998

HENRY FORD HEALTH SYSTEM,

*Defendant-Appellee.*

┘

Appeal from the United States District Court
for the Eastern District of Michigan at Detroit.
No. 2:15-cv-12312—Marianne O. Battani, District Judge.

Argued: June 14, 2018

Decided and Filed: July 31, 2018

Before: MOORE, KETHLEDGE, and STRANCH, Circuit Judges.

───────────────

### COUNSEL

**ARGUED:** Gerald D. Wahl, STERLING ATTORNEYS AT LAW, P.C., Bloomfield Hills, Michigan, for Appellant. Terrence J. Miglio, VARNUM LLP, Detroit, Michigan, for Appellee. Anne Noel Occhialino, EQUAL EMPLOYMENT OPPORTUNITY COMMISSION, Washington, D.C., for Amicus Curiae. **ON BRIEF:** Gerald D. Wahl, STERLING ATTORNEYS AT LAW, P.C., Bloomfield Hills, Michigan, for Appellant. Terrence J. Miglio, Barbara E. Buchanan, VARNUM LLP, Detroit, Michigan, for Appellee. Anne Noel Occhialino, EQUAL EMPLOYMENT OPPORTUNITY COMMISSION, Washington, D.C., for Amicus Curiae.

MOORE, J., delivered the opinion of the court in which STRANCH, J., joined, and KETHLEDGE, J., joined in part. KETHLEDGE, J. (pg. 21), delivered a separate opinion concurring in part and dissenting in part.

No. 17-1998          *Rogers v. Henry Ford Health Sys.*          Page 2

————————————

## OPINION

————————————

KAREN NELSON MOORE, Circuit Judge. Plaintiff Monica Rogers, an African-American woman in her sixties, has been employed by defendant Henry Ford Health System ("HFHS") for over thirty years. In late 2012, Rogers was working as a consultant in HFHS's Organizational Human Resources Development ("OHRD") Department. After she was denied reclassification as a Senior OHRD Consultant, Rogers made an internal complaint of racial and age discrimination. When the resulting internal investigation found no evidence of discrimination, Rogers filed an EEOC charge.

A few months after Rogers filed this charge, co-workers began reporting that Rogers's emotional state was erratic and that they feared she might pose a physical threat to herself or others. In response, Rogers was placed on paid leave and sent for a fitness-for-duty exam. After a doctor cleared Rogers for work, she claims that she was offered the choice of either transferring to a position in a subsidiary of HFHS or taking severance. Rogers chose the transfer. She then filed a second EEOC charge alleging retaliation; the EEOC found probable cause to support this complaint.

Rogers subsequently filed suit against HFHS alleging multiple violations of 42 U.S.C. § 1981; Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e *et seq.*; and the Michigan Elliott-Larsen Civil Rights Act, MICH. COMP. LAWS § 37.2101 *et seq.* HFHS moved for summary judgment on all counts, and the district court granted its motion. For the reasons set forth below, we **AFFIRM** the district court's grant of summary judgment with respect to Rogers's claims of racial discrimination and age discrimination. We **REVERSE** the district court's grant of summary judgment with respect to Rogers's claims of retaliation, and **REMAND** for further proceedings.

# I. FACTS AND PROCEDURE

## A. Events Preceding the First EEOC Charge

Rogers first began working at HFHS in 1981 and has held a variety of positions over the years, most of which have been in human resources. R. 55-7 (Pl. Decl. at ¶ 3) (Page ID #1369);[1] R. 48-3 (Pl. Resume) (Page ID #761). In 2007, Rogers became a consultant in the OHRD Department after a rotation in a different unit of HFHS. R. 48-2 (Pl. Dep. at 54) (Page ID #725); R. 48-6 (Apr. 26, 2007 Announcement) (Page ID #777). "OHRD Consultant" was a new title and this position required a bachelor's degree. R. 48-5 (OHRD Consultant Job Description at 2) (Page ID #774). Although Rogers does not have a college degree, HFHS waived this requirement upon Rogers's return to the OHRD Department because she met the qualifications for the position prior to her rotation and the position's retitling. R. 48-2 (Pl. Dep. at 49, 57) (Page ID #724, 726).

When she first started as an OHRD Consultant, Rogers reported to Laurie Jensen. *Id.* at 60 (Page ID #726). In 2009, Monica Jackson-Lewis became Rogers's direct supervisor. R. 55-7 (Pl. Decl. at ¶ 32) (Page ID #1376). Then, in 2013, Rogers began reporting to Barbara Bressack. R. 48-11 (Bressack Dep. at 37, 103–04) (Page ID #810–11). During the time they supervised Rogers, both Jackson-Lewis and Bressack reported to Jensen. R. 48-10 (Jackson-Lewis Dep. at 8) (Page ID #796); R. 48-11 (Bressack Dep. at 8–9) (Page ID #808–09).

---

[1]Both the parties and the amicus cite to R. 55-7 and list it as a relevant document. *See, e.g.*, Appellant Br. at 8; Appellee Br. at 3, 61; Amicus Br. at 3, C-4. This declaration is not competent summary-judgment evidence because it fails to comply with either Federal Rule of Civil Procedure 56(c)(4) or 28 U.S.C. § 1746: It is neither signed, dated, nor made under penalty of perjury. *See, e.g.*, *Sfakianos v. Shelby Cty. Gov't*, 481 F. App'x 244, 245 (6th Cir. 2012); *Worthy v. Mich. Bell Tel. Co.*, 472 F. App'x 342, 343–44 (6th Cir. 2012). On the day of the hearing on the defendant's motion for summary judgment, Rogers submitted a second, corrected declaration that attempted to comply with 28 U.S.C. § 1746. R. 59 (Pl. 2d Decl.) (Page ID #1746–76). This document is also not competent summary-judgment evidence because it was not made under penalty of perjury. 28 U.S.C. § 1746(2). Rogers then filed a motion for leave to file a third corrected declaration, R. 60 (Mot. for Leave to File) (Page ID #1777–78), which the district court denied as moot because Rogers filed the motion after the district court granted summary judgment to the defendant, R. 66 (Dist. Ct. Order) (Page ID #1957). Because the defendant has relied on R. 55-7 before this court, and did not move the district court to strike it (or the second declaration), any objection to the declaration "was waived, and we may consider the defective declaration for purposes of this appeal." *Kent v. Oakland Cty.*, 810 F.3d 384, 389 n.3 (6th Cir. 2016).

Rogers's tenure at HFHS between 2008 and 2013 was a mixture of positive performance reviews, interpersonal problems, and ultimately a denial of Rogers's request to be reclassified as a Senior OHRD Consultant. Although Rogers received consistently good reviews from both Jensen and Jackson-Lewis throughout this period, in July 2010 Jackson-Lewis issued Rogers an HFHS-Employee Assistance Program ("EAP") Formal/Disciplinary Action Referral. R. 48-13 (EAP Referral) (Page ID #825–26). In the EAP referral, Jackson-Lewis reported that Rogers "appears to focus primarily on what other employees are doing, or not doing, rather than focusing on what is expected of her." *Id.* (Page ID #825). Furthermore, "[t]here is a persistent trend as reported by other employees, that Monica [Rogers] initiates harmful gossip and tries to incite other employees to engage in similar negativity." *Id.* When confronted about these issues, Jackson-Lewis stated that Rogers "assume[d] a victim mentality resulting in obvious anger (loud and fist pounding) or withdrawn." *Id.* Consequently, Jackson-Lewis was "concerned about [Rogers's] emotional and physical well-being and that of the team." *Id.* On the EAP form, Jackson-Lewis noted that Rogers had already received verbal and written warnings regarding her behavior. *Id.* (Page ID #826). Rogers denies that she ever received a verbal or written warning before the EAP referral, R. 55-7 (Pl. Decl. at ¶¶ 55–56) (Page ID #1381), although there is a copy of a written warning in Rogers's personnel file dated one day prior to the EAP referral, R. 48-14 (July 19 Note to File) (Page ID #828–29).

In 2012 two Senior OHRD Consultants left the department and were not replaced, so Rogers helped fulfill their duties. R. 55-7 (Pl. Decl. at ¶ 76) (Page ID #1384); R. 55-15 (Pl. 2012 Eval. at 1, 7) (Page ID #1455, 1461). In December 2012 and January 2013, Rogers began asking the OHRD management for reclassification as a Senior OHRD Consultant—as opposed to simply an OHRD Consultant—because she believed she was performing the duties of the more senior position. R. 48-2 (Pl. Dep. at 125–26) (Page ID #731). Rogers first approached Jan Harrington-Davis—who describes her role as "the HR person for HR," R. 48-4 (Harrington-Davis Dep. at 42) (Page ID #764)—about being reclassified. Rogers asked Harrington-Davis if she had not been reclassified as a Senior OHRD Consultant due to her age, and Harrington-Davis allegedly responded: "[I]t has nothing to do with your age, it's because you're black." R. 55-7 (Pl. Decl. at ¶ 82) (Page ID #1385-86); R. 56-9 (Mar. 2013 Internal Comp.) (Page ID #1589). Rogers asserts that Harrington-Davis agreed, however, that Rogers deserved to be a Senior

OHRD Consultant.  *Id.*  Harrington-Davis disputes Rogers's recollection of this meeting, and testified that she made the comment about race in response to a story Rogers told her about an instance of discrimination that Rogers had faced years earlier.  R. 56-8 (Harrington-Davis Dep. at 55–56) (Page ID #1577); *see also* R. 48-20 (Internal Investigation Rep. at 5) (Page ID #863).

Rogers next met with Jensen and told Jensen that she believed she was doing the work of a Senior OHRD Consultant.  The parties contest whether Jensen agreed or disagreed with Rogers's self-assessment, but both agree that Jensen suggested that she and Rogers meet with Harrington-Davis about Rogers's request.  R. 48-15 (Jensen Journal) (Page ID #831); R. 55-7 (Pl. Decl. at ¶ 83) (Page ID #1386).  Prior to this meeting, Harrington-Davis reviewed the job description of a Senior OHRD Consultant.  R. 48-4 (Harrington-Davis Dep. at 59) (Page ID #766).  The job description lists an M.B.A., M.A., or M.S. as the minimum required education for the position.  R. 48-8 (Sr. OHRD Consultant Job Description at 2) (Page ID #791).  Based on this, Harrington-Davis told Rogers that she could be reclassified as a Senior OHRD Consultant only if Rogers obtained a master's degree or if the job description were revised to remove this requirement.  R. 48-4 (Harrington-Davis Dep. at 71–72) (Page ID #767).

Subsequently, in March 2013, Rogers submitted a complaint alleging discrimination by Jensen to Derick Adams, the Vice President of Human Resources.  R. 56-9 (Mar. 2013 Internal Compl.) (Page ID #1589).  In response, Adams asked Dan Champney, an attorney in the general counsel's office of HFHS's subsidiary Health Alliance Plan ("HAP"), to investigate Rogers's claims.  R. 48-18 (Adams Dep. at 10–11) (Page ID #841).  Champney conducted an internal investigation and concluded "that there is little evidence that Monica Rogers has been discriminated against on the basis of her age or race."  R. 48-20 (Internal Investigation Rep. at 7) (Page ID #865).  On July 3, 2013, just over a month after Champney finished his internal investigation, Rogers filed an EEOC charge alleging racial discrimination and retaliation.  R. 48-21 (July 2013 EEOC Charge) (Page ID #902).  The record is silent as to the outcome of this EEOC charge.

## B. Events Preceding the Second EEOC Charge

In August and September 2013, several of Rogers's co-workers raised concerns about her behavior. Karen Giovannini met with Jensen and told her that she was concerned about Rogers because during a meeting Rogers was "acting very euphoric and very out of sorts[,] laughing really loud, kind of swaying back and forth." R. 48-24 (Giovannini Dep. at 8) (Page ID #915); R. 55-6 (Jensen Dep. at 178, 180) (Page ID #1333). During this meeting, Rogers was allegedly touching a co-worker with both of her hands. *Id.* at 10 (Page ID #916). Another of Rogers's co-workers, Lamya Yelda, informed Jensen that she had heard Rogers was engaged in "strange behavior" and that, although Yelda had "always gotten along with [Rogers]", Yelda was keeping to herself to avoid being embroiled in "any workplace dynamics." R. 48-25 (Yelda Dep. at 5, 8, 10) (Page ID #920–22); *see also* R. 55-6 (Jensen Dep. at 180) (Page ID #1333).

Subsequently, Patrick Payne, who described himself as a "pretty good work friend[]" of Rogers, R. 55-3 (Payne Dep. at 30) (Page ID #1239), went to Jensen upset that Rogers had named him in her racial discrimination complaint as another African-American employee who had faced discrimination at HFHS. R. 48-22 (Jensen Notes) (Page ID #904). Payne told Jensen "who knows what [Rogers] could do," and referenced an incident in which Rogers had smashed in the car windows of her husband's mistress with a baseball bat.[2] R. 55-3 (Payne Dep. at 52, 64–65) (Page ID #1244, 1247–48); R. 48-22 (Jensen Notes) (Page ID #904). Payne also said that he thought Rogers "is the type to go 'postal' and bring in a gun to work and start shooting" and that it was "well known" that Rogers had stated that "no one messes with her." R. 48-22 (Jensen Notes) (Page ID #904); R. 55-3 (Payne Dep. at 95, 101) (Page ID #1255, 1257). In his deposition, Payne denied that, at the time of this conversation, he was afraid for his personal safety, and disputed Jensen's notes indicating that he was "physically shaking and nervous" when talking to her. *Compare* R. 55-3 (Payne Dep. at 66, 98) (Page ID #1248, 1256), *with* R. 48-22 (Jensen Notes) (Page ID #904).

---

[2]Rogers denies that she told any of her colleagues about this incident, but does not explicitly deny the veracity of the underlying story. R. 55-7 (Pl. Decl. at ¶ 145) (Page ID #1397); R. 48-2 (Pl. Dep. at 256) (Page ID #747).

After Payne raised his concerns with Jensen, she spoke with Bressack to determine if Rogers had made other threats. R. 55-6 (Jensen Dep. at 177–78) (Page ID #1333); R. 48-11 (Bressack Dep. at 120–21) (Page ID #813–14). Bressack told Jensen that she had been unsettled by Rogers's belief that her co-workers were lying and that Rogers had told her "justice would be served." R. 48-11 (Bressack Dep. at 121) (Page ID #814); R. 55-6 (Jensen Dep. at 177) (Page ID #786). And, at some point in time, Jackson-Lewis talked with Jensen about the concerns surrounding Rogers's behavior, and confirmed that Rogers had also told Jackson-Lewis that Rogers had used a baseball bat to destroy the windows of her husband's mistress's car. R. 55-6 (Jensen Dep. at 186–87) (Page ID #1335).

Jensen spoke with Kathy Oswald, Senior Vice President and Chief Human Resource Officer for HFHS, about the reports Jensen had received regarding Rogers's behavior. R. 55-6 (Jensen Dep. at 168) (Page ID #1330); R. 48-26 (Oswald Dep. at 6, 13) (Page ID #926, 928). Jensen then reported her concerns to Adams; she said that Rogers had displayed "erratic behavior" and Jensen was "concerned for her personal safety." R. 55-5 (Adams Dep. at 15) (Page ID #1266). Adams's testimony about exactly what he knew after this initial conversation with Jensen and what he learned later is somewhat inconsistent, but the thrust of his testimony is that he was primarily concerned about reports of Rogers's unpredictability and the fact that Jensen felt threatened. *Id.* at 42–45, 50, 56 (Page ID #1273–76).

On September 11, 2013, Adams met with Rogers and told her that she was being put on paid leave and was being referred to the EAP for a fitness-for-duty exam. *Id.* at 65–68, 71 (Page ID #1279–78). After this conversation, Adams took Rogers's badge, walked her back to her desk so that she could retrieve her purse, and then walked her out the back entrance of the building. *Id.* at 67–68, 71–72 (Page ID #1278–79). Shortly afterwards, another employee created an automatic response on Rogers's HFHS email account stating that she was no longer with HFHS. *Id.* at 58 (Page ID #1277); R. 56-12 (Auto. Email) (Page ID #1603). Adams testified that this was a mistake and the employee was instructed to delete this automatic response. *Id.* at 60 (Page ID #1277).

Rogers met with Dr. Bodnar, an HFHS physician, on September 20, 2013 for her fitness-for-duty exam. R. 48-29 (Bodnar Report) (Page ID #951). Dr. Bodnar cleared Rogers to return

to work. R. 48-2 (Pl. Dep. at 254) (Page ID #747); R. 55-5 (Adams Dep. at 75) (Page ID #1281). According to Rogers, Dr. Bodnar said to her: "I don't know why they sent you down here" and apologized. R. 48-2 (Pl. Dep. at 254) (Page ID #747). Dr. Bodnar did recommend that Rogers follow up with the EAP however. R. 48-29 (Bodnar Report) (Page ID #951). On September 24, following her fitness-for-duty exam, Rogers filed a second EEOC charge, alleging that she was retaliated against for filing her previous charge. R. 56-14 (Sept. 2013 EEOC Charge) (Page ID #1607).

**C.  Transfer to HAP**

Approximately a week after Rogers passed her fitness-for-duty exam, she had a meeting with Adams and Harrington-Davis. R. 48-2 (Pl. Dep. at 255) (Page ID #747); R. 55-5 (Adams Dep. at 75) (Page ID #1281). Adams testified that he gave Rogers at that meeting three options: (1) she could return to her position as OHRD Consultant; (2) she could transfer to HAP and work as a Business Partner in that division; or (3) take a severance package and leave HFHS entirely. R. 55-5 (Adams Dep. at 77) (Page ID #1282). Adams said that he gave Rogers the option of transferring to HAP because: "that way it would not put her right in the same area with Laurie [Jensen, and] having to report to Barbara [Bressack], you know, because we knew that at that point that she had an outstanding EEOC complaint and we just thought that that would give her kind of some space from all of that." *Id.* at 76 (Page ID #1281).

Rogers disputes that she was given the option of remaining in her current position. R. 48-2 (Pl. Dep. at 257) (Page ID #748). Harrington-Davis's recollection of the meeting is that Adams offered Rogers the first and second options—stay in her current position or transfer to HAP—but Harrington-Davis did not testify about the severance option. R. 48-4 (Harrington-Davis Dep. at 85) (Page ID #770).

Rogers chose to transfer to HAP and began working in that division on October 14, 2013. R. 48-2 (Pl. Dep. at 258) (Page ID #748). She received the same pay as a Business Partner at HAP as she did as an OHRD Consultant, and has since received salary increases, but she claims it is an inferior position within the structure of HFHS. *Id.* at 280 (Page ID #752); R. 55-7 (Pl.

Decl. at ¶¶ 130–35) (Page ID #1395).  Rogers is still employed at HAP.  *Id.* at 25 (Page ID #722).

## D.  Instant Lawsuit

The EEOC investigated Rogers's claim of retaliation and concluded that there was "reasonable cause to believe [Rogers's] allegations are true in that she was placed on administrative leave and later reassigned in retaliation for engaging in prior protected activity." R. 56-15 (EEOC Determination) (Page ID #1610).

Rogers subsequently filed a complaint against HFHS in federal district court, alleging claims of racial discrimination, age discrimination, and retaliation in violation of § 42 U.S.C. § 1981, Title VII, and Michigan's Elliott-Larsen Civil Rights Act.  R. 1 (Compl.) (Page ID #1– 12).  Following discovery, HFHS moved for summary judgment.  R. 48 (Def. Mot. for Summ. J.) (Page ID #687–716).  The district court concluded that Rogers had not made out a prima facie case of racial discrimination or retaliation, and had waived her age-discrimination claim because she had not defended it in front of the district court.  R. 64 (Dist. Ct. Op. at 10, 16) (Page ID #1948, 1954).  It thus granted HFHS's motion for summary judgment.  *Id.* at 16 (Page ID #1954).  Rogers filed a motion for reconsideration, R. 67 (Pl. Mot. for Reconsideration) (Page ID #1958–82), which the district court denied, R. 69 (Aug. 17, 2017 Dist. Ct. Op.) (Page ID #2241– 44).  Rogers timely appealed.  R. 71 (Notice of Appeal) (Page ID #2247).

## II.  ANALYSIS

### A.  Standard of Review

We review de novo a district court's grant of summary judgment.  *Schleicher v. Preferred Sols., Inc.*, 831 F.3d 746, 752 (6th Cir.), *cert. denied*, 137 S. Ct. 531 (2016).  "The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  FED. R. CIV. P. 56(a).  In conducting this analysis, we draw all inferences in the light most favorable to the non-moving party—here, Rogers.  *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).

"We review claims of alleged race discrimination [and retaliation] brought under § 1981 and the Elliott-Larsen Act under the same standards as claims of race discrimination brought under Title VII . . . ." *Jackson v. Quanex Corp.*, 191 F.3d 647, 658 (6th Cir. 1999); *Kuhn v. Washtenaw Cty.*, 709 F.3d 612, 627 (6th Cir. 2013); *Wade v. Knoxville Utilities Bd.*, 259 F.3d 452, 464 (6th Cir. 2001). "At the summary-judgment stage, a plaintiff must adduce either direct or circumstantial evidence to prevail on a Title VII race-discrimination claim" or retaliation claim. *Upshaw v. Ford Motor Co.*, 576 F.3d 576, 584 (6th Cir. 2009); *see also Wade*, 259 F.3d at 464. If the plaintiff offers only circumstantial evidence of racial discrimination, the *McDonnell Douglas* burden-shifting framework applies.[3] *Upshaw*, 576 F.3d at 584. Under this framework, the plaintiff must first make out a prima facie case of racial discrimination or retaliation. *Id.* Then, "the burden shifts to the employer to proffer a legitimate, nondiscriminatory [or nonretaliatory] reason for its decision." *Id.* If the employer does so, "the plaintiff must then prove by a preponderance of the evidence that the reasons offered by the employer were pretextual." *Id.*

## B. Racial Discrimination

Rogers brought racial-discrimination claims under § 1981, Title VII, and Michigan's Elliott-Larsen Civil Rights Act. R. 1 (Compl. at ¶¶ 31–34, 39–41, 45–47) (Page ID #7–10). Although Rogers originally styled her claim as a failure to promote, R. 1 (Compl. at ¶ 17) (Page ID #4), she briefed the claim as a failure to reclassify in her response to HFHS's motion for summary judgment, R. 64 (Dist. Ct. Op. at 7) (Page ID #1945). Consequently, the district court treated this as a request to amend the complaint, and analyzed her claim as a failure to reclassify and not as a failure to promote. *Id.* at 8 (Page ID #1946). Rogers does not contest this portion of

---

[3]Although Rogers has arguably presented direct evidence of racial discrimination, *see* R. 55-7 (Pl. Decl. at ¶ 82) (Page ID #1385-86) (stating that Harrington-Davis told Rogers that she would not be reclassified as a Senior OHRD Consultant "because you're black"), and retaliation, *see* R. 55-5 (Adams Dep. at 76) (Page ID #1281) (testifying that Adams gave Rogers the option of transferring because "we knew that at that point that she had an outstanding EEOC complaint and we just thought that that would give her kind of some space from all of that"), she neither made this argument before the district court nor before us. Instead, Rogers implicitly concedes that the *McDonnell Douglas* burden-shifting framework applies to her racial-discrimination and retaliation claims. *See* R. 55 (Pl. Opp. to Def. Mot. for Summ. J. at 18, 21, 27, 29) (Page ID #1211, 1214, 1220, 1222); Appellant Br. at 19–20, 36.

the district court's decision and proceeded before us to argue her claim as a failure to reclassify. Oral Argument at 6:35.

To establish a prima facie case of unlawful discrimination due to a failure to reclassify, Rogers must show that:  (1) she is a member of a protected class; (2) she was subject to an adverse employment action; (3) "she performed job duties more advanced than those covered by her job description and, therefore, that she was qualified for reclassification"; and (4) she was treated differently than a similarly situated person outside the protected class.  *Russell v. Ohio, Dep't of Admin. Servs.*, 302 F. App'x 386, 391 (6th Cir. 2008); *Tennial v. United Parcel Serv., Inc.*, 840 F.3d 292, 303 (6th Cir. 2016).  The district court held that Rogers failed to establish a prima facie case because she failed to satisfy the third prong:  that she was qualified for reclassification as a Senior OHRD Consultant.  R. 64 (Dist. Ct. Op. at 10) (Page ID #1948).

HFHS does not contest that Rogers is a member of a protected class and that she suffered an adverse employment action.  *Id.* at 9 (Page ID #1947); Appellee Br. at 26.  Thus, the only two elements of the prima facie case at issue are whether Rogers was qualified for reclassification and whether she was treated differently than similarly situated individuals outside the protected class.

The parties do not dispute that Rogers helped perform some of the extra workload created by the departure of two Senior OHRD Consultants.  R. 55-7 (Pl. Decl. at ¶ 76) (Page ID #1384); R. 55-15 (Pl. 2012 Eval. at 1, 7) (Page ID #1455, 1461); R. 55-6 (Jensen Dep. at 199–201) (Page ID #1338–39).  They do disagree, however, over whether Rogers was fulfilling all of the duties of a Senior OHRD Consultant or temporarily helping to alleviate the issues caused by two employees leaving simultaneously.  *Compare* R. 48-2 (Pl. Dep. at 125–28 (Page ID #731), *with* R. 55-6 (Jensen Dep. at 199–201) (Page ID #1338–39), *and* R. 55-15 (Pl. 2012 Eval. at 1, 7) (Page ID #1455, 1461), *and* R. 48-4 (Harrington-Davis Dep. at 87–88 (Page ID #770); *see also* R. 64 (Dist. Ct. Op. at 9) (Page ID #1947).

HFHS argues that Rogers was not qualified for reclassification, regardless of what duties she was actually performing, because she did not have the requisite minimum education. Appellant Br. at 27–29.   Education and fulfillment of duties do sometimes converge.

For example, someone without a science degree may be physically able to teach a science class, but his or her execution of the task would be significantly inferior to that of another person with a science degree, such that we could say that the person lacking the degree is not qualified to be a science teacher.  On the other hand, some jobs do not require a degree and can be performed by any capable person, regardless of specific educational background.  *Cf. Griggs v. Duke Power Co.*, 401 U.S. 424, 431–32 (1971).  Rogers argues that this is the latter situation:  HFHS waives the educational requirement so frequently that it is a sham requirement, and therefore she met the minimum qualifications that are actually important to HFHS.  Appellant Br. at 23–24.

Whether Rogers was qualified for reclassification as a Senior OHRD Consultant, therefore, merges into an evaluation of whether similarly situated individuals outside of the protected class were treated differently.  If HFHS did not require other employees to meet the minimum educational requirements, then this casts doubt on whether the educational requirement for the position of Senior OHRD Consultant was a necessary requirement or whether, in practice, someone without the requisite degree could ably perform all of the duties of this position.  In other words, if Rogers can make a prima facie case that the purported educational requirements for the position of Senior OHRD Consultant are a sham—because HFHS did not actually require them to be met for similarly situated individuals—she will have shown that she was both qualified for reclassification and that HFHS treated similarly situated employees outside of the protected class differently.

Rogers initially identified six other HFHS employees, who are not African-American, that she claims were reclassified without meeting the stated minimum qualifications:  Brian Robertson, Patti Sanburn, Carol Bridges, Tarra Bufford, Nicole Logan, and Debbie Saoud.[4] R. 56-9 (Mar. 2013 Internal Comp.) (Page ID #1591); R. 55-7 (Pl. Decl. at ¶¶ 95–108) (Page ID #1388–91).  In her response to HFHS's motion for summary judgment, Rogers abandoned her comparisons to Tarra Bufford and Nicole Logan.  R. 55 (Pl. Opp. to Def. Mot. for Summ. J. at

---

[4]Rogers originally identified the sixth comparator as Debra Temrowski, R. 56-9 (Mar. 2013 Internal Comp.) (Page ID #1591), but testified at her deposition that she meant to refer to Debbie Saoud, R. 48-2 (Pl. Dep. at 170) (Page ID #732).

No. 17-1998               *Rogers v. Henry Ford Health Sys.*               Page 13

12) (Page ID #1205).  None of the remaining four comparators are Senior OHRD Consultants, but three of the four work in human resources.  R. 55-7 (Pl. Decl. at ¶ 106) (Page ID #1390).

<u>Brian Robertson.</u>  Robertson has been an OHRD Consultant since 2011.  R. 48-43 (Robertson Aff. at ¶ 4) (Page ID #1001).  Prior to that time he was in the Technical Education Services ("TES") Department and was classified as a Technical Trainer, a position that did not require a bachelor's degree.  *Id.*; R. 48-10 (Jackson-Lewis Dep. at 12) (Page ID #797).  In 2011, the TES Department was merged into the OHRD Department.  R. 48-43 (Robertson Aff. at ¶ 4) (Page ID #1001).  The employees from the TES Department who were reassigned to the OHRD Department following the merger were retitled as OHRD Consultants.  *Id.*; R. 48-10 (Jackson-Lewis Dep. at 12) (Page ID #797).  Although the position of OHRD Consultant requires a bachelor's degree, R. 48-5 (OHRD Consultant Job Description at 2) (Page ID #774), HFHS waived that requirement for Robertson because he was performing the same duties as he had done previously; his position was simply retitled.  R. 48-43 (Robertson Aff. at ¶ 4) (Page ID #1001).  In other words, Robertson—like Rogers—was grandfathered into the position of OHRD Consultant and—like Rogers—he did not meet the minimal educational requirement of OHRD Consultant.  *Id.*; R. 48-2 (Pl. Dep. at 49, 57) (Page ID #724, 726).

<u>Patti Sanburn.</u>  Sanburn is the Director of Human Resources for Community Care Services; she has been in that position since 2007.  R. 48-41 (Sanburn Aff. at ¶ 12) (Page ID #993).  Her position requires either a bachelor's degree or eight years of experience as a human-resources manager.  R. 48-42 (HR Director Cmty. Care Servs. Job Description at 2) (Page ID #997).  Sanburn does not have a bachelor's degree, R. 48-20 (Internal Investigation Rep.) (Page ID #900), but at the time she assumed her current position she had fifteen years of experience as a human-resources manager, R. 48-41 (Sanburn Aff. at ¶¶ 10–11) (Page ID #993).

<u>Carol Bridges.</u>  Bridges has been the Director of Service Excellence and Volunteer Services at Henry Ford Wyandotte Hospital since 2011.  R. 48-39 (Bridges Aff. at ¶ 8) (Page ID #982).  Rogers and HFHS provide two different versions of the same job description.  *Compare id.* at Ex. A (Page ID #986–87), *with* R. 55-7 (Pl. Decl. at Ex. 1) (Page ID #1401–02).  The job description provided by Rogers clearly states that a bachelor's degree is required.  R. 55-7 (Pl. Decl. at Ex. 1) (Page ID #1402).  In contrast, HFHS provides a job description that suggests that

a bachelor's degree is only preferred and not required, but the language is ambiguous enough that it could be read to require a bachelor's degree. R. 48-39 (Bridges Aff. at Ex. A) (Page ID #986). Thus, drawing all inferences in favor of Rogers, *Matsushita Elec. Indus. Co.*, 475 U.S. at 587, Bridges is currently in a position that requires a bachelor's degree, which she does not have. R. 48-20 (Internal Investigation Rep.) (Page ID #900).

Debbie Saoud. Saoud has been employed as a Director of Human Resources for Physician Services since 2012. R. 48-32 (Saoud Aff. at ¶ 9) (Page ID #963). Saoud has a bachelor's degree in business administration, an associate's degree in computer programming, and a second associate's degree in general studies. *Id.* at ¶ 3 (Page ID #963). The job description for the position she is in requires a bachelor's degree, with a master's degree preferred. R. 48-33 (Dir. for Physicians Job Description) (Page ID #966). It also requires "[s]even years of progressively more responsible related work experience" and "one year of leadership experience in Human Resources."[5] *Id.* Saoud met both of these experience requirements at the time she assumed her current position. R. 48-32 (Saoud Aff. at ¶¶ 4–8) (Page ID #963).

Sanburn and Saoud both meet the stated minimum qualifications of their jobs and therefore are not similarly situated to Rogers. In contrast, Robertson and Bridges are in positions that require bachelor's degrees, although neither has the requisite degree. Robertson and Bridges did not receive more favorable treatment than Rogers in this regard, however, because Rogers also occupied a position that required a bachelor's degree and HFHS waived that requirement for her as well. The evidence Rogers has adduced—including her own treatment—is sufficient for a reasonable trier of fact to conclude that HFHS will waive a stated minimum education requirement if an employee has one degree less than what is required, i.e., a high school diploma but not the required bachelor's degree. But the examples of Robertson, Bridges, and Rogers herself do not establish that HFHS is willing to waive an educational requirement that is two levels more than what an employee possesses. In other words, Rogers is claiming that HFHS

---

[5]Rogers argues that Saoud actually needed three to five years of human-resources management experience, but provides no evidence supporting this assertion. R. 55-7 (Pl. Decl. at ¶ 102) (Page ID #1390); Appellant Reply Br. at 6.

discriminated against her by not reclassifying her into a position that requires a master's degree when she has only a high school diploma, but points to no other employee—inside or outside the protected group—who was afforded a two-level educational "jump." *Cf. Ercegovich v. Goodyear Tire & Rubber Co.*, 154 F.3d 344, 352 (6th Cir. 1998) ("The plaintiff need not demonstrate an exact correlation with the employee receiving more favorable treatment in order for the two to be considered similarly-situated; rather . . . the plaintiff and the employee with whom the plaintiff seeks to compare himself or herself must be similar in all of the *relevant* aspects." (internal quotation marks omitted)).

Rogers, therefore, has not produced sufficient evidence to establish the third and fourth elements of her prima facie case: that "she performed job duties more advanced than those covered by her job description and, therefore, that she was qualified for reclassification" and that she was treated differently than a similarly situated person outside the protected class. *Russell*, 302 F. App'x at 391. Consequently, we affirm the district court's grant of summary judgment to HFHS with respect to Rogers's racial-discrimination claims.

## C. Retaliation

Rogers also brought retaliation claims pursuant to § 1981, Title VII, and Michigan's Elliott-Larsen Civil Rights Act. R. 1 (Compl. at ¶¶ 35–38, 42–44, 45–47) (Page ID #7–10). These claims are all analyzed under the same standard. *Kuhn*, 709 F.3d at 627; *Wade*, 259 F.3d at 464.

### 1. Prima Facie Case

To establish a prima facie case of retaliation a plaintiff must establish that: (1) she engaged in a protected activity; (2) her "exercise of such protected activity was known by the defendant; (3) thereafter, the defendant took an action that was 'materially adverse' to the plaintiff; and (4) a causal connection existed between the protected activity and the materially adverse action." *Laster v. City of Kalamazoo*, 746 F.3d 714, 730 (6th Cir. 2014) (quoting *Jones v. Johanns*, 264 F. App'x 463, 466 (6th Cir. 2007)). HFHS has implicitly conceded that Rogers has established the first and second elements of her prima facie case, as it makes no argument with respect to either. Appellee Br. at 33–42.

In articulating the third element of a prima facie case of retaliation, the district court erred and stated that Rogers needed to show that she suffered an adverse employment action constituting a "significant change in employment status." R. 64 (Dist. Ct. Op. at 12) (Page ID #1950) (quoting *Burlington Indus., Inc. v. Ellerth*, 524 U.S. 742, 761 (1998)). The Supreme Court has rejected the application of this requirement, which is applied to Title VII *discrimination* claims, to Title VII *retaliation* claims. *Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53, 64 (2006) ("[T]he antiretaliation provision, unlike the substantive [discrimination] provision, is not limited to discriminatory actions that affect the terms and conditions of employment."). Instead, "a plaintiff must show that a reasonable employee would have found the challenged action materially adverse, which in this context means it well might have dissuaded a reasonable worker from making or supporting a charge of discrimination." *Id.* at 68 (internal quotation marks and citation omitted)). This showing is less burdensome than what a plaintiff must demonstrate for a Title VII discrimination claim. *Laster*, 746 F.3d at 731.

A reasonable factfinder could conclude that Rogers suffered materially adverse actions. Rogers was referred to a fitness-for-duty exam, placed on leave, escorted out of the office, had her badge removed, and her email set to send out an automated reply that she was no longer with HFHS. R. 55-5 (Adams Dep. at 65–68, 71–72) (Page ID #1279–79); R. 56-12 (Auto. Email) (Page ID #1603). Upon her return to work after she passed her fitness-for-duty-exam, Rogers met with Adams and Harrington-Davis and they offered Rogers a choice about her future employment with HFHS. R. 48-2 (Pl. Dep. at 255) (Page ID #747); R. 55-5 (Adams Dep. at 75) (Page ID #1281). The parties dispute exactly what Rogers was offered, *compare* R. 55-5 (Adams Dep. at 77) (Page ID #1282), *with* R. 48-2 (Pl. Dep. at 257) (Page ID #748), but a rational factfinder could credit Rogers's testimony that she had the choice only between taking a severance package or transferring to HAP. According to Rogers, her position at HAP is inferior to her position in the OHRD Department of HFHS even though she received the same salary. R. 55-7 (Pl. Decl. at ¶¶ 128–35) (Page ID #1394–95). Her previous position allowed her to interact with many members of senior management and take on more impactful roles. *Id.* At HAP, she has relatively little exposure to upper management and Rogers feels that her opportunities to advance are damaged by that lack of interaction. *Id.* HFHS has proffered no evidence rebutting Rogers's claims about the inferiority of her new position.

The cumulative effect of these actions is sufficient such that a jury could find that they would have dissuaded a reasonable employee from making a charge of discrimination. *See Michael v. Caterpillar Fin. Servs. Corp.*, 496 F.3d 584, 596 (6th Cir. 2007), *cert. denied*, 552 U.S. 1258 (2008) (holding that placement on a brief paid administrative leave and a 90-day performance-improvement plan might dissuade a reasonable employee from making or supporting a charge of discrimination); *Sanford v. Main St. Baptist Church Manor, Inc.*, 327 F. App'x 587, 599 (6th Cir. 2009) ("Here, while some of the incidents alone may not rise to the level of an adverse employment action, the incidents taken together might dissuade a reasonable worker from making or supporting a discrimination charge.").

In addition to establishing that she faced a material adverse action, Rogers must show a causal connection between this action and the protected activity. *Laster*, 746 F.3d at 730. "Where an adverse employment action occurs very close in time after an employer learns of a protected activity, such temporal proximity between the events is significant enough to constitute evidence of a causal connection for the purposes of satisfying a prima facie case of retaliation." *Mickey v. Zeidler Tool & Die Co.*, 516 F.3d 516, 525 (6th Cir. 2008). In this case, Rogers filed her first EEOC charge on July 3, 2013. R. 48-21 (July 2013 EEOC Charge) (Page ID #902). Adams met with Rogers and referred her to a fitness-for-duty exam on September 11, 2013. R. 55-5 (Adams Dep. 65–68, 71) (Page ID #1279–78). This is sufficient temporal proximity to establish a causal connection. *See Seeger v. Cincinnati Bell Tel. Co.*, 681 F.3d 274, 283–84 (6th Cir. 2012) (collecting cases holding that a two- to three-month time lapse between a plaintiff's protected activity and occurrence of a materially adverse action is sufficient temporal proximity to satisfy a plaintiff's prima facie case of retaliation).

Rogers, therefore, has made out a prima facie case of retaliation and the burden shifts to HFHS to proffer a legitimate, non-retaliatory reason for its conduct.

### 2. Legitimate Non-Retaliatory Reason

HFHS states that it placed Rogers on paid leave and required her to complete a fitness-for-duty exam because of complaints from her co-workers about Rogers's unsettling behavior. Appellee Br. at 46. HFHS has adduced evidence showing that Rogers's co-workers had raised

concerns about her behavior, *see* Section I.B *supra*, and thus satisfied its burden to articulate a legitimate, non-retaliatory reason for its decision to send Rogers to a fitness-for-duty exam and then offer her a transfer to HAP.

### 3. Pretext

Because HFHS has proffered a legitimate, non-retaliatory reason for its behavior, the burden shifts back to Rogers "to demonstrate that [HFHS's] proffered reason[] w[as] actually a pretext to hide unlawful retaliation" by a preponderance of the evidence. *Michael*, 496 F.3d at 597. "To meet [her] burden on pretext, the plaintiff must produce evidence sufficient that a reasonable finder of fact could reject the employer's proffered reason." *Id.* (alteration in original) (quoting *Haughton v. Orchid Automation*, 206 F. App'x 524, 531 (6th Cir. 2006)). Pretext can be demonstrated three ways: "by showing that the proffered reason (1) has no basis in fact, (2) did not actually motivate the defendant's challenged conduct, or (3) was insufficient to warrant the challenged conduct." *Id.* (quoting *Hopson v. DaimlerChrysler Corp.*, 306 F.3d 427, 434 (6th Cir. 2002)). Rogers argues that she can demonstrate pretext via all three avenues. Appellant Br. at 27–28.

Rogers first argues that Adams did not have a sufficient basis for ordering her to undergo a fitness-for-duty exam. Appellant Br. at 28–33. This argument is premised on undermining the credibility of Rogers's co-workers and the concerns that they had about Rogers's erratic behavior. Rogers points to a form that Adams asked Payne to complete after Jensen reported the concerns Rogers's co-workers had raised. Appellant Br. at 28; R. 55-5 (Adams Dep. at 30) (Page ID #1270). On that form—which consists, in part, of a checklist of adjectives—Payne indicated that Rogers was "[c]ooperative," "[p]olite," and "[c]alm"; he did not check off other available options such as "[e]rratic," "[had] [t]emper [o]utburst[s]," "[h]ostile," "[t]hreatening," or "[a]rgumentative." R. 55-4 (Payne Form) (Page ID #1260). In the form's comment box, Payne stated, in part:

> I'm not sure if you would classify this as delusion[al], but Monica [Rogers] feels she's treated differently and has different rules just for her. She feels that rules set upon her are more restricted than other team members. She's . . . expressed she's required to be more productive and held to a higher standard than others.

*Id.* (Page ID #1261). The form indicates that, at the time Payne completed the form, he was not afraid physically of Rogers or especially worried about her emotional state, but it does not negate the reported concerns of others regarding Rogers's mental health.[6]

At the time Adams made his decision to refer Rogers for a fitness-for-duty exam, he had received reports from at least five other employees expressing unease with Rogers's emotional state. *See* Section I.B *supra*. Furthermore, Rogers had a documented history of emotional outbursts which predated her EEOC charge. *See* Section I.A. *supra*. Consequently, Rogers has not produced sufficient evidence such that a reasonable trier of fact could conclude that Adams's decision to put her on paid leave and undergo a fitness-for-duty exam had no basis and was pretextual.

Rogers's second argument, however, which focuses on Rogers's transfer, is more convincing. Appellant Br. at 33–34. Rogers transferred to HAP after she was cleared for duty.[7] Thus—although HFHS legitimately investigated concerns about Rogers's alleged erratic behavior to ensure the safety of both Rogers and her co-workers—after these concerns were addressed, they could not support the decision to offer Rogers only a transfer to HAP or severance. Furthermore, Adams's testimony about why he proposed that she transfer allows a reasonable factfinder to conclude that he was motivated by the EEOC charge that Rogers had recently filed. R. 55-5 (Adams Dep. at 76) (Page ID #1281) (testifying that he gave Rogers the option of transferring because: "that way it would not put her right in the same area with Laurie [Jensen, and] having to report to Barbara [Bressack], you know, because *we knew that at that point that she had an outstanding EEOC complaint and we just thought that that would give her kind of some space from all of that*." (emphasis added)). Rogers has adduced sufficient evidence, therefore, to allow a reasonable factfinder to find that HFHS's purported legitimate reason for its actions are pretextual with respect to her transfer to HAP. *Michael*, 496 F.3d at 597 (holding that

---

[6]It is unclear whether Adams had received Payne's form when Adams ordered Rogers to undergo a fitness-for-duty exam, as Adams's testimony is inconsistent on this point. R. 55-5 (Adams Dep. at 42–45, 50, 56) (Page ID #1273–76). There is some evidence that Adams did not circulate these forms to Rogers's co-workers until after his September 11 meeting with Rogers. *See* R. 55-16 (Emails re Behavioral Checklist) (Page ID #1618–19).

[7]For the purposes of summary judgment, we must credit Rogers's testimony that she had the choice only between taking a severance package or transferring to HAP. *Matsushita Elec. Indus. Co.*, 475 U.S. at 587.

pretext can be demonstrated if the legitimate reasons proffered "did not actually motivate the defendant's challenged conduct" or were "insufficient to warrant the challenged conduct").

* * *

Rogers has established a prima facie case of retaliation and produced sufficient evidence to allow a reasonable factfinder to reject HFHS's articulated legitimate, non-retaliatory reason for its behavior. Consequently, we reverse the district court's grant of summary judgment to HFHS with respect to Rogers's retaliation claims.

## D. Age Discrimination

Rogers asserted an age-discrimination claim under Michigan's Elliott-Larsen Civil Rights Act. R. 1 (Compl. at ¶¶ 51–55) (Page ID #11). The district court held that Rogers had waived this claim by failing to defend it. R. 64 (Dist. Ct. Op. at 10) (Page ID #1948). Similarly, on appeal, Rogers makes no substantive arguments about her age-discrimination claim in her opening brief, and argues that the claim was not waived only in her reply brief. Appellant Reply Br. at 18–19. Because Rogers failed to defend her age-discrimination claim in front of the district court and does not argue on appeal that the district court erroneously deemed her claim waived, we affirm the district court's grant of summary judgment to HFHS with respect to Rogers's age-discrimination claim. *See Kelly Servs., Inc. v. Creative Harbor, LLC*, 846 F.3d 857, 867 (6th Cir. 2017) (holding that a party's failure to brief an issue before the district court meant "it has thus waived the right to make that argument on appeal"); *Sanborn v. Parker*, 629 F.3d 554, 579 (6th Cir. 2010)) ("We have consistently held . . . that arguments made to us for the first time in a reply brief are waived."), *cert. denied*, 565 U.S. 980 (2011).

## III. CONCLUSION

For the foregoing reasons, we **AFFIRM** the district court's grant of summary judgment with respect to Rogers's claims of racial discrimination and age discrimination (Counts 1, 3, 5, and 7). We **REVERSE** the district court's grant of summary judgment with respect to Rogers's claims of retaliation (Counts 2, 4, and 6) and **REMAND** for further proceedings consistent with this opinion.

---

## CONCURRING IN PART AND DISSENTING IN PART

---

KETHLEDGE, Circuit Judge, concurring in part and dissenting in part. Monica Rogers argues that Henry Ford transferred her to a new position (with the same pay) in retaliation for her EEOC complaint against Henry Ford. Yet she lacks evidence that the person who offered her the transfer—Derick Adams—had any animus toward her. That leaves us with the benign motive Henry Ford proffers: namely, that Adams offered the transfer to defuse the tension between Rogers and the many coworkers who had independently raised concerns about her behavior.

For two reasons, the majority thinks this motive might be pretextual. First, Rogers had been cleared to return to her original position despite her coworkers' concerns. But that suggests at most that Adams was overly cautious, not "that retaliation was the real reason" for his actions. *Tingle v. Arbors at Hilliard*, 692 F.3d 523, 530 (6th Cir. 2012). Second, Adams testified that he had wanted to give Rogers "some space" from the people at the core of her complaint. But that shows that Adams was "actually motivate[d]" to keep the peace, not to retaliate. *Id.* I therefore respectfully dissent from this part of the opinion, and concur in the rest.

UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT

No. 17-1998

MONICA J. ROGERS,

    Plaintiff - Appellant,

    v.

HENRY FORD HEALTH SYSTEM,

    Defendant - Appellee.

> **FILED**
> Jul 31, 2018
> DEBORAH S. HUNT, Clerk

Before: MOORE, KETHLEDGE, and STRANCH, Circuit Judges.

# JUDGMENT

On Appeal from the United States District Court
for the Eastern District of Michigan at Detroit.

THIS CAUSE was heard on the record from the district court and was argued by counsel.

IN CONSIDERATION THEREOF, it is ORDERED that the district court's grant of summary judgment with respect to Monica Rogers's claims of racial and age discrimination (Counts 1, 3, 5, and 7) is AFFIRMED. IT IS FURTHER ORDERED that the district court's grant of summary judgment with regard to Rogers's claims of retaliation (Counts 2, 4, and 6) is REVERSED, and the case is REMANDED for further proceedings consistent with the opinion of this court.

**ENTERED BY ORDER OF THE COURT**

_____

Deborah S. Hunt, Clerk